**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**OFFICE OF THE CLERK**

Alfred A. Arraj
United States Courthouse
901 19th Street
Denver, Colorado 80294
www.cod.uscourts.gov

JEFFREY P. COLWELL
Clerk

Phone: (303) 844-3433

April 24, 2026

☐ Pro Se ☒ Retained ☐ CJA ☐ FPD ☐ USA or Other Federal Agency (Appeal Fee Exempt)

Case No.: 22-cv-01625-GPG-KAS

Date Filed: 4/23/2026

Appellant: Society for Human Resource Management

☐ Amended Notice of Appeal
☐ Other Pending Appeals
☐ Transferred Successive §2254 or §2255
☐ Supplemental Record

Pro Se Appellant:

☐ IFP Forms Mailed / Given ☐ Motion IFP Pending ☐ Appeal Fee Paid
☐ IFP Denied ☐ Appeal Fee Not Paid

Retained Counsel:

☒ Appeal Fee Paid ☐ Appeal Fee Not Paid ☐ Motion IFP Filed

The Preliminary Record on Appeal is hereby transmitted to the Tenth Circuit Court of Appeals. Please refer to the forms, procedures, and requirements for ordering transcripts, preparing docketing statements and briefs, and designations of the record that are found on the Tenth Circuit's website, www.ca10.uscourts.gov.

If not already completed, either an appeal fee payment for filing this case or filing of a motion to proceed *in forma pauperis* will be made to this District Court.

The transcript order form must be filed in the District Court as well as in the Court of Appeals within 14 days after the notice of appeal was filed with the District Court.

If you have questions, please contact this office.

Sincerely,

JEFFREY P. COLWELL, CLERK

By: s/E. Lucero
Deputy Clerk

ALLMTN,APPEAL,JD1,MJ CIV PP,TERMED

# U.S. District Court − District of Colorado
# District of Colorado (Denver)
# CIVIL DOCKET FOR CASE #: 1:22−cv−01625−GPG−KAS

Mohamed v. Society for Human Resource Management
Assigned to: District Judge Gordon P Gallagher
Referred to: Magistrate Judge Kathryn A. Starnella
Cause: 42:2000(e)(2)−(o)(t) − Job Discrimination (Other)

Date Filed: 06/30/2022
Date Terminated: 01/12/2026
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Rehab Mohamed** represented by

**Ariel Beryl DeFazio**
Lowrey Parady Lebsack DeFazio LLC
1490 Lafayette Street
Suite 304
Denver, CO 80218
303−593−2595
Fax: 303−502−9119
Email: ariel@lowrey−parady.com
*ATTORNEY TO BE NOTICED*

**Hunter Anthony Swain**
Swain Law LLC
1490 North Lafayette Street
Suite 303
Denver, CO 80218
720−815−5281
Email: hunter@swainemploymentlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Society for Human Resource Management** represented by

**Julian G.G. Wolfson**
Littler Mendelson P.C.
1900 16th Street
Suite 800
Denver, CO 80202
303−629−6200
Email: jwolfson@littler.com
*ATTORNEY TO BE NOTICED*

**Kaitlin I. Spittell**
Ogletree Deakins Nash Smoak & Stewart PC
2000 South Colorado Boulevard
Tower 3
Suite 900

Denver, CO 80222
303−764−6804
Email: kaitlin.spittell@ogletree.com
*TERMINATED: 10/18/2023*

**Katherine Hoffman**
Hall & Evans LLC
1001 Seventeenth Street
Suite 300
Denver, CO 80202
617−838−8611
Email: hoffmank@hallevans.co
*TERMINATED: 10/18/2023*
*ATTORNEY TO BE NOTICED*

**Kendra K. Smith**
Hall & Evans LLC
1001 Seventeenth Street
Suite 300
Denver, CO 80202
303−628−3300
Fax: 303−628−3368
Email: smithk@hallevans.com
*TERMINATED: 10/18/2023*
*ATTORNEY TO BE NOTICED*

**Malcolm Levy Leatherman**
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202
706−662−4001
Email: lleatherman@littler.com
*TERMINATED: 03/14/2025*

**Nicholas Hankins**
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202
303−362−2856
Email: nhankins@littler.com
*ATTORNEY TO BE NOTICED*

**Tanja L. Darrow**
Littler Mendelson P.C.
633 West 5th Street
63rd Floor
Los Angeles, CA 90071
213−443−4300
Fax: 213−443−4299
Email: tdarrow@littler.com

*ATTORNEY TO BE NOTICED*

**Virginia LeeAnn Woodfork**
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202
303−362−2880
Email: vwoodfork@littler.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Danielle Polifroni** represented by **Robert Allen Lees**
Robert A. Lees & Associates
5655 South Yosemite Street
Suite 350
Greenwood Village, CO 80111
303−292−1020
Email: ral@robertalees.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 04/23/2026 | 193 | NOTICE OF APPEAL as to 164 Judgment, 119 Order on Motion in Limine,, Order on Motion to Bifurcate,, Trial Preparation Conference, 190 Order on Motion for Judgment as a Matter of Law,, Order on Motion for New Trial,, Order on Motion to Stay, 89 Order on Motion for Summary Judgment,, 162 Transcript,,, 82 Order on Motion to Strike, by Defendant Society for Human Resource Management (Filing fee $ 605, Receipt Number ACODC−10968838) (Hankins, Nicholas) (Entered: 04/23/2026) |
| 04/20/2026 | 192 | ORDER granting 191 Unopposed Motion for Extension of Time to File Reply. The Court Orders that Plaintiff is granted a nine−day extension of time up to and including May 1, 2026, to submit her Reply in Support of her Motion for Attorneys' Fees. By District Judge Gordon P. Gallagher on April 20, 2026. Text Only Entry. (gpglc3) (Entered: 04/20/2026) |
| 04/17/2026 | 191 | Unopposed MOTION for Extension of Time to File Response/Reply as to 184 MOTION for Attorney Fees by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 04/17/2026) |
| 04/15/2026 | 190 | ORDER. It is ORDERED that Defendant's Renewed Motion for Judgement as a Matter of Law (D. 170 ) and Defendant's Motion for New Trial (D. 171 ) are DENIED. It is FURTHER ORDERED that Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174 ) is DENIED AS MOOT. By District Judge Gordon P. Gallagher on 4/15/2026. (anewt,) (Entered: 04/15/2026) |
| 04/08/2026 | 189 | RESPONSE to 184 MOTION for Attorney Fees filed by Defendant Society for Human Resource Management. (Attachments: # 1 Exhibit Exhibit A to Defendant's Response in Opposition to Motion for Attorneys' Fees)(Woodfork, Virginia) (Entered: 04/08/2026) |
| 04/03/2026 | 188 | REPLY to Response to 171 MOTION for New Trial filed by Defendant Society for Human Resource Management. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Wolfson, Julian) (Entered: 04/03/2026) |

| | | |
|---|---|---|
| 04/03/2026 | 187 | REPLY to Response to 170 Renewed MOTION for Judgment as a Matter of Law filed by Defendant Society for Human Resource Management. (Hankins, Nicholas) (Entered: 04/03/2026) |
| 03/25/2026 | 186 | ORDER granting 185 Unopposed Motion for Extension of Time to File Reply. The Court hereby Orders that Defendant may have a one−week extension of time to submit reply briefs in support of its Motion for Judgment as a Matter of Law [ECF No. 170] and Motion for New Trial [ECF No. 171], up to and including April 3, 2026.By District Judge Gordon P. Gallagher on March 25, 2026. Text Only Entry. (gpglc3) (Entered: 03/25/2026) |
| 03/25/2026 | 185 | Unopposed MOTION for Extension of Time to File Response/Reply as to 171 MOTION for New Trial , 170 Renewed MOTION for Judgment as a Matter of Law by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 03/25/2026) |
| 03/19/2026 | 184 | MOTION for Attorney Fees by Plaintiff Rehab Mohamed. (Attachments: # 1 Exhibit 1 − Swain Law, LLC Attorneys' Fees Statement, # 2 Exhibit 2 − LPLD, LLC Attorneys' Fees Statement, # 3 Exhibit 3 − Affidavit of Hunter A. Swain, # 4 Exhibit 4 − Affidavit of Ariel B. DeFazio, # 5 Exhibit 5 − Declaration of Darold Killmer, # 6 Exhibit 6 − Declaration of Ben Lebsack, # 7 Exhibit 7 − Declaration of John Culver)(DeFazio, Ariel) (Entered: 03/19/2026) |
| 03/16/2026 | 183 | REPLY to Response to 174 MOTION to Stay re 164 Judgment *Execution of Judgment Without Filing Bond* filed by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 03/16/2026) |
| 03/13/2026 | 182 | RESPONSE to 171 MOTION for New Trial filed by Plaintiff Rehab Mohamed. (Attachments: # 1 Exhibit 1 − Trial Tr. Vol. Ia, # 2 Exhibit 2 − Trial Tr. Vol. II, # 3 Exhibit 3 − Trial Tr. Vol. IV, # 4 Exhibit 4 − Trial Tr. Vol. V, # 5 Exhibit Trial Exhibit 15)(DeFazio, Ariel) (Entered: 03/13/2026) |
| 03/13/2026 | 181 | RESPONSE to 170 Renewed MOTION for Judgment as a Matter of Law filed by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 03/13/2026) |
| 03/12/2026 | 180 | NOTICE of Change of Address/Contact Information *Firm Name Change* by Ariel Beryl DeFazio (DeFazio, Ariel) (Entered: 03/12/2026) |
| 03/02/2026 | 179 | RESPONSE to 174 MOTION to Stay re 164 Judgment *Execution of Judgment Without Filing Bond* filed by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 03/02/2026) |
| 02/26/2026 | 178 | ORDER granting 176 Motion for Extension of Time to File Response. Pursuant to Plaintiff's Unopposed Motion for Extension of Time to File Response to Defendant's Renewed Motion for Judgment as a Matter of Law [Dkt. 171 ], [Dkt. 176 ], it is ORDERED that Plaintiff is granted a 2−week extension of time up to and including March 13, 2026 to submit her Response to Defendant's Motion. By District Judge Gordon P. Gallagher on 2/26/2026.(amona, ) (Entered: 02/26/2026) |
| 02/26/2026 | 177 | ORDER granting 175 Motion for Extension of Time to File Response/Reply. Pursuant to Plaintiff's Unopposed Motion for Extension of Time to File Responseto Defendant's Renewed Motion for Judgment as a Matter of Law [Dkt. 170 ], [Dkt. 175 ], it is ORDERED that Plaintiff is granted a 2−week extension of time up to and including March 13, 2026 to submit her Response to Defendant's Motion. By District Judge Gordon P. Gallagher on 2/26/2026. (amona,) (Entered: 02/26/2026) |
| 02/25/2026 | 176 | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 171 MOTION for New Trial by Plaintiff Rehab Mohamed. (DeFazio, Ariel) Modified on 2/26/2026 to correct filing event (amona, ). (Entered: 02/25/2026) |
| 02/25/2026 | 175 | Unopposed MOTION for Extension of Time to File Response/Reply as to 170 Renewed MOTION for Judgment as a Matter of Law by Plaintiff Rehab Mohamed. (DeFazio, Ariel) |

| | | |
|---|---|---|
| | | (Entered: 02/25/2026) |
| 02/10/2026 | 174 | MOTION to Stay re 164 Judgment *Execution of Judgment Without Filing Bond* by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 02/10/2026) |
| 02/09/2026 | 173 | ORDER granting 172 Motion for Extension of Time to File. Plaintiff is granted a 5−week extension of time up to and including March 20, 2026 to submit Motion for Attorney Fees.By District Judge Gordon P. Gallagher on February 9, 2026. Text Only Entry.(gpglc3) (Entered: 02/09/2026) |
| 02/09/2026 | 172 | Unopposed MOTION for Extension of Time to *File Motion for Attorney Fees* by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 02/09/2026) |
| 02/06/2026 | 171 | MOTION for New Trial by Defendant Society for Human Resource Management. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Woodfork, Virginia) (Entered: 02/06/2026) |
| 02/06/2026 | 170 | Renewed MOTION for Judgment as a Matter of Law by Defendant Society for Human Resource Management. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Woodfork, Virginia) (Entered: 02/06/2026) |
| 01/30/2026 | 169 | Costs Taxed by Clerk in the amount of $15,006.60 against Defendant in favor of Plaintiff. Costs awarded pursuant to the parties' Stipulation. (zcoth) (Entered: 01/30/2026) |
| 01/29/2026 | 168 | Corrected REDACTED TRANSCRIPT of Jury Trial Vol. V held on 12/05/2025 before Judge Gallagher. Pages: 1−76. Redaction of 163 Transcript,,,. (mstra, ) (Entered: 01/29/2026) |
| 01/26/2026 | 167 | STIPULATED Proposed Bill of Costs by Plaintiff Rehab Mohamed. Parties conferred on 1/22/2026.<br><br>The Proposed Bill of Costs is stipulated to in its entirety by all parties. No costs remain under dispute (Attachments: # 1 Receipt Fees of the Clerk, # 2 Receipt Fees for exemplification and copies of papers, # 3 Receipt Cost incident to taking of depositions, # 4 Receipt Other costs)(DeFazio, Ariel) (Entered: 01/26/2026) |
| 01/21/2026 | 166 | ORDER granting 165 Unopposed Motion for Extension of Time to File. The Court Orders that Plaintiff shall have an 18−dayextension of time up to and including February 13, 2026, to submit her Motion for AttorneyFees.By District Judge Gordon P. Gallagher on January 21, 2026. Text Only Entry. (gpglc3) (Entered: 01/21/2026) |
| 01/21/2026 | 165 | Unopposed MOTION for Extension of Time to *File Motion for Attorney Fees* by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 01/21/2026) |
| 01/12/2026 | 164 | JUDGMENT in favor of Rehab Mohamed against Society for Human Resource Management. Entered by the Clerk on 01/12/2026. (dclem) (Entered: 01/12/2026) |
| 12/17/2025 | 163 | TRANSCRIPT of Jury Trial Vol. V held on 12/05/2025 before Judge Gallagher. Pages: 1−76. **NOTICE − REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** |

| | | |
|---|---|---|
| | | Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mstra, ) (Entered: 12/17/2025) |
| 12/17/2025 | 162 | TRANSCRIPT of Jury Trial Vol. IV held on 12/04/2025 before Judge Gallagher. Pages: 1−258. **NOTICE − REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mstra, ) (Entered: 12/17/2025) |
| 12/17/2025 | 161 | TRANSCRIPT of Jury Trial Vol. III held on 12/03/2025 before Judge Gallagher. Pages: 1−240. **NOTICE − REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mstra, ) (Entered: 12/17/2025) |
| 12/17/2025 | 160 | TRANSCRIPT of Jury Trial Vol. II held on 12/02/2025 before Judge Gallagher. Pages: 1−253. **NOTICE − REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mstra, ) (Entered: 12/17/2025) |
| 12/17/2025 | 159 | TRANSCRIPT of Jury Trial Vol. Ia held on 12/01/2025 before Judge Gallagher. Pages: 156−245. **NOTICE − REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mstra, ) (Entered: 12/17/2025) |
| 12/17/2025 | 158 | VOIR DIRE TRANSCRIPT of proceedings held on 12/01/2025 before Judge Gallagher. Pages: 1−155. (mstra, ) (Entered: 12/17/2025) |
| 12/05/2025 | 157 | Witness List. (dclem) (Entered: 12/08/2025) |
| 12/05/2025 | 156 | Admitted Exhibit List. (dclem) (Entered: 12/08/2025) |

| | | |
|---|---|---|
| 12/05/2025 | 155 | Jury Verdict – Unredacted – Level 3 – Viewable by Court Only. (dclem) (Entered: 12/06/2025) |
| 12/05/2025 | 154 | JURY VERDICT. (dclem) (Entered: 12/06/2025) |
| 12/05/2025 | 153 | Jury Notes – Unredacted – Level 3 – Viewable by Court Only. (dclem) (Entered: 12/06/2025) |
| 12/05/2025 | 152 | Jury Notes. (dclem) (Entered: 12/06/2025) |
| 12/05/2025 | 151 | Jury Notes – Unredacted – Level 3 – Viewable by Court Only. (dclem) (Entered: 12/06/2025) |
| 12/05/2025 | 150 | Jury Notes. (dclem) (Entered: 12/06/2025) |
| 12/05/2025 | 149 | Jury Instructions. (dclem) (Entered: 12/06/2025) |
| 12/05/2025 | 148 | MINUTE ENTRY for day five (5) of the Jury Trial proceeding held before District Judge Gordon P Gallagher on 12/5/2025 and JURY VERDICT read into the record. Court Reporter: Megan Strawn. (dclem) (Entered: 12/06/2025) |
| 12/04/2025 | 147 | MINUTE ENTRY for day four (4) oof the Jury Trial proceeding held before District Judge Gordon P Gallagher on 12/4/2025 denying 146 Motion for Judgment as a Matter of Law. Court Reporter: Megan Strawn. (dclem) (Entered: 12/04/2025) |
| 12/04/2025 | 146 | MOTION for Judgment as a Matter of Law by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 12/04/2025) |
| 12/03/2025 | 145 | MINUTE ENTRY for Day Three (3) of the Jury Trial proceeding held before District Judge Gordon P Gallagher on 12/3/2025. Court Reporter: Megan Strawn. (dclem) (Entered: 12/03/2025) |
| 12/02/2025 | 144 | MINUTE ENTRY for day two (2) of the Jury Trial proceeding held before District Judge Gordon P Gallagher on 12/2/2025. Court Reporter: Megan Strawn. (dclem) (Entered: 12/02/2025) |
| 12/01/2025 | 143 | RESTRICTED DOCUMENT – Level 3: Juror Strike Sheet. (dclem, ) (Entered: 12/01/2025) |
| 12/01/2025 | 142 | Peremptory Challenges Redacted(dclem) (Entered: 12/01/2025) |
| 12/01/2025 | 141 | MINUTE ENTRY for day one (1) of the Jury Trial proceeding held before District Judge Gordon P Gallagher on 12/1/2025. Court Reporter: Megan Strawn. (dclem) (Entered: 12/01/2025) |
| 11/28/2025 | 140 | Exhibit List by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 11/28/2025) |
| 11/24/2025 | 139 | MINUTE ORDER on Plaintiffs and Defendants Objections as to Deposition Designations for Michael Timmy Jackson by District Judge Gordon P Gallagher on 11/24/2025. (dclem) (Entered: 11/24/2025) |
| 11/21/2025 | 138 | MINUTE ORDER Proposed Preliminary Jury Instructions by District Judge Gordon P Gallagher on 11/21/2025. (Attachments: # 1 Proposed Preliminary Jury Instructions) (dclem) (Entered: 11/21/2025) |
| 11/21/2025 | 137 | MINUTE ENTRY for Video Status Conference proceeding held before District Judge Gordon P Gallagher held on 11/21/2025. Court Reporter: Megan Strawn. (dclem) (Entered: 11/21/2025) |
| 11/21/2025 | 136 | OBJECTIONS to 127 Proposed Voir Dire *Amended* by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 11/21/2025) |
| 11/19/2025 | 135 | ORDER : VTC Status Conference set for 11/21/2025 at 1:45 PM in Room 323 (Grand Junction) before District Judge Gordon P. Gallagher. By District Judge Gordon P. Gallagher on November 19, 2025. Text Only Entry. (gpglc3) (Entered: 11/19/2025) |
| 11/19/2025 | 134 | |

| | | |
|---|---|---|
| | | MINUTE ORDER. The Court has prepared a proposed set of introductory jury instructions, which are attached to this Minute Order. These instructions will be read to the jury after jury selection, but before opening statements. The Court will address any objections or comments to the proposed introductory jury instructions at its next conference with the Parties. By District Judge Gordon P. Gallagher on 11/19/2025. (amona,) (Entered: 11/19/2025) |
| 11/19/2025 | 133 | ORDER granting 131 Unopposed Motion for Extension of Time to File. The Court Orders that both Parties shall have a one−day extension of time to submit transcripts of designated deposition testimony alongside objections and responses to such objections, up to and including November 20, 2025. By District Judge Gordon P. Gallagher on November 19, 2025. Text Only Entry. (gpglc3) (Entered: 11/19/2025) |
| 11/19/2025 | 132 | ORDER granting 130 Unopposed Motion for Extension of Time to File. The Court Orders that there shall be an additional one−day extension of time to submit transcripts of designated deposition testimony alongside objections and responses to such objections, up to and including November 20, 2025.By District Judge Gordon P. Gallagher on November 19, 2025.(gpglc3) (Entered: 11/19/2025) |
| 11/19/2025 | 131 | Unopposed MOTION for Extension of Time to *Submit Transcript of Designated Deposition Testimony and Objections* by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 11/19/2025) |
| 11/19/2025 | 130 | Unopposed MOTION for Extension of Time to *Submit Transcript of Designated Deposition Testimony and Objections* by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 11/19/2025) |
| 11/17/2025 | 129 | ORDER granting 128 Unopposed Motion for Extension of Time to File. The Court Orders that the parties shall have a two day extension of time to submit transcripts of designated deposition testimony alongsideobjections and responses to such objections, up to and including November 19, 2025.By District Judge Gordon P. Gallagher on November 17, 2025. Text Only Entry. (gpglc3) (Entered: 11/17/2025) |
| 11/14/2025 | 128 | Unopposed MOTION for Extension of Time to *Submit Transcript of Designated Deposition Testimony and Objections* by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 11/14/2025) |
| 11/14/2025 | 127 | Proposed Voir Dire *Amended* by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 11/14/2025) |
| 11/13/2025 | 126 | MINUTE ORDER on Defendants Objections and Counter−Designations to Plaintiffs Deposition Designations for Sean Sullivan by District Judge Gordon P Gallagher on 11/13/25. (gpglc4, ) (Entered: 11/13/2025) |
| 11/10/2025 | 125 | MINUTE ENTRY for Telephonic Status Conference held before District Judge Gordon P Gallagher on 11/10/2025. Five Day Jury Trial continued to 12/1/2025 8:00 AM in Courtroom C202 before District Judge Gordon P Gallagher. Court Reporter: Megan Strawn. (lgale, ) (Entered: 11/13/2025) |
| 11/07/2025 | 124 | ORDER: The Court sets a Telephone Status Conference for 11/10/2025 at 2:00 PM in Courtroom C202 before District Judge Gordon P. Gallagher. At the time of the hearing, parties shall call 571−353−2301, Access 435 004 390#. By District Judge Gordon P. Gallagher on November 7, 2025. Text Only Entry. (gpglc3) (Entered: 11/07/2025) |
| 11/04/2025 | 123 | ORDER. Before the Court is Plaintiff's Motion In Limine (Motion) (D. 120 ). Plaintiff Rehab Mohamed asks the Court to exclude the recording of an exit interview with her former coworker Carrie Mills (the Recording) (id.). It is ORDERED that Plaintiff's Motion In Limine (D. 120 ) is DENIED. So Ordered by District Judge Gordon P. Gallagher on 11/4/2025.(amona,) (Entered: |

| | | |
|---|---|---|
| | | 11/04/2025) |
| 10/22/2025 | 122 | RESPONSE to 120 MOTION in Limine filed by Defendant Society for Human Resource Management. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Woodfork, Virginia) (Entered: 10/22/2025) |
| 10/21/2025 | 121 | TRANSCRIPT of Trial Preparation Conference held on 10/17/2025 before Judge Gallagher. Pages: 1−31.<br>**NOTICE − REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.**<br>Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (mstra, ) (Entered: 10/21/2025) |
| 10/20/2025 | 120 | MOTION in Limine by Plaintiff Rehab Mohamed. (Attachments: # 1 Exhibit Ex. 1 − Letter to J. C. Taylor, Jr., # 2 Exhibit Ex. 2 − Letter to CCRD with charges, # 3 Exhibit Ex. 3 − P's First Set of Discy. Requests, # 4 Exhibit Ex. 4 − D's Responses to P's First Set of Discy. Requests, # 5 Exhibit Ex. 5 − D's 1st Supp. Responses, # 6 Exhibit Ex. 6 − D's 2nd Supp. Responses, # 7 Exhibit Ex. 7 − Email re D's Third Supp. Responses, # 8 Exhibit Ex. 8 − Mills Decl., # 9 Exhibit Ex. 9 − D's Third Supp. Responses)(DeFazio, Ariel) (Entered: 10/20/2025) |
| 10/17/2025 | 119 | MINUTE ENTRY for Video Trial Preparation Conference proceeding held before District Judge Gordon P Gallagher on 10/17/2025 denying without prejudice 105 Motion in Limine and denying 106 Motion to Bifurcate. Court Reporter: Megan Strawn. (dclem) (Entered: 10/17/2025) |
| 10/16/2025 | 118 | NOTICE of Entry of Appearance by Nicholas Hankins on behalf of Society for Human Resource ManagementAttorney Nicholas Hankins added to party Society for Human Resource Management(pty:dft) (Hankins, Nicholas) (Entered: 10/16/2025) |
| 10/16/2025 | 117 | NOTICE of Entry of Appearance by Julian G.G. Wolfson on behalf of Society for Human Resource ManagementAttorney Julian G.G. Wolfson added to party Society for Human Resource Management(pty:dft) (Wolfson, Julian) (Entered: 10/16/2025) |
| 10/15/2025 | 116 | TRIAL BRIEF *of Defendant Society for Human Resource Management* by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 10/15/2025) |
| 10/15/2025 | 115 | RESPONSE to 106 MOTION to Bifurcate *Punitive Damages Claim* filed by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 10/15/2025) |
| 10/10/2025 | 114 | Exhibit List by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 10/10/2025) |
| 10/10/2025 | 113 | Proposed Voir Dire by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 10/10/2025) |
| 10/10/2025 | 112 | Witness List by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 10/10/2025) |
| 10/10/2025 | 111 | Witness List by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 10/10/2025) |
| 10/10/2025 | 110 | Proposed Voir Dire by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 10/10/2025) |
| 10/10/2025 | 109 | RESPONSE to 105 First MOTION in Limine filed by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 10/10/2025) |

| | | |
|---|---|---|
| 09/30/2025 | 108 | Order that 107 Unopposed Motion for Extension of Time is GRANTED. Plaintiff shall file a response to 105 Defendant's Motion in Limine before or on October 10, 2025 by District Judge Gordon P Gallagher on 09/30/2025. Text Only Entry(dclem) (Entered: 09/30/2025) |
| 09/30/2025 | 107 | Unopposed MOTION for Extension of Time to File Response/Reply as to 105 First MOTION in Limine by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 09/30/2025) |
| 09/26/2025 | 106 | MOTION to Bifurcate *Punitive Damages Claim* by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 09/26/2025) |
| 09/26/2025 | 105 | First MOTION in Limine by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 09/26/2025) |
| 09/26/2025 | 104 | Joint STATUS REPORT */UPDATE* by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 09/26/2025) |
| 09/18/2025 | 103 | ORDER. This matter is set to proceed to a trial preparation conference in approximately thirty days and then to a jury trial in November 2025. Therefore, within ten (10) days, the Parties SHALL jointly update the Court as to any outstanding issues needful of resolution and the possibility of settlement of this matter. So Ordered by District Judge Gordon P. Gallagher on 9/18/2025. Text Only Entry. (amona,) (Entered: 09/18/2025) |
| 03/14/2025 | 102 | ORDER granting 100 Motion to Withdraw as Attorney. Attorney Malcolm Levy Leatherman is relieved of any further representation of Defendant. The Clerk of Court is instructed to terminate Attorney Leatherman as counsel of record, and to remove this name from the electronic certificate of mailing. Defendant shall continue to be represented by Attorneys Tanja L. Darrow and Virginia LeeAnn Woodfork. by Magistrate Judge Kathryn A. Starnella on 03/14/2025. Text Only Entry(kaslc4,) (Entered: 03/14/2025) |
| 03/14/2025 | 101 | MEMORANDUM regarding 100 MOTION to Withdraw as Attorney filed by Society for Human Resource Management. Motions referred to Magistrate Judge Kathryn A. Starnella By District Judge Gordon P. Gallagher on March 14, 2025. Text Only Entry. (gpglc3) (Entered: 03/14/2025) |
| 03/14/2025 | 100 | MOTION to Withdraw as Attorney by Defendant Society for Human Resource Management. (Leatherman, Malcolm) (Entered: 03/14/2025) |
| 02/20/2025 | 99 | ORDER: Video−Teleconference (VTC) Trial Preparation Conference set for 10/17/2025 at 9:00 AM in Room 323 (Grand Junction) before District Judge Gordon P. Gallagher. For VTC link information, please email Donald_Clement@cod.uscourts.gov at least one week prior. By District Judge Gordon P. Gallagher on February 20, 2025. Text Only Entry. (gpglc3) (Entered: 02/20/2025) |
| 02/20/2025 | | ***Set/Reset Hearings: Jury Trial set for 11/17/2025 at 8:00 AM to 4:00 PM, 11/18/2025 at 9:00 AM to 4:00 PM, 11/19/2025 at 9:00 AM to 4:00 PM, 11/20/2025 at 9:00 AM to 4:00 PM, and 11/21/2025 at 9:00 AM to 4:00 PM in Courtroom C202 (Byron Rogers Courthouse−Denver) before District Judge Gordon P Gallagher. (dclem) (Entered: 02/20/2025) |
| 02/19/2025 | 98 | ORDER granting 97 Unopposed Motion to Reset Jury Trial. Jury Trial re−set for the week of 11/17/2025 beginning at 8:00 AM in Courtroom C202/Byron Rogers Courthouse before District Judge Gordon P Gallagher. A five−day Jury Trial is hereby set for 11/17/2025 at 8:00 AM to 4:00 PM, 11/18/2025 at 9:00 AM to 4:00 PM, 11/19/2025 at 9:00 AM to 4:00 PM, 11/20/2025 at 9:00 AM to 4:00 PM, and 11/21/2025 at 9:00 AM to 4:00 PM in Courtroom C202 (Byron Rogers Courthouse−Denver, CO). Within five days from today, the parties are to email Judge Gallagher's Clerk at Angela_Barnes@cod.uscourts.gov with a mutually convenient date to which to re−set the Video Trial Preparation Conference. Trial which had been set for the week of 7/21/2025 is VACATED; likewise the Trial Preparation Conference which had been set for 6/16/2025 is also |

| | | |
|---|---|---|
| | | VACATED. By District Judge Gordon P. Gallagher on February 19, 2025. Text Only Entry. (gpglc3) (Entered: 02/19/2025) |
| 02/19/2025 | 97 | Unopposed MOTION to Reset *Trial Date* by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 02/19/2025) |
| 12/10/2024 | 96 | PRETRIAL ORDER by District Judge Gordon P Gallagher on 12/10/2024. (dclem) (Entered: 12/10/2024) |
| 12/10/2024 | 95 | MINUTE ENTRY for Final Pretrial Conference proceeding held before District Judge Gordon P Gallagher on 12/10/2024. Set Video Trial Preparation Conference for 6/16/2025 at 8:00 AM to 10:00 AM in Courtroom 323 (Grand Junction). A five−day Jury Trial set for 7/21/2025 at 8:00 AM to 4:00 PM, 7/22/2025 at 9:00 AM to 4:00 PM, 7/23/2025 at 9:00 AM to 4:00 PM, 7/24/2025 at 9:00 AM to 4:00 PM, and 7/25/2025 at 9:00 AM to 4:00 PM in Courtroom C202 (Byron Rogers Courthouse−Denver, CO). Court Reporter: Erin Valenti. (dclem) (Entered: 12/10/2024) |
| 12/05/2024 | 94 | Proposed Pretrial Order by Plaintiff Rehab Mohamed. (Attachments: # 1 Exhibit Plaintiff's Initial Witness List, # 2 Exhibit Plaintiff's Initial Exhibit List, # 3 Exhibit Defendant's Initial Witness List, # 4 Exhibit Defendant's Initial Exhibit List)(Swain, Hunter) (Entered: 12/05/2024) |
| 12/03/2024 | 93 | Minute ORDER by Magistrate Judge Kathryn A. Starnella on 3 December 2024. IT IS HEREBY ORDERED that the Unopposed Motion for Two−Day Extension of Time to File the Parties' Pretrial Order 91 is GRANTED. The parties' deadline to file their Pretrial Order is extended to **December 5, 2024.**(cmadr, ) (Entered: 12/04/2024) |
| 12/03/2024 | 92 | MEMORANDUM regarding 91 Unopposed MOTION for Extension of Time to *File the Parties' Pretrial Order* filed by Society for Human Resource Management. Motion referred to Magistrate Judge Kathryn A. Starnella by District Judge Gordon P Gallagher on 12/03/2024. Text Only Entry (dclem) (Entered: 12/03/2024) |
| 12/03/2024 | 91 | Unopposed MOTION for Extension of Time to *File the Parties' Pretrial Order* by Defendant Society for Human Resource Management. (Attachments: # 1 Proposed Order (PDF Only))(Woodfork, Virginia) (Entered: 12/03/2024) |
| 10/22/2024 | 90 | ORDER: Video−Teleconference (VTC) Final Pretrial Conference set for 12/10/2024 at 8:30 AM in Room 323 (Grand Junction) before District Judge Gordon P Gallagher. Prior to 11/29/2024, parties shall contact Donald_Clement@cod.uscourts.gov to practice logging in. By District Judge Gordon P Gallagher on October 22, 2024. Text Only Entry (gpglc3) (Entered: 10/22/2024) |
| 10/08/2024 | 89 | ORDERED that Defendant's Motion for Summary Judgment 83 is DENIED. Within 30 days, the parties shall jointly email **Gallagher_Chambers@cod.uscourts.gov** to set a Final Pretrial Conference. GPG Standing Order Regarding Pretrial and Trial Procedures CIVIL, III.A ("If dispositive motions are filed, parties shall contact the Court jointly via email within thirty days after the Court has issued a ruling (assuming the case survives a motion for summary judgment) to set a Final Pretrial Conference."). So Ordered by District Judge Gordon P Gallagher on 10/8/2024.(sphil, ) (Entered: 10/08/2024) |
| 09/27/2024 | 88 | REPLY to Response to 83 MOTION for Summary Judgment filed by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 09/27/2024) |
| 09/17/2024 | 87 | ORDER granting 86 Unopposed MOTION for Extension of Time to File Reply as to 83 MOTION for Summary Judgment. Good cause exists to support a one−week extension of time, to September 27, 2024, for Defendant to file its forthcoming Reply. By District Judge Gordon P Gallagher on September 17, 2024. Text Only Entry(gpglc3) (Entered: 09/17/2024) |
| 09/17/2024 | 86 | |

| | | |
|---|---|---|
| | | Unopposed MOTION for Extension of Time to File Response/Reply as to 83 MOTION for Summary Judgment by Defendant Society for Human Resource Management. (Woodfork, Virginia) (Entered: 09/17/2024) |
| 09/09/2024 | 85 | Exhibits in Support of 83 MOTION for Summary Judgment by Defendant Society for Human Resource Management. (Leatherman, Malcolm) (Entered: 09/09/2024) |
| 09/09/2024 | 84 | RESPONSE to 83 MOTION for Summary Judgment *Dated August 4, 2023/September 6, 2024* filed by Plaintiff Rehab Mohamed. (Attachments: # 1 Appendix Respondent's Appendix)(DeFazio, Ariel) (Entered: 09/09/2024) |
| 09/06/2024 | 83 | MOTION for Summary Judgment by Defendant Society for Human Resource Management. (Attachments: # 1 Exhibit A−1 Mohamed Deposition, # 2 Exhibit A−2 Offer Letter, # 3 Exhibit A−3 June 22, 2028 Letter, Mohamed, # 4 Exhibit A−4 January 29, 2020 Promotion Letter, # 5 Exhibit A−5 Personnel File Excerpt, # 6 Exhibit A−6 Job Description, # 7 Exhibit A−7 C. Barley Deposition, # 8 Exhibit A−8 N. Schacht Deposition, # 9 Exhibit A−9 J. Morris Deposition, # 10 Exhibit A−10 2020 Review, # 11 Exhibit A−11 Barley Notes (6.20.2020), # 12 Exhibit A−12 June 12, 2020 Email Chain, # 13 Exhibit A−13 M. Jackson Deposition, # 14 Exhibit A−14 August 31, 2020 Letter, # 15 Exhibit A−15 August 7, 2020 Email from Sullivan, # 16 Exhibit A−16 S. Sullivan Deposition, # 17 Exhibit A−17 B. Long Deposition, # 18 Exhibit A−18 August 7, 2020 Email from Barley, # 19 Exhibit A−19 Collections of Emails from 7.16.2020 to 8.28.2020, # 20 Exhibit A−20 8.25.2020 Email)(Leatherman, Malcolm) (Entered: 09/06/2024) |
| 09/06/2024 | 82 | ORDER denying 75 Motion to Strike the Declaration and Testimony of Carrie Mills. It is FURTHER ORDERED that the parties shall contact the Court within two weeks of the date of this Order to set a status conference. By District Judge Gordon P Gallagher on 9/6/2024.(schap, ) (Entered: 09/06/2024) |
| 09/06/2024 | | Motion(s) No Longer Referred: 75 MOTION to Strike *Declaration and Testimony of Carrie Mills* by District Judge Gordon P Gallagher on 9/6/2024. (schap, ) (Entered: 09/06/2024) |
| 03/19/2024 | 81 | ORDER denying 40 Motion for Summary Judgment WITHOUT PREJUDICE. Defendant Society for Human Resource Management moves for summary judgement on all of Plaintiff's claims (D. 40). Plaintiff responded (D. 73), appending thereto a declaration from Carrie Mills (D. 73−1 at 74−79). Defendant Society for Human Resource Management moves to strike the declaration (D. 75). Additionally, a date for filing a reply in support of the motion for summary judgment has been delayed pending an order regarding the motion to strike (see D. 78). It is therefore not currently possible to address the motion for summary judgment and, should the motion to strike be granted, the briefing may need to be modified to reflect such circumstances. It is therefore Ordered that the motion for summary judgment is DENIED without prejudice. If the motion to strike is NOT granted, the motion and response are to be immediately refiled AS IS and any reply is to be lodged within 14 days. If the motion to strike is granted, the parties SHALL provide U.S. Magistrate Judge Starnella with a proposed re−briefing schedule within 10 days of a final order on the motion to strike. So Ordered. by District Judge Gordon P Gallagher on 3/19/24. Text Only Entry(Gallagher, Gordon) (Entered: 03/19/2024) |
| 02/29/2024 | 80 | REPLY to Response to 75 MOTION to Strike *Declaration and Testimony of Carrie Mills and 79 Plaintiff's Response to Defendant's Motion to Strike* filed by Defendant Society for Human Resource Management. (Attachments: # 1 Appendix)(Darrow, Tanja) (Entered: 02/29/2024) |
| 02/15/2024 | 79 | RESPONSE to 75 MOTION to Strike *Declaration and Testimony of Carrie Mills and Request for Oral Argument* filed by Plaintiff Rehab Mohamed. (Attachments: # 1 Appendix Respondent's Appendix)(Swain, Hunter) (Entered: 02/15/2024) |
| 02/13/2024 | 78 | |

| | | |
|---|---|---|
| | | Minute ORDER by Magistrate Judge Kathryn A. Starnella on 13 February 2024. IT IS HEREBY ORDERED that the Motion for Extension of Time to File Reply to Response to Motion for Summary Judgment Pending Resolution of Defendant's Motion to Strike the Declaration and Testimony of Carrie Mills 76 is GRANTED. The deadline for Defendant to file a Reply in support of its Motion for Summary Judgment 40 is extended to fourteen days after Defendant's Motion to Strike the Declaration and Testimony of Carrie Mills 75 is adjudicated.(cmadr, ) (Entered: 02/13/2024) |
| 01/26/2024 | 77 | MEMORANDUM regarding 76 MOTION for Extension of Time to File Response/Reply as to 40 MOTION for Summary Judgment *Pending Resolution of Defendant's Motion to Strike the Declaration and Testimony of Carrie Mills* filed by Society for Human Resource Management, 75 MOTION to Strike *Declaration and Testimony of Carrie Mills* filed by Society for Human Resource Management. Motions referred to Magistrate Judge Kathryn A. Starnella, by District Judge Gordon P Gallagher on 1/26/2024. Text Only Entry (schap, ) (Entered: 01/26/2024) |
| 01/26/2024 | 76 | MOTION for Extension of Time to File Response/Reply as to 40 MOTION for Summary Judgment *Pending Resolution of Defendant's Motion to Strike the Declaration and Testimony of Carrie Mills* by Defendant Society for Human Resource Management. (Darrow, Tanja) (Entered: 01/26/2024) |
| 01/26/2024 | 75 | MOTION to Strike *Declaration and Testimony of Carrie Mills* by Defendant Society for Human Resource Management. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Darrow, Tanja) (Entered: 01/26/2024) |
| 01/26/2024 | 74 | **REASSIGNING MAGISTRATE JUDGE** Due to recent appointment of Magistrate Judge S. Kato Crews as a United States District Judge, this case is reassigned to Magistrate Judge Kathryn A. Starnella. All future pleadings should reference Magistrate Judge Starnella at the end of the civil action number (22−cv−01625−GPG−KAS). Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained. (Text Only Entry) (cthom, ) (Entered: 01/26/2024) |
| 01/19/2024 | 73 | RESPONSE to 40 MOTION for Summary Judgment *Dated August 4, 2023 [Dkt. # 40]* filed by Plaintiff Rehab Mohamed. (Attachments: # 1 Appendix Respondent's Appendix)(DeFazio, Ariel) (Entered: 01/19/2024) |
| 01/19/2024 | 72 | NOTICE of Entry of Appearance by Malcolm Levy Leatherman on behalf of Society for Human Resource ManagementAttorney Malcolm Levy Leatherman added to party Society for Human Resource Management(pty:dft) (Leatherman, Malcolm) (Entered: 01/19/2024) |
| 11/17/2023 | 71 | ORDER granting 70 Fourth Motion for Extension of Time to File Answer or Otherwise Respond re 40 Motion for Summary Judgment by Plaintiff Rehab Mohamed. The deadline for Plaintiff's response to Defendant's Motion for Summary Judgment is now **January 19, 2024**. By District Judge Gordon P Gallagher on 11/17/2023. Text Only Entry(schap, ) (Entered: 11/17/2023) |
| 11/17/2023 | 70 | Fourth MOTION for Extension of Time to File Answer or Otherwise Respond re 40 MOTION for Summary Judgment by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 11/17/2023) |
| 11/07/2023 | 69 | ORDER GRANTING Defendant's 67 Unopposed Motion for Extension of Time to Complete 30(b)(6) Deposition. The parties are ORDERED to complete the 30(b)(6) deposition of Defendant, in accordance with this Court's prior 59 Minute Order, except that now the deposition shall be completed on or before 12/15/2023. SO ORDERED by Magistrate Judge S. Kato Crews on 11/7/2023. Text Only Entry (skclc3) (Entered: 11/07/2023) |
| 11/06/2023 | 68 | MEMORANDUM regarding 67 Unopposed MOTION for Extension of Time to *Complete 30(b)(6) Deposition* filed by Society for Human Resource Management. Motion referred to |

| | | |
|---|---|---|
| | | Magistrate Judge S. Kato Crews, by District Judge Gordon P Gallagher on 11/6/2023. Text Only Entry (schap, ) (Entered: 11/06/2023) |
| 11/03/2023 | 67 | Unopposed MOTION for Extension of Time to *Complete 30(b)(6) Deposition* by Defendant Society for Human Resource Management. (Darrow, Tanja) (Entered: 11/03/2023) |
| 11/03/2023 | 66 | NOTICE of Entry of Appearance by Tanja L. Darrow on behalf of Society for Human Resource ManagementAttorney Tanja L. Darrow added to party Society for Human Resource Management(pty:dft) (Darrow, Tanja) (Entered: 11/03/2023) |
| 10/18/2023 | 65 | ORDER granting 62 Motion to Withdraw as Attorney. Attorneys Kaitlin I. Spittell; Katherine Hoffman; and Kendra K. Smith are terminated as counsel of record in this case. By Magistrate Judge S. Kato Crews on 10/18/2023. Text Only Entry (skclc1) (Entered: 10/18/2023) |
| 10/18/2023 | 64 | MEMORANDUM regarding 62 Unopposed MOTION to Withdraw as Attorney filed by Society for Human Resource Management. Motion referred to Magistrate Judge S. Kato Crews, by District Judge Gordon P Gallagher on 10/18/2023. Text Only Entry (schap, ) (Entered: 10/18/2023) |
| 10/18/2023 | 63 | NOTICE of Entry of Appearance by Virginia LeeAnn Woodfork on behalf of Society for Human Resource ManagementAttorney Virginia LeeAnn Woodfork added to party Society for Human Resource Management(pty:dft) (Woodfork, Virginia) (Entered: 10/18/2023) |
| 10/18/2023 | 62 | Unopposed MOTION to Withdraw as Attorney by Defendant Society for Human Resource Management. (Smith, Kendra) (Entered: 10/18/2023) |
| 10/16/2023 | 61 | ORDER granting 60 Motion for Extension of Time to File Response/Reply re 60 Third MOTION for Extension of Time to File Response/Reply as to 40 MOTION for Summary Judgment. By District Judge Gordon P Gallagher on 10/16/2023. Text Only Entry(schap, ) (Entered: 10/16/2023) |
| 10/16/2023 | 60 | Third MOTION for Extension of Time to File Response/Reply as to 40 MOTION for Summary Judgment by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 10/16/2023) |
| 09/28/2023 | 59 | MINUTE ORDER GRANTING Plaintiff's construed motion to compel, as set forth in greater detail in the Order. SO ORDERED by Magistrate Judge S. Kato Crews on 9/28/2023. (skclc3) (Entered: 09/28/2023) |
| 09/27/2023 | 58 | COURTROOM MINUTES for proceedings held before Magistrate Judge S. Kato Crews: Discovery Hearing held on 9/27/2023. FTR: Courtroom C−201. (amont, ). Modified on 9/28/2023 to attach email string (amont, ). (Entered: 09/27/2023) |
| 09/27/2023 | 57 | MINUTE ORDER: The Court **RE−SETS** the in−person Discovery Conference for 9/27/2023 from 1:30 PM to **2:00 PM** in Courtroom C201 before Magistrate Judge S. Kato Crews regarding the discovery dispute concerning the 30(b)(6) deposition of Defendant. SO ORDERED by Magistrate Judge S. Kato Crews on 9/27/2023. Text Only Entry (skclc3) (Entered: 09/27/2023) |
| 09/22/2023 | 56 | ORDER granting 55 Motion for Extension of Time to File Response as to 40 MOTION for Summary Judgment. The Court grants the motion and extends, by three weeks, the deadline for Plaintiff to respond to Defendant's Motion for Summary Judgment to October 20, 2023. The Court notes that this was Plaintiff's second such request, yet she did not note "Second" in the title of the motion. Plaintiff need not refile; but is asked to please adhere to that practice in the future if it is a second or subsequent request. By District Judge Gordon P Gallagher on September 22, 2023. Text Only Entry(gpglc3, ) (Entered: 09/22/2023) |
| 09/22/2023 | 55 | |

| | | |
|---|---|---|
| | | MOTION for Extension of Time to File Response/Reply as to 40 MOTION for Summary Judgment by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 09/22/2023) |
| 09/22/2023 | 54 | MINUTE ORDER: The Court SETS an in−person Discovery Conference for 9/27/2023 at 1:30 PM in Courtroom C201 before Magistrate Judge S. Kato Crews regarding the discovery dispute concerning the 30(b)(6) deposition of Defendant. SO ORDERED by Magistrate Judge S. Kato Crews on 9/22/2023. Text Only Entry (skclc3) (Entered: 09/22/2023) |
| 08/22/2023 | 53 | ORDER granting 50 Unopposed Motion for Extension of Time to File Response to Defendant's 40 Motion for Summary Judgment. Plaintiff shall file her response brief on or before 9/29/2023. SO ORDERED by Magistrate Judge S. Kato Crews on 8/22/2023. Text Only Entry (skclc3) (Entered: 08/22/2023) |
| 08/22/2023 | 52 | MEMORANDUM regarding 50 Unopposed MOTION for Extension of Time to File Response/Reply as to 40 MOTION for Summary Judgment filed by Rehab Mohamed. Motion referred to Magistrate Judge S. Kato Crews, by District Judge Gordon P Gallagher on 8/22/2023. Text Only Entry (schap, ) (Entered: 08/22/2023) |
| 08/22/2023 | 51 | ORDER denying 41 Defendant's Unopposed Motion to File Confidential Motion for Summary Judgment Exhibits under Restricted Access. The Court can discern no information warranting restriction. The Motion does not explain why the purported interest to be protected outweighs the presumption of public access, nor does it identify a clearly defined and serious injury. Moreover, the Motion does not explain why, e.g., redaction would not protect the purported privacy interest. From the Court's review, these documents contain information related to Plaintiff's employment file, internal company communications regarding her employment and the Company's satisfaction or dissatisfaction with the same, and generic information concerning her position. Even the salary information is limited to the position, which is not private, or to Plaintiff's particular salary, which must be disclosed to prove her alleged damages. Nor does the Motion identify any legal basis to restrict these documents.<br><br>Defendant and/or Plaintiff may file a renewed motion to restrict, on or before August 28, 2023. The subject documents shall remain under seal until the later of August 29, 2023, or the Court's resolution of any renewed motion to restrict. SO ORDERED by Magistrate Judge S. Kato Crews on 8/22/2023. Text Only Entry (skclc3) (Entered: 08/22/2023) |
| 08/21/2023 | 50 | Unopposed MOTION for Extension of Time to File Response/Reply as to 40 MOTION for Summary Judgment by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 08/21/2023) |
| 08/18/2023 | 49 | NOTICE of Entry of Appearance by Robert Allen Lees on behalf of Danielle PolifroniAttorney Robert Allen Lees added to party Danielle Polifroni(pty:misc) (Lees, Robert) (Entered: 08/18/2023) |
| 08/11/2023 | 48 | ORDER granting 46 Joint Motion to Amend Scheduling Order to Extend Case Deadlines. The Court, having found good cause, ORDERS that the Discovery Cutoff deadline is extended to, and including, September 11, 2023. SO ORDERED by Magistrate Judge S. Kato Crews on 8/11/2023. Text Only Entry (skclc3) (Entered: 08/11/2023) |
| 08/11/2023 | 47 | MEMORANDUM regarding 46 Joint MOTION to Amend/Correct/Modify 21 Scheduling Order *to Extend Case Deadlines* filed by Rehab Mohamed. Motion referred to Magistrate Judge S. Kato Crews, by District Judge Gordon P Gallagher on 8/11/2023. Text Only Entry (schap, ) (Entered: 08/11/2023) |
| 08/11/2023 | 46 | Joint MOTION to Amend/Correct/Modify 21 Scheduling Order *to Extend Case Deadlines* by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 08/11/2023) |

| | | |
|---|---|---|
| 08/08/2023 | 45 | ORDER granting 44 Joint Motion to Vacate Final Pretrial Conference. Consistent with Judge Gallagher's Civil Standing Order III(A), the Parties will contact the Gallagher Chambers jointly via email to obtain a date for a Final Pretrial Conference within thirty days after the Court has issued a ruling on any Motions for Summary Judgment. By District Judge Gordon P Gallagher on August 8, 2023. Text Only Entry(gpglc3, ) (Entered: 08/08/2023) |
| 08/08/2023 | 44 | Joint MOTION to Vacate *Final Pretrial Conference* by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 08/08/2023) |
| 08/04/2023 | 43 | MEMORANDUM regarding 41 Unopposed MOTION for Leave to Restrict filed by Society for Human Resource Management. Motions referred to Magistrate Judge S. Kato Crews, by District Judge Gordon P Gallagher on 8/4/2023. Text Only Entry (angar, ) (Entered: 08/04/2023) |
| 08/04/2023 | 42 | RESTRICTED DOCUMENT – Level 1: Exhibits to 40 Motion for Summary Judgment by Defendant Society for Human Resource Management.. (Attachments: # 1 Exhibit A–3 June 22, 2018 Letter (Mohamed 000354), # 2 Exhibit A–4 January 29, 2020 Promotion Letter (Mohamed 00369), # 3 Exhibit A–5 Personnel File Excerpt (SHRM 0253), # 4 Exhibit A–6 Job Description (Mohamed 00373–383), # 5 Exhibit A–10 2020 Review (SHRM 0054–55), # 6 Exhibit A–11 Barley Notes (SHRM 0726–735), # 7 Exhibit A–12 June 12, 2020 Email Chain (SHRM 044–45), # 8 Exhibit A–14 August 31, 2020 Letter (SHRM 0042–43), # 9 Exhibit A–15 August 7, 2020 Email from Sullivan (SHRM 0049), # 10 Exhibit A–18 August 7, 2020 Email from Barley (SHRM 0788), # 11 Exhibit A–19 Collection of Emails from July 16, 2020 to August 28, 2020 (SHRM 139–147), # 12 Exhibit A–20 August 25, 2020 Email (SHRM 0714–715), # 13 Exhibit A–21 September 1, 2020 Termination Letter (SHRM 00087))(Smith, Kendra) Modified on 8/7/2023 to add title (schap, ). (Entered: 08/04/2023) |
| 08/04/2023 | 41 | Unopposed MOTION for Leave to Restrict by Defendant Society for Human Resource Management. (Smith, Kendra) (Entered: 08/04/2023) |
| 08/04/2023 | 40 | MOTION for Summary Judgment by Defendant Society for Human Resource Management. (Attachments: # 1 Exhibit A–1 Plaintiff Mohamed's Deposition Transcript, # 2 Exhibit A–7 Barley Deposition Transcript, # 3 Exhibit A–8 Schacht Deposition Transcript, # 4 Exhibit A–9 Morris Deposition Transcript, # 5 Exhibit A–13 Jackson Deposition Transcript, # 6 Exhibit A–16 Sullivan Deposition Transcript, # 7 Exhibit A–17 Long Deposition Transcript)(Smith, Kendra) (Entered: 08/04/2023) |
| 07/24/2023 | 39 | **ORDER RE: DISCLOSURE OF DEFENDANT'S LITIGATION HOLD LETTER**: During the 7/18/2024 Discovery Hearing 38 , the Court took under advisement Plaintiff's Rule 30(b)(6) topic which would require testimony (and disclosure) of the substance of Defendant's litigation hold letter involving this lawsuit. The Court ordered Defendant to email the letter to Chambers for the Court's *in camera* review, and the parties to email a joint statement summarizing their core arguments concerning the applicability of the attorney–client privilege or work–product doctrine over the letter. The parties' Joint Statement emailed to Chambers is attached for the record. And the Court did review the litigation hold letter *in camera*.<br><br>Under the circumstances of this case, the Court agrees with Defendant that Plaintiff's claimed *prima facie* showing of spoliation in order to invade privilege or work product is premature. Given the seriousness of claims of spoliation, the seriousness of finding a potential waiver of privilege or work product, and the fact–intensive nature of any spoliation inquiry, the Court is persuaded by those legal authorities which invade privilege or work product over litigation hold letters when those requests are supported by Rule 30(b)(6) testimony justifying the invasion. *See Thomas v. Cricket Wireless, LLC*, No. 19–CV–07270–WHA–AGT, 2020 WL 7344742, at *2 (N.D. Cal. Dec. 14, 2020); *Major Tours, Inc. v. Colorel*, No. CIV 05–3091(JBS/JS), 2009 WL 2413631, at *3 (D.N.J. Aug. 4, 2009). During the earlier Discovery Hearing, this Court approved |

| | | |
|---|---|---|
| | | a host of Rule 30(b)(6) topics into which Plaintiff may inquire concerning the facts related to Defendant's preservation efforts. Accordingly, any *prima facie* finding of spoliation for the purpose of invading privilege or work product, at this time, is premature.<br><br>For these reasons, Plaintiff's request to inquire into the substance of Defendant's litigation hold letter is **DENIED**, without prejudice. By Magistrate Judge S. Kato Crews on 07/24/2023. Text Only Entry (skc) (Entered: 07/24/2023) |
| 07/18/2023 | 38 | COURTROOM MINUTES for proceedings held before Magistrate Judge S. Kato Crews: Telephone Discovery Hearing held on 7/18/2023. By July 20. 2023, Defendant shall email the litigation hold notice(s) to the Court (Crews_chambers@cod.uscourts.gov) for an in−camera review. By July 21, 2023, counsel shall email a joint statement to the Court regarding litigation hold notices and attorney client privilege. Each side is limited to 3 pages. FTR: Courtroom C−201. (amont, ) (Entered: 07/18/2023) |
| 07/13/2023 | 37 | MINUTE ORDER: The parties contacted this Court's chambers pursuant to its practice standards regarding discovery disputes and regarding the 30(b)(6) deposition topics. A two−hour Telephonic Discovery Conference is set for 7/18/2023 at 01:30 PM before Magistrate Judge S. Kato Crews. Dial in information for the Conference is as follows:CONFERENCE CALL LINE: (888) 251−2909ACCESS CODE: 5662814# SO ORDERED by Magistrate Judge S. Kato Crews on 7/13/2023. Text Only Entry (skclc1) (Entered: 07/13/2023) |
| 07/06/2023 | 36 | MINUTE ORDER. Defendant contacted Chambers via email (copying Plaintiff) and forwarding Defendant's designation of its Rule 30(b)(6) deponent, and its objections to Plaintiff's 30(b)(6) topics. The Court never received anything from Plaintiff following the email. It is unclear what the status of this discovery dispute is, what relief the parties are currently seeking, and whether the parties have been able to confer further to narrow the dispute. The Court, therefore, ORDERS the parties to confer meaningfully regarding Defendant's Rule 30(b)(6) Designation, and then to contact Chambers telephonically, together, no later than July 14, 2023, to identify any outstanding issues that remain after such meaningful conferral. *See* SKC Prac. Standards at § F(1). The parties should be prepared to explain to the Court what their conferral efforts have been to date.<br><br>SO ORDERED by Magistrate Judge S. Kato Crews on 7/6/2023. Text Only Entry (skclc3) (Entered: 07/06/2023) |
| 06/26/2023 | 35 | ORDER granting 34 Joint Motion to Amend Scheduling Order to Extend Deadlines. The Court, finding good cause, hereby extends the discovery cutoff deadline to August 18, 2023. SO ORDERED by Magistrate Judge S. Kato Crews on 6/26/2023. Text Only Entry (skclc3) (Entered: 06/26/2023) |
| 06/26/2023 | 34 | Joint MOTION to Amend/Correct/Modify 21 Scheduling Order *to Extend Case Deadlines* by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 06/26/2023) |
| 04/17/2023 | 33 | MINUTE ORDER granting the parties' 31 Joint Motion To Amend Scheduling Order to Extend Case Deadlines upon finding sufficient good cause. The Scheduling Order is amended as to the following deadlines:Discovery Cut−Off: 7/7/2023Dispositive Motion Deadline: 8/4/2023The Court further reminds Counsel of their duty to fully comply with D.C.COLO.LCivR 6.1(b), i.e., to state the *length* of the requested extension, which the parties did not provide in the Motion. Accordingly, the Court may summarily deny any of the parties' future motions for extension/continuance(s) that fail to comply with *all* applicable court rules and/or judge's practice standards. *See* [Dkt. 21 p. 17.]SO ORDERED by Magistrate Judge S. Kato Crews on 4/17/2023. Text Only Entry (skclc2). (Entered: 04/17/2023) |
| 04/11/2023 | 32 | |

| | | |
|---|---|---|
| | | MEMORANDUM regarding 31 Joint MOTION to Amend/Correct/Modify 21 Scheduling Order *to Extend Case Deadlines* filed by Rehab Mohamed. Motion referred to Magistrate Judge S. Kato Crews. By District Judge Gordon P. Gallagher on 4/11/2023. Text Only Entry (sdunb, ) (Entered: 04/11/2023) |
| 04/11/2023 | 31 | Joint MOTION to Amend/Correct/Modify 21 Scheduling Order *to Extend Case Deadlines* by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 04/11/2023) |
| 04/05/2023 | 30 | REASSIGNMENT OF JUDGE. This action is reassigned to Judge Gordon P. Gallagherupon his appointment as United States District Judge. Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained. Judge Gallagher is located in Courtroom 323 in the Wayne Aspinall Courthouse. His telephone number is (970) 241−8932. All future pleadings should be designated as 22−cv−01625−GPG. (Text only entry) (msmot, ) (Entered: 04/05/2023) |
| 01/13/2023 | 29 | STIPULATION for Extension of Time *to Respond to Plaintiff's First Set of Discovery Requests* by Defendant Society for Human Resource Management. (Spittell, Kaitlin) (Entered: 01/13/2023) |
| 12/28/2022 | 28 | Joint STATUS REPORT by Plaintiff Rehab Mohamed. (DeFazio, Ariel) (Entered: 12/28/2022) |
| 11/28/2022 | 27 | STIPULATION for Extension of Time *for Plaintiff to Respond to Defendant's First Set of Written Discovery Requests to Plaintiff* by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 11/28/2022) |
| 11/09/2022 | 26 | CERTIFICATE of Mailing/Service *DEFENDANTS FIRST SUPPLEMENTAL DISCLOSURES PURSUANT TO F.R.C.P. 26(a)(1)* by Defendant Society for Human Resource Management. (Spittell, Kaitlin) (Entered: 11/09/2022) |
| 10/26/2022 | 25 | PROTECTIVE ORDER by Magistrate Judge S. Kato Crews on October 26, 2022. (csarr, ) (Entered: 10/26/2022) |
| 10/26/2022 | 24 | ORDER granting 22 Motion for Protective Order by Magistrate Judge S. Kato Crews on October 26, 2022.(csarr, ) (Entered: 10/26/2022) |
| 10/18/2022 | 23 | MEMORANDUM regarding 22 Joint MOTION for Protective Order *(Also, filed on Plaintiff's behalf)* filed by Society for Human Resource Management. Motion referred to Magistrate Judge S. Kato Crews. By Judge Raymond P. Moore on 10/18/2022. (Text Only Entry) (rmsec) (Entered: 10/18/2022) |
| 10/18/2022 | 22 | Joint MOTION for Protective Order *(Also, filed on Plaintiff's behalf)* by Defendant Society for Human Resource Management. (Attachments: # 1 Proposed Document Protective Order)(Spittell, Kaitlin) (Entered: 10/18/2022) |
| 10/06/2022 | 21 | SCHEDULING ORDER: by Magistrate Judge S. Kato Crews on 10/6/2022. (amont, ) (Entered: 10/06/2022) |
| 10/06/2022 | 20 | COURTROOM MINUTES for proceedings held before Magistrate Judge S. Kato Crews: Scheduling Conference held on 10/6/2022. Discovery due by 5/26/2023. Dispositive Motions due by 6/23/2023. Joint Status Report due by 12/29/2022. Telephone Final Pretrial Conference set for 8/29/2023 10:00 AM in Courtroom C201 before Magistrate Judge S. Kato Crews. FTR: Courtroom C−201. (amont, ) (Entered: 10/06/2022) |
| 09/27/2022 | 19 | MINUTE ORDER resetting the # 18 Court's Telephonic Scheduling Conference for 10/6/2022 at 11:00 AM before Magistrate Judge S. Kato Crews after counsel's joint phone call notifying the Court of the parties' new availability. Dial−in instructions remain the sameSO ORDERED by Magistrate Judge S. Kato Crews on 9/27/2022. Text Only Entry (skclc2). (Entered: 09/27/2022) |
| 09/27/2022 | 18 | |

| | | |
|---|---|---|
| | | MINUTE ORDER *Resetting Telephonic Scheduling Conference* . Telephonic Scheduling Conference is RESET for 9/30/2022 10:30 AM before Magistrate Judge S. Kato Crews. Dial−in instructions remain the same. If this new setting does not work for counsel, they should jointly contact chambers for a new setting. SO ORDERED by Magistrate Judge S. Kato Crews on 9/27/2022. Text Only Entry (amont, ) (Entered: 09/27/2022) |
| 09/26/2022 | 17 | MINUTE ORDER: With the assignment of this matter, the parties are advised that throughout this case they are expected to be familiar and comply with not only the Local Rules of this District, but also Judge Raymond P. Moore's Civil Practice Standards, which may be found at: http://www.cod.uscourts.gov/JudicialOfficers/ActiveArticleIIIJudges/HonRaymondPMoore.aspx. SO ORDERED by Judge Raymond P. Moore on 9/26/2022. (Text Only Entry) (rmsec ) (Entered: 09/26/2022) |
| 09/26/2022 | 16 | ORDER REFERRING CASE to Magistrate Judge S. Kato Crews. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non−dispositive motions, (4) conduct a pretrial conference and enter a pretrial order, and (5) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. By Judge Raymond P. Moore on 9/26/2022. (Text Only Entry) (rmsec ) (Entered: 09/26/2022) |
| 09/23/2022 | 15 | CASE REASSIGNED pursuant to 12 Consent to Jurisdiction of Magistrate Judge. All parties do not consent. This case is randomly reassigned to Judge Raymond P. Moore and drawn to Magistrate Judge S. Kato Crews. All future pleadings should be designated as 22−cv−01625−RM. (Text Only Entry) (csarr, ) (Entered: 09/23/2022) |
| 09/23/2022 | 14 | MINUTE ORDER *Vacating Telephonic Scheduling Conference*. Pursuant to parties not consenting to Magistrate Judge Jurisdiction (ECF doc. 12 ), this case will be drawn to a District Judge. The Telephonic Scheduling Conference set for 9/26/2022 is VACATED and will be reset upon a referral from the presiding judge. SO ORDERED by Magistrate Judge S. Kato Crews on 9/23/2022. Text Only Entry (amont, ) (Entered: 09/23/2022) |
| 09/16/2022 | 13 | Proposed Scheduling Order by Plaintiff Rehab Mohamed. (Swain, Hunter) (Entered: 09/16/2022) |
| 09/13/2022 | 12 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff Rehab Mohamed All parties do not consent.. (Swain, Hunter) (Entered: 09/13/2022) |
| 08/30/2022 | 11 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES:re: 9 Notice of Entry of Appearance filed by attorney Kaitlin I. Spittell. **DO NOT REFILE THE DOCUMENT. Action to take** − counsel must submit a change of contact request through the Manage my Account tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (csarr, ) (Entered: 08/30/2022) |
| 08/29/2022 | 10 | NOTICE of Entry of Appearance by Katherine Hoffman on behalf of Society for Human Resource ManagementAttorney Katherine Hoffman added to party Society for Human Resource Management(pty:dft) (Hoffman, Katherine) (Entered: 08/29/2022) |

| | | |
|---|---|---|
| 08/29/2022 | 9 | NOTICE of Entry of Appearance by Kaitlin I. Spittell on behalf of Society for Human Resource ManagementAttorney Kaitlin I. Spittell added to party Society for Human Resource Management(pty:dft) (Spittell, Kaitlin) (Entered: 08/29/2022) |
| 08/29/2022 | 8 | CORPORATE DISCLOSURE STATEMENT. (Smith, Kendra) (Entered: 08/29/2022) |
| 08/29/2022 | 7 | *Defendant's* ANSWER to 1 Complaint, *and Jury Demand and Defendant's Demand for Jury Trial* Attorney Kendra K. Smith added to party Society for Human Resource Management(pty:dft) by Society for Human Resource Management.(Smith, Kendra) (Entered: 08/29/2022) |
| 07/21/2022 | 6 | *Setting Telephonic Rule 16(b) Scheduling Conference*. The Telephonic Scheduling Conference is set for 9−26−2022 at 11:00 am in Courtroom C201 before Magistrate Judge S. Kato Crews. The parties shall file their proposed scheduling order, and email a copy in Word format to Crews_Chambers@cod.uscourts.gov, 7 days before the Telephonic Scheduling Conference (on or before 9−19−2022). The Magistrate Judge Consent Form [#3] is due 9−19−2022. Dial in information for the Scheduling Conference is as follows:CONFERENCE CALL LINE: (888) 251−2909ACCESS CODE: 5662814# SO ORDERED by Magistrate Judge S. Kato Crews on 7−21−2022. Text Only Entry (skclc2). (Entered: 07/21/2022) |
| 07/21/2022 | 5 | WAIVER OF SERVICE Returned Executed by Rehab Mohamed. Society for Human Resource Management waiver sent on 6/30/2022, answer due 8/29/2022. (Swain, Hunter) (Entered: 07/21/2022) |
| 07/01/2022 | 4 | NOTICE of Entry of Appearance by Ariel Beryl DeFazio on behalf of Rehab MohamedAttorney Ariel Beryl DeFazio added to party Rehab Mohamed(pty:pla) (DeFazio, Ariel) (Entered: 07/01/2022) |
| 06/30/2022 | 3 | Magistrate Judge consent form issued pursuant to D.C.COLO.LCivR 40.1, direct assignment of civil actions to full time magistrate judges. No Summons Issued. (jcharl, ) (Entered: 06/30/2022) |
| 06/30/2022 | 2 | Case assigned to Magistrate Judge S. Kato Crews. Text Only Entry. (jcharl, ) (Entered: 06/30/2022) |
| 06/30/2022 | 1 | COMPLAINT *AND JURY DEMAND* against Society for Human Resource Management (Filing fee $ 402,Receipt Number ACODC−8531568)Attorney Hunter Anthony Swain added to party Rehab Mohamed(pty:pla), filed by Rehab Mohamed. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Attachment to Civil Cover Sheet)(Swain, Hunter) (Entered: 06/30/2022) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**ORDER**

---

Before the Court are Defendant's Renewed Motion for Judgement as a Matter of Law (D. 170), Defendant's Motion for New Trial (D. 171), and Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174). The Court DENIES the motions for the following reasons.

## I. BACKGROUND

This civil action arises from the termination of Plaintiff Rehab "Ruby" Mohamed by Defendant Society for Human Resources Management (SHRM). On October 10, 2024, the Court denied SHRM's motion for summary judgment (D. 89). Before trial, Mohamed dismissed all but two of her claims: (1) discrimination in violation of 42 U.S.C. § 1981 (Section 1981) and (2) retaliation under the same section. SHRM sought to exclude various evidence (D. 75; D. 105), which the Court denied without prejudice (D. 82; D. 119). SHRM also sought to bifurcate the trial between liability and punitive damages issues (D. 106), but the Court denied this motion (D. 119).

The Court held a five-day jury trial from December 1–5, 2025 (D. 141–45, 147–48). SHRM moved for judgment by written motion at the close of Mohamed's evidence (D. 146). The Court orally denied this motion (D. 147). The jury returned a verdict for Mohamed on all claims, awarding $1.5 million in compensatory damages and $10 million in punitive damages (D. 154).

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 50

Rule 50 provides that judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Although courts are to review all of the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id*. Moreover, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 150-151. (citation omitted). "Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *United States ex rel. MMS Constr. & Paving, L.L.C. v. W. Sur. Co.*, 754 F.3d 1194, 1199 (10th Cir. 2014) (quotation omitted).

Where a party properly moves for judgment as a matter of law prior to the case being submitted to the jury, that party may renew the motion after the jury returns its verdict. *See* Fed. R. Civ. P. 50(b). Courts apply the same legal standard for a renewed motion under Rule 50(b) as is applied to the original motion for judgment as a matter of law under Rule 50(a). *Hinds v. Gen.*

*Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993). However, there is an added limitation in that generally "[t]he renewed motion under Rule 50(b) cannot assert grounds for relief not asserted in the original motion." *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739-40 (10th Cir. 2007); *see also Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017) ("Arguments presented in a Rule 50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion."). The Court should grant such relief "only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion." *Hinds*, 988 F.2d at 1045 (citation omitted). Motions under Rule 50(b) "should be cautiously and sparingly granted." *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1400 (10th Cir. 1988).

**B. Federal Rule of Civil Procedure 59**

Rule 59 provides that a court "may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A motion for a new trial may be granted where "the district court concludes the 'claimed error substantially and adversely' affected the party's rights." *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008) (quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998)). Such motions are "not regarded with favor and should only be granted with great caution." *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991).

**C. Federal Rule of Civil Procedure 62**

Rule 62 addresses stays of proceedings to enforce a judgment. It provides for an automatic 30-day stay of "execution on a judgment and proceedings to enforce it." Fed. R. Civ. P. 62(a).

After that time, "a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b).

The purpose of such a bond "is to secure an appellee from loss resulting from the stay of execution." *Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871, 873 (10th Cir. 1986). The general rule is that a supersedeas bond will be equal to the "full amount of the judgment." *Strong v. Laubach*, 443 F.3d 1297, 1299 (10th Cir. 2006). However, "the district court has the discretion to reduce or waive the bond requirement if 'the appellant demonstrates a present financial ability to respond to the judgment that is likely to continue' or if the appellant's 'present financial condition is such that posting a full bond would impose an undue financial burden.'" *Lech v. Jackson*, No. 16-cv-01956-PAB-MJW, 2018 WL 2183984, at *1 (D. Colo. May 10, 2018) (quoting *Sierra Club v. El Paso Gold Mines, Inc.*, No. 01-cv-02163-OES, 2003 WL 25265871, at *8 (D. Colo. Apr. 21, 2003)). The party seeking to reduce or waive the bond requirement must demonstrate that such a departure is warranted and "present the court with a financially secure plan that will provide adequate security for the judgment creditor, in lieu of posting a supersedeas bond." *Sierra Club*, 2003 WL 25265871, at *2. In deciding the amount of a supersedeas bond, the Court may consider factors including:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the appellant's ability to pay the judgment is obvious enough that the cost of the bond would be a waste of money; and (5) whether the appellant is in such dire financial circumstances that a bond would place the appellant's other creditors at risk.

*Myers v. Mid-West Nat'l Life Ins. Co.*, No. 04-cv-00396-CMA-KLM, 2009 WL 306366, at *2 (D. Colo. Feb. 6, 2009) (citing *Dillon v. City of Chicago*, 866 F.2d 902, 904–05 (7th Cir. 1988)).

## III. ANALYSIS

### A. Defendant's Renewed Motion for Judgement as a Matter Of Law (D. 170)

SHRM filed a written Rule 50(a) motion, and its Rule 50(b) motion is largely identical (*compare* D. 146 *with* D. 170). It argues that Mohamed failed to establish that she was terminated under circumstances giving rise to an inference of discrimination (D. 170 at 7). SHRM also asserts that she did not engage in protected activity or causation with respect to her retaliation claim (id. at 8–10). Finally, it asserts that it had legitimate reasons for her termination (*id*. at 10).[1]

These arguments are unconvincing in face of the evidence presented at trial. As the Court explained in its summary judgment order:

> Contrary to Defendant's arguments, it is relatively straightforward to form a narrative from the disputed and undisputed facts showing discrimination and retaliation caused Mohamed to be terminated:
>
> Just months after [Carolyn] Barley began to supervise Mohamed, she complained of racial discrimination based on Barley micromanaging her [in comparison to white colleagues]. This complaint is a protected activity under Title VII. *See [Davis v. Unified Sch. Dist.*, 500, 750 F.3d 1168, 1171 (10th Cir. 2014)]. It upset Barley. Mohamed's colleagues corroborated her complaints that Barley treated non-white employees differently. Because of Mohamed's complaints or as part of her discriminatory micromanagement, Barley imposed rigid deadlines on Mohamed that Barley would not have given to Mohamed's white colleagues. Mohamed complained that this action was retaliatory and, either in retaliation for the initial complaint or this new complaint, one or more of Defendant's employees decided to terminate Mohamed. Indeed, Defendant began drafting Mohamed's termination documents on the same day that she complained of retaliation. Mohamed turned in her projects by the arbitrary deadline, but it did not matter what she turned in because the decision had already been

[1] SHRM also argues that the evidence did not support an award of punitive damages (D. 170 at 15–16). SHRM was aware that Mohamed sought punitive damages but did not raise this argument in its Rule 50(a) motion; it is therefore forfeit (*see* D. 146). *Marshal*, 474 F.3d at 739-40. Regardless, the Court would reject it for the reasons indicated below.

> made to terminate her based on the pretext that she did not meet the deadlines.

(D. 89 at 9–10).

When viewed in the light most favorable to Mohamed, as the evidence must be in light of the verdict, the trial record supports and reinforces this narrative. It suggests that Mohamed was treated differently than her similarly situated white colleagues, including those in similar roles with the same supervisor working on similar projects. Even if Mohamed's first complaints about Barley were not explicitly about race discrimination, it was clear to SHRM very shortly thereafter that Mohamed was complaining about being treated differently than her white colleagues (D. 160 Trial Tr. Vol. 2 at 188:9–13). This upset Barley to the extent that she wrote that she wanted Mohamed "held accountable" for her race complaints and took various actions, along with her colleagues, to get rid of Mohamed (*see id*. at 204–08).

By way of example, the testimony of Carrie Mills touched on many of these themes, directly and indirectly. Mills, who is white, worked in essentially the same role as Mohamed and reported to the same supervisor, Barley. It was reasonable for the jury to conclude they were similarly situated. *See Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1232 (10th Cir. 2000) ("An employee is similarly situated to the Plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline.") (quotation marks omitted). Although there were many issues on which the jury could have seized on to find Mills and another white colleague were treated better, her related testimony could also be seen to show retaliation and pretext. In particular, she testified that in mid-August, i.e., around the time Mohamed explicitly asserted that the imposed deadlines were discriminatory and retaliatory, Barley came to Mills in something of a panic—"She said she needed to speak to me urgently and

privately. She was, again, red-faced, sweaty" (D. 161, Trial Tr. Vol. 3 116:16–17). Barley then imposed the same deadlines on Mills as she had given Mohamed:

> The tone that she used with me was unlike she ever had before. She was very rushed and said that I had to have my project done by the end of August; there was no flexibility, that if it was not complete by the end of August, I would face career repercussions at SHRM, that our -- the people above us, so, like, Jeanne Morris and Nick, were going to be watching for this and that there was a larger context and reason that she could not share with me at the time.
>
> * * *
>
> She had never been strict about a deadline up until this point. And then for her to be strict about a deadline with just a couple weeks remaining seemed like -- I mean, it was very inflexible. It was unlike -- it was just also the way she spoke to me, that prescriptive, that directive, no jovialness to it.

(*id*. at 116:19–117:11). In the context of an organization that trains people on HR tasks in view of discrimination law, i.e., that knows what evidence could be helpful, this can reasonably be viewed as a transparent post hoc attempt to concoct evidence of equal treatment, a culture of rigid deadlines, a basis for the associated deadline, etc. Essentially, viewing it in favor of Mohamed and drawing reasonable inferences, one could infer that management knew that they were in a pickle because Mohamed had seen through their termination scheme and sought to concoct some evidence for SHRM's benefit in a ham-fisted manner. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003) ("The plaintiff need not show both that the defendant's reasons were a pretext *and* that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination.").

Ultimately, Mills did not meet the deadline but suffered no repercussions. Mohamed was terminated.

As SHRM argues, it put forward non-discriminatory and non-retaliatory reasons for Mohamed's termination. But there is no reason that a jury was required to credit that evidence, particularly in view of evidence like the example above.[2] Mohamed met her burden when the evidence is viewed in her favor. This motion is denied.

**B. Defendant's Motion for New Trial (D. 171)**

SHRM takes issue with two of the Court's pre-trial rulings: (1) allowing Mills to testify and (2) declining to bifurcate liability and punitive damages (D. 171 at 6–7, 9).

The Court resolved SHRM's challenge to Mills by written order (D. 82). The testimony and evidence presented at trial reinforces the Court's prior conclusion that, "[t]o the extent that Defendant [was] presented with difficulties due to Mohamed contacting Mills late in the discovery process, these difficulties are of Defendant's own making" (*id*. at 4). While SHRM seeks to fault Mohamed for failing to disclose Mills as a person with knowledge, etc., the undisputed evidence at trial suggested that SHRM (unlike Mohamed) was well aware of Mills' potential relevance but failed to disclose her and related evidence. Mills was properly allowed to testify because Mohamed's related disclosures were timely and ultimately harmless (*id*.). SHRM points to nothing the occurred at trial that would alter these conclusions.

SHRM argues that the decision not to bifurcate was prejudicial solely based on the admission of "earnings of certain SHRM employees and SHRM's overall revenue" that it asserts would not have otherwise been admissible (D. 171 at 9). Notably, it points to no emphasis placed

[2] While the Court provides this one example, the trial record is replete with similar evidence which, viewed in Mohamed's favor, supports the verdict. The Court has reviewed all evidence and the entire record in relation to these motions.

on this information by Mohamed or improper arguments founded on it, for example, arguing for liability based on this information. Ultimately, the trial proved correct the Court's expectation that bifurcation was unnecessary.

SHRM also challenges certain rulings made during trial including: (3) the jury instructions in relation to but-for-causation, (4) testimony referencing Ebony Thompson's termination, (5) admission of Barley's notes, and (6) alleged arguments that a higher standard applied to SHRM (D. 171). These arguments largely ignore the trial record and do not provide a basis for the Court to conclude that SHRM's rights were substantially and negatively affected. SHRM does not argue cumulative error, so the Court considers each issue in isolation.

Without citing any specific instruction as faulty, SHRM asserts that the jury was improperly instructed on the but-for-causation standard (D. 171 at 3–4). This is wholly unhelpful and ignores that the Court gave a "SAME RESULT" instruction that embodies and restates the but-for-causation standard by explaining explicitly that, "[e]ven if you find that SHRM violated Section 1981, if you find by the preponderance of the evidence that SHRM would have terminated Ms. Mohamed's employment regardless of her race, or whether she engaged in protected activity under Section 1981, you must find in SHRM's favor" (D. 149 at 21).

Similarly, SHRM's argument that the evidence related to Thompson's termination was inadmissible because, among other things, Mohamed "did not need Ms. Thompson's alleged statements or termination to show that she held a good-faith belief that she was subjected to conduct prohibited by Section 1981" ignores that SHRM has vigorously contested that Mohamed

had a good-faith basis for her complaints (D. 171 at 6).[3] Nothing was made of this brief testimony beyond its proper purpose of supporting a good-faith basis for Mohamed's complaints.

SHRM asserts that "Barley's notes constituted inadmissible hearsay," but this is plainly incorrect because much of the notes were not statements by others. Indeed, the most problematic portion of the notes for SHRM, in which Barley indicated she wished Mohamed were "held accountable" for her race complaints simply expresses the Barley's apparent mental state and motivations in the context of recording notes related to her work role (*see* D. 160 Trial Tr. Vol. 2 at 204–08). *See* Fed. R. Evid. 803(3). Barley's work notes are not hearsay and were plainly admissible. *See* Fed. R. Evid. 801(d)(2)(D).[4]

SHRM's arguments that there was some "improper theme throughout the trial, including during testimony and argument" that "portray[ed] SHRM as a so-called 'model employer' or suggesting that it should be held to a higher standard than other employers based on its expertise in human resources" simply lacks support in the record (D. 171 at 8). SHRM's knowledge of human resources laws and proper processes was relevant to issues in the trial, including whether

---

[3] Before ruling on the admissibility of this evidence, the following colloquy occurred:

> THE COURT: Are you challenging that the Plaintiff had a good faith basis for making her discrimination complaint?
> MS. DARROW: This particular plaintiff?
> THE COURT: This particular plaintiff. I mean, she has to have a good faith basis for making her complaint. One of the things that she can include in that is information about others. So it goes to her state of mind. So are you --
> MS. DARROW: We absolutely are challenging that, Your Honor.

(D. 159 Trial Tr. Vol. 1 at 233:24–234:9).

[4] To the extent that any of the statements recorded in Barley's notes could be properly considered hearsay despite being statements of SHRM's employees in the relation to their business duties, they are nonetheless subject to various exceptions under Fed. R. Evid. 803. Regardless, the role of these statements at trial, if any, was minor in comparison to the strong probative value of Barley's recordings of her work-related thoughts, and SHRM has not shown prejudice from the admission of her records of conversations. *See Equal Emp. Opportunity Comm'n v. Jetstream Ground Servs., Inc.*, No. 13-cv-02340-CMA-KMT, 2016 WL 8201623, at *2 (D. Colo. Nov. 3, 2016), *aff'd*, 878 F.3d 960 (10th Cir. 2017) ("Thus, it is only those errors that have caused substantial harm to the losing party that justify a new trial. Those errors that are not prejudicial do not call for relief under Rule 59." (citation omitted)).

its explanations were pretextual and it acted with malice or reckless indifference (*see* D. 149 at 25). The evidence and argument at trial was appropriately tied to these issues, for example, in the instance discussed above that could be seen as an attempt to use knowledge of discrimination law to craft a pretext in the face of potential liability.

Finally, SHRM makes a broad challenge to the damages award in this case, asserting that the compensatory damages and punitive damages awards were excessive (D. 171 at 10–16). It also makes a conclusory argument for remittitur (*id*. at 16).

A damages award, whether for compensatory or punitive damages, "itself must be supported by substantial evidence." *Wulf v. City of Wichita*, 883 F.2d 842, 874 (10th Cir. 1989) (citation omitted). "Additionally, absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial, the court's determination of the amount of damages is inviolate." *Id*. (cleaned up).

In analyzing the constitutionality of a punitive damage award, the Court examines factors including: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003); *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–75 (1996)

With respect to remittitur, "[i]f the court finds that insufficient evidence exists, or finds the amount of the verdict a product of jury passion or prejudice, the court then may determine a reasonable amount as plaintiff's damages and allow plaintiff to remit the excess over such

amount." *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir. 1987) (citations omitted). "[R]emittitur is not proper unless the amount of damages awarded is so excessive that it shocks the judicial conscience." *Id*. (same).

Although the damages awards in this case were quite large, the Court finds that they were supported by the evidence and does not find them excessive. SHRM is correct that Mohamed's testimony directly addressing damages and emotional distress was limited. But significant testimony also addressed the totality of the circumstances surrounding her claim. Taken together, this evidence was sufficient to support the substantial damages award. *See McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 723 (10th Cir. 2011) (citing *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416 (10th Cir. 1997)). Viewing the evidence in the light favorable to Mohamed, the evidence suggested not only acute emotional suffering during the process leading to her termination but also chronic emotional suffering thereafter as a result. As Mohamed argues (D. 182 at 10–11), the evidence indicated suffering building from the stress of the initial perception that she was being treated differently than white colleagues to crushing disillusion and desperation as the company turned against her and set her up to fail as a pretext for termination. She testified to the lasting impacts of these events in the forms of deadening her ambition and loss of trust in others, particularly in work environments where she had previously excelled and was open to sharing herself, including her race and cultural background. Mohamed watched her claims of discrimination and retaliation, which the jury unambiguously found to be substantiated, systematically disregarded and dismissed as she was isolated from assistance and told, in effect, that she was the problem.

One incident captures some of the flavor of this process. After Barley, with the assistance of senior management ghost-writing her emails, imposed rigid deadlines on Mohamed for the first time in the wake of her discrimination complaints, Mohamed sought assistance and resources for her tasks of the sort she had previously expected and received. Instead of being assisted by her team, she was informed in no uncertain terms that no assistance whatsoever was provided and she was harshly criticized by senior management essentially for seeking assistance. A jury can reasonably understand the devastating short-term and long-term effects of such actions in context. An award of $1.5 million in these circumstances does not shock the judicial conscience.

Likewise, the Court does not find the punitive damages reward constitutionally excessive. SHRM contends that "the constitutional reprehensibility factors confirm that SHRM's conduct lies at the low end of the spectrum" (D. 171 at 14). But this essentially ignores the substantial evidence showing, when viewed in favor of Mohamed, systematic acts to retaliate against Mohamed taken with the aid and consent of senior management for raising discrimination complaints that the jury found substantiated. This is perhaps not the height of reprehensibility in the employment discrimination context simply because it is not overt racism and retaliation, but it is far from the low end.

As to the second factor, simple division shows that the award here is within the "single-digit ratio between punitive and compensatory damages" that "are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *State Farm*, 538 U.S. at 425.

With respect to the last factor, the damages award here, while perhaps in excess of most[5] prior verdicts in this Circuit for employment discrimination cases, is in line with past affirmed punitive damages awards when inflation is taken into account. In the absence of statutory penalties, the "fundamental question is whether [SHRM] had reasonable notice that its [conduct] could result in such a large punitive award." *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996). If anyone knew the possibility of high potential punitive damages for employment discrimination and malicious retaliation, it was SHRM, which trains businesses on related issues including potential liability. In 1996, the Tenth Circuit authorized punitive damages of $6,000,000.00 for harm that was "entirely economic" even in the absence of "harm to health and safety." *Id*. at 642.[6] This is less than the punitive damages awarded here when adjusted for inflation. The jury's award in this hard-fought case is "sufficient to cover plaintiffs' reasonable costs of litigation with enough left over to reward plaintiffs for pursuing a case the jury obviously thought justified significant punishment of [SHRM]'s behavior." *Id*. at 643. The Court denies this motion.

**C. Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174)**

SHRM seeks only a stay of execution during the pendency of the motions resolved above (D. 174 at 5). Because the Court has resolved these motions, it denies the stay request as moot.

---

[5] A jury awarded $5 million in compensatory damages and $15 million in punitive damages in a Section 1981 racial discrimination and retaliation case in this District last year. *See Joppy v. HCA-HealthOne LLC*, No. 22-cv-00986-CNS-STV, ECF No. 380 (D. Colo. Aug. 19, 2025). Post trial motions, including motions seeking remittitur, remain pending.

[6] As discussed above, there was substantial evidence of harm to Mohamed's mental health.

## IV. CONCLUSION

Accordingly, it is ORDERED that Defendant's Renewed Motion for Judgement as a Matter of Law (D. 170) and Defendant's Motion for New Trial (D. 171) are DENIED. It is FURTHER ORDERED that Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174) is DENIED AS MOOT.

DATED April 15, 2026.

BY THE COURT:



Gordon P. Gallagher
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**District Judge Gordon P. Gallagher**

Civil Action No. 1:22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**FINAL JUDGMENT**

---

This matter was tried on December 1, 2025, through December 5, 2025, before a jury of nine duly sworn to try the issues herein, the Honorable Gordon P. Gallagher, Judge, presiding.

Pursuant to the Jury Verdict [D. 154] returned on December 5, 2025, it is

**ORDERED** that judgment shall enter in favor of Plaintiff Rehab Mohamed and against Defendant Society for Human Resource Management. It is further

**ORDERED** that plaintiff is awarded his costs, to be taxed by the Clerk of the Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

This case is closed.

Dated at Grand Junction, Colorado this 12th day of January 2026.

FOR THE COURT:

APPROVED:

Jeffrey P. Colwell, Clerk

________________________
United States District Judge

By:________________
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

REHAB MOHAMED,

Plaintiff,

vs.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

Case No. 22-CV-1625

Denver, Colorado

December 4, 2025
7:54 a.m.

Vol. IV

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218

APPEARANCES: (Cont.)

For the Defendant:

TANJA DARROW
Littler Mendelson P.C.
633 West Fifth Street
63rd Floor
Los Angeles, CA 90071

VIRGINIA WOODFORK
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202

*MEGAN E. STRAWN, RPR, CRR*
*901 19th Street, Denver, CO 80294*
*303.335 2111 * strawnreporting@gmail.com*

*Proceedings reported with realtime stenography;*
*transcript produced with computer-aided transcription.*

I N D E X


| PLAINTIFF'S WITNESSES | PAGE |
|---|---|
| MICHAEL JACKSON | |
| Designated deposition testimony | 8 |
| REHAB MOHAMED | |
| Rebuttal - Ms. DeFazio | 212 |

| DEFENDANT'S WITNESSES | PAGE |
|---|---|
| JOHNNY TAYLOR | |
| Direct - Ms. Darrow | 114 |
| Cross - Mr. Swain | 124 |
| BERNÉE LONG | |
| Direct - Ms. Darrow | 132 |
| Cross - Ms. DeFazio | 158 |
| ELIZABETH LACEY | |
| Direct - Ms. Darrow | 167 |
| Cross - Ms. DeFazio | 200 |
| Redirect - Ms. Darrow | 210 |

| PLAINTIFF'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 9 | Letter to Mohamed re promotion to Senior Instructional Designer | 200 | 200 |
| 34 | Long and Mohamed emails re conversation follow-up | 151 | 150 |
| 40 | Jackson, Sullivan, and Long emails | 98 | 99 |
| 42 | Letter from Mohamed to Long | 153 | 154 |
| 46 | Long and Mohamed emails | 152 | 151 |
| 59 | Jackson draft letter | 42 | 42 |
| 62 | Mohammed letter | 34 | 34 |

| | | | |
|---|---|---|---|
| 64 | Separation agreement and general release | 38 | 40 |
| 65 | Resignation/termination policy | 57 | 59 |

| DEFENDANT'S EXHIBITS | DESCRIPTION | IDENTIFIED | RECEIVED |
|---|---|---|---|
| 4 | SHRM Employee Code of Conduct | 196 | 196 |
| 5 | SHRM Employee Code of Conduct | 199 | 199 |
| 24 | Emails re Jackson notes on call with Mohamed | 137 | 137 |
| 35 | Schacht, Morris and Long emails re Mohamed's retaliation complaint | 161 | 161 |
| 41 | Long and Sullivan conversation follow-up emails | 155 | 156 |

| MOTIONS | PAGE |
|---|---|
| Rule 50 Motion - Mr. Swain | 104 |
| Ms. Woodfork | 110 |
| Taken Under Advisement | 113 |
| Ruling | 220 |

(Proceedings reconvened at 7:54 a.m., December 4, 2025.)

THE COURT: All right. We are -- back on the record in 22-CV-1625. Everybody is back with us on day four of the trial.

And sounds like there may be an exhibit issue that we need to discuss. Mr. Swain.

MR. SWAIN: Yes, Your Honor. And there's another issue I'd like to discuss, too, maybe first, because it's more discrete.

THE COURT: Okay.

MR. SWAIN: I'm going to be asking for permission to present Mr. Taylor with this calculator during his exam because I'm going to ask him to do some arithmetic, and I believe it would assist him in doing that.

Do I have permission from the Court to provide him with the calculator?

THE COURT: Ms. Darrow?

MS. DARROW: First I've heard. I don't see how that's going to come up because he's just a rebuttal witness, but --

THE COURT: I'm not pre-ruling on relevance or the other items. Unless it's a magic calculator, I don't know that there's anything problematic with the actual use of a calculator if it's necessary.

So I don't have a problem with the calculator. As to

other potential objections related to it, those, I think, will need to be reserved for issues related to when we get to his testimony.

MR. SWAIN: Understood, Your Honor.

And, you know, it may very well be that we don't need to do that at all, but I didn't want to interrupt the proceedings by --

THE COURT: No, that is no problem. Hopefully his math skills are better than mine.

MR. SWAIN: And -- I'm sorry, Your Honor.

THE COURT: No, go ahead.

MR. SWAIN: The second item was we are going to be seeking to introduce certain exhibits during the deposition reading, and the logic is that by the deponent's testimony, they will have laid the appropriate foundation and authentication of certain documents that have not been introduced yet.

THE COURT: Okay.

MR. SWAIN: And I wanted to bring that up because when I mentioned it to Ms. Darrow earlier, she seemed somewhat taken aback. So I wanted to ensure that there's no disruptive objections about the process of trying to introduce, understanding that she may have objections to the actual introduction of the exhibits.

THE COURT: I mean, thinking out loud, I have never

seen that occur before. I guess intellectually -- and I'll certainly turn to Ms. Darrow -- I don't know that it is impossible for that to occur, but never seen it happen.

Ms. Darrow, thoughts?

MS. DARROW: 31 years, nor have I.

THE COURT: Okay. Well, I mean that, doesn't mean you can't try, Mr. Swain. I don't know what the objections are going to be. You know, in terms of the foundation, you know, obviously, the issue that you've got there is it gets a bit difficult to clean up any foundational issues that might exist because you don't have a body here to ask further questions, but I guess we'll see.

I don't know if you want to make any further record on it right now, Ms. Darrow, or wait and see how it plays out.

MS. DARROW: We'll see how it plays out.

THE COURT: All right. Other than that, I know jurors were still coming in as I came in. And I guess I don't want to preclude -- Ms. Darrow, do you have issues you would like to raise this morning?

MS. DARROW: Thank you, Your Honor. Nothing further from the Defense.

THE COURT: All right. Then we will take a couple-minute break. Don can make sure we have all of our jurors. And as soon as we do, we'll get rolling here.

(A recess was taken from 7:58 a.m. to 8:04 a.m.)

THE COURT: All right. Don, we are ready for them.

(The jury entered the courtroom at 8:04 a.m.)

THE COURT: Please be seated, everybody. Welcome back. Thank you again for being here.

Folks, you're going to hear again some deposition testimony. And you will be introduced to the reader, who really has nothing to do with this case other than they are the reader. But the big way that you can tell that they're the reader is I do not swear them in because they are not actually testifying. So if you don't see me swear somebody in, then you know that they are a reader for a deposition. But counsel will introduce them as well and then also tell you whose deposition we are listening to.

With that, Mr. Swain, you may proceed.

MR. SWAIN: Thank you, Your Honor.

Plaintiff calls Michael Timmy Jackson. And his deposition will be read by Adam Harrison.

THE COURT: And I'm guessing you must be Mr. Harrison, sir?

Okay. Come on up.

And if everybody could just go exceedingly slow, that would be helpful.

**MICHAEL JACKSON, PLAINTIFF'S WITNESS, DIRECT EXAMINATION**

//

//

## DEPOSITION TESTIMONY BY DESIGNATION

BY MR. SWAIN:
Q. "Good morning, Mr. Jackson.
Can you state your full name for the record and spell it.
A. Michael, M-I-C-H-A-E-L; middle name Timmy, T-I-M-M-Y; last name Jackson, J-A-C-K-S-O-N.
Q. Why did you leave SHRM?
A. For -- for a new position.
Q. At the time you left SHRM in October 2021, what was your title?
A. My title was Manager of Employee Experience.
Q. Did you hold any other titles at SHRM while you worked there?
A. I had a couple of titles. I had the title of -- within -- during my work with the Council for Global Immigration, which it's formally known as American Council on International Personnel, which became an affiliate of SHRM's in -- technically in July of 2012. And we became part of -- became part of SHRM orbit officially as staff in August of 2012.
And after that time, my title was -- I had multiple titles: Manager of Exchange Visitor Programs, Manager of Marketing and Exchange Visitor Programs. And then we split up my position back to Manager of Exchange Visitor Programs. And then I moved into the HR unit, and my title shifted to Manager

of Employee Experience.
Q. And Manager of Employee Experience, is that title ever referred to as Manager, Employee Relations?
A. It -- my portfolio and job description within the role encompassed a number of areas and so that -- it did include the employee relations element within SHRM.
Q. Can you generally describe what your job duties were in that position as Manager of Employee Experience?
A. So there were sort of three main areas that -- that -- that involved, you know, the employee relations piece; again, working with Sean Sullivan, our CHRO, our legal counsel, and others to address employee-related matters as they arose across various forms.
That also included overseeing the performance management process within SHRM that would -- that we would do throughout the year as well as facilitating the onboarding process for -- within the HR function for employees. And so that was one element.
The second element, employee engage -- employee experience, really focused on the -- sort of the employee engagement and various elements of trying to facilitate the process, you know, the experience of employees within SHRM in conjunction with the executive office within our communications team within -- and within other stakeholders, both within the United States but then also collaborating with

our colleagues in India.

And then the -- and that element also included from the HR function overseeing sort of the implementation in conjunction with our consultants of our -- of employee engagement survey.

And then the third piece was really sort of -- was really related to HRIS and sort of that -- the data piece of that. I inherited that piece. A couple of" --

THE COURT: Sir, let me just have you slow down a little bit more. It's no problem. Folks just tend to read a little bit faster than they might actually talk. It makes it a little bit harder to keep up with.

MR. HARRISON: I apologize.

THE COURT: No worries. Thank you.

A. "And then the third piece was really sort of -- was really related to the HRIS and sort of that -- the data piece of that. I inherited that piece a couple of months into my time within SHRM. And so that was sort of the third piece of my portfolio, working across the HR team and with our technology team as we -- as we implemented a new HR information system in 2020 into 2021.

BY MR. SWAIN:

Q. Okay. And for now I would like to focus on the first of those three elements that you described. The -- I think you put it as working with Sean Sullivan to manage employee

personnel matters.

Is that a fair description of that segment that you described?

A. I would work with Sean Sullivan but also with other members of the -- of the HR team, as well as legal counsel and others. And so, again, it varies depending on the -- depending on the issue, depending on sort of who was needed to connect and, you know -- but I worked very closely with -- with Sean but also with others within SHRM.

Q. And in that portion of your role, which types of employee personnel matters did you work on?

A. Really involved with the range of -- range of things that would come up within the organization, whether it's performance-related issues, issues between employees, issues between a manager and employee, involuntary terminations, whether it be performance related or due to restructuring or -- or voluntary, you know, departures, helping to facilitate that process.

So a real mix, depending -- again, typical with what you would see with -- within any employer.

Q. What I was asking is for that portion of your manager of employee relations job, would your responsibilities include investigating employee complaints of discrimination and retaliation?

A. Yes, you know, any sort of employee issue, which would

include any sort of -- any sort of discrimination or retaliation. Any -- any sort of employee issue would fall within the employee relations part of my portfolio.

Q. And while you were at SHRM in your manager of employee relations position, how many employee complaints of discrimination did you investigate?

A. The only -- the only one that I recall that involved any discussion of discrimination involved Ruby Mohamed.

Q. Okay. And do you recall that Ms. Mohamed also made complaints of retaliation?

A. The -- I've read that in the complaint.

Q. But you had not learned that Ms. Mohamed had made complaints of retaliation until you read it in the complaint; is that correct?

A. If I recall correct, I -- I think there had been talk about various activities that -- where -- meetings where she -- where she had been either -- and again, where she had been -- either felt that she had been micromanaged or that she -- she had not been allowed to do the duties as the Senior Instructional Design. Within the complaint, it was -- it was framed within sort of that -- that element of retaliation.

But I -- what I recall, and, again, from looking at my notes and everything, there was -- again, looking through the circumstances connected with that, and then I think it did. Again, without looking back, I think that this did come

up in conversation with others, but I think that in a conversation that I had -- the conversations that I had with Ruby Mohamed, I don't specifically recall that phrasing. But I do recall, again, elements that in the complaint, you know, were connected as such.
Q. And just to clarify, when you say "the complaint," which complaint are you referring to?
A. Looking at what was filed. Again, just looking -- I think that was initially filed in Colorado.
Q. You knew that Ms. Mohamed had made complaints of discrimination, with a lowercase c, while she was employed at SHRM; is that correct?
A. Based on my recollection of the conversation with Mr. Sullivan that -- that I took notes on, I believe that -- that that was the case. Again, I -- I don't have you -- you know, you've got the notes specifically that were taken, but I'm just working off of recollection.
Q. And you conducted an investigation into Ms. Mohamed's complaints of discrimination while Ms. Mohamed was still employed at SHRM, didn't you?
A. Correct.
Q. Okay. Tell me, what is your educational background?
A. I have a bachelor's degree as well as a master's degree.
Q. What is your bachelor's degree in?
A. History.

Q. And from which university did you earn that bachelor's degree?
A. The George Washington University.
Q. And what is your master's degree in?
A. Public diplomacy.
Q. Do you have any human resources certifications?
A. Yes, I do.
Q. Which ones do you have?
A. I have my SHRM CP from SHRM.
Q. What is CP?
A. Certified Professional.
Q. Okay. And can you describe what educational work you have to do to obtain that SHRM CP certification?
A. In -- in terms of educational training that has to be done, in theory -- and, again, I'm trying to -- I don't fully recall the specifics. I don't know if you necessarily have to -- you don't have to take a certain number of educational requirements, per se. It's certain -- certain level -- there are discussed materials and other things, and, basically, it's -- it's certifying you on your body of knowledge that you have with -- with -- across the industry.
I don't -- it doesn't require, necessarily, X amount of educational experience in the HR field, but many people, and myself included, did take certificate -- do take certification prep courses, which I did through SHRM, the

training for the -- the SCP or -- sorry -- for the Society for Human Resource Management CP exam.

Q. Did you obtain your SHRM CP certification while you were employed at SHRM?

A. Yes, I did.

Q. And what qualifications do you have to be a human resources professional?

A. So my -- my experience, I worked for -- prior to moving into the HR function as a -- prior to moving into the HR function as -- in 2019 as the manager of employee experience, I worked for over a decade in the -- in a number of HR-adjacent areas involving, again, learning and development; helping facilitate training and internship programs; developing training internship placement plans with -- in conjunction with companies; helping to be able to manage compliance issues, again, from the immigration angle for individuals; managing my own direct reports within -- within the organization, but then also doing sort of educational development programs for foreign nationals that were under the programs that -- that I did, you know, both in the context of SHRM but also in a prior -- prior to us becoming part of SHRM at the American Council on International Personnel, and then in my prior experience as well.

Q. Is it fair to say that you've worked in -- that you've worked in human resources or human resources-adjacent roles

for decades now?
A. I would -- I would say that over -- I would say over a decade. You know, how you define decades could -- could be up for interpretation, but I've -- I've got -- at this point well over ten years. I'd have to stop and do the math, but . . .
Q. And how many complaints of employment discrimination have you investigated in your career?
A. Just -- just the one.
Q. Ruby Mohamed's?
A. Correct.
Q. What qualifications do you have to conduct investigations of employee complaints of discrimination?
A. It -- I guess the question would be how do you define qualification?
Q. Well, use your personal interpretation of that word.
A. Uh-huh. You know, again, I think you -- my experience, I worked -- I've had quite a lot of experience dealing with compliance-related matters, primarily in the immigration space, but then also dealing with -- dealing with issues and really just going through a process and -- process and method.
So I think I've dealt both in -- in my in -- in various roles with issues that -- that have arised where it did involve having to go through some sort of investigation, you know, to go through a process. So -- so do I -- you know, did I know -- going into this experience in a range of areas

even though this was the first, you know, discrimination-related matter that I had to investigate.
Q. Describe the previous experience that you had that qualified you to investigate -- conduct the investigation into Ms. Mohamed's discrimination complaint.
A. I would say -- I would point to a couple of different things dealing -- dealing with employee-related issues where -- where there was a disagreement or -- or disagreements or issues between employees, between being able to -- to see what happened, what occurred in that situation, and then work it through to -- to resolution.
Dealing with issues related to, again, with -- on the immigration side, looking -- looking -- reviewing people's -- people's information, again, making sure that we have compliance with various immigration laws under the J1 visa program. And those were just two off the top of my head.
Q. Have you ever undergone any training in conducting employee complaints of discrimination?
A. When I joined the HR department, I did do -- I did do a number of trainings, both online -- both virtual training but then also several of our in-person seminars, including one of the -- one on investigations. And I did that. I don't -- some -- it was sometime in the fall of 2019, if I remember correctly.
Q. So less than a year before Ms. Mohamed made her first

complaint of discrimination, correct?
A. It would have been -- it would have been less than a year before the events that occurred with Ms. Mohamed.
Q. Tell me what you recall from the training that you underwent on conducting employee investigations.
A. In terms of this specific curriculum, again, I haven't reviewed it in four years, so I can't speak specifically to details, but really talking through on a high level, really looking at the -- sort of the -- sort of the process and context for going through and doing an investigation, sort of some of the common scenarios that comes up and then -- and then that sort of -- the working through with and collaborating with -- with counsel, with other, you know, stakeholders, see the process through.
Q. Would you agree that it's important that employees -- employers conduct thorough investigations of complaints of discrimination made by their employees?
A. Yes.
Q. Why? Why is that important?
A. I -- it's important because it -- I -- to ensure that issues are addressed and that -- and that -- well, the issues, you know, if they are addressed, but then also by making sure the -- really ensure that compliance with federal, state, and local requirements and laws.
Q. In your mind, what steps are necessary to ensure that an

employee's complaint of discrimination is thoroughly investigated?

A. I -- again, I would point to a couple of things. I think, one, it's really looking, talking through, really going through the various information to discover what and learn what, you know, has or hasn't -- hasn't occurred. Then -- and that includes talking with the individuals directly involved, but then others that are connected in, and then take -- and then making sure that, depending on the course of that -- that action, that things -- that action occurs, again depending one way or the other, depending on what occurs with the scope of the investigation.

Q. Did you know anything about Ms. Mohamed's complaint -- or claims of discrimination or retaliation before you read the complaint that she filed in court?

A. As I mentioned before, we discussed various elements, but then also there were -- I had been a part of conversations that -- where I did take notes with the conversations that she had with -- with Sean Sullivan, our CHRO.

Q. And when you said we had discussed various elements, who is "we"?

A. So I had -- I had two conversations with -- with Ms. Mohamed, involving Ms. Mohamed that -- that I recall, and both in early July of 2020.

Q. And just to clarify, so you're saying you had two

conversations with Ms. Mohamed about her claims of discrimination, correct?
A. That -- two conversations involving Ms. Mohamed that -- where we discussed matters, again, relating with -- with these various elements of the circumstances described here.
Q. And when you say 'involving Ms. Mohamed,' do you mean where Ms. Mohamed was present for the conversations?
A. It depends on how you define 'present.' One was, if I recall, a phone conversation. And then the second was -- and with -- if I recall, an in-person with Carolyn Barley.
Q. Because you certainly had more than two conversations about Ms. Mohamed where she was not present or directly involved; isn't that right?
A. Correct.
Q. Who made the decision to fire Ms. Mohamed?
A. In terms of the -- in terms of the final decision, I -- I do not know. You know, I ultimately -- I ultimately -- any sort of action, usually it's -- it's a discussion. It, again, involves multiple people in the process. And -- but I don't know what -- in the decision process leading up to her termination, I -- I was not directly involved with any -- with conversations where any final decision on action was made.
Q. Okay. Who, to your knowledge, was involved in the discussions about Ms. Mohamed's being terminated before she was actually terminated?

A. In terms of -- in terms of discussion, again, I -- I can't speak to -- to specifics because, again, the final actions that -- that they -- a lot of the final circumstances occurred after I was -- after I was out on medical leave for a medical procedure on the 24th of August of 2020.

So I -- so I can't speak specifically about what might have -- specific conversations. But in general, it would typically be -- with SHRM it would be a process that would involve -- involuntary termination would involve discussions not just with the manager in HR, but also with, typically, other leadership involved within the organization.

But, again, I -- I can't speak to what specific conversations about a decision to be -- to proceed with the involuntary termination occurred. I -- if I recall, I -- I was notified that the action was moving forward, but I think -- but conversations had happened, you know, before that had occurred. So I couldn't speak to that.

Q. Who notified you that the termination was moving forward?

A. My recollection was that it was Sean Sullivan, and I -- and I received, I recall, an email from him.

Q. So can you describe your involvement in the decision to terminate Ms. Mohamed's employment?

A. My involvement into -- again -- as I stated before, again, I was out on medical leave when the -- and was not involved in -- in discussions where the decision was made to terminate

the employment.
Q. You prepared --
A. I can't --
Q. -- multiple documents related to Ms. Mohamed's termination, didn't you?
A. Yes.
Q. Who --
A. Yes.
Q. Who told you to prepare those documents?
A. And so in terms of who told me, I -- one, that typically fell within my portfolio. I -- before I went out -- to prepare exit-related documentation, before I went out on leave, I tried to prepare as much as possible for -- for any four scenarios where they come in, where there might be things -- where things were needed within my portfolio while I was out.
I -- I did, in terms of what I prepared, I do know I did offer to support -- because, ultimately, my employee relations portfolio was being handled by another colleague, Keren Maldonado, who was our director of total rewards while I was out.
I did offer to go ahead and -- I did offer to prepare that exit-related documentation related to -- to Ruby's exit, including the excerpt letter -- exit letter, as well as the package that would be provided, both the electronic and then

Keren would then print out a physical copy.
Q. What were the dates of your medical leave around that time period in August 2020?
A. So I went -- so it -- on that, it depends on how you define medical leave. I was technically on open leave, which -- which we have within SHRM, from August 24, and then returning, I think, a day after Labor Day. I don't remember the exact date, but roughly early September, whatever the -- whatever the date was there.
But then for two weeks prior, I had been working -- upon request of doctors working remotely to be able to make sure that -- to minimize any potential exposure to COVID prior to -- prior to my medical procedure.
Q. What was the purpose of your leave that you took? Was it for a medical procedure?
A. Yes. I was having gastric bypass surgery, the Roux-en-Y gastric bypass procedure.
Q. And did the procedure go well?"
THE COURT: Hold on just a moment. Let's go back so we get the spelling correctly.
MR. HARRISON: I'm sorry. R-O-U-X-E-N-Y; the Roux-en-Y gastric bypass procedure.
BY MR. SWAIN:
Q. "And did the procedure go well?
A. It did.

Q. Good. I'm glad to hear that.
Do you recall the date of the actual bypass procedure?
A. April -- August 24.
Q. And you were working remotely in the days following your bypass procedure, weren't you, while you were recovering?
A. I -- I had very limit -- very limited involvement, but there were certain elements I did -- that I did offer to -- to do to -- to make sure that things went smoothly or -- that did include preparing the exit documents related to Ms. Mohamed.
Q. Did you prepare any exit documents for Ms. Mohamed before your bypass surgery?
A. I don't -- I don't recall. You know, again, I think you would be able to see from the timestamps, but I did try to prepare as much in advance for things that may have been maybe needed during that period.
If I recall, Ms. Mohamed was the only sort of employee relations matter that -- that was on my docket during -- during that two-week period that -- that -- where there -- where things may or may not have been needed.
Q. And I want to make sure that we're fully understanding the distinction here.
So in your mind is there a significant distinction between making the decision to terminate Ms. Mohamed and carrying out the termination?

A. I don't understand your question. Can you elaborate?
Q. Sure. So certainly you were involved in taking actions to facilitate Ms. Mohamed's termination, like preparing termination documents, correct?
A. Yes.
Q. And is it your testimony that you didn't participate in actually making the decision to fire Ms. Mohamed?
A. I was not -- the decision by the organization to -- to involuntarily separate Ms. Mohamed was made while -- by the organization while I was out on leave. I had been involved with and -- and had seen email communications prior, but the -- to my recollection, until I got an email from Sean Sullivan that the action was moving forward, I did not know that a determination had been made.
Q. Understood.
So is it true that you had seen email communications about the termination of Ruby Mohamed before your medical procedure?
A. I -- not about -- no. You know, in terms of the -- everything that was transpiring related to Ruby Mohamed, that included the -- that included the -- the -- I had been included on some -- on a number of the emails related to sort of progress with meeting deadlines and sort of the -- the requirements there.
You know, I had also had -- had been involved with

some of the communication and seen communication, again, which we had said at -- within HR, you know, function as we set up the facilitation involving both Ms. Mohamed as well as Ms. Barley. So I had been CC'd on a lot of -- a lot of various email communication, again which you could -- which you could see from the discovery documentation.

Q. So I asked you a question earlier and I don't think I got a responsive answer to it.

Did anyone ask you to start preparing Ms. Mohamed's termination documents?

A. Not that I'm aware of. Typically that -- I -- what -- typically what -- this was a -- this was a unique situation where, again, with my being out on leave and someone else covering, I cover as many bases as possible in -- in case someone did -- in this case, it would have been Keren Maldonado had to step in to deal with anything.

So I try to line up as much things -- looking at sort of where things were on the employee relations document. I had created step-by-step processes of what I typically do and -- of everything. But then I did offer to step in and create the documents for -- for Ms. Mohamed even though I was out on medical -- out on the open leave at that period.

Q. And so is it your testimony that at the time you went on leave for your medical procedure on August 24th, you did not yet -- you did not know yet that Ms. Mohamed was going to be

terminated?

A. I -- my recollection is that the email that I received from -- from Mr. Sullivan informing me that the decision had been made to -- to separate Ruby occurred while I was on medical leave, which would have been after -- on or after the 24th of August.

Q. And do you recall if you prepared termination documents for Ms. Mohamed before or after you received that email from Mr. Sullivan?

A. I -- I do remember that I prepped a number of things that may or may not have been needed during the two weeks that I was out. I don't remember specifically if -- if I had prepped something prior to the 24th related to -- related to any exit documents that may or may not have been needed. But again, you should be able to see that from the timestamps. But unfortunately, I don't -- I don't recall the exact timing.

But again, as I mentioned, I did also, once I did know of the -- of the action per the email from Sean Sullivan, offer to -- offer to create the full package of items that would ultimately be sent to make sure that everything was in correct order.

Q. When you were a manager of employee relations at SHRM, was it your typical practice to prepare termination documents for an employee when no termination decision had been made?

A. So, one, let me -- let me just preface again, my title was

Manager of Employee Experience, not manager of employee -- manager of employee relations. But as I mentioned before, this was a -- this was a unique circumstance with me being out on medical leave and trying to -- trying to prepare for every conceivable contingency that I could think of that might come up, at least in -- as I knew at the -- at the time that may or may not be needed, and so trying to lighten the load as much as possible for my HR colleagues that may have to step in on various matters.

So this was a unique circumstance within my going out on -- with my going out on -- on open leave with my procedure.

Q. I would like to look at a document with you --

A. Yeah.

Q. -- that I'm going to place in the chat function of Zoom.

A. Okay.

Q. This document that I'm sending you has now been previously marked as Deposition Exhibit 41.

And when it appears in your chat box, please open it up.

A. One moment.

Yes, I see it.

Q. Have you ever seen this document before?

A. Yes.

Q. What is it?

A. It is -- it is a copy of a separation agreement and

general release.

Q. Between who?

A. You know, as -- as stated here, between Ruby Mohamed and SHRM."

MR. SWAIN: Your Honor, at this time I'd move to admit Exhibit 60, which is -- corresponds to Deposition Exhibit 41.

THE COURT: I show that Exhibit 60 was already admitted. That was the separation agreement.

MR. SWAIN: My apologies, Your Honor. Can we publish for the jury, please?

THE COURT: Sure. Sure. 60 is already admitted. You may publish.

MR. SWAIN: Just one moment, Your Honor.

(Discussion off the record.)

BY MR. SWAIN:

Q. "You prepared this document, didn't you?

A. In -- depends on how you define 'prepared.' This was based off of -- this was based off of a template that -- that we were provided and reviewed typically by general counsel or -- but let me rephrase it -- the general counsel's office."

THE COURT: Can I have you scoot that microphone a bit closer to you, sir? As you scooted left, the microphone kind of migrated away.

A. "Depends on how you define prepared. This was based off

of -- this was based off of a template that -- that we were provided and reviewed typically by general counsel or -- or -- let me phrase it -- the general counsel's office. Typically, it would be with the assistant general counsel. But typically it would be a combination of -- of me, of HR, my role working with legal counsel to prepare any sort of separation agreement and general release.

BY MR. SWAIN:

Q. And I'm not asking you in general terms. I'm asking specifically about this Deposition Exhibit 41.

So --

A. Uh-huh.

Q. -- you indicated that SHRM has a template, so someone had to take the template and insert the name "Ruby Mohamed," correct?

A. Well, there would be a number of things that would have been updated on -- on each template and not -- and name being one of them, but not -- but not just name.

Q. Who updated the template for this document --

A. I --

Q. -- Exhibit 41.

A. I -- I -- I don't recall specifically. I can't -- I can't remember. I can't remember if this one was one of the things that I had updated with other documents, or if this was updated and handled by counsel directly. I, unfortunately,

just don't recall the specifics.
Q. Okay. I'm going to share my screen.
A. Yeah.
Q. So right now I have Deposition Exhibit 41 right here.
A. Uh-huh.
Q. It's the very same document that I just showed to you.
A. Yeah.
Q. Do you see that?
A. Uh-huh.
Q. Is that a yes?
A. Yes. I can see your screen.
Q. Okay. I'm going to the properties of Deposition Exhibit 41, and I am going to -- let's see here. Here are the properties for Deposition Exhibit 41, the one that I just showed to you.
A. Uh-huh.
Q. That's the same title, correct?
A. I'm sorry. Let -- hold on. Let me -- 00589, Confidential.
Yes.
Q. I'm going to the details of the properties, and I'm going to scroll down.
So do you see the date the content was created?
A. Uh-huh.
Q. Is that a yes?

A. Yes.
Q. And what's the date and time that this content was created?
A. Per your screen, it says August 28th, 2020, 4:31 p.m. I'm not sure what time zone.
Q. And the date that the document was last saved, what's the date and time that it was last saved?
A. According to your screen, it says August 30th, 2020, 8:09 a.m.
Q. I am sharing with you what has been marked as Deposition Exhibit 54 with you, Mr. Jackson. Please let me know when you're ready. Go ahead and open it up.
A. One moment.
Yes, I've got it open.
Q. Okay. And bear with me just one moment, please.
While I'm doing something, please take a look at that document, and I am --
A. Uh-huh.
Q. -- going to ask you some questions about it.
A. Yeah.
Q. Okay. Deposition Exhibit 54, do you recognize this document, Mr. Jackson?
A. Yes, I do.
Q. And what is this Deposition Exhibit 54?
A. This is a copy of our standard exit letter that -- that --

what we use for exits, both voluntary and involuntary.
Q. And on the second page of Deposition Exhibit 54 appears your signature, correct?
A. Correct. That was a standard part of the -- of every exit letter."
MR. SWAIN: Your Honor, at this time I move to admit Exhibit 62, which corresponds to Deposition Exhibit 54.
THE COURT: Ms. Darrow?
MS. DARROW: No objection.
THE COURT: 62 is admitted.
(Plaintiff's Exhibit 62 received.)
BY MR. SWAIN:
Q. "Do you recall if you prepared this exit letter?
A. I recall preparing -- I recall preparing exit -- preparing an exit letter, and, actually, I -- if I recall correctly, I think -- if I recall correctly, that -- I don't -- that it -- if I recall correctly, there were some -- there was some uncertainty over dates. I think I prepared two versions of this date.
Q. Again -- I'm sorry?
A. Again, you would be able to have that in the documentation, but I -- my -- from my recollection, I created exit letters related to Ruby Mohamed.
Q. I'm going to share my screen again. I'm sharing the properties of Deposition Exhibit 54.

Have you reviewed the title to make sure that it's the same document I was just talking about -- asking you about?
A. Yes, it is.
Q. I'm going to the Details tab of the properties of Deposition Exhibit 54.
And can you tell me who it says the document was last saved by?
A. By Mike Jackson.
Q. That's you, correct?
A. That -- it appears to be me. And it aligns with my recollection that I created the exit letter.
Q. So you don't have any reason to believe that the Mike Jackson here is another Mike Jackson other than you, correct?
A. Not that I -- not that I'd be aware of. My -- again, this -- seeing this aligns with my recollection that I created the exit letters related to Ruby Mohamed.
Q. And the Content Created field indicates that this Deposition Exhibit 54 was created on August 31st, 2020 at 8:12 a.m., correct?
A. Yes, that is correct.
Q. And that it was last saved one minute later at 8:13 a.m. on August 31st, 2020, correct?
A. Yes, that is correct.
Q. Do you recall if the decision to fire Ms. Mohamed had

already been made by 8:12 or 8:13 a.m. on August 31st, 2020?
A. Again, this -- my -- I don't recall when I received the email from Sean Sullivan. I -- so I can't speak specifically to whenever that -- the email I received versus when I created this document.
Q. Okay. Let's take a look at Deposition Exhibit 55.
What is Deposition Exhibit 55?
A. This is a cover sheet that we would include with the -- with the copy of the separation agreement and general release.
Q. And Deposition Exhibit 55 is a native format document produced in Microsoft Word format that bears the Bates stamp Mohamed 000560.
Do you see that?
A. Yes, I do.
Q. And the same story as before, I am going to share my screen and look at the properties --
A. Okay.
Q. -- of Deposition Exhibit 55.
Do you see the properties that I'm looking at bear the same title as the document that we were just looking at before?
A. Yes.
Q. And the Last Saved date indicates that it was last saved by Mike Jackson, correct?"
THE COURT: And, Counsel, let me ask you to slow down

just a bit. Thank you very much.

MR. SWAIN: I'm sorry.

BY MR. SWAIN:

Q. "And the Last Saved date indicates that it was last saved by Mike Jackson, correct?

A. Correct.

Q. Do you have any reason to believe that does not refer to you?

A. No. As stated before, I -- my recollection is creating exhibit -- exit-related documents."

MR. SWAIN: Your Honor, at this time I move to admit Exhibit 61 that corresponds to Deposition Exhibit 55.

THE COURT: I've got that 61 was already admitted.

MR. SWAIN: My apologies, Your Honor. I made some notations.

THE COURT: No problem.

MR. SWAIN: And I'm --

THE COURT: It's already in, so it's easy. We'll just move on. You can publish it if you like.

BY MR. SWAIN:

Q. "And this document indicates that the content was created at 10:29 a.m. on August 31st, 2020; is that correct?

A. Yes. That's what I -- that's what I read on your screen, 10:29 a.m.

Q. And it was last saved the same minute, 10:29 a.m., on

August 31st, correct?
A. Yes, that is correct.
Q. Let's look at Deposition Exhibit 56 now, which is a native format document --
A. Uh-huh.
Q. -- produced in Microsoft Word format, bearing the Bates Number Mohamed 000562.
And what is Deposition Exhibit 56?
A. It is a copy of a separation agreement and general release.
Q. Between Ms. Mohamed and SHRM, correct?
A. Correct.
Q. Again, let's take a look at the properties of Deposition Exhibit 56.
The properties that I have open on my screen now, can you verify that the title is the same document we were just looking at, Deposition Exhibit 56.
A. One moment.
Let me make sure I've got it. 56, Mohamed 000562.
Yes, that is correct.
Q. And in the Details tab of the properties of Deposition Exhibit 56, it indicates that the content of this document was created at 8:11 a.m. on August 30th, 2020, correct?
A. Correct.
Q. Do you recall if you were the person who created the

content of this Deposition Exhibit 56?

A. I -- again, it depends on how you define, you know, created. Again, this was a standard template with -- within the -- that was used and then updated. I don't specifically recall the updating, but it would be consistent with updating all the other documents. But -- so I -- so it -- so I don't recall specifically this document, if it was done by general counsel or me or the -- or by the general counsel's office. Excuse me.

Q. Understood.

Who at the general counsel's office were you working with to facilitate Ms. Mohamed's termination?

A. My primary -- my primary contact within -- primary with any employee relations matter, I would work with our assistant general counsel, La Tanya James-Rouse. But -- but I would, depending on circumstances, also work with others on -- in the office, but I -- but I don't recall working with -- with Jim Banks directly, who was the general counsel at the time, on anything related to Ruby Mohamed.

So I -- my recollection, La Tanya James-Rouse."

MR. SWAIN: Your Honor, at this time I move to admit Exhibit 64, which corresponds to Deposition Exhibit 56.

MS. DARROW: No objection.

THE COURT: 64 is admitted.

(Plaintiff's Exhibit 64 received.)

THE COURT: And I think what we'll do, Mr. Swain, is probably go about another 25 minutes, and at 9:30 we'll take a break, because we've been sitting an hour and a half, and then we'll pick up after that, or -- give or take, whenever you get to a question around 9:30-ish when you think is a good one to break at.

MR. SWAIN: Yes, Your Honor.

BY MR. SWAIN:

Q. "And you don't know whether it was her or you who created this document, Deposition Exhibit 56, correct?

A. I don't recall specifically, and -- and that's where it -- it could have been -- typically, it was some combination of -- typically, it would be -- I would get a draft and then update from legal.

But in this particular circumstance, I'm not sure -- I'm not sure sort of -- I don't recall the -- what may or may not have occurred.

Q. Understood.

I'm going to show you Deposition Exhibit 57 now, which is another native format document produced in Microsoft Excel format --

A. Uh-huh.

Q. -- bearing the Bates Number Mohamed 000563."

MR. SWAIN: And, Your Honor, this is Exhibit 63, which is previously admitted. I request it be published.

THE COURT: Sure.

BY MR. SWAIN:

Q. "Tell me what this Deposition Exhibit 57 is.

A. This is an Excel document that -- that -- of a template that I used for -- as a checklist for terminations and would create with terminations to be able to -- to concisely have the -- coordinate any -- any involuntary termination or voluntary.

Q. So you believed that you took the template and updated it to reflect Ms. Mohamed's termination; is that correct?

A. That -- I don't specifically recall -- recall creating this document, but it would be in line with creating all the -- the various other exit-related items.

Q. Understood.

Let's take a look at Deposition Exhibit 58, which is a native format document produced in Microsoft Word format that --

A. Uh-huh --

Q. -- bears the Bates Number Mohamed 000585.

And tell me what Deposition Exhibit 58 is.

A. This is a -- this is a template exit letter similar to the -- similar to the one referred to earlier.

Q. And it bears your signature, correct?

A. Correct. That is part -- that is standard with -- with our exit template of the time."

MR. SWAIN: Your Honor, at this time I move to admit Exhibit 59, which corresponds to Deposition Exhibit 58.

MS. DARROW: No objection.

THE COURT: 59 is admitted.

(Plaintiff's Exhibit 59 received.)

BY MR. SWAIN:

Q. "Understood.

And so this termination letter has the exit date highlighted right? And it's not a date. It just says "exit date"; is that --

A. Uh-huh.

Q. -- correct?

A. Correct.

Q. So does that indicate that the date of Ms. Mohamed's termination had not been decided yet?

A. Typically -- typically, with the -- with a template like this, if a date wasn't listed, then an earlier -- it -- either it wasn't on board or it hadn't -- or this form hadn't been fully filled out at that point. You know, I'm not sure what -- what specifically there, but clearly, looking at the form, there are no dates listed on this form as of -- as of what I'm seeing here.

Q. Does the fact that this letter was prepared indicate that the decision to terminate Ms. Mohamed had already been made, but the date was just to be determined?

A. No.
Q. Why not?
A. Because, again, as I mentioned previously, prior to me knowing that I was going on leave, I did try to line -- prepare for as many scenarios as potentially possible that may or may not happen.
And so, again, not knowing when this document was created -- I'm not sure of the circumstances, but I think this doesn't say that it -- that a decision had been made.
Q. But would you agree the fact that you prepared this means that you viewed her termination as a real possibility?
A. It meant that I was trying to cover as many -- as many scenarios, likely or unlikely, as possible. As I mentioned before, this was the employee relations matter that was on the -- on the docket when I went out on surgery. And, again, I can't prepare for the unexpected, but, you know -- but again, thinking what even remotely could happen during the -- during the course of my absence. If there was a situation that may -- may have warranted an exit, this is the only one that -- that I was aware of that could have progressed to that point, but it hadn't by that time been -- but it hadn't by the time that I had went out on leave.
Q. What other scenarios did you prepare for before your leave with respect to Ms. Mohamed?
A. I had -- preparing checklists of how to handle both

voluntary and involuntary processes that may come up that I hadn't anticipated, looking at -- I was trying to -- think trying to, again, make sure that my team members knew how to handle various things related to our HRIS system, things in that regard, so trying to think through sort of what was within my portfolio that might have -- that I could prepare to the extent that I could, again, not knowing what may or may not happen.

Q. Did you prepare anything for the possibility that Ms. Mohamed would not be separated during your leave?

A. Well, at that point there -- well, from my -- from my role of things, there wouldn't be -- there wouldn't be anything for me to prepare, per se. And when I went out on leave, my recollection was that she was still engaging with the facilitation with -- with Bernée Long and that, again, there was work with the team on various elements.

So that's -- that's -- so -- but to your question, there wouldn't -- there wouldn't have been -- it wouldn't have been -- if she hadn't been exited out, she -- there would have been nothing on -- on that exit-related side to do because she would still be an employee.

Q. By the way, of the documents that we looked at earlier, Deposition Exhibits 41, 54, 55, 56, 57 --

A. Uh-huh.

Q. -- do you recall that those -- the properties all

indicated that those were prepared on August 30th or August 31st?

A. Yes.

Q. And that was during your leave, correct?

A. Yes.

Q. And so to me that indicates that you actually were working on matters related to Ms. Mohamed's termination during your leave.

Is that --

A. Which is -- which is consistent with what I said before. I offered, to -- to -- to the extent possible, to prepare exit documents related to Ms. Mohamed and, again, prepare and support my team in scenario planning with what may or may not happen, as I led up before, so just as I said before.

Q. And you indicated the fact that this template doesn't have an exit date. That indicates that the decision to terminate Ms. Mohamed had not been formally made yet; is that right?

A. Again, I can't -- without knowing the date of the -- that the template was created, but then, two, the date of when I received the email notification from Mr. Sullivan that the action was moving forward, I -- it would just be speculation.

Q. Well, the separation checklist that we looked at or -- I'm sorry -- the separation agreement, Deposition Exhibit 56, do you recall that the creation date of that document was on August 30th, 2020?

A. I -- I don't -- I recall that some of the -- some of the documents were discussed. Again, I would have to go back and look at -- see the screen again to confirm, but --
Q. Well, let's do it.
A. Let's do it.
Q. I'm showing you the properties of Deposition Exhibit 56, the separation agreement we looked at a few moments ago.
Do you see where it says the content was created on August 30th, 2020 at 8:11 a.m.?
A. Yes, I do.
Q. And you should still have Deposition Exhibit 56 --
A. Uh-huh.
Q. -- available to you to open up, so please open it up again.
A. I have it open.
Q. Good. So on the bottom of the first page of Deposition Exhibit 56 --
A. Uh-huh.
Q. -- in paragraph 3A, it says, "Employee's last date of employment will be August 31st, 2020."
Do you see that?
A. Yes, I do.
Q. So when you -- when SHRM prepares termination documents that actually include a termination date, does that indicate to you that the decision to terminate an employee had already

been made?
A. Not necessarily. You know, if I -- if I recall correctly, the -- I'm not sure. Again, without -- without knowing when exactly I received the communication there, I -- I'm not sure. It's not uncommon for us to -- to draft documents to have them available if needed, but then, you know -- but then dates shift or actions don't occur. We've had that also happen before. So I don't see that that says August 31, you know.
Again, in terms of the specific timing, I, again, without -- without recollection of this specific email, when I received -- was informed from Sean Sullivan, I can't speak specifically to the dates there. But -- but yes, that form does say August 31, to your question.
Q. And Ms. Mohamed was, in fact, fired, correct?
A. She was. It was an involuntary termination.
Q. Okay. But -- so you said, you know, generally, maybe there were circumstances where you would prepare this document with a termination date, and then the employee would not be terminated.
Is that correct?
A. We've had scenarios where -- where documents were created where an action was not -- where a separation agreement was created and the -- and the action ultimately did not happen.
Q. And can we agree that this is not one of those circumstances?

A. Correct. This -- Ms. Mohamed was -- was an involuntary termination.
Q. Is it your testimony that as of August 31st -- I'm sorry -- 30th, the date this document was created, the decision to terminate Ms. Mohamed's employment had not yet been made?
A. I do not -- again, I was not involved with the specific discussions and decisions there. As I mentioned before, my awareness of when the decision came is from an email from Sean Sullivan. And so, unfortunately, I don't recall specifically when that email was received.
You should have that in your documentation, but, unfortunately, I just -- I don't -- I don't recall.
Q. Let's take a look at the properties of Deposition Exhibit 58. That's the template letter that we looked at that had kind of a placeholder for the termination date."
MR. SWAIN: Can we publish Exhibit 59 for the jury, please.
BY MR. SWAIN:
Q. "Do you --
A. Yeah.
Q. -- recall that?
A. Yeah. And I've got it pulled up here.
Q. All right. And I -- please look at my screen that I'm sharing, because I'm showing you the Details.

A. One moment. Let me just -- let me just make -- verify -- 500585.

Yes.

Q. This indicates that the document was last saved by Mike Jackson, correct?

A. Correct.

Q. And you don't have a reason to think that's another Mike Jackson, correct?

A. No.

Q. And the properties of this document indicate that it was created at 7:40 a.m. on August 21st, 2020.

Do you see that?

A. Yes, I do.

Q. And is it your testimony that you just took it upon yourself to prepare Ms. Mohamed's termination documents on August 21st without any instruction from Sean Sullivan or La Tanya James-Rouse or anyone else?

A. As I mentioned previously, you know, I prepared a number of documents that may or may not have been needed by the HR department during the time of my leave, which, again, my surgery was on August 24. This was the Friday prior, if I'm -- and if I'm calculating the dates correctly, this would have been Friday the 21st.

And so, again, this would be consistent with -- with my trying to prepare things that may or may not have been

needed by my team while I was out, as I mentioned before.
Q. And it would also be consistent with an inference that the decision to fire Ms. Mohamed had already been made, wouldn't it?
A. No.
Q. Why not?
A. Because, again, if you -- as noted before, the -- there were no dates or information on that. Again, as I mentioned before, I tried to think through scenarios, even remote ones, that -- that could potentially occur. You know, that doesn't say that the decision had been made at that point. And again, as I mentioned before, I was not made aware of -- that decision had been made until I received the email from Sean Sullivan.
Q. And you don't recall the date that you received that email from Mr. Sullivan?
A. Unfortunately, I don't.
Q. Do you recall when you completed your investigation of Ms. Mohamed's discrimination complaints?
A. So in terms of -- well, my work with -- related to Ms. Mohamed really started -- really from late June, and then I -- I continued to engage with -- with various parties and everything there. But, really, if I recall correctly, my conversations went on through, I think, sometime in mid- to late July. But then I know that there were other

conversations looking into this matter that were made by Sean Sullivan subsequent to that.

Q. So when did your portion of the investigation of Ms. Mohamed's discrimination complaints conclude?

A. From my recollection, I think the -- the core -- the core investigation that I did in terms of following up with various parties, I believe, occurred from late June to mid- to late July. I can't remember exactly when, but -- but then I do know that -- again, that Sean Sullivan had talked -- had subsequent further conversations related to this matter and the -- and the -- and the claims by Ms. Mohamed subsequent to that.

Q. Okay. Do you -- to your knowledge, what was the reason for Ms. Mohamed's termination?

A. If I'm -- if I recall, it was due to performance.

Q. What about her performance?

A. I -- I believe, if I recall, it had been the -- it had been the circumstances occurring, really, from July on in terms of communication, missed deadlines, but then also in sort of -- also in terms of issues related to the work product, it ranged with a -- with a number of different elements.

I believe there were -- if I recall correctly, I think there were -- there were two particular projects that -- that were involved. I think one on Digital HR and one -- it

may have been Compliance, but I'm -- I can't -- I can't recall specifically what the second one was. But I believe that there were two main -- two main products that -- that were -- that she was focused on during that period of July -- July into August.
Q. And what specifically about those two projects was related to her termination?
A. I -- again, I think the -- if I recall correctly, the issue was really the totality of communication, lack of communication, and responsiveness to various stakeholders, delays in delivering the product and when products were delivered, issues with the quality, if I'm -- if I'm remembering correctly.
Q. And you testified that you didn't actually -- that you actually didn't personally participate in the decision to terminate Ms. Mohamed, correct?
A. I was out -- yeah. As noted before, I was not involved with the -- with the decision to -- I was not involved when the decision was made to terminate Ms. Mohamed. Again, I found out about the decision after, you know, with -- from the email from Sean Sullivan.
Q. In the email from Mr. Sullivan that the decision had been made to terminate Ms. Mohamed, did he say the reason why?
A. I don't recall specifically. Again, without having seen that email, I can't -- it would -- it would be speculation. I

don't recall specifically. But the key part of the email that -- that I remember was the decision had been made.

Q. And, you know, acknowledging that you didn't personally participate in the decision to terminate Ms. Mohamed, how do you know the reason why she was terminated?

A. I -- you -- again, you -- I -- you -- having been involved with the -- with the process up to that point and if -- having to -- having been involved with -- having seen the correspondence related to that -- even though I was out on leave, I was still CC'd on a number of emails, again, related to the -- the performance challenges, deadline challenges, various things there."

MR. SWAIN: Your Honor, I think now is a good time for the break.

THE COURT: Okay. Well, ladies and gentlemen, we'll take about a 12-minute break or so. If we could get back together at 9:40, that would be great.

Please rise for the jury.

(The jury exited the courtroom at 9:27 a.m.)

THE COURT: Thank you. Please be seated.

Don, do you have that form I printed?

So, folks -- please be seated -- one thing that we haven't discussed that I think bears some very brief discussion is there's, I think, half a dozen or so stipulations that are going to be included ultimately in the

jury instructions. It seems that it might be -- and there are eight of them, to be exact. It seems that it might be problematic for the jurors to first hear those for the very first time in jury instructions, and there should be some method for me reading those. I'm entirely open to when the parties think that that should be, but there should be -- you know, that instruction should actually be read previous to that.

Thoughts from the Plaintiff's perspective on when we should do that?

MS. DeFAZIO: Your Honor, we're flexible. I don't think we have any specific timing in mind, but certainly we -- you know, both sides agreed to those stipulations, so whenever Your Honor thinks it would be prudent to read it, that would be fine.

THE COURT: Ms. Darrow.

MS. DARROW: Just thinking it through, it would seem to me that logically the best time is right before Plaintiff rests so it's part of your case, not that I'm trying to be helpful to the Plaintiff's case.

THE COURT: Just looking at these -- and let me do this -- I also want to print another copy of these because I want to make crystal clear and sure that these are, in fact, the stipulations that everybody has agreed to, so I'll print what we have in our final version for each of you, and you can

look at them over the break.

I'm happy to read them at the end of Plaintiff's case. I don't want to presume that they're helpful to one side or the other because I don't know that. I mean, they're joint stipulations, and maybe they're helpful to one, maybe the other, maybe both. But I -- I don't really care. I'll read them whenever you all like. I just think they need to be read.

MS. DARROW: I'd have to look at them.

THE COURT: So why don't we do that over the break. And when we come back, before we bring the jury in, you can let me know. I will print these here momentarily, copies for you.

Anything else anybody else thinks we need to talk about before we take a break?

MR. SWAIN: No, Your Honor.

MS. DARROW: Nothing from the Defense, Your Honor.

THE COURT: We're on a break.

(A recess was taken from 9:30 a.m. to 9:43 a.m.)

THE COURT: We're back on the record.

Folks had an opportunity to at least briefly look at those stipulated facts?

MS. DeFAZIO: Yes, Your Honor.

THE COURT: Okay. One option might be, after Plaintiff closes, before any case the Defense presents, to

read them in so it's not clearly associated with either case.
Plaintiff's thoughts on that?

MS. DeFAZIO: That would be fine.

THE COURT: Ms. Darrow?

MS. DARROW: Wonderful idea, Your Honor.

THE COURT: Anybody have any corrections, additions, changes, to the stipulated facts? I think we just ported them over from what was already there, but just so we didn't make any computer snafus, do those look like what Plaintiff wants them to look like?

MS. DeFAZIO: Yes, Your Honor. That's fine. They're from our final pretrial order.

THE COURT: From the Defense?

MS. DARROW: No changes, Your Honor.

THE COURT: Anything anybody wants to address before we bring the jurors back in?

MR. SWAIN: Just to confirm, we're restarting at page 78, line 17; is that right?

THE COURT: I have no idea. I don't have that.

MS. DARROW: That looks right.

MR. SWAIN: I thought you may have been following along as well.

THE COURT: Okay. Ms. Darrow, anything from your perspective?

MS. DARROW: Nothing from the Defense, Your Honor.

THE COURT: Okay. Let's bring them in.

(Discussion off the record.)

(The jury entered the courtroom at 9:44 a.m.)

THE COURT: Please be seated. Welcome back.

Mr. Swain, you may continue, sir.

BY MR. SWAIN:

Q. "Were you present for any discussions between Mr. Sullivan and anyone else about the reason for Ms. Mohamed's termination?

A. Present for discussions related -- related to the decision -- so now you're asking related to the decision to terminate? Again, I -- the decision was made -- to make -- I was not -- I was on leave at the time that that was made. I was aware, again, of the various performance matters that were occurring in the weeks prior, and -- and both, again, from the various conversations that I was involved with but also email communications.

So I did know that there was the progression of issues in July into August.

Q. And remind me specifically what the performance issues were.

A. In terms -- from my recollection, it was really sort -- a couple, but one was lack of communication and lack of responsiveness to -- to her manager and other leadership related to various initiatives and challenges there.

Two, was there was -- there was issues related to deadlines and -- with, I believe, the two main projects. Again, as I -- as I noted before.

And then, if I recall, I think there was also some issues with, again, some of the deliverables of various projects along the way.

So I think -- so my recollection is, again, sort of around those three areas.

Q. And is it your testimony that each of those three areas was part of the motivation for Ms. Mohamed's termination?

A. Again, not having been part of the -- of the conversation, I can't -- I can't specific -- say specifically. But, again, the situation is looking at the totality of -- would be looking at the totality of events.

Q. Do you know if Ms. Mohamed actually missed deadlines or not?

A. My understanding, I -- I know that there -- I -- but again, without looking -- going back and looking, I know that there were issues related to deadlines and -- and -- but -- and I believe that there were deadliness missed, you know. In terms of specifics, I'm afraid I don't recall specific examples. But that -- but my recollection was that there was issues related to deadlines at various points.

Q. Let's look at Deposition Exhibit 28, which I'm going to share with you.

What is Deposition Exhibit 28?
A. This was -- it appears to be a copy of our resignation/termination policy."
MR. SWAIN: Your Honor, at this time I move to admit Exhibit 65, which corresponds to Deposition Exhibit 28.
MS. DARROW: No objection.
THE COURT: 65 is admitted.
(Plaintiff's Exhibit 65 received.)
BY MR. SWAIN:
Q. "And as the manager of employee engagement, were you familiar with SHRM's various internal human resources policies?
A. Yes.
Q. And did you follow SHRM's internal human resources policies in that role?
A. Yes.
Q. Would you agree that SHRM following its own internal human resources policies was important?
A. That's the nature of policies, yes.
Q. Why is it important for SHRM to follow its own policies?
A. In terms of consistency, in terms of, again, ensuring that we comply with various -- various legal requirements. It just -- it -- there was a range of -- yeah.
Q. Let's take a look at the second page of Deposition Exhibit 28. I want you to look at the page that says 'SHRM 0037' at

the bottom.
A. Yep. Yep, I've got it.
Q. Okay. And about one-third of the way through that page, there's a section called Involuntary Departure.
Do you see that?
A. Yep. Yep.
Q. And under Involuntary Departure, it says, 'If a supervisor believes an employee should be terminated, the supervisor must first discuss the situation with the director, Human Resources, or the manager, Employee Relations.'
Do you see that?
A. Uh-huh. Uh-huh.
Q. And did I read it correctly?
A. Well, I -- if you could read it again, I -- I will -- I can confirm that.
Q. How about you read it?
A. 'If a supervisor believes an employee should be terminated, the supervisor must first discuss the situation with the director, Human Resources, or the manager, Employee Relations.'
Q. So in August 2020, who was the director of Human Resources?
A. We did not have a director of Human Resources.
Q. Okay. And in August of 2020, who was the manager of Employee Relations?

A. We did not have a manager of employee relations. Again, that role, once it became vacant, evolved into a broader position, manager of employee experience.

Q. So do you believe that this portion of the policy was no longer applicable because there was not someone in either of those roles at the time of Ms. Mohamed's termination?

A. No, I do not believe that.

Q. Why not?

A. Because, again, the -- even though the titles have changed and the organizational structure has evolved, there was -- the essence of roles were there. And again, the policy to make sure that that -- that there is review, review before any decision, is -- remained the same. So even though titles changed in the organization, the essence being covered there remained the same.

Q. So who would those two individuals have been at the time of Ms. Mohamed's termination, given that there weren't folk folks in either of those two named roles?

A. So, you know, the equivalent in the structure that had at the time -- that we had at the time in question would have been -- would have been Sean Sullivan for the -- in the director, Human Resources, and then myself for the manager, Employee Relations, would have been the closest equivalents.

Q. Okay. And that next sentence says, 'The director, Human Resources, or the manager, Employee Relations, will ensure

that the progressive discipline policy has been adhered to as appropriate prior to concurring with an involuntary termination.'

Did I read that correctly?"

THE COURT: Let me have you slow down a little bit. Thank you.

A. "Yes, you did.

BY MR. SWAIN:

Q. And again, that would be either Sean Sullivan or you during this time period in August 2020, correct?

A. Correct.

Q. Describe SHRM's progressive discipline policy at the time.

A. So -- so in terms of progressive discipline policy, you know, at the -- at this time, this was something that had evolved within -- within the organization. The organization, prior to that point, had moved away from a -- from structured performance improvement plan structure to really being able -- to more of a -- as issues arised, working with -- working directly with the employee to address issues and lay out milestones for -- for an expectations for mitigating those, so that -- so that -- the process had evolved.

But, again, the essence of laying out markers for -- for addressing concerns and looking for improvement in processes was still there.

Q. Before Ms. Mohamed was terminated, did you ensure that

SHRM's progressive discipline policy had been adhered to?
A. When -- again, both Sean Sullivan and myself were -- have been connected with -- have been connected in with -- with the process of seeing the progression related to deadlines and -- and things there.
We had seen that expectations had been set out and then had seen that what had or had not occurred related to that. I would -- I would say that that was adhered to.
Q. When did you first meet Ruby Mohamed?
A. I don't recall specifically when I first met Ruby Mohamed, but I will say I knew her in my prior role when I worked at the Council for Global Immigration and with the J1 visa program. I had -- had known her and then had actually worked with her.
And at the time -- well, I worked with her, and my team had worked with her, too, to update an e-Learning program that we had for our program participants during that time. And so I had -- had worked with her in that capacity and then knew her from that -- from that time at SHRM.
Q. What were your observations about Ms. Mohamed's work on that e-Learning program that you and your team worked on with her?
A. From my experience, she did a fantastic job with it. She was very, very, very thorough with getting the updates. She -- she responded well to the feedback that we gave and

allowed us to be able to meet the guidelines that we had for being able to -- to get this updated. So very positive from my experience with her on that project.

Q. Did you have any other observations about Ms. Mohamed's work from the time period when you were actually collaborating with her?

A. The only -- to my -- to the best I can recall, that was the only project I specifically worked with her on that with e-Learning. But, again, as I said before, it was a very positive experience and was very pleased with the collaboration and the -- and the outcome.

Q. Mr. Jackson, do you know Ruby Mohamed's race?

A. Hold on. Sorry about that.

From documentation, yes.

Q. What is her race?

A. I know that she -- I know that she is a protected class, Egyptian origin. You know, I can't remember how specifically she was classified in the documentation, but I do know, again, a protected class.

Q. You just know that she was a member of a protected class?

A. I believe.

Q. But --

A. I believe, you know -- I can't tell, you know -- you know, I can't recall specifically from the documentation. I'm -- I can't remember if it was classified African. I know it was

Egyptian. You know, Egyptian origin, but I can't remember -- I can't remember specifically.
Q. Have you ever met Ms. Mohamed?
A. Have I -- have I met Ms. Mohamed?
Q. Yes.
A. Yes.
Q. What color is her skin?
A. It's a -- a dark color skin.
Q. And you don't know her race offhand, correct?
A. Again, I'm not speculating. I want to -- I don't recall what was specifically within the documentation. I -- I'm just stating what I know or don't know.
Q. And I'm asking you, do you know her race?
A. If I recall, it's African-American. But again, I don't -- but I can't remember the -- what it -- what it was -- how it was officially classified in documentation or other things.
Q. Let me ask you -- you're referring to the documentation in a few of your prior answers.
What documentation are you referring to?
A. Well, I remember, again, reading the -- the complaint. Chicago -- not Chicago. Excuse me -- Colorado, whatever the agency was, it labeled -- it listed both for Ms. Mohamed as well as a number of other folks identified in what -- what their -- you know, their -- you know, their race. So I just don't recall what it listed there or from -- again, the

documentation from the time at SHRM, again, that being over three years ago.

Q. So was it your testimony that you may have known her race during her time at SHRM but have since forgotten it?

A. I -- I'm not saying that. What I'm saying is I don't -- I don't want to say something independently without -- I don't know how she identifies. I have my best -- what I think it is, but again, I -- I do want to be mindful, again, knowing that I'm under oath.

Q. Did you ask her how she self-identifies racially?

A. Have I ever asked her?

Q. Yes.

A. I don't recall asking her specifically.

Q. What about generally?

A. I don't recall generally, either.

Q. So is it your testimony that your only understanding of her race is from reviewing documents filed with the Colorado Civil Rights Division?

A. In terms of the question of her -- in terms of the question of her race, there's -- I will say, one, I've known -- knowing Ms. Mohamed -- I know her personally, have seen the color of her skin. But again, that doesn't suppose race one -- you know -- again, what I officially know would have been either from the documentation or, again, reading the complaint.

Q. Okay. So let me ask you a really direct question.
A. Uh-huh.
Q. And I can't imagine that there's any other answer besides yes and no.
Do you know what Ms. Mohamed's race is?
A. Do I -- it depends on how you define do I know. Again, I don't have the official document. Without -- without seeing the documentation that we have from the EEO or how she identified in the legal filings, I can give you what I believe. But -- but, again, that's not definitive. And again, so I -- that's where I -- again, being mindful that I'm under oath, so as I stated before, I -- I know -- I believe I know, but, again, I want to be mindful.
Q. At some point you became aware that Ms. Mohamed had made a complaint of race discrimination during her employment at SHRM, correct?
A. Correct.
Q. How did you learn that -- and Ms. Mohamed's complaint of race discrimination was specifically about her direct supervisor, Carolyn Barley, correct?
A. Correct.
Q. And how did you learn about Ms. Mohamed's complaint of race discrimination against Ms. Barley?
A. My recollection is that I learned from Carolyn Barley directly.

Q. What do you recall about the nature of the complaint that you learned from Ms. Barley directly?
A. If I -- if I remember correctly -- and, again, caveating that this was over three years ago -- it was along the lines of -- that -- that -- that Carolyn Barley was -- was discriminatory against her by -- in terms of various actions related to projects that she was doing in terms of micromanaging, treating her differently than other -- other employees.
And I think -- if I recall correctly, potential microaggressions.
Q. And specifically, her complaint related to being treated differently than employees of other races; right?
A. Correct.
Q. Do you recall the date that you learned Ms. Mohamed had made this race discrimination complaint about Ms. Barley?
A. I don't recall the specific -- the specific date. The earliest recollection of where I have notes was June 30. And to the best my -- to the best of my recollection, I -- that aligns with my memory of it being in late June. But specific -- but again, I can't specifically say if -- if June 30 was the first day that I learned, but I would say late June.
Q. And have you -- you testified earlier that you initially were responsible for investigating Ms. Mohamed's complaint of

race discrimination, correct?

A. Correct.

Q. How long after you learned that Ms. Mohamed had made a race discrimination complaint did you begin investigating?

A. The -- in terms of specific timelines, I, again, can't -- I don't specifically recall exact dates and times. But I do recall, I think, based off the conversation with -- with Ms. Barley, them talking -- excuse me -- Jeanne Morris, in -- you know, and because, again, at that point had learned that there had been conversations there -- talked with Ms. Morris and then -- and then also consulted with Sean Sullivan, and then basically the decision was made to then basically -- to then do a facilitated conversation with -- with Ms. Barley and Ms. Mohamed.

Q. Was that facilitated conversation part of your investigation into Ms. Mohamed's discrimination complaints?

A. It was. Looking into the totality of the -- of the complaint by -- the totality of the complaint, again, there were -- there were elements at the time. The -- it was really focused on, again, sort of the -- the micromanagement, lack of empowerment in terms of -- of opportunities there. And -- and they had mentioned that then there was the element of -- that she was being treated differently. But, again, the conversation was about the totality of -- of matters that had been occurring.

Q. Okay. What did you actually do to investigate Ms. Mohamed's race discrimination complaints?

A. So in -- in terms of -- in terms of looking into the complaints, again, there were, one, multiple conversations with -- with Carolyn Barley and Jeanne Morris. You know, there were -- there was a conversation with Ruby Mohamed in early July, then the facilitated conversation that occurred, and then also conversations with other team members in, you know -- during -- during that time. The two that I recall are Ann Godmere and Carrie Mills.

Q. Those conversations, did you consider them to be an interview, or was it more informal?

A. It was -- it was a conversation with the individuals, but, again, within the confines of determining what had or hadn't occurred related to the totality of the situation.

Q. Okay. So did you have conversations with Ann Godmere and Carrie Mills and Carolyn Barley and Jeanne Morris as part of a fact-finding portion of your investigation? Is that what you're saying?

A. It was part of looking into the overall situation. So, yes, there were conversations that were had.

Q. Does SHRM have internal processes that govern investigations of employee complaints of discrimination?

A. Again, it depends on how you define specific processes. Again, there are policies within harassment and discrimination

that do provide sort of out -- processes and outlines there.

Again, I haven't seen those within -- in several years, so you -- but any investigation would -- would be done, would be aligned with either -- our employee code of conduct that we had. We didn't have a handbook per se -- or the various policies that would be applicable.

Q. And tell me what you recall of the requirements of the policies for investigating employee complaints of discrimination.

A. At -- at this point, I -- I haven't seen that policy in a couple years. I wouldn't want to speculate. So I'm afraid that I would -- I wouldn't want to speculate without -- because, again, it's my memories two-plus years removed now, almost -- no -- yes. Three years? Two years -- almost two years.

Q. I'm not asking you to speculate. I'm asking you what your memory is, so if you can't remember anything about them, you can just say that.

A. Yeah. I'm afraid I don't recall the -- what the policy said.

Q. But you were the manager of employee experience at the time, correct?

A. Correct.

Q. So other than the chief human resources officer, the one person responsible for investigating and resolving employee

complaints of discrimination, correct?
A. That -- employee relations was within my portfolio. Again, we -- your question makes it sound like -- again, HR would work in conjunction with legal and others. But, yes, it would be myself and CHRO from the HR side of things.
Q. And initially you were the one person tasked with investigating Ms. Mohamed's complaints of discrimination, correct?
A. I would -- I would say that I had -- I had official conversations, but, again, I worked closely and connected with Sean Sullivan throughout the process, partly, again, out of due diligence to make sure that -- that he was -- was kept in the loop, but then also looking -- using him as a resource for helping frame for next courses of action. So I worked very closely with Sean throughout the process.
Q. Describe the division of labor between you and Mr. Sullivan in more detail, like, what tasks was he hand -- was he -- what tasks he was handling and what tasks you were handling with respect to the investigation of Ms. Mohamed's race discrimination complaint.
A. And so I -- in terms of -- I had conversations, again, as I mentioned, with a number -- number of players within -- involved with -- within the process and shared -- shared my findings, again, with Mr. Sullivan. Additionally, he had conversations with a number of folks, as well, in addition to

what I had done.

So it was -- and, again, part of this was, again, making sure that we look -- that we had an understanding of the totality of what -- what had or was occurring with the situation.

Q. What were the findings that you shared with Mr. Sullivan?

A. The -- in terms of the -- in terms of the findings, through the conversations that I had, I had not come across any specific evidence where Ruby had been -- had been discriminated against because of race. I -- you know, what I had discovered was that there -- there had been -- that there had been challenges related to -- with her manager and that -- that there were -- that there had been, again, instances that had occurred where -- where Carolyn had not empowered Ms. Mohamed in her role as a senior director, but nothing where it was -- it was -- where it indicated it was due to race.

Q. And just to be clear, sitting here today you don't even know Ms. Mohamed's race; right?

A. Again, I said I may have known, but I -- I'm -- again, I'm mindful that I'm on the record. I believe that she -- that she listed as African-American. But, again, I'm mindful that I'm under oath, so I'm being -- being careful because, again, I don't have access to what -- either hearing directly from her or remembering what was stated on documentation, either

the complaint or that. So I'm being -- I'm, you know, erring on the side of caution.

Q. And you don't think it would make sense to ask Mohamed what her race was given that she had made a complaint of race discrimination?

A. In the -- well, in terms of asking, that's where -- in terms of the documentation, I would have looked at her employee personnel file, which would have had both EEO determination as well as would have information listed there. So it's something that I could have seen through -- through other -- and determined through other means, and I would have at the time.

Again, I -- that's something, again, I don't have in front of me. I'm being mindful of --

Q. And this was the only complaint of race discrimination you've ever investigated in your entire career?

A. That I -- to my -- to my recollection, yes.

Q. And you indicated that you had a series of conversations with Ms. Morris, with Ms. Barley?

A. Uh-huh.

Q. And that you had a facilitated discussion once with Ms. Barley and Ms. Mohamed, correct?

A. Correct.

Q. Did you ever meet with Ms. Mohamed or speak to her one on one about her complaints of discrimination?

A. I did prior to the facilitated discussion.
Q. Tell me about that discussion you had with Ms. Mohamed.
A. The conversation was, again, she had -- yeah, it was per her request and really wanted to discuss with me, you know, her -- her perspective of things prior to the facilitated conversation.
And so I had the conversation, the notes of which I -- I know are included, again, in the discovery documents that you have.
Q. Tell me, without us looking at the notes together, what you recall she said during that conversation.
A. Again -- again, this is without -- not -- without remembering the specifics, you know, the elements I do particularly recall, again, the elements of micromanagement that -- that she -- there had been something related -- again, this was the PMQ project she was on at the time where there had been some -- there had been a back-and-forth with Ms. Barley about attending and where she -- where she had felt that -- that Ms. Barley did not want her to -- -- to attend. I can't remember the specific language, but that was a piece.
And then also, if I recall, there was an element about concern -- about having the autonomy to work with the -- with the subject matter experts, you know, freely without having Carolyn engage with that, if I'm remembering.
I think those were three of the elements that I --

that I recall from the conversation.
Q. Is it your testimony that you investigated each of those three elements while you were investigating Ms. Mohamed's race discrimination complaints?
A. I -- those various elements, again, came through both with the conversations with -- with Ms. Barley, during the conversation -- in conversations with Ms. Mohamed, as well as with -- with others.
Q. I'm asking you if you investigated those three elements.
A. I -- I would say yes.
Q. What did you do to investigate those three elements?
A. As I mentioned before, I had conversations with multiple parties and ascertained their perspective on their -- on various elements.
Q. What's the source of your knowledge on conducting race discrimination investigations?
A. Again, as I had mentioned previously, my -- this was the first -- this was the first specific investigation that I had done. I had done the -- the training through the -- through the SHRM in-person seminar and had done other online trainings, but -- previously, you know, but -- so in terms of experience, there had been that -- that prior training. But this was the first case that I had actually been involved with.
Q. Do you believe you were qualified to handle this -- this

discrimination of -- Ms. Mohamed's race discrimination complaints?

A. I -- it was my role and it was my job. I believe I was qualified. You know, it would -- in my opinion, yes.

Q. And have you described all of your qualifications already?

A. In prior -- prior conversations, yes. I -- again, I've described my experience to you as well as the trainings that I've done.

Q. And you've described all your experience and trainings at least with respect to conducting investigations of employee complaints of race discrimination, correct?

A. Insofar as I can recall.

Q. Did you ever ask Ms. Mohamed to document her race discrimination complaints in writing?

A. I can -- I don't recall specific -- I believe I had taken -- I recall taking notes during both of our conversations, and -- but I don't recall if she sent anything subsequent. I feel -- I believe she may have, but I don't recall specifically. So . . .

Q. My question wasn't whether she sent you anything but whether you asked her to document her complaints in writing.

A. I don't recall.

Q. Other than the discussions with various individuals that you've described, did you do anything else to investigate Ms. Mohamed's complaints of discrimination?

A. I, again, had the multiple conversations, looked at information available to me, and then -- and then provided my findings and what I -- what I found, again, to Mr. Sullivan.
Q. And did you examine any other information besides the -- having conversations with folks?
A. You know, I -- I don't -- in terms of -- I, again, typically would look at any other material. I do recall looking at the personnel file, looking at performance reviews, looking at other employee-related information that was available, as well as the communication then, I think, items -- and then any items that would have been shared by any other parties.
But, again, I don't remember specific documents or documentation, but, typically, with any -- with any situation that would arise, I would look at the -- at the documentation and the employee's record, which -- that I had access to within the -- within the HR function.
Q. Did you ever document what steps you were taking during the investigation?
A. I -- in terms of -- in terms of documentation, again, I took notes at various points and then -- and then provided, you know -- provided my updates and findings to Sean Sullivan.
Q. Did you provide your updates and findings to Sean Sullivan in writing or verbally, or by some other means?
A. I primarily recall verbally. Again, I -- there were -- I

believe that there were -- that there would have been some small exchange back and forth. But, again, I don't recall. I can't say for certain some of -- what was what, but I believe it was a combination, but primarily verbally --
Q. Did you ever prepare --
A. -- to my recollection.
Q. Okay.
Did you ever prepare a written summary of your findings?
A. I -- again, I feel like I did provide -- provide something for Mr. Sullivan when he -- and, again, I'm vaguely -- my memory is a bit hazy here. But, again, outlining, I think, particularly sort of what had been -- had or had not been looked into. But -- and I believe it was in a Word document, but I -- but I don't recall, yeah, the specifics; again, you know, sort of outlining the allegations and then sort of what had or hadn't been looked into there. So it was a combination.
Q. Can you agree it would have been a best practice to document what you were actually doing as part of the investigation?
A. I would argue that I did document. I had notes from my conversations and then provided -- and you've got access to -- to those. So I would argue that to -- to your question, I did.

Q. Okay. Can you agree it would have been a best practice to ask Ms. Mohamed to reduce her employment discrimination complaints to writing so you could ensure that you were adequately investigating them?
A. Can I -- can I say that it would have -- that it was a -- that it would have been a best practice? I -- again, that I -- I don't recall that I did do that. And, you know, in a -- and if I -- and if I didn't, again, any error therein would have been my responsibility. But I don't -- I can't recall. I don't recall doing it, but, again -- again, three years removed.
Q. Before the lunch break, we talked about your investigation of Ms. Mohamed's complaints of race discrimination.
Do you recall that?
A. Yes.
Q. And did it come to your attention before Ms. Mohamed's termination that she had complained of retaliation as well?
A. Yes.
Q. Did you investigate Ms. Mohamed's complaints of retaliation?
A. The -- the claims were, again, within the context of the circumstances related, again, with Ms. -- with her relationship with the manager and were -- and were looked into as part of the -- the overall circumstances of events.
Q. Did you investigate her retaliation complaints or not?

A. Again, it depends. It -- the retaliation -- it depends on how you're defining retaliation. She -- as noted previously, she -- she hadn't talked about impacts related -- that related to various projects, and that was looked into.

I don't know how specifically you're defining it, so without -- without specific examples, I can't -- it would be hard for me to say specifically what you're -- what you're referring to.

Q. Do you know what the word "retaliation" means in this context?

A. Do I know what the word "retaliation" means? Yes, I do know what the word "retaliation" means.

Q. What does it mean?

A. It means -- and again, not to -- not to play Merriam-Webster, but to answer your question, it -- you really -- it basically means negative -- negative impact, adverse impact based on something -- to an issue raised or allegation raised.

Q. Okay. Now that you've defined retaliation, tell me if you investigated Ms. Mohamed's complaints of retaliation.

A. I looked in -- I looked to see if there was -- if there was any -- if there was any adverse impact related to -- to what she claimed related to Ms. Barley. And in my -- from everything I saw, I did not see any -- any cause, anything that pointed to retaliation.

Q. What did you look into as part of that investigation?

A. You know, as we talked about -- as talked about previously, again, looking into the areas of micromanagement in terms of being -- her role being impacted and being able to work within projects or not in projects. You know, really seeing if there was, you know, any impact raised as a result of -- of the -- of her raising concerns about Ms. Barley.
Q. I'm going to show you what's been previously marked as Deposition Exhibit 37.
A. Okay."
MR. SWAIN: And, Your Honor, this is also Exhibit 37. I request it be published.
THE COURT: It's in evidence, so it may be.
BY MR. SWAIN:
Q. "Please open it up, and -- when you get it in the chat function --
A. Uh-huh. Yep, I have it open.
Q. -- and I'll direct you to the second page of this document, the one that's marked SHRM 0133."
THE COURT: Hold on a second, Counsel. We're trying to get the stability on it . . .
(Pause in the proceedings.)
THE COURT: All right. We're good. You may proceed.
BY MR. SWAIN:
Q. "0133, that will be page 2 of this seven-page PDF.
A. Yep, I see it.

Q. Okay. And, actually, going to the bottom of page 1, you'll see that there's an email from Ruby Mohamed sent on Wednesday, August 19th, 2020.
A. Yes, I do see that.
Q. And the recipients of this email are Nick Schacht, Carolyn Barley, and Jeanne Morris, correct?
A. From -- from reading this, that appears to be the case.
Q. Do you have any reason to believe that these were not the actual recipients of the email?
A. Not that I'm aware of.
Q. And in the body of the email I will direct your attention to the second paragraph, the longest one. Okay? And I will read it.
I want you to follow along and tell me if I misread it. Okay? Agreed?
A. Agree.
Q. "As an employee who has been with the organization for almost five years and with a documented history of excellent performance, I am very troubled that I have just now started receiving criticism about my performance and vague complaints about the tone of my conversations with others.
"As you know, I made a complaint of race discrimination about my manager's treatment of me in early June. I have elaborated on my discrimination complaints and repeated them several times since, including in conversations

with you, Jeanne, and Carolyn (not to mention with HR and with SHRM's CEO and CHRO).

'Almost immediately after Jeanne and Carolyn learned that my discrimination claims had been reported to you and the rest of the division, I started being subjected to hostility, undeserved criticism, increased scrutiny, and other forms of retaliation.

'One of the things I complained about was differential treatment by Carolyn compared to my White peers. I have given lots of examples and am happy to provide them again.

'Now, just weeks after I made my discrimination complaints, SHRM is setting me up to fail by imposing an inflexible and unrealistic deadlines on me while denying me the support I need to successfully complete the project before the deadline. Meanwhile, White colleagues are given support, allowed to delegate tasks to others when necessary to complete deadlines, and are allowed to freely miss or extend similar deadlines.

'This retaliation against me and ongoing discrimination goes against SHRM's guiding principles and everything you have been communicating to us about challenge culture and open conversation. I have spent almost five years going above and beyond to help SHRM move forward, and I sincerely hope that I can continue to be a successful member

of our team without further retaliation.'
Did I read that correctly?
A. Yes, you did.
Q. Did you ever become aware of the specific complaint of retaliation between when Ms. Mohamed sent it and when she was fired less than two weeks later?
A. I am -- I don't recall seeing this particular email. You know, again, there was -- I was either included on or -- or did the range of communications, but I don't -- I don't recall specifically if this one was -- was one that I had seen. So I -- I can't say for certain.
Q. Can you agree that it's a direct and unambiguous complaint of discrimination and retaliation?
A. I would -- I would say -- I would say that from -- from Ruby's perspective that she is stating the -- that the circumstances -- that she raises retaliation in relation to the circumstances, as she states in this email.
Q. And my question was her complaint of discrimination and retaliation in this August 19th email is direct and unambiguous, correct?
A. I -- she -- she states it in this email.
Q. Is that a yes?
A. You -- you read it. I -- it depends on how you -- depends on how -- you say "direct and unambiguous." The words speak for themselves.

Q. What does the word 'direct' mean to you?
A. What does the word 'direct' mean to me?
Q. Yes. You're indicating that you're not -- you don't understand my question because the word "direct and unambiguous" may be confusing to you. So I'm --
A. I didn't -- I didn't indicate that.
Q. Can you just answer the question, then?
A. I did. You know -- and I said that -- and I'll reiterate again, the email, as -- as, you know, read and as I see here, there -- there is -- she does state within the circumstances that she -- she feels that there -- that there was -- that she was being set to fail based on the -- on the deadlines and that being -- and that there was, you know, differing treatment, again, as her -- her perspective in the email."
THE COURT: And, Mr. Swain, we'll probably take a short break within -- unless you think we're about done with this witness, within maybe about the next ten minutes, but you may have a better feel for --
MS. DeFAZIO: We're not very close to done, Your Honor.
THE COURT: We are or are not?
MR. SWAIN: We are not.
THE COURT: Okay. So I'd say anytime in the next ten minutes when you're ready for a short break, we'll take one, and then we'll keep going with this witness.

MR. SWAIN: Thank you, Your Honor.

BY MR. SWAIN:

Q. "Do you have any reason to believe that Ms. Mohamed was not making this complaint in good faith?

A. I can't speak to -- I can't speak to, again, her -- to her perspective. I will say that from the moment that -- that I -- that I learned of this, this was something that, again, as part of reviewing the totality of the situation, that -- that I did look into, into a range of areas with -- and with a range of individuals, as noted previously, and did not find any -- any -- you know, any evidence where that -- where, you know, Carolyn -- where the events that occurred were due to Ruby's race.

Q. And I can't recall, did you say you investigated her complaints that she was being retaliated against for her discrimination complaints?

A. I looked at -- as I noted before, looked into the totality of the circumstances related to this situation.

Q. So please tell me what you did specifically to look into the totality of the circumstances.

A. So this was -- when I talked with Ms. Barley, when I talked with Ms. Morris and as -- as well as others, I did ask about sort of how -- how projects were managed, if there was distinctions based on different members of the team.

And nothing that I came -- that in my conversations

looking -- in looking into the matter indicated that there were -- that there were -- that Carolyn Barley was -- was discriminating based on race.

Q. You know, when I asked you what you did to investigate, the gist of your responses: I talked to Jeanne Morris and Carolyn Barley and some other members of the team, and I looked into the matter. Okay?

I'm entitled to know specifically what you did to look into the matter. So tell me everything you did to investigate Ms. Mohamed's complaints of discrimination.

A. So, one, again, as I mentioned before, I had multiple conversations with different stakeholders, multiple conversations with Ms. Barley, with Ms. -- with Jeanne Morris, had two -- the two conversations with -- with Ruby Mohamed. Also had conversations with Ann Godmere and Carrie Mills. And then had looked at again -- and then, if I recall, I believe -- and, again, I'm recollecting you had gotten various documents about emailed communications that had gone back and forth over the course and had reviewed what had been shared with me by various parties.

Q. By which parties?

A. Again, as noted before, the parties involved the various stakeholders involved. In terms of what I specifically received, you had -- I don't recall, again, like, specific emails and examples, but you would -- that would be within

the -- the email correspondence that was saved. I don't remember specifics.
Q. And you didn't document in a summary of your investigation or anything like that specifically which documents you reviewed, did you?
A. I -- I had -- again, I shared my findings, primarily verbally, with -- with Sean Sullivan, but there was email communication that, as I recall, I believe also did include, in some cases, Microsoft Word documentation.
Q. Okay. I still haven't gotten an answer.
Did you or did you not investigate Ms. Mohamed's complaint of retaliation that she made separate from her complaints of discrimination?
A. As I've mentioned before and I will again reiterate, looked into -- look into various -- all the various matters of this that were raised. So, yes.
Q. What did you do to investigate her complaint of discrimination?
A. That's different than investigating her prior complaints of discrimination in terms -- in terms of -- again, this was looking at conversations and seeing what -- what -- the conversations with the stakeholders, looking to see if there were -- if there was any -- anything that pointed to retaliation.
And, again, based off my review and findings, I -- I

saw no instance that indicated retaliation.
Q. But you indicated earlier that your role in investigating Ms. Mohamed's complaints was primarily in June and July of 2020, didn't you?
A. Correct.
Q. Okay.
A. And, you know, in this -- this is where -- but that -- and, again, there were concerns being raised even in -- even in July, if I recall, even, you know, leading up about -- again, impacts on programs and deadlines. So this email that you point to was in August, but, again -- then, again, I wasn't included -- while my primary investigation and work was done in June and July, I was still included on emails after that with this.
Q. What did you do after -- on or after August 19th to investigate Ms. Mohamed's complaint of retaliation?
A. In terms of -- well, again, as I mentioned before with this email, I -- I don't recall if I had seen this particular email. Again, as I noted before, I was on -- was out of the office with my medical procedure on the 24th. So this -- this email would have been 19 -- probably the Wednesday. I would have to look at the calendar.
And so, you know, I -- so my time would have been -- would have been very narrow if I -- prior to that. Again, I don't know if I had seen this particular email, so I can't

really answer that.
Q. Are you willing to take responsibility for the integrity of SHRM's investigation into Ms. Mohamed's complaints of discrimination and retaliation?
A. I can only speak to the -- to the elements that I -- that I was involved with. You're asking for the overall -- there were many different players, not just me involved with -- with the circumstances here. I -- I can only speak for -- for my role and my -- the elements that I was involved with.
Q. You were the manager of employee experience, correct?
A. Yes.
Q. Second-in-command to the chief human resources officer?
A. I -- depends on -- again, I would object to -- you know, second-in-command technically, you know, depends on how you define the organizational structure.
Q. So when it comes to investigating complaints of discrimination, that was one of your duties secondary to Sean Sullivan, the chief human resources officer, correct?
A. Correct.
Q. Are you or are you not willing to take responsibility for the integrity of the investigation into Ms. Mohamed's race discrimination and retaliation complaints?
A. I can only -- I can only take responsibility for, you know, again, the elements that -- that I was directly involved with. Again, that -- so that's -- that's how I would respond.

Q. You have not been able to explain cogently which elements you were involved with, so that's what I'm trying to understand.

A. Again, we've been -- we've been over this multiple, multiple times. Happy to -- happy to address again.

Again, you know --

Q. Please.

A. -- when the circumstances -- when I learned of the matter in late June, again, I talked with -- with Carolyn Barley, with Jeanne Morris, also had the two conversations with Ms. Mohamed, and then also, you know, had conversations with Ann Godmere and Carrie Mills in the mid-to-late-July range. I can't remember specific dates there.

I -- I reviewed the information available and talked to various parties and, again, provided my -- my findings to Sean Sullivan, CHRO, who then also had conversations with Ruby Mohamed, as well as Carolyn Barley, as well as other parties involved."

MR. SWAIN: Your Honor, maybe now is the good time for the break.

THE COURT: Okay. Folks, we'll take a ten-minute break until 11:00 a.m. Please rise for the jury.

(The jury exited the courtroom at 10:50 a.m.)

THE COURT: Please be seated if you wish.

We'll be in recess for about ten minutes. Thanks.

MS. DARROW: Your Honor, before we take our recess, I have grave concerns about time.

THE COURT: Okay. Yeah. So we're --

MS. DARROW: Defense hasn't even put their case on yet. That gives me an afternoon, which is not fair.

THE COURT: Sure. And how much time do you think you're going to need, realistically?

MS. DARROW: The entire afternoon, if we can get done with this and I can get my witnesses here in the afternoon.

THE COURT: Okay. How much time do you think you have left, Mr. Swain?

MR. SWAIN: You know, I can eliminate some of the -- the designations so we can finish up with Mr. Jackson if -- I just need a few minutes during the break.

THE COURT: Okay. Can you be done by lunch?

MR. SWAIN: With Mr. Jackson?

THE COURT: With --

MR. SWAIN: With everything?

THE COURT: Yes.

MR. SWAIN: Let me -- I have a big stack of paper here, and I would really like a chance to look through the designations to see if we can speed this along.

THE COURT: Okay. Don, can you -- while we're on break -- I know you need a break too, but can you run a time clock and see where we're at and we'll address it here at

11:00 o'clock.

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: If we're done and we take a lunch from noon to 1:00, does that give you enough time then?

MS. DARROW: I sure hope so, Your Honor.

THE COURT: All right. Well, everybody put their heads together.

We'll be back in ten minutes.

(A recess was taken from 10:52 a.m. to 11:05 a.m.)

(Discussion off the record.)

THE COURT: If you all would like a minute to chat about this, I can certainly step off.

MS. DARROW: I need about five minutes, Your Honor.

THE COURT: The reality is -- and let me just give some initial comments that might add some context to this.

Setting aside the reading of the depositions, because I think that's a different animal, every -- all the other time is easy to calculate because if one of you is at the podium, it doesn't matter if you're doing direct or cross; it's time that you're using. The deposition is a bit different because you're reading -- at least the way I understand it, the reading has been of both the designations and the counterdesignations.

MS. DARROW: Right.

THE COURT: What I have not been doing, and I don't

think it's my job to, is determine what portion of the reading applies to what. That's something that you all need to, essentially, self-police between yourselves how much of that time has gone.

But under any reasonable calculations, the Plaintiff is essentially out of time. Now, the Defense may not need all of the time that basically remains, which is much of the afternoon. Obviously, if we could use some of the afternoon to work on jury instructions, we will. If not, we'll have to go a little bit late, although I think those are in good form, although everybody needs an opportunity to make their record and try and convince me of what they think. And we'll give you some copies of those as we get into lunch.

So with that, why don't you all talk for a few minutes.

MR. SWAIN: Your Honor, may I respond?

THE COURT: Well, I don't know that -- why don't you talk first --

MR. SWAIN: I just would like to inform the Court that Ms. Darrow and I had an agreement earlier in the case that the time spent doing the depositions would be allocated 50/50 between the parties.

THE COURT: And that's -- if that's how you all want to agree, that's fine. Even 50/50, I think -- you know, Don can run the clock, but even the 50/50, which I think is how he

was actually splitting it, the Plaintiff is essentially out of time.

MR. SWAIN: Okay.

THE COURT: But that doesn't mean -- we're not going to leave time on the table if there's -- if there's some more to use. It's not -- the time isn't a sword and a shield; it's a guide.

So you all can talk. Let me know where you think we're at, and I'll come back out in a couple of minutes when you're ready. Obviously, we're still using time for this discussion, but I think it's well used. So let me know and I'll come back out.

MR. SWAIN: Thank you, Your Honor.

(A recess was taken from 11:07 a.m. to 11:19 a.m.)

THE COURT: Okay. Back on the record.

Where are we at?

MR. SWAIN: Your Honor, we managed to cut practically everything.

THE COURT: Okay.

MR. SWAIN: And after we're finished with this reading, we're going to rest. We're not going to read Sean Sullivan, just for the sake of time.

THE COURT: And in terms of timing, how much more do you think we've got?

MR. SWAIN: Maybe five minutes.

THE COURT: Oh, great. So I will plan on -- we'll do that. I will -- you can rest. I don't know if there's going to be any mid-trial motions or not.

Okay. We'll address mid-trial motions. And then -- actually, I'll read the stipulations before mid-trial motions, because those are stipulated, so those have to go into my Rule 50 considerations. And then we'll release the jury for lunch.

Will you be able to then have witnesses here starting at 1:00, or do you even think before? We can probably do 15 minutes -- quarter of 1:00, if you want.

MS. DARROW: We can have them here.

THE COURT: Okay. Let's bring them in.

Anything from your perspective, Ms. Darrow?

MS. DARROW: You're fine, Your Honor. Thank you so much.

THE COURT: Don't want to not ask.

MS. DARROW: I appreciate it.

(The jury entered the courtroom at 11:20 a.m.)

THE COURT: Please be seated. Thank you. Welcome back.

Mr. Swain, you may continue.

BY MR. SWAIN:

Q. "By the way, do you know if it's true that Ms. Mohamed was canceling her meetings with Carolyn Barley right before they were scheduled to happen?

A. That was my understanding, again, that there were canceled meetings. I don't -- I -- in terms of specifics that were shared or not shared, I -- I don't, you know, recall. But that is my recollection from -- from conversations from the time.
Q. Conversations with who?
A. With Carolyn Barley, and I believe that it was also brought up in the context with Jeanne Morris.
Q. I'm going to share what's been marked as Deposition Exhibit 63.
A. Okay. One moment.
Let's see here. What was the number again? I'm sorry. 63?
Q. Yes.
A. Okay. Yep.
Q. And I'll direct your attention to the second page of Deposition Exhibit 63, the one that's Bates Number SHRM 1419.
A. Uh-huh. Yep.
Q. And at the top of that page is the very same email we were just looking at, Ms. Mohamed's August 19th, 2020, complaint of retaliation, correct?
A. Correct.
Q. On August 21st, 2020, Sean Sullivan forwarded the August 19th, 2020 retaliation complaint email to you and Bernée Long, correct?

A. Uh-huh."

MR. SWAIN: Your Honor, at this time I move to admit Exhibit 40 into evidence, which corresponds to Deposition Exhibit 63.

MS. DARROW: No objection.

THE COURT: 40 is admitted.

MS. DARROW: I'm not sure that's the right number.

THE COURT: Well, let's check it before we publish it. I haven't seen it, so -- I can't see a number on the screen that I'm looking at. I can see the -- if Plaintiff's counsel could scroll down or scroll in the exhibit -- 40 is what is being displayed on the Court's exhibit screen.

MR. SWAIN: And this corresponds identically to Deposition Exhibit 63, the same one that was just read in the testimony, Your Honor.

MS. DARROW: No objection.

THE COURT: Okay. 40 is admitted.

(Plaintiff's Exhibit 40 received.)

MR. SWAIN: Your Honor, at this time the deposition reading will conclude.

THE COURT: Okay.

MR. SWAIN: Oh, yes, Your Honor. I'm sorry.

THE COURT: Okay. You may step down. Thank you very much.

Does Plaintiff wish to present any further evidence?

MR. SWAIN: At this time, Plaintiff rests our case, Your Honor.

THE COURT: All right. Thank you very much.

Ladies and gentlemen, let me read to you, now that the Plaintiff has rested, some stipulated facts.

The parties have stipulated to certain facts. I'll tell you, you will receive these stipulations in written form in the jury instructions that I give to you later, but I need to read them now.

This agreement makes the presentation of any evidence to prove these facts unnecessary. The agreement means that you must accept these facts as true.

In this case, the parties have stipulated to the following facts:

SHRM hired Ms. Mohamed as an e-Learning specialist on April 18th, 2016.

Ms. Mohamed was born in Egypt.

SHRM is a human resources membership association providing education, certification, and networking opportunities to its members.

In July 2018, Ms. Mohamed's position changed from e-Learning specialist to Instructional Designer.

On January 29th, 2020, SHRM notified Ms. Mohamed that she received a promotion to Senior Instructional Designer. The promotion was effective February 10th, 2020, and included

a salary increase.

When Ms. Mohamed was first promoted, she reported initially to Jeanne Morris, Vice President of Education. By May 2020, Ms. Mohamed began reporting to Carolyn Barley, Manager, Instructional Design. Ms. Barley oversaw Ms. Mohamed, as well as three other Senior Instructional Designers: Ann Godmere, who is White; Carrie Mills, who is White; and Ebony Thompson, who is Black.

On September the 1st, 2020, SHRM notified Ms. Mohamed that it was terminating her employment the next day.

That concludes my reading of stipulated facts.

And with that, ladies and gentlemen, it will be time for lunch. We're at essentially what would be considered halftime of the case. That raises circumstances where there are legal issues I have to deal with outside of your hearing. We will start back with the Defense case at 12:45.

So we'll take about an hour-and-15-minute lunch, and thank you very much for this morning.

Please remember those instructions I previously gave to you.

And please rise for the jury.

(The jury exited the courtroom at 11:27 a.m.)

THE COURT: Please be seated.

Please give me a moment to take a look at the computer.

(Pause in the proceedings.)

THE COURT: All right. In terms of motions -- I don't even know if the Plaintiff has seen it -- I did just briefly review what was filed in the last moments at Document 146, which is the Defendant's Motion for Judgment as a matter of Law under Rule 50.

I'm guessing that the Plaintiff probably isn't prepared at this juncture to be in a position to respond orally, although if you think you are, just let me know and we can do that.

What you may wish to do is respond orally or in writing at the conclusion of the Defense case. I do intend to defer ruling on the motion for a directed verdict until both sides have rested, citing to a number of cases, which includes *Romero versus Helmerich*, H-E-L-M-E-R-I-C-H, *and Payne* at 2017 Westlaw 3608194, star 1; *Hillman versus U.S. Postal Services* at 169 F.Supp. 2d 1218; and *Therrell versus Georgia Marble*, 960 F.2d 1555, which is a circumstance where -- the quotation therein is, "Where there is any doubt at all as to the propriety of a directed verdict, district courts should not jump the gun, but should wait until both sides have presented their evidence before ruling on motions for a directed verdict."

And you can certainly tell me at the conclusion of our lunch break if the Plaintiff wants to address this orally

at the conclusion of evidence or just wishes to, over the next couple of hours, draft and file a written response. Or you might know now.

MR. SWAIN: Your Honor, I can represent to you that we will respond orally.

THE COURT: Okay.

MR. SWAIN: And so we're happy to do that at the conclusion of Defendant's case-in-chief.

THE COURT: Okay. Anything else, then, from the Plaintiff that you think we need to address right now? And then I'll turn to Ms. Darrow.

MR. SWAIN: No, Your Honor.

THE COURT: Ms. Darrow?

MS. DARROW: Nothing further from the Defense, Your Honor.

THE COURT: Okay. All right. Then what we'll plan on is in about an hour and ten minutes, quarter of, starting the Defense case, and then at the conclusion of the Defense case, once we've released the jury, we can take up the motion under Rule 50 and then, if appropriate, proceed to jury instructions after that this afternoon/evening and keep on the same schedule that we're on.

Okay. Thanks, everybody. We'll be in recess.

(A recess was taken from 11:33 a.m. to 12:48 p.m.)

THE COURT: Welcome back.

Mr. Swain, I understand you want to respond to the Rule 50 motion before we start addressing Defense witnesses?

MR. SWAIN: That's correct, Your Honor. I'd like to get it out of the way.

THE COURT: Sure. Go ahead.

MR. SWAIN: Your Honor, the Court should deny SHRM's motion in its entirety. As SHRM acknowledges in its motion, the Court must construe all the -- of the evidence in favor of Ms. Mohamed. The Court must also construe all inferences that can be rationally drawn from the evidence in favor of her.

That means considering all direct and circumstantial evidence and looking at it from the standpoint of the Plaintiff as if the jury accepts all of that evidence as true and draws all those inferences in her favor.

Also acknowledged by SHRM is that the adjudication of summary judgment motions employs the same standard. This Court dismissed SHRM's summary judgment motion in its entirety on a much less developed factual record. The Court should do the same here.

SHRM claims on the first page of its motion that the -- quote, "The record contains no evidence that could support a verdict for Ms. Mohamed." This is patently untrue. On this factual record a rational jury could easily find in favor of Ms. Mohamed on both of her claims.

Now, as an initial matter, SHRM repeatedly misstates

the causation standard under Section 1981. And I anticipate that this is something we'll talk about this afternoon when we're talking about jury instructions.

So in *Comcast Corporation versus The National Association of African-American-Owned Media* -- that's 589 U.S. 327, 2020, at page 333 -- the Supreme Court explained that, "A Section 1981 Plaintiff must prove that race was a but for cause of the injury." Throughout its motion, SHRM repeatedly articulates the standard as requiring "the" but for cause, implying, falsely, that Ms. Mohamed must demonstrate sole causation.

This is a drastic misstatement of the standard. And Your Honor has acknowledged in its September 2024 opinion that, quote, "In Section 1981 cases, a Plaintiff bears the burden of showing that race was a but for cause of its injury." And the citation to this case from this Court is *Amarsingh versus Frontier Airlines, Inc.*, No. 23-CV-01875-GPG-KAS. And I can provide a LEXIS citation, too, if the Court prefers that.

THE COURT: That's not necessary. Thank you.

MR. SWAIN: The date of that opinion is September 24, 2024, District of Colorado.

Moving on section by section, SHRM argues that Ms. Mohamed has submitted no direct or indirect evidence of discrimination. This is also patently untrue, and I'll return

to that in just a moment.

SHRM argues that Carrie Mills is not a valid comparator given, quote, "Her formal" -- I'm not quoting -- her formal training as an Instructional Designer and her years of experience. It's not clear exactly what Defendant refers to when it says "formal training as an Instructional Designer" because there are no citations to the factual record at all in the motion.

But Ms. Mohamed already had two years of experience as an Instructional Designer at SHRM before her promotion to Senior Instructional Designer. And there is no question that Ms. Mills is a comparator of Ms. Mohamed. In *Kendrick versus Penske Transportation Services* -- that is 220 F.3d 1220, (10th Cir. 2000) -- the Tenth Circuit said, "A Plaintiff may also show pretext on a theory of disparate treatment by providing evidence that she was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness.

"An employee is similarly situated to the Plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline."

That quotation was from page 1232 of the opinion.

So here we have Ms. Mills, a person who has an identical job title, identical job description, the same

manager all the way up the line, and who is subject to the same standards governing performance evaluation and discipline. And we've easily met the violated work rules of comparable seriousness.

As SHRM has said, Ms. Mohamed was terminated for missing a deadline of August 31st. Well, Ms. Mills testified that she missed an August 31st deadline on purpose. Not only -- she didn't submit anything by the deadline, nothing at all, unlike Ms. Mohamed, that not only did she receive no discipline whatsoever for missing the deadline, let alone be fired unceremoniously, but missing the deadline wasn't even noted in her next performance review.

The factual record simply does not support SHRM's claim that it treated Ms. Mohamed more favorably than other Senior Instructional Designers. SHRM claims that Ms. Mohamed was assigned fewer projects, but, in Carolyn Barley's examination and in Exhibits 17 and 37, it became clear that Ms. Mohamed actually had more work projects than her peers. She had the most of any Senior Instructional Designer.

By the way, SHRM points to no evidence in the factual record to support this assertion at all.

And going to the point that SHRM was more -- more lenient with Mohamed with respect to deadline extensions, there's just no evidence of that whatsoever, either. In fact, Carrie Mills testified that she didn't even need to request

deadline extensions because she routinely missed deadlines without asking for an extension. Again, no discipline whatsoever.

And the record is also replete with other evidence of differential treatment that could support a jury finding that race was a but for cause of her termination.

Ms. Mohamed testified at length about the different forms of differential treatment between herself and her White peers, as did Ms. Mills as I talked about a moment ago with respect to the deadline, and many other items. In fact, Ms. Mills' testimony corroborated Ms. Mohamed's testimony about all the other ways that Carolyn Barley subjected her to differential treatment compared to her White peers.

SHRM repeatedly claims that Ms. Mills' testimony was speculative, but it wasn't in the least. Ms. Mills testified based on personal knowledge, for instance, her observations in team meetings, email communications to which she was a party, and statements made directly to her by Barley and others -- Ms. Barley -- I'm sorry -- about Ms. Mohamed.

And, Your Honor, I'm, frankly, baffled by the argument that Ms. Mohamed has failed to introduce sufficient evidence that she engaged in protected activity. I've -- I've never used this word in my career before, but it borders on frivolous. To my recollection, every single witness called in Ms. Mohamed's case-in-chief acknowledged that Ms. Mohamed made

complaints of race discrimination, that she invoked the word "race discrimination."

But if the Court prefers not to review all of that witness testimony from Ms. Mohamed's case-in-chief, Your Honor only needs to look at Exhibit 29 in which Mohamed makes a direct and unambiguous complaint of discrimination and retaliation. In that email, she uses the word "discrimination" five times, and she uses the word "retaliation" three times.

Finally, there's voluminous evidence of pretext from which a jury could conclude that Ms. Mohamed's termination was -- was because of retaliation and discrimination. SHRM's witnesses generally agree, not completely but generally, that Ms. Mohamed was fired for the sole reason that she missed her August 31st deadlines. But we have evidence that the termination was set in motion long before there was deadlines.

Mr. Jackson testified by deposition today that he started preparing her termination paperwork the very same day that he learned of her retaliation complaint that I just referenced, Exhibit 29. That was August 21st, very same day. And that was ten days before the deadlines were even coming.

We have Ms. Maldonado's testimony that she learned Ms. Mohamed would be fired a few days before the actual date of the termination -- September 1st -- from Mr. Jackson and Mr. Sullivan. A reasonable jury could easily conclude that

these deadlines were nothing more than a pretext for race discrimination and retaliation.

In conclusion, there's more than ample evidence from which a jury could find for Ms. Mohamed on both of her claims. Thank you.

THE COURT: All right. Thank you very much.

Ms. Darrow, would you like to briefly reply?

MS. DARROW: My colleague, Ms. Woodfork, will address this.

THE COURT: Good afternoon, Ms. Woodfork.

MS. WOODFORK: Good afternoon.

While we appreciate Mr. Swain's argument that our -- our motion lacks evidence, we stand by it and believe that Ms. Mohamed has failed to present legally sufficient evidence for which any reasonable jury could find in her favor on her race or her retaliation claim.

Going back through our motion and just highlighting some of the points we believe support our argument, again, it's -- her race must be the but for factor, and here we presented, in her own case alone, sufficient evidence to show that she was terminated because she failed to submit projects that she had twice the amount of time to complete in a timely manner. She admits that the projects she did complete or she did submit were incomplete. In fact, one of them had not been, honestly, modified or worked on in months. She relied

on one subject matter expert for that project, despite her expectations needing to look for other SMEs, or SMEs or other resources at SHRM and outside of SHRM to find that information. She was coached along the way.

And in terms of her complaints about micromanagement and Ms. Barley treating her differently or having more oversight over her work, the evidence has shown that her alleged comparators had significantly more experience than her.

Ann Godmere had more than 20 years of experience. She recently retired from being an Instructional Designer. Carrie Mills had held the position before, had four to five years of experience as a senior designer. Yet Ms. Mohamed wants to be treated the same as these two comparators.

And that's not about race, Your Honor. That's about experience. That's what the evidence showed us, that she was treated based on her experience.

She asked for the check-ins, repeatedly asking her to be kept on track after turning her -- in her design project late, again pointing to her performance and not her race as the issue for increased check-ins, more micromanagement, more involvement from Ms. Barley.

In terms of Ms. Mills, we heard that, while, yes, she had observations of what she believed to be microaggressions based on her understanding of discrimination or race, that's

just her opinion and that's just based on what she observed to be unfair or what she observed to be different, and she had no knowledge of Ms. Mohamed's experience herself, and she admitted that.

So while she may say that was based on race, the evidence shows us that, again, it's based on experience.

And then in terms of Mr. Jackson where we want to talk about the timing of the retaliation complaint, the record has shown us that he was going out on a medical leave. He did what a diligent employee would do, preparing paperwork ahead of that leave and making sure that his teammates were covered and they could do their job.

On one hand counsel's arguing that Mr. Jackson compared or didn't do what he was supposed to do, but on the other hand, the evidence shows he was acting for every possible reason and trying to do what was right to support his team.

Given all of this evidence, all of the facts that we've heard today -- and we're still going to hear more testimony from the Defense about Ms. Mohamed's repeated ongoing performance issues in terms of managing her work, taking responsibility for her work -- we stand by our motion that but for her performance, she would have held her job.

You'll hear from Ms. Long, too, about the mediation that she helped facilitate, which that was the goal as well.

And the standard is clear that it's but for her race, she would have been terminated, and here we've presented sufficient evidence that but for her performance issues, she would have retained her employment.

THE COURT: All right. Thank you very much.

As indicated, I will take and do take the motion under advisement. I intend to issue an oral order on it later this afternoon.

With that taken care of, are we ready for witnesses?

MS. DARROW: Yes, Your Honor.

THE COURT: Okay. Let's bring the jury in.

(The jury entered the courtroom at 1:04 p.m.)

THE COURT: Welcome back, everybody. Please be seated.

Would the Defense like to present witnesses?

MS. DARROW: Yes, Your Honor. The Defense would like to call Johnny C. Taylor Jr.

THE COURT: Okay.

Good afternoon, sir. I'll have you stop there and raise your right hand.

(Witness sworn.)

THE COURT: Please be seated, sir. Once you've done that, if you don't mind, sir -- well, grab some water.

THE WITNESS: This mile high stuff is real.

THE COURT: I've got mine right here.

If you don't mind telling us your first and last name, please, and spelling each.

THE WITNESS: Johnny, J-O-H-N-N-Y, Taylor, T-A-Y-L-O-R.

THE COURT: Thank you.

Your witness, Counsel.

**JOHNNY TAYLOR, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

BY MS. DARROW:

Q. Good afternoon, Mr. Taylor.

A. Good afternoon, Ms. Darrow.

Q. What is your current job title?

A. President and CEO, chief executive officer, of SHRM.

Q. Of SHRM?

A. Yes.

Q. And how long have you held that title?

A. December 17th will be eight years, so just shy of eight years this month.

Q. And prior to becoming the president and CEO of SHRM, where did you work?

A. I'm old. This is going all the way back. I began my career as a lawyer and had a law firm in Florida. And then I went in-house for Blockbuster where I -- yes, that was once a thing -- Blockbuster Entertainment, and I was the chief labor and employment lawyer for Blockbuster Entertainment, became the VP of HR --

Q. Can I ask you to slow down just a little bit because madam court reporter wants to accurately record you.
A. Apologies. So Blockbuster Entertainment Group where I was the chief labor and employment lawyer and then promoted to Vice President of Human Resources for the Americas.
I then left there and went to Alamo Rent-A-Car where I was the general counsel, the chief lawyer, for the company.
Then I came back to Paramount Pictures -- Paramount and Blockbuster were parent -- sister companies -- where I was the general counsel, again, chief lawyer, and head of human resources jointly.
I left there and went to Compass Group, which is the world's largest food services company, where I was general counsel. We had 408,000 employees across the globe.
Then I came back and was a partner of a law firm. Feels like I can't keep a job, but I was a partner at a major law firm and ultimately became the head of human resources for a company called IAC, Interactive Court. IAC, you wouldn't know, but we owned Home Shopping Networks, Ticket Master, Lending Tree, et cetera. So it was the parent company for this New York-based company and I was head of HR for --
(Reporter requested clarification.)
A. So IAC for Interactive Court based in New York City. And our major divisional companies were Home Shopping Network, Ticketmaster, Lending Tree, and Match.com.

Then I left there and I retired. I retired, and then was called back by a couple of friends to run what's called the Thurgood Marshall College Fund, which is the college fund that supports America's historically Black colleges and universities.

And I did that for seven and a half years, and then I came to SHRM in December of 2017 as president and CEO.

Q. Thank you.

What is SHRM's open-door policy?

A. So I don't know they call it SHRM's. It's mine as the CEO, but, therefore, I brought it in 2018. And that means any person, from the janitor, entry level, up to the executives can come and have conversations with the CEO. So it's just an open door. Whatever you want to talk about, if I'm not traveling, and even if I am traveling, we make time virtually to speak with the CEO to give us a sense of -- give me a sense of how the organization is doing culturally.

Q. And do SHRM employees utilize that open-door policy with you?

A. Yes, they do. I probably have three to five per month employees who will take advantage of it. And often, if I'm in the office, not traveling, they will come in and sit in the office with me. They will have lunch. I always have lunch because I have to have lunch, and it's a way for me to kill two birds with one stone, have lunch and then get to know

employees. So probably three to five on an average month.
Q. And is that how you came to know Ms. Mohamed?
A. Yes. It wasn't an in-person meeting, no, but, yes.
Q. And when did you first become aware of Ms. Mohamed having -- or reaching out to -- with respect to your open-door policy?
A. So I don't know -- it was June or July of 2020. I don't remember exactly. What makes me remember is I was picking up my daughter from school. I'm a single dad. She -- we were post-COVID, so no one was taking care of children so I had to pick her up by 5:00. And so we had scheduled some time for an employee, Ms. Mohamed, who I didn't ever remember meeting. I still don't know that I've met her. But I agreed to take a call from her while I was sitting in the parking lot waiting to pick up my daughter from taekwondo.
Q. And did you have that conversation with Ms. Mohamed?
A. Yes.
Q. And do you have a recollection of that -- that call?
A. Oh, I remember it really well because, again, we were in the throes of COVID and George Floyd's murder and just a lot going on.

So sitting in the parking lot waiting for my daughter, I took the call that was scheduled. And I was surprised because immediately she said, "I feel like I've been discriminated against." And that caught my attention,

obviously. So I pulled -- I was sitting in the car line waiting for my daughter. I pulled over into a parking space, because this required my full attention.

Q. And what did Ms. Mohamed tell you during that phone call?

A. So again, at the outset, there was not much of an exchange of pleasantries. I was surprised because typically my open doors -- I'm not the company's HR department; I'm not the legal department, so typically it's, like, This is where I want to go with my career -- all sorts of things. I had one guy come in and play chess with me over lunch, one of our employees -- okay. He taught me because I don't know how to play it.

In any event, she said almost literally from the beginning, "I feel like I've been discriminated against at work."

And, again, because of that, I pulled over, pulled into a proper parking space, and I said, "Tell me more."

Q. And what else did she tell you?

A. Well, she said that she felt that in -- and, again, because I -- she was a remote employee, so I didn't really know much about what she did, so I opened with, Tell me more.

And she said, "I'm being held to unreasonable deadlines for my work, and they're treating me differently than other employees."

I proceeded with, once again, "Tell me more," because

I needed context.

And she said, "I had some deadlines to meet."

And I asked her, I said, "Well, did you meet them?" And she said, "No, but some other people may not have met their deadlines."

And so I said, "Listen. This is not what I do. Like, I hear you. I want to hear you out. I'm glad you voiced your concerns, but I need to get this to our head of HR, to your department head, to others to look into. But I'm really appreciative of you calling and sharing this with me."

Q. How did it make you feel that these type of concerns were being expressed to you?

A. Well, in context, this was right after George Floyd's murder. It was on the heels of COVID. And everyone was feeling -- it was already kind of overstressed. I have a little daughter and a son, both of whom are African-American, and it just -- even the notion of this sent me to, like, I need to pay attention to this. Aside from the fact that I had not been confronted like that from an employee before, it surprised me and it also concerned me, because no one should be subjected to that, if it were true.

Q. Did -- anything else was said during that call that you recall?

A. I told her that I took this very seriously, that the company would take it very seriously, and that as soon as I

hung up from her, which I did, I would call the head of HR -- our CHRO is what we call him, his name is Sean Sullivan -- which I did, and, I will ensure you -- I said, "I can assure you we will look into this, and you will be taken care of if you've been wronged."

Q. Anything else that you recall being said during that phone call?

A. I mean, it was five years ago. So I don't remember everything, but that's not -- it wasn't a long conversation. It was -- 10, 15 minutes, because my daughter was standing there waiting. I can see her standing on the side and -- but that's it. I didn't go into much detail because I just didn't know enough.

As you heard from my background, I'm a lawyer. I'm listening to all of this, and it didn't make -- I'm a labor and employment lawyer, so I don't know what I was supposed to say but "Let me hear you and let me get it to some people."

So I'm very careful not to play lawyer. We have a law department. So -- and then we have an HR department. I've been both before. So I'm very careful to stay in my CEO lane, which, again, the point of the call was to use our open-door policy, and that is to speak directly to the CEO.

Q. During that call, did Ms. Mohamed request any type of leave?

A. I don't recall that.

Q. Did she request any type of transfer from her manager?
A. I don't recall that.
Q. During that call, did you tell Ms. Mohamed that, "We have a discrimination problem"?
A. No.
Q. How --
A. No for two reasons. One, we didn't have a discrimination problem. I'm very, very proud of the diversity that is SHRM. In fact, it's one of the things that people point to is the diversity that makes up and constitutes our workforce. And we have Black women, Black men. We have Hispanics. We have Asians. We have White men and White women. We are a diverse organization with a lot of intentionality.
So I knew that -- I wouldn't have said it because it's not true. But, secondly, and perhaps more importantly, I'm a trained 35-year-plus lawyer. I'm the head of HR for big companies. I just -- there would be no reason for me to say that.
Q. Did you say, We have a managerial problem at SHRM?
A. I don't remember that part of the conversation at all, but I will say this: It is not unusual for me as the CEO of SHRM to say the country, indeed, probably the world, has a people manager problem, which means we have people in management responsibilities who are oftentimes put in those roles before they've been fully trained. And that happens in every company

in America.

So -- but I can't imagine, and that's -- I'm not going to say no, but I can tell you with 99 percent accuracy I would have no reason to say that.

Q. Did you say, "We have a diversity problem at SHRM"?

A. Absolutely not. Because we don't.

Q. How are you so certain?

A. Well, we are -- not to rattle off facts, but one in four, roughly 25 percent, of my employees are Black. And that's at the executive level all the way throughout the organization. We have a -- my executive team of 12, I have an Indian woman; we have two Hispanics. My CFO was Black. My chief of staff, head of government affairs is Black. I'm Black. Like, I just -- no. The data, it just doesn't reflect that. Period.

Q. Was there anything Ms. Mohamed asked you to do during that call that you did not do?

A. No. No. I -- as I said, at the end of the call I don't know that she asked me to do anything. The call ended with me understanding, given the environment that we were in -- George Floyd -- plus a single dad of a Black daughter, I was, like, we've got to -- I need to look into this. I have a heightened level of sensitivity around it.

So I immediately spoke with Sean Sullivan, the CHRO.

Q. When you said you immediately spoke to Sean Sullivan, the CHRO, that's the chief human resources officer?

A. Yes, ma'am. The chief --
Q. I'm sorry.
A. I interrupted you. I'm sorry.
Q. Was that immediately after the call?
A. Immediately after the call, I -- this was a big deal for me, so I called Sean in that parking lot, and I shared with him -- I said, "This is what I've heard. I need you to look into this, and I need you to look into this -- look into this seriously."

And not that we wouldn't have, because that's what he said -- I remembered him joking, "We look into all of these things seriously."

I said, "I understand that, but given the environment and given who I am, I have a sensitivity around this." And I said, "To that point, we have" -- there's a gentleman by the name of Michael Jackson who was at the time -- he's no longer with us -- employed with us. Michael was responsible for employee relations.

We had another woman on our executive team, an African-American, lawyer, former administrative law judge in Iowa from the -- as a personnel lawyer and judge, and it's Bernée Long, who happened to be the dean of admissions of my law school, so I've known her for a long time. She happened to be on my staff.

I said, "I'd love for Bernée to be involved in

whatever you're going to do. You're the CHRO. You're the chief human resources officer. I can't tell you what to do, but you have someone on your team who is especially trained in this area."
Q. Aside from that instruction communicated to Mr. Sullivan, did you do anything else with respect to Ms. Mohamed?
A. No.
Q. Were you involved in the decision to terminate her employment?
A. No.
MS. DARROW: No further questions.
THE COURT: All right. Cross-examination.

**CROSS-EXAMINATION**

**BY MR. SWAIN**:
Q. Good afternoon, Mr. Taylor.
A. Good afternoon.
Q. Thank you for flying in to be with us.
Mr. Taylor, do you agree that SHRM is a trusted leader in setting organizational standards?
MS. DARROW: Objection. Outside the scope.
THE COURT: I think it's reasonably within the scope. I'll allow it.
Objection is overruled.
A. What organizational standards?
//

BY MR. SWAIN:
Q. Human resources organizational standards.
A. Are we the -- I'm not being difficult. Can you repeat the question again? I want to make sure I answer it properly.
Q. Would you agree that SHRM is a trusted leader in setting human resources organizational standards?
A. So we don't have HR standards, so, no. Every organization has its own unique culture. We are fully required to ensure that our members are compliant with the law. So if that's the standards you're speaking with -- with regard to employment legal standards, yes, we should be the trusted source of that.
Q. Well, part of SHRM's work includes advising HR professionals about best practices, correct?
A. Yes.
MS. DARROW: Outside the scope, Your Honor.
THE COURT: Counsel?
MR. SWAIN: Your Honor, Mr. Taylor was explaining that everyone looks at SHRM because of its diversity, and I'm just exploring SHRM's stature in the community as a prominent nonprofit organization.
THE COURT: I think some limited exploration of that is reasonable, so I'll allow a couple of questions on that.
The objection is overruled.
BY MR. SWAIN:
Q. You may answer.

A. I'm sorry. Remind me of the question.
Q. And part of SHRM's work includes advising HR professionals about best standards, correct?
A. Best?
Q. Best practices. I'm sorry.
A. Best practices, yes.
Q. That includes best practices for investigating internal complaints of discrimination and retaliation, correct?
A. We do have a -- a set of curriculum around best practices for investigating, yes, employment complaints.
Q. The curriculum that SHRM develops and sells to other organizations and individuals, correct?
A. We offer to our members, yes.
Q. And members pay to be a member, correct?
A. Yes.
Q. How many members did SHRM have?
A. I --
MS. DARROW: Objection. Outside the scope.
THE COURT: Counsel?
MR. SWAIN: I'll withdraw the question.
THE COURT: Objection is sustained.
BY MR. SWAIN:
Q. Do you --
MR. SWAIN: And I'm following up on the previous question, Your Honor, because I anticipate another scope

objection.
BY MR. SWAIN:
Q. Do SHRM's curricula that it provides to its members include, as a human resources best practice, preparing termination letters for employees before a termination decision has even been made?
MS. DARROW: Outside the scope, Your Honor.
THE COURT: Objection sustained.
BY MR. SWAIN:
Q. Would you agree that SHRM is an organization with a lot of integrity?
A. I would like to think so, yes.
Q. I'd like to ask you about a statement that you've made in the past. First I am going to read the statement, and then I'll ask you if you recall making it.
A. Okay.
Q. "Workplace bias and racial inequality bloom in the dark. If we continue to be silent, unable to speak candidly about our uncomfortable experiences and those of others, nothing will change, and businesses will pay the price."
Do you recall making that statement?
A. I don't remember making that statement, but it wouldn't surprise me, because the sentiments I actually absolutely believe in. I'm an African-American. I do feel that way.
Q. Would it refresh your recollection if I showed you an

article that you wrote with that statement in it?

MS. DARROW: Objection. Sorry, I didn't mean to cut off counsel.

Not relevant and outside the scope.

THE COURT: Objection is overruled. There was testimony with regard to, essentially, the scope of SHRM's internal diversity as well as this witness's belief in core principles related to diversity. Some cross-examination on that is entirely warranted.

BY MR. SWAIN:

Q. We are pulling up an article that will refresh your recollection.

MR. SWAIN: Can we scroll to the top and then down just a little bit.

There we go.

BY MR. SWAIN:

Q. Let me know when you've reviewed this.

A. Well, I've only reviewed the first couple paragraphs because it stopped, but, yes, that's my picture and that's my statement, yes.

Q. By the way, I think you may have testified to this earlier, but I just want to clarify.

Is it your testimony that you've only spoken to Ms. Mohamed once in your life?

A. No. What I said was I don't recall -- because she worked

remotely. If she were in the building, I might have had an interaction. I come to Colorado, for example, and we have convenings around the country where she may have attended. The only time I recall speaking with her was that one time, but it could be that I've had one or two other conversations. I don't think I've met her before now.

Q. And you testified that you did not have any involvement in the decision to terminate Ms. Mohamed, correct?

A. Right. Yes. Correct.

Q. Were you subpoenaed to come testify here today?

A. As a technical matter, I don't know if I was subpoenaed. I was requested by our in-house counsel and our outside counsel, Ms. Darrow, so I came. I don't know if I was subpoenaed.

Q. Given that you only recall speaking to Ms. Mohamed once in your entire life and you were not involved in her termination, do you have any understanding as to why you were requested to come testify here today?

MS. DARROW: Objection. Privilege.

THE COURT: Counsel?

MR. SWAIN: Your Honor, I'll ask him if he can answer that question without revealing privilege.

THE COURT: All right. Well, the question as modified is allowed.

The privilege objection is sustained.

A. Yes. I'm the CEO of SHRM, and SHRM was named as a defendant in this case, so it would stand to reason that I might be called to testify, particularly because I did have a conversation with Ms. Mohamed.

BY MR. SWAIN:

Q. Just one though, right?

A. One that I recall. I've been very clear, we have -- I travel the world, literally, and I meet a lot of people. And I've had a number of conversations. Because I have an open-door environment, I could speak to someone -- we have a -- almost biweekly CEO call, for example, or convening. And we have holiday parties. We do things. So it could be that I've spoken with Ms. Mohamed before. I only recall one time.

Q. Would you agree that SHRM was under financial stress in 2020 because of the COVID pandemic?

MS. DARROW: Objection. Outside the scope.

THE COURT: Mr. Swain?

MR. SWAIN: Withdrawn.

No further questions, Your Honor.

THE COURT: All right. Any redirect?

MS. DARROW: Nothing further from the Defense, Your Honor.

THE COURT: All right. You may step down. Thank you very much.

THE WITNESS: Thank you, Your Honor.

THE COURT: Ms. Darrow, would you like to call another witness?

MS. DARROW: Yes, Your Honor. We have a remote witness, Ms. Bernée Long.

THE COURT: Do we need a couple minutes to take a break and get her on?

MS. DARROW: Yes.

THE COURT: So, folks, stay with us. I'm guessing this break will be from five to ten minutes until we have our next witness queued up. And I don't want to keep you all sitting here while we do that, and we will bring you all back as soon as we have that witness ready. Thank you.

Please rise for the jury.

(The jury exited the courtroom at 1:31 p.m.)

THE COURT: Please be seated if you wish.

And just let us -- just let Don know -- is it Long or Delong?

MS. DARROW: It's Long.

THE COURT: As soon as Ms. Long is ready, just let us know and we'll come back out.

MS. DARROW: Thank you, Your Honor.

(A recess was taken from 1:32 p.m. to 1:38 p.m.)

THE COURT: Are we all set?

Okay. Let's bring them in.

(The jury entered the courtroom at 1:38 p.m.)

THE COURT: Please be seated, everybody. Thank you, and welcome back.

And who does the Defense call next?

MS. DARROW: The Defense calls Bernée Long.

THE COURT: All right. Ms. Long, I'll have you stay seated, but I will have you raise your right hand.

(Witness sworn.)

THE COURT: Thank you. You can put your hand down.

Can we turn Ms. Long's volume up a little bit?

All right. Ms. Long, let me have you tell us your first and last name, please, and spell each.

THE WITNESS: My name is Bernée Long. My name is spelled B-E-R-N-E-E. There's an accent aigu over the second-to-the-last E. And my last name is L-O-N-G.

THE COURT: Thank you, Ms. Long.

Your witness, Counsel.

MS. DARROW: Thank you, Your Honor.

**BERNÉE LONG, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

BY MS. DARROW:

Q. Good afternoon, Ms. Long.
A. Good afternoon.
Q. Where do you currently work?
A. I'm currently retired.
Q. And when did you retire?
A. When I left SHRM. I guess that was the end of '21, first

part of 2022.
Q. What position did you hold when you last worked at SHRM?
A. I was a director of organizational learning and talent development.
Q. I'm going to ask you to speak a little bit slower just to ensure that our court reporter can accurately record everything.
A. Okay.
Q. And is that the same role you held in 2020?
A. Yes.
Q. Okay. What were your core responsibilities as the director of organizational learning and talent development?
A. I was hired to come in and work with employees on development. So really good things, right? Helping people be the best versions of themselves, all that. I was tasked with the development of a leadership development program, but a lot of my duties, that first year in particular, were kind of centered around infrastructure. We did not have an HR information system, so we spent a lot of time trying to stand that up.
Q. Can you briefly tell us your professional background before joining SHRM?
A. Let's see. Early in my career, I did labor relations work, and then I went into -- I guess it was still labor relations work, but I was an administrative law judge with the

Iowa Public Employment Relations Board, where I also had mediation responsibilities on the cases that I was not actually hearing.

And then I left that and -- and got into legal education, which I really enjoyed. The first job was on the administration side at Drake University Law School.

And then from there I went to Cumberland Law School at Stanford University, where I had a dual appointment, administrator/assistant dean of students, as well as adjunct professor where I taught classes in contracts and alternative dispute resolution. And then I started working with undergraduate students.

So my career really -- several universities working with undergraduate students, and that was pretty much out of a desire to reach students sooner in terms of helping them with their career goals. Law students had already finished undergrad, so if they had not prepared adequately in undergraduate for law school, there wasn't much that I could do to help them.

Q. What training do you have in mediation?

A. So the training that I received really was on the job in my role as an administrative law judge with Iowa PERP.

Q. Are you a licensed attorney?

A. No, I'm not.

Q. Do you have any -- well, let me ask you this: How did you

become involved in the mediation between Ms. Mohamed and Ms. Barley?

A. I was asked by my manager at that time, who was the CHRO, chief human resources officer, Sean Sullivan.

Q. And what specifically were you asked to do in that regard?

A. I was just made aware that there had been a breakdown in their working relationship, and I was asked to just use my mediation background and experience to try to see if I could help facilitate a conversation between them and to resolve whatever it was that had caused them to be at odds with each other.

Q. Did you get a communication via email from Mr. Sullivan asking you to assist?

A. I want to say that we -- he asked me that in person, but, I mean, it's been five years, so I can't tell you whether it was, you know, in person or an email. But I think he asked me in person. It seems that he asked me in person.

Q. Do you recall having any email communication with Mr. Sullivan regarding meeting with Ms. Mohamed?

A. I know that we had email communication regarding me getting started with the process. He was offering, you know, basically kind of an update of what his notes were.

And then there was another colleague, Michael Jackson, who was over employee relations work on the team and apparently had been involved in whatever had gotten them to

this point. So whatever their initial discussions were had not yielded, I guess, the -- any kind of resolution.
Q. All right. I'm going to show you an exhibit. Give me a moment. It's Exhibit Number 24.
A. Okay.
MS. DARROW: It's stipulated to, so permission to admit and publish.
THE COURT: Well, are you moving to admit 24?
MS. DARROW: Yes, Your Honor.
THE COURT: I don't actually show that it's stipulated. That isn't checked on mine.
Any problem with that from Plaintiff's perspective?
MS. DeFAZIO: You said Exhibit 24?
THE COURT: 24.
MS. DeFAZIO: I see that as a different exhibit.
MS. DARROW: I can lay a foundation.
Let me show the witness Exhibit Number 24 so I can lay a foundation, unless counsel wants to stipulate to it.
THE COURT: I'm guessing the witness has a book. I see the witness appearing to move something around.
BY MS. DARROW:
Q. Ms. Long, do you have an exhibit binder with you?
A. Yes, I do.
Q. Can you look at Exhibit No. 24?
A. Yes.

MS. DeFAZIO: I'm sorry. We stipulate to this. I thought it was something different.

THE COURT: Okay. So 24 has been stipulated. It's been offered. It's been stipulated. It is admitted.

(Defendant's Exhibit 24 received.)

MS. DARROW: Permission to publish, Your Honor.

THE COURT: Sure.

THE COURTROOM DEPUTY: Your Honor, would you let Ms. Long know that it will disappear?

THE COURT: So, Ms. Long, this is the first you've had this experience on your end in this trial. Others here have heard this. We don't have the ability to split the screens, so the exhibit will be displayed; counsel will not ask you any questions while it's being displayed so that when counsel goes to ask you questions, we can see you again.

So we're going to take your screen -- you don't need to move or do anything. We'll just take your screen down on our end. And then when Ms. Darrow starts asking you questions, you'll know that it's back up because she'll wait until we see you again.

THE WITNESS: Okay.

(Pause in proceedings.)

BY MS. DARROW:

Q. Ms. Long, did you recognize Exhibit 24?

A. Yes. I recognize it.

Q. Was this the communication between yourself and Mr. Sullivan sending you notes about what had occurred related to Ms. Mohamed?

A. This is not the -- I guess your initial question was whether -- how he had asked me to participate. This would have been subsequent to that.

Q. Okay. So this was later on in the process?

A. I don't know how much later, but it would have -- I knew -- like, we had already had the discussion for me to be in the role of mediating, facilitating their discussions before he sent me anything.

Q. Got it.

Let me show you --

MS. DARROW: I've got to find the exhibit number. I apologize.

THE COURT: Sure.

MS. DARROW: It's actually Exhibit No. 26.

THE COURT: And 26 I show has been admitted already.

MS. DARROW: Yes, Your Honor. Permission to publish.

THE COURT: Sure.

BY MS. DARROW:

Q. Ms. Long, can you go to Exhibit No. 26?

A. Yes.

(Pause in the proceedings.)

MS. DARROW: Okay. We can go to Ms. Long.

BY MS. DARROW:
Q. You recognize Exhibit No. 26?
A. Yes.
Q. And what's your understanding as to what was being communicated to -- well, let me back up.
Were you copied on the communication between Sean Sullivan and Ruby Mohamed? Right?
A. Yes.
Q. Okay. And what was your understanding as to what was being communicated to Ms. Mohamed?
A. That he had invited me to have discussions with she and Carolyn Barley to facilitate and mediate to determine a path forward, is what he said here.
Q. What did Mr. Sullivan communicate to you as to what he was asking you to do with regards to facilitating that path forward?
A. So it was really a breakdown in communication. So he did not get into a lot of details what it was about. I didn't inquire because to me a person in a mediation-type environment should try to remain as neutral as possible.
Q. Before the mediation began -- and to be clear, when this mediation process is going on, you're an employee of SHRM, right?
A. That's correct.
Q. And Ms. Barley is an employee of SHRM, and Ms. Mohamed is

an employee of SHRM?
A. That's correct.
Q. Okay. And so before the mediation process began, what was your understanding of the situation between them?
A. I didn't know the merits of what they were talking about. I just knew that whatever had been going on before I got pulled into it and invited in or asked to be a part of it, that those efforts had not resulted in a resolution.
Q. How did your experience as an administrative law judge influence your approach to mediation with them?
A. I mean, I think what I learned through that process and having applied it in many situations since that time -- that was very early in my career -- that you want to be neutral. It's so easy to have a lot of information in your head and then you try to sort through about, you know -- as best as one can humanly do, I wanted to just not have anybody -- any preconceived who thought what. I didn't want to know any of that.
Q. You talked about neutrality or being neutral.
What did you do specifically to maintain that neutrality during the mediation process?
A. Initially, though Sean had -- Mr. Sullivan had -- and that's back in reference to the initial exhibit that you -- 24. I did not dig into those notes, right? I just chose to not read anything because, again, once something is in your

head, it's hard to not have it in your head.

So I really went in there with a clean slate to see where the parties were. I didn't know, like I said, the nature of what it was about or anything. I just wanted to know each party's thoughts of, Where are we? What's going on? So I wanted them to tell me the story, so to speak.

Q. So what were the outcomes you were hoping to achieve during the mediation?

A. Well, when I think about mediation, to me the goal is -- and I think by definition that there's been somewhat of an impasse somewhere along the way; something has broken down; the parties aren't communicating, and there is no --

THE COURT: Ms. Long, let me ask you to slow down slightly if we could.

THE WITNESS: I'm sorry.

THE COURT: No problem at all. I want to make sure we can keep up on our end. Thank you very much.

THE WITNESS: I apologize.

THE COURT: No apologies necessary.

You may certainly continue with your answer.

THE WITNESS: I'm so much better than I was when I was younger. I used to talk really fast, but apparently I haven't slowed down enough just yet.

A. I think for me it was about being able to go into a setting where -- with fresh ears, fresh eyes, to hear each

party express where they were without their respective positions, so to speak, having been colored by what somebody else said it was.

BY MS. DARROW:

Q. Got it.

So how did you structure the mediation to make sure both parties felt heard?

A. So the way that -- again, that I learned as an ALJ was that you try to bring the parties initially just to kind of make sure together -- that they're both in the room together, to say, This is what we're going to do. This is what we're trying to accomplish. They both hear it at the same time, so we start off with this -- not like, Oh, you talked to her first, but I don't know what you said. It wasn't that.

They come -- I brought them both together initially and then from there had individual conversations with each.

Q. Got it.

Did you encounter any challenges during the mediation process?

A. Initially, no. I think, initially, the parties were receptive to the process. I think over time there were -- there started to be challenges.

And I would say for me, thinking back on it, the biggest challenge was that the parties were so emotionally charged about their relative positions. And when people are

dealing with emotions, it's kind of hard to be objective and to hear that other party. It's just the nature of humans.

So I think that was the biggest challenge, not being able to get the parties to kind of hear beyond what they were saying.

Q. What was Ms. Mohamed's demeanor during your mediation process?

A. It wasn't a negative demeanor. I didn't pick up anything negative from her. I would say that what I took away -- and this will be true of both of them -- they were both very hurt.

Q. And how did you respond to that?

A. I tried to -- I try to be an empathetic, compassionate person. I think I'm kind of wired to be that way. And I tried to -- to me, that's the beauty of being in more of a mediator position than an advocate, right? You can try to see both sides, try to hear both sides.

And then, ultimately, sometimes -- and I think this is the nature of communication -- sometimes you can hear things that the parties can't hear each other say. And the ability to be able to hear that and then try to relay to the other person, Well, this is what I heard when they said -- so that's -- that was really what I was trying to do, trying to help them hear each other.

Q. Do you think you were effective in doing so?

A. Well, that seems like -- that's a challenging question to

answer, because I would say if I was effective, we probably would not be here today. I don't know if that's a big leap, but I would think, you know, when you get people understanding, they're more apt to be able to work together.

But then my focus was on the work, right, their working relationship. As it turns out, there were, you know, other issues there that I think probably were separate issues that would not have prevented my being -- whatever I had done may not have prevented us from being here today.

Q. What do you mean?

A. I don't know if that's clear.

So it's my understanding, right, this -- this trial is about an allegation of discrimination. But initially when we were talking, it was about work, about job performance, being able to -- Yes, I hear, and I -- and Ruby did express early on that she felt that she was being discriminated against.

But I also talked to her about -- as I learned -- that there was another issue on the table, which was job performance. So there were two separate things there, and I was trying to kind of separate them.

So initially when I met with Ruby, our conversation was around -- and this is important, I think, for both parties. People want to feel heard, I think. And so I definitely tried to make the effort of not to dismiss that she

was alleging discrimination -- I don't want to dismiss. I wanted to give, I guess, a level of validation to, I hear you. This is -- this is what you're feeling. This is what you're alleging. But I wasn't there to resolve that issue.

Q. The discrimination claim issue?

A. The discrimination claim, correct.

Q. You talked -- well, you talked about both parties being emotional.

Did you get the impression that -- this was shortly after George Floyd's death, right?

A. Oh, yes. This was the same year. So the -- I mean, just the climate in America was -- everything was escalated. It was high. It was tension. It was tension everywhere. It was just really high racial tension. And I think George Floyd's death probably really escalated things, because there just had been a pattern of, you know, Black people being in situations with police that resulted in their death.

Q. So did you take any role regarding Ms. Mohamed's discrimination claim?

A. No. That wasn't really what I was asked to do from my manager. My role was to facilitate their discussions and their communication.

Q. So based upon your observations during the mediation, can you describe each -- Ms. Mohamed and Ms. Barley's openness to repairing the working relationship?

A. I don't know that we really were able to get far on that particular point. And I say that because from Ms. Mohamed's perspective, it was about the feeling of having been discriminated against by her manager, and from Ms. Barley's perspective, it was the feeling of the hurt that comes with being labeled a racist.

So each of them had, you know, perhaps different pain, but they were each hurting.

Q. And what was your -- did you garner some type of understanding as to what Ms. Mohamed's goal was in participating in the mediation?

A. I don't really know what her goal was. I can't say that I know what Ms. Barley's goal was for participating, but perhaps to be heard.

MS. DeFAZIO: Objection, Your Honor. Calls for speculation and lack of foundation.

THE COURT: Counsel?

MS. DARROW: I'll withdraw.

THE COURT: Objection is sustained.

BY MS. DARROW:

Q. How many discussions did you have with Ms. Mohamed in the context of this mediation process?

A. I don't know. I mean, it's been five years.

Q. What's your best estimate?

A. I don't know. I just know I would have a -- a meeting

with one, and then I would have a meeting with the other one. I tried to make sure that I had an even number, you know what I mean? I tried to go back and forth with each. But to say how many there were, I don't know.

Q. Was there any discussion -- you said there was -- job performance came up during the -- this process.

What was discussed in that regard?

A. So when I found out about work that needed to be done, that deadlines had been missed, that the team was behind on meeting deadlines, I did discuss that with Ms. Mohamed, and I discussed that more than once. And I will say that, for me, the point that I was trying to get across to her was that, I'm not dismissing that you may have a claim of discrimination. I don't know that.

But what I did feel was that, let's say -- to me, one issue clouded the other. So if -- if your job performance is a problem, job performance is -- is a grounds for people being terminated, if you're not doing your job.

So that was not my goal, for her to be terminated. I wanted -- I wanted them to be able to continue working together effectively.

So anything that would have been kind of detrimental to their working together, I was trying to not have that. So I guess I would say cloud. I wanted to keep those two issues separate.

Q. So did you believe that if Ms. Mohamed had a discrimination claim, she need not worry about her job performance issues?

A. No. I think -- I mean, initially we were all there because we were hired to work. We were hired to be employees. So, again, my perspective was that we come to work because we've been hired to do a job. There are other things that come up in the workplace every day with people, right? But the number one reason for being on the job is to do the job.

Q. Was there any discussion with regards -- you said missed deadlines.

What were you told about that?

MS. DeFAZIO: Objection, Your Honor. Calls for hearsay.

THE COURT: Hold on.

Go ahead.

MS. DeFAZIO: Objection, Your Honor. Calls for hearsay.

THE COURT: Objection's overruled. It goes to the effect on the listener.

BY MS. DARROW:

Q. Go ahead, Ms. Long.

A. I don't recall specifically exactly what the details were of -- I mean, I don't know the ins and outs of what was happening. But I -- but I do remember that in my

conversations with Ms. Barley, the issue of the work that needed to be done came up. And in listening to her, it seemed to me that -- and I can appreciate this as a manager -- that -- so here's the stress of, you know, I've got somebody labeling me something that's not pleasant to be labeled, but I also have the stress of as the manager, I have a team, and I have a job to do, and I have to do it through others.

Q. Did you have any discussion with Ms. Mohamed specifically about meeting her deadlines?

A. Oh, yes. Like I said, I had discussions with her about that, and I had it more than once. And, you know, I wouldn't -- I don't know that she felt that I was -- I don't know -- in more of a mother perspective, but I talked to her in a way that I would have talked to my own daughter to say, This may be true that these other things are happening on your job, but at the same time -- this is kind of my philosophy -- if I believe that somebody had it, quote/unquote, "in for me," for lack of any better language, I am not going to supply the ammunition for them to use to make that happen.

Q. Was -- in saying that to her, were you trying to empower Ms. Mohamed?

A. I felt like -- I don't even know if I would say -- I don't know what characterization, but I felt like that's what I would have said to my daughter -- and I love my daughter, you know, and I want her to be successful in the workplace. So I

would have said to her, Do your work. Like, that -- in my mind, the job performance should not even have been an issue.

Q. I'm going to show you Exhibit Number 34.

MS. DARROW: It's a stipulated exhibit, Your Honor. Permission to admit?

THE COURT: 34 is admitted.

(Plaintiff's Exhibit 34 received.)

MS. DARROW: Permission to publish?

THE COURT: Of course.

(Pause in the proceedings.)

MS. DARROW: Can we go to Ms. Long?

BY MS. DARROW:

Q. I've just -- have you reviewed Exhibit No. 34 on -- your email correspondence to Ms. Mohamed on August 19th, 2020, at 12:11 p.m.?

A. Yes.

Q. What were you trying to communicate to Ms. -- it's -- well, I'll withdraw that question and ask you this: Were you communicating to Ms. Mohamed what you just described earlier about ensuring that she meets her deadlines?

A. Yes. That's what this email is saying to her.

Q. And how did the mediation process conclude?

A. Ultimately, after, like I said, several conversations about the work, I think I was trying to schedule another -- because I think this says that Carolyn was on vacation that

week, and I said, "It's not productive to continue discussions with only one party."

So whenever we resumed after Carolyn came back, then I remember sending an email to try to schedule, and Ruby declined moving forward with the process.

Q. I'm going to show you Exhibit No. 46.

MS. DARROW: Move to admit Exhibit No. 46. It's a stipulated exhibit.

THE COURT: 46 is admitted.

(Plaintiff's Exhibit 46 received.)

MS. DARROW: Permission to publish?

THE COURT: Sure.

(Pause in the proceedings.)

MS. DARROW: Can we go back to Ms. Long, Your Honor?

BY MS. DARROW:

Q. Hi, Ms. Long.

So in response to your email to Ms. Mohamed, she responded saying, "I would like to respectfully decline"; is that right?

A. Yes.

Q. That's what's communicated in Exhibit No. 46?

A. Yes. I mean -- and, actually, even what I said in that email was being mindful that they had this project deadline and that I was willing to even postpone the mediation process to allow both parties to do their work. I mean, I was trying

to focus on making sure that, you know, the organization's work was being done while also addressing that, you know, these other issues, you know, needed to be addressed, though I was not charged with addressing those in particular.
Q. At any time during this process did anyone from SHRM, including Sean Sullivan, indicate to you that they were going to terminate Ms. Mohamed?
A. No. No one ever talked to me about that.
Q. What was your perspective to Ms. Mohamed's decision to withdraw from the mediation process?
A. I was disappointed. I don't know. I guess -- I don't know. I felt like, I think, that quitting wouldn't resolve anything. I don't know. I'm kind of a "let's try to see this thing true and not quit." So -- yeah, I was disappointed.
Q. So did Ms. Mohamed provide any other correspondence to you?
A. During the mediation process or after this or -- what's the time frame?
Q. I'll make it easy. Let me -- it's kind of in the middle of the mediation process.
A. Okay.
Q. Do you recall receiving a letter on or about August 13, 2020, from Ms. Mohamed outlining some -- her complaints with regards to working at SHRM?
A. I don't remember the date, but I do remember there was a

really long email with a lot of, I guess, points in it.

Q. I'll help refresh your recollection. Can you look at Exhibit No. 42 in your binder?

Is that the letter that was sent to you by Ms. Mohamed or an attachment to a letter that was sent to you?

A. This is the one that I was thinking of when you asked that question.

MS. DARROW: Move to admit Exhibit No. 42.

MS. DeFAZIO: No objection.

THE COURT: 42 is admitted.

(Plaintiff's Exhibit 42 received.)

MS. DARROW: Permission to publish?

(Pause in the proceedings.)

BY MS. DARROW:

Q. Why did you think Ms. Mohamed was sending this letter to you?

MS. DeFAZIO: Objection, Your Honor. Lack of foundation. Calls for speculation.

THE COURT: Ms. Darrow?

MS. DARROW: The foundation has been laid, and it's the effect on the listener.

THE COURT: Well, the question was, "Why do you think she sent it to you?" How is that --

MS. DARROW: I'll rephrase it, then.

THE COURT: All right. Objection is sustained.

BY MS. DARROW:
Q. What's your understanding as to why this letter was sent to you?
A. I don't know -- so I don't have the first part of this, if it came from an email. I don't know if it was just sent to me. So I don't have context around that. And why it was sent, I don't know that that's a question for me, either.
Q. Okay. Did you do anything with the letter once you received it?
A. Seems that it came in an email, and I will say, given the length of it, you know, when you open it and you see how long it is -- and I can't remember if this was -- I don't even know at what point -- is this after everything ended or -- I don't know when this came, but I don't think -- memory does not say that I sat and went over this with a fine-tooth comb.
Because the first part of it is talking about the engagement survey, and I wasn't involved in engagement surveys as it relates to, you know, results and all that.
Q. I'm going to have you look at Exhibit No. 41.
THE COURT: I think you said 41?
MS. DARROW: Yes, Your Honor.
THE COURT: Okay. Thank you.
BY MS. DARROW:
Q. Is Exhibit No. 41 your -- well, let me back up.
Do you recognize the communication in Exhibit

Number 41?
A. Well, they're emails from me. Looks like there's a -- it's a continuing email string.
Q. Looking at the first page of it --
A. These are all between Ruby and I.
Q. That's okay. Let me go through one by one.
A. Okay.
Q. So on August 21st, 2020, you had some communication with Mr. Sullivan, right, about the -- the letter that Ms. Mohamed sent to you?
A. Yes.
Q. Did you share the letter with anyone else?
A. Not that I know of. And, in fact, I say here that I didn't read it thoroughly at the time, either, which is what I was testifying to earlier. But I think this is answering -- Sean's asking me about sharing the letter, and I think I'm saying here that, no, I had not shared that with anybody.
Q. Why not?
A. Well, really, I don't know. To me, in a point of neutrality, and because of, I guess, my role not only as trying to facilitate their conversations, but in general, I wasn't really one to share other people's communications of a kind of confidential nature with other people.
MS. DARROW: Move to admit Exhibit Number 41.
A. This is --

THE COURT: 41 is admitted.

MS. DARROW: Thank you. Permission to publish?

THE COURT: You may.

(Defendant's Exhibit 41 received.)

BY MS. DARROW:

Q. All right. Did you have any further communication with Mr. Sullivan about the letter written by Ms. Mohamed?

A. I don't know based upon this exhibit whether I did. Nothing comes to mind about it, so I don't know.

Q. You specifically didn't share it with Ms. Barley.

Why didn't you share it with her?

A. I think, being the nature of it, it was opening up a much broader issue than a role I had been called to serve in the process. So I -- I don't think that anything would have been served by sharing it other than adding more fuel to an already relationship that wasn't going well.

Q. Given that Ms. Mohamed -- she had communicated to you that she believed she was being discriminated against, yes?

A. Yes.

Q. Had you heard or anything from that communication to confirm that discrimination had actually occurred?

A. I can't point to anything in particular, because, again, my focus was on the relationship between Carolyn and Ruby. And so as it relates to those two people, I just did not -- I personally did not have that sense of discrimination.

Q. If you had, what would you have done?

MS. DeFAZIO: Objection, Your Honor. Calls for speculation.

THE COURT: I don't believe it does.

Objection is overruled.

A. I think that if I believed that there was evidence of discrimination, that there was -- you know, whatever it was that would have led me to believe that something's not right, I would have escalated that up to my manager.

BY MS. DARROW:

Q. I asked you earlier about being a lawyer.

Do you have a law degree?

A. Yes.

MS. DARROW: No further questions, Your Honor.

THE COURT: All right. Ms. DeFazio, in terms of cross-examination -- in no way trying to pin you to an amount of time -- do you think it makes sense to take a break before we do it for a few minutes?

MS. DeFAZIO: Otherwise when would you want to do it?

THE COURT: I would say in the next 15 minutes is probably -- we've been sitting now for an hour and a half or so.

MS. DeFAZIO: Why don't we take it now?

THE COURT: Folks, we'll take about a ten-minute break and come back for cross-examination. Thank you.

Please rise for the jury.

(The jury exited the courtroom at 2:27 p.m.)

THE COURT: We'll be in recess for about ten minutes. Thank you.

(A recess was taken from 2:27 p.m. to 2:38 p.m.)

THE COURT: Are we all set?

(Discussion off the record.)

THE COURT: Are we ready for cross-examination?

MS. DeFAZIO: Yes, Your Honor.

THE COURTROOM DEPUTY: Ms. Long? Okay.

THE COURT: Ms. Long is back. Okay. Great.

(The jury entered the courtroom at 2:39 p.m.)

THE COURT: Thank you. Please be seated, everybody.

Ms. DeFazio, you may inquire when you're ready.

MS. DeFAZIO: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MS. DeFAZIO:

Q. Good afternoon, Ms. Long.

A. Good afternoon.

Q. You were an employee of SHRM for about three years, right?

A. Correct.

Q. And even though your position was in HR, you were not an HR professional, were you?

A. No, I was not.

Q. And your position was eliminated in January of 2022?

A. Correct.
Q. Okay. Now you testified about serving as a mediator to Ms. Barley and Ms. Mohamed, right?
A. Yes. I wanted to mediate the -- and facilitate the discussion in a mediation-type process, yes.
Q. Sure. And you had never been pulled in before to help mediate an issue between a supervisor and an employee at SHRM before, have you?
A. Not to my knowledge. I can't remember an occasion where that was necessary.
Q. And I believe you testified to this, but, again, to ask, it was not your role to evaluate whether Ms. Mohamed's discrimination claim had any merit, right?
A. Oh, no. That was not my -- my role.
Q. You were just there to see if you could bridge the relationship between the two of them, right?
A. Yes, their working relationship.
Q. And you testified about meeting one-on-one with Ms. Mohamed, right?
A. Yes.
Q. And when you met with Ms. Mohamed, you believed that she was hurting, right?
A. I did.
Q. And you had no doubt that she was in pain?
A. No, no doubt.

Q. And you also testified that over time there were challenges between -- because the parties were so emotionally charged about their positions.

Did I state that correctly?

A. Yes.

Q. Okay. And that was on both sides, both Ms. Mohamed and Ms. Barley, right?

A. Yes. Correct.

Q. And you think that the nature of claims of racial discrimination are inherently painful, don't you?

A. I guess, speaking as a Black female who has been in that situation, yes, I would say they're inherently painful.

Q. And you could relate to where Ms. Mohamed was coming from, right?

A. Yeah. I wasn't trying to dismiss her feelings.

Q. Sure. Now, you recall -- or do you recall in your mediation sessions with Ms. Barley that she said something along the lines of she has children of mixed heritage so it would just not be possible for her to be racist? Do you recall that?

A. I recall something along those lines, yes.

Q. And your response to that was that this was a situation where education was necessary for her, right?

A. Right.

Q. Because that's not what racism is, right?

A. I don't think a person can use that as a defense for not having racist views.
Q. Sure. And having children of mixed heritage doesn't mean that you don't have bias?
A. Correct.
Q. We probably all have bias, frankly?
A. I would think -- humans, by nature we have some biases.
Q. Let's take a look at Exhibit 35.
Ms. Long, when you've had a chance to review the exhibit, just let me know.
A. Okay.
Q. And is this a series of emails that you -- were forwarded to you eventually, but included yourself, Mr. Sullivan, and then, further back, Ms. Jeanne Morris and Nick Schacht? Is that right?
A. Yes. Let me just read . . .
Q. And they were all sent on August 13th, 2020?
A. Yes.
MS. DeFAZIO: Your Honor, we move to admit Exhibit 35.
THE COURT: Ms. Darrow, as to Exhibit 35?
MS. DARROW: No objection.
THE COURT: 35 is admitted.
(Defendant's Exhibit 35 received.)
//

BY MS. DeFAZIO:
Q. Now, this exhibit, the essence of it, you were being asked to write, along with Mike Jackson, a response for Ms. Barley to send to Ms. Mohamed; is that right?
A. I don't think that -- it doesn't look to me that I was being asked, because my email says that I -- I asked if -- I asked my manager whether he wanted me to draft a brief response --
Q. Sure.
A. -- for Carolyn, Ms. Barley.
Q. So let's look at the last page, SHRM 0543.
A. Okay.
Q. And you see an email from Nick Schacht there?
A. Uh-huh.
Q. And it looks like he's making a suggestion to Ms. Morris. I'll just read it aloud: "You may already be working down this track. I suggest having Carolyn confer with Mike Jackson on a response to Ruby's email. That email shouldn't go unanswered by Ruby's manager. But this offers an opportunity to get the right language on the table to correct her quickly or to support an eventual case for termination. We want the right words in there."
Do you see that?
A. I see that.
Q. Okay. And then above that there's an email from Jeanne

saying, "Hi, Nick. Carolyn is working with Bernée and Mike on a response."

Do you see that part?

A. I do.

Q. Okay. And so does that refresh your memory that you may have worked on a response to an email from Ms. Barley?

A. I didn't say that I didn't work on a response. I thought -- I don't know what the earlier question was, but --

Q. Okay.

A. -- anyway.

Q. Let me ask it again.

A. I'm not denying that I worked on a response. It's just whose it was. Whose -- yeah, I think that's what it was, which party. Okay.

Q. Sure. Absolutely.

So it is your recollection that you drafted a response for Ms. Barley to send to Ms. Mohamed at some point, right?

A. Yes.

Q. Okay.

A. Yes.

Q. Great. Thank you. Sorry. That was confusing.

Now, you talked in your testimony about taking neutrality very seriously as your -- in your role as a mediator, right?

A. Uh-huh.

Q. Did you see being involved by ghostwriting an email on behalf of Ms. Barley as compromising that in any way?

A. Well, I wouldn't characterize it as ghostwriting. I did -- my mind wasn't thinking ghostwriting at the time. It was about keeping the issues separated and to not have things be inflamed. Because if -- in my mind, if either party inflamed the other, the mediation process was going to get kind of blown up.

Q. Sure.

A. So that -- that was kind of my thinking at the time.

Q. Okay. But would you agree with me that ghostwriting is essentially writing something to then have someone else send under their name?

MS. DARROW: Objection.

MS. DeFAZIO: I'm done.

MS. DARROW: I thought -- I didn't mean to interrupt counsel. I thought the question was complete.

My objection is that the use of the term "ghostwriting" mischaracterizes the evidence.

THE COURT: The objection is overruled. The question was essentially asking the witness to confirm a definition of ghostwriting, which doesn't indicate that the letter was or wasn't ghostwritten. In fact, the answer seems to have been the opposite. But that doesn't mean that the question can't

be asked as to the definition and then argued however the parties want to argue it later.

So the objection is overruled.

BY MS. DeFAZIO:

Q. You can answer the question if you can remember it.

A. So I have never heard the term "ghostwriting" being used other than a person writing a novel under a word that I can never pronounce.

Q. Pseudonym.

A. That word. So, no, that just never occurred to me as being -- that was not my intent.

Q. Well, taking that term out, you wrote an email for Ms. Barley to send to Ms. Mohamed under Ms. Barley's name, right?

A. Yes. I helped her draft that to say that let's keep the issues tight, and -- because there was a lot to be addressed, it seemed to me, we talked about earlier.

Q. Now, you testified that you saw two separate issues from Ms. Mohamed's perspective, both her concerns about discrimination but then also the work performance concerns; is that right?

A. Correct.

Q. Did you have an understanding that Ms. Mohamed was concerned that supposed issues with her job performance were part of her discrimination complaint?

A. I wasn't clear on all the details of it because, again, my focus was let's focus on the work and, indeed, if there is a discrimination claim that might move forward, whatever happens with that, or even if -- I guess to the question that was asked to me earlier, even if I were to escalate it up to say, We've got a problem; this is wrong, the work issue to me was separate. Just how I look at things.

Q. And you testified that you did not see anything indicating discrimination; is that right?

A. Not on the part of Ms. Barley, no.

Q. Okay. And then you also testified that you did not review the lengthy letter, Exhibit 42, right?

A. I didn't go into detail in it, no.

Q. So you have no idea if there was evidence of discrimination provided by Ms. Mohamed in that letter, do you?

A. I wasn't looking for that.

Q. Okay.

MS. DeFAZIO: No further questions, Your Honor.

THE COURT: All right.

MS. DeFAZIO: Thank you, Ms. Long.

THE COURT: Redirect?

MS. DARROW: Nothing further, Your Honor.

THE COURT: Ms. Long, thank you very much. You may -- not only may, but you must sign off at this point. But thank you, and have a good afternoon.

THE WITNESS: Thank you. You as well.

MS. DARROW: Next the Defense calls Elizabeth Lacey.

THE COURT: And I can't recall, is that in person or --

MS. DARROW: In person.

THE COURT: Okay. Thank you.

MS. DARROW: Make life easier.

THE COURT: Good time to stand up and stretch -- I know you haven't been sitting long -- if you wish.

(Discussion off the record.)

(Pause in the proceedings.)

THE COURT: Good afternoon, ma'am. I'll have you raise your right hand.

(Witness sworn.)

THE COURT: Please be seated.

And I will have you state your first name and your last name, please, and spell each of those.

THE WITNESS: So my name is Elizabeth, or Liz, Lacey; E-L-I-Z-A-B-E-T-H, last name is Lacey, L-A-C-E-Y.

THE COURT: Your witness, Counsel.

MS. DARROW: Thank you, Your Honor.

**ELIZABETH LACEY, DEFENDANT'S WITNESS, DIRECT EXAMINATION**

BY MS. DARROW:

Q. Good afternoon, Ms. Lacey.

A. Good afternoon.

Q. Where are you currently employed?
A. At SHRM.
Q. What is your job title?
A. I am the Director of Consumer Products and Programs.
Q. How long have you worked at SHRM?
A. Over 18 years.
Q. And what's your -- what are your job duties as the Director of -- well, actually I don't need to know that.
What was your job title before you became the Director of Consumer Products and Programs?
A. I was the Director of Educational Programs.
Q. And during what time period were you the Director of Educational Programs?
A. October 2019 to June 202024.
Q. And what were your core responsibilities as the Director of Education Programs?
A. I would oversee the operations of the entire educational programs business, so that would include the annual P&L for the business. That would include the annual schedule.
Q. I'm going to have you slow down, one.
THE COURT: And pull that microphone even closer to you. Thank you very much.
MS. DARROW: Sorry, Your Honor.
THE COURT: No problem. We both had the same idea at the same time.

BY MS. DARROW:

Q. I'm going to ask you to do two things. In addition to slowing down, when you use an acronym, can you immediately let us know what the acronym stands for instead of me having to ask it later? I'm going to try to speed this up a little bit.

So tell us what your core responsibilities were as the Director of Educational Programs.

A. I would have oversight, accountability and responsibility for the entire operations of the business, including the P&L, so the profit and loss, as well as the overall curriculums, the annual schedule that would then determine our annual revenue goals and operational expense, et cetera.

Q. And how familiar are you with the Instructional Design team and their work?

A. Very familiar with the Instructional Design team. We would -- do you want me to keep going?

Q. Yes.

A. We would work in lockstep with them on their design and development work. That would certainly be a leading point or a leading factor into our annual program schedule and development that would then stipulate our annual P&L or revenue goals and expenses.

Q. All right. Were you -- did you have any responsibilities in relation to Ms. Mohamed's work specifically?

A. I was very familiar and involved with Ms. Mohamed's work

as it related to curriculum, design and development.
Q. How so?
A. That those programs that were being designed would be a component of our annual or seasonal program schedule. And so as she was working on the development of those programs, I would be tracking those milestones and those deadlines as it related to our monthly and annual revenue goals. And we would have other activities across the organization that would coincide with that, like our marketing efforts to promote those programs, et cetera.
Q. Did you have opportunities to provide feedback with regards to the programs or projects that she was working on?
A. I did.
Q. And did you monitor her deadlines as well?
A. I did.
Q. Were you familiar with her workload in comparison to others on her team?
A. I was.
Q. How did you first meet Ms. Mohamed?
A. I met Ms. Mohamed when she first joined SHRM as a staff member.
Q. How would you describe your relationship with her during her time as SHRM?
A. We were friendly. We would socialize both in work and outside of work. We would text about personal things that we

had going on in our lives, and it even went as far as when she was living in Naples, Florida, she came to my mother's house and met my mother, my daughter at the time, and we had a couple of glasses of wine with my family in Naples.

Q. During your friendship -- well, I should -- would it be safe to say that you and Ms. Mohamed were friends?

A. Yeah. We were friendly.

Q. Didn't want to make any assumptions.

During your friendship with Ms. Mohamed, what, if anything, did she share about her experiences with supervisors that were providing feedback to her?

A. She would share some frustrations or challenges she had with supervisors that she had over the years. She would complain or solicit some feedback or advice as she was navigating those challenges.

Q. Which supervisors was she talking to you about that she was having challenges with?

A. She previously talked to me or asked my advice around Kim Lang and Elizabeth Jackson.

Q. When did she work with Liz Jackson and Kim Lang?

A. I don't have the exact years, but it would have been as I was the Manager of Educational Programs and then moved into the director role.

Q. Were they managers to Ms. Mohamed prior to Ms. Barley?

A. Yes.

Q. Did she give you any specifics about the challenges that she was having with Ms. Jackson or Kim Lang?
A. She did. She shared that she felt that she was being held to an un -- being held to unfair deadlines or wasn't being held to the same standards as one of her other coworkers. And I shared with her that the nature of their two roles were very different at the time, and I tried to share my perspectives with her, as I would any other friend. And Ms. Mohamed became defensive when I didn't agree with her.
Q. What was your impression of those situations that she was sharing with you with regards to her interaction with those prior managers?
A. I personally had a different opinion. I thought that it was fair in project or task-related feedback. But Ms. Mohamed at times felt that it was -- or perceived it as a personal attack or implied that there was a bias in place when prior managers were providing that feedback or coaching to her.
Q. Based upon your observations in interacting with Ms. Mohamed as a friend or a manager, did you observe any recurring behavior or patterns with respect to Ms. Mohamed?
A. Yes. She seemed to have conflicts with a few of her managers over the years and felt that it was personal versus work related, and she would react to feedback that she was given somewhat viscerally. There were times, too, where I could hear the conversations that she would have with a prior

manager behind a closed office door several ways [sic] away.

Q. What did you observe?

A. Ms. Mohamed was raising her voice quite significantly at her manager. Again, they were in a closed office, and I could hear it from my desk that was 20, 30 feet away. Ms. Mohamed's voice was the only voice that I could hear being several feet away.

Q. Who was the manager that she was raising her voice to?

A. Liz Jackson.

Q. What, if anything, did Ms. Mohamed share with you with regards to Ms. Barley prior to 2020?

A. Ms. Mohamed reached out to me over text prior to 2020, upset or frustrated that Ms. Barley was working on a project with her, and I said that I didn't perceive it that way. I took it that it was an "all hands on deck" scenario and we would all come together as a team to solve for some pressing needs.

And Ms. Mohamed was very frustrated or unhappy that Ms. Barley was even involved. She seemed to just be very sensitive to anything that Ms. Barley was involved in with her.

Q. And this was prior to Ms. Barley becoming her manager?

A. Correct.

Q. What, if anything, did you observe about Ms. Barley's interactions with Ms. Mohamed?

A. I always found Ms. Barley to be incredibly kind and supportive of Ms. Mohamed. Ms. Barley, I've always found her to be very soft-spoken and supportive. I didn't see anything wrong based on what I witnessed or saw from Ms. Barley towards Ms. Mohamed.
Q. Did your relationship with Ms. Mohamed evolve over time?
A. It did.
Q. How so?
A. Shortly after George Floyd's murder, our friendship, I would call it, changed drastically. Ms. Mohamed became very cold towards me, very standoffish. We stopped communicating after that. And we had been very friendly. She was dating a gentleman at the time. His name was Ryan. My husband's name is Ryan. So we used to laugh about that and say "your Ryan" versus my Ryan."

But my Ryan works in law enforcement, and after George Floyd's murder, Ms. Mohamed did not take well to anybody that was in law enforcement and was very vocal about that. And it seemed that she was not able to separate our friendship from what my husband did. And in any profession there are good apples and bad apples. But I -- I hope most spouses do -- I think very fondly of my husband. He's wonderful. He's done very well in his career. And what his career choice is should have no bearing on my friendships or relationships at work. Ms. Mohamed was very vocal about her

feelings towards law enforcement.

MS. DeFAZIO: Your Honor, we object on the continued answer given that it's not relevant.

THE COURT: I find that it is relevant, and the objection is overruled.

A. After that, Ms. Mohamed was very vocal about her feelings towards law enforcement, and she began making statements about it at work. She was really coming after both Ms. Barley and SHRM with regards to their feelings around law enforcement and the law enforcement community. And our friendship never rebounded after that.

BY MS. DARROW:

Q. How did that make you feel?

A. Not great. I thought we were friends. We hung out outside of work. We used to joke. She would send me pictures of -- she had -- her boyfriend's father was dating a lady named Cricket who would write messages in lipstick on the mirror in the bathroom and she would send me pictures of it. So we were friendly. We used to joke and have fun. It was a fun existence.

Q. Let's talk about Ms. Mohamed's promotion to Senior Instructional Designer position in 2020.

What was your involvement in the decision to promote her to that position?

A. I was a part of the interview process.

Q. Who else participated in the interviewing process?
A. Jeanne Morris, Nick Schacht, and Carolyn Barley.
Q. Do you recall any specifics about Ms. Mohamed's interview for the Senior Instructional Designer position?
A. I do. I had asked Ms. Mohamed if she could share with me what her sense or take was on the difference between a Junior Instructional Designer and a Senior Instructional Designer. And Ms. Mohamed noted that she recognized that it would be taking on more work, but she did not fully grasp or was not able to communicate the true scope of the difference between a Junior Instructional Designer and a Senior Instructional Designer, to include being able to independently develop and design programs using the ADDIE model, to leverage and really manage subject matter experts, or SMEs, effectively. She would be delivering work at a higher caliber.
A Senior Instructional Designer, for all intents, is a matter of their trade, so that would mean that the caliber of the work, the design work that they are doing, is at a higher caliber.
Q. And she didn't seem to understand that?
A. That did not come through in her response during the interview process.
Q. What did you think of Ms. Mohamed's readiness or qualifications?
A. I had mixed feelings. Putting our friendship aside,

Ms. Mohamed did not, to my knowledge, have any formal instructional design training. She had a history of prolonged development or missing design deadlines that were in place. So I had some concerns, but, again, I wanted to support my friend and support her continued career growth.

Q. Can you give examples of the missed deadlines you just referenced?

A. Sure. In 2019, Ms. Mohamed was given the opportunity to convert an instructor-led program, Leading Internal Investigations, into a self-paced program. So the content was not new. It was -- had been delivered for years in an instructor-led capacity. In fact, Ms. Mohamed went and sat in on one of those instructor-led deliveries live.

And it took her a full year to develop that program or to convert it from an instructor-led delivery to a self-based delivery, which is excessive.

Q. How did you become aware of that excessive delay?

A. In my role I would have oversight and responsibility for the revenue goals and the operations of that program. So if it was delayed, that meant that we weren't selling it, which meant that we were not contributing revenue to the business. We would also be paying an Instructional Designer during that time of development. So, essentially, SHRM would have been losing money or creating -- widening the gap between our budgeted plans and our actuals.

Q. So you had these concerns. So what led to Ms. Mohamed getting promoted anyway?

A. At the end of the day, Ms. Barley advocated for it. She felt that Ms. Mohamed was ready, that as an organization and as a team, we were choosing to invest in our people to provide, again, a career ladder opportunity for her. Ms. Mohamed was excited and wanted the opportunity, and at the end of the day, it was the hiring manager's decision, Ms. Barley, to promote Ms. Mohamed.

Q. Does SHRM often hire people who aren't fully qualified for a role?

A. It's not uncommon. You wouldn't want to hire -- offer somebody a role that meets every qualification 100 percent. They would get bored, and they would leave. You want to provide that opportunity for someone to be able to grow into the role, to develop, to fine-tune their expertise. And SHRM believes in promoting from within and providing those opportunities. We were choosing to invest in Ms. Mohamed's growth and development. And Ms. Mohamed was agreeing to that growth and development in accepting the role, especially given that she had seen the job description when she applied.

Q. So what projects was Ms. Mohamed assigned to after her promotion to the Senior Instructional Designer in January 2020?

A. She would have been assigned two projects: The Compliance

project as well as the Digital HR project.

Q. I know the jurors already heard about both projects.

Tell us very briefly, what's the HR Compliance project?

A. That would have been a program that navigates the employee life cycle from a labor and compliance perspective, so really the legal implications that an HR professional would need to navigate throughout the employee life cycle.

Q. Okay. So how was Ms. Mohamed expected to obtain the content for the HR Compliance course?

A. This is SHRM's bread and butter. HR compliance is something that we have a plethora of resources around. We had identified a SME, our subject matter expert, named Lou Lessig, who was a labor and employment attorney and dealt with a lot of these things on a daily basis. We also had a ton of content on our website. We had a number of other courses that touch on HR compliance, including our certification program and other programs that have content areas that focus on this.

We also have attorneys on staff at SHRM that are well versed in this arena.

Q. So before I get into the Lou Lessig piece, was this a new course or a redesign?

A. It was a new course but not new content.

Q. Got it.

And Lou Lessig, was that the SME, or the subject

matter expert?
A. Yes, ma'am.
Q. Okay. And had you ever worked with Lou Lessig before?
A. I had on various other projects and roles within his tenure at SHRM.
Q. So just so we're clear, what was Ms. Mohamed's responsibilities in relation to Mr. Lessig's responsibilities?
A. So Mr. Lessig was the content expert. Ms. Mohamed was essentially going to -- or supposed to take the content that we were getting from Mr. Lessig and effectively create that educational experience in a way that delivered the content that catered towards adult learning principles and in an effective and engaging way.
Q. What was your involvement in this HR Compliance project?
A. I was not initially involved outside of providing the SME, or subject matter expert, in Lou Lessig over to the Instructional Design team and Ms. Mohamed. However, once we started to encounter those delays, I stepped back in to lean in on some of those communications so that we could get the project back on track.
Q. What was the -- the consequences of those delays?
A. It hurt the business. We were not able to sell the program, which meant that we did not have revenue coming in at the time, and we were paying our subject matter expert, our SMEs, as well as Ms. Mohamed on the development. So

essentially, this program was operating in the red.

And what made it so critical is we were in 2020, and so that revenue for our organization from a virtual delivery standpoint was key. And at that time SHRM education was delivering two-thirds of the organization's revenue. So every program, every registration counted.

Q. You said 2020. Are you referring to COVID?

A. Yes, ma'am.

Q. So given the delays kind of forced you to have to jump in, what would you have expected from a Senior Instructional Designer?

A. I would have expected a -- a plan A, B, C, and D. I mean, we needed -- this was how we were paying our salaries and servicing our members, the core functions of our organization. So if plan A was encountering a roadblock, that means we pivot to plan B and would be finding other SMEs, leveraging other course content that we already had, reaching out to other resources across the organization and the articles that we have on our website.

Again, HR Compliance was our bread basket. We had this. We just needed to create the educational experience to deliver it.

Q. So did Ms. Mohamed need to rely on Lou Lessig in order to complete that project?

A. He could have been a resource but not the sole resource.

Q. What was Ms. Barley's role in the project?
A. Outside of being Ms. Mohamed's direct manager, she did not play a role. I don't believe she joined any of our calls, or anything for that matter.
Q. Did Ms. Mohamed say anything to you about her communications with Mr. Lessig, the SME, the subject matter expert?
A. About Ms. Mohamed's communications with him?
Q. Yes.
A. Just that she was struggling to get some of the content that she needed. But outside of that, my understanding was they had a very pleasant relationship.
Q. So when there were these missed deadlines related to the HR Compliance program, how did SHRM respond to that?
A. We gave both Mr. Lessig and Ms. Mohamed extensions on those deadlines.
Q. At some point -- I'm going to show you Exhibit No. 12. It's already been admitted.
Take your time and go through it. I'll ask you some questions about it. I know it's a lot of communication in here. I'm going to focus on 7598.
Do you see that? What's your understanding of what's going on in Exhibit No. 12?
A. My understanding? I'm just waiting for the little thing to go past the screen.

My understanding was that Ms. Mohamed was waiting to receive content from Mr. Lessig, that we had agreed to him providing the content by Memorial Day. We confirmed the firm delivery date, and Ms. Mohamed noted that the new delivery date was 5/31.

Q. Did Mr. Lessig meet that deadline?

A. I do not believe he did.

Q. And how did that affect the launch date?

A. If we didn't have the content, we couldn't deliver a program without the content.

Q. What should Ms. Mohamed have done when Mr. Lessig didn't meet that deadline?

A. Moved on to plans B, C, or D, which was leverage, any of the other resources that she had at her disposal.

Q. What was the impact of having to move that launch date?

A. It meant that we could not deliver the program in July as we had intended to, which meant that we did not have revenue coming in for that program yet we were incurring the expense.

Q. Were there any marketing pressures related to having to move the launch date?

A. Absolutely. We would have been marketing the program to our audiences because we knew that this was such a critical topic at this time. And so we would have had marketing outreach already in the market, and we would have had to pull those back at that time because we would not be delivering

that program on the dates that we would have advertised.
Q. Was marketing reaching out directly to you?
A. Yes, I would have been working in lockstep with marketing on this.
Q. I'm going to show you Exhibit No. 18. I'm going to focus on 7575.
MS. DARROW: And if you could blow that up or for the jurors, please. Just the top one.
BY MS. DARROW:
Q. Do you recognize this communication?
A. I do.
Q. What's your understanding of what's going on in Exhibit No. 18?
A. My understanding is this would be a communication from Ms. Mohamed to Ms. Barley and I providing an update on the Compliance program.
Q. So is this the point that you jumped in and started communicating as part of the -- this program?
A. I believe so.
Q. And this is when Ms. Mohamed decided to take over the project completely; is that right?
A. It was Ms. Mohamed's recommendation that she take over full development and management oversight responsibility for the delivery of this program.
Q. How was that different from what she was supposed to be

doing before?
A. Before she was waiting or relying on all of that content from Mr. Lessig and now she would be taking that content development on and leveraging Mr. Lessig as a SME, or subject matter expert, to ensure legal accuracy with regards to the content that was being produced.
Q. And did you have an understanding that Ms. Mohamed had full autonomy as to the -- this project?
A. Absolutely. Once we made that pivot for her, per her recommendation, to take on the full development and design of the program, she would have full autonomy and independence required to get the project done.
Q. So to be clear, so Mr. Lessig was supposed to be providing the content up to that point, right?
A. Yes, ma'am.
Q. But even so, if there were issues with Mr. Lessig providing the content, you would expect the Senior Instructional Designer to continue -- to figure out another plan?
A. Absolutely. And in that last exhibit, it shows that Ms. Mohamed did reach out to our legal counsel at the time, La Tanya, and shared a program outline with her. My sense, based on the communication, was that our legal counsel had said that it looked good and that she was even open to reviewing the course in an alpha version when Ms. Mohamed had

it ready.
Q. So there was nothing to stop Ms. Mohamed from doing that at any point earlier?
A. That is correct.
Q. And there is nothing to stop Ms. Mohamed from doing that from that point forward?
A. Correct.
Q. So would you say that as a Senior Instructional Designer -- you had mentioned having a plan B, C, and D?
A. Yes, ma'am.
Q. Okay. Why is that important?
A. You never want to have a single point of failure. Everybody that knows -- that works with me knows that that is one of my biggest pet peeves, because when you have a single point of failure, you are presenting a lot of risk to a plan. And by always having a backup plan, if and when you need to pivot, because inevitably at some point you will need to -- everything is set in sand -- you are then able to be agile enough to move on to plan B and just keep rolling with the punches.
Q. And that's an expectation of a Senior Instructional Designer?
A. Absolutely.
Q. Let's talk about the Digital HR course.
What was your involvement in the Digital HR course?

A. I would have been aware of the development and the progress towards completion of that program specifically as it related, just like the Compliance program, for us to be able to deliver it and align to our revenue goals the revenue that we had ear marked for that program.
Q. Now, wasn't there a change in July of 2020 related to the Digital HR program?
A. There was.
Q. What was that change?
A. We had asked Dr. Deborah Waddill to be the instructor for this program.
Q. Why was Dr. Waddill asked to teach the course?
A. Because she was a recognized SME and thought leader in this space. She had published a book in this content area, and it would provide higher level of credibility to the content that we were delivering in this program. And it meant that we could market her as the instructor of the program. That would likely generate additional revenue because she is so well known in this content area.
Q. Did Dr. Waddill have any conditions for her teaching this course?
A. She did. She wanted us to incorporate elements of her book.
Q. How much of the book?
A. She probably had thoughts about how much she would have

liked for us to incorporate, but we at SHRM made the decision to incorporate no more than 10 percent due to copyright restrictions.

Q. What conversations did you have with Ms. Mohamed with regards to Dr. Waddill's involvement in this Digital HR course?

A. Ms. Mohamed was aware that we had asked Dr. Waddill to be the instructor for this program, and Ms. Mohamed was excited about it. I believe that Ms. Mohamed had originally reached out to Dr. Waddill very early in the design process for this program as a potential SME, although I -- she did not receive a response, which happens from time to time, is normal. But the fact that we were able to engage this recognized SME and thought leader to be the instructor for this course and incorporate or offer the book as a part of the registration for this program was a new and exciting thing for us to be able to do, and Ms. Mohamed excitedly supported that.

Q. At some point did Dr. Waddill drop out of the project?

A. She did.

Q. How do you know that?

A. Because she reached out to me to withdraw her -- or to rescind her potential acceptance around being an instructor for this program.

Q. And what's your understanding as to why she dropped out?

A. My understanding was that there were two core themes

around why she was not comfortable facilitating that program. One was that she did not feel that the content from her book was integrated well into the program design; and, two, she did not feel that the content that was in the program was strong or in alignment with what SHRM should be delivering in this content space. So essentially it was a quality issue.
Q. Whose quality?
A. Ms. Mohamed's.
Q. How did you respond?
A. I thanked Dr. Waddill for sharing her concerns with us. I did not by any means want to ruin the relationship that we had with Dr. Waddill with regards to SHRM. And I said that I hope that we have the opportunity to partner in other opportunity -- to partner in future opportunities.
Q. Did that ever happen?
A. Not on the SHRM education side.
Q. Now, by the point that Dr. Waddill got involved in the project, what was the state of the project?
A. It was mostly complete.
Q. So how long would you have expected a Senior Instructional Designer to take to incorporate Dr. Waddill's book into it.
A. It was under 10 percent, so it should not have been a significant or very heavy lift. And I believe I even confirmed that with Ms. Mohamed, and she agreed.
Q. When you say not a heavy lift, can you quantify that for

us?

A. It wouldn't have taken months or weeks -- a week, maybe two max, while working on other projects at the same time.

Q. Ms. Mohamed has suggested that deadlines for these programs were arbitrary.

What's your perspective on that?

MS. DeFAZIO: Objection, Your Honor. That mischaracterizes evidence.

THE COURT: I don't believe it does.

The objection is overruled.

A. Do you mind repeating the question real quick?

BY MS. DARROW:

Q. There has been a suggestion that the deadlines for these programs are arbitrary.

What is your perspective on that?

A. I vehemently do not agree on that. We operate on an annual programmatic schedule that has revenue tied to it, and, again, especially during 2020, the organization was so heavily reliant on the revenue that was coming in through SHRM education. I think I mentioned that it was two-thirds of the organization's revenue at that time because we could not deliver in-person programs. And the biggest in-person program that the organization delivers is our annual conference, and we did not have that in 2020. So we were heavily reliant on the revenue that came in through SHRM Education and extremely

high profit margins of approximately 70 percent.
Q. Did the HR Compliance course have to get -- did that launch date have to get pushed back as well?
A. Yes, ma'am.
Q. And what was the -- why?
A. Because the product that we received was not in final format and could not be delivered in its current state.
Q. I'm going to show you Exhibit 50, already admitted.
What is this? What is Exhibit 50?
A. This would be our weekly registration report, our daily count that shows how our program registrations are tracking for upcoming courses. And then you will see between the Subject line that our colleague Mr. Estrella sent out and the forward from Ms. Barley we had several attachments, one of which was the road to 6 million, which was our annual revenue goal. So we were tracking every registration for every program in order to reach that revenue goal.
Q. Can you talk us through how many registrants there were for these programs?

MS. DARROW: It's on the second page.
A. I can. So do you want me to go through each program?
Q. No. Let's just look at Ms. Mohamed's programs.
A. Okay. So I see the Digital Transformation October 1st program had three registrations at the time of this report.

Q. Why was registration so low?
A. We didn't have a lot of content to market. And so when you're asking people and customers to pay over a thousand dollars for a program and you don't have a program outline or a thorough description of the content that is going to be covered in a program, I'd be hard-pressed to part with a significant amount of money given that it's very uncertain what I would be getting as a result of registering for that program.
Q. Whose responsibility was it to create that content?
A. Ms. Mohamed.
Q. Given the low registration numbers, was SHRM doing anything to try to increase registration?
A. Absolutely. We would have been marketing it, but the content that marketing would have had at its disposal to use in those marketing efforts would have been very shallow at the time.
Q. And those materials you were waiting for from Ms. Mohamed?
A. Yes, ma'am.
Q. Was SHRM calling folks and doing something else to try to increase registration?
A. We would have been leveraging all of our marketing channels. So it would have been digital and paid media. It would have been email. We would have been sending print collateral and the like.

Q. We had heard some testimony earlier about folks on the educational team making calls.
What were they making calls for?
A. Sure. So when COVID dropped in our laps, we had a number of in-person programs that were scheduled for the spring, over 100. And several members of the Education team were calling each of those individual registrants to, A, give them white glove service at a time that was very uncertain in our country, in the world, but, B, in an effort to transfer their registrations from an in-person delivery to a virtual program.
And so we were calling each person individually in that effort.
Q. How many calls were being made?
A. Hundreds. A lot. I mean, we had over 100 programs. If we average 25 to 30 registrations per program, it's a lot of phone calls.
Q. What's -- did Ms. Mohamed have to make any of those phone calls?
A. No, she did not.
Q. Why not?
A. Ms. Mohamed had a pattern of not meeting deadlines when it came to program deliverables, and so we really wanted to make sure that Ms. Mohamed had the opportunity to focus on the delivery and the development of those programs because they were so important given the hard pivot that we swung to solely

virtual deliveries.
Q. I'm going to show you Exhibit No. 28. It's already been admitted. And I want to go down to the -- we've seen this a few times. Let's go page 9558.
Well, actually, I'm going to lay a foundation here.
So in the top -- it says from Carolyn Barley. You're copied on this email, correct?
A. Yes, ma'am.
Q. Okay. And so first, tell the jury what this document is.
A. This would be a report that Ms. Barley would send out around the overall operations and project status of the projects that the Instructional Design team was working on at that time.
Q. Okay. And so it lists all the projects that everybody's working on?
A. I'm not sure if it lists all the projects. It lists most, I believe.
Q. So let's look at -- you see Ann Godmere. I only see her name in two places, so does that mean Ann Godmere was only working on two projects at the time?
A. No.
Q. What other projects was she working on?
A. Ann was also making those phone calls to a number of the registrants that we had for our in-person programs to move them over to our virtual programs. Ann was also working with

several of our other colleagues in departments across the organization to train them on how to effectively deliver a virtual program.

So, for example, our chapters and state councils deliver a number of in-person programs and experiences at a local level, and they did not have the skill sets or the understanding on how to deliver a virtual program. And given the COVID environment and their inability to deliver an in-person program, Ann was training our chapters and state councils on how to deliver effective virtual programs. She was also doing it for our SHRM India and SHRM East team and the like.

Q. That's not listed on here?

A. It's not.

Q. Carrie Mills is listed on here twice.

Was she only working on two projects at the time?

A. No.

Q. What else was she working on?

A. Carrie was -- well, first, Carrie was making the phone calls to our in-person registrants. She was also a part of the cross-functional organizational team that we stood up very quickly in 2020 to develop content and tool kits and resources for our members around navigating the climate with regards to workplace bias and social justice. It was a need that our members were screaming for and needing to be able to help

their organizations navigate this really complex time.
Q. Ms. Mohamed is listed in two spots and then -- three spots.
Was she working on anything other than what's listed on here?
A. I do not believe so.
Q. Were you aware of the designers' workload on the Education team?
A. I was.
Q. Why would you be familiar with their workloads?
A. A, because we were working in lockstep and it was an "all hands on deck" to preserve our business at the time during COVID. Also, it would have direct implications onto the operations and the performance of our business, specifically our revenue.
Q. Given your knowledge of the workload of the Education team, what was Ms. Mohamed's workload in comparison to her peers in 2020?
A. I think it was less.
Q. Let me show you Exhibit No. 4.
MS. DARROW: Move to admit Exhibit No. 4, Your Honor.
THE COURT: 4 is admitted.
(Defendant's Exhibit 4 received.)
MS. DARROW: Permission to publish?
THE COURT: Sure.

BY MS. DARROW:
Q. What is Exhibit No. 4?
A. The SHRM employee code of conduct.
Q. Are you familiar with it?
A. Yes.
Q. I'm going to direct your attention to page 7. It says "Respect and Personal Professional Integrity."
Does this accurately reflect the SHRM's policy with respect to respect and personal and professional integrity?
A. Yes, I believe so.
Q. It says, "Treat everyone with respect, dignity, fairness, mutual consideration; refrain from harassment and illegal discrimination; act with integrity; comply with our equal employment opportunity policy and affirmative action policy; refrain from office gossip."
That comports with your understanding of what SHRM's policy is with respect to respect and personal and professional integrity?
A. Yes, ma'am.
Q. Let's go to page 9.
MS. DARROW: And so you can highlight both the equal employment opportunity and -- yeah. Just -- that's fine.
BY MS. DARROW:
Q. Does this comport with your understanding of what SHRM's policy is with regards to equal employment opportunity?

A. Yes, ma'am.
Q. Go to 24.
And so every employee of SHRM is expected to comply with this SHRM employee code of conduct, right?
A. Yes, ma'am.
Q. Has that always been your understanding all the years you've worked at SHRM?
A. It has.
Q. Go to 27.
And you haven't -- this is SHRM's nonretaliation policy, right?
A. Yes.
Q. Okay. Does this comport with your understanding of what SHRM's nonretaliation policy?
A. Yes. We've always said we have a zero-tolerance policy.
MS. DARROW: You can take that down.
THE COURT: Ms. Darrow, I'm not trying to limit your examination. We are going to take a brief afternoon break at some point, but if you're close to being done, I'll do it at the end. If not, we can do it sooner and then come back to your questioning.
MS. DARROW: We can take a break right now.
THE COURT: Folks, if we can be back right at 4:00, about an eight-or nine-minute break but let everybody stretch their legs, and then we'll get back together and finish off

the day.

Please rise for the jury.

(The jury exited the courtroom at 3:52 p.m.)

THE COURT: We'll be in recess, folks. We'll start right back up at 4:00. Thank you.

(A recess was taken from 3:52 p.m. to 4:01 p.m.)

THE COURT: Let's bring them back in.

THE COURT: Welcome back. Please be seated.

Ms. Darrow, you may continue.

MS. DARROW: Thank you, Your Honor.

BY MS. DARROW:

Q. Ms. Lacey, I'm going to show you another exhibit.

(Discussion off the record.)

BY MS. DARROW:

Q. All right. Look at Exhibit No. 5. It's already been stipulated to.

MS. DARROW: Move to admit, Your Honor.

THE COURT: 5 is admitted.

(Plaintiff's Exhibit 5 received.)

MS. DARROW: Permission to publish?

BY MS. DARROW:

Q. You're familiar with this document, Ms. Lacey?

A. Yes, ma'am.

Q. Okay.

MS. DARROW: And go to the second page.

BY MS. DARROW:
Q. Does this comport with your understanding as to SHRM's policies and procedures?
A. Yes, ma'am.
Q. All right. I'm going to show you another exhibit.
MS. DARROW: Move to admit Exhibit Number 9. It's already stipulated to.
THE COURT: 9 is admitted.
(Plaintiff's Exhibit 9 received.)
BY MS. DARROW:
Q. You were aware that Ms. Mohamed was offered the position of Senior Instructional Designer, correct?
A. Yes, ma'am.
MS. DARROW: No further questions, Your Honor.
THE COURT: Okay. Cross-examination.

**CROSS-EXAMINATION**

BY MS. DeFAZIO:
Q. Good afternoon, Ms. Lacey.
A. Good afternoon.
Q. You testified that you've been at SHRM for over 18 years?
A. Yes, ma'am.
Q. Is SHRM the only employer you've worked for since you graduated from college?
A. Yes, ma'am.
Q. So you've worked your way up there?

A. Fair.
Q. You testified about Mr. Lou Lessig.
Did you know him before he became a SME at SHRM?
A. I knew him through his volunteer leader role.
Q. At SHRM?
A. At SHRM.
Q. Is he still an instructor at SHRM?
A. Yes.
Q. What's the last course that he presented?
A. It would be the updated version of the Compliance course.
Q. You testified that Dr. Waddill --
A. I'm with you.
Q. -- that she pulled out of her involvement in the Digital HR course because of the content or the state of the course that Ms. Mohamed had put together; is that right?
A. That is correct.
Q. Was that ever communicated to Ms. Mohamed?
A. It was.
Q. And how?
A. I emailed Ms. Mohamed to let her know that Dr. Waddill had withdrawn her -- had pulled out of the opportunity to be the instructor for that program.
Q. My question is was Ms. Mohamed ever notified that she was the reason for the -- or the content of the course was the reason for Dr. Waddill pulling out?

A. She was. I believe Ms. Mohamed was sent an email from Dr. Waddill directly indicating why she was not comfortable facilitating that program.
Q. Okay. You believe that email was sent?
A. I do.
Q. And how do you know that?
A. I would have seen that email.
Q. And you believe that that was produced in this case?
A. I do.
Q. Okay. Now, you -- you testified that you had knowledge of Ms. Mohamed's workload, right?
A. Yes, ma'am.
Q. And how she kept up with deadlines, right?
A. How she performed against deadlines.
Q. Okay. But you were never her manager?
A. Her direct supervisor, no.
Q. And you never had input -- or did you have input into her performance reviews?
A. My feedback would have been solicited by her managers.
Q. Okay. And that was throughout the time she was employed at SHRM?
A. Yes, ma'am.
Q. Do you know how she performed as SHRM in her performance reviews?
A. I would not have seen the final version of her performance

reviews, but I would have been been able to share my insight and my experiences based on what I was involved with regards to Ms. Mohamed's performance.

Q. Okay. Would you have provided your concerns about timeliness or any other issues to her supervisor at the time?

A. Yes.

Q. And would that have made it into her performance reviews?

A. I can't speak to that because I was not the one compiling her performance review.

Q. Okay. Do you think it would be best practice to have done so?

A. Again, I wasn't her manager. I wasn't the one who was writing her performance review.

Q. Sure. Do you think it's important for employees to be on notice about the ways in which their performance is lacking?

A. Absolutely. But that would be a part of the regular conversation between a manager and their direct report. So I would assume that there are one-on-one meetings that happen on a regular basis. Whether it's one-on-one, there would be team meetings that occur, and in those conversations there would be feedback that is provided and coaching that is provided as a part of that regular cadence.

MS. DeFAZIO: Your Honor, I would strike that answer as nonresponsive.

THE COURT: I believe it was reasonably responsive to

the question. The request is denied.
BY MS. DeFAZIO:
Q. At SHRM the way that employees get input in their performance in writing is in performance reviews, right?
A. That would not be the sole mechanism. There would be email communications, Slack communications, any method of communication.
Q. Okay. So other than emails and Slack, the formal documentation of how an employee is doing at SHRM is their performance reviews, right?
A. I would believe so.
Q. And would you agree with me that it's important that those employee performance reviews accurately reflect how an employee is doing?
A. Yes.
Q. Okay. And that if there is an issue with performance it be documented in that -- those performance reviews?
A. It would have been mentioned.
Q. You said you were friendly with Ms. Mohamed at a point; is that right?
A. Yes.
Q. Did you ever reach out to her after she she was fired?
A. No.
Q. When is the last time that you talked to her?
A. When she was still employed at SHRM.

Q. You testified about a conversation that you overheard between Ms. Mohamed and Ms. Jackson where you heard Ms. Mohamed raise her voice, right?
A. Yes.
Q. And are you aware that Ms. Mohamed received an extremely favorable performance review from Ms. Jackson?
A. I would not have seen that performance review.
Q. It was her best performance review that she received at her time at SHRM; did you know that?
A. No. I would not have seen that.
Q. Okay. Now, when Ms. Mohamed was an Instructional Designer, before she was promoted she completed a course called Workplace Communication Storytelling.
Did you remember that?
A. Uh-huh, yes.
Q. And she completed that in four months.
Do you recall that?
A. I can't speak to the specific timeline.
Q. Do you recall that you personally identified that course to be included in SHRM's advocacy conference because you were so impressed with it?
A. I suggested that program not because I was so impressed with the course, but because the need for that specific offering aligned. It had nothing to do with the caliber of the delivery.

Q. Okay.
A. And, in fact, it was the instructor of that course that we would be leveraging and adjusting that content for that specific audience. It would not have been an off-the-shelf delivery.
Q. Okay. But by the time Ms. Mohamed was interviewing for the Senior Instructional Designer course, you knew of at least one course she had completed independently, which was that one, the workplace communications, right?
A. She did not complete it solely independently. She also had significant involvement from a subject matter expert who was providing her the content in the form of Trisha Zulic
Q. Okay. But as an Instructional Designer and a Senior Instructional Designer, one of your tools is subject matter experts, right?
A. Yes.
Q. So it's up to you to get content from SMEs, because Instructional Designers don't know all of these areas, do they?
A. They don't. But a SME is not the sole resource. There should be several resources that are leveraged.
Q. Okay. You testified about concerns with Ms. Mohamed's timeliness in completing projects.
Did you ever communicate those concerns to Ms. Mohamed directly?

A. Yes.
Q. And how so?
A. We had several conversations during the development of the Leading Internal Investigations self-paced module because I was looking to understand why it was taking approximately a year to develop, given that the content was already in hand and being delivered through a different modality.
Q. And did you communicate that in writing?
A. I can't recall.
Q. Okay. If it had been communicated in writing, would you have expected it to have been produced in this case?
MS. DARROW: Objection. Privilege.
THE COURT: I'm sorry. I guess I don't understand the privilege objection as it relates to this.
MS. DARROW: She's asking about the expectation of what's going to be done during litigation.
THE COURT: That's not how the question came out.
MS. DARROW: Maybe I misunderstood the question.
THE COURT: The question was whether it would have been produced in this case, not whether it would have been produced for this case.
So I don't believe that that's a privilege issue.
The objection is overruled.
A. I wasn't involved in anything that was produced in this case.

BY MS. DeFAZIO:
Q. You testified that Ms. Mohamed did not provide an agenda for the digital HR course; is that right?
A. An outline.
Q. An outline. An outline and agenda are not the same thing?
A. No.
Q. Okay. Would an outline have been the design document at the beginning of the development phase?
A. No.
Q. Okay. Do you know why Ms. Mohamed was terminated?
A. For not meeting deadlines, I believe.
Q. Deadlines plural?
A. Two programs that we needed to offer and could not offer.
Q. Were you involved in the termination decision?
A. No.
Q. You mentioned The Road to 6 Million. Tell us more about that.
A. That would be an Excel document where we were tracking the registration counts for each of the programs that we had slated, the revenue that would have been received for each of those programs, and we would be then showing on a weekly basis the gap between where we were currently performing and where we needed to end our year, which was at the 6 million revenue mark.
Q. So my understanding was to have the Education department

bring in 6 million in revenue in a year; is that right?
A. Yes, ma'am, at 70 percent profit margin.
Q. And did that end up happening in 2020?
A. I can't recall. I believe so, but I can't recall.
Q. Okay. How about 2021?
A. We -- is your question did we meet 6 million in 2021?
Q. Yeah.
A. Absolutely.
Q. Did you exceed 6 million?
A. I believe so.
Q. How much more than 6 million?
A. I don't have the figure in front of me. I'd have to check.
Q. If you saw tax returns from SHRM from the year 2021, would that refresh your memory?
A. No, because I don't believe that it would break down to that granular of a level. But I can't speak definitively.
Q. Okay.
MS. DeFAZIO: Just a moment, Your Honor.
THE COURT: Sure.
(Pause in the proceedings.)
BY MS. DeFAZIO:
Q. So, Ms. Lacey, you said that SHRM, you suspect, exceeded 6 million in 2021; is that right?
A. I believe so.

Q. How about 2022?

MS. DARROW: Objection. Relevance.

THE COURT: Ms. DeFazio.

MS. DeFAZIO: Well, it has to do with -- well, punitive damages, first of all, with revenue. And, secondly, there's a claim in this case that there was hardship to revenue, and so we want to know how SHRM did.

THE COURT: I don't find -- the hardship to revenue claim was specifically related to 2021. It hasn't been expanded beyond that.

In terms of the punitive damage claim, how a particular or singular division did, frankly, isn't relevant. Already in evidence is, essentially, a total revenue figure, which would appear more relevant, particularly given the objection.

So with that, the objection is sustained.

MS. DeFAZIO: Certainly.

MS. DeFAZIO: No further questions. Thank you Ms. Lacey.

THE COURT: Would you like to redirect?

MS. DARROW: Just super short, Your Honor.

THE COURT: I'm not putting any time limit on it.

REDIRECT EXAMINATION

BY MS. DARROW

//

Q. Let's pull up Exhibit Number 97 real quick.

THE COURT: I'm sorry?

MS. DARROW: 97, Your Honor.

Already admitted Your Honor. So permission to publish?

THE COURT: Okay.

BY MS. DARROW:

Q. You were asked earlier whether Dr. Waddill dropping out and the reason for her dropping out was communicated to Ms. Mohamed.

A. Yes, ma'am.

Q. Does Exhibit No. 97 reflect that communication to Ms. Mohamed?

A. Yes, it does.

Q. And then you were specifically asked --

MS. DARROW: Let's pull up Exhibit No. 51.

BY MS. DARROW:

Q. You were also asked if you communicated to Ms. Mohamed that Dr. Waddill had dropped out.

Is that what you were communicating to Ms. Mohamed in this communication that's been marked as Exhibit Number 51?

A. Yes, specifically in the line that begins, "Additionally, I wanted to let you know . . ."

MS. DARROW: No further questions, Your Honor.

THE COURT: All right. You may step down. Thank you

very much.

Ms. Darrow, would you like to call another witness?

MS. DARROW: Defense rests.

THE COURT: All right. Does the Plaintiff intend to present a rebuttal case?

MS. DeFAZIO: Yes, a brief one, Your Honor.

THE COURT: Who do you call?

MS. DEFAZIO: We call Ms. Mohamed.

THE COURT: All right. Ms. Mohamed, it's a new day so I'll need to administer a new oath.

(Witness sworn.)

THE COURT: Please be seated.

The record will reflect this is Ms. Mohamed again.

And your witness, Ms. DeFazio.

**REHAB MOHAMED, PLAINTIFF'S WITNESS, REBUTTAL EXAMINATION**

BY MS. DeFAZIO:

Q. Good afternoon, Ms. Mohamed.

A. Good afternoon.

Q. There has been some testimony in this case about your experience and qualifications at the time that you applied to be a Senior Instructional Designer.

Will you tell us in your own words what your qualifications were at that point?

A. Well, I can tell you in terms of certifications that I've gained in the field, but also the years of experience that

I've spent building online learning programs. In 2018 --

THE COURT: Let me have you slow down just a bit, ma'am.

THE WITNESS: Yes. I should know better by now. Thank you.

THE COURT: No problem.

A. In 2018, I obtained a certification from the Association for Talent Development, ATD, on design learning. I also obtained a certification on e-Learning instructional design from the same association.

I've attended several conferences annually with regards to instructional design and digital learning. One of them is called DevLearn. It's a big deal in the field. And I would go there in person. They would hold it in Vegas or in Chicago, and I would go and attend a three-to five-day conference and I would attend various conferences with regards to instructional design and digital learning solutions.

I would like to speak now about my career and the years of experience that I gained before applying to the Senior Instructional Designer.

From the year 2013 until 2016, I worked with Women's Learning Partnership to build online learning programs. I believe over the three years, I've launched over 15 blended learning programs, which means that they have virtual aspects and self-paced aspects and face-to-face.

These blended learning programs covered several topics: Financial stability for nonprofits in the Middle East, violence against women and empowering social workers and the global south, and leadership and political participation for women also in the Middle East.

I also helped the organization convert their entire face-to-face training into an online learning ecosystem. To do so, I had to test -- do extensive testing on learning the platforms to find out which platforms are capable of delivering these digital solutions. This is -- this was the same platform that SHRM used, by the way, which was one of the reasons why I applied for the position at SHRM, given my experience with that platform, additionally for Adobe Connect. I'm sure you've heard that platform throughout. I've also helped the organization to use Adobe Connect prior to joining SHRM.

So just before I even joining SHRM, I had about three years of experience in the field. Since my joining SHRM until the time I applied for the Senior Instructional Designer, I -- from 2016 until 2019, I believe, so two additional years that I applied adult learning theories and instructional design strategies to build various courses, including Leading Internal Investigations, California HR Employment Laws, and the communications storytelling workplace seminar.

Q. Thank you, Ms. Mohamed.

There has also been testimony about your workload in comparison to your peers in or around the summer of 2020.

Can you speak to whether your workload was compare -- how it compared to your peers at that time?

A. My workload, I would describe it as above average or above what my teammates had. Additional to the two main projects that I was working on, I was part of the PMQ cross-functional team, which I had to do extensive reviews on a weekly basis. Those were timely reviews that we had to get back very quickly. So I was able to do that.

I received a letter of appreciation and a gift card from senior leadership for my contribution to this program.

Additionally, I worked with marketing to identify how can we bundle education programs and create learning paths, which was basically a new product.

I created a presentation, and I presented this presentation to the sales team.

One of my main things that I also have to contribute -- because you've heard that I was tech savvy, I had to create assessments for the microcredential programs that SHRM was offering. Every time they create a new specialty credential or a microcredential, I was tasked with creating the assessment, a digital assessment, for these products. And that was also a very time-sensitive task, so once the assessment was ready, I had maybe less than a week to

turn it back and -- actually, I received a gift card from Ms. Lacey herself for my contribution for these microcredential programs.

And additionally, the last thing is I was also the go-to person for the organization learning management system because of my previous experience on the platform. So any issues on the platform I was pulled into, which happened, I would say, monthly, where I had to -- if a customer reaches out to SHRM and says, I can't get my certification after completing this program, or, I can't access a course, and so forth, I was pulled into these customer requirements.

Q. And was Ms. Barley aware of these additional projects outside of the Compliance, Law and Digital HR program?

A. Yes.

Q. And how would she have been aware of these --

MS. DARROW: Objection.

THE COURT: I did not hear if there was an objection.

MS. DARROW: The Defense -- the question itself is outside proper rebuttal. This is all new evidence that should have been presented in Plaintiff's case-in-chief. This is not proper rebuttal evidence.

THE COURT: Well, I find that it is. Essentially, the workload was brought up. It was attacked on Defendant's case, one example, specifically, with regard to use of the chart through one of the exhibits. Bringing this up in this

limited fashion on rebuttal I find is proper rebuttal.

So the objection is overruled.

BY MS. DeFAZIO:

Q. How was Ms. Barley aware of these additional projects?

MS. DARROW: Calls for speculation.

BY MS. DeFAZIO:

Q. Do you know?

THE COURT: The objection to the question as asked is sustained. You may ask again, as you were doing so.

MS. DeFAZIO: Thank you, Your Honor.

BY MS. DeFAZIO:

Q. Do you know how Ms. Barley was aware of these additional projects?

A. So usually the manager of the Instructional Design Team is the one that gets contacted with these assignments and then she would let me know about these assignments. I wouldn't know about these assignments if she wouldn't channel this communication to myself.

Q. So were these opportunities that Ms. Barley presented to you?

A. I wouldn't say opportunities. It was more of work, yeah, "Do this" kind of thing.

Q. Gotcha.

And so she -- Ms. Barley would provide you those additional work items?

A. Yes.

Q. Okay.

MS. DeFAZIO: No further questions, Your Honor.

THE COURT: Okay. Cross-examination?

MS. DARROW: Nothing further, Your Honor.

THE COURT: You may step down.

Do you have further rebuttal evidence?

MS. DeFAZIO: We do not Your Honor. We rest.

THE COURT: Okay. So, ladies and gentlemen, what this means for you -- and maybe you'll be happy at 4:30 on a somewhat still snowy Thursday afternoon -- is you will be done for today.

Let me talk with you a bit about tomorrow. We still have a significant amount of work yet to do tonight. One of our jobs is to finish up the jury instructions. What will happen tomorrow morning starting at 8:00 o'clock is you will be read the jury instructions. That generally will take 30 to 40 minutes, somewhere along those lines. You'll also have those in writing for your review.

After that you will hear the closing arguments of the parties and then be able to retire to deliberate on the case.

I anticipate that you will receive the case late morning to around lunchtime. We will provide lunch. It won't be Elway's, so my apologies. But there will be something for lunch, subs or pizza. Don will have menus for you for that to

provide lunch during your deliberation. So you should have the case by lunchtime tomorrow to deliberate.

Thank you again for a long day. Please remember that longer instruction that I gave to you that I like to tell you about before every long break.

And with that, please rise for the jury.

(The jury exited the courtroom at 4:31 p.m.)

THE COURT: We're outside the hearing of the jury.

Please be seated.

What I want to do now is take maybe five minutes to address the Rule 50 motion. Then I'll hand out some packets of at least where matters stand in my mind on jury instructions at this point in time and then probably take a ten-minute break so folks can review and digest those.

Realistically, I think what you'll find is that, unsurprisingly, there some core instructions that there are going to be argument and many instructions that you all probably are perfectly happy with, as is normal in this process.

But we'll give you copies of where we think we are are now and then come back and have discussion about jury instructions. My intent is to have those complete and take argument on them before we leave tonight so that I can work with Alex on and Don on getting those ready and have them sitting on the chair for the jurors first thing in the morning

and that we have nothing to do other than have jury instructions and arguments in the morning.

So let me start with the Rule 50. Just to briefly set the table, under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate when a party has been fully heard on an issue during a jury trial and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for a party on an issue. All inferences are drawn in favor of the nonmoving party.

I refer to *Escue*, E-S-K-U-E, *versus North Oklahoma College,* 450 F.3d 1146.

The Court, however, does not make credibility determinations or weigh the evidence. The Court should deny a motion for judgment as a matter of law when, viewing the record in the light most favorable to the nonmoving party, there is evidence upon which the jury could have properly returned a verdict in its favor.

I'll refer the parties to *Harold Stores, Inc., versus Dillard Department Stores* at 82 F.3d 1533, a Tenth Circuit case from 1996.

Here, when viewing the light -- the evidence in the light most favorable to the nonmoving part, Ms. Mohamed, there has been sufficient evidence that the jury could properly return a verdict in favor of her.

A but for causation test applies to Plaintiff's

claims under Section 1981, referring to *Comcast Corp versus National Association of African-American-Owned Media,* United States Supreme Court at 589 U.S. 327, a 2020 case.

In terms of the discrimination claim, the jury has heard evidence that Ms. Mohamed was treated worse than her White colleagues in the same position. Even with regard to the purported reason for termination, namely, submission of products by an August 31st, 2020 deadline, Ms. Mohamed was fired for it; Ms. Mills was not.

In terms of retaliation, the differential treatment from Ms. Barley described by Ms. Mohamed and Ms. Mills was sufficient that a jury could find a good faith basis for her complaints. The jury saw evidence that Ms. Barley wanted Ms. Mohamed punished for making a discrimination complaint and took various steps thereafter that ultimately caused her termination purportedly for missing a deadline.

A reasonable jury could conclude that the imposition of these deadlines and related termination was a pretext, particularly in view of Ms. Barley's expressed desire to punish Ms. Mohamed.

Or, put another way, this is a case that a jury needs to decide, not a case that should be removed from the jury's province at this point.

With that, the motion is denied. And let me --

Can I give you these, Don?

The front page, for whatever reason, we've left the statement of the case on there. I was going to just rip it off and Alex stopped me because page 2 actually has an instruction we need. So my intent is not to give the statement of the case instruction again. That's to give a roadmap, not to be given in final instructions. So you can ignore page 1, and it would start at page 2.

So with that, I think it's appropriate to take about a ten-minute break, have everybody have a chance to read it, and we'll come back out and have some discussion.

MR. SWAIN: Your Honor, before we take the break may I raise one item?

THE COURT: Okay.

MR. SWAIN: Now that the Rule 50 motion has been disposed with, this pertains to closing arguments.

So the Court had ordered the parties to exchange their closing slides by 8 a.m. this morning. And by -- the parties agreed to push that to 9 a.m.

By 4 p.m., just when court reconvened, I had not received anything from the Defendant. So I approached them to, you know, confirm that they weren't planning on submitting any slides during closing. And the response I received was, Oh, sorry. We're going to get them to you.

And to be fair, the reason that they explained was that -- that Ms. Woodfork had been in a car accident at some

point. And I'm sympathetic.

MS. DARROW: It was Ms. Davidson.

MR. SWAIN: I'm sorry. One member of their trial team had been in a car accident. And I'm certainly sympathetic to that.

The issue is they have four counsel of record on this case, and, to be frank, Littler Mendelson has an army of paralegals that could have stepped in to help with this.

So, you know, given how much we've heard about deadlines and the theme of Ms. Darrow's opening argument that deadlines matter, I -- I find it ironic that they would try to skirt this morning's deadline.

But, in any case, it's prejudicial to the Plaintiff that they did not meet the deadline, because I was planning on if they were going to submit slides, looking at them today while I was not, you know, at the podium and trying to get any objections resolved before court closes for the day. And we're not going to be able to do that.

So if they were, for example, to get slides to us at some point now or later, that would interfere with my ability to be able to prepare for tomorrow's closing argument.

So that's all to say I move that the Defendant be forbidden from late disclosing any slides to be used during closing.

THE COURT: Just to be clear, you do not have slides

at this juncture?

MR. SWAIN: No, Your Honor, I do not.

THE COURT: Ms. Darrow.

MS. DARROW: Yes.

THE COURT: First, I'm very sorry to hear that somebody has a car wreck.

MS. DARROW: Yes, a critical member of my team got into a car accident last night, who was responsible for preparing the slides.

I can't review slides that I don't have when that member is involved in a car accident.

The fact that we have -- I can't parachute somebody else into the case, just because the size of my firm, that has no relationship to this case, to do closing slides. That doesn't even make sense, one.

And, two, it's not prejudicial. It's not -- it wasn't even going to be a lot of slides. We're talking, like, eight slides, eight or nine slides, ten at the absolute most and probably not even that many. So it would take opposing counsel five minutes to review them.

Because I don't want the jury looking at slides; I want them looking at me when I'm doing the closing. So the slides were not going to be extremely text heavy or anything like that that's going to cause a lot of time for opposing counsel to review. There is absolutely no prejudice at all to

opposing counsel get the slides at some point today.

THE COURT: Realistically, when do you think you can produce those?

MS. DARROW: Well, I mean --

THE COURT: I know you're here. I'm just asking just so the Plaintiff's counsel knows when -- depending on what I order -- they might get them. What's your, essentially, last time that you think you could have those ready?

MS. DARROW: Within 30 minutes of us finishing here, so I can look at them because I haven't seen them because I've been in trial.

THE COURT: Anything further?

MR. SWAIN: Your Honor, I was planning on devoting tonight's working hours, before I spend time with my children and my wife, to actually preparing for closing and not for doing something that, frankly, should have been -- should have been able to do today while court was in session. This is why we set the deadline.

And like I noted, there are four lawyers who are counsel record for SHRM. One of them has been set sitting in the back of the courtroom every day during the trial. Ms. DeFazio and I prepare our own slides. There's no reason that this couldn't have gotten to us.

THE COURT: Well, I appreciate it. The objection to wholesale exclude the slides is denied.

Unfortunately, we'll have to take this up at 7:45 tomorrow morning. The slides are to be provided no later than an hour after we conclude tonight, which I don't know what time that will be -- obviously, I hope it's sooner rather than later -- but that it be provided by then.

At that point in time -- well, first, in terms of the prejudice of it, I'm not sure if there is any. From a quarter century as trial counsel, often I wanted my opponents' slides because it kind of gave me an idea of where they were heading, so I would rather have had them than not in a real tactical world. I really put no stock in the argument that deadlines matter -- not that they don't matter in a court. They do. But in relationship to the case, that just happens to be an ironic juxtaposition that it really has nothing to do with what I should or should not order.

What I've observed -- and I think it's fair to put on the record because the record is silent as to this -- is that the individual who was unfortunately in a car wreck was also the individual who was running the tech for the Defense team and would logically be the slide person. The fact that Plaintiff's counsel might do it differently is their call, but that doesn't mean that I should ding somebody for something that sounds like it was outside their control.

If, ultimately, you get those slides and it appears to you that there is a prejudice, that can be raised in the

morning. I'll address it very briefly. Defense needs to be in a position that if there are some slides that I order need to be pulled from the deck because of that, that they have the ability to quickly do that. If it's through a PowerPoint, that's generally very easy because the tech person can usually just delete that out of the deck and we can go with the rest of the deck.

So we'll deal with that tomorrow morning at 7:45 if we need to. And it may be there isn't any need to and all it does is give Plaintiff the idea of where the argument is going with at least some structure to it.

So with that, let's take about -- Ms. Darrow. Did you have anything before we break?

MS. DARROW: Nothing further, Your Honor.

THE COURT: We'll take a ten-minute break, and we'll come back and we will address jury instructions. Thank you.

(A recess was taken from 4:44 p.m. to 4:59 p.m.)

THE COURT: Welcome back, everybody.

We're here for jury instruction conference. I'm certainly not in any way indicating that Ms. Mohamed shouldn't be here, but I always offer the opportunity that the parties don't need to be here for instruction conferences on either side.

So I'll leave that entirely up to you, Ms. Mohamed.

In terms of things, my hope is that we can -- I had

read through all the briefing and all the drafts. So my hope is that we can go through these, address them, and make a record and make any adjustments that I might feel are appropriate after hearing the argument within an hour or less. But I really do want you all to have an evening, and we still have to do some back-of-the-house work on them.

We'll have copies for you in the morning. We will have copies without a verdict form for -- and I don't see on here --

MS. DeFAZIO: We don't have the verdict form.

THE COURT: We'll print some draft verdict forms; and ultimately, the jurors, in their copies that they have for their personal use, will not have verdict forms. We will have one original that we place in the middle of the table with a verdict form labeled "original," the idea being that it does not suggest to the jurors that the Court has any impression of who the foreperson should be. They can figure it out for themselves.

With that, let's start with what is on page 2 of the instructions. We're disregarding page 1, the statement of the case. That won't be regiven.

Instruction No. 2 is the introductory instruction.

Anybody have any issues, proposed changes, et cetera?

MS. DeFAZIO: Not from the Plaintiff, Your Honor.

MS. DARROW: Not from the Defense. Oh, sorry.

Ms. Woodfork will be speaking.

THE COURT: Okay. Whoever wants to address or all of the above. I certainly don't require for jury instruction conferences that it be just one person addressing it, as you all may have some specialties between you.

No. 2, the evidence, which is on page 3.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: No objection from the Defendant.

THE COURT: The instruction equality under the law, page 4.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: The instruction direct and circumstantial evidence that is on page 5.

MS. DeFAZIO: No objection.

MS. DARROW: Can we go back to the instruction equality under the law?

THE COURT: Absolutely. Actually, while we're on direct and circumstantial evidence, because I suspect you all have no objection because it's the stock instruction, anybody have a problem with the direct and circumstantial on page 5?

MS. DARROW: No, Your Honor.

MS. DeFAZIO: No.

THE COURT: Going back to equality under the law.

MS. WOODFORK: Your Honor, we would like to renew the

argument that we made in our briefing that we believe the instruction about not being held to a higher standard should be included under equality under the law.

(Reporter interruption.)

MS. WOODFORK: Just given some of the evidence that has come in and the questioning that we've heard to the witnesses about SHRM's expertise and their -- what they do as a business, instructing the jury that they should be treated like any other employer we believe would be appropriate here.

THE COURT: All right. How is that not encapsulated in -- I thought there was an encapsulation of it somewhere else. Maybe not.

So what additional language do you think it should have?

MS. WOODFORK: Just what we proposed initially: "Further, Defendant SHRM is not held to a higher standard under the law because it offers educational training and resources for human resources professionals."

THE COURT: Ms. DeFazio?

MS. DeFAZIO: I think the instruction as it stands includes that sentiment, just more generally. I don't believe there's any need to add the Defendant's name specifically to this.

MS. WOODFORK: I would also just add, Your Honor, that there's been a lot of press and media about this,

misconstruing our request for a motion in limine and just misstating the law and what we've done to advocate for our client.

So understanding that there are already eyes on this and while we may instruct the jury not to consider what's out there and what's published, I think instructing them on this issue would just further instill what we're asking them to do and what the sentiment of this rule is, the purpose.

THE COURT: Well, I'll tell you, just so we're clear for the record, I reject that last reasoning and that is because, frankly, it matters not to this Court, nor should it, what the media has done or said except as to how it might affect our jurors. And our jurors have all indicated that they haven't seen anything and have all been told not to view anything. Beyond that, this Court should not consider that issue.

I do think one additional sentence is probably warranted, and I'm trying to craft how I'm going to say that. So give me just a moment, please.

MR. SWAIN: Your Honor, may I add an argument before you make your order?

THE COURT: Of course.

MR. SWAIN: So this instruction is about equality under the law, meaning individuals and business entities are not subjected to different legal standards in terms of

liability.

But it would be proper for the jury to consider SHRM's standing and its professed human resources expertise if the jury finds for liability and finds that a punitive damages award is appropriate.

It would be completely appropriate for the jury to have discussions about, Look who SHRM is. They should have known better. Right? And so in my mind, inserting SHRM's name into this, which is a stock instruction given in practically every case, tilts the balance towards SHRM by making the instruction about them specifically rather than about human beings and corporations generally.

THE COURT: Ms. Woodfork?

MS. WOODFORK: I would say that that's the very reason we need the instruction here is that we're arguing throughout this case that SHRM should be held to a higher standard, that they should be -- or having lines of questioning to that to witnesses. And that's on Plaintiff to prove that in her case, not to shift that burden to SHRM to show that we should not or -- we should not be held to this higher standard or that we are on the defense here.

It's her burden to prove her case. Her burden to prove her elements. And if the jury finds that punitive damages are appropriate, helping them understand that under the law, SHRM should not be held to a different standard just

because of its business in terms of helping other employers with compliance.

THE COURT: What do you legally think about the idea that punitive damages could conceivably be higher, if warranted, given the nature of SHRM's business?

MS. WOODFORK: Well, that's on Plaintiff to prove that.

THE COURT: Sure. If they did?

MS. WOODFORK: Then that's up to the jury to decide what that looks like through the evidence that has been presented by Ms. Mohamed and what she's established.

THE COURT: So I think the way to thread that needle that I'm contemplating is an additional sentence at the end of the first paragraph. I think it is inappropriate to mention, nor does anywhere else in this instruction mention, SHRM by name. And I'm not going to do that. But I do think it's appropriate to have a sentence along the lines of, "The nature of a corporation's business does not alter the preponderance of the evidence standard that I will discuss later."

MR. SWAIN: No objection to that insertion by Plaintiff.

MS. WOODFORK: No objection.

THE COURT: All right. That will be inserted on page 4 at the end of paragraph 1. I think that that threads the needle between addressing an argument that has been

raised, at least in some ways, but also does not foreclose the punitive damage issue that is being addressed.

Don, don't let me forget that text you sent me. We'll talk about it. We can discuss that in a little bit.

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: Okay. There was no objection to the direct and circumstantial evidence one on page 5.

On page 6 is the standard stock inferences instruction.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: All right. No party objects.

On page 7 is the standard burden of proof instruction.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: On page 8 is the stipulated facts instruction, which has also already been read.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: On page 9 is the use of depositions instruction, which, again, has already been read.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: On page 10 is -- and 11 is the stock

witness credibility instruction.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: No objection.

THE COURT: On page 12 is the stock no requirement to produce instruction.

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: No objection.

THE COURT: On page 13 is the -- it is not a stock instruction, but it's a standard instruction identifying the nature of the statute involved in the allegations.

MS. DeFAZIO: No objection from Plaintiff.

MR. SWAIN: Your Honor, I think the technical name of the law is Section 1981 of the Civil Rights Act of 18-something. The Civil Rights Act of 1991 is separate from 42 U.S. Code 1981.

THE COURT: Can you take a look at that, Alex?

MR. SWAIN: But other than that, no objection.

THE COURT: If that change is made to reflect the correct statute if that isn't the correct statute, does the Defense have a problem with the instruction on page 13?

MS. WOODFORK: No. No objection.

THE COURT: We'll look at that as we go along.

Page 14, nature of the claim.

MR. SWAIN: Your Honor, I was just able to track it down. It's Section 1981 of the Civil Rights Act of 1866.

That's the year that the statute was enacted. So there was a Civil Rights Act of 1991. That's a slightly different civil rights statute.

MS. DeFAZIO: And that error was in our submitted change. Sorry.

MR. SWAIN: Apologies for that, Your Honor. We just noticed it.

THE COURT: So page 13, the proposal is to change it to Section 1981 -- frankly, I guess, ultimately I'm trying to figure out why it matters. Maybe what we just want to do is have it be federal civil rights law, Section 1981 of the Civil Rights Act, comma.

Do we need an enacting year? Does anybody care?

MS. DeFAZIO: No.

MS. WOODFORK: No.

THE COURT: Okay. Then let's just strike the enacting year and not go down the rabbit hole of Civil War history, and we will just leave that out of it.

Okay. Moving to page 14, nature of the claim.

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: No objection.

THE COURT: All right. Page 15, discrimination based on race, the elements.

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: We would like to renew our objection

from our briefing and just argue or note that we believe it should be -- regarding the second element, race must be the but-for cause of Ms. Mohamed's termination.

The suggestion in this instruction that there may be more than one but-for cause isn't consistent with the law. See *Romero versus Tucson Unified School District*, No. CV-20-00507-TUC-AMM, 2024 Westlaw 4893941 at 2 from the District of Arizona, November 26, 2024. It's also supported by the Supreme Court's decision in *Comcast,* just establishing that to the extent that this states that Ms. Mohamed's complaints of discrimination need not be the primary cause of SHRM's decision to terminate her, it conflicts with Tenth Circuit precedent that has made clear that the but-for causation standard requires Ms. Mohamed to prove that her race was the factor that made a difference.

THE COURT: Plaintiff response?

MS. DeFAZIO: Well, the instruction as written accurately reflects the law. The factor that makes a difference is in here. That comes from *Jones*. And there can indeed be more than one but-for cause as discussed by the U.S. Supreme Court in *Bostock*. And in *Comcast* itself, that case references a but-for case. And Your Honor, in *Emerson,* quotes that from *Comcast* that Ms. Mohamed need prove only that race was a but-for cause.

So we believe it accurately reflects the law as

written.

THE COURT: Ms. Woodstock [sic], any reply?

MS. WOODFORK: No. We would just point to the cases we cited already.

THE COURT: I will indicate that, first, I carefully reviewed the competing jury instructions on this. I think that the instruction -- which is probably unsurprising because this is what we gave you in written form, not that that in any way precludes argument on it or, in some instances, significant or minor changes to the instructions.

But I anticipated this may be one of the more hotly contested issues, although it was, realistically -- and I appreciate the thoroughness of the prior briefing on this because it really focused the Court's attention. I think that this accurately reflects what I would put in a different context, if you look at the scales of justice, it has to be a cause that tipped it over the edge. And I think that that accurately reflects the state of the case law and accurately explains it to the jury.

I understand that this is a nuanced description, but I think it's an appropriate description that's supported by law. So I will give instruction -- the instruction on page 15, discrimination based on race, as it is right now.

Page 16, retaliation generally. I think it's kind of a carrying instruction that probably has no changes to it, but

from the Plaintiff's perspective?

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: All right. 17, elements of retaliation.

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: Just the same objections we made to the discrimination elements.

THE COURT: Okay. Appreciate that. For the same reasons, those objections are overruled for the same record and as is set forth in the briefing in this case.

Instruction 18, similarly situated.

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: No objection.

THE COURT: 19, business judgment.

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: No objection.

THE COURT: 20, pretext -- 20 and 21, pretext.

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: We object on this one in that we don't think we need to add the pretext standard to the facts of the case. The rule that we propose or we had proposed conveys the purpose of pretext, what it is, explains it to the jury. And just giving the jury this much detail and comparing it to issues in the case, we believe it's prejudicial to SHRM and could misconstrue some of the evidence.

We'd also add that it's the Plaintiff's burden to prove pretext and must convince the jury that there are inconsistencies. By laying them out here, it almost assumes that she has proven these things.

It also can imply that these are elements to her causes of action. It just implies that SHRM has the burden to prove each of these things or prove that it did not do these things. It could be shifting the burden or imply to the jury that the burden shifted to SHRM here when pretext remains with the Plaintiff to prove.

THE COURT: Sorry for the long silence. I'm considering it. Let's come back to this one momentarily. I want to give some more thought to it.

MS. DeFAZIO: Your Honor, may I make a contribution?

THE COURT: Of course.

MS. DeFAZIO: Thank you. From our perspective, providing the bullet-pointed items just gives the jury context. If you give them a pretext instruction with no specifics, they have nothing to work from with respect to what kinds of evidence they should be looking for.

And certainly, Defendant's concern about any of this being prejudicial is cured by the last sentence, which states that even if the jury does find pretext, it's not required to infer that race and/or retaliation was a factor. This just allows them to.

But again, in the absence of these specific examples, the jurors are not given enough guidance to know what to look for.

THE COURT: Okay. Let me think about it. I do want to circle back to it, and I think it probably needs some modification. But I'm mulling in my head what I want to do with that, so let me circle back to that.

The same result --

MS. DeFAZIO: No objection from Plaintiff.

THE COURT: -- on page 22.

MS. WOODFORK: No objection.

THE COURT: All right. Damages on 23.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: No objection.

THE COURT: Economic damages on 24.

MS. DeFAZIO: Your Honor, this instruction should come out. Ms. Mohamed is not seeking economic damages.

THE COURT: Okay. I'm guessing that the Defense doesn't have any problem with that?

MS. WOODFORK: We have no problem with that, Your Honor.

THE COURT: All right. 24, economic damages, is coming out.

25, compensatory damages.

MS. DeFAZIO: On that point, about six lines down,

there are two paragraphs that reference economic damages that should also come out: the one that begins with "You may award as actual economic damages" and then the one that starts with "You must reduce any award."

THE COURT: So basically paragraph 3 and 4 would come out.

MS. DeFAZIO: Yes. Yes, Your Honor.

THE COURT: All right. Any problem with the rest of it?

MS. DeFAZIO: Not from Plaintiff, no.

THE COURT: All right.

MS. WOODFORK: Not from Defendant. No objection.

THE COURT: So paragraphs 3 and 4 are being removed. Otherwise, it is as it is.

27, multiple recovery.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: No objection.

THE COURT: 28, failure to mitigate.

MS. DeFAZIO: That should come out given that Ms. Mohamed is not seeking economic damages.

THE COURT: I'm guessing the Defense has no objection to that.

MS. WOODFORK: No objection. Sorry.

THE COURT: Failure to mitigate is coming out.

29, punitive.

MS. DeFAZIO: We just caught a typo on the fourth line, "engaged" and "in." Just need a space between --

THE COURT: Okay. Thank you.

MS. DeFAZIO: Other than that, no objection.

THE COURT: All right. From the Defense?

MS. WOODFORK: We would just renew our objection that we made in our briefing about introducing this before liability has been established.

THE COURT: I appreciate that. I previously rejected that, I think, in this case. If not, I think that the instruction on page 30 is the proper ameliorative instruction there.

MR. SWAIN: Your Honor -- oh, I'm sorry.

THE COURT: Go ahead.

MR. SWAIN: Just for the record, there have been multiple references to punitive damages throughout the trial, probably every day, although I don't know, and Defendant has not objected to our reference to the availability of punitive damages during the trial.

So that objection should be deemed waived to instructing the jury at this time.

THE COURT: Well, that's an issue for another day. Whether an objection has been waived is not a decision for this Court; it's for the Circuit. So I'm not going to tell them how to do their job.

In terms of -- though I'm not bifurcating damages, I am giving an instruction -- obviously, I haven't heard yet if the parties have a problem with the instruction on 30 yet or not, but I am going to give a punitive damages instruction in the case-in-chief. But I will make, of course, the typo change.

Any other change from the Defense?

MS. WOODFORK: No objection.

THE COURT: As to effect of instructions on what is now page 30?

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: No objection.

THE COURT: Jury procedures, which are pages 31, 32, and 33, which, you know, I don't know they get split into two, but they are.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: We would just -- for the purposes of preserving the record, appeal purposes, just renewing our request for the same actor instruction.

THE COURT: Let me come to that one in a moment because -- yeah, I am absolutely going to ask if anybody has other instructions and the like. You're not waiving that by waiting until the end.

But in terms of the jury procedures on 31 and 32, 33, any problem with those?

MS. WOODFORK: No. No objection.

THE COURT: Okay. Then let me turn to the Plaintiff. Other instructions? And -- well, actually, let's just do the verdict form while we're at it, and then we'll come back.

Verdict form from the Plaintiff's perspective?

MR. SWAIN: No objections to the verdict form, Your Honor.

THE COURT: Okay. And from the Defense perspective?

MS. WOODFORK: No objection.

THE COURT: Okay. Then I think we're at -- I'll start with the Plaintiff because I think I need to. Any additional instructions that you think I need to be giving?

MR. SWAIN: Just one moment, Your Honor.

MS. DeFAZIO: No. No. Nothing else from the Plaintiff.

THE COURT: Okay. That brings us right back to where we were, Ms. Woodfork.

MS. WOODFORK: We wanted to renew or request or offer that we believe the same actor instruction should be given here. It's been used in the district before. It's an inference that's not merely applied for summary judgment. It has been a pattern instruction that federal courts have given in different forms. And given the facts in this case and the timeline that we're dealing with, we believe it's appropriate here.

THE COURT: From the Plaintiff's perspective?

MS. DeFAZIO: Well, I understand the perspective that Ms. Barley was the same actor, but there's disputed testimony as to exactly what Ms. Barley's role was with respect to Ms. Mohamed's promotion, how enthusiastic she was about it or not. And, you know, I just think it's not appropriate.

MR. SWAIN: And, Your Honor, may I add, it's doubly inappropriate with respect to when there's a retaliation claim involved, because the same actor inference is unavailable when there are intervening circumstances that could change the so-called same actor's view of the plaintiff.

THE COURT: For the reasons stated by Plaintiff, I find -- I appreciate the Defense preserving that for the record. I find it inappropriate to give the same actor instruction; and I think it's unnecessary here despite the fact that in, perhaps, different contexts or even somewhat similar -- it may have been given in the district before -- I'm not going to give the same actor instruction.

Other instructions, Ms. Woodfork, you think I need to --

MR. SWAIN: Your Honor, may I make one more additional statement for the appellate record?

THE COURT: Sure.

MR. SWAIN: So the same actor instruction is additionally inappropriate because it's an inference that a

court may take into account at the summary judgment stage. It's a burden-shifting concept where the moving party may put forth certain facts that create an inference. And I'll give a cite for that. The case name is *Coghlan* -- that's C-O-G-H-L-A-N -- *versus American Seafoods Company LLC*. That's 413 F.3d 1090. That is a Ninth Circuit case from 2005.

The instruction is also improper when the parties dispute whether the same person actually hired or promoted the plaintiff and took the adverse action against them. The citation for that proposition is *Jackson versus Host International Incorporated,* 426 F. App'x 215 at page 220 to 221, (5th Cir. 2011).

THE COURT: Any further record that Defendant would like to make?

MS. WOODFORK: Yes. We'd like to cite to Colorado District Court -- we'd like to cite to a Colorado District Court case that has used the same actor defense, *Bardales*, B-A-R-D-A-L-E-S, *versus Western Stone and Metal*, 2007 Westlaw 1087096 at page 6, note 8, District of Colorado, April 10th, 2007.

We'd also like to cite to a Sixth Circuit authority that held the same actor inference is not merely to be applied at the summary judgment phase. *Buhrmaster versus Overnight Transportation Company*. B-U-H-R-M-A-S-T-E-R, *Overnite*, Over-N-I-T-E, *Transportation Company*, 61 F.3d 461, 464 (6th

Cir. 1995).

THE COURT: All right. Thank you very much. I appreciate the record.

The order stands that the instruction will not be given. I think the Defendant didn't have any other additional instructions, but I'm, frankly, tired and I don't recall.

Let me circle back to the pretext instruction. I do think that this needs to be -- the bullet points need to be rewritten. And what we'll do is we'll go back and quickly make these changes and hopefully come back out to you here in a moment.

But, for example, what I would do is for bullet point one -- and I want to massage these a little bit and bring them back out, but it would read something like, "Evidence of differential treatment of the employee compared to similarly situated White employees" -- I think it's appropriate to strip out the idea that it's based on evidence in a particular case and to make it essentially look like a generic list that could be applicable to any case.

It's going to take me a few minutes to kind of massage those. Alex will probably, if he hasn't already done it, will make all of the rest of the changes. I'll go back and sit down and quick run through those, and then we'll print out a couple of copies, bring them back out. We can flip through these page by page and make sure everybody's happy

with them with the record preserved, obviously, as to objections. And then you all can get going, and we'll stay and get them printed.

So let's take about a ten-minute break.

THE COURTROOM DEPUTY: Do you want to cover --

THE COURT: Yeah. Let's do that. So, Don, how did Business Insider get a hold of you, and what was their request?

THE COURTROOM DEPUTY: They left a message at our court's office form for me.

THE COURT: Asking what?

THE COURTROOM DEPUTY: Asking if they could have copies of the admitted exhibits. And I advised them that the Court does not keep those copies and that they are returned to the parties, and they would have to contact the parties to obtain any exhibits that are introduced into evidence.

THE COURT: We don't upload those into the system.

THE COURTROOM DEPUTY: No. They're all provided back to the parties.

THE COURT: Well, I will issue a very short order on that right now here orally, which is once we're done and there's a verdict issued, it -- well, I'll say it this way: No exhibits are to be provided to anyone by the attorneys or the parties to this case prior to the jury reaching a verdict in this matter.

After that, I don't know if the parties have a position as to whether they should be provided or not. Really, that's not something we need to decide right now. You all can think about that overnight; and, frankly, it might depend to you on how the verdict turns out.

So I guess that's something we don't need to deal with at 5:40 while we have a whole bunch of people sitting here. You all can think about that. Nobody's going to provide anything to anybody while we have an ongoing case. And then I know we're going to have a little bit of time after the jury leaves tomorrow to go deliberate. We can talk about it at that point in time.

So be ready to think about that. I don't know that it requires an in-depth analysis, but it's something we can talk about tomorrow.

We'll take a short break. Thanks, Don.

(A recess was taken from 5:40 p.m. to 5:54 p.m.)

THE COURT: All right. We are back on the record. Let me pull my copy up. I'll look through it simultaneously. We've gone through essentially everything other than confirming that the changes have been made.

We didn't change the order. So there was no change to Instruction No. 1.

There was no change to Instruction No. 2.

Instruction No. 3, equality under the law, we added a

sentence at the end of paragraph 1.

Anybody have a problem with Instruction No. 3 as it's now written?

MS. DeFAZIO: Not from the Plaintiff.

MS. DARROW: No objection.

THE COURT: Instruction No. 4 did not change.

Instruction No. 5 did not change.

Instruction No. 6 did not change.

Instruction No. 7 did not change.

Instruction No. 8 did not change.

Instruction No. 9 did not change.

Instruction No. 10 did not change.

Instruction No. 11, we removed the words "of 1991."

Anybody have a problem with instruction No. 9 -- Instruction No. 11? I think I heard no, Ms. DeFazio?

MS. DeFAZIO: Yeah. No.

MS. DARROW: No objection.

THE COURT: Okay. Instruction No. 12 did not change.

Instruction No. 13 did not change.

Instruction No. 14 did not change.

Instruction No. 15 did not change.

Instruction 16 did not change.

17 did not change.

18 probably has the most significant changes, which essentially stripped out anything related to -- in the

exemplars, stripped out anything related to this case and put it all in very generic language.

Ms. DeFazio?

MS. DeFAZIO: We're just looking through the rest of the bullet points. So far so good, though.

MR. SWAIN: I notice one typo, Your Honor.

THE COURT: Okay.

MR. SWAIN: The bottom of the first page of Instruction No. 18, the last bullet point, it says, "Evidence that an employer failed to fully investigate an employer's complaints." It should be "employee's complaints."

THE COURT: Yep. Thank you.

Okay. I'll tell you, we'll make that change, but we won't bring it back out for you all to look at tonight.

MR. SWAIN: Understood.

MS. DeFAZIO: Otherwise it's just fine from the Plaintiff.

MS. WOODFORK: We would just keep our same objection that we don't believe bullet points showing types of evidence are appropriate in that a pretext instruction may not be appropriate in itself, but definitely not what the evidence laid out and the inferences it could give the jury at this stage.

THE COURT: I appreciate that. I'll note that a similar instruction was given by Judge Sweeney in *Joppy versus*

*HCA HealthOne* at 22-CV-986 and by Judge Jackson in *Harris versus Falcon*, 18-CV-2310, and in a number of other cases.

In those it appeared that there was a more evidence-specific list, from my recollection, although it's been a little while. I think that this appropriately gives some context to the jury but does it in a way that doesn't prejudice, because -- I think people understand lists don't always indicate that things have or haven't happened, particularly with the final concluding sentence in this instruction.

So I will give the modified one, and I will correct the typo.

Instruction 19 did not change.

Instruction 20 did not change.

We removed economic damages, so Instruction 21 is now compensatory damages with a redaction of the two or an excision of the two compensatory -- it's been a long day -- with an excision of the two economic damage paragraphs.

Ms. DeFazio, as it now reads?

MS. DeFAZIO: No objection.

THE COURT: Or from the Defense?

MS. WOODFORK: No objection.

THE COURT: Instruction No. 22 is unchanged.

We removed failure to mitigate, so punitive damages is now moved up to Instruction 23. And the typo was changed.

Other than that, any objections?

MS. DeFAZIO: No.

THE COURT: Any objections that weren't preserved from the Defense? I know you have an objection to the punitive damages in general. That's been preserved. Any other objections?

MS. DARROW: No.

THE COURT: Okay. 24 is unchanged.

25 and 26 are unchanged.

And the verdict form is unchanged.

Anything else for the record on instructions, Ms. DeFazio?

MS. DeFAZIO: Not from the Plaintiff, Your Honor.

THE COURT: Or from the Defense?

MS. DARROW: Nothing from the Defense, Your Honor.

THE COURT: Okay. In terms of timing tomorrow, this isn't -- thinking back to the packet we read a couple of weeks ago that was probably a third to half longer that took me probably 40 minutes to read, what I won't do is have these transcribed into the record because the record will stand on the instructions as they are.

The only other instruction I do give them is one that isn't in here. Maybe we should think about writing it some day. But we tell them that they're losing their phones, their smart watches and the like when they go back. I tell them

that in advance so they don't get ticked off with the CSOs. If they want to be mad at somebody about it, they can be mad at me. They won't have electronic communication during jury deliberations and the like. Other than that, I think I'll probably be through these in half an hour.

So we'll, at 7:45, address any issues with regard to slides. At 8:00 I'll start reading. You'll get your first close at 8:30. In terms of that, if you can have the tech ready to go in the morning so that, essentially, we don't have to take a break between reading of instructions and first close, probably take a break at that point.

Do you have a rough idea what your first close is going to look like time-wise?

MR. SWAIN: Less than an hour, Your Honor.

THE COURT: Okay. So that's a good time, then, for a break. We'll take a break, and you all can set up whatever tech you want and do close. And then depending on the timing, we may or may not take a break before rebuttal close. If you need it for tech, we will. Or if it's been long enough that it makes sense to not keep the jury sitting, in any event, I think we're realistically done well before lunchtime tomorrow for the jurors.

Anything else Plaintiff thinks we need to address tonight?

MR. SWAIN: Just two more items, Your Honor. So I

just wanted to clarify your earlier statement about the official verdict form. We'll be provided copies of the final verdict form tomorrow morning, too, correct? The parties will be?

THE COURT: The parties will be. We only send -- you know, what I don't do -- maybe I should phrase it that way because it's easiest. I don't send back nine copies of the verdict form to the jurors because I only want one back and it just confuses things.

So I will read it to them when I read the forms, but I will not send back multiple copies. That will only be in -- so they will get ten copies of the instructions, only one of which is labeled "original," and that will be the only one with the verdict form. You will all get one for posterity for your files.

MR. SWAIN: Understood.

One item. So your earlier order was that the slides should be provided within an hour of when court goes in recess?

THE COURT: Yeah, so you've got a little bit of time and then can do whatever else you need to do this evening.

THE COURT: Anything else from the Defense perspective tonight?

MS. DARROW: Nothing further from the Defense, Your Honor.

THE COURT: Okay. Well, thank you all for a good, long day. Appreciate it. And we will see everybody first thing tomorrow morning and get this to the jury.

(Proceedings concluded at 6:04 p.m., December 4, 2025.)

C E R T I F I C A T E

I, MEGAN E. STRAWN, Federal Official Court Reporter for the United States District Court for the District of Wyoming, a Registered Professional Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein on the aforementioned subject on the date herein set forth, and that the foregoing 257 pages constitute a full, true, and correct transcript.

Dated this 17th day of December 2025.

/s/ Megan E. Strawn

MEGAN E. STRAWN
Registered Professional Reporter
Certified Realtime Reporter

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Gordon P. Gallagher**

| | |
|---|---|
| Date: | October 17, 2025 |
| Courtroom Deputy: | Donald L. Clement |
| Court Reporter: | Megan Strawn |

| | |
|---|---|
| Civil Action No. **22-cv-01625-GPG-KAS** | Counsel: |
| REHAB MOHAMED,<br><br>Plaintiff, | Ariel Beryl DeFazio<br>Hunter Anthony Swain |
| v. | |
| SOCIETY FOR HUMAN RESOURCE MANAGEMENT,<br><br>Defendant. | Tanja L. Darrow<br>Virginia LeeAnn Woodfork<br>Nicholas Hankins<br>Julian G. G. Wolfson |

## COURTROOM MINUTES

**Video Final Trial Preparation Conference**

**9:05 a.m. Court in session.**

Court calls case. Appearances of counsel.

Opening remarks by the Court.

Discussion held regarding direction of case, courtroom location, setting concerns, opening statements, stipulations of facts, witness lists, trial length, exhibit lists, voir dire, pending motions, jury instructions, jury questionnaires, the Court's practice standards, and tech training prior to the jury trial.

The Court reserves five (5) days for trial. Each side shall have 30 minutes for voir dire, 30 minutes for opening statements and 60 minutes for closing arguments.

Mr. Swain orally makes motion for witnesses to appear remotely. Defendants have no objection.

Ms. Darrow orally makes a motion for a gag order pertaining to communication with the press.

**ORDERED:** Court **DENIES** request for a gag order.

**ORDERED:** Court **GRANTS** oral motion to allow witnesses to appear virtually by VTC.

**ORDERED:** Court authorizes late designation of depositions testimony.

**ORDERED:** First Motion in Limine [D. 105] is **DENIED WITHOUT PREJUDICE** with the ability to readdress those things at an appropriate time during trial.

**ORDERED:** Motion to Bifurcate Punitive Damages Claim [D. 106] is **DENIED**.

**ORDERED:** Plaintiff is to file a Motion in Limine pertaining to Defendant's Exhibit 115 on or before Monday October 20, 2025, that is not to exceed four (4) pages. Defendant's response shall be submitted on or before October 22, 2025, that is not to exceed four (4) pages.

**ORDERED:** A five-day jury trial is set to commence at 8:00 a.m. on Monday, November 17, 2025, in Courtroom C202 (Denver).

**ORDERED:** On or before October 17, 2025, counsel shall exchange with each other their designation of anticipated deposition and videotaped deposition testimony. Plaintiff's designations shall be highlighted in yellow; Defendant's designations highlighted in blue.

**ORDERED:** On or before October 27, 2025, the parties shall file their counter-designations and objections regarding deposition designations.

**ORDERED:** On or before November 3, 2025, parties shall submit directly to Chambers the transcript of the designated highlighted deposition testimony with the objections highlighted in red and a notation as to the basis for the objection along with a response to such objection.

**ORDERED:** On or before November 3, 2025, the parties shall contact Courtroom Deputy Donald Clement at Donald_Clement@cod.uscourts.gov to address any technology questions and arrange a technology training session.

**ORDERED:** On or before November 10, 2025, the parties shall email to Gallagher_Chambers@cod.uscourts.gov a glossary of any difficult, unusual, scientific or technical words, names, or phrases, along with the spellings of witnesses' names, names of persons or entities that will be referenced and acronyms or abbreviations that may be used in testimony or argument.

**ORDERED:** On or before November 13, 2025, each side shall submit to chambers, via email, a roster identifying by name and capacity at trial everyone who will be at counsel tables.

**ORDERED:** On or before November 13, 2025, by 9:00 am, the parties shall submit one USB flash drive and three exhibit notebooks, one containing the original exhibits and two containing copies of the exhibits for the Court.

**ORDERED:** On the first day of trial, the parties will provide three (3) copies of the glossary to the Courtroom Deputy.

**ORDERED:** On the first day of trial, each party shall provide the Courtroom Deputy with four (4) paper copies of the final list of its witnesses, which includes an estimate of the time anticipated for each witness's direct and cross-examination.

**9:49 a.m.** **Court in recess. Hearing concluded.**

Total time in court: 44 minutes

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**ORDER**

---

Before the Court is Defendant's Motion for Summary Judgment (Motion) (D. 83). Defendant Society for Human Resource Management asks the Court to enter summary judgment on its former employee Plaintiff Rehab Mohamed's claims for race discrimination and retaliation under 42 U.S.C. § 1981 (Section 1981) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII). For the reasons set forth below, the Court DENIES the Motion.

## I. BACKGROUND

This is a messy employment discrimination case. The Court will limit the recitation of facts and procedural background to those issues necessary to decide the Motion.[1]

[1] Defendant refiled its Motion without complying, again, with the Court's practice standard requiring exhibits be presented as a consecutively paginated appendix. GPG Civ. Practice Standard 7.1A(a)(3) ("Where a motion is supported by exhibits, said motion shall be accompanied by one consecutively numbered appendix, containing all exhibits and shall be referenced in the motion, response, and reply by appendix page number and name, e.g., (Movant's Appx., p. 30 – Smith Affidavit)."). Additionally, Defendant merely refiled its Motion and exhibits as they can be downloaded from CM/ECF complete with markings such that the document and page numbers are generally obscured by the new markings overlying the previous markings. Defendants exhibits each bear only a single exhibit number marking and most contain no page markings, making it functionally impossible for the Court to efficiently consider

Defendant terminated Mohamed's employment on September 1, 2020, with her last day being the next day (D. 83 at ¶ 58).[2] Defendant contends that the sole reason for the termination was Plaintiff failed to complete two projects by their August 31, 2020, deadlines (*id.* at ¶ 57). Mohamed disagrees.

Defendant hired Mohamed in April 2016 (D. 83 at ¶ 1). Her last performance reviews before the events at issue "rated Mohamed as a Solid Performer or Role Model in all criteria" and "did not raise timeliness or meeting deadlines as an issue" (D. 84 at ¶ 1).

On January 19, 2020, Mohamed was promoted to Senior Instructional Designer (D. 83 at ¶ 5). In this role, Mohamed was to design, develop, and enhance new and existing education programs in conjunction with vendors that were, when complete, offered to clients (*id.* at ¶ 6). Her primary supervisor in the new role was Carolyn Barley, Manager Instructional Design (*id.* at ¶¶ 7, 13). Barley had encouraged Mohamed to apply for the promotion and congratulated her (*id.* at ¶¶ 10, 12). They had previously interacted in person without conflict, and Barley knew from these interactions that Mohamed is Egyptian and non-white[3] (*id.* at ¶¶ 8–9).

---

Defendant's 1451 pages of exhibits. Defendant is advised that any future failures to comply with the Court's practice standards will likely result in its filings being stricken or denied with prejudice.

[2] The Court draws the operative facts by paragraph number from the Statement of Undisputed Facts (D. 83 at 1–14) and Statement of Additional Disputed Facts (D. 84 at 4–15). The Court finds the following facts undisputed for the purposes of deciding the motion unless otherwise indicated. Mohamed purports to deny this fact but cites no contrary evidence as required by the Court's Practice Standards (D. 83 at 2). GPG Civ. Practice Standard 7.1D(b)(4) ("Any denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial."). This fact is deemed admitted.

[3] The protected classes asserted in the Complaint are "Arab/Egyptian/non-White" (D. 1 at 23). In her deposition, she referred to herself as a Black woman (D. 84-1 at 4).

On June 3, 2020, Mohamed complained regarding Barley to Jeanne Morris, Vice President of Education (D. 83 at ¶ 20).[4] Mohamed testified that she shared frustration about Barley micromanaging her during specific incidents, told Morris that she believed Barley treated their white peers differently, and stated that she was having a hard time performing her work because of the situation (*id*.). The next day, Mohamed raised these same concerns in a Zoom meeting with both Morris and Barley (D. 84 at ¶ 13). Barley was upset by Mohamed's complaint and cried (D. 83 at ¶ 23).[5] On June 12, 2020, Mohamed again discussed these concerns on a call with Barley (*id*. at ¶ 24).[6]

After this June 12 call, Barley consulted Mike Jackson, a human resources (HR) employee, who advised Barley to keep documentation about her interactions with Mohamed (D. 83 at ¶ 25). Jackson was, thereafter, responsible for investigating Mohamed's complaint (*id*. at ¶ 30; D. 84 at ¶ 46).[7] As part of the investigation, Jackson spoke with Mohamed. Jackson also met with Morris and Barley's team without Barley (D. 84 at ¶ 14). Mohamed and Ebony Thompson, who is Black, both complained that Barley micromanaged them and otherwise treated them differently based on their race (*id*. at ¶¶ 5, 14; D. 83 at ¶ 28). Carrie Mills and Ann Godmere, both white, did not report any similar concerns about their own interactions with Barley (D. 83 at ¶ 28; D. 84 at ¶¶ 5, 14). Mohamed testified that Barley's micromanagement included requesting to review Mohamed's emails and attend all meetings Mohamed had with vendors (D. 83 at ¶ 29). Mohamed also testified

[4] Mohamed purports to deny this fact but cites no contrary evidence. This fact is deemed admitted.

[5] Mohamed purports to deny this fact but cites no contrary evidence. This fact is deemed admitted.

[6] Mohamed purports to deny this fact but cites no contrary evidence. This fact is deemed admitted.

[7] There is some dispute over whether another HR employee was also responsible for the discrimination investigation.

that Barley discouraged her from attending an important project meeting that all team members were invited to attend (*id.*).

During the same period he was investigating Mohamed's complaint against Barley, Jackson was also helping Barley ghostwrite emails regarding Mohamed's project deadlines (D. 84 at ¶ 34). On August 12, 2020, Barley emailed Mohamed indicating that both projects that Mohamed was working on should be finished by the "end of the month, August 31" (D. 83-19 at 7). Mohamed responded by describing the issues that she was having with the vendors for each program and inviting Barley to "work with me to ensure that these deadlines are met" (*id.* at 6). On August 13, Nick Schalcht, Chief Global Development Officer, directed Jackson to assist Barley on drafting a response to Mohamed's email asking for assistance with project delays caused by vendors (D. 84-1 at 146). Schalcht wrote in his email that "this offers an opportunity to get the right language on the table to correct her quickly, or to support an eventual case for termination" (*id.*). The ghostwritten email told Mohamed that no assistance whatsoever would be provided and that the "August 31 deadline for both projects is non-negotiable" (D. 83-19 at 6).

On August 19, 2020, Mohamed raised an additional complaint that she was being retaliated against for her previous racial discrimination complaint (D. 84 at ¶ 36). That same day, Defendant created a draft of Mohamed's termination documents (*id.* at ¶ 58).[8] Jackson was also responsible for investigating Mohamed's August 19 retaliation complaint, but he never spoke with her about it and had already provided his recommendations to management (*id.* at ¶ 52). Defendant puts

[8] Defendant appears to admit that it was Jackson who began drafting these documents the same day or two days after Mohamed made the retaliation complaint he was responsible for investigating (D 83 at ¶ 55 ("Beginning August 21, 2020, Jackson prepared termination documents for Plaintiff"); D. 84 at 3). Defendant is a HR membership organization that *trains* people on how to do HR tasks (D. 83 at ¶¶ 3, 6).

forward no facts indicating that it ever investigated Mohamed's retaliation complaint (*see* D. 83 at ¶¶ 30–34). Defendant notified Mohamed on August 31 that it concluded her complaints were unfounded (*id*. ¶ 53).

Before August 31, 2020, Mohamed had turned in both of her projects (D. 84 at ¶ 54). On September 1, Defendant gave Mohamed termination documents, including documents that had been prepared and approved a few days before (*id*. at ¶ 57). Nonetheless, Defendant and Barley claim that Barley decided to terminate Mohamed on September 1 solely because she failed to meet the August 31 deadline (*id*. at ¶ 55).

Mohamed's teammate Mills stated in a declaration[9] that Mohamed's two projects were assigned one each to her and the other their other white teammate, Godmere (D. 84-1 at 78). For the project given to Mills, Mills declares that Barley told her that she was not sure how complete it was and gave her no completion date (*id*.). Mills asserts she completed it within a week (*id*. at 79). Mills also declared that "[n]ot once during my employment with [Defendant] did I *ever* meet the target completion deadline for a major project [and] was never disciplined or coached for missing a deadline" (*id*. at 78). She stated that she found Barley's focus on deadlines with respect to Mohamed "quite odd given that neither me nor Ann Godmere were held to the same standard" (*id*.).

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must consider the factual record and reasonable inferences based on said record

[9] The Court previously denied a motion seeking to strike Mills' declaration (D. 82).

"in the light most favorable to the non-moving party." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* If the moving party meets this burden, the opposing party must go beyond the pleadings and designate evidence showing there is a genuine triable issue. *Celotex*, 477 U.S. at 323–24. Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial." *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To prevail on a claim of wrongful discharge based on race under Title VII, plaintiff has the ultimate burden of proving, either directly or indirectly, that his discharge was motivated by racial bias." *Elmore v. Capstan, Inc.*, 58 F.3d 525, 529 (10th Cir. 1995) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Title VII also prohibits employers from retaliating against an employee

who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (explaining that the same standards apply to Title VII and Section 1981 claims).

"A plaintiff proves a violation of Title VII either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Chalepah v. Canon City*, No. 13-cv-02166-NYW-KLM, 2015 WL 5093200, at *7 (D. Colo. Aug. 31, 2015). In *McDonnell Douglas*, the Supreme Court set forth a burden-shifting framework for indirect proof in Title VII or Section 1981 cases. *Id*. Mohamed does not present direct evidence of discrimination. Accordingly, the Court applies the burden-shifting framework.

At the first step of the burden-shifting framework, a plaintiff is required to prove a prima facie case. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017). The particular elements of the prima facie case depend on the alleged circumstances. A plaintiff in a wrongful termination suit establishes a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) he was qualified for the job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005).[10] To establish a prima facie case of retaliation, a plaintiff "must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there

[10] Defendant does not specify what discrimination theory Mohamed is proceeding under, and the Complaint does not clarify (*see* D. 1). Mohamed could also be proceeding under a disparate treatment theory. *See Carpenter v. Boeing Co.*, 456 F.3d 1183, 1186 (10th Cir. 2006).

was a causal connection between the protected activity and the adverse action." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (internal quotation marks omitted).

Once a plaintiff has established a prima facie case, a defendant must articulate some legitimate, nondiscriminatory reason for the employee's termination. *See DePaula*, 859 F.3d at 969. The defendant need only "articulate through some proof a facially nondiscriminatory reason" for the termination that is "reasonably specific and clear." *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992).

After a defendant articulates its reason for the adverse employment action, then the burden shifts back to the employee to prove by a preponderance of the evidence that the legitimate justification offered by the employer is merely a pretext for discrimination. A plaintiff may prove pretext by showing that the employer was motivated by a discriminatory reason or that the employer's explanation was not credible. *Vaughn*, 537 F.3d at 1153. To show pretext under Title VII, "the employee need neither prove his or her employer's proffered reasons were false, nor that a discriminatory factor was the sole motivating factor in the employment decision." *Davis v. Wesley Ret. Communities, Inc.*, 913 F. Supp. 1437, 1445 (D. Kan. 1995). "Instead, the employee must prove only that a discriminatory factor was also a reason for the employer's decision, and that it was the factor that made a difference." *Id*. In evaluating a plaintiff's evidence, the Court must determine whether the evidence interpreted in the light most favorable to the plaintiff could persuade a reasonable jury that the employer discriminated against the plaintiff. *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994).

## III. ANALYSIS

Defendant seeks summary judgment based on four issues: (1) that Mohamed cannot show that discrimination caused her termination, (2) that Mohamed cannot show the August 31 deadline was a pretext for discrimination, (3) that Mohamed cannot show that her termination was caused by retaliation, and (4) that Mohamed has not shown that entitlement to punitive damages (D. 83). The Court addresses the first three of these issues together before addressing the issue of punitive damages.

### A. Plaintiff Has Raised a Genuine Issue of Material Fact as to Her Discrimination and Retaliation Claims.

Defendant argues that no reasonable jury could conclude from the available evidence that discrimination and retaliation caused Mohamed to be fired as opposed to her alleged failure to submit completed projects (D. 83 at 14–19). Contrary to Defendant's arguments, it is relatively straightforward to form a narrative from the disputed and undisputed facts showing discrimination and retaliation caused Mohamed to be terminated:

Just months after Barley began to supervise Mohamed, she complained of racial discrimination based on Barley micromanaging her. This complaint is a protected activity under Title VII. *See Unified Sch. Dist. 500*, 750 F.3d at 1171. It upset Barley. Mohamed's colleagues corroborated her complaints that Barley treated non-white employees differently. Because of Mohamed's complaints or as part of her discriminatory micromanagement, Barley imposed rigid deadlines on Mohamed that Barley would not have given to Mohamed's white colleagues. Mohamed complained that this action was retaliatory and, either in retaliation for the initial complaint or this new complaint, one or more of Defendant's employees decided to terminate Mohamed. Indeed, Defendant began drafting Mohamed's termination documents on the same day

that she complained of retaliation. Mohamed turned in her projects by the arbitrary deadline, but it did not matter what she turned in because the decision had already been made to terminate her based on the pretext that she did not meet the deadlines.

This precise scenario is perhaps or even likely not what occurred, and the Court makes no such finding, but there are undisputed facts, admissible evidence, or reasonable inference supporting each point. The Court finds that a reasonable jury could conclude that Defendant discriminated and retaliated against Mohamed when the facts are viewed in the light most favorable to Mohamed, which they must be at this stage. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). Defendant's assertions that there is no apparent causal link between discrimination or retaliation and Mohamed's termination fails to account for the substantial plausible evidence that Barley's imposition of inflexible deadlines itself reflected discrimination and retaliation. *See, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 (1977) ("Claims of disparate treatment . . . involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."). Mohamed presents evidence under which the use of facially neutral deadlines could plausibly be viewed as discriminatory in context because her non-white colleagues were not treated in the same way. *See Carpenter*, 456 F.3d at 1186 (addressing discrimination where "supervisors are exercising their discretion (intentionally or subconsciously)"). Indeed, she presents evidence that her colleagues Thompson and Mills, who were aware of the context, viewed Barley's alleged different management style for whites and non-whites as discriminatory, including with respect to deadlines. A reasonable jury could reach

the same conclusion. With this in mind, causation is also satisfied. Even under Defendant's theory, Mohamed would not have been terminated but for the deadline.

Mohamed has also shown a genuine dispute whether Defendant's justification for the termination was pretextual. Mohamed "may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted [legitimate] reasons." *Vaughn*, 537 F.3d at 1153. The timing of Defendant's employee's termination-related actions, which began well before the August 31 deadline, casts substantial doubt on Defendant's assertion that Barley decided to terminate Mohamed on September 1 solely because she failed to meet the previous day's deadline. *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1200 (10th Cir. 2015) ("Although evidence of temporal proximity between the protected activity and the alleged adverse employment action alone is insufficient to show pretext, it can support a finding of pretext when combined with other evidence of pretext." (citations omitted)). This inference of pretext is also supported by evidence of the actions surrounding the imposition of those deadlines and Defendant's apparent failure investigate Mohamed's retaliation complaint.[11] *Id.* (finding "evidence demonstrating that ORMC did not fully investigate his ethics line complaint and

[11] Defendants assert that its investigation cannot be the basis for pretext because it asked Mohamed for her side of the story (D. 88 at 9). But this argument presumes that there was a meaningful investigation, which the summary judgment record does not support, at least with respect to the retaliation complaint. Further, the Court finds that a jury could reasonably conclude that the investigation was a sham in view of, for example, Jackson's failure to discuss Mohamed's retaliation complaint with her and his involvement in drafting the email setting deadlines that led to both the retaliation complaint and termination. *See Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) ("A 'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext." (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008))).

complaint of race discrimination" supported an inference of pretext). Accordingly, the Court will deny summary judgment on Mohamed's discrimination and retaliation claims.

**B. Mohamed has Presented Sufficient Evidence to Support Her Request for Punitive Damages.**

A plaintiff is entitled to punitive damages under Title VII if her employer engaged in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). "'Malice' or 'reckless indifference' do not require 'a showing of egregious or outrageous' conduct, but instead require proof that the employer acted 'in the face of a perceived risk that its actions [would] violate federal law.'" *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1136 (10th Cir. 2006) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535–36 (1999)).

Defendant asserts in conclusory fashion that Mohamed "offers no evidence showing [Defendant] engaged in a discriminatory practice with malice or reckless indifference to her rights, thus foreclosing her punitive damages claim" (D. 83 at 20). Mohamed responds that the facts support a conclusion that Jackson and another high-ranking HR employee "provided Barley cover with a flawed investigation and orchestrated Mohamed's termination in concert with Barley" (D. 84 at 20). The Court agrees that, when viewed in the light most favorable to Mohamed, a reasonable jury could conclude that Defendant maliciously discriminated and retaliated against Mohamed and did so with reckless indifference to her rights. *See Kennedy v. Life Care Centers of Am.*, No. 21-CV-00706-PAB-STV, 2023 WL 155874, at *9 (D. Colo. Jan. 11, 2023) (finding evidence sufficient to support punitive damages where "defendant's Human Resources employee at its regional office, participated in discussions on whether plaintiff should be terminated"); *Horsewood v. Kids R Us*, 27 F. Supp. 2d 1279, 1284–85, 1288 (D. Kan. Nov. 30, 1998) (denying

summary judgment on punitive damages where management potentially participated in discriminatory conduct despite awareness of protections for the disabled). Therefore, the Court will also deny summary judgment on Mohamed's request for punitive damages.

## IV. CONCLUSION

Accordingly, it is ordered that Defendant's Motion for Summary Judgment (D. 83) is DENIED. Within 30 days, the parties shall jointly email Gallagher_Chambers@cod.uscourts.gov to set a Final Pretrial Conference. GPG Standing Order Regarding Pretrial and Trial Procedures – CIVIL, III.A ("If dispositive motions are filed, parties shall contact the Court jointly via email within thirty days after the Court has issued a ruling (assuming the case survives a motion for summary judgment) to set a Final Pretrial Conference.").

DATED October 8, 2024.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**ORDER**

---

Before the Court is Defendant's Motion to Strike the Declaration and Testimony of Carrie Mills (D. 75). Defendant asks the Court to strike the declaration of non-party Carrie Mills, one of its former employees, (D. 73-1 at 74–80) that was attached to the response to Defendant's Motion for Summary Judgment (D. 40) and to preclude her from testifying at trial. In the alternative, Defendant requests the Court to reopen discovery and allow it to depose her. For the reasons set forth below, the Court DENIES the Motion.

According to her declaration, Carrie Mills is a former employee of Defendant Society for Human Resource Management (D. 73-1 at 74). She worked on a small team of instructional designers led by Carolyn Barley (*id.*). Mills and Barley worked in neighboring cubicles (*id.*). Barley is white. Plaintiff Rehab Mohamed was on the same team and worked remotely (*id.*). Mohamed is black. Defendant fired Mohamed. This is the related employment discrimination case.

Before leaving the company, Mills told at least six employees of Defendant that she believed Barley was racially discriminating against Mohamed (*id*. at 76–77). She told at least two of Defendant's employees that she was leaving because of Barley's racial discrimination, including discussing it during her exit interview (*id*.).

On September 23, 2022, Mohamed disclosed Mills as a potential witness on her initial disclosures as having information about "Plaintiff's job duties, work projects, job performance, and the performance of her peers" (D. 75 at 1).

On August 4, 2023, Defendant filed its motion for summary judgment (D. 40).

At the end of August 2023, Mohamed's counsel contacted Mills for the first time (D. 75 at 13). On September 11, 2023, discovery closed. On that date, Mohamed supplemented her initial disclosures to identify those among her previously disclosed potential witnesses that have information regarding "Plaintiff's protected activity during her employment and Defendant's response to the same, including retaliatory treatment of Plaintiff;" "Defendant's pattern of race and color discrimination and retaliation against other employees;" and "Plaintiff's economic and/or non-economic damages" (D. 75-2 at 4–7). Mohamed identified Mills in each of these categories. Mohamed also disclosed the "Declaration of Carrie Mills, signed September 8, 2023" as a document she would use to support her claim and produced a copy (*id*. at 8).

On October 18, 2023, Defendant's prior attorneys were terminated as counsel of record (D. 65) and new counsel entered their appearance shortly thereafter (D. 66).

In January 2024, Mohamed attached the previously disclosed declaration as an exhibit to her response to the motion for summary judgment (D. 73-1 at 74–80).

Defendant asserts that Mohamed violated Federal Rules of Civil Procedure 26(a) and 26(e) through her initial and supplemental disclosures and Rule 26(g)(3) by failing to make a proper inquiry before making her initial disclosures (D. 75 at 4, 12). Defendant asserts that the initial disclosures were inadequate because Mills is listed with forty-one other individuals with knowledge about her work (i.e. Defendant's employees) and that the supplemental disclosures were untimely (*id*. at 4–11). These arguments are not well taken. There is nothing in the Motion or the record to suggest that Mohamed knew Mills had further information than was listed on the initial disclosures, and disclosing Mills with other coworkers is consistent with Mohamed's obligations in the context of an employment discrimination case. *See* Fed. R. Civ. P. 26(a)(1)(A)(ii) ("each individual likely to have discoverable information--along with the subjects of that information"). Thus, the initial disclosures were not materially incomplete. Likewise, Mohamed's supplemental disclosure was not untimely given that they were made shortly after Mills was first contacted and Mills was already listed as a witness. The cases that Defendant cites in support of its argument are not analogous. They involve disclosures of hundreds of names with generic descriptions of information or the disclosure of *new* witnesses shortly before the close of discovery. *See, e.g.*, *Sender v. Mann*, 225 F.R.D. 645, 650 (D. Colo. 2004) ("Sender disclosed the names of 196 investors and 126 brokers"); *First W. Cap. Mgmt. Co. v. Malamed*, No. 16-CV-01961-WJM-MJW, 2017 WL 6628108, at *2 (D. Colo. Oct. 2, 2017) (new witness disclosed two days before the close of discovery).

Even if Defendant could show a violation of Rule 26, the Court would find it harmless. Fed. R. Civ. P. 37(c)(1); *Sender*, 225 F.R.D. at 656 ("Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure." (internal

quotations omitted)).[1] Mills is Defendant's former employee and, according to her uncontested declaration, told Defendant in no uncertain terms what she thought about issues relevant to the case.[2] Defendant's (prior) counsel's failure to uncover (or disclose) this may put Defendant's (new) counsel in a tight spot. The Court is sympathetic. But this is not harm as prejudicial injustice or unfairness as contemplated by the Rule. *Id.* ("prejudice or surprise to the party against whom the testimony is offered" (internal quotations omitted)); *Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 501 F. Supp. 3d 886, 896 (E.D. Cal. 2020) (holding a violation harmless where "Clear was aware of the additional facts Comcast seeks to use"). Defendant itself cannot credibly claim surprise. Likewise, in these circumstances, Defendant's assertion that it was Mohamed's counsel that failed to conduct a sufficient Rule 26(g)(3) investigation before making her initial disclosures is absurd.

The Court denies the Motion and will also deny Defendant's requested alternative relief. To the extent that Defendant is presented with difficulties due to Mohamed contacting Mills late in the discovery process, these difficulties are of Defendant's own making. *See Tesone v. Empire Marketing Strategies*, 942 F.3d 979, 988 (10th Cir. 2019) ("Good cause is likely to be found when the moving party has been generally diligent, the need for more time was neither foreseeable nor

---

[1] If there had been a failure to disclose, the Court would look to whether the failure was substantially justified or harmless using the following factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Co.*, 170 F.3d 985, 993 (10th Cir. 1999). Given the timing, there will be no disruption to the trial, which is not yet set. "Defendant does not assert that Plaintiff has acted in bad faith," and there is nothing in the record to suggest it (D. 75 at 11).

[2] Notably, Defendant makes no attempt to contest Mill's account of, for example, her exit interviews, or explain how these facts had not come to light earlier in discovery. Rather, Defendant makes the incredible claims that it "does not have the ability to investigate Ms. Mills' allegations" and that "she was not properly disclosed in any capacity" (D. 75 at 9, 11).

its fault, and refusing to grant the continuance would create a substantial risk of unfairness to that party."). As Mohamed argues, Defendant "has known about the depth and breadth of Ms. Mills's knowledge for years and had ample opportunity to obtain her testimony through discovery but chose not to do so" (D. 79 at 2).

## V. CONCLUSION

Accordingly, it is ordered that Defendant's Motion to Strike the Declaration and Testimony of Carrie Mills (D. 75) is DENIED. It is FURTHER ORDERED that the parties shall contact the Court within two weeks of the date of this Order to set a status conference.

DATED September 6, 2024.

BY THE COURT:

Gordon P. Gallagher
United States District Judge