No. 26-1142

---

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

---

REHAB MOHAMED,

Plaintiff-Appellee

v.

SOCIETY FOR HUMAN RESOURCE
MANAGEMENT,

Defendant-Appellant

---

On Appeal from the United States District Court for the
District of Colorado
Case No. 1:22-cv-01625-GPG-KAS
Judge Gordon P. Gallagher

---

# APPELLANT'S OPENING BRIEF

---

Tanja Darrow
tdarrow@littler.com
Littler Mendelson, P.C.
633 West Fifth Street
63rd Floor
Los Angeles, CA 90071
Telephone: 213.443.4300
Facsimile: 213.443.4299

Virginia L. Woodfork
vwoodfork@littler.com
Kelsey A. VanOverloop
kvanoverloop@littler.com
Littler Mendelson, P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Facsimile: 303.629.0200

*Attorneys for Defendant-Appellant*

**Oral Argument Requested**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellant Society for Human Resources Management, by and through its undersigned counsel, states it is a nongovernmental corporate party to this proceeding.

Society for Human Resources Management is a non-profit corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS


PRIOR OR RELATED APPEALS ........................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................................ 2

STATEMENT OF THE CASE ........................................................... 2

I. RELEVANT FACTS ................................................................ 2

II. PROCEDURAL HISTORY ........................................................... 5

A. The Judge Issues An Erroneous Jury Instruction ................................. 6

B. Mohamed Offered Hearsay Statements To Support Her Case ......................... 10

C. The Jury Was Inflamed By Prejudice And Awarded Mohamed An Excessive Damages Award ... 12

D. SHRM's Motion for A New Trial ................................................. 13

SUMMARY OF THE ARGUMENT ........................................................ 14

ARGUMENT ....................................................................... 17

III. STANDARD OF REVIEW ........................................................... 17

A. Standard Of Review for an Error of Law is *De Novo* ............................ 17

B. Erroneous Jury Instructions are Reviewed *De Novo* ............................. 18

C. Standard Of Review Motions *In Limine* And Admissibility Of Evidence Is Abuse of Discretion ... 18

D. The Tenth Circuit Reviews The Denial Of A Motion For New Trial For Abuse of Discretion ... 19

IV. DISCUSSION ....................................................................... 20

A. It Was Reversible Error For The Court To Instruct The Jury That Race Need Not Be The Primary Cause Of Mohamed's Discharge ................................ 20

1. The District Court's "But-For" Instruction Caused the Jury to Apply the Wrong Standard to the Evidence ....................................................... 21

2. The Supreme Court Reaffirmed § 1981 Causation Standard..................... 22

3. ADEA Also Requires But For Causation; Age As A Motivating Factor is Not Sufficient ......................................................................................... 25

4. An Internally Inconsistent Jury Instruction Should Not Be Permitted. ..... 28

B. The District Court Abused its Discretion By Allowing Hearsay Evidence Of Another's Terminations ......................................................................... 29

C. The Excessive Damages Award Merits A New Trial Or Remittitur............ 34

1. It Was an Abuse of Discretion to Allow the $1.5 Million in Compensatory Damages to Stand ........................................................................... 35

2. The Jury's Note Demonstrates It Was Inflamed by Passion, Making Its Punitive Damages Award Improper ......................................................... 39

3. It Was An Abuse Of Discretion To Allow The Excessive Punitive Damages Awards Of $10 Million to Stand ............................................................ 40

STATEMENT OF COUNSEL AS TO ORAL ARGUMENT ............................... 47

CONCLUSION ....................................................................................... 47

CERTIFICATE OF DIGITAL SUBMISSION ..................................................... 50

CERTIFICATE OF SERVICE ......................................................................... 51

ORDER AT ISSUE........................................................................................ 52

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*,
405 F.3d 764 (9th Cir. 2005) ....................45

*Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*,
642 F. Supp. 2d 1250 (D. Colo. 2009)....................35

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996)....................41, 42, 43, 45, 46

*United States v. Boger*,
No. 25-4027, 2026 WL 852229 (10th Cir. Mar. 27, 2026)....................32, 33

*Bond v. Sheriff of Ott. Cnty.*,
173 F.4th 1265 (10th Cir. 2026) ....................19

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)....................17, 18

*Bostock v. Clayton Cty.*,
140 S. Ct. 1731 (2020)....................7, 8, 14, 20, 21 27

*United States v. Burch*,
48 F.3d 1233 (10th Cir. 1995) ....................19

*Burke v. Regalado*,
935 F.3d 960 (10th Cir. 2019) ....................19

*Carey v. Piphus*,
435 U.S. 247 (1978)....................35

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
589 U.S. 327 .................... 7, 8, 14, 15, 20, 22, 23, 24, 25, 26, 28

*DeAngelis v. City of Bridgeport*, No. 3:14-CV-01618 (JAM),
2018 WL 429156 (D. Conn. Jan. 15, 2018) ....................33

*Erlenbaugh v. United States*,
409 U.S. 239 (1972)....................24, 25

*Est. of Holl v. Comm'r*,
967 F.2d 1437 (10th Cir. 1992) ....................17

*Exxon Shipping Co. v. Baker*,
554 U.S. 471 (2008)....................44

*Faulk v. Dimerco Express USA Corp.*,
172 F.4th 844 (11th Cir. 2026) ....................38

*Faulkner v. Super Valu Stores, Inc.*,
3 F.3d 1419 (10th Cir. 1993) ....................30, 32

*Fitzgerald v. Mountain States Tel. & Tel. Co.*,
68 F.3d 1257 (10th Cir. 1995) ....................34, 35

*Gibson v. Moskowitz*,
523 F.3d 657 (6th Cir. 2008) ....................44

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009).................... 15, 24, 25, 26, 27, 28

*Hampton v. Dillard Dep't Stores, Inc.*,
247 F.3d 1091 (10th Cir. 2001) ....................20

*Horinek v. Spirit Aerosystems, Inc.*, No. CV 24-1171-KHV,
2026 WL 1469796 (D. Kan. May 26, 2026)....................46

*Hudson v. AIH Receivable Management Services*,
No. 10-CV-2287-JAR, 2012 WL 5306277 (D. Kan. Oct. 29, 2012) ....................46

*Hynes v. Energy W., Inc.*,
211 F.3d 1193 (10th Cir. 2000) ....................35

*Johnson v. Interstate Brands Corp.*,
351 F. App'x 36 (6th Cir. 2009)....................34

*United States v. Johnson*,
941 F.2d 1102 (10th Cir. 1991) ....................18

*Joppy v. HCA-HealthOne LLC*,
No. 1:22-cv-00986-CNS-STV (D. Colo.) ....................6, 21, 47

*Kauffman v. Maxim Healthcare Servs., Inc.*,
509 F. Supp. 2d 210 (E.D.N.Y. 2007) ........................................................45, 46

*Kramer v. Wasatch Cnty. Sheriff's Off.*,
743 F.3d 726 (10th Cir. 2014) ..................................................................32

*Lee ex rel. Lee v. Borders*,
764 F.3d 966 (8th Cir. 2014) ....................................................................44

*Level 3 Commc'ns, LLC v. Liebert Corp.*,
535 F.3d 1146 (10th Cir. 2008) ..................................................................18

*Lompe v. Sunridge Partners, LLC*,
818 F.3d 1041 (10th Cir. 2016) ..........................................................43, 44, 45

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
703 F.2d 1152 (10th Cir. 1981) ..........................................................20, 35, 39

*Morton v. Progressive N. Ins. Co.*,
498 F. App'x 835 (10th Cir. 2012) ............................................................18

*O'Neal v. Ferguson Const. Co.*,
237 F.3d 1248 (10th Cir. 2001) ..........................................................36, 37, 38

*Osterhout v. Bd. of Cnty. Comm'rs of LeFlore Cnty.*,
10 F.4th 978 (10th Cir. 2021) .........................................................19, 20, 35, 37

*Pac. Mut. Life Ins. Co. v. Haslip*,
499 U.S. 1 (1991)..................................................................................39, 45

*PAS Commc'ns, Inc. v. Sprint Corp.*,
139 F. Supp. 2d 1149 (D. Kan. 2001)..........................................................31

*Perkins v. Fed. Fruit & Prod. Co.*, No. 11-CV-542 JAP-KLM, 2013
WL 2112230, at *4-10, *27 (D. Colo. May 14, 2013) ......................................36

*Perkins v. Fed. Fruit & Produce Co.*, No. 11-CV-00542-REB-KLM,
2012 WL 1658871 (D. Colo. May 3, 2012) ..........................................33, 37, 46

*Pullman-Standard v. Swint*,
456 U.S. 273 (1982)......................................................................................17

*Russello v. United States*,
464 U.S. 16 (1983)....................24

*Scala v. Moore McCormack Lines Inc.*,
985 F.2d 680 (2d Cir. 1993)....................35

*Sherman v. Kasotakis*,
314 F. Supp. 2d 843 (N.D. Iowa 2004)....................46

*Skyline Potato Co. v. Hi-Land Potato Co.*, No. CIV 10-0698 JB/RHS,
2013 WL 311846, at *19 n. 3 (D.N.M. Jan. 18, 2013)....................32

*Smith v. N.M. Coal 401(K) Pers. Sav. Plan*,
334 F. App'x 150 (10th Cir. 2009)....................18

*Smith v. Nw. Fin. Acceptance, Inc.*,
129 F.3d 1408 (10th Cir. 1997)....................35, 37

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003).................... 17, 40, 41, 42, 43, 44, 45

*Stenson v. Edmonds*,
86 F.4th 870 (10th Cir. 2023)....................18

*Sw. Stainless, LP v. Sappington*,
582 F.3d 1176 (10th Cir. 2009)....................28

*Thomas v. iStar Fin., Inc.*,
508 F. Supp. 2d 252 (S.D.N.Y. 2007)....................42

*Townsend v. Lumbermens Mut. Cas. Co.*,
294 F.3d 1232 (10th Cir. 2002)....................18, 29

*Turley v. ISG Lackawanna, Inc.*,
774 F.3d 140 (2d Cir. 2014)....................44

*United States v. Alqahtani*,
73 F.4th 835 (10th Cir. 2023)....................19

*United States v. Gutierrez Del. Lopez*,
761 F.3d 1123 (10th Cir. 2014)....................31

*United States v. Little*,
119 F.4th 750 (10th Cir. 2024) ........................................................................19

*Whittenburg v. Werner Enters. Inc.*,
561 F.3d 1122 (10th Cir. 2009) ........................................................ 16, 34, 35

*Wulf v. City of Wichita*,
883 F.2d 842 (10th Cir. 1989) ...................................................................16, 35

**Statutes**

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1

29 U.S.C. § 623(a)(1)..............................................................................26, 27

42 U.S.C. § 1981 ......... 1, 2, 5, 6, 7, 9, 14, 15, 17, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 37, 38, 45, 46, 47

Age Discrimination in Employment Act .......................................................15

Civil Rights Act of 1866 .................................................................................24

Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071,
1071-72 (1991)...............................................................................................23

Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1071,
1075 (1991)....................................................................................................23

Title VII ……………………….....6, 7, 14, 15, 17, 21, 23, 24, 26, 27, 29, 37, 45, 46

**Other Authorities**

Federal Rule of Civil Procedure 52 ...............................................................17

Federal Rule of Civil Procedure 59(a)............................................................19

Federal Rule of Evident 401 ...................................................................32, 33

Federal Rule of Evidence 403.............................................................13, 32, 33, 34

Federal Rule of Evidence 602.............................................................15, 30, 31, 32

Federal Rule of Evidence 803.......................................................................29

## PRIOR OR RELATED APPEALS

None.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, as this case involves claims under 42 U.S.C. § 1981 ("§ 1981"). This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court's judgment was entered on January 12, 2026. [App. Vol 1 at 217]. Appellant Society for Human Resource Management ("SHRM") filed a Renewed Motion for Judgment as a Matter of Law ("JMOL") and a Motion for a New Trial on February 6, 2026. [*Id.* at 218-253. The district court denied both motions on April 15, 2026. [App. Vol. 2 at 264-278]. SHRM then timely filed its Notice of Appeal on April 23, 2026. [*Id.* at 279-281].

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the district court err when it instructed the jury that, in a case brought under 29 U.S.C. § 1981, "but-for" causation did not require the plaintiff to prove that illegal discrimination was "the … primary cause" of the adverse action?

2. Did the district court abuse its discretion in allowing hearsay evidence of another employee's discharge that was unrelated to Appellee's discharge?

3. Did the district court abuse its discretion in refusing to grant a new trial or reduce the jury's excessive damages awards of $1.5 million in compensatory damages and $10 million in punitive damages?

## STATEMENT OF THE CASE

### I. RELEVANT FACTS

SHRM is a human resources ("HR") association providing education, certification, and networking opportunities. [App. Vol 1 at 51-52 ¶ 1]. Appellee Rehab Mohamed ("Mohamed"), an Egyptian woman, worked for SHRM from April 2016 until September 2020. [App. Vol. 3 at 7, 8, 61, 95]. At the time SHRM discharged her, Mohamed served as a Senior Instructional Designer reporting to Carolyn Barley, ("Barley"), the Manager of Instructional Design. [*Id.* at 9, 75-77, 181]. A key component of her job was designing, developing, and enhancing education programs. [*Id.* at 10, 66-68, 107-108, 182-192].

In 2020, Mohamed was assigned as the lead designer for two online education

programs: an HR compliance program and a digital HR program. [App. Vol. 3 at 12-13, 88]. She started developing both programs in January 2020 with due dates at the end of March. [*Id.* at 37-38, 42]. The deadlines had to be extended until May 2020, in part because the lawyer advising on the HR Compliance program was not sending Mohamed his modules on time and there was a disconnect related to how the content in the Digital HR should be evolving. [*Id.* at 39, 57, 69-73, 80, 99, 104, 115, 195-220, 257-266, 268-271].

SHRM issued Mohamed a performance review in May 2020, with Barley writing that Mohamed needed to balance her design experience "against timelines for improved efficiency and business impact." [App. Vol. 3 at 20-23, 78-80, 193-194].

In early June 2020, shortly after Mohamed received the performance review in which Barley criticized Mohamed's timeliness, Mohamed complained about Barley to Jeanne Morris ("Morris"), the Vice President of Education. [App. Vol. 3 at 27, 122-125]. Mohamed testified that she told Morris she felt Barley treated her (Mohamed) differently than her white colleagues. [*Id.* at 27-28]. In response, on June 4, 2020, Morris met with Mohamed and Barley to try to facilitate a conversation between them. [*Id.* at 29-30, 81-82].

After a second discussion with Mohamed, Barley escalated Mohamed's complaint to HR. [App. Vol. 3 at 31-32, 83-84, 85]. HR investigated by interviewing

employees and reviewing documentation, including personnel records, performance evaluations, and relevant communications. [*Id.* at 35-36, 86, 134, 138-145, 148]. SHRM issued a report on August 31, 2020, concluding that the evidence did not substantiate Mohamed's allegations of discrimination. [*Id.* at 54-55, 252-253].

As of mid-July 2020, Mohamed's projects were still not complete despite the many extensions SHRM had already provided to Mohamed. [App. Vol. 3 at 40, 53, 114-115, 222-234]. Accordingly, Barley extended the deadline to complete the projects one final time, to August 31, 2020, or roughly six additional weeks. [*Id.* at 41, 50, 87-88, 90-91, 93, 116, 226-234, 132-138].

The August 31, 2020 deadlines were necessary to allow sufficient time for review and editing before launch. [App. Vol. 3 at 89-90, 93-94, 105-106, 113]. Timely completion was especially important in 2020 because COVID-19-related cancellation of in-person conferences had reduced revenue and increased reliance on online programming. [*Id.* at 110, 112, 119-120, 126-127, 131, 162-163].

Despite having only a month remaining before the revised deadlines, Mohamed took a vacation at the end of July 2020. [App. Vol. 3 at 235-237]. When she returned in August 2020, HR facilitated a mediation between Mohamed and Barley to help the two individuals work together. [*Id.* at 45-48, 155-158, 221]. The mediation, however, was unsuccessful because Mohamed declined to continue participating. [*Id.* at 52, 128, 159-160, 245-246].

In late August 2020, Mohamed emailed Nick Schacht ("Schacht"), the Chief Global Development Officer, and complained that Barley was "setting [Mohamed] up to fail by imposing an inflexible and unrealistic deadline …." [App. Vol. 3 at 49, 92-93, 130, 226-147]. She said this, notwithstanding the multiple extensions from to the end of August 2020. [*Id.* at 226-147].

Mohamed submitted the two projects by August 31, 2020. [App. Vol. 3 at 58-60, 97-98, 247-251]. However, both projects were incomplete, which Mohamed later admitted. [*Id.* at 56, 74 (Q. It's also true you turned in projects, but you would agree with me the projects you turned in ultimately were incomplete? A. Yes."), 126, 129]. By way of example: (1) the Digital HR program did not incorporate enough content from a resource on which the presenter planned to rely and; (2) the HR Compliance program was missing specific information about the legal landscape for HR professionals. [*Id.* at 111-112, 114, 118-119, 222-225]. SHRM discharged Mohamed on September 2, 2020, because she failed to complete her projects by their deadlines despite multiple extensions totaling roughly three full months. [*Id.* at 61-62, 95, 97, 132-133, 254].

## II. PROCEDURAL HISTORY

Mohamed brought this action under 42 U.S.C. § 1981 alleging race discrimination and retaliation in 2022. [App. Vol. 1 at 22-50].

### B. The Judge Issues An Erroneous Jury Instruction

On September 26, 2025, the parties submitted to the district court via email, "Stipulated and Plaintiff's Competing and Non-Stipulated Jury Instructions." [App. Vol. 1 at 91-136]. The parties disagreed on the instruction titled: "42 U.S.C. § 1981 – DISCRIMINATION BASED ON RACE," (which ultimately became Instruction No. 13) [ *Id.* at 125-126]. As proposed by Mohamed, the instruction would read:

> Ms. Mohamed claims that Defendant's termination of her constitutes race discrimination.
> In order for Ms. Mohamed to establish her claim for race discrimination under Section 1981, she must prove the following by a preponderance of the evidence:
> 1. Defendant SHRM terminated Ms. Mohamed; and
> 2. Defendant SHRM would not have terminated Ms. Mohamed but for her race.
>
> Regarding the second element, race must be a "but-for" cause of the adverse employment action. Ms. Mohamed's race does not need to be the sole cause of Defendant's action, but Ms. Mohamed must show that it played a part.

[*Id.* at 125]. Mohamed's argument on this instruction was:

> This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-[00986]-CNS-STV (D. Colo.) (Dkt. #377) and has been modified [for] … clarification that Ms. Mohamed need only prove the second element because it is undisputed that SHRM terminated her. It is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – DISCRIMINATION BASED ON RACE, p. 4 (Sept. 2013), but has been updated to include the but-for causation standard that is applicable to [§] 1981 discrimination and retaliation claims. The instruction

> provides the elements of a [§] 1981 discrimination claim and an accurate explanation of the but-for causation standard as set forth in *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). … in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020), [the Supreme Court] revisited the but-for standard in the context of a Title VII [of the Civil Rights Act of 1964 ("Title VII")] discrimination claim … The *Bostock* Court states unequivocally that "the plaintiff's sex need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. Furthermore, the Court noted that "a traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the [prohibited factor] was one but-for cause of that decision, it is enough to trigger the law." *Id.* at 1739. *See also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation …).

[*Id*. at 126]. SHRM objected, asserting: "As courts in this jurisdiction and the U.S. Supreme Court have explained, … to prevail on a [§] 1981 claim, 'a plaintiff must show that her race was not just one factor, but indeed the reason for, her injuries.'" [*Id.*] (citing *Garcia v. Summit Tech. Sols., LLC*, No. 21-CV-03077-CNS-MDB, 2022 WL 4467038, at *4 (D. Colo. Sept. 26, 2022), *report and recommendation adopted*, No. 121CV03077CNSMDB, 2022 WL 10028881 (D. Colo. Oct. 17, 2022); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 344 … (2020)). The district court waited to rule on the jury instructions until trial. [*Id.* at 149-151].

During trial on December 4, 2025, the district court and the parties discussed

the proposed jury instructions. In discussing Instruction No. 13, SHRM renewed its objection, stating:

> regarding the second element, race must be the but-for cause of Ms. Mohamed's termination. The suggestion in this instruction that there may be more than one but-for cause isn't consistent with the law. *See Romero v[.] Tucson Unified School District*, No. CV-20-00507-TUC-AMM, …. It's also supported by the Supreme Court's decision in *Comcast*, just establishing … that this states that Ms. Mohamed's complaints of discrimination need not be the primary cause of SHRM's decision to terminate her, it conflicts with Tenth Circuit precedent that has made clear that the but-for causation standard requires Ms. Mohamed to prove that her race was the factor that made a difference.

[App. Vol 3 at 164-165]. Mohamed's counsel argued it was sufficient that the instruction contained the phrase "[t]he factor that makes a difference," going on: "there can indeed be more than one but-for cause as discussed by the U.S. Supreme Court in *Bostock*. And in *Comcast* itself, that case references a but-for cause. And … in *Emerson*, quotes that from *Comcast* that Ms. Mohamed need prove only that race was a but-for cause." [*Id*. at 165-166]. The district court responded:

> I appreciate the thoroughness of the prior briefing on this because it really focused the Court's attention. I think that this accurately reflects what I would put in a different context, if you look at the scales of justice, it has to be a cause that tipped it over the edge. And I think that that accurately reflects the state of the case law and accurately explains it to the jury. I understand that this is a nuanced description, but I think it's an appropriate description that's supported by law. So I will give … the instruction

> … as it is right now.

[*Id*. at 166].

The instruction the district court ultimately gave on § 1981 causation was:

> Mohamed claims that Defendant's termination of her constitutes race discrimination.
> In order for Ms. Mohamed to establish her claim for race discrimination under Section 1981, she must prove the following by a preponderance of the evidence:
> 1. SHRM terminated Ms. Mohamed; and
> 2. SHRM would not have terminated Ms. Mohamed but for her race.
>
> Regarding the second element, race must be a "but-for" cause of Ms. Mohamed's termination. SHRM may be held liable for race discrimination if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her race was the factor that made the difference. Ms. Mohamed's ***race does not need to be the sole or primary cause*** of Defendant's decision to terminate her.

[App. Vol. 1 at 198] (emphasis added).

In his closing, Mohamed's counsel spent considerable time underscoring how Instruction No. 13 should drive the outcome of the trial:

> "But for" … means she must prove that her race was the factor that made a difference, meaning if she weren't a Black woman, this wouldn't have happened to her. Not even a woman; if she weren't Black that this wouldn't have happened to her.
>
> And I want to show you something really important in this … But Ms. Mohamed's ***race does not need to be the sole or primary cause*** of SHRM's decision to terminate her.

[App. Vol. 3 at 170-171] (emphasis added). ***Thus, under the language of the instruction as given, and as emphasized by Mohamed's counsel during closing arguments, it was entirely possible for Plaintiff to prevail even if the jury also concluded that her failure to turn in completed projects after three months of extensions was the <u>primary</u> cause of the termination of her employment.***

Counsel continued this emphasis in discussing how the jury instruction's standard should drive the outcome of the retaliation claim: "Mohamed's ***complaints of discrimination and/or retaliation do not need to be the sole or primary cause*** of SHRM's decision to terminate her." [App. Vol. 3 at 172] (emphasis added).

### C. <u>Mohamed Offered Hearsay Statements To Support Her Case</u>

SHRM submitted its motions *in limine* on September 26, 2025 arguing, among other things, that the district court should exclude hearsay evidence pertaining to alleged discrimination and retaliation faced by other employees. [App. Vol. 1 at 139-142]. The district court denied SHRM's motions *in limine* on October 17, 2025. [*Id.* at 159-160, 163-164].

At trial, therefore, Mohamed was permitted to give hearsay testimony about her African American peer, Ebony Thompson ("Thompson") for which she otherwise had no personal knowledge:

> Q. In the spring of 2020, did you learn that any of your other teammates had concerns about Ms. Barley's management of them?

> A. Yes.
>
> Q. Who?
>
> A. Ms. Ebony Thompson.
>
> Q. And what did you understand her concerns were?
>
> MS. DARROW: Objection. Hearsay.
> …
> THE COURT: Thanks. … The objection is overruled. You are about to hear testimony that is being admitted for a non-hearsay purpose. That means it does not go to the truth of the information that you are receiving but, instead, only for its effect on the listener. ….
> …
> If you could read it back, that would be wonderful. (Previous question read.)
>
> A. Ms. Ebony Thompson reached out to me, and she asked me if I noticed Ms. Barley's different treatment of people of color on the team comparing to White peers. And at that point, I had been noticing how Ms. Barley at least treating me as a person of color comparing to the White peers on the team. And she said she's been experiencing the same kind of treatment. She said that Ms. Barley has been treating her with less credibility and with inferior kind of tone when she's talking to her.

[App. Vol. 3 at 14-20].

Mohamed elaborated with further hearsay testimony that Thompson "shared that she [was] feeling that she [was] being treated different and shared that she [felt] that Ms. Barley [was] treating her in a discriminatory way." [App. Vol. 3 at 33].

Then, Mohamed testified that SHRM fired Thompson, and this caused

Mohamed concern because "after [Thompson] raised … concerns about Ms. Barley's discriminatory behavior … she was fired because of performance issues." [App. Vol. 3 at 43]. SHRM objected to that statement as impermissible hearsay, but the district court overruled the objection, finding the statement met the effect-on-the-listener exception. This time, however, the district court did not offer a limiting instruction. [*Id*. at 43-44]. Thompson did not testify at trial.

### D. <u>The Jury Was Inflamed By Prejudice And Awarded Mohamed An Excessive Damages Award</u>

Mohamed also testified at trial about the emotional distress she felt both in her last three months at SHRM and in the months following her discharge. [App. Vol. 2 at 75-76, 85-86; App. Vol. 3 at 62-65]. But despite these feelings, Mohamed also testified she never attended therapy after her complaint to SHRM or after her discharge. [App. Vol. 3 at 51, 135]. In fact, Mohamed presented no evidence of medical or psychological treatment, counseling, diagnosis, prescription medication, or other professional intervention related to her emotional distress. Nor did she offer testimony from family members, friends, coworkers, or other witnesses who could corroborate changes in her emotional state or the severity of the suffering to which she testified. And on cross-examination, Mohamed admitted she could and did continue working in her chosen field within three months of her discharge. [*Id*. at 63].

During their deliberation, the jury asked a question about punitive damages: "Who receives punitive damages AND [i]s there a formular or max value for punitive damages." [App. Vol. 1 at 214]. The district court answered, "[a]ny punitive damages, should you choose to award them, would go to the Plaintiff" and "[w]hile there is no specific formula for calculation of punitive damages, I refer you back to Instruction No. 23 for various factors you can consider." [*Id.*; App. Vol. 3 at 177]. A few hours later, the jury returned a verdict for Mohamed, awarding $1.5 million in compensatory damages, and $10 million in punitive damages. [App. Vol 1 at 215-216].

### E. SHRM's Motion for A New Trial

SHRM moved for a new trial, remittitur, and related post-trial relief. [App. Vol 1. 218-252]. In the motion for a new trial, SHRM argued the district court improperly instructed the jury on "but-for" causation because the instruction suggested "there may be multiple 'but-for' causes." [*Id.* at 239-240]. SHRM also argued, as it had in its motions *in limine*, that it was an abuse of discretion for the district court to allow testimony of Thompson's statements into evidence, because it was hearsay and improper under Federal Rule of Evidence 403. [*Id.* at 239]. Finally, SHRM argued the excessive damages the jury awarded warranted a new trial or remittitur because the compensatory damages bore "little or no relationship to the

evidentiary record," and "the punitive damages verdict was infected by jury passion and prejudice" and violated the Due Process Clause. [*Id.* at 245-248, 251].

On April 15, 2026, the district court denied the motion. [App. Vol. 2 at 264-278]. SHRM then filed its appeal on April 23, 2026. [*Id.* at 279-280].

## **SUMMARY OF THE ARGUMENT**

The district court committed reversible error when it instructed the jury that but-for causation meant race and/or protected activity need not be the primary cause of Mohamed's discharge. The instruction's incorporation of *Bostock*'s more lenient "motivating factor" test, which meant the jury had to find for Mohamed if the evidence showed race or Mohamed's complaints were ***at all*** considered in SHRM's discharge. Thus, even if the jury concluded that Mohamed's inability to complete her assignments (which predated her complaint) was the primary cause of her termination, Instruction 13 required the jury to find in Mohamed's favor. If the jury had applied the proper standard under § 1981 from *Comcast*, the verdict would have been strikingly different.

In *Comcast*, the Supreme Court wrestled with the very question the district court faced but held § 1981's causation is different from Title VII's "motivating factor test." 589 U.S. at 333. Looking at the statute's text and the legislative history around Congress' amendment of § 1981 and Title VII, the Supreme Court highlighted Congress ***did not*** incorporate Title VII's motivating factors test into

§ 1981. *See Comcast*, 589 U.S. at 337-38. And looking to the Age Discrimination in Employment Act ("ADEA"), the Supreme Court echoed its holding that the statute's language imposes liability only when discrimination is "because of" the protected characteristics, not "simply a motivating factor." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 167 (2009). By offering both standards, Instruction No. 13 was internally inconsistent: saying race was "the factor that made the difference" while simultaneously stating race need not be the "sole or primary cause." This mixed-motives standard caused the jury to improperly weigh the evidence and thus was an erroneous instruction that severely prejudiced SHRM, was reversible error, and the only remedy is a new trial.

The district court abused its discretion when it permitted Mohamed to offer out-of-court statements about Thompson, as well as her belief why SHRM discharged Thompson. Mohamed's testimony invited the jury to consider untested allegations by a non-witness and draw impermissible inferences about SHRM's motives. The district court should have excluded this testimony because it was hearsay, Mohamed was not competent to testify about SHRM's decision to discharge Thompson under Federal Rule of Evidence 602, and the testimony was unduly prejudicial. Even worse, after perhaps the most damning statement—that Thompson was fired ***because*** she complained about discrimination—the district court did not provide a curative instruction telling the jury the testimony was not offered for the

truth of the matter it asserted. Given the prejudice these statements caused SHRM, a new trial that disallows such evidence must be ordered.

Finally, the jury's award of $1.5 million in compensatory damages and $10 million in punitive damages is excessive and merits a new trial or remittitur. "[T]he size of a verdict—whether it is large or excessive—is a significant factor suggesting prejudice sufficient to require a new trial." *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1132 (10th Cir. 2009). First, the $1.5 million in compensatory damages, solely for emotional harm, is not "supported by substantial evidence." *Wulf v. City of Wichita*, 883 F.2d 842, 874 (10th Cir. 1989). The evidence showed that: Mohamed never encountered racially charged language; SHRM took many steps to address her discrimination complaints; Mohamed worked for Barley for only seven months and testified that any retaliation lasted only three months, and; Mohamed never sought mental health treatment. Mohamed offered no evidence to support her testimony about emotional distress, and similar cases with more egregious facts demonstrate courts regularly approve or remit compensatory damages to significantly smaller amounts.

As to the punitive damages, the excessive amount shows the jury was enflamed by passion and prejudice in making its award. The jury's note asking who would receive punitive damages demonstrates this.

Ultimately, the size of the punitive damages award, $10 million, is

unconstitutionally large. The Due Process Clause prohibits "grossly excessive" punitive damages awards. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). Here, the conduct Mohamed ascribed to SHRM was at the low end of the Supreme Court's hierarchy of reprehensible acts. And the 6.7:1 ratio between the compensatory and punitive damages is unconstitutionally high given the evidence and the fact that these damages are intangible. Last, Title VII's $300,000 damages cap and similar cases with lower awards demonstrate the $10 million punitive damages award is unconstitutionally excessive.

Given this, the Court should reverse the district court's order denying SHRM's motion for a new trial, order a new trial with a jury instruction providing § 1981's correct standard and excluding testimony about Thompson. In the alternative, the Court should significantly remit Mohamed's damages award.

## ARGUMENT

### III. STANDARD OF REVIEW

#### B. Standard Of Review for an Error of Law is *De Novo*

An appellate court reviews *de novo* "questions of law." *Est. of Holl v. Comm'r*, 967 F.2d 1437, 1438 (10th Cir. 1992); *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982). Federal Rule of Civil Procedure 52 "does not inhibit an appellate court's power to correct errors of law, including ... a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp.*

*v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984). "De novo review means [the Court] make[s] an independent determination of the issues." *Smith v. N.M. Coal 401(K) Pers. Sav. Plan*, 334 F. App'x 150, 157 (10th Cir. 2009). Deference is not given to the district court's determinations. *United States v. Johnson*, 941 F.2d 1102, 1111 (10th Cir. 1991).

**B. Erroneous Jury Instructions are Reviewed *De Novo***

The Tenth Circuit "review[s] de novo legal objections to the jury instructions." *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (quoting *Daniel v. Ben E. Keith Co.*, 97 F.3d 1329, 1334 (10th Cir. 1996)). "[W]here a jury instruction is legally erroneous, [the appellate court] reverse if the jury might have based its verdict on the erroneously given instruction." *Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1242 (10th Cir. 2002)

**C. Standard Of Review Motions *In Limine* And Admissibility Of Evidence Is Abuse of Discretion**

An appellate court "review[s] evidentiary rulings and rulings on motions *in limine* for abuse of discretion." *Stenson v. Edmonds*, 86 F.4th 870, 879 (10th Cir. 2023). Once the district court "definitively ruled on the admissibility of this evidence, [the moving party is] not obligated to renew [its] objection at trial. *Morton v. Progressive N. Ins. Co.*, 498 F. App'x 835, 840 (10th Cir. 2012) (quoting FED. R. EVID. 103(b) ("Once the court rules definitively on the record—either before or at

trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal.”)); *United States v. Little*, 119 F.4th 750 (10th Cir. 2024) (same).

Additionally, an appellate court “reviews a district court’s evidentiary rulings for abuse of discretion.” *United States v. Alqahtani*, 73 F.4th 835, 848 (10th Cir. 2023) (quoting *United States v. Rosario Fuentez*, 231 F.3d 700, 708 (10th Cir. 2000)). The prejudice of a wrongly admitted hearsay statement is magnified when the district court fails to provide “limiting instructions.” *See United States v. Burch*, 48 F.3d 1233 (10th Cir. 1995) (Table).

### D. <u>The Tenth Circuit Reviews The Denial Of A Motion For New Trial For Abuse of Discretion</u>

“The court may, on motion, grant a new trial on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]” *Bond v. Sheriff of Ott. Cnty.*, 173 F.4th 1265, 1294-95 (10th Cir. 2026) (quoting FED. R. CIV. P. 59(a)(1)(A)). The Tenth Circuit reviews “the denial of a Rule 59(a) motion for abuse of discretion. A district court abuses its discretion if it made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.” *Burke v. Regalado*, 935 F.3d 960, 1026 (10th Cir. 2019) (internal quotations omitted). “Upon a finding that passion or prejudice tainted the findings on liability and damages, the court must order a new trial.” *Osterhout v. Bd. of Cnty. Comm’rs of LeFlore Cnty.*, 10 F.4th 978, 996 (10th Cir. 2021) (citing

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981)). In the alternative, remittitur is appropriate if the error affects the amount of damages awarded without affecting the finding of liability. *Id.* at 996.

## IV. DISCUSSION

### B. <u>It Was Reversible Error For The Court To Instruct The Jury That Race Need Not Be The Primary Cause Of Mohamed's Discharge</u>

"Section 1981 prohibits racial discrimination in 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1102 (10th Cir. 2001) (quoting 42 U.S.C. § 1981). The statute protects individuals only from discrimination based on race. 42 U.S.C. § 1981. Under § 1981, race must be the but-for cause of an employer's adverse action—one factor of many is not enough. *Comcast*, 589 U.S. at 340-41. Here, the district court instructed the jury:

> SHRM may be held liable for race discrimination if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her race was the factor that made the difference. Ms. Mohamed's ***race does not need to be the sole or primary cause*** of Defendant's decision to terminate her.

[App. Vol. 1 at 198]. This instruction was wrong, as the portion stating that race need not be ***the primary cause*** incorporates the "motivating factor" standard of

*Bostock* instead of a properly stated "but for" standard applicable to § 1981 cases articulated in *Comcast*..

### 1. The District Court's "But-For" Instruction Caused the Jury to Apply the Wrong Standard to the Evidence

The district court's instructions wrongly defined § 1981 causation, stating race need not be "the … primary cause of defendant's decision to terminate [Mohamed]." [App. Vol. 1 at 198].[1] While the initial language of the instruction—that Mohamed must prove "SHRM would not have terminated Ms. Mohamed but for her race"—reflected § 1981, what followed incorporated Title VII's "motivating factor" standard, which directly contravened *Comcast*. *Id.*; *see Comcast*, 589 U.S. at 341.

And the district court instruction was prejudicial because it was outcome determinative. It required the jury to find in Mohamed's favor even though SHRM demonstrated that the ***primary*** factor for her discharge was her failure to meet her projects' deadlines. As long as Mohamed presented evidence that her race or complaints of discrimination were in the decisionmaker's mind at the time of her discharge, that was enough to find liability under the portion of the instruction that

[1] These instructions were incorporated from another § 1981 case, *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.), ECF #337 (cited at App. Vol 1 at 126). That case resulted in a significant damages award of $5 million in compensatory damages and $15 million in punitive damages and is pending before the district court on motions for renewed JMOL and new trial. *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo. Aug. 19, 2025), ECF #381 (cited at App. Vol 1 at 126).

required the jury to find for Mohammed even if race was not the primary cause of her discharge.

Given the severe prejudice the erroneous instruction caused, the only option is to reverse the verdict and remand for a new trial in which the district judge instructs the jury correctly on the meaning of the "but for" causation standard.

### 2. The Supreme Court Reaffirmed § 1981 Causation Standard

In *Comcast*, the Supreme Court set out the causation standard for a § 1981 claim. 589 U.S. at 331. There, at the pleading stage, the district court had dismissed the complaint, finding the plaintiffs failed to plausibly allege race was the but-for cause of the defendant's decision. *Id*. at 330-31. The Ninth Circuit had reversed in part, concluding a plaintiff need plead race was only a "motivating factor" in the contracting decision. *Id*. at 331.

The Supreme Court reversed the Ninth Circuit. Looking to the statutory text, the Court held § 1981 requires that race must be ***the determinative cause of the injury*** and does not include language allowing liability when race is merely a "motivating factor." *Id*. at 334, 337.

Instead, the Court held that "[t]o prevail" on a § 1981 claim "a plaintiff must initially plead and ultimately prove that, ***but for race***, it would not have suffered the loss of a legally protected right." *Comcast*, 589 U.S. at 341 (emphasis added), *id*. at 344 ("The Court holds today that Entertainment Studios must plead and prove that

race was **<u>the</u>** but-for cause of its injury—in other words, that Comcast would have acted differently if [the plaintiff] were not African-American owned.") (Ginsburg, J., concurring in judgment) (emphasis added).

#### a. The Text and Legislative History Shows Courts Cannot Apply Motivating Factor Language To § 1981

Section 1981, enacted in 1866, never "said a word about motivating factors." *Comcast*, 589 U.S. at 337-38. Instead, the statute promises that "[a]ll persons ... shall have the same right … to make and enforce contracts, to sue, be parties, [and] give evidence … as is enjoyed by white citizens." *Id*. at 333. When interpreting Title VII, the Supreme Court created the "motivating factor" test in *Price Waterhouse*. *Id*. at 337 (citing *Price Waterhouse,* 490 U.S. at 246). Years later, "Congress … displaced *Price Waterhouse* in favor of its own version of the motivating factor test," writing that a plaintiff need show only that her protected characteristic was at least one of many motivating factors in the defendant's adverse employment decision. *Id.*; Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075 (1991)). The same year Congress amended Title VII, it also amended § 1981. *Comcast*, 589 U.S. at 338. But in the § 1981 amendments, Congress ***did not*** incorporate Title VII's new motivating factors test into the post-Civil War statute. *Id*.; Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071, 1071-72 (1991). Where "Congress has simultaneously chosen to amend one statute in one way and a second statute in

another way, [the Court] normally assume[s] the differences in language imply differences in meaning." *Comcast*, 589 U.S. at 338 (citing *Gross*, 557 U.S. at 174-75; *see Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.").

Instead of looking to Title VII's motivating factor test, the Supreme Court looked to § 1981's neighboring statute, 42. U.S.C. § 1982 ("§ 1982"). *Comcast*, 589 U.S. at 336. Like § 1981, Congress first enacted § 1982 as part of the Civil Rights Act of 1866. *See id*. at 336. And unlike Title VII, § 1982 uses nearly identical language to § 1981, "the same right … ***as is enjoyed by white citizens*** … to inherit, purchase, lease, sell, hold, and convey real and personal property." 42. U.S.C. § 1982 (emphasis added). The common language, origin, and purpose of §§ 1981 and 1982 require the Court to interpret them similarly. *Comcast*, 589 U.S. at 336 (citing *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 448 (2008) ("[O]ur precedents have long construed §§ 1981 and 1982 similarly.")); *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("The rule of *in pari materia* … is … [that] a legislative body generally uses a particular word with a consistent meaning in a given context …" and "is but a logical extension of the principle that individual sections of a single statute should be construed together …."). Claims under both §§ 1982 and 1981 arise

when an individual is discriminated against "***because of*** color." *Id*. (emphasis added). *Comcast* held there is no reason to read the language differently, despite the difference in the claims,[2] because the two statutes achieve the same purpose: "If a § 1982 plaintiff must show the defendant's challenged conduct was 'because of' race, it is unclear how we might demand less from a § 1981 plaintiff." *Id*.

In reaching this conclusion, the Court repeatedly confirms § 1981's causation standard is not "motivating factor." *See id*. at 334 (quoting *Gross*, 557 U.S. at 176-77) ("To prove a violation … the government had to show that the defendant's challenged actions were taken 'on account of' or 'by reason of' race—terms we have often held indicate a but-for causation requirement."); *id*. at 335 (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975)) ("When it first inferred a private cause of action under § 1981, this Court described it as 'afford[ing] a federal remedy against discrimination ... on the basis of race,' language (again) strongly suggestive of a but-for causation standard."). Any reading of *Comcast* applying a motivating factor standard to a § 1981 claim is an error of law and cannot stand.

**3. ADEA Also Requires But For Causation; Age As A Motivating Factor is Not Sufficient**

The ADEA, like §1981, prohibits discrimination based on a singular protected characteristic: age. Under the ADEA, it is unlawful for an employer to take adverse

[2] Section 1982 claims involve racial discrimination in the right to buy and sell property. *Comcast*, 589 U.S. at 336.

action against an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). In *Gross*, relied on by *Comcast*, *see* 589 U.S. at 334, the Supreme Court held: "A plaintiff bringing an ADEA disparate-treatment claim must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." 557 U.S. at 167. As in *Comcast*, in *Gross*, the Court rejected the argument that Title VII's "motivating factor" test be applied to ADEA, writing, "ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Id*. at 174-75. And like in *Comcast*, the *Gross* Court also relied on Congress' decision to amend Title VII and the ADEA at the same time without implementing the same "motivating factor" language. *Id*. at 175. Instead, an ADEA plaintiff must show age-based discrimination was the sole or primary factor for the termination. *Id*. at 179.

Because Congress did not incorporate mixed-motive liability in either the ADEA or § 1981, a plaintiff cannot prevail on either by showing the protected characteristic was one of several reasons for the challenged conduct. The plaintiff must establish that the adverse action would not have occurred in the absence of age discrimination under ADEA and race discrimination under § 1981. *Comcast*, 589 U.S. at 334 (holding actions taken "on account of" or "by reason of" race satisfy the but-for causation requirement) (citing *Gross*, 557 U.S. at 176-77). In this way, § 1981, like the ADEA, imposes a strict causation standard that forecloses any

liability based on the more forgiving motivating-factor showing. *Compare* 42 U.S.C. § 1981 ("All persons … shall have the same right … to make and enforce contracts, to sue, be parties, give evidence … as is enjoyed by white citizens."), *and* 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer [to take an adverse employment action] because of [an] individual's age.")

Importantly here, instead of looking to a law with a similar standard, like the ADEA, Mohamed and the district court relied on *Bostock*, a case about sex discrimination under Title VII in crafting Instruction 13. [App. Vol. 1 at 126) ("The U.S. Supreme Court came to the same conclusion in *Bostock* … where it revisited the but-for standard in the context of a Title VII"); App. Vol. 3 at 165-166]. The problem is that the meaning of "but for" under Title VII, on the one hand, and § 1981 and the ADEA, on the other hand, are entirely different. Title VII's standard is a motivating factor standard whereas § 1981 and the ADEA require a much higher standard requiring the Plaintiff to show that discrimination was, at a minimum, the ***primary*** cause.

Even more damaging, this reasoning carried through to Mohamed's closing argument, in which counsel emphasized, "Mohamed's ***race does not need to be the sole or primary cause*** of SHRM's decision to terminate her" for the jury to find in her favor. [App. Vol. 3 at 170-171] (emphasis added). Mohamed's misapplication of *Bostock* and the "motivating factor" standard to § 1981 resulted in the judge

instructing the jury to weigh the evidence incorrectly, severely prejudicing SHRM. This was clear legal error, and a new trial must be ordered.

#### 4. An Internally Inconsistent Jury Instruction Should Not Be Permitted.

The formation of Instruction No. 13 was legal error because it was internally inconsistent. This Court has found that "internally inconsistent [factual] findings constitute clear error," *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1184 (10th Cir. 2009), so the same must be true when the district court presents an internally inconsistent rule of law.

The first part of the instruction required race to be "the factor that made the difference," while the next part of the instruction stated that race need not be the "primary cause." It is axiomatic that the factor that "made the difference" must be the decisive or controlling and, at a minimum, primary reason for the outcome. Stating that race need not be the primary factor was wrong. *See Comcast,* 589 U.S. at 334 (holding actions taken "on account of" or "by reason of" race satisfy the but-for causation requirement) (citing *Gross*, 557 U.S. at 176-77); *see* Fed. Civ. Jury Instr. 3rd Cir. 6.1.2 (2026) (emphasis added) ("[Plaintiff's] race was ***a determinative factor*** in [defendant's] decision"). By failing to reconcile those standards or explain how they interact in § 1981, Instruction No. 13 created a substantial risk that jurors would apply different and legally incorrect tests when determining liability.

"A faulty jury instruction requires reversal when (1) [the Court has] substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations,' and (2) when a deficient jury instruction is prejudicial.'" *Townsend*, 294 F.3d at 1242 (quoting *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1235 (10th Cir. 1999)). The district court here clearly led the jury astray by blending § 1981 causation with Title VII's mixed-motive liability, creating a substantial likelihood that jurors would apply the improper causation standards to the evidence. This prejudiced SHRM, because "the jury might have based its verdict on the erroneously given instruction." *Id*. The Court must therefore reverse the judgment and order a new trial.

### C. <u>The District Court Abused its Discretion By Allowing Hearsay Evidence Of Another's Terminations</u>

It was an abuse of discretion to allow Thompson's out-of-court statements and testimony of her discharge to be offered at trial. Mohamed's testimony about the former employee invited the jury to consider untested allegations by a non-witness and to draw impermissible inferences about SHRM's motives. The district court should have excluded this testimony because it was hearsay, Mohamed was not competent to testify to it, and it was unduly prejudicial.

First, Mohamed's testimony of what Thompson told her was impermissible hearsay. While "hearsay is generally not admissible under Fed. R. Evid. 803," an

out-of-court statement may be offered for its "effect on the listener." *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993). Although the district court purported to allow it for that purpose, that is not what actually occurred. Mohamed was prompted, "[i]n the spring of 2020, did you learn that any of your other teammates had concerns about Ms. Barley's management of them?" In response, Mohamed was permitted to testify to what Thompson *told* her. [App. Vol. 3 at 14-20]. Nowhere was Mohamed asked—nor did she testify—how these alleged statements affected Mohamed's thinking or altered her conduct; instead, she simply relayed out-of-court conversations to the jury. Without such foundation, Thompson's alleged statements were offered to demonstrate Barley acted in a "particular way," which was impermissible. *See Faulkner*, 3 F.3d at 1434-35 (finding statements about employees violating policy and acting improperly were admissible because "[a]lthough this testimony incorporates out-of-court statements, it was expressly presented to demonstrate Super Valu's state of mind in not hiring Associated Grocers' ex-employees and was not offered to prove the truth of the matter overheard.").

Even more problematic was Mohamed's testimony that SHRM fired Thompson because Thompson "raised concerns about Ms. Barley's discriminatory behavior." [App. Vol. 3 at 43]. This violated Federal Rule of Evidence 602 because Mohamed had no personal knowledge as to SHRM's reason for discharging

Thompson—this testimony was based purely on an assumption. "A witness may testify to a matter ***only if*** evidence is introduced sufficient to support a finding that the witness ***has personal knowledge of the matter***." FED. R. EVID. 602 (emphasis added). Moreover, "a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact ...." FED. R. EVID. 602 Advisory Committee's Note to 1972 Proposed Rules. Mohamed offered no testimony that she was in any meeting or told by any SHRM employee why SHRM discharged Thompson. "While it is true that 'personal knowledge' includes inferences and opinions, those inferences and opinions must be grounded in observation or other first-hand personal experience. ***They must not be flights of fancy, speculations, hunches, intuitions, or rumors*** about matters remote from that experience." *PAS Commc'ns, Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1181-82 (D. Kan. 2001) (emphasis added).

Because Mohamed did not have "personal knowledge" of why SHRM discharged Thompson, she could testify only to that reason if her testimony complied "with the hearsay rule." *United States v. Gutierrez Del. Lopez,* 761 F.3d 1123, 1132-33 (10th Cir. 2014) (citing FED. R. EVID. 602 Advisory Committee's Notes (1972)). Again, for this testimony, the district court overruled SHRM's objection, finding it met the effect-on-the-listener exception. [App. Vol. 3 at 43-44]. But Mohmed's testimony was not about an out-of-court statement she heard; it was her belief that

SHRM fired Thompson, "after she raised … concerns [about Ms. Barley's discriminatory behavior]." [*Id.* at 43]. This does not fit within the effect on the listener hearsay exception. In this testimony, Mohamed offered only her opinion, not a statement someone else said about why Thompson was discharged. Thus, here testimony was not offered "for the fact that it was said, that [Mohamed] heard it, and that it contributed to her perception of" SHRM's actions. *See Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 752 (10th Cir. 2014). Thus, the only reason this testimony could have been offered was for its truth, and Mohamed was not competent to offer such evidence under Rule 602. Even worse, in that instance, even after SHRM objected, the district court did not "provide[] a limiting instruction to the [jury] to limit the possibility that the evidence [would] be used improperly." *Skyline Potato Co. v. Hi-Land Potato Co.*, No. CIV 10-0698 JB/RHS, 2013 WL 311846, at *19 n. 3 (D.N.M. Jan. 18, 2013) (citing cases); *c.f. Faulkner*, 3 F.3d at 1435 (finding no abuse of discretion, in part, because "the trial court repeatedly instructed the jury as to the limited purpose of the testimony.").

And even if evidence about Thompson was admissible, a simple weighing under Federal Rule of Evidence 403 reveals the testimony was far more prejudicial than probative. Even when evidence is relevant under Rule 401, the district court retains the discretion to exclude that evidence, under Rule 403, if it is unduly prejudicial, confusing, misleading, or cumulative. FED. R. EVID. 403; *United States*

*v. Boger*, No. 25-4027, 2026 WL 852229, at *1 (10th Cir. Mar. 27, 2026) (quoting *Tanberg v. Sholtis*, 401 F.3d 1151, 1162 (10th Cir. 2005) (holding a court has discretion to "determine[e] … relevance under Rule 401 and … conclu[de] under Rule 403 that relevant evidence should nonetheless be excluded due to its tendency to cause jury confusion or unfair prejudice."); *Perkins v. Fed. Fruit & Produce Co.*, No. 11-CV-00542-REB-KLM, 2012 WL 1658871, at *3 (D. Colo. May 3, 2012) ("evidence of past racial discrimination cannot be used to show that a defendant discriminated on a specific subsequent occasion.").

Here, the prejudicial impact of Mohamed's testimony about Thompson was substantial and only magnified by the fact that Thompson was absent from trial, precluding SHRM's opportunity to examine the credibility of the statements. This evidence allowed the case to "devolve[e] into a prolonged trial about an employer's alleged discrimination against … other employees who are not parties to the case." *DeAngelis v. City of Bridgeport*, No. 3:14-CV-01618 (JAM), 2018 WL 429156, at *1 (D. Conn. Jan. 15, 2018). Allowing the jury to hear these unverified statements allowed Mohamed "to inject [the] trial with evidence of wrongful acts against others" effectively putting SHRM and Barley "on trial for presiding over a generally toxic or dysfunctional workplace, rather than on trial for acts of illegal discrimination or retaliation." *Id.* at *2. Mohamed asserting that SHRM discharged Thompson for speaking out "in no way establishes that [SHRM]'s reason for

discharging [Mohamed] was pretext for … discrimination" or retaliation. *Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 41 (6th Cir. 2009). But that is likely how the jury took it, so this evidence was prejudicial and not worth the probative value it offered, making it an abuse of discretion to allow its admission under Rule 403. Such an error rendered Mohamed's testimony improper under the Federal Rules of Evidence and a clear abuse of discretion, meriting a new trial.

### D. The Excessive Damages Award Merits A New Trial Or Remittitur

The jury awarded Mohamed $1.5 million in compensatory damages and $10 million in punitive damages. [App. Vol. 1 at 215-216; App. Vol. 3 at 178-179]. This award was not supported by the evidence presented at trial and far exceeds what courts have deemed permissible under the facts presented. Instead, the verdict reflects an impermissible punishment—as demonstrated by the note the jury sent during deliberation, the fact that the award was largely untethered to the evidence at trial, and is not in line with cases presenting similar, or worse evidence against the employer. Accordingly, the district court abused its discretion in not granting SHRM a new trial, or, at a minimum, remittitur.

This Court has "previously held that the size of a verdict—whether it is large or excessive—is a significant factor suggesting prejudice sufficient to require a new trial." *Whittenburg*, 561 F.3d at 1132; *Fitzgerald v. Mountain States Tel. &*

*Tel. Co.*, 68 F.3d 1257, 1262 (10th Cir. 1995) ("plainly excessive damages … may support an inference that bias, passion or prejudice contributed to the award.").

**1. It Was an Abuse of Discretion to Allow the $1.5 Million in Compensatory Damages to Stand**

The jury awarded Mohamed $1.5 million in compensatory damages, solely for emotional harm, not economic injury. [App. Vol. 1 at 207 (Instruction No. 21), 215-216; App. Vol. 3 at 178-179]. The law requires "[t]he award itself … be supported by substantial evidence." *Wulf*, 883 F.2d at 874; *Scala v. Moore McCormack Lines Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) ("While a jury has broad discretion in measuring damages, it may not abandon analysis for sympathy … as though it were a winning lottery ticket."). Compensatory damages can be established, among other ways, by a plaintiff's testimony about her harm and the testimony of others about that harm. *See Osterhout*, 10 F.4th at 993; *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416 (10th Cir. 1997). Emotional distress is "essentially subjective," *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978), but when that subjective decision is excessive, it may be cause for a new trial, or a reduction of the award. *See Hynes v. Energy W., Inc.*, 211 F.3d 1193, 1206 (10th Cir. 2000); *Malandris*, 703 F.2d at 1168; *Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1256 (D. Colo. 2009).

Here, the jury's compensatory damages award was excessive, and untethered

to the evidence presented. Mohamed's testimony shows she never encountered explicitly racist slurs, statements, or actions; instead, her entire case is premised on alleged disparate treatment. [App. Vol. 3 at 74]. Additionally, SHRM took Mohamed's complaints seriously, with Morris engaging Mohamed and Barley in a discussion about Mohamed's complaint, HR investigating Mohamed's complaints, and SHRM holding a mediation to try to facilitate a resolution between Mohamed and Barley. [*Id.* at 29-30, 44-48, 54-55, 81-82, 86, 103, 117, 121, 138-143, 146-148, 155, 157-158, 221, 252-53]. And Mohamed did not work for Barley as long as many plaintiffs who received far less in emotional distress damages. *See, e.g.*, *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1251 (10th Cir. 2001) (plaintiff who worked for defendant "for approximately thirty-two years" was awarded $302,721.25 in compensatory damages); *see also Perkins v. Fed. Fruit & Prod. Co.*, No. 11-CV-542 JAP-KLM, 2013 WL 2112230, at *4-10, *27 (D. Colo. May 14, 2013) (employee who faced discrimination for less than a year was awarded $70,000 in damages). Instead, Mohamed reported to Barley for only seven months and testified she faced retaliation for less than three months. [App. Vol. 3 at 9, 61, 75-76, 81-82, 181, 254-256].

As relates to the harm to which Mohamed did testify, while she discussed a compromised emotional state, she also testified she never sought mental health treatment, nor did any witness corroborate that testimony or any exhibits support it.

*C.f. Osterhout*, 10 F.4th at 993 ("Nor was the evidence of Mr. Osterhout's damages as thin as Mr. Morgan argues. [He] did not rely solely on his testimony, for he supported his version of events with medical bills, photos, and testimony from other witnesses about Mr. Osterhout's depression, anxiety, and lost income."); *Smith*, 129 F.3d at 1416 ("The record reveals that Plaintiff's testimony was, in part, corroborated by independent, objective testimony.").

Likewise, a survey of comparable cases demonstrates the jury's award is not supported by substantial evidence:

- In *Perkins*, the district court upheld an award of $70,000 in emotional distress damages. 2013 WL 2112230, at *27. The plaintiff brought claims under § 1981 and Title VII for disparate treatment based on race, discriminatory discharge, and retaliation in response to complaints of racial discrimination. *Id.* at *1. There, the plaintiff testified that the individual co-defendant used "racial epithets." *Id.*
- In *O'Neal*, this Court upheld a jury award of $302,721.25 in compensatory damages for the plaintiff's retaliation claim under Title VII and § 1981. 237 F.3d at 1251. A former employee testified the Company's president stated: if he "got rid of" the plaintiff "he would never have another 'black son of a bitch' working at" the Company. *Id.* at 1251. The plaintiff "further testified that … [the] vice president who was responsible for hiring and

firing employees, regularly told racial jokes which included derogatory, offensive terms to African–Americans." *Id.* As relates to his emotional distress damages, the plaintiff "testified at trial that he began seeing a psychiatrist before being terminated but could not afford further treatment after his termination. He further testified about his inability to sleep and loss of appetite which continued through trial." *Id.* at 1257. His wife corroborated this, testifying the plaintiff "condition had gotten worse since his termination … [and] that her husband was more worried and very unhappy as compared to when she first met him." *Id.*

- In *Faulk v. Dimerco Express USA Corp.*, 172 F.4th 844 (11th Cir. 2026), the Eleventh Circuit upheld a jury award of $390,000 in damages for lost wages and emotional distress for a § 1981 race discrimination claim. *Id.* at 849. There, the Company's president explicitly stated that the Company "could only hire 'white Caucasi[a]n[s]"—preferably men under 40—as account executives," and "that 'Ideal Sales Candidates' would be 'American and Caucasian (preferred) ethnicity.'" *Id.* at 50.

Mohamed offered little evidence her experience caused her future damage. There is substantial evidence her emotional harm was reduced once she stopped working at SHRM—she testified that she found work in the same industry doing her preferred profession quickly after her discharge. [App. Vol. 3 at 63]. Thus,

Mohamed's evidence cannot sustain the excessive compensatory damages award because the evidence showed only garden-variety, short-lived, emotional distress.

### 2. The Jury's Note Demonstrates It Was Inflamed by Passion, Making Its Punitive Damages Award Improper

The jury's note, asking who would receive the punitive damages it imposed, shows the jury was inflamed with passion and prejudice against SHRM. If this Court "determines that the verdict was the result of passion or prejudice, or for any other reason it appears that the jury erred or abused its discretion … on the issue of damages … the court must unconditionally order a new trial …." *Malandris*, 703 F.2d at 1168 (citing 6A MOORE'S FEDERAL PRACTICE pp. 59-68).

During the jury's deliberations, the jury asked "[w]ho receives punitive damages AND [i]s there a formula or max value for punitive damages." [App. Vol 1 at 214-215]. Such a note is telling, as it demonstrates the jury did not think punitive damage should go to Mohamed, but wanted simply to punish SHRM. While punishment is one aspect of punitive damages, the note demonstrates that the punitive damages award was "greater than reasonably necessary to punish and deter." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22 (1991). And given Mohamed's counsel's closing remarks that directed the jury's focus on a responsibility to punish SHRM, how could the jury's passion not be enflamed?[3]

[3] In closing, Mohamed's counsel dwelled on SHRM being "the gold standard for HR." [App. Vol 3 at 173-176]. He encouraged the jury "to send a message strong enough that it will be heard far

In asking their question, the jury demonstrated that it was not seeking to compensate Mohamed, but to punish SHRM. At Mohamed's encouragement, the jury here used "[t]his case… as a platform to expose, and punish, the perceived deficiencies of [SHRM]'s operations throughout the country." *State Farm*, 538 U.S. at 420. But that is not the purpose of punitive damages, and it is error to "award[] punitive damages to punish and deter conduct that bore no relation to the … harm. … A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory … business." *Id.* at 422-23.

#### 3. It Was An Abuse Of Discretion To Allow The Excessive Punitive Damages Awards Of $10 Million to Stand

The size of the jury's punitive damages award, $10 million, is unconstitutionally large, meriting a new trial, or, in the alternative, remittitur. The Fifth Amendment's Due Process Clause prohibits punitive damages that are "grossly excessive." *State Farm*, 538 U.S. at 416. To determine whether a punitive damages award is unconstitutionally large, the Supreme Court offered three "guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm [the plaintiff] suffered … and the punitive

beyond the walls of this courtroom." [*Id.* at 174]. "Your verdict can tell every HR person in the United States of America what the standards really are. You heard evidence that SHRM has hundreds of thousands of members." [*Id.*] He then instructed, "[i]f you choose to award punitive damages, make it an award that SHRM will actually notice." [*Id.* at 175].

damages award; and (3) the difference between the punitive damages awarded … and the civil penalties authorized or imposed in comparable cases." *Id.* at 418.

#### a. SHRM's Level of Reprehensibility Does Not Support the Punitive Damages Award

Reprehensibility is the "most important indicium of the reasonableness of a punitive damages award." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). The reprehensibility of the defendant's conduct is judged by

> considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. The Supreme Court has suggested a hierarchy of reprehensibility, with acts of violence or threats of bodily harm being the most reprehensible, followed by acts taken in reckless disregard for others' health or safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence. *See Gore*, 517 U.S. at 575. The record here demonstrates the conduct Mohamed attributed to SHRM is not high on the reprehensibility spectrum. Mohamed suffered no physical injury and there is no evidence SHRM's management carried out acts or threats of violence. Additionally, testimony and documentary evidence showed SHRM took Mohamed's complaints seriously.

[App Vol. 3 at 27, 29-30, 34-36, 44-47, 54-55, 81-82, 86, 139, 144-145, 149-151, 153-154, 221, 252-253, 267]. Nor is there any indication SHRM set out with the *purpose* of discriminating or retaliating against Mohamed. *Cf. Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 262 (S.D.N.Y. 2007) (finding lack of such behavior warranted a reduction).

Additionally, the complaint of harm came from one individual, and based on Mohamed's testimony, the discrimination she testified to lasted only seven months and the retaliation lasted only three months. [App Vol. 3 at 27-30, 61, 81-82, 95-96, 181, 254-255]; *see State Farm*, 538 U.S. at 419. The challenged conduct posed no risk to others, Mohamed suffered no economic harm, and her emotional harm was largely cabined to her time at SHRM. [App. Vol. 3 at 62-63, 65]; *see State Farm*, 538 U.S. at 419. Under *State Farm*, these circumstances place the conduct at a low degree reprehensibility and compel the conclusion that the jury's $10 million punitive damages award cannot stand.

**b. In This Case, the 6.7:1 Ratio Is Unconstitutional**

The second guidepost is the ratio of punitive damages to "actual harm." *Gore*, 517 U.S. at 580. The Supreme Court is "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 424. It has said, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant

degree, will satisfy due process…." *Id.* at 425. When "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. In short, the punitive damages must be "reasonable and proportionate" to the harm and compensatory damages. *Id.*

As the judgment stands, the punitive damages were 6.7 times the amount of compensatory damages. While this is a single digit ratio, it is unconstitutional because it does not bear a "'reasonable relationship' to compensatory damages." *Gore*, 517 U.S. at 580. In *State Farm*, the U.S. Supreme Court "concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." 538 U.S. at 425. And where, as here, the compensatory damages award is imprecise because of the nature of the injury and the award is comparatively high, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

Because Mohamed's compensatory damages award is substantial, an award of punitive damages equal to that award—$1.5 million—"represents the outermost limit of the due process guarantee." *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1073 (10th Cir. 2016). "[S]ince the Supreme Court's decision in *State Farm*, many federal appellate courts have imposed a 1:1 ratio." *Id*. When courts have

deviated upwards from a 1:1 ratio, the defendant has either intended to cause the substantial compensatory damages or engaged in particularly egregious behavior.[4]

Constitutional limitations aside, this Court "must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Lompe*, 818 F.3d at 1513 (quoting *State Farm,* 538 U.S. at 426). Where the compensatory award is particularly high—here, $1.5 million—a 6.7-to-1 ratio of punishment to compensation serves neither predictability nor proportionality. This is particularly so where the underlying compensation is intangible and therefore uncertain, like emotional damages. Imposing extensive punitive damages on top of such an award stacks one attempt to monetize offensive behavior upon another. *Cf. Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 (2008) (noting uncertainties associated with punitive damages); CASS R. SUNSTEIN, DANIEL KAHNEMAN & DAVID SCHKADE, *Assessing Punitive*

---

[4] *See, e.g., Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 146, 167 (2d Cir. 2014) (holding remittitur to 2:1 ratio was constitutional where defendants subjected plaintiff to "extraordinary and steadily intensifying drumbeat of racial insults, intimidation, and degradation over a period of more than three years"); *Lee ex rel. Lee v. Borders*, 764 F.3d 966, 976 (8th Cir. 2014) (upholding 3:1 ratio between punitive and compensatory damages where employee at facility for individuals with developmental disabilities intentionally harmed patient by raping her, abusing a position of trust); *Ondrisek*, 698 F.3d at 1029-31 (reducing 10:1 ratio to 4:1 in a case involving "extreme reprehensibility," where defendant repeatedly and brutally battered minors, despite having been previously found liable of beating children in similar circumstances); *Gibson v. Moskowitz*, 523 F.3d 657, 664-65 (6th Cir. 2008) (upholding 2:1 ratio where mentally ill inmate died of dehydration after defendant doctor prescribed medication he knew caused "thermoregulation problems," left inmate confined in room that reached 96 degrees, and ignored warnings inmate was dangerously dehydrated).

*Damages (with Notes on Cognition and Valuation in Law)*, 107 Yale L.J.2071, 2131-33, 2135 (1998) (explaining emotional distress awards suffer from substantial unpredictability, deriving from uncertainties in translating "underlying moral judgments into dollar amounts").

Here, if this Court determines a new trial is not warranted, application of the *Gore* factors calls at the very least for a 1:1 ratio of punitive damages to compensatory damages. "A ratio of 1:1 under the present facts ensures that the punishment imposed on [SHRM] is 'reasonable and proportionate' to the harm [Mohamed] suffered." *Lompe*, 818 F.3d at 1075 (quoting *State Farm*, 538 U.S. at 426). A higher amount of punitive damages, under these circumstances, would be "greater than reasonably necessary to punish and deter." *Haslip*, 499 U.S. at 22.

**c. Comparable Cases Provide Far Less In Punitive Damages For Significantly Worse Behavior**

Third, this Court must examine the "disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 428 (internal quotation marks and citation omitted). Other courts have stated "the $300,000 statutory limitation on punitive damages in Title VII cases [i]s an appropriate benchmark for reviewing § 1981 damage awards, even though the statute d[oes] not apply to § 1981 cases." *Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.*, 405 F.3d 764, 777 (9th Cir. 2005); *Kauffman v. Maxim*

*Healthcare Servs., Inc.*, 509 F. Supp. 2d 210, 220-21 (E.D.N.Y. 2007) ("while it is not appropriate to institute a *de facto* judicial cap on punitive damages awards in [§] 1981 suits by requiring consistency with Title VII capped awards, the Court should take the Title VII cap into account."); *Sherman v. Kasotakis*, 314 F. Supp. 2d 843, 876 (N.D. Iowa 2004) (citing *Gore*, 517 U.S. at 583-85) ("Though the Title VII punitive damages cap clearly does not apply to § 1981 cases, the Supreme Court has instructed courts to analyze this factor in light of such analogous restrictions in determining the constitutionality of a punitive damages award."). Comparing the sheer discrepancy between the $10 million in punitive damages awarded here and that $300,000 cap in Title VII cases, this factor supports a reduction.

And, in cases similar to Mohamed's, juries awarded much less in punitive damages. For example, in *Perkins*, *supra* Section IV.C.1, the jury awarded punitive damages of $350,000. 2013 WL 2112230, at *1. In *Horinek v. Spirit Aerosystems, Inc.*, No. CV 24-1171-KHV, 2026 WL 1469796 (D. Kan. May 26, 2026), the jury found for the plaintiff on two claims—race discrimination and retaliation under § 1981—awarding $2 million in punitive damages. *Id.* at *1. And in *Hudson v. AIH Receivable Management Services*, No. 10-CV-2287-JAR, 2012 WL 5306277 (D. Kan. Oct. 29, 2012), on claims of § 1981 hostile work environment and retaliation, the jury awarded $75,000 in punitive damages. *Id.* at *1.

Given Title VII's statutory cap, which also prohibits race discrimination, and

similar punitive damage awards in this district, this guidepost too weighs in favor of a lower constitutional limit for Mohamed's damages. Thus, to ensure SHRM's Due Process rights are not violated, the Court should grant a new trial, or remit the punitive damages amount to a significantly lower amount.

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Because of the complex legal issues presented here, including proper jury instruction for § 1981 claims, the question of a witness's competency to offer hearsay testimony about out-of-court statements and occurrences, and addressing excessive damages, counsel believes oral argument would be helpful to the Court. Counsel also believes oral argument would be especially helpful on the question of the proper jury instruction for § 1981, given that the instruction at issue has been used by other district courts in the Tenth Circuit. *See Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.), ECF #337 (cited at App. Vol 1 at 126).

## CONCLUSION

This Court should reverse the district court's order denying SHRM's motion for a new trial, ordering a new trial with a jury instruction providing the correct standard for § 1981 and excluding testimony about Thompson. In the alternative, the Court should significantly reduce Mohamed's damages award, as her compensatory damages were not supported by the evidence, and punitive damages was wrongfully infected by passion and prejudice and violated of SHRM's Due Process rights.

Date: August 3, 2026

Respectfully submitted,

*/s/Tanja Darrow*
Tanja Darrow
tdarrow@littler.com
Littler Mendelson, P.C.
633 West Fifth Street, 63rd Floor
Los Angeles, CA 90071
Telephone: 213.443.4300
Facsimile: 213.443.4299

Virginia L. Woodfork
vwoodfork@littler.com
Kelsey A. VanOverloop
kvanoverloop@littler.com
Littler Mendelson, P.C.
1900 Sixteenth Street, Suite 800
Denver, Colorado 80202
Telephone: 303.629.6200
Facsimile: 303.629.0200

*Attorneys for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. Rule 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[**X**] this document contains 11,417 words or

[ ] this brief uses a monospaced typeface and contains 1,300 lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), (a)(6) and 10th Cir. R. 32(A) because:

[**X**] this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point, or

[ ] this document has been prepared in a monospaced typeface using Microsoft Word 365 with 10.5 characters per inch in Times New Roman.

Dated: August 3, 2026

Respectfully submitted,

*/s/Kelsey A. VanOverloop*

Tanja Darrow
tdarrow@littler.com
Virginia L. Woodfork
vwoodfork@littler.com
Kelsey A. VanOverloop
kvanoverloop@littler.com
LITTLER MENDELSON, P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Facsimile: 303.629.0200

Attorneys for Appellant

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

1. All required privacy redactions have been made pursuant to 10th Cir. R. 25.5;

2. If required to file additional hard copies, the ECF submission is an exact copy of those documents;

3. The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender Antivirus v.1.413.425.0, most recently updated on August 3, 2026, and according to the program are free of viruses.

Dated: August 3, 2026

Respectfully submitted,

*/s/ Kelsey A. VanOverloop*

Tanja Darrow
tdarrow@littler.com
Virginia L. Woodfork
vwoodfork@littler.com
Kelsey A. VanOverloop
kvanoverloop@littler.com
LITTLER MENDELSON, P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Facsimile: 303.629.0200

Attorneys for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of August 2026, a true and correct copy of the foregoing OPENING BRIEF was filed with the Clerk of Court using the CM/ECF system and served via CM/ECF to the following:

Ariel Beryl DeFazio
Lowrey Parady Lebsack LLC
1490 Lafayette Street, Suite 304
Denver, CO 80218
Tel: 303-593-2595
ariel@lowrey-parady.com

Hunter Anthony Swain
Swain Law LLC
1490 North Lafayette Street, Suite 303
Denver, CO 80218
Tel: 720-815-5281
hunter@swainemploymentlaw.com

*Attorneys for Plaintiff-Appellee*

*/s/Kelsey A. VanOverloop*

# ORDER AT ISSUE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**ORDER**

---

Before the Court are Defendant's Renewed Motion for Judgement as a Matter of Law (D. 170), Defendant's Motion for New Trial (D. 171), and Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174). The Court DENIES the motions for the following reasons.

## I. BACKGROUND

This civil action arises from the termination of Plaintiff Rehab "Ruby" Mohamed by Defendant Society for Human Resources Management (SHRM). On October 10, 2024, the Court denied SHRM's motion for summary judgment (D. 89). Before trial, Mohamed dismissed all but two of her claims: (1) discrimination in violation of 42 U.S.C. § 1981 (Section 1981) and (2) retaliation under the same section. SHRM sought to exclude various evidence (D. 75; D. 105), which the Court denied without prejudice (D. 82; D. 119). SHRM also sought to bifurcate the trial between liability and punitive damages issues (D. 106), but the Court denied this motion (D. 119).

The Court held a five-day jury trial from December 1–5, 2025 (D. 141–45, 147–48). SHRM moved for judgment by written motion at the close of Mohamed's evidence (D. 146). The Court orally denied this motion (D. 147). The jury returned a verdict for Mohamed on all claims, awarding $1.5 million in compensatory damages and $10 million in punitive damages (D. 154).

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 50

Rule 50 provides that judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Although courts are to review all of the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id*. Moreover, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 150-151. (citation omitted). "Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *United States ex rel. MMS Constr. & Paving, L.L.C. v. W. Sur. Co.*, 754 F.3d 1194, 1199 (10th Cir. 2014) (quotation omitted).

Where a party properly moves for judgment as a matter of law prior to the case being submitted to the jury, that party may renew the motion after the jury returns its verdict. *See* Fed. R. Civ. P. 50(b). Courts apply the same legal standard for a renewed motion under Rule 50(b) as is applied to the original motion for judgment as a matter of law under Rule 50(a). *Hinds v. Gen.*

*Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993). However, there is an added limitation in that generally "[t]he renewed motion under Rule 50(b) cannot assert grounds for relief not asserted in the original motion." *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 739-40 (10th Cir. 2007); *see also Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017) ("Arguments presented in a Rule 50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion."). The Court should grant such relief "only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion." *Hinds*, 988 F.2d at 1045 (citation omitted). Motions under Rule 50(b) "should be cautiously and sparingly granted." *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1400 (10th Cir. 1988).

**B. Federal Rule of Civil Procedure 59**

Rule 59 provides that a court "may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A motion for a new trial may be granted where "the district court concludes the 'claimed error substantially and adversely' affected the party's rights." *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008) (quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998)). Such motions are "not regarded with favor and should only be granted with great caution." *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991).

**C. Federal Rule of Civil Procedure 62**

Rule 62 addresses stays of proceedings to enforce a judgment. It provides for an automatic 30-day stay of "execution on a judgment and proceedings to enforce it." Fed. R. Civ. P. 62(a).

After that time, "a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b).

The purpose of such a bond "is to secure an appellee from loss resulting from the stay of execution." *Miami Int'l Realty Co. v. Paynter*, 807 F.2d 871, 873 (10th Cir. 1986). The general rule is that a supersedeas bond will be equal to the "full amount of the judgment." *Strong v. Laubach*, 443 F.3d 1297, 1299 (10th Cir. 2006). However, "the district court has the discretion to reduce or waive the bond requirement if 'the appellant demonstrates a present financial ability to respond to the judgment that is likely to continue' or if the appellant's 'present financial condition is such that posting a full bond would impose an undue financial burden.'" *Lech v. Jackson*, No. 16-cv-01956-PAB-MJW, 2018 WL 2183984, at *1 (D. Colo. May 10, 2018) (quoting *Sierra Club v. El Paso Gold Mines, Inc.*, No. 01-cv-02163-OES, 2003 WL 25265871, at *8 (D. Colo. Apr. 21, 2003)). The party seeking to reduce or waive the bond requirement must demonstrate that such a departure is warranted and "present the court with a financially secure plan that will provide adequate security for the judgment creditor, in lieu of posting a supersedeas bond." *Sierra Club*, 2003 WL 25265871, at *2. In deciding the amount of a supersedeas bond, the Court may consider factors including:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the appellant's ability to pay the judgment is obvious enough that the cost of the bond would be a waste of money; and (5) whether the appellant is in such dire financial circumstances that a bond would place the appellant's other creditors at risk.

*Myers v. Mid-West Nat'l Life Ins. Co.*, No. 04-cv-00396-CMA-KLM, 2009 WL 306366, at *2 (D. Colo. Feb. 6, 2009) (citing *Dillon v. City of Chicago*, 866 F.2d 902, 904–05 (7th Cir. 1988)).

## III. ANALYSIS

### A. Defendant's Renewed Motion for Judgement as a Matter Of Law (D. 170)

SHRM filed a written Rule 50(a) motion, and its Rule 50(b) motion is largely identical (*compare* D. 146 *with* D. 170). It argues that Mohamed failed to establish that she was terminated under circumstances giving rise to an inference of discrimination (D. 170 at 7). SHRM also asserts that she did not engage in protected activity or causation with respect to her retaliation claim (id. at 8–10). Finally, it asserts that it had legitimate reasons for her termination (*id*. at 10).[1]

These arguments are unconvincing in face of the evidence presented at trial. As the Court explained in its summary judgment order:

> Contrary to Defendant's arguments, it is relatively straightforward to form a narrative from the disputed and undisputed facts showing discrimination and retaliation caused Mohamed to be terminated:
>
> Just months after [Carolyn] Barley began to supervise Mohamed, she complained of racial discrimination based on Barley micromanaging her [in comparison to white colleagues]. This complaint is a protected activity under Title VII. *See [Davis v. Unified Sch. Dist.*, 500, 750 F.3d 1168, 1171 (10th Cir. 2014)]. It upset Barley. Mohamed's colleagues corroborated her complaints that Barley treated non-white employees differently. Because of Mohamed's complaints or as part of her discriminatory micromanagement, Barley imposed rigid deadlines on Mohamed that Barley would not have given to Mohamed's white colleagues. Mohamed complained that this action was retaliatory and, either in retaliation for the initial complaint or this new complaint, one or more of Defendant's employees decided to terminate Mohamed. Indeed, Defendant began drafting Mohamed's termination documents on the same day that she complained of retaliation. Mohamed turned in her projects by the arbitrary deadline, but it did not matter what she turned in because the decision had already been

[1] SHRM also argues that the evidence did not support an award of punitive damages (D. 170 at 15–16). SHRM was aware that Mohamed sought punitive damages but did not raise this argument in its Rule 50(a) motion; it is therefore forfeit (*see* D. 146). *Marshal*, 474 F.3d at 739-40. Regardless, the Court would reject it for the reasons indicated below.

> made to terminate her based on the pretext that she did not meet the deadlines.

(D. 89 at 9–10).

When viewed in the light most favorable to Mohamed, as the evidence must be in light of the verdict, the trial record supports and reinforces this narrative. It suggests that Mohamed was treated differently than her similarly situated white colleagues, including those in similar roles with the same supervisor working on similar projects. Even if Mohamed's first complaints about Barley were not explicitly about race discrimination, it was clear to SHRM very shortly thereafter that Mohamed was complaining about being treated differently than her white colleagues (D. 160 Trial Tr. Vol. 2 at 188:9–13). This upset Barley to the extent that she wrote that she wanted Mohamed "held accountable" for her race complaints and took various actions, along with her colleagues, to get rid of Mohamed (*see id*. at 204–08).

By way of example, the testimony of Carrie Mills touched on many of these themes, directly and indirectly. Mills, who is white, worked in essentially the same role as Mohamed and reported to the same supervisor, Barley. It was reasonable for the jury to conclude they were similarly situated. *See Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1232 (10th Cir. 2000) ("An employee is similarly situated to the Plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline.") (quotation marks omitted). Although there were many issues on which the jury could have seized on to find Mills and another white colleague were treated better, her related testimony could also be seen to show retaliation and pretext. In particular, she testified that in mid-August, i.e., around the time Mohamed explicitly asserted that the imposed deadlines were discriminatory and retaliatory, Barley came to Mills in something of a panic—"She said she needed to speak to me urgently and

privately. She was, again, red-faced, sweaty" (D. 161, Trial Tr. Vol. 3 116:16–17). Barley then imposed the same deadlines on Mills as she had given Mohamed:

> The tone that she used with me was unlike she ever had before. She was very rushed and said that I had to have my project done by the end of August; there was no flexibility, that if it was not complete by the end of August, I would face career repercussions at SHRM, that our -- the people above us, so, like, Jeanne Morris and Nick, were going to be watching for this and that there was a larger context and reason that she could not share with me at the time.
>
> * * *
>
> She had never been strict about a deadline up until this point. And then for her to be strict about a deadline with just a couple weeks remaining seemed like -- I mean, it was very inflexible. It was unlike -- it was just also the way she spoke to me, that prescriptive, that directive, no jovialness to it.

(*id*. at 116:19–117:11). In the context of an organization that trains people on HR tasks in view of discrimination law, i.e., that knows what evidence could be helpful, this can reasonably be viewed as a transparent post hoc attempt to concoct evidence of equal treatment, a culture of rigid deadlines, a basis for the associated deadline, etc. Essentially, viewing it in favor of Mohamed and drawing reasonable inferences, one could infer that management knew that they were in a pickle because Mohamed had seen through their termination scheme and sought to concoct some evidence for SHRM's benefit in a ham-fisted manner. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003) ("The plaintiff need not show both that the defendant's reasons were a pretext *and* that the real reason was discrimination—the fact of pretext alone may allow the inference of discrimination.").

Ultimately, Mills did not meet the deadline but suffered no repercussions. Mohamed was terminated.

As SHRM argues, it put forward non-discriminatory and non-retaliatory reasons for Mohamed's termination. But there is no reason that a jury was required to credit that evidence, particularly in view of evidence like the example above.[2] Mohamed met her burden when the evidence is viewed in her favor. This motion is denied.

**B. Defendant's Motion for New Trial (D. 171)**

SHRM takes issue with two of the Court's pre-trial rulings: (1) allowing Mills to testify and (2) declining to bifurcate liability and punitive damages (D. 171 at 6–7, 9).

The Court resolved SHRM's challenge to Mills by written order (D. 82). The testimony and evidence presented at trial reinforces the Court's prior conclusion that, "[t]o the extent that Defendant [was] presented with difficulties due to Mohamed contacting Mills late in the discovery process, these difficulties are of Defendant's own making" (*id.* at 4). While SHRM seeks to fault Mohamed for failing to disclose Mills as a person with knowledge, etc., the undisputed evidence at trial suggested that SHRM (unlike Mohamed) was well aware of Mills' potential relevance but failed to disclose her and related evidence. Mills was properly allowed to testify because Mohamed's related disclosures were timely and ultimately harmless (*id.*). SHRM points to nothing the occurred at trial that would alter these conclusions.

SHRM argues that the decision not to bifurcate was prejudicial solely based on the admission of "earnings of certain SHRM employees and SHRM's overall revenue" that it asserts would not have otherwise been admissible (D. 171 at 9). Notably, it points to no emphasis placed

[2] While the Court provides this one example, the trial record is replete with similar evidence which, viewed in Mohamed's favor, supports the verdict. The Court has reviewed all evidence and the entire record in relation to these motions.

on this information by Mohamed or improper arguments founded on it, for example, arguing for liability based on this information. Ultimately, the trial proved correct the Court's expectation that bifurcation was unnecessary.

SHRM also challenges certain rulings made during trial including: (3) the jury instructions in relation to but-for-causation, (4) testimony referencing Ebony Thompson's termination, (5) admission of Barley's notes, and (6) alleged arguments that a higher standard applied to SHRM (D. 171). These arguments largely ignore the trial record and do not provide a basis for the Court to conclude that SHRM's rights were substantially and negatively affected. SHRM does not argue cumulative error, so the Court considers each issue in isolation.

Without citing any specific instruction as faulty, SHRM asserts that the jury was improperly instructed on the but-for-causation standard (D. 171 at 3–4). This is wholly unhelpful and ignores that the Court gave a "SAME RESULT" instruction that embodies and restates the but-for-causation standard by explaining explicitly that, "[e]ven if you find that SHRM violated Section 1981, if you find by the preponderance of the evidence that SHRM would have terminated Ms. Mohamed's employment regardless of her race, or whether she engaged in protected activity under Section 1981, you must find in SHRM's favor" (D. 149 at 21).

Similarly, SHRM's argument that the evidence related to Thompson's termination was inadmissible because, among other things, Mohamed "did not need Ms. Thompson's alleged statements or termination to show that she held a good-faith belief that she was subjected to conduct prohibited by Section 1981" ignores that SHRM has vigorously contested that Mohamed

had a good-faith basis for her complaints (D. 171 at 6).[3] Nothing was made of this brief testimony beyond its proper purpose of supporting a good-faith basis for Mohamed's complaints.

SHRM asserts that "Barley's notes constituted inadmissible hearsay," but this is plainly incorrect because much of the notes were not statements by others. Indeed, the most problematic portion of the notes for SHRM, in which Barley indicated she wished Mohamed were "held accountable" for her race complaints simply expresses the Barley's apparent mental state and motivations in the context of recording notes related to her work role (*see* D. 160 Trial Tr. Vol. 2 at 204–08). *See* Fed. R. Evid. 803(3). Barley's work notes are not hearsay and were plainly admissible. *See* Fed. R. Evid. 801(d)(2)(D).[4]

SHRM's arguments that there was some "improper theme throughout the trial, including during testimony and argument" that "portray[ed] SHRM as a so-called 'model employer' or suggesting that it should be held to a higher standard than other employers based on its expertise in human resources" simply lacks support in the record (D. 171 at 8). SHRM's knowledge of human resources laws and proper processes was relevant to issues in the trial, including whether

---

[3] Before ruling on the admissibility of this evidence, the following colloquy occurred:

> THE COURT: Are you challenging that the Plaintiff had a good faith basis for making her discrimination complaint?
> MS. DARROW: This particular plaintiff?
> THE COURT: This particular plaintiff. I mean, she has to have a good faith basis for making her complaint. One of the things that she can include in that is information about others. So it goes to her state of mind. So are you --
> MS. DARROW: We absolutely are challenging that, Your Honor.

(D. 159 Trial Tr. Vol. 1 at 233:24–234:9).

[4] To the extent that any of the statements recorded in Barley's notes could be properly considered hearsay despite being statements of SHRM's employees in the relation to their business duties, they are nonetheless subject to various exceptions under Fed. R. Evid. 803. Regardless, the role of these statements at trial, if any, was minor in comparison to the strong probative value of Barley's recordings of her work-related thoughts, and SHRM has not shown prejudice from the admission of her records of conversations. *See Equal Emp. Opportunity Comm'n v. Jetstream Ground Servs., Inc.*, No. 13-cv-02340-CMA-KMT, 2016 WL 8201623, at *2 (D. Colo. Nov. 3, 2016), *aff'd*, 878 F.3d 960 (10th Cir. 2017) ("Thus, it is only those errors that have caused substantial harm to the losing party that justify a new trial. Those errors that are not prejudicial do not call for relief under Rule 59." (citation omitted)).

its explanations were pretextual and it acted with malice or reckless indifference (*see* D. 149 at 25). The evidence and argument at trial was appropriately tied to these issues, for example, in the instance discussed above that could be seen as an attempt to use knowledge of discrimination law to craft a pretext in the face of potential liability.

Finally, SHRM makes a broad challenge to the damages award in this case, asserting that the compensatory damages and punitive damages awards were excessive (D. 171 at 10–16). It also makes a conclusory argument for remittitur (*id*. at 16).

A damages award, whether for compensatory or punitive damages, "itself must be supported by substantial evidence." *Wulf v. City of Wichita*, 883 F.2d 842, 874 (10th Cir. 1989) (citation omitted). "Additionally, absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial, the court's determination of the amount of damages is inviolate." *Id*. (cleaned up).

In analyzing the constitutionality of a punitive damage award, the Court examines factors including: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003); *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574–75 (1996)

With respect to remittitur, "[i]f the court finds that insufficient evidence exists, or finds the amount of the verdict a product of jury passion or prejudice, the court then may determine a reasonable amount as plaintiff's damages and allow plaintiff to remit the excess over such

amount." *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir. 1987) (citations omitted). "[R]emittitur is not proper unless the amount of damages awarded is so excessive that it shocks the judicial conscience." *Id*. (same).

Although the damages awards in this case were quite large, the Court finds that they were supported by the evidence and does not find them excessive. SHRM is correct that Mohamed's testimony directly addressing damages and emotional distress was limited. But significant testimony also addressed the totality of the circumstances surrounding her claim. Taken together, this evidence was sufficient to support the substantial damages award. *See McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 723 (10th Cir. 2011) (citing *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416 (10th Cir. 1997)). Viewing the evidence in the light favorable to Mohamed, the evidence suggested not only acute emotional suffering during the process leading to her termination but also chronic emotional suffering thereafter as a result. As Mohamed argues (D. 182 at 10–11), the evidence indicated suffering building from the stress of the initial perception that she was being treated differently than white colleagues to crushing disillusion and desperation as the company turned against her and set her up to fail as a pretext for termination. She testified to the lasting impacts of these events in the forms of deadening her ambition and loss of trust in others, particularly in work environments where she had previously excelled and was open to sharing herself, including her race and cultural background. Mohamed watched her claims of discrimination and retaliation, which the jury unambiguously found to be substantiated, systematically disregarded and dismissed as she was isolated from assistance and told, in effect, that she was the problem.

One incident captures some of the flavor of this process. After Barley, with the assistance of senior management ghost-writing her emails, imposed rigid deadlines on Mohamed for the first time in the wake of her discrimination complaints, Mohamed sought assistance and resources for her tasks of the sort she had previously expected and received. Instead of being assisted by her team, she was informed in no uncertain terms that no assistance whatsoever was provided and she was harshly criticized by senior management essentially for seeking assistance. A jury can reasonably understand the devastating short-term and long-term effects of such actions in context. An award of $1.5 million in these circumstances does not shock the judicial conscience.

Likewise, the Court does not find the punitive damages reward constitutionally excessive. SHRM contends that "the constitutional reprehensibility factors confirm that SHRM's conduct lies at the low end of the spectrum" (D. 171 at 14). But this essentially ignores the substantial evidence showing, when viewed in favor of Mohamed, systematic acts to retaliate against Mohamed taken with the aid and consent of senior management for raising discrimination complaints that the jury found substantiated. This is perhaps not the height of reprehensibility in the employment discrimination context simply because it is not overt racism and retaliation, but it is far from the low end.

As to the second factor, simple division shows that the award here is within the "single-digit ratio between punitive and compensatory damages" that "are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *State Farm*, 538 U.S. at 425.

With respect to the last factor, the damages award here, while perhaps in excess of most[5] prior verdicts in this Circuit for employment discrimination cases, is in line with past affirmed punitive damages awards when inflation is taken into account. In the absence of statutory penalties, the "fundamental question is whether [SHRM] had reasonable notice that its [conduct] could result in such a large punitive award." *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996). If anyone knew the possibility of high potential punitive damages for employment discrimination and malicious retaliation, it was SHRM, which trains businesses on related issues including potential liability. In 1996, the Tenth Circuit authorized punitive damages of $6,000,000.00 for harm that was "entirely economic" even in the absence of "harm to health and safety." *Id*. at 642.[6] This is less than the punitive damages awarded here when adjusted for inflation. The jury's award in this hard-fought case is "sufficient to cover plaintiffs' reasonable costs of litigation with enough left over to reward plaintiffs for pursuing a case the jury obviously thought justified significant punishment of [SHRM]'s behavior." *Id*. at 643. The Court denies this motion.

**C. Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174)**

SHRM seeks only a stay of execution during the pendency of the motions resolved above (D. 174 at 5). Because the Court has resolved these motions, it denies the stay request as moot.

---

[5] A jury awarded $5 million in compensatory damages and $15 million in punitive damages in a Section 1981 racial discrimination and retaliation case in this District last year. *See Joppy v. HCA-HealthOne LLC*, No. 22-cv-00986-CNS-STV, ECF No. 380 (D. Colo. Aug. 19, 2025). Post trial motions, including motions seeking remittitur, remain pending.

[6] As discussed above, there was substantial evidence of harm to Mohamed's mental health.

## IV. CONCLUSION

Accordingly, it is ORDERED that Defendant's Renewed Motion for Judgement as a Matter of Law (D. 170) and Defendant's Motion for New Trial (D. 171) are DENIED. It is FURTHER ORDERED that Defendant's Motion to Stay Execution of Judgment Without Filing Bond (D. 174) is DENIED AS MOOT.

DATED April 15, 2026.

BY THE COURT:



Gordon P. Gallagher
United States District Judge