Case No. 26-1142

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

REHAB MOHAMED,

Appellee,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Appellant.

---

# APPELLEE'S RESPONSE BRIEF

---

Appeal from the United States District Court for the District of Colorado

The Honorable Gordon P. Gallagher
Originating Case No. 1:22-cv-01625-GPG-KAS

**ORAL ARGUMENT REQUESTED**

Hunter A. Swain
SWAIN LAW, LLC
1490 N. Lafayette St., Ste. 303
Denver, CO 80218
Phone: (720) 815-5281

*Attorney for Appellee*

Ariel B. DeFazio
LOWREY PARADY LEBSACK DEFAZIO, LLC
1490 Lafayette St., Ste. 304
Denver, CO 80218
Phone: (303) 593-2595

*Attorney for Appellee*

# TABLE OF CONTENTS


I. STATEMENT OF RELATED CASES ........ 1

II. STATEMENT OF THE ISSUES ........ 2

III. STATEMENT OF THE CASE ........ 3

A. Introduction ........ 3

B. Factual Background ........ 4

C. Procedural Background ........ 19

IV. SUMMARY OF THE ARGUMENT ........ 24

V. ARGUMENT ........ 27

A. Standard of Review ........ 27

1. Jury instructions are subject to *de novo* review ........ 27
2. Evidentiary rulings are reviewed for abuse of discretion only if the objection was preserved at trial; otherwise for plain error.. ........ 27
3. Common law excessiveness is reviewed for abuse of discretion; constitutional excessiveness is reviewed *de novo* ........ 28

B. The District Court Properly Instructed The Jury That A But-For Cause Need Not Be The Sole or Primary Cause ........ 28

1. Supreme Court and Tenth Circuit precedent foreclose SHRM's argument that Section 1981 requires proof that race was "the" "primary" but-for cause of Ms. Mohamed's injury ........ 29

a. Events may—and often do—have multiple but-for causes.. ........ 29

b. A Section 1981 plaintiff must prove only that race was "a" (not "the") but-for cause of her injury. ........ 30

c. Taken together, *Bostock, Comcast, Wilkerson*, and *Jones* confirm that Ms. Mohamed did not need to prove race was "the primary cause" of her termination.. ....32

2. The Court must reject SHRM's argument that Jury Instruction No. 13 was internally inconsistent because it rests on a misquotation of the instruction ....33

3. But-for causation cannot mean "primary" cause because that interpretation would foreclose simultaneous Section 1981 discrimination and retaliation claims ....35

C. The District Court Properly Denied SHRM's Hearsay Objections, And SHRM Waived Its Rules 602 and 403 Arguments By Failing To Raise Them At Trial ....36

1. The district court properly ruled that Ms. Mohamed's testimony about a conversation with Ms. Thompson was not hearsay ....36

2. SHRM waived its new Fed. R. Evid. 602 argument, and Ms. Mohamed's testimony was based on personal knowledge in any event ....38

3. SHRM likewise waived its Fed. R. Evid. 403 arguments, which in any event rest on speculation rather than the record ....39

D. The District Court Did Not Err in Denying SHRM's Motion For A New Trial Or Remittitur Based On The Damages Awarded ....40

1. The compensatory damages award is supported by the evidence adduced at trial ....40

2. The district court did not abuse its discretion in upholding the $10 million punitive damages award on common law excessiveness grounds ....47

a. The Court need not consider SHRM's argument about the jury's note because SHRM failed to raise it below ....47

b. There was no evidence of bias, prejudice, or passion by the jury ....47

3. The punitive damages award does not violate SHRM's right to Due Process ....49

a. The volitional actions of its executives rendered SHRM's conduct highly reprehensible ........................................ 50

b. The single-digit ratio award serves the goals of deterrence and retribution ........................................ 52

c. SHRM was on notice that its conduct could result in a significant punitive damages award ........................................ 54

VI. CONCLUSION ........................................ 55

VII. STATEMENT REGARDING ORAL ARGUMENT ........................................ 56

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ........................................ 57

ADDITIONAL CERTIFICATION ........................................ 58

CERTIFICATE OF SERVICE ........................................ 59

# TABLE OF AUTHORITIES

**Cases**

*Bach v. First Union Nat'l Bank*,
149 F. App'x 354 (6th Cir. 2005) ....................45

*BMW of N. Am., Inc. v. Gore*,
517 U.S. 559 (1996) .................... 49, 50

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .................... 21, 24, 29, 31, 32, 33, 34

*CBOCS W., Inc. v. Humphries,*
553 U.S. 442 (2008) ....................28

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
589 U.S. 327 (2020) .................... 21, 24, 29, 30, 31, 32, 34

*Cont'l Trend Res., Inc. v. OXY USA Inc.*,
101 F.3d 634 (10th Cir. 1996)....................54

*Deters v. Equifax Credit Info. Servs.*,
202 F.3d 1262 (10th Cir. 2000).................... 28, 43, 53

*Faulk v. Dimerco Express USA Corp.*,
172 F.4th 844 (11th Cir. 2026) ....................46

*Hampton v. Dillard Dep't Stores, Inc.*,
247 F.3d 1091 (10th Cir. 2001).................... 28, 54, 55

*Hardeman v. City of Albuquerque*,
377 F.3d 1106 (10th Cir. 2004)....................28

*Horinek v. Spirit Aerosystems, Inc.*,
2026 U.S. Dist. LEXIS 115475 (D. Kan. May 26, 2026)....................55

*Jones v. Okla. City Pub. Sch.*,
617 F.3d 1273 (10th Cir. 2010).................... 21, 32, 33, 34

*Llewellyn v. Allstate Home Loans, Inc.*,
711 F.3d 1173 (10th Cir. 2013)....................................................................45

*Lompe v. Sunridge Partners, LLC*,
818 F.3d 1041 (10th Cir. 2016)............................................................ 28, 52, 53

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
703 F.2d 1152 (10th Cir. 1981)....................................................................48

*McDonald v. City of Wichita*,
735 F. App'x 529 (10th Cir. 2018) ............................................................ 30, 31

*McInerney v. United Air Lines,*
463 F. App'x 709 (10th Cir. 2011) ..............................................................47

*O'Neal v. Ferguson Constr. Co.*,
237 F.3d 1248 (10th Cir. 2001).............................................................. 44, 46

*Osterhout v. Bd. of Cnty. Comm'rs*,
10 F.4th 978 (10th Cir. 2021) ............................................................ 40, 44, 46

*Perkins v. Fed. Fruit & Produce Co.*,
No. 11-cv-00542-REB-KLM, 2013 U.S. Dist. LEXIS 69340 (D. Colo. May 14, 2013)...................................................................................................46

*Peshlakai v. Ruiz*,
39 F. Supp. 3d 1264 (D.N.M. 2014) ..............................................................50

*Schulenberg v. BNSF Ry. Co.,*
911 F.3d 1276 (10th Cir. 2018).............................................................. 27, 39

*Shaw v. AAA Eng'g & Drafting, Inc.*,
213 F.3d 519 (10th Cir. 2000)................................................................ 27, 39

*Singleton v. Wulff*,
428 U.S. 106 (1976) .....................................................................................47

*Smith v. Ingersoll-Rand Co.*,
214 F.3d 1235 (10th Cir. 2000)....................................................................45

*Smith v. Nw. Fin. Acceptance, Inc.*,
129 F.3d 1408 (10th Cir. 1997)....................42

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003).................... 49, 50, 52, 53

*United States v. Leffler*,
942 F.3d 1192 (10th Cir. 2019)....................47

*United States v. McGlothin*,
705 F.3d 1254 (10th Cir. 2013).................... 27, 39

*United States v. Sinclair*,
109 F.3d 1527 (10th Cir. 1997).................... 27, 39

*United States v. Twitty*,
689 F. App'x 890 (10th Cir. 2017)....................36

*Valenzuela v. Coleman*,
No. 18-cv-00329-CMA-STV, 2022 U.S. Dist. LEXIS 120009 (D. Colo. July 7, 2022)....................54

*Whittenburg v. Werner Enters. Inc.*,
561 F.3d 1122 (10th Cir. 2009)....................48

*Wilcox v. Homestake Mining Co.*,
619 F.3d 1165 (10th Cir. 2010)....................30

*Wilkerson v. Shinseki*,
606 F.3d 1256 (10th Cir. 2010).................... 32, 33

**Statutes**

42 U.S.C. § 1981 ..............2, 4, 20, 21, 23, 24, 25, 28, 29, 30, 32, 34, 35, 46, 51, 54

42 U.S.C. § 1981a....................46

42 U.S.C. § 1983....................54

**Rules**

Fed. R. App. P. 28(b) ........................................................................................2

Fed. R. Evid. 103 ...........................................................................................28

Fed. R. Evid. 403 ............................................................ 2, 25, 27, 36, 39, 40

Fed. R. Evid. 602 ............................................................ 2, 25, 27, 36, 38, 39

Fed. R. Evid. 801 ...........................................................................................36

**Other Authorities**

Black's Law Dictionary (Abridged 6th ed. 1991) ............................................35

## I. STATEMENT OF RELATED CASES

There are no prior or related appeals.

## II. STATEMENT OF THE ISSUES

Appellee restates Appellant's Statement of Issues Presented for Review as follows pursuant to Fed. R. App. P. 28(b):

1. Did the district court err when it instructed the jury that, in a case brought under 42 U.S.C. § 1981, "but-for" causation did not require the plaintiff to prove that illegal discrimination was "the sole or primary cause" of the adverse action?

2. Did the district court abuse its discretion in denying two of Appellant's hearsay objections at trial, and did the district court commit plain error by failing to disallow testimony under Fed. R. Evid. 602 and 403 when those objections were not raised at trial?

3. Did the district court abuse its discretion in declining to grant a new trial or reduce the jury's damages awards, and did the district court err by finding that the punitive damages award was not constitutionally excessive?

## III. STATEMENT OF THE CASE

### A. Introduction

Rehab ("Ruby") Mohamed, a Black woman who immigrated to the U.S. from Egypt as a teenager, worked for SHRM from April 2016 until September 2020, first as an e-Learning Specialist/Instructional Designer and then as a Senior Instructional Designer. In late 2019, she began reporting to a former peer, Carolyn Barley.

Ms. Barley gave Ms. Mohamed and another Black peer, Ebony Thompson, less autonomy than she gave their white counterparts, Senior Instructional Designers Ann Godmere and Carrie Mills.

On June 3, 2020, at SHRM's encouragement, Ms. Mohamed raised this race-based treatment to a trusted mentor, Vice President of Education Jeanne Morris. Ms. Morris prompted her to tell Ms. Barley, who became very upset.

Over the summer, Ms. Mohamed raised race discrimination with other SHRM leaders, including Manager of Employee Experience Michael Jackson, Director of Organizational Learning and Talent Development Bernée Long, Chief Global Development Officer Nick Schacht, Chief Human Resources Officer Sean Sullivan, and Chief Executive Officer Johnny Taylor, Jr. When Ms. Barley then set an unrealistic deadline for two of her projects, Ms. Mohamed also complained of retaliation.

SHRM did not fully investigate the discrimination complaint and did not investigate the retaliation complaint at all. Instead, it supported Ms. Barley's enforcement of a deadline she never held Ms. Mills to, and it terminated Ms. Mohamed on September 1, 2020.

After a five-day trial in December 2025, a jury found for Ms. Mohamed on her race discrimination and retaliation claims under 42 U.S.C. § 1981. It awarded her $1.5 million in compensatory damages and $10 million in punitive damages. The district court denied SHRM's motion for a new trial or remittitur. SHRM now asks this Court to relitigate a verdict amply supported by evidence of disparate treatment, Ms. Mohamed's emotional harm, and SHRM's culpability.

### B. Factual Background

#### 1. Ms. Mohamed was a valued SHRM employee.

Ms. Mohamed is a Black woman from Egypt. (App. Vol. 3 at 7.)[1] She immigrated to the United States at age 16 and began going by "Ruby." (*Id.* at 7; Supp. App. Vol. 1 at 165.) She attended college in Arkansas and then moved to Washington, D.C., where she worked for three years designing online programs for social workers. (Supp. App. Vol. 1 at 165-66; Supp. App. Vol. 2 at 348-49.)

---

[1] Citations to Appellant's appendix appear as "App." followed by the volume. Citations to Ms. Mohamed's Supplemental Appendix appear as "Supp. App." followed by the volume. The page numbering continues through both volumes.

SHRM hired Ms. Mohamed in April 2016 as an e-Learning Specialist, a role that SHRM changed to Instructional Designer. (Supp. App. Vol. 1 at 166-67; App. Vol. 3 at 7.) SHRM is highly regarded as a provider of online and in-person learning for human resources ("HR") professionals. (Supp. App. Vol. 2 at 303.) In 2024, its total revenue was $264 million. (Supp. App. Vol. 2 at 305-06.) That year, Mr. Schacht earned $979,000. (*Id.* at 306-07.)

Ms. Mohamed worked at SHRM's office in Virginia and then became a remote employee after she moved to Denver in 2019. (App. Vol. 3 at 8; Supp. App. Vol. 1 at 167.) As an e-Learning Specialist and Instructional Designer, Ms. Mohamed designed in-person, live, and self-paced courses for HR professionals. (App. Vol. 3 at 8; Supp. App. Vol. 1 at 167-68.) This involved working with subject matter experts ("SMEs"), creating a PowerPoint with the course content and instructor notes, compiling program materials for attendees, and completing a virtual room for online courses. (Supp. App. Vol. 1 at 169-71.)

**2. Ms. Barley treated her white subordinates better than Ms. Mohamed.**

Ms. Barley became the Instructional Design ("ID") Manager and Ms. Mohamed's supervisor in December 2019. (Supp. App. Vol. 1 at 172, 247; App. Vol. 3 at 75-76.) In January 2020, Ms. Mohamed applied for a Senior Instructional Designer position on the ID team at the encouragement of Ms. Morris. (Supp. App. Vol. 1 at 173-75; App. Vol. 3 at 9.) At the time, Ms. Mohamed held certifications in

design learning and e-Learning instructional design. (Supp. App. Vol. 2 at 347-48.) SHRM selected Ms. Mohamed, and she started in January or February 2020. (App. Vol. 3 at 9; Supp. App. Vol. 1 at 175-76.) Ms. Mohamed's duties did not change, as she had already been performing as a Senior Instructional Designer. (App. Vol. 3 at 10-11; Supp. App. Vol. 1 at 176.) By February 2020, there were four Senior Instructional Designers who reported to Ms. Barley: Ms. Godmere (white), Ms. Mills (white), Ms. Mohamed (Black), and Ms. Thompson (Black). (App. Vol. 3 at 11, 76.)

Ms. Barley insisted on attending and leading Ms. Mohamed's meetings with SMEs, even though Ms. Mohamed had done so herself previously. (Supp. App. Vol. 1 at 183-84, 252; App. Vol. 3 at 92-93.) Ms. Barley also communicated with others about Ms. Mohamed's projects without including Ms. Mohamed. (Supp. App. Vol. 1 at 177-78, 179; App. Vol. 3 at 21-22.) Ms. Barley further assigned Ms. Mohamed the low-skill task of downloading graphics. (Supp. App. Vol. 1 at 177-78.) Ms. Mohamed noticed that Ms. Barley allowed Ms. Godmere and Ms. Mills to meet with SMEs independently and discuss their work with others. (*Id.* at 177.)

In conversations with Ms. Mills, Ms. Barley referred to Ms. Mohamed as a "junior designer" with below average skills. (Supp. App. Vol. 2 at 257-61.) Ms. Barley requested that Ms. Mills and Ms. Godmere provide critical feedback to Ms. Mohamed on her work. (*Id.* at 260, 264.) Ms. Barley critically questioned,

interrupted, and used an aggressive tone with Ms. Mohamed, while she was warm with Ms. Mills and Ms. Godmere. (*Id.* at 261-62, 271-73.) Ms. Barley freely gave Ms. Godmere and Ms. Mills, but not Ms. Mohamed, more time to complete their courses. (Supp. App. Vol. 1 at 185-86; Supp. App. Vol. 2 at 264-69.)

Ms. Barley provided Ms. Mohamed with a positive performance review in May 2020. (App. Vol. 3 at 20, 193.) Ms. Barley wrote that "as [Ms. Mohamed] grow[s] in [her] design experience, [she]'ll be able to balance [her creativity and institutional knowledge] against timelines for improved efficiency and business impact." (*Id.* at 193.) When Ms. Mohamed asked about this comment, Ms. Barley said that Ms. Mohamed had nothing to worry about. (*Id.* at 22-23.) Ms. Barley expressed no concern about Ms. Mohamed's performance. (*Id.* at 23.)

In May 2020, Ms. Thompson said that Ms. Barley treated her and other people of color with "less credibility and with inferior kind of tone." (App. Vol. 3 at 14, 19-20.) After this, Ms. Mohamed suspected that Ms. Barley's treatment of her might be related to her race. (*Id.*)

**3. At SHRM's encouragement, Ms. Mohamed brought forward her concern about race discrimination.**

Following the murder of George Floyd on May 25, 2020, Mr. Taylor and Mr. Schacht, among others, sent messages to SHRM employees in which they committed to create a safe space to address racism in the workplace. (Supp. App. Vol. 1 at 184; App. Vol. 3 at 27.) SHRM launched "Together Forward @ Work," a "call of action

to . . . eliminate racial inequity in all workplaces in America, starting with SHRM." (App. Vol. 3 at 35; Supp. App. Vol. 2 at 271.) Ms. Morris reached out to several employees of color, including Ms. Mohamed. (App. Vol. 3 at 27.)

Ms. Mohamed and Ms. Morris spoke on June 3, 2020. (App. Vol. 3 at 27-28, 124-25.) Ms. Mohamed said that Ms. Barley was treating her with less credibility and respect than her two white teammates and it was "becoming stressful to navigate." (*Id.* at 27-28.) Ms. Mohamed had never complained about race discrimination at another job; she hoped to be afforded the same treatment as her peers. (*Id.* at 29.) When Ms. Mohamed repeated her concerns during a meeting with Ms. Morris and Ms. Barley the next day, Ms. Barley became defensive and cried. (*Id.* at 29-30, 83; Supp. App. Vol. 2 at 298-99.)

Ms. Barley then met with Mr. Jackson; he advised her to keep notes of her interactions with Ms. Mohamed. (App. Vol. 3 at 85, 86; Supp. App. Vol. 1 at 248-50.) SHRM assigned Mr. Jackson to investigate Ms. Mohamed's race discrimination complaint. (App. Vol. 3 at 140-41, 144-45.)

Ms. Mohamed repeated her race discrimination complaint: on June 25 during a meeting with Ms. Morris, the ID team, and others from the Education Department (Supp. App. Vol. 1 at 189-90); on July 7 with Ms. Barley and Mr. Jackson, during which Ms. Barley accused Ms. Mohamed of "trying to set her up" (*id.* at 192-94); and on July 20 with the ID team, Ms. Morris, and Mr. Jackson, during which Ms.

Mohamed broke down crying (App. Vol. 3 at 33; Supp. App. Vol. 1 at 195-96). She had not cried like that since learning of her father's death. (Supp. App. Vol. 1 at 196.)

Ms. Mohamed reported her ongoing concerns about Ms. Barley to Mr. Schacht and Mr. Taylor. (Supp. App. Vol. 1 at 197-200.) Mr. Taylor said that SHRM had problems with managers and diversity and had launched "several initiatives internally to tackle those issues." (*Id.* at 200; App. Vol. 3 at 34-35.) He promised to put her in touch with Mr. Sullivan, SHRM's CHRO. (App. Vol. 3 at 35.)

When Ms. Mohamed spoke with Mr. Sullivan on July 22 and 23, he acknowledged that Ms. Barley needed training on leading a diverse team. (App. Vol. 3 at 35-36; Supp. App. Vol. 1 at 201.) Mr. Jackson surreptitiously attended these two calls. (App. Vol. 3 at 35-36; Supp. App. Vol. 1 at 201.)

To Ms. Mohamed, "going to work every day felt like [she] was suiting up for battle." (Supp. App. Vol. 1 at 201-02.) She questioned her "sense of reality" and stopped trusting her own judgment. (*Id.*) She needed time away, so she requested eight days of vacation, which Ms. Barley approved. (Supp. App. Vol. 1 at 202-03; Supp. App. Vol. 2 at 353; App. Vol. 3 at 235.) Ms. Barley asked Ms. Mohamed to send out an update on the two courses that she was working on, which she did. (Supp. App. Vol. 1 at 203; App. Vol. 3 at 37, 236-37.)

Before returning to work, Ms. Mohamed learned that SHRM had terminated Ms. Thompson. (App. Vol. 3 at 43.) Given Ms. Thompson's race and protected activity, Ms. Mohamed was concerned for her own job. (*Id.*)

Mr. Sullivan arranged to have Ms. Long, his direct report, facilitate discussions between Ms. Barley and Ms. Mohamed. (App. Vol. 3 at 44-46, 155, 221.) Ms. Long validated Ms. Mohamed, recognizing that Ms. Barley's behavior was problematic. (*Id.* at 48.) Ms. Mohamed was then "quite shocked and confused" when the focus shifted to her tone and performance and away from Ms. Barley. (App. Vol. 3 at 48; Supp. App. Vol. 1 at 228, 230.) Ms. Mohamed opted out of further sessions. (App. Vol. 3 at 52, 245.) Ms. Long saw that Ms. Mohamed was "hurting" and "in pain." (Supp. App. Vol. 2 at 343.)

**4. Ms. Barley resented Ms. Mohamed for raising race discrimination concerns and retaliated against her.**

Ms. Barley was distraught over Ms. Mohamed's race discrimination complaints. (Supp. App. Vol. 2 at 269, 301-02.) She often said to Ms. Mills, "I can't be racist. I have a Hispanic son." (*Id.* at 269-70.) She also questioned whether Ms. Mohamed "is even Black" and noted that no other Black woman on the Education team had complained that she was racist. (*Id.* at 269.) Ms. Barley appeared frantic. (*Id.* at 270.)

In the notes that Mr. Jackson advised Ms. Barley to keep, she wrote that she was upset "more and more" about the situation and "These accusations have no

justification. [Ms. Mohamed] is allowed to keep saying them and is damaging my character and reputation across SHRM and continues to be rewarded for it." (App. Vol. 3 at 86; Supp. App. Vol. 1 at 66, 251.) She wrote further in this July 22, 2020 entry: "I am not sure how I can get passed [sic] this knowing a colleague can threaten me and not be held accountable." (Supp. App. Vol. 1 at 66.)

Ms. Barley's poor treatment of Ms. Mohamed in team meetings increased. (Supp. App. Vol. 2 at 270.) Ms. Barley also tried to exclude Ms. Mohamed from the People Manager Qualification ("PMQ") project. (Supp. App. Vol. 1 at 187-89; Supp. App. Vol. 2 at 273-75.) Ms. Barley was upset when Ms. Mohamed attended a PMQ meeting at Ms. Mills's request. (Supp. Appl. Vol. 1 at 191-92; Supp. App. Vol. 2 at 275.)

Ms. Mills reported to others, including Mr. Jackson, Ms. Long, Ms. Morris, and Mr. Schacht, her concern that Ms. Barley was discriminating against Ms. Mohamed. (Supp. App. Vol. 2 at 275-79, 290.) Mr. Schacht said that he would coach Ms. Barley more closely, Ms. Morris was surprised, and Ms. Long "was appalled." (*Id.* at 276-79.)

#### 5. SHRM conducted a limited investigation into Ms. Mohamed's race discrimination complaint.

Mr. Jackson investigated Ms. Mohamed's race discrimination complaint from late June until mid-to-late July. (App. Vol. 3 at 140-41, 144-45.) He had never investigated a discrimination complaint before and had minimal training. (Supp.

App. Vol. 2 at 320-23, 336.) He could not recall SHRM's relevant policy or whether he ever asked Ms. Mohamed to reduce her complaint to writing. (*Id.* at 335; App. Vol. 3 at 146.) He spoke with Ms. Barley, Ms. Morris, Ms. Mills, Ms. Godmere, and once with Ms. Mohamed. (App. Vol. 3 at 143.) When Ms. Mills corroborated Ms. Mohamed's concerns, Mr. Jackson followed up with basic, surface-level questions. (Supp. App. Vol. 2 at 279-80.) Mr. Jackson shared his findings—that there was no specific evidence of race discrimination—with Mr. Sullivan. (App. Vol. 3 at 144-45.)

**6. Ms. Barley set an inflexible deadline as a pretext to terminate Ms. Mohamed.**

On August 12, Ms. Barley told Ms. Mohamed that her two courses in development, Digital HR and Compliance, were due on August 31, 2020. (Supp. App. Vol. 1 at 230-32; App. Vol. 3 at 223.) This was the first time that Ms. Mohamed learned of this deadline. (Supp. App. Vol. 1 at 232-33.) Ms. Mohamed explained the work that she had been doing on both courses, acknowledged that the deadline seemed urgent, and asked for assistance. (*Id.* at 233; App. Vol. 3 at 49, 222.) At Mr. Schacht's direction, Ms. Long wrote an email for Ms. Barley to send to Ms. Mohamed stating that the deadline was non-negotiable and that Ms. Mohamed would receive no help. (Supp. App. Vol. 1 at 234; Supp. App. Vol. 2 at 344-46, 357-58; App. Vol. 3 at 49-50, 230-31.) Mr. Schacht described Ms. Barley's response as "offer[ing] an opportunity to get the right language on the table, to correct her

quickly or to support an eventual case for termination." (Supp. App. Vol. 2 at 356-58.)

Mr. Schacht then sent his own email to Ms. Mohamed in which he criticized her "tone." (App. Vol. 3 at 229.) Ms. Mohamed initially thanked him for providing her with a "teachable lesson." (Supp. App. Vol. 1 at 235-36; App. Vol. 3 at 229.) She felt that she had "betrayed [her]self" by doing so. (Supp. App. Vol. 1 at 235-36; App. Vol. 3 at 51.) She reached out to her therapist, whom she had not seen in five months. (App. Vol. 3 at 51.)

On August 19, Ms. Mohamed expressed concern about retaliation to Ms. Barley, Ms. Morris, and Mr. Schacht:

> As an employee who has been with the organization for almost five years and with a documented history of excellent performance, I am very troubled that I have just now started receiving criticism about my performance and vague complaints about the tone of my conversations with others. As you know, I made a complaint of race discrimination about my manager's treatment of me in early June. I have elaborated on my discrimination complaints and repeated them several times since . . . . Almost immediately after Jeannie and Carolyn learned that my discrimination claims have been reported to you and the rest of the division, I started being subjected to hostility, undeserved criticism, increased scrutiny and other forms of retaliation. . . . Now, just weeks after I made my discrimination complaints, SHRM is setting me up to fail by imposing an inflexible and unrealistic deadline on me while denying me the support I need to successfully complete the project before the deadline. Meanwhile, white colleagues are given support, allowed to delegate tasks to others when necessary to complete deadlines, and are allowed to freely miss or extend similar deadlines.

(App. Vol. 3 at 228.)

Although Mr. Jackson claimed that he investigated Ms. Mohamed's retaliation complaint, he could not explain how, given that his investigation concluded in late July and he started a medical leave on August 24. (Supp. App. Vol. 2 at 340-42.) Mr. Jackson prepared Ms. Mohamed's termination letter and a termination checklist prior to his leave so that a colleague could complete them in his absence. (Supp. App. Vol. 2 at 294, 329, 362.) SHRM drafted a separation agreement for Ms. Mohamed on August 28. (*Id.* at 324-28.)

Ms. Barley expected Senior Instructional Designers to design two courses per year. (Supp. App. Vol. 2 at 257, 292-93.) Each course took about six months to develop, but that timeline was flexible. (*Id.* at 263-64.) The goal was to complete a course one to two months before its scheduled launch; however, one to two weeks prior was sufficient. (*Id.* at 265-66.) SHRM frequently changed launch dates due to low enrollment. (*Id.* at 266.)

Ms. Barley assigned a course to Ms. Mills in February 2020 with a June deadline; Ms. Mills did not finish it until early September. (Supp. App. Vol. 2 at 264-65, 268.) Twice, Ms. Barley extended the deadline by a month without question. (*Id.* at 266-68.) In mid-August, Ms. Barley told Ms. Mills that the course was due by August 31, that Ms. Morris and Mr. Schacht were tracking this deadline, and "there was a larger context and reason that she could not share with [Ms. Mills] at the time."

(*Id.* at 283-84.) Ms. Barley delivered this information with uncharacteristic graveness. (*Id.* at 284.)

**7. Ms. Mohamed diligently worked on her two courses; she never requested extensions.**

An outside contractor, Lou Lessig, initially agreed to develop the Compliance course by March 25, 2020. (App. Vol. 3 at 37-38.) In January 2020, Ms. Barley assigned Ms. Mohamed to help Mr. Lessig by downloading pictures for him. (*Id.*) Despite numerous extensions, Mr. Lessig was unresponsive and never provided the completed course. (App. Vol. 3 at 38, 196, 198, 203-06, 214-15, 219; Supp. App. Vol. 1 at 204-06; Supp. App. Vol. 2 at 366.) SHRM pushed the launch date to early October; this delay had nothing to do with Ms. Mohamed. (Supp. App. Vol. 1 at 214-16.) Ms. Barley and Director of Education Programs Liz Lacey were aware of these delays. (App. Vol. 3 at 38; Supp. App. Vol. 1 at 204-13; Supp. App. Vol. 2 at 281-82, 366.)

Ms. Mohamed volunteered to help, first by holding weekly meetings with Mr. Lessig (Supp. App. Vol. 1 at 207-09, 211), then by taking over developing the course (*Id.* at 213-14). Ms. Mohamed intended to deliver the course by the end of August; however, that depended on Mr. Lessig providing her with all remaining content, which he did not do. (*Id.* at 216; App. Vol. 3 at 39-40, 42.)

Ms. Barley assigned Ms. Mohamed the Digital HR (a/k/a Optimizing the Digital Experience) course in January 2020. (App. Vol. 3 at 42; Supp. App. Vol. 1 at

217.) Ms. Mohamed interviewed five SMEs and delivered drafts of the PowerPoint for review in March, April, June, and July 2020. (*Id.* at 218-24.) Each time, she could not finalize it because a SHRM executive or the instructor asked her to alter the course's scope or content. (*Id.* at 218-27; *see, e.g.*, App. Vol. 3 at 257-58, 268-71.) SHRM moved the launch date from July to October because there were no registrants. (Supp. App. Vol. 1 at 224-25; Supp. App. Vol. 2 at 300.)

After Ms. Barley unilaterally set the August 31 deadline for both courses, Ms. Mohamed did what she could to finish them. (Supp. App. Vol. 1 at 237-38.) She handed in the final Digital HR PowerPoint on August 27. (*Id.* at 239; App. Vol. 3 at 56, 247.) An editor was scheduled to review it by September 3, after which Ms. Mohamed would complete the participant guide within a day or two. (App. Vol. 3 at 56; Supp. App. Vol. 1 at 240.) In August, Digital HR's enrollment goal was 12; there were three registrants. (Supp. App. Vol. 1 at 240-41; Supp. App. Vol. 2 at 360.)

On August 28, Ms. Mohamed handed in a version of the Compliance PowerPoint missing the three modules Mr. Lessig had not provided. (App. Vol. 3 at 58-60, 227.) She let Ms. Barley know that she could not proceed further without material from Mr. Lessig. (*Id.*) Ms. Barley suggested that Ms. Mohamed recruit a new SME, which would have taken weeks. (Supp. App. Vol. 2 at 285-87; App. Vol. 3 at 57.)

**8. SHRM made the termination decision before the deadline.**

On August 31, Mr. Sullivan sent Ms. Mohamed a letter stating that he did not find a basis to support her complaints of race discrimination or retaliation. (App. Vol. 3 at 54, 253.) SHRM terminated Ms. Mohamed on September 1, 2020; she felt "sick to [her] stomach." (*Id.* at 61.)

Before firing an employee, SHRM's HR department must ensure that "the progressive discipline policy has been adhered to, as appropriate." (Supp. App. Vol. 2 at 330-33, 364.) Mr. Jackson was unable to articulate what the progressive discipline policy required or how it was adhered to before Ms. Mohamed's termination. (*Id.* at 333-34.)

Ms. Barley and Ms. Morris testified that the decision to terminate Ms. Mohamed was made on August 31. (App. Vol. 3 at 96-97, 126.) Mr. Schacht and SHRM said that it was made on September 1. (*Id.* at 132; Supp. App. Vol. 2 at 314-16.) HR employee Keren Maldonado learned about the termination from Mr. Jackson and Mr. Sullivan "a few days" before September 1. (Supp. App. Vol. 2 at 295-97.)

**9. Ms. Mills missed her course deadline without consequence.**

Ms. Barley reassigned Digital HR to Ms. Mills without setting a deadline or knowing how far along it was; Ms. Mills found that it was complete. (Supp. App. Vol. 2 at 287-89.) Ms. Barley assigned Compliance to Ms. Godmere to complete

with Mr. Lessig. (*Id.* at 287-88.) SHRM replaced Ms. Mohamed with a white employee. (*Id.* at 303-04.)

Ms. Mills did not turn in her course by August 31. (Supp. App. Vol. 2 at 285.) Ms. Barley neither disciplined Ms. Mills nor mentioned the missed deadline in Ms. Mills's performance review. (*Id.* at 286-87.) Ms. Mills resigned in March 2021. (*Id.* at 289.)

**10.SHRM's conduct caused Ms. Mohamed emotional damage.**

After her termination, Ms. Mohamed became a "completely different" employee at her next job: her experience at SHRM deadened her ambition and made her extremely hesitant to connect with co-workers or even turn on her video for fear that they would see her race. (App. Vol. 3 at 62-63.) Her main goal was "not to be seen" and not to speak up, especially about anything related to diversity and inclusion. (*Id.* at 63.)

In her personal life, Ms. Mohamed withdrew from people, questioning whether they were judging her by the value that she brought or by her race. (App. Vol. 3 at 64.) She had profound difficulty trusting and opening up to others given how SHRM's leadership had "reiterated over and over again their commitment of creating a safe space where we can share our feelings and different perspectives without any judgment. I believed that. I truly did. And after . . . my experience with SHRM, there's no way I can believe that." (*Id.*) She "let years go by while . . . being

withdrawn from social settings, from forming social relationships with friends, and even advancing in [her] career." (Supp. App. Vol. 1 at 246.) Ms. Mohamed also felt that her reputation as a professional was diminished; she was made out to be a "complainer . . . who deflects and brings excuses." (App. Vol. 3 at 65.) Ms. Mohamed regrets bringing forward her concerns about Ms. Barley because "I wouldn't wish on anyone to go through what I went through . . . ultimately terminated just because I spoke up and responded to the call of action that SHRM . . . initiated on eliminating racial inequity in the workplace." (Supp. App. Vol. 1 at 246.)

### C. Procedural Background

#### 1. Jury instructions

Ms. Mohamed filed her Complaint and Jury Demand in the U.S. District Court for the District of Colorado in June 2022. (App. Vol. 1 at 22.) The district court denied SHRM's motions to strike the testimony of Ms. Mills and for summary judgment. (*Id.* at 13-14.) SHRM moved to exclude testimony about Ms. Thompson, and the district court denied that motion without prejudice. (*Id.* at 139-41, 149-51.)

Before trial, Ms. Mohamed's counsel provided proposed jury instructions to the district court three times by email: on September 26, 2025 (App. Vol. 1 at 91-138); on November 5, 2025 at 10:54 am (Supp. App. Vol. 1 at 69); and on November 5, 2025 at 12:55 pm (*id.* at 115).

The Section 1981 race discrimination instruction sent by Ms. Mohamed's counsel to the district court on September 26 read, in part, as follows:

> In order for Ms. Mohamed to establish her claim for race discrimination under Section 1981, she must prove the following by a preponderance of the evidence:
>
> 1. Defendant SHRM terminated Ms. Mohamed; and
> 2. Defendant SHRM would not have terminated Ms. Mohamed but for her race.
>
> Regarding the second element, race must be a "but-for" cause of the adverse employment action. Ms. Mohamed's race does not need to be the sole cause of Defendant's action, but Ms. Mohamed must show that it played a part.

(App. Vol. 1 at 125.)

The Section 1981 retaliation proposed instruction included the following portion on causation that mirrored the discrimination instruction:

> Regarding the third element, retaliation or retaliatory motive must be a "but-for" cause of the adverse employment action. Ms. Mohamed's complaints of discrimination and/or retaliation do not need to be the sole cause of SHRM's termination of her, but Ms. Mohamed must show that they played a part.

(App. Vol. 1 at 128.)

On November 5, Ms. Mohamed's counsel submitted a second set of proposed competing and non-stipulated jury instructions for the district court's consideration. (Supp. App. Vol. 1 at 69.) This included modified instructions for Section 1981 race discrimination and retaliation. (Supp. App. Vol. 1 at 79-81, 83-85, 101-03, 105-07.) Ms. Mohamed's counsel sent a third and final set of proposed competing and non-stipulated jury instructions on November 5 at 12:55 pm with additional arguments

from SHRM about the Section 1981 race discrimination and retaliation instructions. (*Id.* at 126-28, 130-32, 148-50, 152-54.)

The final November 5 proposed instruction for Section 1981 race discrimination changed only one paragraph:

> Regarding the second element, race must be a "but-for" cause of Ms. Mohamed's termination. SHRM may be held liable for race discrimination if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her race was the factor that made a difference. Ms. Mohamed's race does not need to be the sole or primary cause of Defendant's decision to terminate her.

(Supp. App. Vol. 1 at 126.)

The Section 1981 retaliation proposed instruction featured the same changes to the section that described but-for causation. (*Id.* at 130.)

In support of both instructions, Ms. Mohamed argued that the inclusion of the phrase "the factor that made a difference" was consistent with *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020), the but-for causation standard set forth by this Court in *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010), and the Supreme Court's statement in *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) that "the plaintiff's sex need not be the sole or primary cause of the employer's adverse action." (Supp. App. Vol. 1 at 127, 131.)

At trial, the district court adopted Ms. Mohamed's November 5, 2025 proposed race discrimination and retaliation instructions. (*Compare* Supp. App. Vol.

1 at 126 *with* App. Vol. 1 at 198; *compare* Supp. App. Vol. 1 at 130 *with* App. Vol. 1 at 200.) The district court also gave a same result instruction. (App. Vol. 1 at 205.)

Over SHRM's objection that it should wait until liability was established, the district court gave a punitive damages instruction (App. Vol. 1 at 209), noting that it had already denied SHRM's motion to bifurcate (App. Vol. 1 at 150). (Supp. App. Vol. 2 at 350-52.)

**2. Testimony about Ebony Thompson**

During Ms. Mohamed's direct examination, she mentioned Ms. Thompson three times. First, Ms. Mohamed testified that she learned that Ms. Thompson had concerns about how Ms. Barley was managing her. SHRM objected on the basis of hearsay. (App. Vol. 3 at 14.) The court overruled SHRM's objection, finding that the testimony being elicited was not hearsay as it was not being offered for the truth of the matter asserted; instead, the court held that the evidence went to prove an essential element, i.e., that Ms. Mohamed had a good-faith basis for her subsequent expressions of concern about race discrimination. (*Id.* at 17-19.) After overruling SHRM's objection, the district court provided an instruction to the jury: "You are about to hear testimony that is being admitted for a non-hearsay purpose. That means it does not go to the truth of the information that you are receiving but, instead, only for its effect on the listener. In this case, the listener would have been Ms.

Mohamed." (*Id.* at 19.) Ms. Mohamed then testified about her May 2020 conversation with Ms. Thompson. (*Id.* at 14, 19-20.)

Second, Ms. Mohamed testified to Ms. Thompson's statement that "she's feeling that she's being treated different and shared that she feels that Ms. Barley is treating her in a discriminatory way" during a meeting with her team facilitated by Mr. Jackson and Ms. Morris. (App. Vol. 3 at 33.) SHRM did not object. (*Id.*)

Finally, Ms. Mohamed testified that she feared for her job after learning that SHRM fired Ms. Thompson. (App. Vol. 3 at 43.) SHRM made a hearsay objection that the district court overruled. (*Id.* at 43-44.)

**3. The jury verdict and post-trial motions**

During deliberations, the jury submitted a note asking two questions: "who receives punitive damages" and "[i]s there a formula or max value for punitive damages." (App. Vol. 1 at 214.) The district court responded that "any punitive damages, should you choose to award them, would go to the Plaintiff" and referred the jury to the instruction on punitive damages for further clarification. (*Id.*) Neither party objected to this answer. (App. Vol. 3 at 177.)

On December 5, 2025, the jury returned a verdict of $11.5 million for Ms. Mohamed—$1.5 million in compensatory damages and $10 million in punitive damages—on her 42 U.S.C. § 1981 race discrimination and retaliation claims. (App.

Vol. 1 at 215-16.) The district court entered final judgment against SHRM on January 12, 2026. (*Id.* at 217.)

SHRM filed its Motion for New Trial on February 6, asking the district court to grant a new trial or a remittitur. (App. Vol. 1 at 236-53.) The court denied SHRM's motion in its Order dated April 15, 2026. (App. Vol. 2 at 264-78.)

## IV. SUMMARY OF THE ARGUMENT

The district court properly instructed the jury that race and/or retaliation need not be "the sole or primary cause" of a 42 U.S.C. § 1981 plaintiff's injury so long as it is "a but-for cause" of the injury. Section 1981 requires a plaintiff to prove that race or retaliation was *a* but-for cause of the challenged action; it does not require proof that the prohibited consideration was the sole or primary cause. *Bostock* makes clear that events may have multiple but-for causes, *Comcast* requires only that race be "a but-for cause" of the injury, and Tenth Circuit precedent likewise rejects any sole-cause requirement.

SHRM's separate argument that Jury Instruction No. 13 was internally inconsistent rests on SHRM's misquotation of the instruction: the jury was instructed that race must be "the factor that made *a* difference," not "the factor that made *the* difference." That language comes verbatim from Tenth Circuit precedent and is fully consistent with the logical axiom that multiple but-for causes may coexist. SHRM's proposed "primary cause" interpretation of but-for cause would also be

irreconcilable with Section 1981's recognition of race discrimination and retaliation as distinct claims that may arise from the same termination. The district court therefore correctly instructed the jury, and SHRM identifies no instructional error warranting reversal.

SHRM's evidentiary arguments also provide no basis for a new trial. The district court properly overruled SHRM's hearsay objections because the challenged testimony was not offered for the truth of the matters asserted, but to explain Ms. Mohamed's state of mind and the basis for her discrimination complaints, issues directly relevant to her retaliation claim. SHRM now concedes that Ms. Mohamed's testimony concerning Ebony Thompson's termination was not hearsay and instead invokes Fed. R. Evid. 602, but that argument was waived because SHRM did not object on personal-knowledge grounds at trial. In any event, Ms. Mohamed did not testify about SHRM's subjective reason for terminating Ms. Thompson; she testified from personal knowledge about the sequence of events she observed and why that sequence caused her to fear for her own job.

SHRM likewise waived its Fed. R. Evid. 403 challenges by failing to raise them at trial after the district court denied its motion *in limine* without prejudice and permitted renewed objections during trial. And even under plain-error review, SHRM identifies no unfair prejudice warranting reversal: the challenged testimony occupied only a handful of transcript lines in a five-day trial and neither party

mentioned Ms. Thompson in closing argument. SHRM's assertion that the jury likely drew dispositive inferences from it is unsupported speculation. The district court therefore committed no evidentiary error, much less plain error requiring a new trial.

SHRM argues that the jury's compensatory and punitive damages awards warrant reduction because the former was unsupported by the evidence and the latter was excessive and constitutionally suspect. The district court did not abuse its discretion when it concluded that the compensatory damages award had solid evidentiary support, including Ms. Mohamed's testimony about the acute and chronic emotional suffering that SHRM's conduct caused her both during her employment and for years afterward.

SHRM forfeited its argument that the jury's note, combined with the size of the punitive damages award, shows that the jury was inflamed by passion, because SHRM never raised it below. Even if the Court does consider this argument, however, it is unavailing given that there was sufficient evidence on which the jury could have relied to support its punitive damages award and the jury's note sought clarification on matters not discussed in the relevant jury instruction.

Finally, the punitive damages award was not constitutionally excessive given SHRM's reprehensibility, the relationship of the award to Ms. Mohamed's actual harm, and the fact that SHRM was on reasonable notice that its conduct could result in a large punitive damages award.

# V. ARGUMENT

## A. Standard of Review

### 1. Jury instructions are subject to *de novo* review.

SHRM accurately states that jury instructions are subject to *de novo* review. (Appellant's Opening Br. at 17-18.)

### 2. Evidentiary rulings are reviewed for abuse of discretion only if the objection was preserved at trial; otherwise for plain error.

SHRM misstates the standard of review for admissibility of evidence. (Appellant's Opening Br. at 18-19.) Specifically, abuse of discretion review applies *only* if an objection is properly preserved at trial; where, as here, a party fails to preserve an evidentiary objection at trial, this Court will not consider the objection on appeal absent plain error. *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1288 n.6 (10th Cir. 2018) (when party objected on hearsay grounds but not Rule 602 grounds, Tenth Circuit declined to consider new Rule 602 arguments on appeal absent plain error); *United States v. McGlothin*, 705 F.3d 1254, 1260-61 (10th Cir. 2013) ("Absent a timely and specific objection, this court reviews [Rule 403] challenges for plain error."); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 537 (10th Cir. 2000) (Fed. R. Evid. 403 objections not raised at trial "waived for appellate review" absent plain error); *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir. 1997) (Fed. R. Evid. 602 objection waived on appeal when not raised at trial). To preserve abuse of discretion review, a party must renew objections raised in a prior motion *in*

*limine* at trial unless the district court has already definitively ruled on admissibility of evidence. Fed. R. Evid. 103(a)-(b).

#### 3. Common law excessiveness is reviewed for abuse of discretion; constitutional excessiveness is reviewed *de novo*.

SHRM's challenge to the district court's denial of the motion for new trial or remittitur is subject to two different standards of review. SHRM's common law excessiveness challenge is subject to abuse of discretion, *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1121-22 (10th Cir. 2004), which requires that the appellate court "review[] the facts in the light most favorable to the prevailing party," *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262, 1272 (10th Cir. 2000).

In contrast, "[d]ue process requires federal courts to perform an 'exacting' de novo review of the constitutionality of punitive damages awards to ensure 'that an award of punitive damages is based upon an application of law, rather than a decisionmaker's caprice.'" *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1061 (10th Cir. 2016) (internal quotations omitted).

### B. The District Court Properly Instructed The Jury That A But-For Cause Need Not Be The Sole or Primary Cause.

42 U.S.C. § 1981 prohibits racial discrimination in contractual relationships, including employment. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1102 (10th Cir. 2001). It also encompasses retaliation claims. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).

To prevail under Section 1981, a plaintiff must prove that race or retaliation "was a but-for cause of [her] injury." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020). As SHRM notes, this standard differs from Title VII's less-demanding "motivating factor" standard. (Appellant's Opening Br. at 23-25.)

The district court instructed the jury:

> [R]ace must be a "but-for" cause of Ms. Mohamed's termination. SHRM may be held liable for race discrimination if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her race was the factor that made a difference. Ms. Mohamed's race does not need to be the sole or primary cause of Defendant's decision to terminate her.

(App. Vol. 1 at 198.) The retaliation instruction used identical causation language, substituting "retaliation or retaliatory motive" for "race." (*Id.* at 200.)

### 1. Supreme Court and Tenth Circuit precedent foreclose SHRM's argument that Section 1981 requires proof that race was "the" "primary" but-for cause of Ms. Mohamed's injury.

#### a. Events may—and often do—have multiple but-for causes.

SHRM's argument rests on the false premise that an injury can have only one true but-for cause. The Supreme Court has expressly held otherwise: "Often, events have multiple but-for causes." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020). The Court illustrated the point by analogy to a collision caused both by one driver running a red light and another failing to signal. *Id.* Each act may be a but-for cause; the existence of one does not exclude another.

But-for causation asks the factfinder to "change one thing at a time and see if the outcome changes." *Id.* If removing a factor changes the result, that factor is a but-for cause. Thus, multiple factors may each qualify.

The Tenth Circuit has long applied the same principle. "[T]here can be multiple but-for causes of a plaintiff's injury." *Wilcox v. Homestake Mining Co.*, 619 F.3d 1165, 1173 (10th Cir. 2010). Put simply, "[b]ut for cause does not mean sole cause." *McDonald v. City of Wichita*, 735 F. App'x 529, 531-32 (10th Cir. 2018).

SHRM would require juries not only to identify but-for causes, but to rank them in order of causal importance and select one "primary" cause. No Supreme Court or Tenth Circuit authority imposes such a requirement. The question is whether the cause at issue (here, race or retaliatory motive) was necessary to the outcome, not whether it was more important than every other cause.

**b. A Section 1981 plaintiff must prove only that race was "a" (not "the") but-for cause of her injury.**

SHRM misstates *Comcast*, which holds that a Section 1981 plaintiff must show race was "a but-for cause" of her injury. 589 U.S. at 332-33. The Court did not require race to be "the" sole or primary cause.

The but-for standard certainly is demanding: it is not enough that race merely played some role or was a "motivating factor." *Id.* A plaintiff must establish counterfactual necessity: that absent race, the injury would not have occurred. *Id.* at

331-33. But requiring race to be "a but-for cause" does not require it to be the sole or primary cause.

*Bostock* confirms this distinction. A defendant "cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." 590 U.S. at 656. So long as the prohibited consideration was "one but-for cause," the causation requirement is satisfied. *Id.*

This Court likewise has recognized the semantic significance of "a" versus "the." In *McDonald*, this Court observed that "'a' is preferable to 'the' as an article to precede 'but for cause.'" 735 F. App'x at 532 n.2. That formulation reflects the possibility of multiple but-for causes.

Ms. Mohamed therefore did not need to prove race was "the primary" cause of her termination. She needed to prove only that race was "a" cause without which the termination would not have occurred. *Comcast*, 589 U.S. at 333. Other necessary causes do not preclude that finding.

The instruction's statement that race need not be the "sole or primary cause" simply conveyed this principle and told jurors they need not rank multiple but-for causes. Finding race to be "a" but-for cause was sufficient.

**c. Taken together, *Bostock, Comcast, Wilkerson*, and *Jones* confirm that Ms. Mohamed did not need to prove race was "the primary cause" of her termination.**

*Bostock* expressly distinguishes but-for causation from a primary-cause standard. Congress could, if it wished, require that an action occur "primarily because of" a prohibited factor, making that factor "the main cause." 590 U.S. at 656. Traditional but-for causation contains no such requirement. *Id.* Although ordinary conversation may focus on an event's "primary or most direct cause," those "conversational conventions do not control" legal causation. *Id.* at 665.

*Comcast* applied that traditional standard to Section 1981, requiring race to be "a but-for cause." 589 U.S. at 331-33. It nowhere requires juries to rank multiple but-for causes or select a "primary" one.

Even before *Comcast*, the Tenth Circuit followed the same approach in employment cases. In *Wilkerson v. Shinseki*, applying the Age Discrimination in Employment Act's but-for standard, this Court held that a plaintiff "is not required to show that age was the sole motivating factor"; age need only be "the factor that made a difference." 606 F.3d 1256, 1266 (10th Cir. 2010) (quotations omitted). Likewise, in *Jones*, 617 F.3d at 1277, this Court rejected the argument that age "must have been the only factor" in the employer's decision.

These cases establish a straightforward rule: *Bostock* rejects a "main" or "primary" cause requirement; *Comcast* requires race to be "a but-for cause"; and

*Wilkerson* and *Jones* confirm that other considerations may contribute to the decision so long as the protected characteristic "was the factor that made a difference."

SHRM's proposed standard improperly adds a second inquiry to the "but-for" test. But-for causation asks whether removing race would have changed the outcome, not whether race was more important or influential than every other cause. *Bostock* expressly rejects that latter inquiry.

The jury therefore did not need to determine whether race outranked every other cause. It needed to determine whether Ms. Mohamed would have been terminated absent her race. If not, race was "a but-for cause," regardless of whether another but-for cause also existed.

**2. The Court must reject SHRM's argument that Jury Instruction No. 13 was internally inconsistent because it rests on a misquotation of the instruction.**

SHRM argues that Jury Instruction No. 13 was internally inconsistent because:

> The first part of the instruction required race to be "the factor that made the difference," while the next part of the instruction stated that race need not be the "primary cause." It is axiomatic that the factor that "made the difference" must be the decisive or controlling and, at a minimum, primary reason for the outcome. Stating that race need not be the primary factor was wrong.

(Appellant's Opening Br. at 28.) SHRM notably makes no comparable argument concerning Jury Instruction No. 15, which used identical causation

language for retaliation. This argument fails because it rests entirely on a misquotation of the instruction. Jury Instructions Nos. 13 and 15 say "the factor that made *a* difference," not "the factor that made *the* difference."[2] (App. Vol. 1 at 198, 200 (emphasis added).)

"The factor that made a difference" is a direct quotation from *Jones*, 617 F.3d at 1277, and is consistent with *Bostock* and *Comcast*: events may have multiple but-for causes, and a Section 1981 plaintiff need show only that race was "a" but-for cause.

That distinction matters. SHRM argues that "the factor that made **the** difference" implies sole or primary causation and conflicts with the instruction's next clause. But that phrase does not appear in the instruction. Whether it might imply sole or primary causation therefore is irrelevant.

The actual instruction properly used "the factor that made *a* difference," and that language creates no inconsistency with the statement that race need not be the sole or primary cause. SHRM's contrary argument rests entirely on a critical misquotation and should be rejected.

---

[2] SHRM misquotes this phrase of the jury instruction throughout its Opening Brief. (Appellant's Opening Br. at 9, 15, 20, 28.)

**3. But-for causation cannot mean "primary" cause because that interpretation would foreclose simultaneous Section 1981 discrimination and retaliation claims.**

SHRM argues that a Section 1981 plaintiff must prove race was the "primary" cause of her injury. "Primary" means "[f]irst; principal; chief; leading." Black's Law Dictionary 826 (Abridged 6th ed. 1991).

By definition, an event cannot have two primary causes. Thus, if Section 1981 required either race or protected activity to be the single "primary" cause of a termination, a plaintiff could not simultaneously prevail on discrimination and retaliation claims as Ms. Mohamed did here. SHRM does not expressly argue those claims are mutually exclusive.

Nor could it. The Supreme Court recognizes race discrimination and retaliation as separate causes of action under Section 1981. *Humphries*, 553 U.S. at 457. Indeed, *Humphries* involved a plaintiff asserting both claims, and the Court did not suggest they were mutually exclusive.

SHRM's proposed "primary cause" requirement therefore conflicts not only with traditional but-for principles, but with Section 1981's recognition of distinct discrimination and retaliation claims that may arise from the same adverse action.

### C. The District Court Properly Denied SHRM's Hearsay Objections, And SHRM Waived Its Rules 602 and 403 Arguments By Failing To Raise Them At Trial.

SHRM argues that the district court abused its discretion by denying two hearsay objections. Both rulings were proper because Ms. Mohamed offered the testimony not for its truth, but for its effect on her as the listener.

SHRM now concedes that one portion of the testimony was not hearsay, but argues instead that Fed. R. Evid. 602 barred it because Ms. Mohamed lacked personal knowledge. SHRM waived that argument by failing to raise it at trial. Regardless, Ms. Mohamed testified only to a sequence of events within her personal knowledge. SHRM likewise waived its Fed. R. Evid. 403 challenges by failing to raise them at trial.

#### 1. The district court properly ruled that Ms. Mohamed's testimony about a conversation with Ms. Thompson was not hearsay.

Testimony offered for its effect on the listener, rather than for the truth of the matter asserted, is not hearsay. Fed. R. Evid. 801(c); *United States v. Twitty*, 689 F. App'x 890, 894-95 (10th Cir. 2017).

Ms. Mohamed's testimony about concerns she and Ms. Thompson discussed regarding Ms. Barley was offered to explain Ms. Mohamed's state of mind—specifically, why she later complained of discrimination. SHRM objected:

> Q. In the spring of 2020, did you learn that any of your other teammates had concerns about Ms. Barley's management of them?
> A. Yes.

Q. Who?
A. Ms. Ebony Thompson.
Q. And what did you understand her concerns were?
MS. DARROW: Objection. Hearsay.

(App. Vol. 3 at 14.)

During the ensuing bench conference, Ms. Mohamed's counsel explained that the testimony was offered because it "goes to Ms. Mohamed's state of mind and why she decided to bring complaints forward about race discrimination." (*Id.*)

That purpose was directly relevant to Ms. Mohamed's retaliation claim, which required her to prove that she "complained about what she reasonably believed was race discrimination and/or retaliation." (App. Vol. 1 at 200.) SHRM's counsel confirmed that SHRM disputed the good-faith basis for those complaints. (App. Vol. 3 at 17-18.) The district court therefore properly found the testimony relevant to a disputed element and denied the hearsay objection. (*Id.* at 16-19.)

After offering a limiting instruction, the court permitted Ms. Mohamed to testify that Ms. Thompson asked whether she had noticed Ms. Barley treating employees of color differently from white employees; that Ms. Thompson said she had experienced similar treatment; and that Ms. Mohamed told Ms. Thompson she felt similarly. (App. Vol. 3 at 19-20.) The testimony thus supplied context for Ms. Mohamed's state of mind and the reasonableness of her discrimination complaint, rather than proof that Ms. Barley in fact discriminated against Ms. Thompson.

### 2. SHRM waived its new Fed. R. Evid. 602 argument, and Ms. Mohamed's testimony was based on personal knowledge in any event.

SHRM mischaracterizes Ms. Mohamed's testimony about Ms. Thompson's termination as testimony "that SHRM fired Thompson *because* Thompson raised concerns about Ms. Barley's discriminatory behavior." (Appellant's Opening Br. at 30 (emphasis added).) The testimony was:

> Q. Before you returned to work from that vacation, Ms. Mohamed, did you learn anything about your team?
> A. Yes.
> Q. What did you learn?
> A. I learned that SHRM fired Ebony Thompson.
> Q. And how did you respond to that?
> A. I -- I said I was concerned about my job at SHRM; I was surprised that Ms. Thompson was fired and wondered if I was next.
> Q. And why did you wonder if you were next?
> A. Because Ms. Thompson raised concerns about Ms. Barley's discriminatory behavior; and after she raised those concerns, she was fired because of performance issues.
> MS. DARROW: Move to strike. Hearsay.

(App. Vol. 3 at 43.)

SHRM now concedes that testimony was not hearsay.[3] It instead argues for the first time that Fed. R. Evid. 602 barred the testimony because Ms. Mohamed lacked personal knowledge of the reasons for Ms. Thompson's termination.

---

[3] Specifically, SHRM states: "Again, for this testimony, the district court overruled SHRM's objection, finding it met the effect-on-the-listener exception. But Mohmed's [sic] testimony was not about an out-of-court statement she heard; it was her belief that SHRM fired Thompson after she raised concerns about Ms. Barley's

That argument is waived because SHRM did not object based on Rule 602 at trial. *Sinclair*, 109 F.3d at 1536 (Rule 602 objection waived when not raised at trial); *Schulenberg*, 911 F.3d at 1288 n.6 (declining to consider unpreserved Rule 602 argument absent plain error where party objected only on hearsay grounds).

In any event, Ms. Mohamed did not testify that Ms. Thompson was fired *because* she raised discrimination concerns. She testified to a temporal sequence within her personal knowledge: Ms. Thompson raised concerns and was later fired for stated performance reasons. Because SHRM does not argue, and cannot show, plain error, the Court should decline to consider its Rule 602 argument.

**3. SHRM likewise waived its Fed. R. Evid. 403 arguments, which in any event rest on speculation rather than the record.**

SHRM also argues that both portions of testimony should have been excluded under Fed. R. Evid. 403 because any probative value was outweighed by the danger of unfair prejudice.

That argument is waived because SHRM did not object under Rule 403 at trial. *Shaw*, 213 F.3d at 537 (Rule 403 objections not raised at trial are "waived for appellate review" absent plain error); *McGlothin*, 705 F.3d at 1260-61 (unpreserved Rule 403 challenges reviewed only for plain error). Although SHRM raised Rule 403 in its motion *in limine*, the district court denied that motion without prejudice,

discriminatory behavior." (Appellant's Opening Br. at 31-32 (internal quotation marks, citations, and alterations omitted).)

expressly permitting SHRM to "readdress those things at an appropriate time during trial." (App. Vol. 1 at 150.) SHRM did not do so.

Nor does SHRM identify unfair prejudice amounting to plain error. It contends that the testimony transformed the case into a trial about discrimination against Ms. Thompson and SHRM's generally dysfunctional workplace. (Appellant's Opening Br. at 33.) The record belies that argument. The challenged testimony occupied only twelve lines of transcript in a five-day trial. (App. Vol. 3 at 19-20, 43.) Neither party mentioned Ms. Thompson during their hour-long closing arguments. Those isolated references did not transform the trial into a case about Ms. Thompson.

SHRM also speculates that the jury "likely" drew dispositive factual inferences from those twelve lines of testimony, but identifies nothing in the record showing that it did. Because SHRM failed to preserve its Rule 403 objections and cannot establish plain error, the Court should reject those arguments.

### D. The District Court Did Not Err in Denying SHRM's Motion For A New Trial Or Remittitur Based On The Damages Awarded.

#### 1. The compensatory damages award is supported by the evidence adduced at trial.

In determining whether the $1.5 million compensatory damages award warrants reduction, the district court focused on whether the verdict was supported by the evidence (App. Vol. 2 at 275). *Osterhout v. Bd. of Cnty. Comm'rs*, 10 F.4th

978, 999 (10th Cir. 2021) (the "appropriate inquiry . . . is whether the verdict is against the weight of the evidence"). Here, there was ample testimony about the distress that Ms. Mohamed suffered while being subjected to different treatment by her manager, and the three months—from her complaint to Ms. Morris on June 3 until her termination—during which her pleas to various HR leaders and C-suite level employees were ignored and met, instead, with retaliation. (*Supra* at 8-10, 12, 16, 18-19.) She also testified to the impact that SHRM's conduct had on her for years. (*Supra* at 18-19.)

The district court summarized this acute and chronic emotional suffering, which is far from the "garden-variety, short-lived, emotional distress" that SHRM claims (Appellant's Opening Br. at 39):

> [T]he evidence indicated suffering building from the stress of the initial perception that she was being treated differently than white colleagues to crushing disillusion and desperation as the company turned against her and set her up to fail as a pretext for termination. She testified to the lasting impacts of these events in the forms of deadening her ambition and loss of trust in others, particularly in work environments where she had previously excelled and was open to sharing herself, including her race and cultural background. Mohamed watched her claims of discrimination and retaliation, which the jury unambiguously found to be substantiated, systematically disregarded and dismissed as she was isolated from assistance and told, in effect, that she was the problem.
>
> One incident captures some of the flavor of this process. After Barley, with the assistance of senior management ghost-writing her emails, imposed rigid deadlines on Mohamed for the first time in the wake of her discrimination complaints, Mohamed sought assistance and resources for her tasks of the sort she had previously expected and received. Instead of being assisted by her team, she was informed in no

> uncertain terms that no assistance whatsoever was provided and she was harshly criticized by senior management essentially for seeking assistance. A jury can reasonably understand the devastating short-term and long-term effects of such actions in context. An award of $1.5 million in these circumstances does not shock the judicial conscience.

(App. Vol. 2 at 275-76.)

SHRM argues that the $1.5 million compensatory damages award was excessive and "untethered" to the evidence given: (1) the absence of "explicitly racist slurs, statements, or actions"; (2) the fact that "SHRM took [her] complaints seriously"; (3) Ms. Mohamed's short time working for Ms. Barley in comparison to some "plaintiffs who received far less in emotional distress damages"; (4) her failure to seek mental health treatment; (5) no third party witness corroborated her distress; (6) there was little evidence that her experience caused her future damage; and (7) Ms. Mohamed recovered more than plaintiffs in "comparable cases." (Appellant's Opening Br. at 35-39.)

These factors cannot neutralize the totality of the evidence that led the jury to value Ms. Mohamed's compensatory damages at $1.5 million. First, discrimination is not any less abhorrent and hurtful in the absence of explicitly racist slurs, statements, or actions. In *Smith v. Nw. Fin. Acceptance*, 129 F.3d 1408, 1417 (10th Cir. 1997), the Tenth Circuit rejected a similar argument in the context of a hostile work environment claim, holding that evidence of "physical abusiveness, contact, or sexual intimidation" was not required to justify a significant compensatory damages

award since the plaintiff was not required to produce this evidence to establish a hostile work environment claim. *Id.* Similarly, Ms. Mohamed did not need to point to overtly racist acts to prove both liability for race-based disparate treatment and the emotional distress that she suffered as a result.

Second, given its finding on liability and damages, the jury clearly did not view SHRM's treatment of Ms. Mohamed following her expressions of concern about discrimination as the organization taking her "complaints seriously" (Appellant's Opening Br. at 36.) SHRM's argument also depends on its own version of the facts rather than the facts viewed in the light most favorable to Ms. Mohamed as the prevailing party. *Deters*, 202 F.3d at 1272.

Third, SHRM's focus on the number of months that Ms. Mohamed endured discrimination and retaliation ignores the fact that Ms. Mohamed worked for SHRM successfully for nearly four and a half years before being unceremoniously fired from a job in which she took great pride only months after bringing forward a discrimination concern at the behest of SHRM. This timing, which supported a finding that SHRM's reasons for terminating her were pretextual (App. Vol. 1 at 203), was at the root of Ms. Mohamed's distress.

Regardless, none of the cases cited by SHRM stand for the proposition that the length of time that a plaintiff suffered discrimination or retaliation has any bearing on whether there is substantial evidence to support a compensatory damages

verdict. *E.g., O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1251-52 (10th Cir. 2001) (refusing to reduce a compensatory damages award to the Title VII cap where the plaintiff was subjected to retaliation over an 11-month period after 32 years of employment).

Fourth, in addition to being inaccurate (*supra* at 12-13), SHRM's argument that Ms. Mohamed's compensatory damages are insubstantial because she "never sought mental health treatment" (Appellant's Opening Br. at 36) is unsupported by case law. In fact, the case that SHRM cites lends itself to the opposite conclusion. *Osterhout*, 10 F.4th at 997 (stating that the plaintiff, who neither sought mental health treatment nor offered a treater as an expert at trial, "didn't need Sigmund Freud to connect his later depression and anxiety to the beating that he'd experienced"). As in *Osterhout*, Ms. Mohamed did not need to proffer evidence that she saw a mental health care provider or have one testify at trial that SHRM's discrimination and retaliation caused her emotional suffering; "[l]aypersons could easily see the connection without the aid of expert testimony." *Id.* at 998.

Fifth, Ms. Mohamed's own testimony about her emotional distress was sufficient alone to support the jury's award; no corroborating testimonial or documentary evidence was required. This Court held at summary judgment that "[a]n injured person's testimony alone may suffice to establish damages for emotional distress provided that she reasonably and sufficiently explains the

circumstances surrounding the injury and does not rely on mere conclusory statements." *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1183 (10th Cir. 2013) (*quoting Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 361 (6th Cir. 2005)). Here, Ms. Mohamed did so.

Sixth, SHRM's claim that Ms. Mohamed offered "little evidence" that SHRM's treatment caused her future damage is belied by her testimony. It is not true that Ms. Mohamed "found work in the same industry doing her preferred profession" as SHRM claims (Appellant's Opening Br. at 38.) She testified that her experience at SHRM deadened her ambition—one of the reasons for her move to the U.S.—and caused her to become "a completely different employee" who was reluctant even to turn on her video for fear that others would see her race. (App. Vol. 3 at 62.) Her goal became "to not be seen" and she did not seek "to form any personal or professional relationships after that given the betrayal that [she] felt from the people [she] trusted at SHRM." (*Id.* at 63.)

Finally, SHRM encourages this Court to look to purportedly comparable cases where juries awarded less in compensatory damages to plaintiffs in race discrimination cases. This Court has previously cautioned that such comparisons are of little value as they "yield no insight into the evidence the jurors heard and saw and how they used it during their deliberations." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1252 (10th Cir. 2000). If a party disputing an award provides a case that

is "similar enough to serve as a meaningful benchmark," then a comparison could be of assistance, *Osterhout*, 10 F.4th at 999; however, SHRM fails to do so here. Instead, it presents a list of three cases, each with its own set of unique facts where the evidentiary support of the compensatory damages award was not even at issue. *Perkins v. Fed. Fruit & Produce Co.*, No. 11-cv-00542-REB-KLM, 2013 U.S. Dist. LEXIS 69340, at *85-86 (D. Colo. May 14, 2013) (reviewing the compensatory damages awards to a plaintiff for duplication) (unpublished); *O'Neal*, 237 F.3d at 1251-52 (denying the defendant's argument that the trial court committed reversible error by failing to apply the statutory cap under 42 U.S.C. § 1981a to a compensatory damages award under § 1981).

SHRM further reaches into the Eleventh Circuit with its citation to *Faulk v. Dimerco Express USA Corp.*, 172 F.4th 844 (11th Cir. 2026), which does little to advance its argument. In *Faulk*, a failure to hire case, the company withdrew an offer of employment to the plaintiff upon learning that he was Black. *Id.* at 849. A jury awarded the plaintiff $390,000 in economic and compensatory damages and $3 million in punitive damages—a 7.69:1 ratio of punitive to actual damages—despite the fact that the plaintiff never worked a day for the company but testified to being "upset," "angry," and "really mad" after learning of the employer's blatantly racist hiring practices. *Id.* at 852. In contrast, Ms. Mohamed suffered eight months of

differential treatment before SHRM brought her highly successful four-and-a-half-year tenure to an end.

**2. The district court did not abuse its discretion in upholding the $10 million punitive damages award on common law excessiveness grounds.**

**a. The Court need not consider SHRM's argument about the jury's note because SHRM failed to raise it below.**

When a party fails to raise an argument below, this Court treats that "argument as forfeited." *U.S. v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) (internal citations omitted). With respect to the jury's note, SHRM did not object to the district court's response at trial or make any mention of the note in its motion for a new trial. (App. Vol. 1 at 236-53; App. Vol. 3 at 177.) In its opening brief, for the first time, SHRM argues that the jury's note requesting clarification on punitive damages indicated that it was inflamed by passion, rendering the punitive damages award excessive. (Appellant's Opening Br. at 39-40.) Because this issue was "not passed upon below," this Court should not consider it. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976).

**b. There was no evidence of bias, prejudice, or passion by the jury.**

"[A]bsent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate." *McInerney v. United Air Lines*, 463 Fed. App'x 709, 723 (10th Cir. 2011)

(citing *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981) (en banc)). Only where courts determine that a jury's verdict on both damages *and* liability was the result of passion or prejudice is a new trial warranted. *Malandris*, 703 F.2d at 1168. If the court deems the amount excessive but there was no error that tainted liability, then a remittitur is appropriate. *Id.* at 1168-69.

New trials based on jury bias, prejudice, or passion are rare and cannot rest on the size of the verdict alone. For example, in *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1128 (10th Cir. 2009), this Court reversed and remanded for a new trial where the jury awarded $3.2 million to a plaintiff injured in a car accident after his counsel referred "extensively" to evidence not in the record in his closing argument and flooded his "argument with abusive references to his opposing party and counsel." This Court noted that "the apportionment of liability and the size of the damages award, *while not beyond the bounds of rationality*, suggest that counsel's comments had a prejudicial effect." *Id.* at 1132 (emphasis added). A further aggravating factor was the district court's failure to take any meaningful curative action. *Id.* at 1133.

Here, the jury's note does not rise to the same level as the blatantly prejudicial and abusive argument from *Whittenburg*. In its note, the jury asked two questions that were not addressed in the punitive damages jury instruction (App. Vol. 1 at 209),

i.e., who the award would go to and whether there was a maximum amount for an award. The trial judge, without objection from SHRM, provided a matter-of-fact response that referred the jury back to Instruction No. 23, which properly informed the jury on the purpose of punitive damages and the three criteria that it could consider. (App. Vol. 1 at 209.) Based on the punitive damages verdict, the jury appeared to have followed this instruction: the $10 million award was less than 4% of the total revenue that SHRM brought in the year before trial and only 6.67 times the compensatory damages award.

**3. The punitive damages award does not violate SHRM's right to Due Process.**

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). In deciding whether the punitive damages award crossed that line, this Court must consider the guideposts enumerated in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996): (1) SHRM's degree of reprehensibility; (2) the disparity between the harm suffered by Ms. Mohamed and the award; and (3) the difference between the award and the civil penalties authorized or imposed in comparable cases.

**a. The volitional actions of its executives rendered SHRM's conduct highly reprehensible.**

The district court observed that SHRM's argument that the company's conduct was at "the low end of the spectrum" of reprehensibility:

> essentially ignores the substantial evidence showing, when viewed in favor of Mohamed, systemic acts to retaliate against Mohamed taken with the aid and consent of senior management for raising discrimination complaints that the jury found substantiated. This is perhaps not the height of reprehensibility in the employment discrimination context simply because it is not overt racism and retaliation, but it is far from the low end.

(App. Vol. 2 at 276.)

The degree of reprehensibility is "[t]he most important indicium of the reasonableness of a punitive damage award." *Campbell*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 575). All five of *Campbell's* reprehensibility factors support the award here.

First, although the harm to Ms. Mohamed was not physical, neither was it merely economic: she broke down crying, she felt sick to her stomach, and she experienced a dramatic loss of ambition and trust in others in the years that followed her termination (*supra* at 8-10, 12, 16, 18-19). *Peshlakai v. Ruiz*, 39 F. Supp. 3d 1264, 1331 (D.N.M. 2014) ("[w]here a plaintiff experiences purely economic harm . . . a substantial punitive damage award is less justified").

Second, SHRM's conduct evinced an indifference to or a reckless disregard for Ms. Mohamed's health and safety: after SHRM assured Ms. Mohamed that it

was safe to speak out about racism, when she did bring concerns forward, the company responded with denial, deflection, and retaliation. The individuals who set Ms. Mohamed up for failure were not simply lower-level managers; they were an HR Manager in charge of investigations at SHRM, a Director in HR, the Vice President of Education, the Chief HR Officer, and the Chief Global Development Officer.

Third, as an employee of SHRM who depended on SHRM for her livelihood, Ms. Mohamed was financially vulnerable.

Fourth, Ms. Mohamed's termination was the culmination of repeated wrongful conduct, not an isolated incident: she experienced worsening treatment by Ms. Barley, retaliation by executives, and then termination.

Finally, the harm to which SHRM subjected Ms. Mohamed was no accident: it was intentional discrimination and retaliation. SHRM's claim that it did not "set out with the *purpose*" of violating Section 1981 (Appellant's Opening Br. at 42) cannot be credited where the jury concluded that its actions constituted intentional race discrimination and retaliation (App. Vol. 1 at 215). Even if Ms. Barley's initial different treatment of Ms. Mohamed was not purposeful, which is not supported by the evidence, SHRM's actions *after* it became aware of Ms. Mohamed's concerns—supporting a biased supervisor's scrutiny, taking volitional actions to silence Ms. Mohamed, and punishing her but not a white peer—rose to the level of intentional

malice, trickery, or deceit. This was not a situation where SHRM's wrongful conduct was simply a "failure to act" that renders a defendant's conduct far less reprehensible. *Lompe*, 818 F.3d at 1067 (finding that the wrongful conduct of the property management company that failed to fix an aging fleet of furnaces that poisoned the plaintiff "consisted of a failure to act rather than any intent to injure through affirmative conduct and thus was not 'the result of intentional malice, trickery, or deceit.'").

**b. The single-digit ratio award serves the goals of deterrence and retribution.**

With respect to the second guidepost, the Supreme Court observed that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process." *Campbell*, 538 U.S. at 425. The Court noted that when compensatory damages are substantial, a "lesser ratio" as low as one to one "can reach the outermost limit of the due process guarantee," but it cautioned that the "precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.*

In *Lompe*, this Court treated a $1 million compensatory award as substantial enough to justify a one-to-one ratio, but the original ratio there was 11.5:1, and the compensatory award included damages for outrage and humiliation that duplicated the punitive award. 818 F.3d at 1069 (*quoting Campbell*, 538 U.S. at 426). In

deciding to reduce the punitive damages award in *Campbell*, the Court found compelling that the ratio was 145 to 1, "[t]he harm arose from a transaction in the economic realm, not from some physical assault or trauma," and the insurance company resolved the pending claim before the complaint was filed. 538 U.S. at 425-26.

Here, the ratio is far more modest, i.e., 6.67:1, which is "more likely to comport with due process, while still achieving the State's goal of deterrence and retribution," *id.* at 425, and the harm did result from a trauma that lasted for years. The $1.5 million compensatory damages award was intended to make Ms. Mohamed whole (App. Vol. 1 at 207), while the $10 million in punitive damages was intended to punish SHRM for its misconduct and to "provide a warning to others" (*id.* at 209). The jury was properly instructed on the distinct purposes of both types of damages and further warned not to award damages "more than once for the same injury" (*id.* at 208). There is no indication that there was duplication in these awards, as there was in *Lompe* or *Campbell*.

This Court has heeded the Supreme Court's warning that there is no "bright-line ratio which a punitive damages award cannot exceed," *Campbell*, 538 U.S. at 425, and has, for example, found that a ratio of 59 to 1 was constitutional in a sexual harassment case. *Deters*, 202 F.3d at 1273 (observing that "where the injury is primarily personal, a greater ratio may be appropriate").

**c. SHRM was on notice that its conduct could result in a significant punitive damages award.**

The third guidepost invites the Court to compare the punitive damages award to civil penalties authorized or imposed in comparable cases to ensure that SHRM had "reasonable notice" that its conduct "could result in such a large punitive award." *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996). Here, there is no comparable civil penalty, but its absence does not favor SHRM.

Courts have recognized that the primary purpose of both 42 U.S.C. § 1983 and punitive damages is "deterrence of future egregious conduct." *Valenzuela v. Coleman*, No. 18-cv-00329-CMA-STV, 2022 U.S. Dist. LEXIS 120009, at *31-32 (D. Colo. July 7, 2022) (unpublished). The same is true for Section 1981, a law designed to eradicate intentional race discrimination to which Congress has not added a damages cap. *See Hampton*, 247 F.3d at 1117.

SHRM assured its employees that they were safe bringing forward concerns about race discrimination—going so far as to launch an initiative designed to eliminate racial inequity "in all workplaces in America, starting with SHRM." (*Supra* at 7-8.) When it discriminated and retaliated against one brave employee who reported her concerns at SHRM's behest, SHRM was on notice that Ms. Mohamed's claim, brought under an uncapped statute, could very well result in the large punitive damage award that the jury awarded. As the district court succinctly put it: "If anyone knew the possibility of high potential punitive damages for employment

discrimination and malicious retaliation, it was SHRM, which trains businesses on issues including potential liability." (App. Vol. 2 at 277.) *See Horinek v. Spirit Aerosystems, Inc.*, 2026 U.S. Dist. LEXIS 115475, at *23 (D. Kan. May 26, 2026) (observing that *Hampton*, 247 F.3d 1091, which upheld a jury award with a 20:1 ratio, "certainly put defendant on notice that in this day and age, race discrimination claims can result in large punitive damages awards") (unpublished).

## VI. CONCLUSION

In light of the above, Ms. Mohamed requests that this Court affirm the district court's order denying SHRM's motion for a new trial.

## VII. STATEMENT REGARDING ORAL ARGUMENT

Appellee Rehab Mohamed respectfully requests oral argument in this matter. This appeal involves the application of law to an extensive factual record. Oral argument would allow counsel to clarify any factual or legal issues necessary for resolution of this appeal.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,961 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). Undersigned relied on our word processing system used to prepare the brief, Microsoft Word, to obtain the count.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

## ADDITIONAL CERTIFICATION

a. No privacy redactions were required per Fed. R. App. P. 25(a)(5), 10th Cir. R. 25.5, and Section II(L) of the Court's CM/ECF User Manual.

b. If hard copies are required, they will match the electronic filing.

c. The brief complies with applicable type-volume limits.

Respectfully submitted, by:

SWAIN LAW, LLC

*s/Hunter A. Swain*
Hunter A. Swain
1490 North Lafayette Street, Suite 303
Denver, CO 80218
Phone: (720) 815-5281
hunter@swainemploymentlaw.com

Attorney for Appellee

LOWREY PARADY LEBSACK DEFAZIO, LLC

*s/Ariel B. DeFazio*
Ariel B. DeFazio
1490 Lafayette Street, Suite 304
Denver, CO 80218
Phone: (303) 593-2595
ariel@lowrey-parady.com

Attorney for Appellee

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2026, a true and correct copy of the foregoing APPELLEE'S RESPONSE BRIEF was filed with the Clerk of Court using the CM/ECF system and served via CM/ECF to the following:

Tanja Darrow
tdarrow@littler.com

Virginia L. Woodfork
vwoodfork@littler.com

Kelsey A. VanOverloop
kvanoverloop@littler.com

*Attorneys for Appellant*

*s/Ariel B. DeFazio*
Ariel B. DeFazio