Case No. 26-1142

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

REHAB MOHAMED,

Appellee,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Appellant.

---

**APPELLEE'S SUPPLEMENTAL APPENDIX**
**VOLUME 1 OF 2**
(Supp. App. 001-252)

---

Appeal from the United States District Court for the District of Colorado

The Honorable Gordon P. Gallagher
Originating Case No. 1:22-cv-01625-GPG-KAS

Hunter A. Swain
SWAIN LAW, LLC
1490 N. Lafayette St., Ste. 303
Denver, CO 80218
Phone: (720) 815-5281

*Attorney for Appellee*

Ariel B. DeFazio
LOWREY PARADY LEBSACK DEFAZIO, LLC
1490 Lafayette St., Ste. 304
Denver, CO 80218
Phone: (303) 593-2595

*Attorney for Appellee*

# TABLE OF CONTENTS

## VOLUME 1 (Supp. App. 001-252)

Exhibit 1 to Plaintiff's Response to Motion for New Trial (Dkt 182-1, filed 3/13/2026) ........ 1-8

Exhibit 2 to Plaintiff's Response to Motion for New Trial (Dkt 182-2, filed 3/13/2026) ........ 9-41

Exhibit 3 to Plaintiff's Response to Motion for New Trial (Dkt 182-3, filed 3/13/2026) ........ 42-52

Exhibit 4 to Plaintiff's Response to Motion for New Trial (Dkt 182-4, filed 3/13/2026) ........ 53-58

Exhibit 5 to Plaintiff's Response to Motion for New Trial (Dkt 182-5, filed 3/13/2026) ........ 59-68

2025.11.05 (10:54 a.m.) Email to Chambers ........ 69

Attachment - Plaintiff's Second Competing and Non-Stipulated Jury Instructions (Clean) ........ 70-92

Attachment - Plaintiff's Second Competing and Non-Stipulated Jury Instructions (Redlined) ........ 93-114

2025.11.05 (12:55 p.m.) Email to Chambers ........ 115-117

Attachment - Plaintiff's Second Competing and Non-Stipulated Jury Instructions (Clean with Defendant's Additions) ........ 118-139

Attachment - Plaintiff's Second Competing and Non-Stipulated Jury Instructions (Redlined with Defendant's Additions) ........ 140-161

Trial Transcript Volume Ia ........ 162-179

Trial Transcript Volume II ........ 180-252

## VOLUME 2 (Supp. App. 253-367)

Trial Transcript Volume III ........ 253-316

Trial Transcript Volume IV ........................................................................ 317-352

Trial Exhibit 30 ........................................................................................... 353

Trial Exhibit 32 ........................................................................................ 354-355

Trial Exhibit 35 ........................................................................................ 356-358

Trial Exhibit 50 ........................................................................................ 359-361

Trial Exhibit 63 ........................................................................................... 362

Trial Exhibit 65 ........................................................................................ 363-364

Trial Exhibit 107 ...................................................................................... 365-367

## CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS

I hereby certify that with respect to this Supplemental Appendix: (1) all required privacy redactions have been made per Fed. R. App. P. 25(a)(5), 10th Cir. R. 25.5, and Section II(L) of the Court's CM/ECF User Manual; (2) any hard copies submitted to the Clerk's office will be exact copies of the ECF submission; and (3) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender (Microsoft Defender Antivirus; Antimalware Client Version 4.18.26080.4, Antivirus Version 1.459.447.0), on September 28, 2026, and, according to the program, is free of viruses.

s/ Ariel B. DeFazio
Ariel B. DeFazio
1490 Lafayette Street, Suite 304
Denver, CO 80218
Phone: (303) 593-2595
ariel@lowrey-parady.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, a true and correct copy of the foregoing APPELLEE'S SUPPLEMENTAL APPENDIX, Volumes 1 and 2, was filed with the Clerk of Court using the CM/ECF system and served via CM/ECF to the following:

Tanja Darrow
tdarrow@littler.com

Virginia L. Woodfork
vwoodfork@littler.com

Kelsey A. VanOverloop
kvanoverloop@littler.com

*Attorneys for Appellant*

s/ Ariel B. DeFazio
Ariel B. DeFazio

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

REHAB MOHAMED,

Plaintiff,

vs.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

Case No. 22-CV-1625

Denver, Colorado

December 1, 2025
1:48 p.m.

Vol. Ia

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218

point and always received positive feedback about my candor and my ability to hold these meetings. I just found it odd that she insists to do so.

Q. In the spring of 2020, did you learn that any of your other teammates had concerns about Ms. Barley's management of them?

A. Yes.

Q. Who?

A. Ms. Ebony Thompson.

Q. And what did you understand her concerns were?

MS. DARROW: Objection. Hearsay.

MS. DeFAZIO: Permission to approach the bench, Your Honor?

THE COURT: You may.

(Proceedings at sidebar with all counsel.)

MS. DeFAZIO: This piece we are not offering for the truth of the matter asserted. This goes to Ms. Mohamed's state of mind and why she decided to bring complaints forward about race discrimination.

THE COURT: What do you expect she's going to say?

MS. DeFAZIO: That Ms. Thompson expressed concern about Ms. Barley not believing her without basis and being condescending.

MS. DARROW: This is the very basis of our motion in limine, the very basis of what we've been arguing all along.

They are 100 percent offering it to show what happened to Ms. Thompson. There has to be an inference drawn with what happened to Ms. Mohamed. And the jury has to believe that what happened to Ms. Thompson in fact happened, was true. It's too prejudicial. If they want to get it in, this is not the way to do it. It's hearsay.

THE COURT: Do you anticipate, Ms. DeFazio, that Ms. Thompson is going to be testifying at any time?

MS. DeFAZIO: No. And, again, the information goes to pretext, not to the issue of whether the discrimination happened, both to Ms. Thompson and Ms. Mohamed. And if the evidence doesn't come in in a way where it's supported, then there can be a curative instruction and/or it doesn't have to be in the pretext instruction.

MS. DARROW: But then the damage is done, and I am being denied an opportunity to cross-examine a witness about that. What matters is what happened to Ms. Thompson, and she's not here for me to cross-examine her on it.

MS. DeFAZIO: Nothing to add.

THE COURT: I'm going to take a short break and think about that one. We'll take about a five-minute recess.

(Sidebar concluded.)

THE COURT: Ladies and gentlemen, we're going to take about a five-minute recess and we'll come right back. I know I said no other breaks, but we need a very short recess at

this point in time. So you all may step out. Thank you.

(The jury exited the courtroom at 4:25 p.m.)

THE COURT: Please be seated, everybody. Thank you.

(Pause in the proceedings.)

THE COURT: Let me make a brief record on this before we bring the jury in.

Ultimately, the objection is overruled. I find that the information being elicited is not hearsay, and it goes to prove an essential element or to attempt to prove an essential element -- please be seated, everybody -- an essential element of what Ms. Mohamed has to prove for one of her claims.

To the extent that a curative instruction is necessary at a later point in time, we may have to address that. Not a curative instruction, but some sort of a limiting instruction. We can address that at a later point in time or, if the Defense, potentially, is asking for a limiting instruction right now, we can discuss that.

What's your thought on that, Ms. Darrow?

MS. DARROW: So a couple of things, Your Honor.

THE COURT: Sure.

MS. DARROW: One, just to make the record, it's hearsay. What's being asked of this witness is hearsay. And, specifically, under the case of *Lingenfelter*, L-I-N-G-E-N-F-E-L-T-E-R, *versus Kaiser Foundation Health Plan of Colorado*, 20 -- 2021 District of Colorado, rumors and

comments made by out-of-court colleagues are inadmissible hearsay. There is no exception that would apply. The state of mind exception which was offered by counsel would not apply because there's case law on point that says that the comment has to be contemporaneous. Here, it is not.

What we know is that Ms. Thompson made some comments in May, and Ms. Mohamed made her complaint in June. So the state of mind would not apply here.

As to the evidence -- or as to the comment being offered for a critical element of her claim, she has to do it another way. She cannot use inadmissible, impermissible evidence as a basis to satisfy her duty. Not duty, but her burden of proof. It still has to be admissible evidence, Your Honor.

THE COURT: So are you challenging the good faith basis for the comment, or what are you challenging there?

MS. DARROW: Well, I'm being denied an opportunity to even challenge the comment because the witness who made the comment -- which is why we have hearsay rules -- because the witness who made the comment is not here for me to cross-examine. That's why we have hearsay rules.

So I'm challenging all of it. I'm challenging the authenticity of it.

THE COURT: Are you challenging that the Plaintiff had a good faith basis for making her discrimination

complaint?

MS. DARROW: This particular plaintiff?

THE COURT: This particular plaintiff. I mean, she has to have a good faith basis for making her complaint. One of the things that she can include in that is information about others. So it goes to her state of mind.

So are you --

MS. DARROW: We absolutely are challenging that, Your Honor.

THE COURT: Okay. All right.

Ms. DeFazio?

MS. DeFAZIO: Well, I agree with Your Honor's analysis of it, and I do think that this goes to the good faith element of her complaint, which is obviously a piece of the retaliation element. I --

THE COURT: I'm sorry. What was the *Lingenfelter* citation again, Ms. Darrow?

MS. DARROW: Let me get the full cite for you.

2021 -- it's a Westlaw cite -- 722974 at page 6, and it's District of Colorado. It's dated February 24, 2021.

THE COURT: Let's take another short recess and I'll be right back. I want to take another look at *Lingenfelter*.

MS. DARROW: Thank you, Your Honor.

(A recess was taken from 4:35 p.m. to 4:43 p.m.)

THE COURT: All right. Thanks, everybody. I wanted

to make sure that I had an opportunity to review the *Lingenfelter* case.

After doing that, that does not change my ruling. I do find that this is not being used -- well, it's being used not for the truth of the matter asserted, and it's thus not hearsay. I will give a limiting instruction to the jury before the answer is given here momentarily. And I'll stand by my prior record with regard to that.

With that, let's go ahead and bring them back in, Don, for all of 10 or 12 minutes.

(The jury entered the courtroom at 4:43 p.m.)

THE COURT: Thanks. Please be seated.

Thank you, ladies and gentlemen. Sorry to have to take that break.

The objection is overruled. You are about to hear testimony that is being admitted for a non-hearsay purpose. That means it does not go to the truth of the information that you are receiving but, instead, only for its effect on the listener. In this case, the listener would have been Ms. Mohamed.

With that, Ms. DeFazio, you can reask the question, or I can have it read back, if you need.

If you could read it back, that would be wonderful.

(Previous question read.)

A. Ms. Ebony Thompson reached out to me, and she asked me if

I noticed Ms. Barley's different treatment of people of color on the team comparing to White peers. And at that point, I had been noticing how Ms. Barley at least treating me as a person of color comparing to the White peers on the team. And she said she's been experiencing the same kind of treatment. She said that Ms. Barley has been treating her with less credibility and with inferior kind of tone when she's talking to her.

And when Ms. -- I confirmed with Ms. Ebony when she shared that with me, I told her, "I also feel similarly about Ms. Barley's treatment."

BY MS. DeFAZIO:

Q. Ms. Mohamed, did you receive a performance review as a Senior Instructional Designer at SHRM?

A. Yes.

Q. I will have you look at Exhibit 11.

MS. DeFAZIO: Your Honor, this has been stipulated. We move to admit it.

THE COURT: 11 is admitted.

(Plaintiff's Exhibit 11 received.)

BY MS. DeFAZIO:

Q. Ms. Mohamed, what is Exhibit 11?

A. That is my performance review for the period of January 2020 to April 30th, 2020.

Q. Do you recall when you received this performance review?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

| | |
|---|---|
| REHAB MOHAMED,<br><br>Plaintiff,<br><br>vs.<br><br>SOCIETY FOR HUMAN RESOURCE MANAGEMENT,<br><br>Defendant. | Case No. 22-CV-1625<br><br>Denver, Colorado<br><br>December 2, 2025<br>7:52 a.m.<br><br>Vol. II |

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218

And she said, "Because I need to be there to help you sound more assertive."

This comment kind of clarified for me that Ms. Barley was not judging me based on the work that I present, but it's a judgment based on the character, an assumption that I am a less assertive person. And I was very concerned that Ms. Barley was letting preconceived ideas about who I am that has nothing to do with the work that I presented and my history of performance get in the way of her managing me.

Q. What did you do after that interaction?

A. This interaction was on June 2nd. On June 4th, it was the aftermath of the murder of Mr. George Floyd. Lots of corporates were putting out statements re-announcing their commitment to anti-racism, and SHRM did the same thing.

On June 4th, I received messages from -- or emails -- not just me personally, but through the entire workforce of SHRM -- from the CEO saying that he is committed to root out racial inequity from workplaces starting at SHRM. And he invited employees to participate in this commitment and make sure that the workplace in SHRM is compliant in that way.

I also received a message from Mr. Nick Schacht, who was, I believe, the vice president of the Education Department at that time, saying his commitment to create a safe space at SHRM to share feelings and different perspectives about racism in the workplace and his promise that this is a safe place

without any judgment, inviting people to come to him directly or to their management to talk about any concerns with regards to that topic.

Finally, Ms. Jeanne Morris, who was the director of the Education Department at that time, called me, and she said, "I'm just checking on you," given what's going on in the nation at that time with regards to racial topics. And she wanted to check on me and make sure that I was okay. She was calling every person of color on that team to do the same, and I was just one of them.

I thought that was a good opportunity to bring up the issues that I've been experiencing with Ms. Barley. My intentions were to get advice on how I can handle the situation with Ms. Barley.

Q. Did you share with Ms. Morris anything about your race?

A. When I spoke to Ms. Morris, I told her, "Actually, things are not going well with Ms. Barley. I have been noticing her not treating me with credibility and the respect she affords to the White peers on the Instructional Design Team." I told her that this is becoming stressful to navigate, and it's getting in the way of me actually completing my tasks successfully because of her heavy involvement and my -- that I have to prove my worth at every single task when it comes to my -- my projects. For example, if I say, "Can I lead this meeting with the vendor," I have to prove that I'm worthy of

A. Yes. It was virtually. I was remote at that time.
Q. And what happened or who was present at that meeting?
A. Ms. Jeanne Morris and Ms. Carolyn Barley and myself.
Q. And what happened during that meeting?
A. Ms. Morrison started by letting Ms. Barley know that "Ruby has concerns about the way you are treating her," and she told me to tell Ms. Barley exactly what I told her the previous day.
Q. And what did you share?
A. I shared exactly what I shared with Ms. Morris the previous day. I told Ms. Carolyn Barley that she is not treating me the same way that she's treating White peers on the team, that her heavy involvement in my day-to-day activities as a Senior Instructional Designer is uncalled for and is creating a stressful environment for me that I have to navigate and that it's getting in the way of actually completing my tasks successfully.
Q. And how did Ms. Barley respond?
A. Ms. Barley was very upset. She thought she was blind-sided. She cried during that meeting. Her initial reaction was either countering my story with, "Oh, that really didn't happen," or, "If it happened, you must have misunderstood what took place," or saying, "I don't remember anything of what you're saying."
Q. What was your demeanor during this meeting?

description was of that.

You may proceed.

BY MS. DeFAZIO:

Q. Did you mention anything about your White peers during this meeting?

A. Yes.

Q. And what did you say in that regard?

A. I told Ms. Barley that I believe that her treatment of me is different than the treatment of Ms. Ann Godmere and Ms. Carrie Mills, my two White peers at that time on that team. I told her that I -- I gave her specific examples of how this -- their treatment is different. And I also told her that I see her extending compassion and kindness and understanding to the White peers that I really hope that she can extend to me as well.

Q. And what specific examples did you share with her?

A. One specific example that I remember was there was a time that I had a presentation for the design document for one of the projects I was working on. I received feedback after that presentation. It wasn't really much, so I thought maybe a day or two it will take time to implement that feedback. But I had a dentist appointment that day. It was just a regular cleaning up kind of appointment that ended up being more where I had to be injected and -- in my jaw and so forth, so I had a medical emergency that -- and I asked Ms. Barley if I can give

the revised version of the design document a day or two later because of that medical emergency.

Ms. Barley's response was very dry and basically asked me, "Can you have it today," which I worked until 1:00 a.m. to give her the feedback on that day because she asked me to.

However, Ms. Mills, who was the White leader on the team, during an ID weekly meeting, mentioned how she won't be able to deliver some content that she promised because she had a medical emergency. Ms. Barley was very forgiving. She told her to not worry about it and take her time and just to prioritize taking care of herself.

Q. Did Ms. Barley say why she had been more forgiving with Ms. Mills?

A. Yes.

Q. And what reason did she give?

A. She said that Ms. Mills came from a very stressful work environment before SHRM, and it's actually a good sign that she's missing deadlines because it shows that the SHRM environment is a less stressful one for her.

Q. I'm going to turn to Exhibit 16.

MS. DeFAZIO: And, Your Honor, this is stipulated, so we move to have it admitted.

THE COURT: All right. Stipulated Exhibit 16 is admitted.

(Plaintiff's Exhibit 16 received.)
BY MS. DeFAZIO:
Q. Ms. Mohamed, what is Exhibit 16?
A. That is an email that I sent to Ms. Barley after our conversation on June 12th.
Q. And let me draw your attention to a few lines down.
"You mentioned that I" -- "You mentioned concerns I had when a similar pattern of behaviors began to surface under your management."
And then a line above that: "There was previous management and negative impact it had on me."
Can you explain what you were referring to?
A. Yes. So under previous management -- there was a manager at that time previous to Ms. Barley who stayed at SHRM for maybe three months; and when she was leaving, there was meetings that were taking place to transition her work before leaving SHRM. And those meetings were taking place without my involvement. And I brought that up to Ms. Jackson at that time that I would like to be involved in the transition meetings that are taking place.
Q. And who -- I'm sorry. Who was Ms. Jackson?
A. That was my manager at that time.
Q. And -- go ahead. Sorry.
A. And this has just been -- I wanted to give Ms. Barley an example of what is it like for a person of color who has to

Q. Did you hear from Mr. Jackson again?
A. No.
Q. After your meeting with Ms. Barley and Mr. Jackson, did your concerns about Ms. Barley come up again at work?
A. Yes.
Q. And when was that?
A. I believe July 20th.
Q. And what occurred on that day?
A. On that day, Mr. Jackson and Ms. Morris gathered ID Team members Ms. Ann Godmere, Carrie Mills, myself, and Ms. Ebony Thompson to talk about concerns with our managers.
Q. And how did that meeting begin?
A. This meeting -- the meeting began with Ms. Morris asking each one of us what is -- what is our experience with our manager, Ms. Barley.
Q. And what was the response?
A. Ms. Ann Godmere mentioned -- she contributed that she has a great experience with Ms. Barley as a manager. Ms. Carrie Mills also shared that her experience with Carolyn Barley was pleasant.
Then Ms. Ebony Thompson shared that she's feeling that she's being treated different and shared that she feels that Ms. Barley is treating her in a discriminatory way.
And then I stayed quiet and . . .
Q. Did you eventually share?

A. Yes.
Q. And why is that?
A. Because Mr. Jackson and Ms. Morris kept saying, "You have to talk. You have to tell us what's going on. We know that you've told us this before, but you need to reiterate and share with us what's going on with your manager."
Q. And how did you respond when they said those things?
A. I said, "Every single person in this meeting have heard me talk about my concerns with Ms. Barley. There's nothing else I can share. You've asked me to share this with individual contributors, and I did. Ms. Barley asked me to share this with HR, and I did. And here you are again asking me to share my experience or asking me if I have any concerns with my manager as if -- as if this is new," like -- I was so confused of them pretending that they don't know, have no idea about my concerns with my manager and asking me, "Oh, what's wrong with you and your manager?" You know what's wrong with me and my manager.
Q. Were you upset?
A. I was very upset.
Q. And how did that -- how could you tell that you were upset?
A. Honestly, when I unmuted myself to respond to the insistence of me to speak up, I just start crying. I was sobbing. I couldn't even get my words out straight. I was

literally on my knees, physically on my knees sobbing. I think for 2 seconds, I wasn't even -- I lost sense of where I was and what was taking place at this meeting.

I felt humiliated and not believed and that, honestly, this meeting was just taking place for compliance and protective measures on the hands of SHRM, and it wasn't there to actually look into my complaints and move towards meaningful change.

Q. Have you ever had that sensation of being kind of out of control, crying before?

A. Yes.

Q. When has that happened in your life?

A. I had similar feelings when I received news that my dad has passed in Egypt. And at that time, I was, like, in -- on a metro station in D.C., and my brother called me, and I think I was crying so loud, but I didn't know. And all of a sudden, I just see so many people around me asking me if I was okay. And -- but there was, like, a couple of seconds that I just wasn't aware of what was going on or lost sense of where I am. And I came back to that finding many people around me.

And it was a similar sensation that I felt during that meeting.

Q. Ms. Mohamed, was there a meeting the next day that you recall?

A. Yes.

A. I told Mr. Nick Schacht that although I'm very passionate about these topics, however, I cannot -- I cannot take part of that program given that I will have to talk about racial issues with Ms. Barley again.

BY MS. DeFAZIO:

Q. And how did Mr. Schacht respond?

A. Mr. Schacht mentioned to me that my experience as a person of color at SHRM is exactly what needs to be captured in that course and that I need to share it in order for -- as a good case study, basically, in that course.

Q. Ms. Mohamed, did you speak to anyone else on July 21st?

A. Yes.

Q. Who?

A. Mr. Johnny C. Taylor.

MS. DeFAZIO: Let's look at Exhibit 103.

And, Your Honor, this is stipulated. We move to admit it.

THE COURT: 1 -- 103?

MS. DeFAZIO: Correct, yes.

THE COURT: 103 is admitted.

(Plaintiff's Exhibit 103 received.)

BY MS. DeFAZIO:

Q. And what is Exhibit 103, Ms. Mohamed?

A. This is an email that I sent to Mr. Taylor on July 21st.

Q. And did you end up having a discussion with him?

A. Yes.

Q. When?

A. The same day.

Q. And what do you recall about that discussion?

A. So Mr. Taylor has been sending communication out and broadcasting his policy of open door. He actually encouraged people to come straight to him when they're feeling that there's a concern because he wanted to know what's going on on the ground.

And I told him that I am facing issues with my manager, but even furthermore, it appears that senior management and HR has formed an alliance in support of my manager, who is being accused of misbehaving.

Q. And what was your basis for believing that HR and management had formed an alliance, in your words?

A. Because of that meeting with HR where they asked me again to -- if I have any concerns with Ms. Barley, knowing that I have told and shared those concerns several times before. But it's like even when I try not to talk about this and have a meeting about the projects I'm working on, the issue keeps coming up.

I didn't want to talk about this anymore. I just wanted to be left alone. And even when I wanted to talk about my work, it seems that this issue keeps coming up, and it's getting in the way of me just -- of my well-being as an

individual and even to work on the project and complete it successfully.
Q. How did Mr. Taylor respond?
A. Mr. Taylor responded with, "I know we have a managerial problem at SHRM. I know that there's a diversity problem at SHRM. And we are -- we have been launching several initiatives internally to tackle those issues."
Q. And what were -- what's your understanding of what those initiatives were?
A. After the murder of Mr. George Floyd, SHRM launched an initiative called Together Forward, and it was a call of action to root out workplace bias from workplace and eliminate racial inequity in all workplaces in America, starting with SHRM.
Q. How did that call end?
A. Mr. Johnny -- Mr. Taylor asked me if HR is aware of what's going on. I told him, "Yes. Mr. Mike Jackson is involved."
And he said, "I'm going to connect you to Mr. Sean Sullivan," who is the CHRO, the head of HR department at SHRM.
Q. Do you know what "CHRO" stands for?
A. Chief of -- Chief Human Resources Officer, CHRO -- yeah.
Q. Did you end up speaking with Mr. Sullivan?
A. Yes.
Q. When?
A. I believe the next day and the day after.

Q. Okay. And let's talk about that first conversation.
Who was on the phone?
A. From my understanding at that time, I thought it was me and Mr. Sullivan.
Q. And what did you tell Mr. Sullivan?
A. I reiterated my complaints, gave specific examples of how Ms. Barley is treating me differently and how it's impacting my well-being to navigate such a stressful environment and also navigate working on my projects in such stressful environments.
Q. And how did Mr. Sullivan respond?
A. Mr. Sullivan had two feedbacks with regards to this conversation. First, he said that, "Given what you've mentioned, it seems that Ms. Barley needs some training on how to lead a diverse team."
The second part was he believes that a heart-to-heart conversation needs to take place in the team in order to heal collectively and move forward. He said that in order for this heart-to-heart conversation to take place, it needs to be facilitated by someone from outside because SHRM does not have the resources or people who are equipped to navigate this conversation.
Q. Moving on to the second call, who was on the line then?
A. From my understanding, it was myself and Mr. Sean Sullivan.

Q. And what did you share with Mr. Sullivan during that second call?
A. So the second call was just a continuation of the first call. And towards the end of the second call, Mr. Sean Sullivan shared the feedback that I just shared with you guys earlier.
Q. Did you later learn that someone else had been on the phone?
A. Yes.
Q. Who?
A. Mr. Mike Jackson was sitting quietly in the room, didn't announce himself that he was there, but he heard everything that I said with Mr. Sullivan.
Q. What happened after these two calls with Mr. Sullivan?
A. Mr. Sullivan said that he would get back to me.
Q. And what did you decide to do?
A. At this point, going to work every day felt like I was suiting up for battle. I was not aware what's going to take place in any meetings, whether it's regard to the issue that we're talking about or with regard to my projects that I was working on. It seemed that I could not escape being intimidated and harassed by senior management and HR because of the complaint that I brought forward.
I had a very hard time to not be consumed by this issue while I'm at work and after I got off work. Completely

took over. I started questioning my sense of reality. I started to not trust my judgment. And I needed a break. I needed to step away from the situation to avoid any further confrontation with senior management, HR, or Ms. Barley.
Q. So what did you decide to do to step away?
A. I reached out to Ms. Barley and I asked her if it's okay to take off.
Q. Let's look at Exhibit 30.
MS. DeFAZIO: And, Your Honor, Exhibit 30 is stipulated. We move to admit.
THE COURT: It is admitted.
(Plaintiff's Exhibit 30 received.)
BY MS. DeFAZIO:
Q. And what is Exhibit 30, Ms. Mohamed?
A. That's a message on Slack between myself and Ms. Barley.
Q. Is this how you reached out to Ms. Barley to ask for that time off?
A. Yes.
Q. How much vacation were you requesting?
A. Eight days.
Q. And in looking at Exhibit 30, what time did you tell Ms. Barley you were going to put in a request for vacation?
A. At 8:30 a.m.
Q. Looks like 8:25?
A. Right, 8:25.

Q. Okay. Thank you.
A. Thank you.
THE COURT: Counsel, anytime, I would say, in the next ten minutes that you're ready, we'll take a break.
MS. DeFAZIO: Great. Thank you, Your Honor.
BY MS. DeFAZIO:
Q. Before you returned to work from that vacation, Ms. Mohamed, did you learn anything about your team?
A. Yes.
Q. What did you learn?
A. I learned that SHRM fired Ms. Ebony Thompson.
Q. And how did you respond to that?
A. I -- I said I was concerned about my job at SHRM; I was surprised that Ms. Thompson was fired and wondered if I was next.
Q. And why did you wonder if you were next?
A. Because Ms. Thompson raised concerns about Ms. Barley's discriminatory behavior; and after she raised those concerns, she was fired because of performance issues.
MS. DARROW: Move to strike. Hearsay.
THE COURT: Ms. DeFazio.
MS. DeFAZIO: Your Honor, it's effect on the listener. We're talking about Ms. Mohamed's good faith belief that she was going to be terminated and retaliated against.
MS. DARROW: That belief has to assume that the

statement was actually made and that the statement was true.

THE COURT: Objection is overruled.

BY MS. DeFAZIO:

Q. Before you returned to work from your vacation, did you have contact with anybody from SHRM?

A. Yes.

Q. Who?

A. Mr. Sean Sullivan, the head of HR.

Q. And what was that interaction?

A. I reached out to Mr. Sean Sullivan three days before I returned to the office to ask if there are any updates with regards to the investigation into my complaints, just to set my expectations of what I'm about to walk into when I return from my vacation.

Q. Did you expect that he would be doing something while you were out?

A. I expected -- per Mr. Sullivan's -- the conversation I had with him before I took off that he would be investigating the complaints that I brought forward.

Q. And what did Mr. Sullivan tell you?

MS. DARROW: Objection. Hearsay.

MS. DeFAZIO: We're trying to establish a timeline. It's not for the truth of the matter asserted.

MS. DARROW: Not -- the proper thing to do is to lay a foundation with respect to timeline. It's hearsay.

we were in at that point. I did give her that and shared my concerns again about Ms. Barley's discriminatory behavior towards me.

Q. And how did Ms. Long respond?

A. Ms. Long actually -- it was the first time I felt validated, that my feelings were validated. She said, "I understand where you come from. I understand the experience about a person of color in a workplace," that she herself lived through the segregation era in the U.S. and had to navigate -- had to navigate being a Black person in the workplace herself. And she said that maybe Ms. Barley weren't exposed to that kind of diversity before.

And we talked about maybe identifying resources -- I think she suggested a TED Talk on workplace bias -- to share with Ms. Barley in order to bridge this communication.

Q. Did you and Ms. Long meet again?

A. Yes.

Q. When?

A. The next day.

Q. And how -- tell us about that meeting.

A. This meeting started with Ms. Long asking me, "So what are we going to do about the team?"

And I said, "I don't follow. What do you mean?"

She said, "Ms. Barley is crying rivers, and the team is feeling tense because of what's going on."

based on Ms. Mohamed [sic] actually saying that statement.

MS. DeFAZIO: That's the effect on the listener.

THE COURT: The objection is overruled. I think it does go to the effect on the listener and not to the truth of the statement.

(Sidebar concluded.)

THE COURT: The objection is overruled.

BY MS. DeFAZIO:

Q. Ms. Mohamed, what else did Ms. Long say in that second meeting?

A. She said that no one is going to listen to me unless I finish the projects that I was working on.

Q. And what was your reaction to that?

A. I was quite shocked and confused that now the mediation sessions -- the focus of that is no longer about the complaints that I brought forward about Ms. Barley, but it became about my tone and my performance.

Q. Let's look at Exhibit 28.

THE COURT: Just so Counsel knows, at least for now, this monitor is down. Don's working with IT to see if we can remote reset it. So we will at least have to, at least at the witness table, use, as Ms. Mohamed is doing, the book. We'll let you know as soon as we have that fixed.

MS. DeFAZIO: Thank you, Your Honor.

//

Q. Did you receive a response -- let me back up.
MS. DeFAZIO: Can we scroll up a little bit?
BY MS. DeFAZIO:
Q. Who else did you send this to besides Ms. Barley?
A. To Mr. Nick Schacht and Ms. Jeanne Morris.
Q. And did anybody respond to this email?
A. I believe Mr. Nick Schacht --
Q. Okay.
A. -- responded.
Q. Thank you. All right.
And when did he send this?
A. He sent this on August 14th.
Q. And what did Mr. Schacht say in this response?
A. Mr. Schacht said that he's disappointed in the tone that I used in that email, and simply kicking the problem up to your manager is not complete work.
Q. Did he mention anything about the deadlines?
A. He mentioned that the deadline is not a surprise; these are not last-minute deadlines and that I've asked for extensions several times.
Q. Was there anything in Mr. Schacht's response that you found to be inaccurate?
A. Yes.
Q. What?
A. That the -- that I knew about the August 31st deadline and

it wasn't a surprise.
Q. Anything else?
A. The fact I asked for extensions for my courses. I've never once asked for an extension for my courses.
Q. Did you respond to Mr. Schacht in turn?
A. Yes.
Q. How did you respond?
A. I thanked him for providing a teachable lesson.
Q. Why did you send that email?
A. I was so tired at that point. I just felt so defeated. Now not only HR and Ms. Barley and Ms. Morris, but also Mr. Schacht and Ms. Bernée Long, all of a sudden, my performance and my tone became an issue. I've been at SHRM for four-plus years at that point.

And I know what they wanted me to say at that point: "Thank you. Everything is great. My problems are solved. Let's move on," and to just stop speaking up.
Q. How did you feel about sending that message to Mr. Schacht?
A. I felt that I betrayed myself, honestly. I didn't want to thank him for criticizing my tone. There was no tone. I always use a professional tone when speaking to them. I know that -- I knew that I was being set up, that this was a diversion from the real issue, which is the racial discrimination claim -- complaint that I brought forward. And

I just felt that I betrayed myself, not only that they betrayed me, but now I'm also telling myself, Be quiet. Say what they want you to do. Thank them for criticizing your tone that you know is not true, and move on.
Q. What actions did you take after this?
A. I reached out to my therapist.
Q. And how long had it been since you had seen your therapist?
A. Last time I saw my therapist was in March 2020.
Q. And how long in -- before March 2020 had you been seeing her?
A. I think for three to four months.
Q. Okay. And at any time before that, had you had therapy?
A. No.
Q. Okay. And why did you reach out to your therapist at this point in August of 2020?
A. I felt that I was operating out of fear; I'm not representing my true self, that I am tying myself into knots trying to explain in a way that resonates with them my side of the story.
Q. Do you recall anything else happening on August 14th?
A. Yes.
Q. What do you recall?
A. Ms. Barley, during the meeting with the team, the Instructional Design Team, mentioned that we're going to

that first page.
BY MS. DeFAZIO:
Q. Do you see, under Section 3(a), a reference to a date?
A. Yes.
Q. So employee's last day of employment will be September 1st?
A. Correct.
MS. DeFAZIO: I think our monitors went off again.
THE COURT: It did.
(Pause in the proceedings.)
THE COURT: All right. I think it's stable for now.
BY MS. DeFAZIO:
Q. Ms. Mohamed, do you see a date in that Section 3(a)?
A. I do.
Q. And that would be your last day of employment?
A. Yes, September 1st.
MS. DeFAZIO: And we can take this exhibit down. Thank you.
BY MS. DeFAZIO:
Q. Ms. Mohamed, when you learned that SHRM was terminating you, what was your reaction?
A. I felt sick to my stomach listening to Ms. Keren and Ms. Barley in that meeting telling me that I am being terminated.
Q. And when did that meeting take place?

A. I think September 1st.
Q. Okay. Did they say anything else about why you were being terminated?
A. For my inability to reach the deadline for my two projects.
Q. Ms. Mohamed, how did your experience at SHRM impact you in the months that followed?
A. So something definitely broke inside of me after that experience. I can definitely see myself before and after this experience. I became a completely different employee. I became a completely different person in a social setting with regards to even my ambition, which is something that I hold very closely to. This is one of the reasons I migrated to the U.S., actually.
I did not pursue anything that would -- my ambitions were basically killed. I didn't -- I thought if -- moving up in my career, at that point, I was a senior. The next is management. And if that's how management operates in the leading HR organization in the entire world, then I definitely don't want to be a part of that. I wanted to operate in the shadows. And I was definitely cautious about who I bring to the workplace, what details I share about myself and my background.
I was very hesitant to even turn on my video so people won't see that I'm Black and treating me different. I

felt the best way to protect myself is just to withdraw and avoid anything that could possibly put me in a similar situation.

Q. Ms. Mohamed, how long were you out of work?

A. I believe for three months.

Q. How many jobs have you held since you were fired from SHRM?

A. Two jobs.

Q. And how has how you were treated at SHRM in your last few months impacted those jobs?

A. Like I mentioned, I was -- my main goal is to not be seen, work in the background, go in, do your work, and leave. Don't speak up if you see anything wrong, especially if they mention anything about diversity and inclusion. I didn't want to do anything with that.

And I definitely didn't seek any -- to form any personal or professional relationships after that given the betrayal that I felt from the people I trusted at SHRM.

Q. Are you out of tissues?

A. Yes. It's fine.

MS. DeFAZIO: Permission to approach the witness, Your Honor?

THE COURT: Actually, Don's got a box.

MS. DeFAZIO: Thank you.

//

BY MS. DeFAZIO:

Q. Ms. Mohamed, did how you were treated at SHRM impact your personal life as well?

A. Yes.

Q. How so?

A. This withdrawal mindset that I formed to protect myself after my experience with SHRM seeped into my private life as well. I became hyperaware of the color of my skin in social settings. I had some really big questions, like how much of a factor does my race play in my relationship with people inside and outside of work? Are people like Ms. Jeanne Morris -- was I a token for her to make her look good? That she is -- she's a charity case? She's lifting this Black woman up to the team? Was I a token for the Instructional Design Team to make it look diverse, or was I really valued based on what I bring to the table, which I held very dearly to myself?

It also became very, very hard to trust and open up. At SHRM, senior leadership reiterated over and over again their commitment of creating a safe space where we can share our feelings and different perspectives without any judgment. I believed that. I truly did.

And after -- after my experience with SHRM, there's no way I can believe that. I just saw that this is the way that corporate operates: Talk big about diversity and inclusion so they can look the part, but when it comes to

actual meaningful, concrete actions on the ground that can make my life easier as a person of color in a workplace, not only that this was disregarded but was attacked.

And my reputation as a professional was diminished. I was portrayed as this complainer, as this person who deflects and brings excuses instead of actually listening to what I was going through and believing my experience.

And this seeped even further into how I look at myself. I thought, how naive of me, how silly that I actually believe this. And I stopped trusting my instinct after that. Because when I trusted my instinct, I was put in a situation that was very harsh. And so I said, Don't trust your instinct. Put it on a low level. Be in the background. Don't cause any issues, and be as pleasant as possible so people can accept you.

At some point, this really created a disconnect between who I am and my true self and how I operate in order to avoid any similar situations.

Q. Ms. Mohamed, did you seek counseling after you were fired?

A. No.

Q. Why not?

A. I can't imagine talking about this again and again, even to a therapist. Talking about what happened, that means reliving the situation and reliving the emotions. And I was not in a place that I can feel any of those feelings anymore.

Q. How are you doing now, Ms. Mohamed?
A. I know I will come back, but I am better. Actually, around this time last year, that's when I started being in touch with myself again. It was like a moment of realizing how I let years go by while I'm being withdrawn from social settings, from forming social relationship with friends, and even advancing in my career.
And I decided to slowly find myself and find ways that I can be myself while protecting my joy and putting boundaries. And I've been on that journey since then.
Q. Looking back, Ms. Mohamed, do you wish that you hadn't said anything to Ms. Morris on June 3rd?
A. Yes.
Q. Why is that?
A. I wouldn't wish on anyone to go through what I went through. Maybe I should have left or stayed complicit and just accepted how Ms. Barley treated differently -- treated me differently than the White peers and not spoke up about it. At the end, I was the one who was portrayed as the complainer, the bullier, that my reputation was tarnished as a person who doesn't deliver deadline and deflect and ultimately terminated just because I spoke up and responded to the call of action that SHRM was -- since has initiated on eliminating racial inequity in the workplace.
MS. DeFAZIO: Thank you, Ms. Mohamed.

everybody could be back at 12:40, that would be fantastic. Thank you.

(A recess was taken from 11:36 a.m. to 12:44 p.m.)

THE COURT: Are we ready for the jury?

MS. DeFAZIO: Your Honor, I just wanted to clarify, for purposes of timekeeping, that Defendant had listed Ms. Mohamed as a will call. It was my understanding this was also going to be their direct piece.

THE COURT: Yeah. So, Ms. Darrow, where are we on that?

MS. DARROW: I'm sorry. I missed all of that.

THE COURT: Essentially, is some portion of this questioning with Ms. Mohamed direct, "will call" of her? Is it all cross? You know, how does that shake out just looking at your --

MS. DARROW: I'll split it.

THE COURT: I had -- I had that there was four hours of -- please be seated if you want -- four hours of direct by each party, four hours, and three hours of cross. It seems -- you know, maybe I'm getting it wrong, but it seems unlikely that we're going to have 15 hours of time with Ms. Mohamed over the course of the trial.

With the idea of splitting this time, at least preliminarily, Ms. DeFazio?

MS. DeFAZIO: Yeah. It was our understanding that

you had had with Ms. Mohamed and Ms. Morris, correct?
A. Yes.
Q. And you also informed Mr. Jackson that Ms. Mohamed had made a race discrimination complaint to you earlier that day, right?
A. Yes. In the follow-up meeting, yes. That same day, yeah.
Q. Do you recall asking Mr. Jackson if Ms. Mohamed's race discrimination complaint was something you should be concerned about?
A. I don't recall.
Q. I'd like to refresh your recollection.
Can you please turn to page 100 of your deposition?
A. Okay. I'm there.
Q. And, actually, I'd like you to silently read starting on the bottom of page 99, line 23, through 100, line 7.
A. Through 7? Okay. Yes.
Q. Does that refresh your recollection that you asked Mike Jackson if Ms. Mohamed's race discrimination complaint was something you should be concerned about?
A. Yes. Yes.
Q. And you wanted to check with him what you should do, correct?
A. Yes.
Q. And Mr. Jackson responded by advising you to keep documentation of your interactions with Ms. Mohamed going

forward, correct?
A. Yes.
Q. And he asked you to loop him in if things took a different turn, right?
A. I don't remember all the tones of the conversation off the top of my head.
Q. Well, I can refresh your recollection a little bit more.
MR. SWAIN: Just one moment, Your Honor.
THE COURT: Sure.
MR. SWAIN: You know, I'll retract that question and move on.
BY MR. SWAIN:
Q. You agree that, generally, when an employee makes a complaint of race discrimination, it's important that it be investigated, correct?
A. Yes.
Q. But you're not sure if you believed that Ms. Mohamed's complaint of race discrimination should be investigated after your June 12th meeting with Mr. Jackson, correct?
A. I'm sorry. Can you repeat that question?
Q. Sure.
A. Make sure I understand what you're asking.
Q. But you're not sure if you believed that Ms. Mohamed's complaint of race discrimination should be investigated after the June 12th meeting, correct?

THE COURT: Based off of that, having read that, the earlier order to strike is reversed. It is in line with prior statements and was in line with essentially the question and the spirit of the question that was asked, and it would not be the correct answer to strike that earlier testimony. So that testimony is unstricken.

MR. SWAIN: Then I will -- there's not a question pending, is there?

THE COURT: No. The last instruction to the witness was to read lines 13 to 17.

MR. SWAIN: Thank you, Your Honor. I'll move on.

BY MR. SWAIN:

Q. Now, you're aware that Mike Jackson began investigating Ms. Mohamed's discrimination complaint at some point after the June 12th, 2020, meeting, correct?

A. I'm assuming it happened.

Q. Ms. Barley, I'd like you to turn back to Exhibit 15, if you don't still have it open.

A. I have it open. I just have to switch binders.

Okay.

Q. Are these notes, Exhibit 15, the notes that you began preparing after Mr. Jackson advised you to start documenting your interactions with Ms. Mohamed?

A. Yes.

MR. SWAIN: Your Honor, I'd like to renew my motion

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

REHAB MOHAMED,

Plaintiff,

vs.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

Case No. 22-CV-1625

Denver, Colorado

December 4, 2025
7:54 a.m.

Vol. IV

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218



EXHIBIT 3

A. Correct.
Q. Okay. Now you testified about serving as a mediator to Ms. Barley and Ms. Mohamed, right?
A. Yes. I wanted to mediate the -- and facilitate the discussion in a mediation-type process, yes.
Q. Sure. And you had never been pulled in before to help mediate an issue between a supervisor and an employee at SHRM before, have you?
A. Not to my knowledge. I can't remember an occasion where that was necessary.
Q. And I believe you testified to this, but, again, to ask, it was not your role to evaluate whether Ms. Mohamed's discrimination claim had any merit, right?
A. Oh, no. That was not my -- my role.
Q. You were just there to see if you could bridge the relationship between the two of them, right?
A. Yes, their working relationship.
Q. And you testified about meeting one-on-one with Ms. Mohamed, right?
A. Yes.
Q. And when you met with Ms. Mohamed, you believed that she was hurting, right?
A. I did.
Q. And you had no doubt that she was in pain?
A. No, no doubt.

Ms. Woodfork will be speaking.

THE COURT: Okay. Whoever wants to address or all of the above. I certainly don't require for jury instruction conferences that it be just one person addressing it, as you all may have some specialties between you.

No. 2, the evidence, which is on page 3.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: No objection from the Defendant.

THE COURT: The instruction equality under the law, page 4.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: The instruction direct and circumstantial evidence that is on page 5.

MS. DeFAZIO: No objection.

MS. DARROW: Can we go back to the instruction equality under the law?

THE COURT: Absolutely. Actually, while we're on direct and circumstantial evidence, because I suspect you all have no objection because it's the stock instruction, anybody have a problem with the direct and circumstantial on page 5?

MS. DARROW: No, Your Honor.

MS. DeFAZIO: No.

THE COURT: Going back to equality under the law.

MS. WOODFORK: Your Honor, we would like to renew the

argument that we made in our briefing that we believe the instruction about not being held to a higher standard should be included under equality under the law.

(Reporter interruption.)

MS. WOODFORK: Just given some of the evidence that has come in and the questioning that we've heard to the witnesses about SHRM's expertise and their -- what they do as a business, instructing the jury that they should be treated like any other employer we believe would be appropriate here.

THE COURT: All right. How is that not encapsulated in -- I thought there was an encapsulation of it somewhere else. Maybe not.

So what additional language do you think it should have?

MS. WOODFORK: Just what we proposed initially: "Further, Defendant SHRM is not held to a higher standard under the law because it offers educational training and resources for human resources professionals."

THE COURT: Ms. DeFazio?

MS. DeFAZIO: I think the instruction as it stands includes that sentiment, just more generally. I don't believe there's any need to add the Defendant's name specifically to this.

MS. WOODFORK: I would also just add, Your Honor, that there's been a lot of press and media about this,

misconstruing our request for a motion in limine and just misstating the law and what we've done to advocate for our client.

So understanding that there are already eyes on this and while we may instruct the jury not to consider what's out there and what's published, I think instructing them on this issue would just further instill what we're asking them to do and what the sentiment of this rule is, the purpose.

THE COURT: Well, I'll tell you, just so we're clear for the record, I reject that last reasoning and that is because, frankly, it matters not to this Court, nor should it, what the media has done or said except as to how it might affect our jurors. And our jurors have all indicated that they haven't seen anything and have all been told not to view anything. Beyond that, this Court should not consider that issue.

I do think one additional sentence is probably warranted, and I'm trying to craft how I'm going to say that. So give me just a moment, please.

MR. SWAIN: Your Honor, may I add an argument before you make your order?

THE COURT: Of course.

MR. SWAIN: So this instruction is about equality under the law, meaning individuals and business entities are not subjected to different legal standards in terms of

liability.

But it would be proper for the jury to consider SHRM's standing and its professed human resources expertise if the jury finds for liability and finds that a punitive damages award is appropriate.

It would be completely appropriate for the jury to have discussions about, Look who SHRM is. They should have known better. Right? And so in my mind, inserting SHRM's name into this, which is a stock instruction given in practically every case, tilts the balance towards SHRM by making the instruction about them specifically rather than about human beings and corporations generally.

THE COURT: Ms. Woodfork?

MS. WOODFORK: I would say that that's the very reason we need the instruction here is that we're arguing throughout this case that SHRM should be held to a higher standard, that they should be -- or having lines of questioning to that to witnesses. And that's on Plaintiff to prove that in her case, not to shift that burden to SHRM to show that we should not or -- we should not be held to this higher standard or that we are on the defense here.

It's her burden to prove her case. Her burden to prove her elements. And if the jury finds that punitive damages are appropriate, helping them understand that under the law, SHRM should not be held to a different standard just

because of its business in terms of helping other employers with compliance.

THE COURT: What do you legally think about the idea that punitive damages could conceivably be higher, if warranted, given the nature of SHRM's business?

MS. WOODFORK: Well, that's on Plaintiff to prove that.

THE COURT: Sure. If they did?

MS. WOODFORK: Then that's up to the jury to decide what that looks like through the evidence that has been presented by Ms. Mohamed and what she's established.

THE COURT: So I think the way to thread that needle that I'm contemplating is an additional sentence at the end of the first paragraph. I think it is inappropriate to mention, nor does anywhere else in this instruction mention, SHRM by name. And I'm not going to do that. But I do think it's appropriate to have a sentence along the lines of, "The nature of a corporation's business does not alter the preponderance of the evidence standard that I will discuss later."

MR. SWAIN: No objection to that insertion by Plaintiff.

MS. WOODFORK: No objection.

THE COURT: All right. That will be inserted on page 4 at the end of paragraph 1. I think that that threads the needle between addressing an argument that has been

raised, at least in some ways, but also does not foreclose the punitive damage issue that is being addressed.

Don, don't let me forget that text you sent me. We'll talk about it. We can discuss that in a little bit.

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: Okay. There was no objection to the direct and circumstantial evidence one on page 5.

On page 6 is the standard stock inferences instruction.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: All right. No party objects.

On page 7 is the standard burden of proof instruction.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: On page 8 is the stipulated facts instruction, which has also already been read.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: On page 9 is the use of depositions instruction, which, again, has already been read.

MS. DeFAZIO: No objection.

MS. WOODFORK: No objection.

THE COURT: On page 10 is -- and 11 is the stock

there are two paragraphs that reference economic damages that should also come out: the one that begins with "You may award as actual economic damages" and then the one that starts with "You must reduce any award."

THE COURT: So basically paragraph 3 and 4 would come out.

MS. DeFAZIO: Yes. Yes, Your Honor.

THE COURT: All right. Any problem with the rest of it?

MS. DeFAZIO: Not from Plaintiff, no.

THE COURT: All right.

MS. WOODFORK: Not from Defendant. No objection.

THE COURT: So paragraphs 3 and 4 are being removed. Otherwise, it is as it is.

27, multiple recovery.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: No objection.

THE COURT: 28, failure to mitigate.

MS. DeFAZIO: That should come out given that Ms. Mohamed is not seeking economic damages.

THE COURT: I'm guessing the Defense has no objection to that.

MS. WOODFORK: No objection. Sorry.

THE COURT: Failure to mitigate is coming out.

29, punitive.

MS. DeFAZIO: We just caught a typo on the fourth line, "engaged" and "in." Just need a space between --

THE COURT: Okay. Thank you.

MS. DeFAZIO: Other than that, no objection.

THE COURT: All right. From the Defense?

MS. WOODFORK: We would just renew our objection that we made in our briefing about introducing this before liability has been established.

THE COURT: I appreciate that. I previously rejected that, I think, in this case. If not, I think that the instruction on page 30 is the proper ameliorative instruction there.

MR. SWAIN: Your Honor -- oh, I'm sorry.

THE COURT: Go ahead.

MR. SWAIN: Just for the record, there have been multiple references to punitive damages throughout the trial, probably every day, although I don't know, and Defendant has not objected to our reference to the availability of punitive damages during the trial.

So that objection should be deemed waived to instructing the jury at this time.

THE COURT: Well, that's an issue for another day. Whether an objection has been waived is not a decision for this Court; it's for the Circuit. So I'm not going to tell them how to do their job.

In terms of -- though I'm not bifurcating damages, I am giving an instruction -- obviously, I haven't heard yet if the parties have a problem with the instruction on 30 yet or not, but I am going to give a punitive damages instruction in the case-in-chief. But I will make, of course, the typo change.

Any other change from the Defense?

MS. WOODFORK: No objection.

THE COURT: As to effect of instructions on what is now page 30?

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: No objection.

THE COURT: Jury procedures, which are pages 31, 32, and 33, which, you know, I don't know they get split into two, but they are.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: We would just -- for the purposes of preserving the record, appeal purposes, just renewing our request for the same actor instruction.

THE COURT: Let me come to that one in a moment because -- yeah, I am absolutely going to ask if anybody has other instructions and the like. You're not waiving that by waiting until the end.

But in terms of the jury procedures on 31 and 32, 33, any problem with those?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

REHAB MOHAMED,

Plaintiff,

vs.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

Case No. 22-CV-1625

Denver, Colorado

December 5, 2025
7:46 a.m.

Vol. V

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218



EXHIBIT 4

start if I was on the jury.

Punitive damages: I can't tell -- if you decide to award punitive damages, I can't tell you what to put there. You're the conscience of the community. And when you're filling this out, you have to decide what kind of message you want to send to every employer in the United States and around the world.

Let me share some final thoughts about punitive damages on that in the same vein. In this system of justice, you are more than fact-finders; you are the conscience of the community. You, people from all over our community, from all walks of life, have the power to say what conduct we will tolerate in our workplace and what conduct we will never tolerate. Not the lawyers, not SHRM; you, the jury.

Now, the Defendant in this case is not just any employer. It's the Society for Human Resource Management, an organization that holds itself out as the ultimate authority on human resources matters, the gold standard for HR. This is the organization that every other employer looks to for guidance on what the law requires and what best practices demand. "Better workplaces, better world"; you remember seeing SHRM's logo?

If SHRM can silence complaints of race discrimination, retaliate against employees who raise those concerns, circle the wagons to protect the harasser, and then

face no meaningfulness consequence, what message does that send to every other employer in the country? What message does that send? This is where your role becomes essential.

Punitive damages are not automatic. Not at all. Punitive damages are reserved for situations like this one where the evidence shows that an employer acted with malice or reckless indifference to the rights of its employees.

And when that happens, the law gives you -- you, the jury -- the power to send a message strong enough that it will be heard far beyond the walls of this courtroom. The punitive damages award we're asking for here is not about sympathy. It's not about emotion. It's about deterrence. It's about accountability. You'll hear that word a lot in a few minutes, too, accountability.

It's about making sure that what happened to Ms. Mohamed does not happen to the next employee who has the courage to speak up the way she did. Punitive damages are about making employers, all employers, take civil rights obligations seriously, not just in their employee handbook and their code of conduct like the one you looked at yesterday, but in their decisions, in their actions, in the moments when doing the right thing is inconvenient.

Your verdict can tell every HR person in the United States of America what the standards really are. You heard evidence that SHRM has hundreds of thousands of members.

Those members rely on SHRM to tell them how to treat people just like Ruby Mohamed. Your verdict tells them that retaliation for reporting discrimination is not an acceptable business decision. It tells them that no employer is above the law, especially the one that claims to teach others how to follow it.

And when you exercise that responsibility, when you hold SHRM accountable, you'll do more than deliver justice to Ms. Mohamed. You'll be protecting every employee who goes to work on Monday morning just wanting to be held to the same standards as their peers. You'll ensure that the rules we all believe in, the rules that SHRM itself claims to champion, still mean something.

That is the power the law gives you. That is the responsibility you were asked to accept when you took your oath as jurors. That's why your verdict matters, not just for Ms. Mohamed, but for the integrity of workplaces across the United States and around the world.

If you choose to award punitive damages, make it an award that SHRM will actually notice. Make it something that will prevent SHRM from ever doing this to someone else. Last year, 2024 alone, SHRM earned 264 million in revenue. You heard it from Nick Schacht. If you choose to award punitive damages, make it something SHRM will notice.

Remember I told you earlier I was going to ask you to

"You should be mindful that" -- let me -- "You should be mindful that the law applicable to this case requires only that an employer not discriminate against an employee because of the employee's race and not retaliate against them because they engaged in protected activity.

"SHRM may terminate an employee, including Ms. Mohamed, for any other reason -- good, bad, fair or unfair -- and you must not second-guess that decision or permit any sympathy for the employee to lead you to substitute your own judgment for that of SHRM even though you personally may not approve of the action taken and would have acted differently under the circumstances."

That's important. I believe SHRM did do the right thing. I think they were fair. That's what the evidence showed. This was a good decision. It was a fair decision. But even if you believe that it's not, we can't second-guess that.

I'm going to show you the verdict form.

Number 1: "Did Ms. Mohamed prove by a preponderance of the evidence that but for her race Defendant SHRM would not have terminated her in violation of Section 1981?"

I think the evidence clearly shows the answer is no.

This wasn't about race. It was about wanting someone to do their job.

"Did Ms. Mohamed prove by a preponderance of the

evidence that but for her complaints about race discrimination and/or retaliation Defendant SHRM would not have terminated her in violation of Section 1981?"

Again, the evidence is clear: No.

Counsel showed you the stuff about pretext. This is what's important. The evidence supports -- no, no. We don't even have to get any further than that. We don't have to talk about punitive damages. Remember, she even testified she doesn't have evidence of punitive damages. We don't even have to talk about that, because, ladies and gentlemen, there's no liability here. It's not a case of punitive damages, right?

We talked a lot during jury selection about following the law. And now it's all I'm asking you to do. Not based on sympathy or emotions, SHRM is just asking you to follow the law. Go back to the jury room. Read those jury instructions. Read the law. Look at those elements, those ingredients to that cake, because the evidence that has been presented proves to you that Ms. Mohamed has not met her burden. She has not baked that cake. And because she has not met her burden, one that she shares alone, the law requires one result. You must complete the verdict form in SHRM's favor and find that Ms. Mohamed is not entitled to damages.

Thank you again so much for your time.

THE COURT: Thank you, Ms. Darrow.

Would the Plaintiff like to use their rebuttal time?

June 3, 2020

I was contacted via text from Jeanne Morris that Ruby shared concerns about my communication and management style. She would set up a time for the 3 of us to talk the following day.

I reached out to Ruby and asked what was wrong. She said she just had some things to share but would wait until the meeting.

June 4, 2020 – Ruby, Jeanne and Carolyn meeting

The meeting began with some small talk. Jeanne asked how we felt about Johnny's message at the SHRM Town Hall a few hours earlier. (background context – this was the week following George Floyd's murder and Johnny addressed some of SHRM's statement and position). I said I appreciated Johnny's message as usual – I like his leadership style. I didn't say much because I had no idea what this meeting was about.

Jeanne gave a brief intro to why we are here. Ruby shared some concerns and Jeanne felt it was important for her to share them with me. This meeting was not for me to respond but for Ruby to be able to share her insights. I said ok – happy to listen.

Ruby started by asking me what my management style was. I responded well I didn't prepare anything because I wasn't sure what this meeting was about. Am I supposed to be listening or should I respond? Jeanne said I could respond. Ruby's tone was accusatory, loud and confrontational. I was very upset – not only because of the lead in and build up without any knowledge what was going on – I also received a phone call about 1 hour before the call that I had a death in the family. Granted, I did not disclose that information because I hadn't slept worrying about what this meeting was about. Why did Ruby go to my supervisor? What on earth did I do to make her feel like she had to do that? I thought Ruby and I had a good dialogue, working relationship, etc.

The conversation continued in the pattern of Ruby making an accusation with an example and trying to force me to defend/agree/acknowledge. Every accusation, I tried to stay calm. I continually acknowledged her feeling, appreciated her for sharing, apologized for her feeling that way and any part I had in it. We didn't seem to get anywhere. Jeanne tried to keep the conversation focused on resolutions.

The summary of things I heard were:

- Micro-managing by asking to join meetings and being copied on emails
- Taking credit for her work
- Unfair deadlines among team
- Lack of support when she moved/unfairness on how I treated her vs a team member

In my response, I have very different views of each of these activities.

- I can only be fair if I know what is going on. For example, we were in communication of the specific days that the IWC Assessment was going to be available. I have given more than a month's notice with continued updates reminding Ruby of the time it would come. I asked if that timing was ok and if Ruby would block time on her calendar. We had a tight turn around so that we could get the assessment out given the SC was already out. The whole time Ruby confirmed no problem, this wasn't a challenge, etc. The assessment would be coming on the Wednesday/Thursday and we needed it as soon as possible. Monday of that week, Ruby submitted a leave request for Friday without any explanation, conversation, etc. I asked her about it before approving and asked if she was still ok to do the assessment and if Friday was essential. She just said yes she needed the day but she would make sure to complete the assessment. There was no mention of moving until just a couple weeks ago. Had I known it was for moving, we could have worked something out when I told her the timeline up front.

EXHIBIT
15
1:22-cv-01625-GPG-KAS

Jeanne messaged after the meeting to do some thinking and reflecting and we would revisit next week.

The following week in my one on one with Jeanne, I asked if Jeanne should be part of follow up conversations with Ruby. Jeanne said she didn't need to be and that actions were more important. I felt a convo was important, too. I am committed to making this better.

I scheduled time with Ruby and met on Friday, June 12.

June 12, 2020 – Carolyn and Ruby meeting.

- I thanked Ruby for taking the time to meet. I wanted to acknowledge her feelings. I let her know this was extremely important to me to understand more where she is coming from and more importantly talk about solutions that can help going forward.
- Some solutions include:
    - Asking team to send me their weekly updates on large and small projects so that I don't misrepresent their work.
    - ID Team review before Alpha.
    - A regular cadence for Ruby and I to meet.
- I proposed having a bi-weekly meeting for her to have a platform to talk to me about concerns and issues on projects. One issues was the micro-managing. I am still a little confused because one issue was that she didn't think I needed to be on meetings with SMEs yet she is also still telling me to come to one of these that is happening right now. At one point, Ruby made the statement, if I were a white male would you ask to be on those meetings? I said, what? I'm completely confused. What makes you think that and ask that about me? I'm on meetings with all of the team members and emails, etc. I'm not treating you any differently. Plus, we don't even have any males on our team so that is a big accusation without any facts.
- The other items will take time to show. I brought up the leave issue she had mentioned about Carrie vs. her. I shared that my from point of view there was a deadline she committed to and the leave was requested last minute. She still got the leave. She also still met her deadline. I'm confused about the unfair treatment. I also did not know why she needed last minute leave and only knew she moved well after that occurred. She said she's private and doesn't always share what is going on. I said well Ruby I can't help the situation if I don't know how you feel or what is going on.
- I was also confused because I thought we had a good relationship. I said I've been your manager basically for 6 months. I thought we had some great dialogue at the beginning of the year about what you wanted/didn't want. Set a good tone. You also got a promotion. We talked about expectations, what you needed from me/didn't need, etc. She said yes I agree but then right around when COVID-19 started and everyone went to telework I saw patterns start again.
- This started a different topic. I was confused – I asked her what patterns? I had only just started as your manager how could I have a pattern? She said oh you know from before – my experiences with other managers. Ruby began disclosing a situation she experienced with a prior manager, Liz Jackson and her supervisor, Christine Paradise. Ruby and I were on the same team under Liz for about 4 months. I had started in January 2018 and Liz left in April 2018. I was completely confused about what Ruby was sharing. She claimed that there was a discrimination lawsuit in the works and that Liz and Christine were forced to leave SHRM. This was the very first I ever heard about this. I was concerned and spoke with Ruby quite a bit to understand what happened. She insisted that I knew. I shared no I didn't – my experiences at that time were quite different. I got some folders from Liz and was surrounded with a lot of confusion about who I was now reporting to – not to mention I was still new. Then, during the transition, Kim Lang came in and asked me to a conference room. Stated, you now report to me and we need to discuss your eLearning programs. She continued to yell at me, tell me I had no idea what I was doing as a designer, she didn't know where I worked before but this level of work just isn't going to cut it, etc. I shared this info for Ruby

to understand what was going on in my world at the time she claimed I was part of this other situation. I told Ruby I was sorry she experienced that before. I did share that knowing this background context is helpful for me going forward as her manager. I also said I couldn't be accountable for what others did.

- The conversation ended positively.

I followed up by email later that day:

**From:** Barley, Carolyn <Carolyn.Barley@shrm.org>
**Sent:** Friday, June 12, 2020 1:34 PM
**To:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>
**Subject:** Follow Up

Hi Ruby –

Thank you for taking the time to talk with me this morning. I appreciate your raising your concerns with me about your experiences both with me and previous managers. While I can't be responsible for previous situations, it helps to have that context in your experience. We've already made some changes in project such as the Compliance and Employment Law program. We are also looking at different approaches across the team such as clarity on what to include in the weekly ID Team report. I'm confident that we can continue to work together and trust that we both do want the same goal(s).

As we discussed, I am going to schedule bi-weekly meetings for you and I to check in. I think this will help our communication.

I look forward to continue collaborating with you.

You are a great asset to the team and I want to position you for success.

Many thanks,
Carolyn

Ruby's response:

RE: Follow Up



Mohamed, Ruby
To Barley, Carolyn

Reply | Reply All | Forward | ...

Fri 6/12/2020 4:01 PM

Hi Carolyn,
I would like to thank you for being open to having this discussion with me. I believe this is a good step towards building a healthy relationship. I hope that sharing my experience under the previous management and the negative impact it had on me has demonstrated my openness, and helped explain the concerns I had when a similar pattern of behaviors began to surface under your management. While I understand that you can't be responsible for the previous situations, I am glad we could both agree that having good intentions alone simply cannot prevent these situations from happening again. That's why I truly appreciate that we were both willing to commit to being mindful of how our actions can impact others and to holding each other accountable with empathy. The changes already made regarding the management of the compliance program have made a big difference (a positive one 😊), which reassured me that we can achieve great things when working together.

I look forward to our bi-weekly meetings and to continue to collaborate with you and the team to build great programs!
Thank you and I hope you have a great weekend.
Ruby

**Ruby Mohamed | Senior Instructional Designer**
**Educational Programs | Remote**
Society for Human Resource Management
Ruby.mohamed@shrm.org| +1.703.535.6416
shrm.org

**From:** Barley, Carolyn <Carolyn.Barley@shrm.org>
**Sent:** Friday, June 12, 2020 1:34 PM
**To:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>
**Subject:** Follow Up

I also spoke with Mike Jackson later that day on June 12 for advice. Ruby's accusations about race made me very concerned about it I needed to document anything. Most importantly, I did not think I was treating Ruby differently and very upset by the accusations.

Mike shared that I needed to document for myself what occurred. I also need to ensure I keep documentation going forward. As far as micro-managing, I do still need to manage her but ok to work on compromising on the points she raised. He agreed to keep conversations open with her. He also asked to be kept in the loop.

Friday, June 19, 2020

Ruby and I had a check in meeting. It seemed to go well on my end. We talked about projects. She seems clear on next steps with Lou and the compliance program. She has a solid plan of what to do. I've told her to let me know when I can help. I continue to offer resources as support if the two projects (compliance and digital HR) collide in timing. Someone else can help do workbooks, virtual layouts, etc.

We also spoke about her helping to coach and support Ebony. Jeanne brought this to my attention that Ruby was open to trying. We spoke about it. I shared thoughts on the flow of Succession Planning, background context with SMEs and instructors. I said I could follow up with Ebony so she's in the loop. Ruby advised and suggested that I don't and let Ruby just reach out to Ebony casually. She thought this would be better received. I agreed and told

her I completely trust her judgment. The goal here is to help Ebony get over the onboarding hurdle. We'll keep trying different things until we figure it out together.

June 18, 2020

Ebony and Ruby verbally disagreed about SHRM not honoring and giving June 19 as a holiday. The comment is that its sad that Johnny of all people should know better. SHRM was making yet another mistake. First Johnny's law enforcement support and now this.

June 30, 2020

This morning I emailed Ruby regarding the PMQ pilot decisions to follow up about a demographic concern across the characters. My email:

---

**From:** Barley, Carolyn <Carolyn.Barley@shrm.org>
**Sent:** Monday, June 29, 2020 10:24 PM
**To:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>
**Subject:** PMQ Pilot Feedback - Demographics

Hi Ruby -
I wanted to follow up regarding the comments you saw in the feedback about demographic concerns (too many white males in authority) in PMQ. I did a review of the program and came up with the attached demographic spread by Friend across the program. For many of the supporting cast, it is a judgment call based on image.
What are your thoughts based on the comments you saw?
I wanted to get your opinion before circulating with the larger group 😊
Best -
Carolyn

**Carolyn Barley | Manager, Instructional Design**
**Education Programs | Losey 4W04**
Society for Human Resource Management
Carolyn.Barley@shrm.org | +1.703.535.6213 | +1.717.940.5487 M

More exchanges:

---

**From:** Barley, Carolyn <Carolyn.Barley@shrm.org>
**Sent:** Tuesday, June 30, 2020 8:02 AM
**To:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>
**Subject:** RE: PMQ Pilot Feedback - Demographics

Hi Ruby –
Ok, great. I appreciate you bringing those comments up.
Hope you have a great morning!
Best –
Carolyn

**Carolyn Barley | Manager, Instructional Design**
**Education Programs | Losey 4W04**
Society for Human Resource Management
Carolyn.Barley@shrm.org | +1.703.535.6213 | +1.717.940.5487 M

---

**From:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>
**Sent:** Tuesday, June 30, 2020 7:47 AM
**To:** Barley, Carolyn <Carolyn.Barley@shrm.org>
**Subject:** RE: PMQ Pilot Feedback - Demographics

Hi there,
It appears to be a diverse group based on the demographic breakdown you shared. Thanks for checking.
Ruby

More exchanges:

**From:** Barley, Carolyn <Carolyn.Barley@shrm.org>
**Sent:** Tuesday, June 30, 2020 8:34 AM
**To:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>
**Subject:** RE: PMQ Pilot Feedback - Demographics

I always value your input. I don't recall saying just "join and listen". If I did, I'm sorry for that and definitely didn't mean to imply you shouldn't share your thoughts. You have been and definitely continue to be a critical member of the PMQ project.

**Carolyn Barley | Manager, Instructional Design**
**Education Programs | Losey 4W04**
Society for Human Resource Management
Carolyn.Barley@shrm.org| +1.703.535.6213 | +1.717.940.5487 M

---

**From:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>
**Sent:** Tuesday, June 30, 2020 8:29 AM
**To:** Barley, Carolyn <Carolyn.Barley@shrm.org>
**Subject:** RE: PMQ Pilot Feedback - Demographics

I am glad you found my comments to be helpful. I know you instructed me during our last team meeting to just "join and listen" but I felt compelled to share my input.
Ruby

**Ruby Mohamed | Senior Instructional Designer**
**Educational Programs | Remote**
Society for Human Resource Management
Ruby.mohamed@shrm.org| +1.703.535.6416
shrm.org

After I hit send, I called Ruby as well. I was a little confused by her note and didn't think email was the best way to get to a resolution. She was extremely angry with me, yelled at me. She told me that I do nothing but disrespect her. I said that the intent of the team meeting regarding this point was that I would like her to join but that if she did not have time to review given other priorities it was ok if she just joined and participated. If she had time to prepare, great but if not, just joining would be great. I'm sure that leadership would direct some of the conversation but we can all contribute.

She disagreed that this is my intent. Says that I do nothing to value her. She cannot do anything to work this out but she can just focus on her work. I apologized that I offended her. It was not my intent. I value her, respect her and do think she does good work. I also said that I had no idea she was feeling this way. I only had a clue based on her email which came 3 days after the meeting. She said well I didn't want to bring it up. I said well Ruby I can't know if you don't tell me. I'm trying to change and show you that is not how I feel. I can't do that though. Sometimes we will also disagree. She said she talked with all 3 members of the ID team and they all agreed that my instruction was for her to just attend and listen only.

She was not open to talking more. I said we need to figure out something to help this situation. I am trying and will brainstorm to see if there is anything else we can try. We had our regularly scheduled check in later that morning. I asked if we should keep it. She said she had nothing left to say so I said I would move it. We then hung up. She also said she would email me a reply to document for the record what I said in the team meeting. This is her reply:

RE: PMQ Pilot Feedback - Demographics



Mohamed, Ruby
To Barley, Carolyn

Reply | Reply All | Forward | ...
Tue 6/30/2020 9:02 AM

Hi Carolyn,
During the team meeting, you have clearly instructed me to, first, feel free to skip the meeting because "big decisions" will be made. Second, if I decide to join the meeting, then I can feel free to "just join and listen", which is a clear implication that I shouldn't share my thoughts.
Just wanted to clarify the events that took place.
Best,
Ruby

**Ruby Mohamed | Senior Instructional Designer**
**Educational Programs | Remote**
Society for Human Resource Management
Ruby.mohamed@shrm.org| +1.703.535.6416
shrm.org

I immediately texted Jeanne and reached out to Mike Jackson. I will be speaking with Mike today at 11:30. Jeanne will be calling me. These quotes are extremely out of context and not at all the intent of the meeting.

Also, note, since our meeting with Jeanne – I offered to not attend the calls with Lou. She insisted that I attend. I tried to give her a project to lead on tagging content. She declined and did not want the extra work. I have gone out of my way to compliment, encourage and try to demonstrate change.

I am not sure how to make this situation better. I enjoy my work and being part of SHRM's mission. I am really struggling with how I can do that successfully. I feel that anything I say is going to be criticized. It is borderline getting toxic. I'm just trying to have open collaborative dialogue and I'm being told that I am treating her unfairly. At this point, I'm going out of my way to compliment, encourage and validate and that does not seem to be working.

Met with Mike

- Suggested a facilitated conversation with HR and documenting.
- Follow up on Strengths finder with Bernee or Laurie (or coaching session to help with her transition as new in her role, frame it in the context of overall professional development resources).

Goal

- Common next steps between her and I
- Coaching for her as well on new position

July 14, 2020

Ruby made rather harsh comments in the Employee Engagement survey results debrief with Nick. I'm noticing a lack of accountability on her part.

July 16, 2020

In verbal team meeting and in email, Ruby is showing aggression toward Ann. In response to a light email from Ann, she responded questioning and dissecting individual words. The intent of Ann's email was to acknowledge and appreciate the team norm the manager has been requesting for over 8 months and Carrie and Ann are the only ones following. Ebony and Ruby did in April/May when reminded the last time but since then they have not. As a manager, asking the team to put current versions of the projects on the S drive is completely reasonable.

July 17, 2020

I had discussions with Jeanne regarding both Ebony and Ruby. She shared that there were challenges in the employee engagement individual contributor debrief meeting. She has asked Mike to facilitate a meeting with the members of the ISD team with Jeanne on Monday, July 20. I am not to attend. I expressed I was confused and concerned given so many conversations continue to occur without me present that seem to directly involve me. Jeanne and Mike both advised to let this meeting happen and then we would meet to discuss next steps.

July 20, 2020

I reached out to Ruby in the afternoon asking for her thoughts on Succession Planning content. I believed she had been coaching Ebony and was curious on her opinion of the draft Ebony sent. Ruby said she had a meeting soon but would connect with me after.

The ISD meeting occurred.

Ruby sent me a note immediately after saying she was not feeling well and could not connect. She would reach out to me the next day.

July 21, 2020

Ruby did not connect regarding Ebony. Ruby and Ebony both stopped replying to team emails and slack messages.

Jeanne, Mike and I had a follow up discussion. This was originally scheduled with Mike as a follow up to the facilitated discussion we had with Ruby. Jeanne had asked to join. In this meeting, they shared that Ruby made many accusations during the ISD team discussion. She and Ebony were both crying. Carrie and Ann both were supportive and had little constructive feedback – if any. Jeanne shared that Ruby said she will no longer work with Carolyn unless she apologies and admits that she had discriminated against her. I said I would not do that because its not true. This is getting out of hand. Mike said he was going to reach out to Bernee for coaching to figure out how to proceed.

July 22, 2020

I get a phone call from Jeanne. She shared that Ruby reached out to Nick and recused herself from the new PMQ project. She refuses to work with Carolyn until I admit her request. I believe Nick told her that she can be off the project but he is not going to discuss her relationship with me. Jeanne encouraged me to talk to Nick so he knew my truth.

I reached out to Nick and connected mid-day that day. I shared my concerns. He reassured me that rumors are not going to change peoples opinion of me. I said I get that but this is going on for some time now for me – over a month. I need to know what is happening because Ruby is spreading these accusations across Education. Nick told me that Ruby was talking to Sean per Johnny's request. Ruby also called Johnny the afternoon before.

I'm so upset, more and more about this situation. These accusations have no justification. Ruby is allowed to keep saying them and is damaging my character and reputation across SHRM. And, continues to be rewarded for it.

I am not sure how I can get passed this knowing a colleague can threaten me and not be held accountable.

July 24, 2020

I had my one on one with Jeanne. She encouraged me to be patient and that she values me on the team.

July 27, 2020

Ruby requested leave this morning for 8 days starting July 29. I approved but would like to address the short notice. It's a long amount of leave –I'm ok with it but the way Ruby goes about it is not right. But, I feel like I can't address these issues given her current ultimatum.

I reached out to Mike to find out what next steps are being taken. At this point, Ruby and Ebony are withdrawn from the team. From what I'm being told, Ruby is spreading accusations across SHRM about me. I am continued to being told to wait. Mike said Ruby spoke to Sean the Wednesday and Thursday before. He would connect with Sean when he returns from the ET retreat later this week.

Jeanne shared with me that she is connecting with Sean on Thursday. She said I am free to do so.

I am unsure what I am supposed to do. I'm feeling harassed or bullied by this situation.

July 30

Jeanne messaged me after speaking with Sean that she suggested he and I connect. I am happy to do so and reached out to Sean to coordinate a time on calendars.

August 6

I spoke with Sean. Today was also Ebony's last day. I called Ruby and left a voicemail to call me about team updates at her convenience. I knew she was OOO but wanted to give her some updates. I communicated with Carrie and Ann as well.

August 7

I followed up with Ruby via email to connect with me about team updates.

Sean reached out to me because Ruby asked to meet with him. I let him know that I did not speak with Ruby yet but have left her messages that she hasn't responded to.

Sean advised that Ruby and I would be mediating with Bernée starting Monday.

August 8

Ebony sent an email that she left SHRM. The team all now knows.

August 10

Ruby reached out and we connected. I told her about Ebony. She was angry and wanted to know if she was fired or it was voluntary. I told her that I couldn't discuss the details since it was a personnel matter but we wish Ebony well on her next endeavors. She said fine, well if you can't answer my question than I don't have anything else to say.

Began mediation with Bernée.

August 17 – 21, Carolyn was OOO on a pre-planned vacation requested earlier in the year.

One on One on August 25 – lasted about 10 minutes.

Ruby jumped in immediately and said well is there an update to the deadlines given the emails and correspondences? I said I don't have any updates to the deadlines. She said so you mean that the deadlines are still 8/31? I said yes. She then got very snarky and ranting about she's told me that she shouldn't be held accountable for the vendor not doing his work. She saw my note about interviewing him but how can she know HR law and the legal implications to document. She needs the SME. She got even more of a tone saying you should know all this, you're a designer. (she went on for a bit). I said first, Ruby, could you please change your tone. Let's talk and focus on solutions. She snapped back that she didn't know she had a tone. I said no problem, I'm asking you to be aware so we can focus this conversation on updates and solutions. I questioned why we were waiting on Lou for documentation. I was just copied on a note last week while I was out asking him for content. I told her I was confused and that we shifted the roles so we wouldn't be waiting on Lou. I used Digital HR as an example – you would get the info from Deborah or any other SME from conversations or emails without waiting on documentation. She then said yes of course (again with tone). And that's what I emailed you . That's exactly how I was doing it with Lou for the first two modules. He gave me documentation and I made the modules. But for the last 3 he has stopped sending documentation. I said ok, now I'm confused, are you waiting on documentation or not. I would interview Lou to fill in gaps of how you are designing the program and ask him to review. I wouldn't wait for documentation. She then said so do you have any other updates for me regarding deadlines. I said Ruby are you asking me to change it? She said no, that's not what I'm saying. I just want to know if you have any updates on the deadlines for me. I said I don't have any updates right now. I was looking for updates from you to help

brainstorm solutions so you can keep your projects on track. She said she will just respond to my emails. She has communicated everything she needs to in emails. She then said thank you and hung up.

8/25 – Ruby notified me when she would need the editor for Digital HR. I've communicated before that we need advance notice to get on the editor's schedule. She is external. She said the materials would be ready by EOD 8/26. I should add that I had coordinate the editor 3 times previously per Ruby and then she did not deliver materials.

**Ariel DeFazio**

**From:** Ariel DeFazio
**Sent:** Wednesday, November 5, 2025 10:54 AM
**To:** Gallagher Chambers
**Cc:** Hunter Swain; Carol Allen; Darrow, Tanja; vwoodfork_littler.com; Wolfson, Julian G.G.; Hankins, Nicholas
**Subject:** Mohamed v. SHRM - Plaintiff's Second Competing & Non-Stipulated Jury Instructions
**Attachments:** Mohamed v. SHRM (22-cv-01625-GPG-KAS) Pla's Second Competing & Non-Stipulated Jury Instructions.docx; Mohamed v. SHRM (22-cv-01625-GPG-KAS) Pla's Second Competing & Non-Stipulated Jury Instructions (redlined).docx

Good morning,

With this email, Plaintiff is submitting a second set of proposed competing and non-stipulated jury instructions for the Court's consideration. This set includes modified instructions for Section 1981 race discrimination (pp. 9-11) and Section 1981 retaliation (pp. 13-15). We have included a redlined version so that the Court can see the changes that we made from the first set of proposed competing and non-stipulated jury instructions submitted on September 26.

Both original proposed instructions were based on instructions given in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV. Since September 26, we have learned that the instructions in *Joppy* have been the subject of post-trial briefing and likely a subsequent Tenth Circuit appeal. We have revisited and modified the instructions accordingly.

Thank you,

**Ariel DeFazio**
**(she/her/hers)**

LOWREY | PARADY | LEBSACK
ATTORNEYS AT LAW

Lowrey Parady Lebsack, LLC
1490 Lafayette Street, Suite 304
Denver, CO 80218
office 303.593.2595 | direct 720.239.2975 | fax 303.502.9119
web www.lowrey-parady.com
email ariel@lowrey-parady.com

**CLIENTS**: Do not forward this email, as doing so may cause it to lose its status as a privileged communication.
**CONFIDENTIALITY NOTICE:** The information contained in this e-mail is confidential, intended only for the named addressee, and may be protected by attorney-client privilege and/or as attorney work product. If you believe you have received this e-mail in error, please notify us immediately and delete this email and any copies of the same.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**PLAINTIFF'S SECOND PROPOSED COMPETING AND NON-STIPULATED JURY INSTRUCTIONS**

---

## EQUALITY UNDER THE LAW

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. Corporations are entitled to the same fair trial as a private individual. All persons, including corporations, stand equal before the law, and are to be treated as equals. You should not be influenced by who the parties are, or who the witnesses are, i.e., whether they are rich or poor, young or old, well-educated or not.

You also should be aware of the natural human tendency to look at others, and to filter what they have to say, through the lens of our own personal experience and background. Because we all do this, we often see life – and evaluate evidence – in a waythat tends to favor people who are like ourselves or who have had life experiences likeour own. In deciding this case, I urge you to be aware of this natural human tendency to stereotype other people and to make assumptions about them based on the stereotypes, and I urge you to avoid such stereotyping.

### PLAINTIFF'S COMPETING INSTRUCTION

**Plaintiff's Argument:** This is Instruction Number 9 from Hon. Christine M. Arguello's stock civil jury instructions[1] and has been given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) (Dkt. #114). As written, it clearly communicates that both Ms. Mohamed, as an individual, and SHRM, as a corporation, should be treated as equals before the law. Defendant's addition that it should not be held to a higher standard under the law because of its type of business is redundant. It is also potentially confusing to jurors who may find Defendant liable for punitive damages based on the company's managerial employees' knowledge of best practices in human resources given that this is at the crux of Defendant's business.

---

[1] http://www.cod.uscourts.gov/Portals/0/Documents/Judges/CMA/CMA_Civil_Final_Jury_Instructions.pdf (last visited Sept. 25, 2025).

**Defendant's Argument:** It is critical to include language which states that Defendant is not held to any higher standard under the law because it offers educational training and resources for human resources professionals. This additional language is a correct statement of the law and would in no way be prejudicial to Plaintiff. While Defendant concedes that this language may not be traditionally included within this instruction, the fact that Defendant is a human resource company is a unique fact that warrants this deviation from the pattern instructions.

**EVIDENCE – DIRECT VS. CIRCUMSTANTIAL**

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. You may draw from the facts you find have been proved such reasonable inference as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

Generally speaking, there are two types of evidence that are presented during a trial: direct evidence and circumstantial evidence. "Direct evidence" is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of facts and circumstances indicating the existence or nonexistence of a fact.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and *Gonzalez v. Univ. of Colo.*, No. 1:18-cv-01178-RBJ (D. Colo.). It provides a clear explanation of direct and circumstantial evidence and the inferences that can follow from the latter. It further uses the rain and wet umbrella example to reiterate these concepts in a way that is accessible to laypeople. Defendant's competing instruction lacks the illustrative example and an introductory sentence that orients jurors to the two types of evidence.

**Defendant's Argument:** Defendant objects to this instruction, largely because of its use of the hypothetical involving the rain and a wet umbrella. Providing such a hypothetical oversimplifies circumstantial evidence and suggests that a piece of circumstantial evidence is indisputable proof of a fact. Moreover, it encourages the jury to draw a specific conclusion (that it was raining) from a set of facts, thereby encroaching on the jury's role as the finder of fact. Defendant also believes it is clearer to have two separate jury instructions---one for direct and circumstantial evidence, and another for inferences. Indeed, this very Court has previously endorsed the separation of these instructions. *See Wolfard v. Douglas Cnty. Sch. Dist.*, Case No. 21-CV-02552-GPG-STV (Dkt. No. 113).

**BURDEN OF PROOF AND PREPONDERANCE OF THE EVIDENCE**

Ms. Mohamed has the burden of proving her claims by a preponderance of the evidence. To prove something by a "preponderance of the evidence" means to prove that it is more probably true than not true. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case. Nor does it require proof "beyond a reasonable doubt" which is a stricter standard that applies in criminal cases.

If you find that the evidence as to a claim or defense weighs so evenly that you are unable to say that there is a preponderance of the evidence on either side, you must reject that claim or defense.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

Those of you who have participated in criminal cases will have heard of "proof beyond a reasonable doubt." The standard of proof in a criminal case is a stricter standard, requiring more proof than a preponderance of evidence. The reasonable doubt standard does not apply to a civil case and you should put that standard out of your mind.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and *Gonzalez v. Univ. of Colo.*, No. 1:18-cv-01178-RBJ (D. Colo.). Given the familiarity of many laypersons with the criminal standard for guilt, it is important to make clear the difference between beyond a reasonable doubt and the civil preponderance of the evidence standards. This instruction does so explicitly in simple terms. It also makes clear to jurors that proof to an absolute certain, which is a common misconception, is not necessary.

**Defendant's Argument:** Defendant objects to this instruction on the basis that it references the "reasonable doubt" standard, which has no application in this case. Moreover, this specific instruction references the reasonable doubt standard on two separate occasions. Defendant believes this is confusing and may mislead the jury.

**42 U.S.C. § 1981 – STATUTE INVOLVED**

In this case, Ms. Mohamed brings claims of race discrimination and retaliation under a federal civil rights law called Section 1981 of the Civil Rights Act of 1991, also known as "Section 1981."

Section 1981 provides in pertinent part as follows:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts… and to the full and equal benefit of all laws and proceedings for the security of persons and property as isenjoyed by white citizens.

For purposes of Section 1981, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the employment relationship.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction is taken directly from the Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – STATUTE INVOLVED, p. 2 (Sept. 2013). It cites directly to 42 U.S.C. § 1981. This instruction provides important context for the jury regarding the substance of the law that the jury is being tasked with applying. This instruction was given by Hon. Charlotte N. Sweeney in a recent Section 1981 case, *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377), with a slight difference in the last paragraph, i.e., all text after "termination of contracts" was omitted in the *Joppy* instruction.

**Defendant's Argument:** Defendant objects to this instruction to the extent it is overly detailed and dense. There is no reason that the jury needs to be informed of the text of the statute. Moreover, the statute's reference to making and enforcing contracts is of no consequence to this case. Defendant does not contest the fact that it terminated Plaintiff's employment. As such, the language included in this instruction is likely to cause confusion

amongst the jurors and may mislead them.

## 42 U.S.C. § 1981 – DISCRIMINATION BASED ON RACE

Ms. Mohamed claims that Defendant's termination of her constitutes race discrimination.

In order for Ms. Mohamed to establish her claim for race discrimination under Section 1981, she must prove the following by a preponderance of the evidence:

1. Defendant SHRM terminated Ms. Mohamed; and
2. Defendant SHRM would not have terminated Ms. Mohamed but for her race.

Regarding the second element, race must be a "but-for" cause of Ms. Mohamed's termination. SHRM may be held liable for race discrimination if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her race was the factor that made a difference. Ms. Mohamed's race does not need to be the sole or primary cause of Defendant's decision to terminate her.

Defendant SHRM does not dispute that it terminated Ms. Mohamed. As a result, Ms. Mohamed only needs to prove the second element, i.e., that SHRM would not have terminated her but for her race. If you find that Ms. Mohamed has failed to prove the second element by a preponderance of the evidence, then you must find against her on her discrimination claim and in favor of Defendant SHRM. If, on the other hand, you find that Ms. Mohamed has proved the second element by a preponderance of the evidence, then you must find in her favor and against Defendant SHRM.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – DISCRIMINATION BASED ON RACE, p. 4 (Sept. 2013), but has been updated to include the but-for causation standard that is applicable to Section 1981 discrimination and retaliation claims. This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and has been modified as to party names, clarification that Ms. Mohamed need only prove the second element because it is undisputed that SHRM terminated her, and further clarification that Ms. Mohamed's race need be "the factor that made a difference" rather than "played a part." This is consistent with the explanation of the but-for causation standard as set forth in *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). In *Jones*, the Tenth Circuit made clear that the but-for causation standard requires that a plaintiff show that their protected class was "the factor that made a difference," not that it was the sole motivating cause. The U.S. Supreme Court came to the same conclusion in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020), where it revisited the but-for standard in the context of a Title VII discrimination claim based on sexual orientation and transgender status. The *Bostock* Court states unequivocally that "the plaintiff's sex need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. Furthermore, the Court noted that "a traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the [prohibited factor] was one but-for cause of that decision, it is enough to trigger the law." *Id.* at 1739*; see also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation because events frequently have multiple but-for causes). This is consistent with *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020), which states that "a plaintiff bears the burden of showing that race was a but-for cause of its injury." *Amarsingh v. Frontier Airlines, Inc.*, 2024 U.S. Dist. LEXIS 190288 at *10 (D. Colo. Sept. 24, 2024) (*quoting Comcast*, 589 U.S. at 333).

**Defendant's Argument:** Defendant objects to this instruction to the extent it is inconsistent with the law. More specifically, Defendant objects to this instruction's use of the phrase "**a** 'but-for' cause." As courts in this jurisdiction and the U.S. Supreme Court have explained, in order to prevail on a Section 1981 claim, "a plaintiff must show that her race was not just one factor, but indeed the reason for, her injuries." *Garcia v. Summit Tech. Sols., LLC*, No. 21-CV-03077-CNS-MDB, 2022 WL 4467038, at *4 (D. Colo. Sept. 26, 2022), *report and recommendation adopted*, No. 121CV03077CNSMDB, 2022 WL 10028881 (D. Colo. Oct. 17, 2022); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 589 U.S. 327, 344, 140 S. Ct. 1009, 1021, 206 L. Ed. 2d 356 (2020) (Ginsberg,

J., concurring in judgment) ("The Court holds today that Entertainment Studios must plead and prove that race was **the** but-for cause of its injury […].") (emphasis added); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350, 174 L. Ed. 2d 119 (2009) (explaining that in order to prove that age was the but-for cause of the adverse employment action, the plaintiff must prove that "age was the 'reason' the employer decided to act"). While race need not be the sole cause of Ms. Mohamed's termination, the use of the phrase "the but-for cause" does not demand that it be. It is for this very reason that the Tenth Circuit has approved of jury instructions which state that a plaintiff must prove "the but-for cause." *See McDonald v. City of Wichita, Kansas*, 735 F. App'x 529, 532 (10th Cir. 2018) ("We reject McDonald's contention that 'the but for cause' is the equivalent of a 'sole cause' standard."). Defendant further objects to this instruction to the extent Plaintiff has added gratuitous language which inappropriately gives a directive to the jury.

## 42 U.S.C. § 1981 – RETALIATION GENERALLY

Ms. Mohamed's claim for retaliation is also brought under Section 1981. The purpose of Section 1981 is to protect the rights of individuals to be free from workplace discrimination. The anti-retaliation protection in Section 1981 provides that it is unlawful for an employer to retaliate against an individual because she in good faith opposed what she believed were discriminatory or retaliatory employment practices.

**PLAINTIFF'S NON-STIPULATED INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377). It is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, RETALIATION – STATUTE INVOLVED, p. 47 (Sept. 2013) and modified with respect to party names and the relevant protected activity, i.e., opposition rather than participation. This instruction provides context for the jury regarding the substance of the law that the jury is being tasked with applying.

**Defendant's Argument:** To prevail on a Section 1981 retaliation claim—like a Section 1981 discrimination claim—the but-for standard articulated in *Comcast Corp.,* 140 S. Ct. at 1014, applies. *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 92 (D.D.C. 2024) ("[I]t seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims."). The suggestion in this instruction, that there may be more than one but-for cause, is inconsistent with the law. *See, e.g., Romero v. Tucson Unified Sch. Dist.,* No. CV-20-00507-TUC-AMM, 2024 WL 4893941, at *2 (D. Ariz. Nov. 26, 2024) ("In Nassar and Comcast, the Supreme Court held a plaintiff must show his protected activity was the but-for cause of his employer's actions in order to establish a prima facie case of retaliation.").

**42 U.S.C. § 1981 – ELEMENTS OF RETALIATION**

Ms. Mohamed claims that SHRM's termination of her amounts to retaliation. In order for Ms. Mohamed to establish her claim for retaliation under Section 1981, she must prove the following by a preponderance of the evidence:

1. Ms. Mohamed complained about what she reasonably believed was race discrimination and/or retaliation;
2. SHRM terminated Ms. Mohamed; and
3. SHRM would not have terminated Ms. Mohamed but for Ms. Mohamed's complaints of discrimination and/or retaliation.

SHRM does not dispute that it terminated Ms. Mohamed. As a result, Ms. Mohamed only needs to prove the first and third elements.

Regarding the third element, retaliation or retaliatory motive must be a "but-for" cause of Ms. Mohamed's termination. SHRM may be held liable for retaliation if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her complaints of discrimination and/or retaliation were the factor that made a difference. Ms. Mohamed's complaints of discrimination and/or retaliation do not need to be the sole or primary cause of SHRM's decision to terminate her.

If you find that Ms. Mohamed has failed to prove the first and third elements by a preponderance of the evidence, then you must find against her on her retaliation claim and in favor of Defendant SHRM. If, on the other hand, you find that Ms. Mohamed has proved the first and third elements by a preponderance of the evidence, then you must

find in her favor and against Defendant SHRM.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and modified with respect to party names, clarification that Ms. Mohamed need not prove the second element because it is undisputed that SHRM terminated her, and further clarification that Ms. Mohamed's protected activity need be "the factor that made a difference" rather than "played a part." The instruction enumerates the proper elements for a retaliation claim, *e.g., Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017), along with guidance on but-for causation, *Miller v. Nat'l Jewish Health*, 2024 U.S. Dist. LEXIS 49600 at **43-44 (D. Colo. March 20, 2024) (holding that a plaintiff must demonstrate "that retaliation played a part in the employment decision" to make out a Title VII retaliation claim) (*quoting Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008)). The instruction is also consistent with the Tenth Circuit's explanation of but-for causation as set forth in *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010) (finding that but-for causation requires that a plaintiff show that their protected class was "the factor that made a difference," not that it was the sole motivating cause). Under the law, there can indeed be more than one but-for cause. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1748 (2020) (noting that "[o]ften events have multiple but-for causes"). And the U.S. Supreme Court has made clear that the plaintiff's protected characteristic "need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. *See also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation because events frequently have multiple but-for causes).

**Defendant's Argument:** To prevail on a Section 1981 retaliation claim—like a Section 1981 discrimination claim—the but-for standard articulated in *Comcast Corp.,* 140 S. Ct. at 1014, applies. *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 92 (D.D.C. 2024) ("[I]t seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims."). The suggestion in this instruction, that there may be more than one but-for cause, is inconsistent with the law. *See, e.g., Romero v. Tucson Unified Sch. Dist.,* No. CV-20-00507-TUC-AMM, 2024 WL 4893941, at *2 (D. Ariz. Nov. 26, 2024) ("In Nassar and Comcast, the Supreme Court held a plaintiff must show his protected activity was the but-for cause of his employer's actions in order to establish a prima facie case of retaliation."). While Ms. Mohamed's protected activity need not be the sole cause her termination, the use of the phrase "the but-for cause" does not demand that it be. It is for this very reason that the Tenth Circuit has approved of jury instructions which state that a plaintiff must prove "the but-for cause." *See McDonald v. City of Wichita, Kansas*, 735

F. App'x 529, 532 (10th Cir. 2018) ("We reject McDonald's contention that 'the but for cause' is the equivalent of a 'sole cause' standard.").

**PRETEXT**

Ms. Mohamed claims that Defendant SHRM's stated reasons for its termination of Ms. Mohamed are false, but instead are a pretext (an excuse) to cover up for race discrimination and/or retaliation.

If you do not believe one or more of the reasons Defendant SHRM offered for the termination, then you may, but are not required to, infer that race and/or retaliation was a factor that made a difference in Defendant SHRM's decision to terminate Ms. Mohamed. Ms. Mohamed need not disprove every reason stated by Defendant SHRM in order to prove pretext.

Ms. Mohamed may show that Defendant SHRM's stated reasons for its actions are pretextual (not the true reason) in any of several ways. Some examples of ways (although these are not the only ways) in which you may determine that Defendant's stated reasons are pretext are:

- Evidence that Defendant SHRM treated Ms. Mohamed differently compared to similarly situated white employees;
- Evidence that Defendant SHRM used subjective criteria in its evaluation of Ms. Mohamed;
- Evidence of Defendant SHRM's prior treatment of Ms. Mohamed;
- Evidence that one or more of Defendant SHRM's witnesses lack credibility;
- Evidence of temporal proximity between Ms. Mohamed's complaints of discrimination and retaliation and the actions that Defendant SHRM's employees took to effectuate Ms. Mohamed's termination;
- Evidence that Defendant SHRM exhibited disturbing procedural irregularities in dealing with Ms. Mohamed, including acting contrary to its policy or established practice;

- Evidence that Defendant SHRM failed to fully investigate Ms. Mohamed's complaints of discrimination and/or retaliation;

- Evidence that Defendant SHRM did not uniformly enforce its own rules; and/or

- Evidence that any one of Defendant SHRM's stated reasons for Ms. Mohamed's termination is false, contradictory, implausible, or not worthy of belief.

In determining whether Defendant SHRM's stated reasons for its actions are genuine or pretextual, you may consider any or all of these factors. If you find pretext, you may, but are not required to infer that race and/or retaliation was a factor that made the difference in Defendant SHRM's termination of Ms. Mohamed.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and modified as to party names and relevant types of evidence of pretext. It is also the model instruction for pretext proffered by the Faculty of Federal Advocates Ad Hoc Committee, Pretext, pp. 6-7 (Sept. 2013). The instruction provides general guidance to jurors about what constitutes pretext and goes on to enumerate specific types of pretext evidence that are present in the case. The latter is supported by: Order Denying Defendant SHRM's Motion for Summary Judgment (Dkt. # 89) p. 11 (noting that "[t]he timing of Defendant's employee's termination-related actions, which began well before the August 31 deadline, casts substantial doubt on Defendant's assertion that Barley decided to terminate Mohamed on September 1 solely because she failed to meet the previous day's deadlines.") (Dkt. 89); *id.* at p. 11 n.11 (noting that "a jury could reasonably conclude that the investigation was a sham"); *Potter v. Synerlink Corp.*, 562 Fed. Appx. 665, 677-78 (10th Cir. 2014) (witness' impugned credibility may be evidence of pretext); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (treatment of similarly situated employees is evidence of pretext); and *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984) (*citing Mohammed v. Callaway*, 698 F.2d 395, 399 (10th Cir. 1983)) (identifying "the employer's prior treatment of the plaintiff" and "the use of subjective criteria" as types of evidence that may be relevant to a showing of pretext).

**Defendant's Argument:** Defendant objects to this instruction in light of the fact that it seeks to apply the pretext standard to the facts of this particular case. This, of course, is unduly suggestive and prejudicial. Additionally, this instruction omits the fact that it is Plaintiff's burden to establish pretext at trial. *See Randle v. City of Aurora,* 69 F.3d 441, 453 n. 18 (10th Cir. 1995) ("At trial, the plaintiff must convince the jury not only that the reason proffered by the defendant was pretextual, but that the jury should infer that the defendant's pretext concealed a motive of discriminating against the plaintiff in violation of the civil rights laws."); *Lyons v. Red Roof Inns, Inc,* 130 F. App'x 957, 961 (10th Cir. 2005) ("At trial, the plaintiff must prove illegal discrimination either (1) inferentially by showing that the proffered reason is a pretext for discrimination; and/or (2) directly by offering direct evidence of discrimination.") (citations and quotations omitted).

## DAMAGES – COMPENSATORY DAMAGES

If you find that Defendant SHRM unlawfully discriminated or retaliated against Ms. Mohamed, then you must determine an amount that is fair compensation for her losses. You may award compensatory damages for injuries that Ms. Mohamed proved were caused by Defendant SHRM's wrongful conduct. The damages that you award must be fair compensation, no more and no less.

You may award damages for any emotional distress, pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, and damage to reputation that Ms. Mohamed experienced as a consequence of the wrongful conduct. No evidence of monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence. There is no exact standard for setting the compensation to be awarded for these elements of damages. Any award you make should be fair in light of the evidence presented at trial.

### PLAINTIFF'S COMPETING INSTRUCTION

**Plaintiff's Argument**: This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and modified with respect to party names. The instruction lists the full panoply of harms that are recoverable by a plaintiff as compensatory damages. *E.g., Foster v. MCI Telecommunications Corp.*, 773 F.2d 1116, 1118 (10th Cir. 1985) (upholding a compensatory damages award for "embarrassment, humiliation, severe anxiety and great emotional suffering"); *Thornton v. Kaplan*, 958 F.Supp. 502, 504 (D. Colo. 1996) (upholding an award for compensatory damages to a plaintiff who prevailed on a retaliation claim for "emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life"). In section (II)(A)(2) its Enforcement Guidance: Compensatory and Punitive Damages,[2] the EEOC lists additional nonpecuniary losses that are recoverable as compensatory damages, including emotional pain, suffering,

[2] https://www.eeoc.gov/policy/docs/damages.html (last visited Sept. 25, 2025).

inconvenience, mental anguish, loss of enjoyment of life, and "injury to character and reputation."

**Defendant's Argument:** Defendant objects to this instruction in light of the fact that the terms used to describe the types of compensatory damages available to Plaintiff (e.g., pain, suffering, inconvenience, mental anguish, etc.) are duplicative, unnecessary, and prejudicial. *See Wolfard v. Douglas Cnty. Sch. Dist.*, Case No. 21-CV-02552-GPG-STV (Dkt. No. 113) (stating only that the jury "may award damages for any pain, suffering, or mental anguish").

## DAMAGES – PUNITIVE DAMAGES

If you find that Defendant SHRM intentionally discriminated or retaliated against Ms. Mohamed, the law allows, but does not require, an award of punitive damages. The purpose of an award of punitive damages is to punish a wrongdoer for misconduct, and also to provide a warning to others.

You may award punitive damages if you find that Defendant SHRM engaged in discrimination or retaliation with malice or with reckless indifference to the right of Ms. Mohamed to be free from such intentional discrimination and retaliation. In order to find Defendant SHRM liable for punitive damages, you must find that Defendant SHRM discriminated or retaliated in the face of a perceived risk that its actions would violate federal law.

In deciding the amount of punitive damages, you may consider the following:

1. The offensiveness of the conduct;
2. The amount needed, considering Defendant SHRM's financial condition, to prevent the conduct from being repeated; and
3. Whether the amount of punitive damages bears a reasonable relationship to the actual damages awarded.

Where discriminatory acts on the part of Defendant SHRM's managerial employees were contrary to Defendant SHRM's good faith efforts to comply with the law by implementing and enforcing policies and programs designed to prevent unlawful discrimination, you shall not award punitive damages.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and modified with respect to party names. It is identical in substance to the model instruction for punitive damages proffered by the Faculty of Federal Advocates Ad Hoc Committee, pp. 66 (Sept. 2013) with the exception of the parties' names and the fact that punitive damages would result from a finding that SHRM intentionally retaliated against Ms. Mohamed, as well as discriminated against her. The Tenth Circuit upheld a judgment of punitive damages in a case that involved a very similar instruction in *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1320 (10th Cir. 2022). The instruction in *Fresquez* included the preponderance of the evidence standard, the three elements to consider when deciding the amount of punitive damages, and an advisement that punitive damages cannot be awarded if the retaliatory actions by a defendant's employees were contrary to the defendant's good faith efforts to comply. *Id.*

**Defendant's Argument:** Defendant objects to introducing this instruction before liability has been establish, as explained in more detail in its motion to bifurcate. In any event, Plaintiff's instruction fails to provide all of the relevant factors that a jury should consider in determining whether its award of punitive damages bears a reasonable relationship to Plainitff's actual injuries.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**PLAINTIFF'S SECOND PROPOSED COMPETING AND NON-STIPULATED JURY INSTRUCTIONS**

---

**EQUALITY UNDER THE LAW**

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. Corporations are entitled to the same fair trial as a private individual. All persons, including corporations, stand equal before the law, and are to be treated as equals. You should not be influenced by who the parties are, or who the witnesses are, i.e., whether they are rich or poor, young or old, well-educated or not.

You also should be aware of the natural human tendency to look at others, and to filter what they have to say, through the lens of our own personal experience and background. Because we all do this, we often see life – and evaluate evidence – in a waythat tends to favor people who are like ourselves or who have had life experiences likeour own. In deciding this case, I urge you to be aware of this natural human tendency to stereotype other people and to make assumptions about them based on the stereotypes, and I urge you to avoid such stereotyping.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This is Instruction Number 9 from Hon. Christine M. Arguello's stock civil jury instructions[1] and has been given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) (Dkt. #114). As written, it clearly communicates that both Ms. Mohamed, as an individual, and SHRM, as a corporation, should be treated as equals before the law. Defendant's addition that it should not be held to a higher standard under the law because of its type of business is redundant. It is also potentially confusing to jurors who may find Defendant liable for punitive damages based on the company's managerial employees' knowledge of best practices in human resources given that this is at the crux of Defendant's business.

[1] http://www.cod.uscourts.gov/Portals/0/Documents/Judges/CMA/CMA_Civil_Final_Jury_Instructions.pdf (last visited Sept. 25, 2025).

**Defendant's Argument:** It is critical to include language which states that Defendant is not held to any higher standard under the law because it offers educational training and resources for human resources professionals. This additional language is a correct statement of the law and would in no way be prejudicial to Plaintiff. While Defendant concedes that this language may not be traditionally included within this instruction, the fact that Defendant is a human resource company is a unique fact that warrants this deviation from the pattern instructions.

**EVIDENCE – DIRECT VS. CIRCUMSTANTIAL**

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. You may draw from the facts you find have been proved such reasonable inference as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

Generally speaking, there are two types of evidence that are presented during a trial: direct evidence and circumstantial evidence. "Direct evidence" is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of facts and circumstances indicating the existence or nonexistence of a fact.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and *Gonzalez v. Univ. of Colo.*, No. 1:18-cv-01178-RBJ (D. Colo.). It provides a clear explanation of direct and circumstantial evidence and the inferences that can follow from the latter. It further uses the rain and wet umbrella example to reiterate these concepts in a way that is accessible to laypeople. Defendant's competing instruction lacks the illustrative example and an introductory sentence that orients jurors to the two types of evidence.

**Defendant's Argument:** Defendant objects to this instruction, largely because of its use of the hypothetical involving the rain and a wet umbrella. Providing such a hypothetical oversimplifies circumstantial evidence and suggests that a piece of circumstantial evidence is indisputable proof of a fact. Moreover, it encourages the jury to draw a specific conclusion (that it was raining) from a set of facts, thereby encroaching on the jury's role as the finder of fact. Defendant also believes it is clearer to have two separate jury instructions---one for direct and circumstantial evidence, and another for inferences. Indeed, this very Court has previously endorsed the separation of these instructions. *See Wolfard v. Douglas Cnty. Sch. Dist.*, Case No. 21-CV-02552-GPG-STV (Dkt. No. 113).

**BURDEN OF PROOF AND PREPONDERANCE OF THE EVIDENCE**

Ms. Mohamed has the burden of proving her claims by a preponderance of the evidence. To prove something by a "preponderance of the evidence" means to prove that it is more probably true than not true. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case. Nor does it require proof "beyond a reasonable doubt" which is a stricter standard that applies in criminal cases.

If you find that the evidence as to a claim or defense weighs so evenly that you are unable to say that there is a preponderance of the evidence on either side, you must reject that claim or defense.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

Those of you who have participated in criminal cases will have heard of "proof beyond a reasonable doubt." The standard of proof in a criminal case is a stricter standard, requiring more proof than a preponderance of evidence. The reasonable doubt standard does not apply to a civil case and you should put that standard out of your mind.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and *Gonzalez v. Univ. of Colo.*, No. 1:18-cv-01178-RBJ (D. Colo.). Given the familiarity of many laypersons with the criminal standard for guilt, it is important to make clear the difference between beyond a reasonable doubt and the civil preponderance of the evidence standards. This instruction does so explicitly in simple terms. It also makes clear to jurors that proof to an absolute certain, which is a common misconception, is not necessary.

**Defendant's Argument:** Defendant objects to this instruction on the basis that it references the "reasonable doubt" standard, which has no application in this case. Moreover, this specific instruction references the reasonable doubt standard on two separate occasions. Defendant believes this is confusing and may mislead the jury.

**42 U.S.C. § 1981 – STATUTE INVOLVED**

In this case, Ms. Mohamed brings claims of race discrimination and retaliation under a federal civil rights law called Section 1981 of the Civil Rights Act of 1991, also known as "Section 1981."

Section 1981 provides in pertinent part as follows:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts… and to the full and equal benefit of all laws and proceedings for the security of persons and property as isenjoyed by white citizens.

For purposes of Section 1981, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the employment relationship.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction is taken directly from the Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – STATUTE INVOLVED, p. 2 (Sept. 2013). It cites directly to 42 U.S.C. § 1981. This instruction provides important context for the jury regarding the substance of the law that the jury is being tasked with applying. This instruction was given by Hon. Charlotte N. Sweeney in a recent Section 1981 case, *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377), with a slight difference in the last paragraph, i.e., all text after "termination of contracts" was omitted in the *Joppy* instruction.

**Defendant's Argument:** Defendant objects to this instruction to the extent it is overly detailed and dense. There is no reason that the jury needs to be informed of the text of the statute. Moreover, the statute's reference to making and enforcing contracts is of no consequence to this case. Defendant does not contest the fact that it terminated Plaintiff's employment. As such, the language included in this instruction is likely to cause confusion amongst the jurors and may mislead them.

**42 U.S.C. § 1981 – DISCRIMINATION BASED ON RACE**

Ms. Mohamed claims that Defendant's termination of her constitutes race discrimination.

In order for Ms. Mohamed to establish her claim for race discrimination under Section 1981, she must prove the following by a preponderance of the evidence:

1. Defendant SHRM terminated Ms. Mohamed; and
2. Defendant SHRM would not have terminated Ms. Mohamed but for her race.

Regarding the second element, race must be a "but-for" cause of Ms. Mohamed's terminationthe adverse employment action. SHRM may be held liable for race discrimination if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her race was the factor that made a difference. Ms. Mohamed's race does not need to be the sole or primary cause of Defendant's decision to terminate heraction, but Ms. Mohamed must show that it played a part.

Defendant SHRM does not dispute that it terminated Ms. Mohamed. As a result, Ms. Mohamed only needs to prove the second element, i.e., that SHRM would not have terminated her but for her race. If you find that Ms. Mohamed has failed to prove the second element by a preponderance of the evidence, then you must find against her on her discrimination claim and in favor of Defendant SHRM. If, on the other hand, you find that Ms. Mohamed has proved the second element by a preponderance of the evidence, then you must find in her favor and against

Defendant SHRM.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** ItThis instruction is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – DISCRIMINATION BASED ON RACE, p. 4 (Sept. 2013), but has been updated to include the but-for causation standard that is applicable to Section 1981 discrimination and retaliation claims. This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and has been modified as to party names and, clarification that Ms. Mohamed need only prove the second element because it is undisputed that SHRM terminated her, and further clarification that Ms. Mohamed's race need be "the factor that made a difference" rather than "played a part." It is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – DISCRIMINATION BASED ON RACE, p. 4 (Sept. 2013), but has been updated to include the but-for causation standard that is applicable to Section 1981 discrimination and retaliation claims. This is consistent with the e instruction provides the elements of a Section 1981 discrimination claim and an accurate explanation of the but-for causation standard as set forth in *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). In *Jones*, the Tenth Circuit made clear that the but-for causation standard requires that a plaintiff show that their protected class was "the factor that made a difference," not that it was the sole motivating cause. The U.S. Supreme Court came to the same conclusion in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020), where it revisited the but-for standard in the context of a Title VII discrimination claim based on sexual orientation and transgender status. The *Bostock* Court states unequivocally that "the plaintiff's sex need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. Furthermore, the Court noted that "a traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the [prohibited factor] was one but-for cause of that decision, it is enough to trigger the law." *Id.* at 1739; s. S*ee also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation because events frequently have multiple but-for causes). This is consistent with *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020), which states that "a plaintiff bears the burden of showing that race was a but-for cause of its injury." *Amarsingh v. Frontier Airlines, Inc.*, 2024 U.S. Dist. LEXIS 190288 at *10 (D. Colo. Sept. 24, 2024) (*quoting Comcast*, 589 U.S. at 333).

**Defendant's Argument:** Defendant objects to this instruction to the extent it is inconsistent with the law. More specifically, Defendant objects to this instruction's use of the phrase "**a** 'but-for' cause." As courts in this jurisdiction and the U.S. Supreme Court have explained, in order to prevail on a Section 1981 claim, "a plaintiff must show that her race was not just one factor, but indeed the reason for, her injuries." *Garcia v. Summit Tech. Sols., LLC*, No. 21-CV-03077-CNS-MDB, 2022 WL 4467038, at *4 (D. Colo. Sept. 26, 2022), *report and recommendation adopted*, No. 121CV03077CNSMDB, 2022 WL 10028881 (D. Colo. Oct. 17, 2022); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 589 U.S. 327, 344, 140 S. Ct. 1009, 1021, 206 L. Ed. 2d 356 (2020) (Ginsberg, J., concurring in judgment) ("The Court holds today that Entertainment Studios must plead and prove that race was **the** but-for cause of its injury […].") (emphasis added); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350, 174 L. Ed. 2d 119 (2009) (explaining that in order to prove that age was the but-for cause of the adverse employment action, the plaintiff must prove that "age was the 'reason' the employer decided to act"). While race need not be the sole cause of Ms. Mohamed's termination, the use of the phrase "the but-for cause" does not demand that it be. It is for this very reason that the Tenth Circuit has approved of jury instructions which state that a plaintiff must prove "the but-for cause." *See McDonald v. City of Wichita, Kansas*, 735 F. App'x 529, 532 (10th Cir. 2018) ("We reject McDonald's contention that 'the but for cause' is the equivalent of a 'sole cause' standard."). Defendant further objects to this instruction to the extent Plaintiff has added gratuitous language which inappropriately gives a directive to the jury.

**42 U.S.C. § 1981 – RETALIATION GENERALLY**

Ms. Mohamed's claim for retaliation is also brought under Section 1981. The purpose of Section 1981 is to protect the rights of individuals to be free from workplace discrimination. The anti-retaliation protection in Section 1981 provides that it is unlawful for an employer to retaliate against an individual because she in good faith opposed what she believed were discriminatory or retaliatory employment practices.

**PLAINTIFF'S NON-STIPULATED INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377). It is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, RETALIATION – STATUTE INVOLVED, p. 47 (Sept. 2013) and modified with respect to party names and the relevant protected activity, i.e., opposition rather than participation. This instruction provides context for the jury regarding the substance of the law that the jury is being tasked with applying.

**Defendant's Argument:** To prevail on a Section 1981 retaliation claim—like a Section 1981 discrimination claim—the but-for standard articulated in *Comcast Corp.,* 140 S. Ct. at 1014, applies. *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 92 (D.D.C. 2024) ("[I]t seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims."). The suggestion in this instruction, that there may be more than one but-for cause, is inconsistent with the law. *See, e.g., Romero v. Tucson Unified Sch. Dist.,* No. CV-20-00507-TUC-AMM, 2024 WL 4893941, at *2 (D. Ariz. Nov. 26, 2024) ("In Nassar and Comcast, the Supreme Court held a plaintiff must show his protected activity was the but-for cause of his employer's actions in order to establish a prima facie case of retaliation.").

**42 U.S.C. § 1981 – ELEMENTS OF RETALIATION**

Ms. Mohamed claims that SHRM's termination of her amounts to retaliation. In order for Ms. Mohamed to establish her claim for retaliation under Section 1981, she must prove the following by a preponderance of the evidence:

1. Ms. Mohamed complained about what she reasonably believed was race discrimination and/or retaliation;
2. SHRM terminated Ms. Mohamed; and
3. SHRM would not have terminated Ms. Mohamed but for Ms. Mohamed's complaints of discrimination and/or retaliation.

SHRM does not dispute that it terminated Ms. Mohamed. As a result, Ms. Mohamed only needs to prove the first and third elements.

Regarding the third element, retaliation or retaliatory motive must be a "but-for" cause of Ms. Mohamed's termination the adverse employment action. SHRM may be held liable for retaliation if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that herMs. Mohamed's complaints of discrimination and/or retaliation were the factor that made a difference. Ms. Mohamed's complaints of discrimination and/or retaliation do not need to be the sole or primary cause of SHRM's decision to termination ofe her, but Ms. Mohamed must show that they played a part.

If you find that Ms. Mohamed has failed to prove the first and third elements by a preponderance of the evidence, then you must find against her on her retaliation claim and in favor of Defendant SHRM. If, on the other hand, you find that Ms. Mohamed has

proved the first and third elements by a preponderance of the evidence, then you must find in her favor and against Defendant SHRM.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and modified with respect to party names and, clarification that Ms. Mohamed need not prove the second element because it is undisputed that SHRM terminated her, and further clarification that Ms. Mohamed's protected activity need be "the factor that made a difference" rather than "played a part." The instruction enumerates the proper elements for a retaliation claim, *e.g., Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017), along with guidance on but-for causation, *Miller v. Nat'l Jewish Health*, 2024 U.S. Dist. LEXIS 49600 at **43-44 (D. Colo. March 20, 2024) (holding that a plaintiff must demonstrate "that retaliation played a part in the employment decision" to make out a Title VII retaliation claim) (*quoting Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008)). The instruction is also consistent with the Tenth Circuit's explanation of but-for causation as set forth in *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010) (finding that but-for causation requires that a plaintiff show that their protected class was "the factor that made a difference," not that it was the sole motivating cause). Under the law, there can indeed be more than one but-for cause. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1748 (2020) (noting that "[o]ften events have multiple but-for causes"). And the U.S. Supreme Court has made clear that the plaintiff's protected characteristic "need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. *See also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation because events frequently have multiple but-for causes).

**Formatted:** Font: Italic

**Defendant's Argument:** To prevail on a Section 1981 retaliation claim—like a Section 1981 discrimination claim—the but-for standard articulated in *Comcast Corp.,* 140 S. Ct. at 1014, applies. *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 92 (D.D.C. 2024) ("[I]t seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims."). The suggestion in this instruction, that there may be more than one but-for cause, is inconsistent with the law. *See, e.g., Romero v. Tucson Unified Sch. Dist.,* No. CV-20-00507-TUC-AMM, 2024 WL 4893941, at *2 (D. Ariz. Nov. 26, 2024) ("In Nassar and Comcast, the Supreme Court held a plaintiff must show his protected activity was the but-for cause of his employer's actions in order to establish a prima facie case of retaliation."). While Ms. Mohamed's protected activity need not be the sole cause her

termination, the use of the phrase "the but-for cause" does not demand that it be. It is for this very reason that the Tenth Circuit has approved of jury instructions which state that a plaintiff must prove "the but-for cause." *See McDonald v. City of Wichita, Kansas*, 735 F. App'x 529, 532 (10th Cir. 2018) ("We reject McDonald's contention that 'the but for cause' is the equivalent of a 'sole cause' standard.").

**PRETEXT**

Ms. Mohamed claims that Defendant SHRM's stated reasons for its termination of Ms. Mohamed are false, but instead are a pretext (an excuse) to cover up for race discrimination and/or retaliation.

If you do not believe one or more of the reasons Defendant SHRM offered for the termination, then you may, but are not required to, infer that race and/or retaliation was a factor that made a difference in Defendant SHRM's decision to terminate Ms. Mohamed. Ms. Mohamed need not disprove every reason stated by Defendant SHRM in order to prove pretext.

Ms. Mohamed may show that Defendant SHRM's stated reasons for its actions are pretextual (not the true reason) in any of several ways. Some examples of ways (although these are not the only ways) in which you may determine that Defendant's stated reasons are pretext are:

- Evidence that Defendant SHRM treated Ms. Mohamed differently compared to similarly situated white employees;
- Evidence that Defendant SHRM used subjective criteria in its evaluation of Ms. Mohamed;
- Evidence of Defendant SHRM's prior treatment of Ms. Mohamed;
- Evidence that one or more of Defendant SHRM's witnesses lack credibility;
- Evidence of temporal proximity between Ms. Mohamed's complaints of discrimination and retaliation and the actions that Defendant SHRM's employees took to effectuate Ms. Mohamed's termination;
- Evidence that Defendant SHRM exhibited disturbing procedural irregularities in dealing with Ms. Mohamed, including acting contrary to its policy or established practice;

- Evidence that Defendant SHRM failed to fully investigate Ms. Mohamed's complaints of discrimination and/or retaliation;

- Evidence that Defendant SHRM did not uniformly enforce its own rules; and/or

- Evidence that any one of Defendant SHRM's stated reasons for Ms. Mohamed's termination is false, contradictory, implausible, or not worthy of belief.

In determining whether Defendant SHRM's stated reasons for its actions are genuine or pretextual, you may consider any or all of these factors. If you find pretext, you may, but are not required to infer that race and/or retaliation was a factor that made the difference in Defendant SHRM's termination of Ms. Mohamed.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and modified as to party names and relevant types of evidence of pretext. It is also the model instruction for pretext proffered by the Faculty of Federal Advocates Ad Hoc Committee, Pretext, pp. 6-7 (Sept. 2013). The instruction provides general guidance to jurors about what constitutes pretext and goes on to enumerate specific types of pretext evidence that are present in the case. The latter is supported by: Order Denying Defendant SHRM's Motion for Summary Judgment (Dkt. # 89) p. 11 (noting that "[t]he timing of Defendant's employee's termination-related actions, which began well before the August 31 deadline, casts substantial doubt on Defendant's assertion that Barley decided to terminate Mohamed on September 1 solely because she failed to meet the previous day's deadlines.") (Dkt. 89); *id.* at p. 11 n.11 (noting that "a jury could reasonably conclude that the investigation was a sham"); *Potter v. Synerlink Corp.*, 562 Fed. Appx. 665, 677-78 (10th Cir. 2014) (witness' impugned credibility may be evidence of pretext); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (treatment of similarly situated employees is evidence of pretext); and *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984) (*citing Mohammed v. Callaway*, 698 F.2d 395, 399 (10th Cir. 1983)) (identifying "the employer's prior treatment of the plaintiff" and "the use of subjective criteria" as types of evidence that may be relevant to a showing of pretext).

**Defendant's Argument:** Defendant objects to this instruction in light of the fact that it seeks to apply the pretext standard to the facts of this particular case. This, of course, is unduly suggestive and prejudicial. Additionally, this instruction omits the fact that it is Plaintiff's burden to establish pretext at trial. *See Randle v. City of Aurora,* 69 F.3d 441, 453 n. 18 (10th Cir. 1995) ("At trial, the plaintiff must convince the jury not only that the reason proffered by the defendant was pretextual, but that the jury should infer that the defendant's pretext concealed a motive of discriminating against the plaintiff in violation of the civil rights laws."); *Lyons v. Red Roof Inns, Inc,* 130 F. App'x 957, 961 (10th Cir. 2005) ("At trial, the plaintiff must prove illegal discrimination either (1) inferentially by showing that the proffered reason is a pretext for discrimination; and/or (2) directly by offering direct evidence of discrimination.") (citations and quotations omitted).

**DAMAGES – COMPENSATORY DAMAGES**

If you find that Defendant SHRM unlawfully discriminated or retaliated against Ms. Mohamed, then you must determine an amount that is fair compensation for her losses. You may award compensatory damages for injuries that Ms. Mohamed proved were caused by Defendant SHRM's wrongful conduct. The damages that you award must be fair compensation, no more and no less.

You may award damages for any emotional distress, pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, and damage to reputation that Ms. Mohamed experienced as a consequence of the wrongful conduct. No evidence of monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence. There is no exact standard for setting the compensation to be awarded for these elements of damages. Any award you make should be fair in light of the evidence presented at trial.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument**: This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and modified with respect to party names. The instruction lists the full panoply of harms that are recoverable by a plaintiff as compensatory damages. *E.g., Foster v. MCI Telecommunications Corp.*, 773 F.2d 1116, 1118 (10th Cir. 1985) (upholding a compensatory damages award for "embarrassment, humiliation, severe anxiety and great emotional suffering"); *Thornton v. Kaplan*, 958 F.Supp. 502, 504 (D. Colo. 1996) (upholding an award for compensatory damages to a plaintiff who prevailed on a retaliation claim for "emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life"). In section (II)(A)(2) its Enforcement Guidance: Compensatory and Punitive Damages,[2] the EEOC lists additional nonpecuniary losses that are recoverable as compensatory damages, including emotional pain, suffering,

[2] https://www.eeoc.gov/policy/docs/damages.html (last visited Sept. 25, 2025).

inconvenience, mental anguish, loss of enjoyment of life, and "injury to character and reputation."

**Defendant's Argument:** Defendant objects to this instruction in light of the fact that the terms used to describe the types of compensatory damages available to Plaintiff (e.g., pain, suffering, inconvenience, mental anguish, etc.) are duplicative, unnecessary, and prejudicial. *See Wolfard v. Douglas Cnty. Sch. Dist.*, Case No. 21-CV-02552-GPG-STV (Dkt. No. 113) (stating only that the jury "may award damages for any pain, suffering, or mental anguish").

**DAMAGES – PUNITIVE DAMAGES**

If you find that Defendant SHRM intentionally discriminated or retaliated against Ms. Mohamed, the law allows, but does not require, an award of punitive damages. The purpose of an award of punitive damages is to punish a wrongdoer for misconduct, and also to provide a warning to others.

You may award punitive damages if you find that Defendant SHRM engaged in discrimination or retaliation with malice or with reckless indifference to the right of Ms. Mohamed to be free from such intentional discrimination and retaliation. In order to find Defendant SHRM liable for punitive damages, you must find that Defendant SHRM discriminated or retaliated in the face of a perceived risk that its actions would violate federal law.

In deciding the amount of punitive damages, you may consider the following:

1. The offensiveness of the conduct;
2. The amount needed, considering Defendant SHRM's financial condition, to prevent the conduct from being repeated; and
3. Whether the amount of punitive damages bears a reasonable relationship to the actual damages awarded.

Where discriminatory acts on the part of Defendant SHRM's managerial employees were contrary to Defendant SHRM's good faith efforts to comply with the law by implementing and enforcing policies and programs designed to prevent unlawful discrimination, you shall not award punitive damages.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and modified with respect to party names. It is identical in substance to the model instruction for punitive damages proffered by the Faculty of Federal Advocates Ad Hoc Committee, pp. 66 (Sept. 2013) with the exception of the parties' names and the fact that punitive damages would result from a finding that SHRM intentionally retaliated against Ms. Mohamed, as well as discriminated against her. The Tenth Circuit upheld a judgment of punitive damages in a case that involved a very similar instruction in *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1320 (10th Cir. 2022). The instruction in *Fresquez* included the preponderance of the evidence standard, the three elements to consider when deciding the amount of punitive damages, and an advisement that punitive damages cannot be awarded if the retaliatory actions by a defendant's employees were contrary to the defendant's good faith efforts to comply. *Id.*

**Defendant's Argument:** Defendant objects to introducing this instruction before liability has been establish, as explained in more detail in its motion to bifurcate. In any event, Plaintiff's instruction fails to provide all of the relevant factors that a jury should consider in determining whether its award of punitive damages bears a reasonable relationship to Plainitff's actual injuries.

**Ariel DeFazio**

**From:** Ariel DeFazio
**Sent:** Wednesday, November 5, 2025 12:55 PM
**To:** Gallagher Chambers
**Cc:** Hunter Swain; Carol Allen; Darrow, Tanja; vwoodfork_littler.com; Wolfson, Julian G.G.; Hankins, Nicholas
**Subject:** RE: 22cv1625 - Mohamed v. SHRM - Plaintiff's Second Competing & Non-Stipulated Jury Instructions
**Attachments:** Mohamed v. SHRM (22-cv-01625-GPG-KAS) Pla's Second Competing & Non-Stipulated Jury Instructions (with Def additions).docx; Mohamed v. SHRM (22-cv-01625-GPG-KAS) Pla's Second Competing & Non-Stipulated Jury Instructions (redlined with Def additions).docx

Good afternoon,

My apologies for the additional email, but please see the attached second set of proposed competing and non-stipulated jury instructions from Plaintiff. The files that I sent earlier today can be disregarded. Defendant's counsel had additional arguments that they wanted to have added to the two modified instructions.

Thank you again,

**Ariel DeFazio**
**(she/her/hers)**

Lowrey Parady Lebsack, LLC
1490 Lafayette Street, Suite 304
Denver, CO 80218
office 303.593.2595 | direct 720.239.2975 | fax 303.502.9119
web www.lowrey-parady.com
email ariel@lowrey-parady.com

**CLIENTS**: Do not forward this email, as doing so may cause it to lose its status as a privileged communication.
**CONFIDENTIALITY NOTICE:** The information contained in this e-mail is confidential, intended only for the named addressee, and may be protected by attorney-client privilege and/or as attorney work product. If you believe you have received this e-mail in error, please notify us immediately and delete this email and any copies of the same.

---

**From:** Gallagher Chambers <Gallagher_Chambers@cod.uscourts.gov>
**Sent:** Wednesday, November 5, 2025 11:19 AM
**To:** Ariel DeFazio <ariel@lowrey-parady.com>
**Cc:** Hunter Swain <hunter@swainemploymentlaw.com>; Carol Allen <carol@lowrey-parady.com>; Darrow, Tanja <tdarrow@littler.com>; vwoodfork_littler.com <vwoodfork@littler.com>; Wolfson, Julian G.G. <jwolfson@littler.com>; Hankins, Nicholas <nhankins@littler.com>
**Subject:** 22cv1625 - Mohamed v. SHRM - Plaintiff's Second Competing & Non-Stipulated Jury Instructions

Rec'd.

**Angela Barnes**
Law Clerk to the Honorable Gordon P. Gallagher
United States District Judge
District of Colorado
Aspinall Federal Bldg.
400 Rood Avenue
Grand Junction, CO 81501
970-241-8932, Option 0

---

**From:** Ariel DeFazio <ariel@lowrey-parady.com>
**Sent:** Wednesday, November 05, 2025 10:54 AM
**To:** Gallagher Chambers <Gallagher_Chambers@cod.uscourts.gov>
**Cc:** Hunter Swain <hunter@swainemploymentlaw.com>; Carol Allen <carol@lowrey-parady.com>; Darrow, Tanja <tdarrow@littler.com>; vwoodfork_littler.com <vwoodfork@littler.com>; Wolfson, Julian G.G. <jwolfson@littler.com>; Hankins, Nicholas <nhankins@littler.com>
**Subject:** Mohamed v. SHRM - Plaintiff's Second Competing & Non-Stipulated Jury Instructions

**CAUTION - EXTERNAL:**

Good morning,

With this email, Plaintiff is submitting a second set of proposed competing and non-stipulated jury instructions for the Court's consideration. This set includes modified instructions for Section 1981 race discrimination (pp. 9-11) and Section 1981 retaliation (pp. 13-15). We have included a redlined version so that the Court can see the changes that we made from the first set of proposed competing and non-stipulated jury instructions submitted on September 26.

Both original proposed instructions were based on instructions given in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV. Since September 26, we have learned that the instructions in *Joppy* have been the subject of post-trial briefing and likely a subsequent Tenth Circuit appeal. We have revisited and modified the instructions accordingly.

Thank you,

**Ariel DeFazio**
(she/her/hers)

Lowrey Parady Lebsack, LLC
1490 Lafayette Street, Suite 304
Denver, CO 80218
office 303.593.2595 | direct 720.239.2975 | fax 303.502.9119
web www.lowrey-parady.com
email ariel@lowrey-parady.com

**CLIENTS**: Do not forward this email, as doing so may cause it to lose its status as a privileged communication.

**CONFIDENTIALITY NOTICE:** The information contained in this e-mail is confidential, intended only for the named addressee, and may be protected by attorney-client privilege and/or as attorney work product. If you believe you have received this e-mail in error, please notify us immediately and delete this email and any copies of the same.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**PLAINTIFF'S SECOND PROPOSED COMPETING AND NON-STIPULATED JURY INSTRUCTIONS**

---

**EQUALITY UNDER THE LAW**

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. Corporations are entitled to the same fair trial as a private individual. All persons, including corporations, stand equal before the law, and are to be treated as equals. You should not be influenced by who the parties are, or who the witnesses are, i.e., whether they are rich or poor, young or old, well-educated or not.

You also should be aware of the natural human tendency to look at others, and to filter what they have to say, through the lens of our own personal experience and background. Because we all do this, we often see life – and evaluate evidence – in a waythat tends to favor people who are like ourselves or who have had life experiences likeour own. In deciding this case, I urge you to be aware of this natural human tendency to stereotype other people and to make assumptions about them based on the stereotypes, and I urge you to avoid such stereotyping.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This is Instruction Number 9 from Hon. Christine M. Arguello's stock civil jury instructions[1] and has been given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) (Dkt. #114). As written, it clearly communicates that both Ms. Mohamed, as an individual, and SHRM, as a corporation, should be treated as equals before the law. Defendant's addition that it should not be held to a higher standard under the law because of its type of business is redundant. It is also potentially confusing to jurors who may find Defendant liable for punitive damages based on the company's managerial employees' knowledge of best practices in human resources given that this is at the crux of Defendant's business.

---

[1] http://www.cod.uscourts.gov/Portals/0/Documents/Judges/CMA/CMA_Civil_Final_Jury_Instructions.pdf (last visited Sept. 25, 2025).

**Defendant's Argument:** It is critical to include language which states that Defendant is not held to any higher standard under the law because it offers educational training and resources for human resources professionals. This additional language is a correct statement of the law and would in no way be prejudicial to Plaintiff. While Defendant concedes that this language may not be traditionally included within this instruction, the fact that Defendant is a human resource company is a unique fact that warrants this deviation from the pattern instructions.

**EVIDENCE – DIRECT VS. CIRCUMSTANTIAL**

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. You may draw from the facts you find have been proved such reasonable inference as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

Generally speaking, there are two types of evidence that are presented during a trial: direct evidence and circumstantial evidence. "Direct evidence" is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of facts and circumstances indicating the existence or nonexistence of a fact.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and *Gonzalez v. Univ. of Colo.*, No. 1:18-cv-01178-RBJ (D. Colo.). It provides a clear explanation of direct and circumstantial evidence and the inferences that can follow from the latter. It further uses the rain and wet umbrella example to reiterate these concepts in a way that is accessible to laypeople. Defendant's competing instruction lacks the illustrative example and an introductory sentence that orients jurors to the two types of evidence.

**Defendant's Argument:** Defendant objects to this instruction, largely because of its use of the hypothetical involving the rain and a wet umbrella. Providing such a hypothetical oversimplifies circumstantial evidence and suggests that a piece of circumstantial evidence is indisputable proof of a fact. Moreover, it encourages the jury to draw a specific conclusion (that it was raining) from a set of facts, thereby encroaching on the jury's role as the finder of fact. Defendant also believes it is clearer to have two separate jury instructions---one for direct and circumstantial evidence, and another for inferences. Indeed, this very Court has previously endorsed the separation of these instructions. *See Wolfard v. Douglas Cnty. Sch. Dist.*, Case No. 21-CV-02552-GPG-STV (Dkt. No. 113).

## BURDEN OF PROOF AND PREPONDERANCE OF THE EVIDENCE

Ms. Mohamed has the burden of proving her claims by a preponderance of the evidence. To prove something by a "preponderance of the evidence" means to prove that it is more probably true than not true. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case. Nor does it require proof "beyond a reasonable doubt" which is a stricter standard that applies in criminal cases.

If you find that the evidence as to a claim or defense weighs so evenly that you are unable to say that there is a preponderance of the evidence on either side, you must reject that claim or defense.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

Those of you who have participated in criminal cases will have heard of "proof beyond a reasonable doubt." The standard of proof in a criminal case is a stricter standard, requiring more proof than a preponderance of evidence. The reasonable doubt standard does not apply to a civil case and you should put that standard out of your mind.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and *Gonzalez v. Univ. of Colo.*, No. 1:18-cv-01178-RBJ (D. Colo.). Given the familiarity of many laypersons with the criminal standard for guilt, it is important to make clear the difference between beyond a reasonable doubt and the civil preponderance of the evidence standards. This instruction does so explicitly in simple terms. It also makes clear to jurors that proof to an absolute certain, which is a common misconception, is not necessary.

**Defendant's Argument:** Defendant objects to this instruction on the basis that it references the "reasonable doubt" standard, which has no application in this case. Moreover, this specific instruction references the reasonable doubt standard on two separate occasions. Defendant believes this is confusing and may mislead the jury.

## 42 U.S.C. § 1981 – STATUTE INVOLVED

In this case, Ms. Mohamed brings claims of race discrimination and retaliation under a federal civil rights law called Section 1981 of the Civil Rights Act of 1991, also known as "Section 1981."

Section 1981 provides in pertinent part as follows:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts… and to the full and equal benefit of all laws and proceedings for the security of persons and property as isenjoyed by white citizens.

For purposes of Section 1981, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the employment relationship.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction is taken directly from the Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – STATUTE INVOLVED, p. 2 (Sept. 2013). It cites directly to 42 U.S.C. § 1981. This instruction provides important context for the jury regarding the substance of the law that the jury is being tasked with applying. This instruction was given by Hon. Charlotte N. Sweeney in a recent Section 1981 case, *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377), with a slight difference in the last paragraph, i.e., all text after "termination of contracts" was omitted in the *Joppy* instruction.

**Defendant's Argument:** Defendant objects to this instruction to the extent it is overly detailed and dense. There is no reason that the jury needs to be informed of the text of the statute. Moreover, the statute's reference to making and enforcing contracts is of no consequence to this case. Defendant does not contest the fact that it terminated Plaintiff's employment. As such, the language included in this instruction is likely to cause confusion amongst the jurors and may mislead them.

**42 U.S.C. § 1981 – DISCRIMINATION BASED ON RACE**

Ms. Mohamed claims that Defendant's termination of her constitutes race discrimination.

In order for Ms. Mohamed to establish her claim for race discrimination under Section 1981, she must prove the following by a preponderance of the evidence:

1. Defendant SHRM terminated Ms. Mohamed; and
2. Defendant SHRM would not have terminated Ms. Mohamed but for her race.

Regarding the second element, race must be a "but-for" cause of Ms. Mohamed's termination. SHRM may be held liable for race discrimination if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her race was the factor that made a difference. Ms. Mohamed's race does not need to be the sole or primary cause of Defendant's decision to terminate her.

Defendant SHRM does not dispute that it terminated Ms. Mohamed. As a result, Ms. Mohamed only needs to prove the second element, i.e., that SHRM would not have terminated her but for her race. If you find that Ms. Mohamed has failed to prove the second element by a preponderance of the evidence, then you must find against her on her discrimination claim and in favor of Defendant SHRM. If, on the other hand, you find that Ms. Mohamed has proved the second element by a preponderance of the evidence, then you must find in her favor and against Defendant SHRM.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – DISCRIMINATION BASED ON RACE, p. 4 (Sept. 2013), but has been updated to include the but-for causation standard that is applicable to Section 1981 discrimination and retaliation claims. This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and has been modified as to party names, clarification that Ms. Mohamed need only prove the second element because it is undisputed that SHRM terminated her, and further clarification that Ms. Mohamed's race need be "the factor that made a difference" rather than "played a part." This is consistent with the explanation of the but-for causation standard as set forth in *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). In *Jones*, the Tenth Circuit made clear that the but-for causation standard requires that a plaintiff show that their protected class was "the factor that made a difference," not that it was the sole motivating cause. The U.S. Supreme Court came to the same conclusion in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020), where it revisited the but-for standard in the context of a Title VII discrimination claim based on sexual orientation and transgender status. The *Bostock* Court states unequivocally that "the plaintiff's sex need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. Furthermore, the Court noted that "a traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the [prohibited factor] was one but-for cause of that decision, it is enough to trigger the law." *Id.* at 1739*; see also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation because events frequently have multiple but-for causes). This is consistent with *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020), which states that "a plaintiff bears the burden of showing that race was a but-for cause of its injury." *Amarsingh v. Frontier Airlines, Inc.*, 2024 U.S. Dist. LEXIS 190288 at *10 (D. Colo. Sept. 24, 2024) (*quoting Comcast*, 589 U.S. at 333).

**Defendant's Argument:** Defendant objects to this instruction to the extent it is inconsistent with the law. More specifically, Defendant objects to this instruction's use of the phrase "**a** 'but-for' cause." As courts in this jurisdiction and the U.S. Supreme Court have explained, in order to prevail on a Section 1981 claim, "a plaintiff must show that her race was not just one factor, but indeed the reason for, her injuries." *Garcia v.*

*Summit Tech. Sols., LLC*, No. 21-CV-03077-CNS-MDB, 2022 WL 4467038, at *4 (D. Colo. Sept. 26, 2022), *report and recommendation adopted*, No. 121CV03077CNSMDB, 2022 WL 10028881 (D. Colo. Oct. 17, 2022); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 589 U.S. 327, 344, 140 S. Ct. 1009, 1021, 206 L. Ed. 2d 356 (2020) (Ginsberg, J., concurring in judgment) ("The Court holds today that Entertainment Studios must plead and prove that race was **the** but-for cause of its injury […].") (emphasis added); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350, 174 L. Ed. 2d 119 (2009) (explaining that in order to prove that age was the but-for cause of the adverse employment action, the plaintiff must prove that "age was the 'reason' the employer decided to act"). While race need not be the sole cause of Ms. Mohamed's termination, the use of the phrase "the but-for cause" does not demand that it be. It is for this very reason that the Tenth Circuit has approved of jury instructions which state that a plaintiff must prove "the but-for cause." *See McDonald v. City of Wichita, Kansas*, 735 F. App'x 529, 532 (10th Cir. 2018) ("We reject McDonald's contention that 'the but for cause' is the equivalent of a 'sole cause' standard."). Defendant further objects to this instruction to the extent that it states that Ms. Mohamed's race need not be the primary cause of SHRM's decision to terminate her. As the Tenth Circuit has made clear, the but-for causation standard requires that a plaintiff's protected class must be "the factor that made a difference." *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). Instructing the jury that Ms. Mohamed is not required to prove that her race was the primary cause for her termination is inconsistent with this case law. Moreover, nowhere in the instructions provided to the jury in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) did the Court ever state that race need not be the "primary cause" of the adverse action. Finally, Defendant objects to this instruction to the extent Plaintiff has added gratuitous language which inappropriately gives a directive to the jury.

## 42 U.S.C. § 1981 – RETALIATION GENERALLY

Ms. Mohamed's claim for retaliation is also brought under Section 1981. The purpose of Section 1981 is to protect the rights of individuals to be free from workplace discrimination. The anti-retaliation protection in Section 1981 provides that it is unlawful for an employer to retaliate against an individual because she in good faith opposed what she believed were discriminatory or retaliatory employment practices.

**PLAINTIFF'S NON-STIPULATED INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377). It is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, RETALIATION – STATUTE INVOLVED, p. 47 (Sept. 2013) and modified with respect to party names and the relevant protected activity, i.e., opposition rather than participation. This instruction provides context for the jury regarding the substance of the law that the jury is being tasked with applying.

**Defendant's Argument:** To prevail on a Section 1981 retaliation claim—like a Section 1981 discrimination claim—the but-for standard articulated in *Comcast Corp.,* 140 S. Ct. at 1014, applies. *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 92 (D.D.C. 2024) ("[I]t seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims."). The suggestion in this instruction, that there may be more than one but-for cause, is inconsistent with the law. *See, e.g., Romero v. Tucson Unified Sch. Dist.,* No. CV-20-00507-TUC-AMM, 2024 WL 4893941, at *2 (D. Ariz. Nov. 26, 2024) ("In Nassar and Comcast, the Supreme Court held a plaintiff must show his protected activity was the but-for cause of his employer's actions in order to establish a prima facie case of retaliation.").

**42 U.S.C. § 1981 – ELEMENTS OF RETALIATION**

Ms. Mohamed claims that SHRM's termination of her amounts to retaliation. In order for Ms. Mohamed to establish her claim for retaliation under Section 1981, she must prove the following by a preponderance of the evidence:

1. Ms. Mohamed complained about what she reasonably believed was race discrimination and/or retaliation;
2. SHRM terminated Ms. Mohamed; and
3. SHRM would not have terminated Ms. Mohamed but for Ms. Mohamed's complaints of discrimination and/or retaliation.

SHRM does not dispute that it terminated Ms. Mohamed. As a result, Ms. Mohamed only needs to prove the first and third elements.

Regarding the third element, retaliation or retaliatory motive must be a "but-for" cause of Ms. Mohamed's termination. SHRM may be held liable for retaliation if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her complaints of discrimination and/or retaliation were the factor that made a difference. Ms. Mohamed's complaints of discrimination and/or retaliation do not need to be the sole or primary cause of SHRM's decision to terminate her.

If you find that Ms. Mohamed has failed to prove the first and third elements by a preponderance of the evidence, then you must find against her on her retaliation claim and in favor of Defendant SHRM. If, on the other hand, you find that Ms. Mohamed has proved the first and third elements by a preponderance of the evidence, then you must

find in her favor and against Defendant SHRM.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and modified with respect to party names, clarification that Ms. Mohamed need not prove the second element because it is undisputed that SHRM terminated her, and further clarification that Ms. Mohamed's protected activity need be "the factor that made a difference" rather than "played a part." The instruction enumerates the proper elements for a retaliation claim, *e.g., Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017), along with guidance on but-for causation, *Miller v. Nat'l Jewish Health*, 2024 U.S. Dist. LEXIS 49600 at **43-44 (D. Colo. March 20, 2024) (holding that a plaintiff must demonstrate "that retaliation played a part in the employment decision" to make out a Title VII retaliation claim) (*quoting Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008)). The instruction is also consistent with the Tenth Circuit's explanation of but-for causation as set forth in *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010) (finding that but-for causation requires that a plaintiff show that their protected class was "the factor that made a difference," not that it was the sole motivating cause). Under the law, there can indeed be more than one but-for cause. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1748 (2020) (noting that "[o]ften events have multiple but-for causes"). And the U.S. Supreme Court has made clear that the plaintiff's protected characteristic "need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. *See also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation because events frequently have multiple but-for causes).

**Defendant's Argument:** To prevail on a Section 1981 retaliation claim—like a Section 1981 discrimination claim—the but-for standard articulated in *Comcast Corp.,* 140 S. Ct. at 1014, applies. *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 92 (D.D.C. 2024) ("[I]t seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims."). The suggestion in this instruction, that there may be more than one but-for cause, is inconsistent with the law. *See, e.g., Romero v. Tucson Unified Sch. Dist.,* No. CV-20-00507-TUC-AMM, 2024 WL 4893941, at *2 (D. Ariz. Nov. 26, 2024) ("In Nassar and Comcast, the Supreme Court held a plaintiff must show his protected activity was the but-for cause of his employer's actions in order to establish a prima facie case of retaliation."). While Ms. Mohamed's protected activity need not be the sole cause her termination, the use of the phrase "the but-for cause" does not demand that it be. It is for this very reason that the Tenth Circuit has approved of jury instructions which state that

a plaintiff must prove "the but-for cause." *See McDonald v. City of Wichita, Kansas*, 735 F. App'x 529, 532 (10th Cir. 2018) ("We reject McDonald's contention that 'the but for cause' is the equivalent of a 'sole cause' standard."). Defendant further objects to this instruction to the extent that it states that Ms. Mohamed's complaints of discrimination and/or retaliation need not be the primary cause of SHRM's decision to terminate her. As the Tenth Circuit has made clear, the but-for causation standard requires that a plaintiff's protected class must be "the factor that made a difference." *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). Instructing the jury that Ms. Mohamed is not required to prove that her protected activity was the primary cause for her termination is inconsistent with this case law. Moreover, nowhere in the instructions provided to the jury in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) did the Court ever state that retaliation need not be the "primary cause" of the adverse action.

## PRETEXT

Ms. Mohamed claims that Defendant SHRM's stated reasons for its termination of Ms. Mohamed are false, but instead are a pretext (an excuse) to cover up for race discrimination and/or retaliation.

If you do not believe one or more of the reasons Defendant SHRM offered for the termination, then you may, but are not required to, infer that race and/or retaliation was a factor that made a difference in Defendant SHRM's decision to terminate Ms. Mohamed. Ms. Mohamed need not disprove every reason stated by Defendant SHRM in order to prove pretext.

Ms. Mohamed may show that Defendant SHRM's stated reasons for its actions are pretextual (not the true reason) in any of several ways. Some examples of ways (although these are not the only ways) in which you may determine that Defendant's stated reasons are pretext are:

- Evidence that Defendant SHRM treated Ms. Mohamed differently compared to similarly situated white employees;
- Evidence that Defendant SHRM used subjective criteria in its evaluation of Ms. Mohamed;
- Evidence of Defendant SHRM's prior treatment of Ms. Mohamed;
- Evidence that one or more of Defendant SHRM's witnesses lack credibility;
- Evidence of temporal proximity between Ms. Mohamed's complaints of discrimination and retaliation and the actions that Defendant SHRM's employees took to effectuate Ms. Mohamed's termination;
- Evidence that Defendant SHRM exhibited disturbing procedural irregularities in dealing with Ms. Mohamed, including acting contrary to its policy or established practice;

- Evidence that Defendant SHRM failed to fully investigate Ms. Mohamed's complaints of discrimination and/or retaliation;

- Evidence that Defendant SHRM did not uniformly enforce its own rules; and/or

- Evidence that any one of Defendant SHRM's stated reasons for Ms. Mohamed's termination is false, contradictory, implausible, or not worthy of belief.

In determining whether Defendant SHRM's stated reasons for its actions are genuine or pretextual, you may consider any or all of these factors. If you find pretext, you may, but are not required to infer that race and/or retaliation was a factor that made the difference in Defendant SHRM's termination of Ms. Mohamed.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and modified as to party names and relevant types of evidence of pretext. It is also the model instruction for pretext proffered by the Faculty of Federal Advocates Ad Hoc Committee, Pretext, pp. 6-7 (Sept. 2013). The instruction provides general guidance to jurors about what constitutes pretext and goes on to enumerate specific types of pretext evidence that are present in the case. The latter is supported by: Order Denying Defendant SHRM's Motion for Summary Judgment (Dkt. # 89) p. 11 (noting that "[t]he timing of Defendant's employee's termination-related actions, which began well before the August 31 deadline, casts substantial doubt on Defendant's assertion that Barley decided to terminate Mohamed on September 1 solely because she failed to meet the previous day's deadlines.") (Dkt. 89); *id.* at p. 11 n.11 (noting that "a jury could reasonably conclude that the investigation was a sham"); *Potter v. Synerlink Corp.*, 562 Fed. Appx. 665, 677-78 (10th Cir. 2014) (witness' impugned credibility may be evidence of pretext); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (treatment of similarly situated employees is evidence of pretext); and *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984) (*citing Mohammed v. Callaway*, 698 F.2d 395, 399 (10th Cir. 1983)) (identifying "the employer's prior treatment of the plaintiff" and "the use of subjective criteria" as types of evidence that may be relevant to a showing of pretext).

**Defendant's Argument:** Defendant objects to this instruction in light of the fact that it seeks to apply the pretext standard to the facts of this particular case. This, of course, is unduly suggestive and prejudicial. Additionally, this instruction omits the fact that it is Plaintiff's burden to establish pretext at trial. *See Randle v. City of Aurora,* 69 F.3d 441, 453 n. 18 (10th Cir. 1995) ("At trial, the plaintiff must convince the jury not only that the reason proffered by the defendant was pretextual, but that the jury should infer that the defendant's pretext concealed a motive of discriminating against the plaintiff in violation of the civil rights laws."); *Lyons v. Red Roof Inns, Inc,* 130 F. App'x 957, 961 (10th Cir. 2005) ("At trial, the plaintiff must prove illegal discrimination either (1) inferentially by showing that the proffered reason is a pretext for discrimination; and/or (2) directly by offering direct evidence of discrimination.") (citations and quotations omitted).

## DAMAGES – COMPENSATORY DAMAGES

If you find that Defendant SHRM unlawfully discriminated or retaliated against Ms. Mohamed, then you must determine an amount that is fair compensation for her losses. You may award compensatory damages for injuries that Ms. Mohamed proved were caused by Defendant SHRM's wrongful conduct. The damages that you award must be fair compensation, no more and no less.

You may award damages for any emotional distress, pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, and damage to reputation that Ms. Mohamed experienced as a consequence of the wrongful conduct. No evidence of monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence. There is no exact standard for setting the compensation to be awarded for these elements of damages. Any award you make should be fair in light of the evidence presented at trial.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument**: This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and modified with respect to party names. The instruction lists the full panoply of harms that are recoverable by a plaintiff as compensatory damages. *E.g., Foster v. MCI Telecommunications Corp.*, 773 F.2d 1116, 1118 (10th Cir. 1985) (upholding a compensatory damages award for "embarrassment, humiliation, severe anxiety and great emotional suffering"); *Thornton v. Kaplan*, 958 F.Supp. 502, 504 (D. Colo. 1996) (upholding an award for compensatory damages to a plaintiff who prevailed on a retaliation claim for "emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life"). In section (II)(A)(2) its Enforcement Guidance: Compensatory and Punitive Damages,[2] the EEOC lists additional nonpecuniary losses that are recoverable as compensatory damages, including emotional pain, suffering,

[2] https://www.eeoc.gov/policy/docs/damages.html (last visited Sept. 25, 2025).

inconvenience, mental anguish, loss of enjoyment of life, and "injury to character and reputation."

**Defendant's Argument:** Defendant objects to this instruction in light of the fact that the terms used to describe the types of compensatory damages available to Plaintiff (e.g., pain, suffering, inconvenience, mental anguish, etc.) are duplicative, unnecessary, and prejudicial. *See Wolfard v. Douglas Cnty. Sch. Dist.*, Case No. 21-CV-02552-GPG-STV (Dkt. No. 113) (stating only that the jury "may award damages for any pain, suffering, or mental anguish").

**DAMAGES – PUNITIVE DAMAGES**

If you find that Defendant SHRM intentionally discriminated or retaliated against Ms. Mohamed, the law allows, but does not require, an award of punitive damages. The purpose of an award of punitive damages is to punish a wrongdoer for misconduct, and also to provide a warning to others.

You may award punitive damages if you find that Defendant SHRM engaged in discrimination or retaliation with malice or with reckless indifference to the right of Ms. Mohamed to be free from such intentional discrimination and retaliation. In order to find Defendant SHRM liable for punitive damages, you must find that Defendant SHRM discriminated or retaliated in the face of a perceived risk that its actions would violate federal law.

In deciding the amount of punitive damages, you may consider the following:

1. The offensiveness of the conduct;
2. The amount needed, considering Defendant SHRM's financial condition, to prevent the conduct from being repeated; and
3. Whether the amount of punitive damages bears a reasonable relationship to the actual damages awarded.

Where discriminatory acts on the part of Defendant SHRM's managerial employees were contrary to Defendant SHRM's good faith efforts to comply with the law by implementing and enforcing policies and programs designed to prevent unlawful discrimination, you shall not award punitive damages.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and modified with respect to party names. It is identical in substance to the model instruction for punitive damages proffered by the Faculty of Federal Advocates Ad Hoc Committee, pp. 66 (Sept. 2013) with the exception of the parties' names and the fact that punitive damages would result from a finding that SHRM intentionally retaliated against Ms. Mohamed, as well as discriminated against her. The Tenth Circuit upheld a judgment of punitive damages in a case that involved a very similar instruction in *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1320 (10th Cir. 2022). The instruction in *Fresquez* included the preponderance of the evidence standard, the three elements to consider when deciding the amount of punitive damages, and an advisement that punitive damages cannot be awarded if the retaliatory actions by a defendant's employees were contrary to the defendant's good faith efforts to comply. *Id.*

**Defendant's Argument:** Defendant objects to introducing this instruction before liability has been establish, as explained in more detail in its motion to bifurcate. In any event, Plaintiff's instruction fails to provide all of the relevant factors that a jury should consider in determining whether its award of punitive damages bears a reasonable relationship to Plainitff's actual injuries.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01625-GPG-KAS

REHAB MOHAMED,

Plaintiff,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

---

**PLAINTIFF'S SECOND PROPOSED COMPETING AND NON-STIPULATED JURY INSTRUCTIONS**

---

**EQUALITY UNDER THE LAW**

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. Corporations are entitled to the same fair trial as a private individual. All persons, including corporations, stand equal before the law, and are to be treated as equals. You should not be influenced by who the parties are, or who the witnesses are, i.e., whether they are rich or poor, young or old, well-educated or not.

You also should be aware of the natural human tendency to look at others, and to filter what they have to say, through the lens of our own personal experience and background. Because we all do this, we often see life – and evaluate evidence – in a waythat tends to favor people who are like ourselves or who have had life experiences likeour own. In deciding this case, I urge you to be aware of this natural human tendency to stereotype other people and to make assumptions about them based on the stereotypes, and I urge you to avoid such stereotyping.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This is Instruction Number 9 from Hon. Christine M. Arguello's stock civil jury instructions[1] and has been given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) (Dkt. #114). As written, it clearly communicates that both Ms. Mohamed, as an individual, and SHRM, as a corporation, should be treated as equals before the law. Defendant's addition that it should not be held to a higher standard under the law because of its type of business is redundant. It is also potentially confusing to jurors who may find Defendant liable for punitive damages based on the company's managerial employees' knowledge of best practices in human resources given that this is at the crux of Defendant's business.

[1] http://www.cod.uscourts.gov/Portals/0/Documents/Judges/CMA/CMA_Civil_Final_Jury_Instructions.pdf (last visited Sept. 25, 2025).

**Defendant's Argument:** It is critical to include language which states that Defendant is not held to any higher standard under the law because it offers educational training and resources for human resources professionals. This additional language is a correct statement of the law and would in no way be prejudicial to Plaintiff. While Defendant concedes that this language may not be traditionally included within this instruction, the fact that Defendant is a human resource company is a unique fact that warrants this deviation from the pattern instructions.

**EVIDENCE – DIRECT VS. CIRCUMSTANTIAL**

You are to consider only the evidence in the case. However, you are not limited to the statements of the witnesses. You may draw from the facts you find have been proved such reasonable inference as seem justified in light of your experience.

"Inferences" are deductions or conclusions that reason and common sense lead you to draw from facts established by the evidence in the case.

Generally speaking, there are two types of evidence that are presented during a trial: direct evidence and circumstantial evidence. "Direct evidence" is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of facts and circumstances indicating the existence or nonexistence of a fact.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining." Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

As a general rule, the law makes no distinction between direct and circumstantial evidence. The law simply requires that you find the facts in accord with all the evidence in the case, both direct and circumstantial.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and *Gonzalez v. Univ. of Colo.*, No. 1:18-cv-01178-RBJ (D. Colo.). It provides a clear explanation of direct and circumstantial evidence and the inferences that can follow from the latter. It further uses the rain and wet umbrella example to reiterate these concepts in a way that is accessible to laypeople. Defendant's competing instruction lacks the illustrative example and an introductory sentence that orients jurors to the two types of evidence.

**Defendant's Argument:** Defendant objects to this instruction, largely because of its use of the hypothetical involving the rain and a wet umbrella. Providing such a hypothetical oversimplifies circumstantial evidence and suggests that a piece of circumstantial evidence is indisputable proof of a fact. Moreover, it encourages the jury to draw a specific conclusion (that it was raining) from a set of facts, thereby encroaching on the jury's role as the finder of fact. Defendant also believes it is clearer to have two separate jury instructions---one for direct and circumstantial evidence, and another for inferences. Indeed, this very Court has previously endorsed the separation of these instructions. *See Wolfard v. Douglas Cnty. Sch. Dist.*, Case No. 21-CV-02552-GPG-STV (Dkt. No. 113).

**BURDEN OF PROOF AND PREPONDERANCE OF THE EVIDENCE**

Ms. Mohamed has the burden of proving her claims by a preponderance of the evidence. To prove something by a "preponderance of the evidence" means to prove that it is more probably true than not true. This standard does not require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case. Nor does it require proof "beyond a reasonable doubt" which is a stricter standard that applies in criminal cases.

If you find that the evidence as to a claim or defense weighs so evenly that you are unable to say that there is a preponderance of the evidence on either side, you must reject that claim or defense.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

Those of you who have participated in criminal cases will have heard of "proof beyond a reasonable doubt." The standard of proof in a criminal case is a stricter standard, requiring more proof than a preponderance of evidence. The reasonable doubt standard does not apply to a civil case and you should put that standard out of your mind.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and *Gonzalez v. Univ. of Colo.*, No. 1:18-cv-01178-RBJ (D. Colo.). Given the familiarity of many laypersons with the criminal standard for guilt, it is important to make clear the difference between beyond a reasonable doubt and the civil preponderance of the evidence standards. This instruction does so explicitly in simple terms. It also makes clear to jurors that proof to an absolute certain, which is a common misconception, is not necessary.

**Defendant's Argument:** Defendant objects to this instruction on the basis that it references the "reasonable doubt" standard, which has no application in this case. Moreover, this specific instruction references the reasonable doubt standard on two separate occasions. Defendant believes this is confusing and may mislead the jury.

**42 U.S.C. § 1981 – STATUTE INVOLVED**

In this case, Ms. Mohamed brings claims of race discrimination and retaliation under a federal civil rights law called Section 1981 of the Civil Rights Act of 1991, also known as "Section 1981."

Section 1981 provides in pertinent part as follows:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts… and to the full and equal benefit of all laws and proceedings for the security of persons and property as isenjoyed by white citizens.

For purposes of Section 1981, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the employment relationship.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction is taken directly from the Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – STATUTE INVOLVED, p. 2 (Sept. 2013). It cites directly to 42 U.S.C. § 1981. This instruction provides important context for the jury regarding the substance of the law that the jury is being tasked with applying. This instruction was given by Hon. Charlotte N. Sweeney in a recent Section 1981 case, *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377), with a slight difference in the last paragraph, i.e., all text after "termination of contracts" was omitted in the *Joppy* instruction.

**Defendant's Argument:** Defendant objects to this instruction to the extent it is overly detailed and dense. There is no reason that the jury needs to be informed of the text of the statute. Moreover, the statute's reference to making and enforcing contracts is of no consequence to this case. Defendant does not contest the fact that it terminated Plaintiff's employment. As such, the language included in this instruction is likely to cause confusion amongst the jurors and may mislead them.

**42 U.S.C. § 1981 – DISCRIMINATION BASED ON RACE**

Ms. Mohamed claims that Defendant's termination of her constitutes race discrimination.

In order for Ms. Mohamed to establish her claim for race discrimination under Section 1981, she must prove the following by a preponderance of the evidence:

1. Defendant SHRM terminated Ms. Mohamed; and
2. Defendant SHRM would not have terminated Ms. Mohamed but for her race.

Regarding the second element, race must be a "but-for" cause of Ms. Mohamed's terminationthe adverse employment action. SHRM may be held liable for race discrimination if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her race was the factor that made a difference. Ms. Mohamed's race does not need to be the sole or primary cause of Defendant's decision to terminate heraction, but Ms. Mohamed must show that it played a part.

Defendant SHRM does not dispute that it terminated Ms. Mohamed. As a result, Ms. Mohamed only needs to prove the second element, i.e., that SHRM would not have terminated her but for her race. If you find that Ms. Mohamed has failed to prove the second element by a preponderance of the evidence, then you must find against her on her discrimination claim and in favor of Defendant SHRM. If, on the other hand, you find that Ms. Mohamed has proved the second element by a preponderance of the evidence, then you must find in her favor and against

Defendant SHRM.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** ~~It~~This instruction is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – DISCRIMINATION BASED ON RACE, p. 4 (Sept. 2013), but has been updated to include the but-for causation standard that is applicable to Section 1981 discrimination and retaliation claims. This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and has been modified as to party names~~ and~~, clarification that Ms. Mohamed need only prove the second element because it is undisputed that SHRM terminated her, and further clarification that Ms. Mohamed's race need be "the factor that made a difference" rather than "played a part." ~~It is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, [TITLE VII AND/OR 42 U.S.C. § 1981] – DISCRIMINATION BASED ON RACE, p. 4 (Sept. 2013), but has been updated to include the but-for causation standard that is applicable to Section 1981 discrimination and retaliation claims.~~ This is consistent with the ~~e instruction provides the elements of a Section 1981 discrimination claim and an accurate~~ explanation of the but-for causation standard as set forth in *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). In *Jones*, the Tenth Circuit made clear that the but-for causation standard requires that a plaintiff show that their protected class was "the factor that made a difference," not that it was the sole motivating cause. The U.S. Supreme Court came to the same conclusion in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020), where it revisited the but-for standard in the context of a Title VII discrimination claim based on sexual orientation and transgender status. The *Bostock* Court states unequivocally that "the plaintiff's sex need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. Furthermore, the Court noted that "a traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the [prohibited factor] was one but-for cause of that decision, it is enough to trigger the law." *Id.* at 1739; s~~. S~~ee *also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation because events frequently have multiple but-for causes). This is consistent with *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 333 (2020), which states that "a plaintiff bears the burden of showing that race was a but-for cause of its injury." *Amarsingh v. Frontier Airlines, Inc.*, 2024 U.S. Dist. LEXIS 190288 at *10 (D. Colo. Sept. 24, 2024) (*quoting Comcast*, 589 U.S. at 333).

**Defendant's Argument:** Defendant objects to this instruction to the extent it is inconsistent with the law. More specifically, Defendant objects to this instruction's use of the phrase "**a** 'but-for' cause." As courts in this jurisdiction and the U.S. Supreme Court have explained, in order to prevail on a Section 1981 claim, "a plaintiff must show that her race was not just one factor, but indeed the reason for, her injuries." *Garcia v. Summit Tech. Sols., LLC*, No. 21-CV-03077-CNS-MDB, 2022 WL 4467038, at *4 (D. Colo. Sept. 26, 2022), *report and recommendation adopted*, No. 121CV03077CNSMDB, 2022 WL 10028881 (D. Colo. Oct. 17, 2022); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 589 U.S. 327, 344, 140 S. Ct. 1009, 1021, 206 L. Ed. 2d 356 (2020) (Ginsberg, J., concurring in judgment) ("The Court holds today that Entertainment Studios must plead and prove that race was **the** but-for cause of its injury […].") (emphasis added); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350, 174 L. Ed. 2d 119 (2009) (explaining that in order to prove that age was the but-for cause of the adverse employment action, the plaintiff must prove that "age was the 'reason' the employer decided to act"). While race need not be the sole cause of Ms. Mohamed's termination, the use of the phrase "the but-for cause" does not demand that it be. It is for this very reason that the Tenth Circuit has approved of jury instructions which state that a plaintiff must prove "the but-for cause." *See McDonald v. City of Wichita, Kansas*, 735 F. App'x 529, 532 (10th Cir. 2018) ("We reject McDonald's contention that 'the but for cause' is the equivalent of a 'sole cause' standard."). Defendant further objects to this instruction to the extent that it states that Ms. Mohamed's race need not be the primary cause of SHRM's decision to terminate her. As the Tenth Circuit has made clear, the but-for causation standard requires that a plaintiff's protected class must be "the factor that made a difference." *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). Instructing the jury that Ms. Mohamed is not required to prove that her race was the primary cause for her termination is inconsistent with this case law. Moreover, nowhere in the instructions provided to the jury in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) did the Court ever state that race need not be the "primary cause" of the adverse action. Finally, Defendant objects to this instruction to the extent Plaintiff has added gratuitous language which inappropriately gives a directive to the jury.

**42 U.S.C. § 1981 – RETALIATION GENERALLY**

Ms. Mohamed's claim for retaliation is also brought under Section 1981. The purpose of Section 1981 is to protect the rights of individuals to be free from workplace discrimination. The anti-retaliation protection in Section 1981 provides that it is unlawful for an employer to retaliate against an individual because she in good faith opposed what she believed were discriminatory or retaliatory employment practices.

**PLAINTIFF'S NON-STIPULATED INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377). It is based on Faculty of Federal Advocates Ad Hoc Committee, Model Employment Law Jury Instructions, RETALIATION – STATUTE INVOLVED, p. 47 (Sept. 2013) and modified with respect to party names and the relevant protected activity, i.e., opposition rather than participation. This instruction provides context for the jury regarding the substance of the law that the jury is being tasked with applying.

**Defendant's Argument:** To prevail on a Section 1981 retaliation claim—like a Section 1981 discrimination claim—the but-for standard articulated in *Comcast Corp.,* 140 S. Ct. at 1014, applies. *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 92 (D.D.C. 2024) ("[I]t seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims."). The suggestion in this instruction, that there may be more than one but-for cause, is inconsistent with the law. *See, e.g., Romero v. Tucson Unified Sch. Dist.,* No. CV-20-00507-TUC-AMM, 2024 WL 4893941, at *2 (D. Ariz. Nov. 26, 2024) ("In Nassar and Comcast, the Supreme Court held a plaintiff must show his protected activity was the but-for cause of his employer's actions in order to establish a prima facie case of retaliation.").

**42 U.S.C. § 1981 – ELEMENTS OF RETALIATION**

Ms. Mohamed claims that SHRM's termination of her amounts to retaliation. In order for Ms. Mohamed to establish her claim for retaliation under Section 1981, she must prove the following by a preponderance of the evidence:

1. Ms. Mohamed complained about what she reasonably believed was race discrimination and/or retaliation;
2. SHRM terminated Ms. Mohamed; and
3. SHRM would not have terminated Ms. Mohamed but for Ms. Mohamed's complaints of discrimination and/or retaliation.

SHRM does not dispute that it terminated Ms. Mohamed. As a result, Ms. Mohamed only needs to prove the first and third elements.

Regarding the third element, retaliation or retaliatory motive must be a "but-for" cause of Ms. Mohamed's termination ~~the adverse employment action~~. SHRM may be held liable for retaliation if other factors contributed to its decision to terminate Ms. Mohamed, as long as Ms. Mohamed can show that her~~Ms. Mohamed's~~ complaints of discrimination and/or retaliation were the factor that made a difference. Ms. Mohamed's complaints of discrimination and/or retaliation do not need to be the sole or primary cause of SHRM's decision to terminat~~ion of~~e her~~, but Ms. Mohamed must show that they played a part~~.

If you find that Ms. Mohamed has failed to prove the first and third elements by a preponderance of the evidence, then you must find against her on her retaliation claim and in favor of Defendant SHRM. If, on the other hand, you find that Ms. Mohamed has

proved the first and third elements by a preponderance of the evidence, then you must find in her favor and against Defendant SHRM.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and modified with respect to party names and, clarification that Ms. Mohamed need not prove the second element because it is undisputed that SHRM terminated her, and further clarification that Ms. Mohamed's protected activity need be "the factor that made a difference" rather than "played a part." The instruction enumerates the proper elements for a retaliation claim, *e.g., Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017), along with guidance on but-for causation, *Miller v. Nat'l Jewish Health*, 2024 U.S. Dist. LEXIS 49600 at **43-44 (D. Colo. March 20, 2024) (holding that a plaintiff must demonstrate "that retaliation played a part in the employment decision" to make out a Title VII retaliation claim) (*quoting Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224 (10th Cir. 2008)). The instruction is also consistent with the Tenth Circuit's explanation of but-for causation as set forth in, *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010) (finding that but-for causation requires that a plaintiff show that their protected class was "the factor that made a difference," not that it was the sole motivating cause). Under the law, there can indeed be more than one but-for cause. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1748 (2020) (noting that "[o]ften events have multiple but-for causes"). And the U.S. Supreme Court has made clear that the plaintiff's protected characteristic "need not be the sole or primary cause of the employer's adverse action." *Id.* at 1744. *See also U.S. ex re. Barrick v. Parker-Migliorini Int'l, LLC*, 79 F.4th 1262, 1277 (10th Cir. 2023) (citing *Bostock* to hold that "but-for causation . . . does not mean sole" causation because events frequently have multiple but-for causes).

**Defendant's Argument:** To prevail on a Section 1981 retaliation claim—like a Section 1981 discrimination claim—the but-for standard articulated in *Comcast Corp.,* 140 S. Ct. at 1014, applies. *Yazzie v. Nat'l Org. for Women*, 712 F. Supp. 3d 56, 92 (D.D.C. 2024) ("[I]t seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims."). The suggestion in this instruction, that there may be more than one but-for cause, is inconsistent with the law. *See, e.g., Romero v. Tucson Unified Sch. Dist.*, No. CV-20-00507-TUC-AMM, 2024 WL 4893941, at *2 (D. Ariz. Nov. 26, 2024) ("In Nassar and Comcast, the Supreme Court held a plaintiff must show his protected activity was the but-for cause of his employer's actions in order to establish a prima facie case of retaliation."). While Ms. Mohamed's protected activity need not be the sole cause her

Formatted: Font: Italic

termination, the use of the phrase "the but-for cause" does not demand that it be. It is for this very reason that the Tenth Circuit has approved of jury instructions which state that a plaintiff must prove "the but-for cause." *See McDonald v. City of Wichita, Kansas*, 735 F. App'x 529, 532 (10th Cir. 2018) ("We reject McDonald's contention that 'the but for cause' is the equivalent of a 'sole cause' standard."). Defendant further objects to this instruction to the extent that it states that Ms. Mohamed's complaints of discrimination and/or retaliation need not be the primary cause of SHRM's decision to terminate her. As the Tenth Circuit has made clear, the but-for causation standard requires that a plaintiff's protected class must be "the factor that made a difference." *Jones v. Okla. City Public Schools*, 617 F.3d 1273, 1277 (10th Cir. 2010). Instructing the jury that Ms. Mohamed is not required to prove that her protected activity was the primary cause for her termination is inconsistent with this case law. Moreover, nowhere in the instructions provided to the jury in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) did the Court ever state that retaliation need not be the "primary cause" of the adverse action.

**PRETEXT**

Ms. Mohamed claims that Defendant SHRM's stated reasons for its termination of Ms. Mohamed are false, but instead are a pretext (an excuse) to cover up for race discrimination and/or retaliation.

If you do not believe one or more of the reasons Defendant SHRM offered for the termination, then you may, but are not required to, infer that race and/or retaliation was a factor that made a difference in Defendant SHRM's decision to terminate Ms. Mohamed. Ms. Mohamed need not disprove every reason stated by Defendant SHRM in order to prove pretext.

Ms. Mohamed may show that Defendant SHRM's stated reasons for its actions are pretextual (not the true reason) in any of several ways. Some examples of ways (although these are not the only ways) in which you may determine that Defendant's stated reasons are pretext are:

- Evidence that Defendant SHRM treated Ms. Mohamed differently compared to similarly situated white employees;
- Evidence that Defendant SHRM used subjective criteria in its evaluation of Ms. Mohamed;
- Evidence of Defendant SHRM's prior treatment of Ms. Mohamed;
- Evidence that one or more of Defendant SHRM's witnesses lack credibility;
- Evidence of temporal proximity between Ms. Mohamed's complaints of discrimination and retaliation and the actions that Defendant SHRM's employees took to effectuate Ms. Mohamed's termination;
- Evidence that Defendant SHRM exhibited disturbing procedural irregularities in dealing with Ms. Mohamed, including acting contrary to its policy or established practice;

- Evidence that Defendant SHRM failed to fully investigate Ms. Mohamed's complaints of discrimination and/or retaliation;
- Evidence that Defendant SHRM did not uniformly enforce its own rules; and/or
- Evidence that any one of Defendant SHRM's stated reasons for Ms. Mohamed's termination is false, contradictory, implausible, or not worthy of belief.

In determining whether Defendant SHRM's stated reasons for its actions are genuine or pretextual, you may consider any or all of these factors. If you find pretext, you may, but are not required to infer that race and/or retaliation was a factor that made the difference in Defendant SHRM's termination of Ms. Mohamed.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and modified as to party names and relevant types of evidence of pretext. It is also the model instruction for pretext proffered by the Faculty of Federal Advocates Ad Hoc Committee, Pretext, pp. 6-7 (Sept. 2013). The instruction provides general guidance to jurors about what constitutes pretext and goes on to enumerate specific types of pretext evidence that are present in the case. The latter is supported by: Order Denying Defendant SHRM's Motion for Summary Judgment (Dkt. # 89) p. 11 (noting that "[t]he timing of Defendant's employee's termination-related actions, which began well before the August 31 deadline, casts substantial doubt on Defendant's assertion that Barley decided to terminate Mohamed on September 1 solely because she failed to meet the previous day's deadlines.") (Dkt. 89); *id.* at p. 11 n.11 (noting that "a jury could reasonably conclude that the investigation was a sham"); *Potter v. Synerlink Corp.*, 562 Fed. Appx. 665, 677-78 (10th Cir. 2014) (witness' impugned credibility may be evidence of pretext); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (treatment of similarly situated employees is evidence of pretext); and *Colon-Sanchez v. Marsh*, 733 F.2d 78, 81 (10th Cir. 1984) (*citing Mohammed v. Callaway*, 698 F.2d 395, 399 (10th Cir. 1983)) (identifying "the employer's prior treatment of the plaintiff" and "the use of subjective criteria" as types of evidence that may be relevant to a showing of pretext).

**Defendant's Argument:** Defendant objects to this instruction in light of the fact that it seeks to apply the pretext standard to the facts of this particular case. This, of course, is unduly suggestive and prejudicial. Additionally, this instruction omits the fact that it is Plaintiff's burden to establish pretext at trial. *See Randle v. City of Aurora,* 69 F.3d 441, 453 n. 18 (10th Cir. 1995) ("At trial, the plaintiff must convince the jury not only that the reason proffered by the defendant was pretextual, but that the jury should infer that the defendant's pretext concealed a motive of discriminating against the plaintiff in violation of the civil rights laws."); *Lyons v. Red Roof Inns, Inc,* 130 F. App'x 957, 961 (10th Cir. 2005) ("At trial, the plaintiff must prove illegal discrimination either (1) inferentially by showing that the proffered reason is a pretext for discrimination; and/or (2) directly by offering direct evidence of discrimination.") (citations and quotations omitted).

**DAMAGES – COMPENSATORY DAMAGES**

If you find that Defendant SHRM unlawfully discriminated or retaliated against Ms. Mohamed, then you must determine an amount that is fair compensation for her losses. You may award compensatory damages for injuries that Ms. Mohamed proved were caused by Defendant SHRM's wrongful conduct. The damages that you award must be fair compensation, no more and no less.

You may award damages for any emotional distress, pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, and damage to reputation that Ms. Mohamed experienced as a consequence of the wrongful conduct. No evidence of monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence. There is no exact standard for setting the compensation to be awarded for these elements of damages. Any award you make should be fair in light of the evidence presented at trial.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument**: This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and modified with respect to party names. The instruction lists the full panoply of harms that are recoverable by a plaintiff as compensatory damages. *E.g., Foster v. MCI Telecommunications Corp.*, 773 F.2d 1116, 1118 (10th Cir. 1985) (upholding a compensatory damages award for "embarrassment, humiliation, severe anxiety and great emotional suffering"); *Thornton v. Kaplan*, 958 F.Supp. 502, 504 (D. Colo. 1996) (upholding an award for compensatory damages to a plaintiff who prevailed on a retaliation claim for "emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life"). In section (II)(A)(2) its Enforcement Guidance: Compensatory and Punitive Damages,[2] the EEOC lists additional nonpecuniary losses that are recoverable as compensatory damages, including emotional pain, suffering,

[2] https://www.eeoc.gov/policy/docs/damages.html (last visited Sept. 25, 2025).

inconvenience, mental anguish, loss of enjoyment of life, and "injury to character and reputation."

**Defendant's Argument:** Defendant objects to this instruction in light of the fact that the terms used to describe the types of compensatory damages available to Plaintiff (e.g., pain, suffering, inconvenience, mental anguish, etc.) are duplicative, unnecessary, and prejudicial. *See Wolfard v. Douglas Cnty. Sch. Dist.*, Case No. 21-CV-02552-GPG-STV (Dkt. No. 113) (stating only that the jury "may award damages for any pain, suffering, or mental anguish").

**DAMAGES – PUNITIVE DAMAGES**

If you find that Defendant SHRM intentionally discriminated or retaliated against Ms. Mohamed, the law allows, but does not require, an award of punitive damages. The purpose of an award of punitive damages is to punish a wrongdoer for misconduct, and also to provide a warning to others.

You may award punitive damages if you find that Defendant SHRM engaged in discrimination or retaliation with malice or with reckless indifference to the right of Ms. Mohamed to be free from such intentional discrimination and retaliation. In order to find Defendant SHRM liable for punitive damages, you must find that Defendant SHRM discriminated or retaliated in the face of a perceived risk that its actions would violate federal law.

In deciding the amount of punitive damages, you may consider the following:

1. The offensiveness of the conduct;
2. The amount needed, considering Defendant SHRM's financial condition, to prevent the conduct from being repeated; and
3. Whether the amount of punitive damages bears a reasonable relationship to the actual damages awarded.

Where discriminatory acts on the part of Defendant SHRM's managerial employees were contrary to Defendant SHRM's good faith efforts to comply with the law by implementing and enforcing policies and programs designed to prevent unlawful discrimination, you shall not award punitive damages.

**PLAINTIFF'S COMPETING INSTRUCTION**

**Plaintiff's Argument:** This instruction was given by Hon. Charlotte N. Sweeney in *Joppy v. HCA-HealthOne LLC*, No. 1:22-cv-00986-CNS-STV (D. Colo.) (Dkt. #377) and by Hon. R. Brooke Jackson in *Harris v. Falcon 49 Sch. Dist. et al*., No. 1:18-cv-02310-RBJ (D. Colo.) and modified with respect to party names. It is identical in substance to the model instruction for punitive damages proffered by the Faculty of Federal Advocates Ad Hoc Committee, pp. 66 (Sept. 2013) with the exception of the parties' names and the fact that punitive damages would result from a finding that SHRM intentionally retaliated against Ms. Mohamed, as well as discriminated against her. The Tenth Circuit upheld a judgment of punitive damages in a case that involved a very similar instruction in *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1320 (10th Cir. 2022). The instruction in *Fresquez* included the preponderance of the evidence standard, the three elements to consider when deciding the amount of punitive damages, and an advisement that punitive damages cannot be awarded if the retaliatory actions by a defendant's employees were contrary to the defendant's good faith efforts to comply. *Id.*

**Defendant's Argument:** Defendant objects to introducing this instruction before liability has been establish, as explained in more detail in its motion to bifurcate. In any event, Plaintiff's instruction fails to provide all of the relevant factors that a jury should consider in determining whether its award of punitive damages bears a reasonable relationship to Plainitff's actual injuries.

# Transcript of Jury Trial Proceedings - Vol. Ia

[198, 199, 201-205, 209, 211, 212, 216, 217, 228, 229, 238]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

REHAB MOHAMED,

Plaintiff,

vs.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

Case No. 22-CV-1625

Denver, Colorado

December 1, 2025
1:48 p.m.

Vol. Ia

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218

APPEARANCES: (Cont.)

For the Defendant:

TANJA DARROW
Littler Mendelson P.C.
633 West Fifth Street
63rd Floor
Los Angeles, CA 90071

VIRGINIA WOODFORK
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202

*MEGAN E. STRAWN, RPR, CRR*
*901 19th Street, Denver, CO 80294*
*303.335 2111 * strawnreporting@gmail.com*

*Proceedings reported with realtime stenography;*
*transcript produced with computer-aided transcription.*

program, a cultural exchange program. And I was hosted in Arkansas for a year with an American family.
Q. And your legal name is Rehab?
A. Yes.
Q. But you go by a different name, right?
A. Yes.
Q. What name?
A. Ruby.
Q. Did you go to college?
A. I did.
Q. Where did you go?
A. I went to the University of Central Arkansas.
Q. What did you major in?
A. Political science and international studies and diplomacy.
Q. What was your first full-time job out of school?
A. Once I graduated, I moved to D.C., and I obtained the position of a fundraiser at United Nations High Commissioners for Refugees, UNHCR.
Q. And how about after that?
A. After that I joined a non-profit called Women's Learning Partnership.
Q. And what did you do there?
A. I joined the non-profit as an intern at the beginning, and then over the course of three years, I obtained a position of program associate. And basically what I did, I built online

learning programs for social workers in the Middle East who was helping to advance women's rights in their region.

Q. And what was your next position after you were at Women's Learning Partnership?

A. After Women's Learning Partnership, I joined SHRM, Society for Human Resource Management.

Q. And how did you come to work for SHRM?

A. I found the job opening in -- on one of the platforms, and I saw that the descriptions in the job role aligned with my experience at the non-profit, specifically the software, the education technology that SHRM was using.

Q. And did you apply?

A. I did.

Q. And why did you do so?

A. The big reason was for financial stability. Working for a non-profit while living in D.C. was not really possible, and I needed more financial stability. Also, the non-profit was a small organization. There weren't really a lot of opportunities to advance. And I thought working at a bigger organization can provide me with opportunities to advance my career.

Q. Did you receive the position?

A. I did.

Q. And what position was it?

A. An e-Learning specialist.

can be accessed by learners from their cell phones or tablet or laptop without the interference of a live element, like an instructor or a facilitator.
Q. So self-paced?
A. Yes, uh-huh.
Q. What department were you in as an Instructional Designer at SHRM?
A. I was under the Education department.
Q. And did the location where you worked change at some point?
A. Yes.
Q. When?
A. At some point in 2019, I became a remote employee.
Q. And where did you go to?
A. I moved to Denver.
Q. Okay. And why Denver?
A. I -- besides wanting a place that is more affordable, I also wanted somewhere with a slower pace but also gave a city vibe. And I visited Denver a couple of times. At that point, it seemed like a viable option.
Q. During your time as an e-Learning specialist, what programs did you develop?
A. There are two main products that -- or programs that I developed as an e-Learning specialist. One of them was a -- four e-Learning courses to help HR professionals develop work

policies that are compliant with the employment law in the state of California. And these four courses were part of a specialty credential, as you would call it. So once the learner or the HR professional, once they finished that, then they can claim that they have an expertise or -- in that specialty, which is California HR law.

The second course was on leading internal investigations, which was a course that helped HR professionals on what to do when a workplace claim comes forward.

Q. And if you know, how did those two programs perform?

A. They were -- according to SHRM, they were well executed and well received in the market.

Q. During your time as an Instructional Designer, what courses did you develop?

A. So that's when I started working on a seminar, which is virtual or face-to-face. And I developed a course on using storytelling to elevate workplace communications.

Q. And how did that course perform, if you know?

A. Also according to SHRM, this course was well executed and well received in the market to the point that they even held it at SHRM's advocacy conference, which is one of their biggest conferences, a concurrent session.

Q. Do you recall who it was that wanted the program to be at that conference?

A. Yes, Ms. Liz Lacey.
Q. What were the steps for developing an e-Learning program or course when you were at SHRM?
A. So as an Instructional Designer, we follow a model called ADDIE, which Ms. Tanja Darrow mentioned. It's an acronym for Analysis, Design, Development, Implementation, Evaluation. And we use this as a guide, really, to manage the development of education products.
Q. And what specifically were the steps you took at SHRM to develop a course when you were assigned one?
A. Yes. So when I first get assigned a course, it starts with what we call an initiation meeting with senior management and my manager where we talk about the context of why we want to build a course on that topic and talk about next steps.
So once -- after the initiation meeting, that's when I go and start on my analysis. I conduct a deep analysis on the market needs for the topic as well as the target audience and the skill level that they have with -- with regard to that topic.
Once the analysis is completed, I present my findings to the senior management and my manager as well. Once that is approved, I move to developing a design strategy or a design document that outlines the main topic and the content flow, as well as the overview of the activities. So imagine module 1 will cover five topics and will have an activity or a

knowledge check at the end. It's a very high level, but it presents a good idea of what will be covered in that course.

Once that design strategy or document is approved, then we move to the heavy lifting, really, of the development process, which is designing the actual course materials, whether it's a PowerPoint or using an authoring tool to create e-Learning courses.

In that development phase, there are several reviews that take place. So you design an initial draft. And then you present that to the ID team, or the Instructional Designers on the team and managers, and you solicit feedback. Then you go back and implement the feedback, present a revised version. And it's really up to the management to say, Yes, this is the scope; this is what we want, or, Hey, can you add X and Y and Z to the course? because they see it in a certain way.

Yes. And once that is completed, that's when we move to the implementation phase. And that's really the logistical part. So the editor takes a look at the punctuation, grammatical errors, and then finalizing the design and making it accessible.

Q. And at the end of that process, what work product do you end up with?

A. So at the end, you'll have a -- the program materials, which it could be a PowerPoint if you're building a seminar,

or an actual e-Learning course where you hit "next" --
(Reporter requested clarification.)
A. It's like a package where you access online and just click on buttons to hit "next."
MS. DeFAZIO: Let's take a look at Exhibit 52, Ms. Allen. Thank you very much.
BY MS. DeFAZIO:
Q. Ms. Mohamed, what is Exhibit 52?
A. That is an example of an outcome of -- that we would have at the end of the development process of a course.
Q. Who created this?
A. I did.
Q. When?
A. In 2020.
Q. And what course was this for?
A. This is the Digital Transformation HR course.
Q. And is that another term for the Digital HR course?
A. Yes.
MS. DeFAZIO: Your Honor, we move to admit Exhibit 52.
MS. DARROW: No objection.
THE COURT: 52 is admitted.
(Plaintiff's Exhibit 52 received.)
MS. DeFAZIO: May we publish that to the jury?
THE COURT: Sure. And just let me make a couple of

Q. So under Ms. Walsh, Ms. Jackson, and Ms. Lang, did any concerns come up about your performance?
A. No.
MS. DARROW: Objection. Compound. Leading.
THE COURT: Objection is overruled.
A. No, I didn't.
BY MS. DeFAZIO:
Q. And how long did you spend under each one of those supervisors?
A. I believe Ms. Walsh, I spent a year under her. And Ms. Liz Jackson just stayed at SHRM for three months and Ms. Kim Lang for a year. And for Ms. Barley, from December 2019 until September 2020.
Q. When did -- and you said Ms. Barley became your manager at the end of '19; is that right?
A. Yes.
Q. Had you known Ms. Barley before she became your manager?
A. Yes.
Q. In what context?
A. We were peers on the same team.
Q. All right. And what was her position at the time?
A. At that time, she was a Senior Instructional Designer.
Q. And what was your role?
A. Instructional Designer.
Q. And when had you met her?

A. Yes.
Q. Who?
A. Ms. Barley.
Q. When?
A. December 2019.
Q. And how did you meet?
A. Virtually. I was remote at that time.
Q. How long had Ms. Barley been your manager at the time you received this review?
A. Less than a month.
Q. Do you have an understanding as to who contributed to the review?
A. Yes.
Q. Who is that?
A. Ms. Jeanne Morris.
Q. As well as Ms. Barley?
A. Yes.
Q. Okay. And do you know why it was both of them?
A. Prior to having our performance review meetings, Ms. Barley reached out to the Instructional Design Team members and told us that she's been working with Ms. Morris to put together the performance reviews, and that's how I came to understand that Ms. Morris contributed to this review.
Q. And who is Ms. Morris?
A. At that time, I believe she was the director of education

programs.
Q. And what was her relationship with respect to Ms. Barley?
A. She was her supervisor.
Q. And what was your relationship with Ms. Morris at that time?
A. I considered Ms. Morris as my mentor, my ally, not only in career and professionally but also personally. So . . .
Q. So can you expound on that a little bit?
MS. DARROW: Objection. Vague and overbroad.
THE COURT: The objection is sustained.
BY MS. DeFAZIO:
Q. Can you tell us in what sense did Ms. Morris serve as your mentor?
A. Well, for example, Ms. Morris was the one who encouraged me to go and apply for the senior -- sorry. Ms. Morris was the one who encouraged me to apply for the Senior Instructional Designer position when it was available. Ms. Morris also advocated for me to be part of several projects throughout my employment at SHRM.
And on a personal level, you know, I shared stories with Ms. Morris. She saw pictures of my family members. I know things about her husband and her dog, and we just had -- we had common jokes going back and forward. So I would describe our relationship was even more personal than just a mentor.

Q. How did that come about?
A. There was an opening on the team for a Senior Instructional Designer position. I remember one day Ms. Morris called me to her office. I was still working in Alexandria, Virginia. And she said, "There's an opening for Senior Instructional Designer. Why don't you apply?"
And I was encouraged by her idea, and I went ahead and applied for the role on SHRM's website.
Q. Did anyone else encourage you to apply?
MS. DARROW: Objection. Leading.
THE COURT: Objection is sustained.
BY MS. DeFAZIO:
Q. Was there anyone else other than Ms. Morris who encouraged you to apply?
MS. DARROW: Same objection, Your Honor.
THE COURT: Actually, overruled -- I'm overturning my earlier objection. It's attempting to direct the witness, and I don't find that it is leading. So the question may be answered.
A. No. No one else.
BY MS. DeFAZIO:
Q. Were you interviewed for the role?
A. Yes.
Q. And who did you interview with?
A. I interviewed with a person in HR first. I'm trying to

remember her name. Maybe Amber, but I can't really remember. Once that was passed, I interviewed -- I was interviewed by Ms. Liz Lacey and Ms. Carolyn Barley.
Q. And who is Liz Lacey?
A. At that time, she was the director of education products.
Q. What happened after the interview?
A. I received an offer letter.
Q. Did you accept the position?
A. Yes.
Q. When did you start as Senior Instructional Designer at SHRM?
A. At some point in late January 2020, early February.
THE COURT: Ms. DeFazio, let's go ahead and take our break right now.
Folks, this will be our last break of the day. We'll take about ten minutes. I know the clock in the back, which is wrong, if you've been watching it, says it's 10 to 5:00. Nobody has changed it since the time change. So we're going to try and get it changed, but it's actually 10 to 4:00. We'll be back at 4:00 and push through until about 5:00 o'clock this afternoon.
With that, please rise for the jury.
(The jury exited the courtroom at 3:48 p.m.)
THE COURT: All right. Please be seated if you wish.
We'll be back -- and you may step down, ma'am. We'll

a little bit. But that was my understanding at that time.

Q. And did you have an understanding as to whether Ms. Barley involved herself in the same way in the projects of your teammates?

MS. DARROW: Again, leading, Your Honor.

THE COURT: Objection is sustained.

BY MS. DeFAZIO:

Q. In IDT meetings, what did you notice about Ms. Barley's interactions with your coworkers?

A. So during the Instructional Design weekly meetings, which all Instructional Designers meet with Ms. Barley, we start the meeting by giving updates of what took place in the previous week and what's going to happen in the next one.

And when my White peers would share their updates, I noticed that they would share that they had -- that they held meetings with the instructors and subject matter experts without Ms. Barley's involvement, that they presented their own design strategy to senior management. Ms. Barley didn't even know that this presentation took place. She wasn't even part of that meeting when they presented their design strategy.

Q. In your first few months of being a Senior Instructional Designer, was there anything else about Ms. Barley's management of you that you found notable?

A. Well, Ms. Barley's assignment for me to download pictures

definitely came across as maybe she doesn't know my value or what I bring to the table or she views me with less credibility.

And once we started working on the compliance HR program, I would share with her one on one what is the plan or what is the next steps. And I found that Ms. Barley would email senior management representing what I've told her in the meeting, giving them updates. So I was also not allowed to give updates to senior management myself; Ms. Barley had to represent my work.

And then she also withheld information about the project. So for the compliance program, I asked Ms. Barley what is the information about this program, because if we follow the ADDIE model that we were talking about earlier, we were supposed to meet to have an initiation meeting that gives me contacts of what this project is about, a timeline and so forth. That didn't take place for the compliance HR program. So I asked, "Are there any details?" And she said, "Oh, your role is so small that I'm just doing all the work. You don't need to know this information."

And eventually, when my role kept expanding to help out that vendor for that course, Ms. Barley insisted that she attend every single meeting that I have with this vendor. Keep in mind, I've been meeting with vendors and subject matter experts and instructors for years, actually, at that

So at that point, I already developed the course and submitted it to management and received positive feedback. But COVID happened, which this is just a very -- it's not bad, but it's that's what happens. Things happen, and you have to adjust the program.

So COVID happens, and she asked me to make revisions to equip HR professionals who was going to take the course on how to manage their workplaces during COVID.

Q. And for No. 3 under Key Accomplishments, can you read that aloud?

A. "As you transitioned into your new role as a Senior Instructional Designer, you jumped into the new expectations of carrying additional side projects. You have supported and continue to support vendor completing" -- "vendor developing compliance and employment law program. You made yourself available to the vendor and supported his needs to collaborate. In projects like these, I'd like you to continue to take more ownership by setting the communication cadence with the vendor and providing updates proactively to leadership."

Q. Who was the vendor that was being referred to in this paragraph?

A. Mr. Lou Lessig.

Q. And was there anything from this point that confused you when you saw your review?

**Transcript of Jury Trial Proceedings - Vol. II**

[13, 14, 21, 22, 24-31, 33, 34, 36-39, 43-45, 48, 50-61, 67-77, 88-93, 96, 98, 99, 110-112, 114, 115, 117, 118, 120, 121, 136, 160, 180, 193, 194, 204, 228]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

REHAB MOHAMED,

Plaintiff,

vs.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

Case No. 22-CV-1625

Denver, Colorado

December 2, 2025
7:52 a.m.

Vol. II

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218

APPEARANCES: (Cont.)

For the Defendant:

TANJA DARROW
Littler Mendelson P.C.
633 West Fifth Street
63rd Floor
Los Angeles, CA 90071

VIRGINIA WOODFORK
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202

*MEGAN E. STRAWN, RPR, CRR*
*901 19th Street, Denver, CO 80294*
*303.335 2111 * strawnreporting@gmail.com*

*Proceedings reported with realtime stenography; transcript produced with computer-aided transcription.*

Q. So we left off yesterday talking about the first review that you had as a Senior Instructional Designer in May of 2020.

Do you remember that?

A. Yes.

Q. Okay. So after you received your review in May, was there something that happened with Ms. Barley that made you concerned about her treatment of you?

A. Yes.

Q. What was that?

A. With regards to the Compliance HR program that I was working on, as the contractor wasn't delivering items and the deadline has been pushed several times, I decided to step up and offer a different approach to deal with the vendor in order to gain efficiency and help him deliver the content.

I ran this approach by Ms. Barley, and I also presented a instructional strategy that we may use for that course to also help the vendor. Ms. Barley was very happy with the approach, with the new approach that I presented to her, and she mentioned that she would need to be in the meeting with me with the vendor once I'm presenting to him this new approach.

And I asked Ms. Barley, I said, "Since you are on board on the plan and you think it's a good idea, why do you think you need to be in the meeting with me?"

And she said, "Because I need to be there to help you sound more assertive."

This comment kind of clarified for me that Ms. Barley was not judging me based on the work that I present, but it's a judgment based on the character, an assumption that I am a less assertive person. And I was very concerned that Ms. Barley was letting preconceived ideas about who I am that has nothing to do with the work that I presented and my history of performance get in the way of her managing me.

Q. What did you do after that interaction?

A. This interaction was on June 2nd. On June 4th, it was the aftermath of the murder of Mr. George Floyd. Lots of corporates were putting out statements re-announcing their commitment to anti-racism, and SHRM did the same thing.

On June 4th, I received messages from -- or emails -- not just me personally, but through the entire workforce of SHRM -- from the CEO saying that he is committed to root out racial inequity from workplaces starting at SHRM. And he invited employees to participate in this commitment and make sure that the workplace in SHRM is compliant in that way.

I also received a message from Mr. Nick Schacht, who was, I believe, the vice president of the Education Department at that time, saying his commitment to create a safe space at SHRM to share feelings and different perspectives about racism in the workplace and his promise that this is a safe place

description was of that.

You may proceed.

BY MS. DeFAZIO:

Q. Did you mention anything about your White peers during this meeting?

A. Yes.

Q. And what did you say in that regard?

A. I told Ms. Barley that I believe that her treatment of me is different than the treatment of Ms. Ann Godmere and Ms. Carrie Mills, my two White peers at that time on that team. I told her that I -- I gave her specific examples of how this -- their treatment is different. And I also told her that I see her extending compassion and kindness and understanding to the White peers that I really hope that she can extend to me as well.

Q. And what specific examples did you share with her?

A. One specific example that I remember was there was a time that I had a presentation for the design document for one of the projects I was working on. I received feedback after that presentation. It wasn't really much, so I thought maybe a day or two it will take time to implement that feedback. But I had a dentist appointment that day. It was just a regular cleaning up kind of appointment that ended up being more where I had to be injected and -- in my jaw and so forth, so I had a medical emergency that -- and I asked Ms. Barley if I can give

the revised version of the design document a day or two later because of that medical emergency.

Ms. Barley's response was very dry and basically asked me, "Can you have it today," which I worked until 1:00 a.m. to give her the feedback on that day because she asked me to.

However, Ms. Mills, who was the White leader on the team, during an ID weekly meeting, mentioned how she won't be able to deliver some content that she promised because she had a medical emergency. Ms. Barley was very forgiving. She told her to not worry about it and take her time and just to prioritize taking care of herself.

Q. Did Ms. Barley say why she had been more forgiving with Ms. Mills?

A. Yes.

Q. And what reason did she give?

A. She said that Ms. Mills came from a very stressful work environment before SHRM, and it's actually a good sign that she's missing deadlines because it shows that the SHRM environment is a less stressful one for her.

Q. I'm going to turn to Exhibit 16.

MS. DeFAZIO: And, Your Honor, this is stipulated, so we move to have it admitted.

THE COURT: All right. Stipulated Exhibit 16 is admitted.

advocate at some point for their involvement in initiatives and programs of that organization.

Q. And in that email, you also mentioned that, "The changes already made regarding the management of the compliance program have made a big difference, a positive one."

Can you tell us more about what you meant when you wrote that sentence?

A. Yes. I'm a believer in positive affirmation. So after my call on June 4th, the initial call on June 4th where I raised my concern with Ms. Barley about her treatment, she did allow me to meet with the vendor by myself, and she did allow me to send updates about the project to the senior management directly.

MS. DeFAZIO: And we can take that exhibit down.

BY MS. DeFAZIO:

Q. What did you observe about Ms. Barley's treatment of you after you had this conversation with her on June 12th?

A. Ms. Barley was very cautious after that. For example, she would go out of her way to document that she's not attending the meetings with me and the vendor. Also, any discussions about race on the team, even though the entire organization was talking about the race due to the initiatives that were launched because of Mr. -- the CEO and other senior management, conversations about race on the team were very tense. And we -- I was told to -- if I have any issues with

regards to race to go to HR and to talk about that with HR rather than talk about them in weekly meetings with the team.

Q. And who told you that?

A. Ms. Barley.

Q. After your meeting with Ms. Barley on June 12th, did you continue to assist with the PMQ program that we discussed yesterday?

A. Yes.

Q. Okay. Did Ms. Barley say anything to you about your involvement in that project?

A. So this project involved -- my involvement in this project is reviewing content once the vendor sends it over. There was a meeting that we were supposed to review the content for that week for that product. And Ms. Barley told me to not attend that meeting and if I do attend this meeting to sit and be quiet and not participate because big decisions would be made.

Q. And when did Ms. Barley say that?

A. When?

Q. Uh-huh.

A. A few days before that meeting was supposed to take place. I'd say maybe June 25th.

Q. And in what context?

A. It was said during a weekly ID meeting.

Q. And who else was present?

A. Ms. Ann Godmere and Ms. Carrie Mills.

Q. And what was your response to her comment?
A. I didn't say anything. I stayed quiet.
Q. Did you bring up your concerns about Ms. Barley again?
A. Yes.
Q. When was the next time?
A. June 25th, I believe.
Q. Okay. And can you tell us what was the context of bringing it up again?
A. Ms. Jeanne Morris was holding meetings with individual contributors on that education team without the managers because she wanted to know why we scored so low on management effectiveness in this department.

Before that meeting, Ms. Morris sent an email to the individual contributors saying, "I want to know what it means to have a positive culture. What is -- what does a positive culture mean for you?" And, "This is a safe space where we want to trust each other with our feelings." And she asked us to open up.

Additionally, right before the meeting, Ms. Morris texted me and she said, "Ruby, I know what's going on with you and your manager, but we have a bigger problem in the Education Department, and I want to get to the bottom of this."

So in order to encourage other people, individual contributors in the Education Department, to speak up -- in

order to encourage others to speak up, she asked me to share what's going on with my manager with others during that meeting.

Q. And did you?

A. Yes.

Q. Who was present at this meeting?

A. Ms. Ann Godmere, who was another Senior Instructional Designer; Ms. Carrie Mills; Ms. Eddice Douglas; Shanetta Walker; and other nonmanagerial positions in the Education Department.

Q. Ms. Mohamed, did you want to talk about your experience with Ms. Barley at this meeting?

A. No.

Q. Why not?

A. My main concern with my experience with Ms. Barley is -- my main objective is for things to get better. I didn't really think me speaking up about Ms. Barley's discriminatory behaviors with the rest was a good idea; but I trusted Ms. Morris' advice, and I knew that maybe me speaking up would help other people of color on the team to speak up about their experience as well.

Q. And why did you ultimately share your experience at that meeting?

A. I trusted Ms. Morris' guidance.

Q. That PMQ meeting that Ms. Barley told you not to attend,

did you end up attending?
A. Yes.
Q. And why?
A. After Ms. Morris -- after Ms. Morris found out about Ms. Barley discouraging me from attending the meeting or telling me to attend and be quiet, she sent me a separate email saying, "We look forward to your participation in this meeting," and encouraged and said, basically, "We always benefit from your input, and we look forward to hearing from you."
Q. And what occurred during that meeting?
A. So this meeting was to discuss feedback that we received from outside reviewers about this product. Some of that feedback had to do with race issues. For example, one of the feedback we received that all -- most managerial characters in that course were presented by characters of White males, and that's a stereotype and we need to diversify the look of managerials -- of managers on that -- in that course.

Keep in mind, this was not my feedback. That was feedback from reviewers who went through the course and presented those -- that feedback to SHRM.
Q. And did you contribute anything during this meeting?
A. I brought up -- I highlighted that feedback to SHRM management.
Q. Did you learn afterward that Ms. Barley had a response to

you attending?
A. Yes.
Q. And what was that response?
A. Ms. Barley was very upset about my -- the feedback I brought up and my involvement in that meeting.
Q. And what happened next regarding your working relationship with Ms. Barley?
A. So Ms. Barley, with regard to that, she -- Mr. Nick Schacht assigned her to go through the course and really confirm if managers are truly portrayed by White males or is there diversity in that representation. After she did that, she sent me an email saying, "Hey, Ruby, I put together a spreadsheet identifying the race of the managers in that course," and she was telling me to just take a look.
In that email, she said, "And I really appreciate you bringing up this concern in the meeting."
And I told her it's great that she appreciated my input, because from my understanding -- or, basically, I said, "I know you told me to just attend and be quiet, but I had to speak up and point out this feedback to SHRM management."
Q. What happened next with respect to you and Ms. Barley?
A. After that I received a meeting invitation from Ms. Barley with a member of HR, Mr. Mike Jackson. The meeting title was "Facilitative Discussion."
Q. And how did you respond?

A. I asked Ms. Barley what was this meeting about. She said, "We want to try something" -- "I want to try something different."

And I asked, Was Ms. Jackson [sic] briefed on the issues between you and I?

And she said, "Yes, I talked to him about the issue." And I asked if I can be afforded the same opportunity to speak with HR one-on-one prior to this facilitative discussion so I can share my side of the story.

Q. And did you speak to HR?

A. Yes.

Q. Who did you speak to?

A. I spoke to Mr. Mike Jackson.

Q. And what did you share with him?

A. I shared with him the same concerns that I shared with Jeanne Morris when I first brought the complaint forward.

Q. And when was this conversation with Mr. Jackson?

A. I want to say at some point in July, July 12th, maybe.

Q. And what did he say to you regarding his next steps, if any?

A. Mr. Jackson said he would look into what I brought up to him, and he will follow up with me.

Q. And did you meet with Mr. Jackson and Ms. Barley?

A. Yes.

Q. When did that occur?

A. When?
Q. Uh-huh.
A. Maybe the next day after my conversation with him.
Q. And what do you recall about that meeting?
A. During that meeting, I brought up the -- the fact that Ms. Barley discouraged me from attending that PMQ meeting and her frustration with me bringing up the concern or the feedback about diversity in that course.
And I reiterated my concerns about her treatment that I brought up before with her.
Q. And how did Ms. Barley respond?
A. Ms. Barley continued to not acknowledge my experience, dismiss my feelings, and said that she would not change a word that she said even though I've explained how her behavior has really impacted me negatively.
Q. Did she say anything else?
A. No.
Q. How about with respect to your original complaint to Ms. Morris?
A. Yes. Ms. Barley said that I was trying to set her up by going to Ms. Morris, her supervisor, and not bringing the complaint to her directly.
Q. And how did the meeting conclude?
A. It concluded with Mr. Jackson saying that he would look into this -- into these claims and will follow up with me.

A. Yes.
Q. And why is that?
A. Because Mr. Jackson and Ms. Morris kept saying, "You have to talk. You have to tell us what's going on. We know that you've told us this before, but you need to reiterate and share with us what's going on with your manager."
Q. And how did you respond when they said those things?
A. I said, "Every single person in this meeting have heard me talk about my concerns with Ms. Barley. There's nothing else I can share. You've asked me to share this with individual contributors, and I did. Ms. Barley asked me to share this with HR, and I did. And here you are again asking me to share my experience or asking me if I have any concerns with my manager as if -- as if this is new," like -- I was so confused of them pretending that they don't know, have no idea about my concerns with my manager and asking me, "Oh, what's wrong with you and your manager?" You know what's wrong with me and my manager.
Q. Were you upset?
A. I was very upset.
Q. And how did that -- how could you tell that you were upset?
A. Honestly, when I unmuted myself to respond to the insistence of me to speak up, I just start crying. I was sobbing. I couldn't even get my words out straight. I was

literally on my knees, physically on my knees sobbing. I think for 2 seconds, I wasn't even -- I lost sense of where I was and what was taking place at this meeting.

I felt humiliated and not believed and that, honestly, this meeting was just taking place for compliance and protective measures on the hands of SHRM, and it wasn't there to actually look into my complaints and move towards meaningful change.

Q. Have you ever had that sensation of being kind of out of control, crying before?

A. Yes.

Q. When has that happened in your life?

A. I had similar feelings when I received news that my dad has passed in Egypt. And at that time, I was, like, in -- on a metro station in D.C., and my brother called me, and I think I was crying so loud, but I didn't know. And all of a sudden, I just see so many people around me asking me if I was okay. And -- but there was, like, a couple of seconds that I just wasn't aware of what was going on or lost sense of where I am. And I came back to that finding many people around me.

And it was a similar sensation that I felt during that meeting.

Q. Ms. Mohamed, was there a meeting the next day that you recall?

A. Yes.

with regards to your program. This information is simply not true." And she went on, her and Ms. Lacey, defending Ms. Barley's position of her withholding information and saying that, "This information was not withheld, and you could have found it on an Excel sheet somewhere on the S drive."

Q. What information did you believe had been withheld from you?

A. So the Digital HR course was scheduled to launch on July 29th, and -- however, due to zero registration to that course, management decided to push it to October. I didn't know that this was pushed, and I was working overnight several days in a row to make sure that the course was ready for July 29th, not knowing that the course was pushed.

Q. What did you do next in this meeting?

A. I reached out to Mr. Nick Schacht and Mr. Taylor.

Q. Okay. Let's talk first about Mr. Schacht.

When did you reach out to him?

A. The same day.

Q. Okay. And -- well, let's look at Exhibit 21.

What is Exhibit 21?

A. This is a chain -- an email communication between myself and Mr. Nick Schacht.

Q. And what date is that exchange?

A. July 21st.

MS. DeFAZIO: Your Honor, we move to admit Exhibit

21.

MS. DARROW: No objection.

THE COURT: 21 is admitted.

(Plaintiff's Exhibit 21 received.)

MS. DeFAZIO: And, Ms. Allen, if we can go to the second-to-last page.

Yeah. A little bit lower.

BY MS. DeFAZIO:

Q. So, Ms. Mohamed, do you see at the bottom of this page an email from you?

A. Yes.

Q. And why did you end up sending this to Mr. Schacht?

A. Earlier that week SHRM assigned Ms. Barley to create a course on eliminating workplace bias and achieving social justice in the workplace. And they asked me to be on that -- on that project.

However, given that last meeting that I had with Ms. Barley and Ms. Morris and with HR, it was very apparent to me that it's not safe to bring up any topic and contribute or bring up my input about social justice and workplace bias.

And I asked to be recused from my participation in this course as it would compromise the quality of the content.

Q. And you said that "they" asked you. Who was "they"?

A. Ms. Morris.

Q. And why were you concerned that the content would be

Appellate Case: 26-1142 Document: 24-1 Date Filed: 09/28/2026 Page: 204


compromised?
A. So as an Instructional Designer building a course on that topic, you would have to speak up about your views and your research about workplace bias and social justice. And these are the very same issues that I had with Ms. Barley. And I thought even if we had a remote discussion, any more discussions with regard to these topics would further escalate the relationship between me and her and would possibly provide an opportunity for me to be retaliated against.
Q. Did you speak to Mr. Schacht about this email?
A. Yes.
Q. When?
A. The same day.
Q. And what do you recall about that conversation?
MS. DARROW: Objection. Hearsay.
MS. DeFAZIO: Not being offered for the truth of the matter asserted, Your Honor.
THE COURT: Ms. Darrow?
MS. DARROW: Then I need a limiting instruction, Your Honor, because we're getting a lot of hearsay.
THE COURT: I don't find that this is an appropriate time for a limiting instruction, at least based off of the question at this juncture. If I determine that it needs one afterwards, I'll issue one.
The objection is overruled.

A. I told Mr. Nick Schacht that although I'm very passionate about these topics, however, I cannot -- I cannot take part of that program given that I will have to talk about racial issues with Ms. Barley again.

BY MS. DeFAZIO:

Q. And how did Mr. Schacht respond?

A. Mr. Schacht mentioned to me that my experience as a person of color at SHRM is exactly what needs to be captured in that course and that I need to share it in order for -- as a good case study, basically, in that course.

Q. Ms. Mohamed, did you speak to anyone else on July 21st?

A. Yes.

Q. Who?

A. Mr. Johnny C. Taylor.

MS. DeFAZIO: Let's look at Exhibit 103.

And, Your Honor, this is stipulated. We move to admit it.

THE COURT: 1 -- 103?

MS. DeFAZIO: Correct, yes.

THE COURT: 103 is admitted.

(Plaintiff's Exhibit 103 received.)

BY MS. DeFAZIO:

Q. And what is Exhibit 103, Ms. Mohamed?

A. This is an email that I sent to Mr. Taylor on July 21st.

Q. And did you end up having a discussion with him?

Q. And what did you share with Mr. Sullivan during that second call?
A. So the second call was just a continuation of the first call. And towards the end of the second call, Mr. Sean Sullivan shared the feedback that I just shared with you guys earlier.
Q. Did you later learn that someone else had been on the phone?
A. Yes.
Q. Who?
A. Mr. Mike Jackson was sitting quietly in the room, didn't announce himself that he was there, but he heard everything that I said with Mr. Sullivan.
Q. What happened after these two calls with Mr. Sullivan?
A. Mr. Sullivan said that he would get back to me.
Q. And what did you decide to do?
A. At this point, going to work every day felt like I was suiting up for battle. I was not aware what's going to take place in any meetings, whether it's regard to the issue that we're talking about or with regard to my projects that I was working on. It seemed that I could not escape being intimidated and harassed by senior management and HR because of the complaint that I brought forward.
I had a very hard time to not be consumed by this issue while I'm at work and after I got off work. Completely

took over. I started questioning my sense of reality. I started to not trust my judgment. And I needed a break. I needed to step away from the situation to avoid any further confrontation with senior management, HR, or Ms. Barley.
Q. So what did you decide to do to step away?
A. I reached out to Ms. Barley and I asked her if it's okay to take off.
Q. Let's look at Exhibit 30.
MS. DeFAZIO: And, Your Honor, Exhibit 30 is stipulated. We move to admit.
THE COURT: It is admitted.
(Plaintiff's Exhibit 30 received.)
BY MS. DeFAZIO:
Q. And what is Exhibit 30, Ms. Mohamed?
A. That's a message on Slack between myself and Ms. Barley.
Q. Is this how you reached out to Ms. Barley to ask for that time off?
A. Yes.
Q. How much vacation were you requesting?
A. Eight days.
Q. And in looking at Exhibit 30, what time did you tell Ms. Barley you were going to put in a request for vacation?
A. At 8:30 a.m.
Q. Looks like 8:25?
A. Right, 8:25.

Q. And what time did she respond?
A. 8:28.
Q. Okay. Did she ask you to do anything before you went on your vacation?
A. No. I told [sic] her that if she foresees any issues with me taking off. She said, "Sure, it's fine with me. Just send me an update about what's going on with your projects, the Digital HR and the Compliance HR courses."
Q. Okay. And did you submit your vacation request?
A. Yes.
Q. Let's look at Exhibit 31.

MS. DeFAZIO: Your Honor, this is also stipulated, and we move to have it admitted.

THE COURT: 31 is admitted.

(Plaintiff's Exhibit 31 received.)

BY MS. DeFAZIO:
Q. Ms. Mohamed, is this the notification you received that your time off was approved?
A. Yes.
Q. Did you send out that update before you went on vacation?
A. I sent out the update after Ms. Barley approved my vacation.
Q. Okay. Let's look at Exhibit 32.

MS. DeFAZIO: And again, that is stipulated, Your Honor. We move to admit it.

MS. DeFAZIO: And, Ms. Allen, let's move to the second page.

BY MS. DeFAZIO:

Q. Ms. Mohamed, do you see any mention of the Compliance program in Ms. Barley's update on that second page?

A. Yes.

Q. In the table; is that right?

A. Yes.

Q. And what does Ms. Barley include in that update about this program?

A. She said, "The vendor continues to be a challenge and nonresponsive. Carolyn and Ruby have continued to follow up. Lou indicated mid-week that he would reach out to Ruby, that he would schedule time to connect, and then he went completely unresponsive. We have been in communication with Liz regarding the concern here."

Q. And in the right-hand column, do you have an understanding as to what the orange signified?

A. Behind, that the progress was behind.

Q. Did Mr. Lessig provide the program by that date in March 2020?

A. No.

Q. I'll have us now look at Exhibit 12.

MS. DeFAZIO: Your Honor, this Exhibit is also stipulated. We ask that it be admitted.

believe, which is Memorial Day weekend, that that would be the new deadline for Mr. Lessig to deliver the content for the course.
Q. Okay.
MS. DeFAZIO: And we can take this exhibit down. Thank you.
BY MS. DeFAZIO:
Q. And what was your role at that point in the project when this new deadline was established?
A. I -- my role was support. I was still just making myself available to help the -- remove any obstacles from the vendor's path in order for him to complete the program and deliver it.
MS. DeFAZIO: Let's pull up Exhibit 100.
Your Honor, this is stipulated. We move to admit it.
THE COURT: 100 is admitted.
(Plaintiff's Exhibit 100 received.)
BY MS. DeFAZIO:
Q. Ms. Mohamed, what is Exhibit 100?
A. This is a weekly report on the progress that the ID Team is working on, sent from Ms. Barley to senior management.
Q. On the second page under the Major Projects heading, do you see the Compliance course mentioned in this table?
A. Yes.
Q. And what is the update that Ms. Barley is providing here?

A. That Mr. Lou, the contractor, is working away, and the goal is to receive draft of the content by May 22nd. After Mr. Lou would send that content, I would layer any necessary graphics and final touch.
Q. And you said May 26th. Any understanding as to whether it was the 22nd or the 26th?
A. I correct myself. It may be May 22nd, then.
Q. And did Mr. Lessig deliver the course by May 22nd?
A. No.
Q. Did he deliver any content by May 22nd?
A. No.
Q. Did Mr. Lessig eventually deliver any content?
A. By June 1st, Mr. Lessig delivered two of the five modules, and they were incomplete.
Q. At the time that Mr. Lessig sent those two incomplete modules, did he ask you for any assistance?
A. Yes.
Q. And what did he ask you for?
A. Mr. Lessig specifically, in the email where he sent the two modules, asked for my assistance to help him move forward because he's struggling to complete and develop the content for that course.
Q. Okay.
MS. DeFAZIO: And we can take this exhibit down. Thank you.

BY MS. DeFAZIO:
Q. Did you share that update with Ms. Barley?
A. Yes.
Q. Did you come up with a plan in response to his request for help?
A. Yes.
Q. And what was your plan?
A. So at this point, I've been witnessing Ms. Lacey and Ms. Barley struggle to get Mr. Lou, the contractor, to deliver content over the past five months. And I thought maybe coming up with a different approach would help Mr. Lessig to deliver content.

So I came up with two ideas. First is to schedule weekly check-ins with the vendor and ask him to deliver modules as he finishes it instead of telling him deliver everything at once.

And the second thing was in the modules that Mr. Lessig shared, it was merely a text of employment law without really helping HR professionals how to interpret this law in order to create policies in a compliance workplace culture. So I proposed an instructional strategy to weave in employment law and how it applies to the employees throughout the employee's life cycle. For example, the life cycle starts with recruiting an employee, so what are laws -- what are the laws in that recruitment phase that HR professionals need to

keep in place or to keep in mind when they are conducting the tasks.

Q. And did you share those ideas with Ms. Barley?

A. Yes.

Q. How did she respond?

A. She thought it was a great approach and it's a great plan that will help us gain efficiency.

Q. And did you meet with Mr. Lessig to talk about that plan?

A. Yes.

Q. And how did he respond?

A. He was also on board, and he believed that this plan will help us gain efficiency.

Q. Did you start meeting with Mr. Lessig weekly?

A. Yes.

Q. When?

A. Starting from late May, early June -- no. Early June we started to meet every Monday for 30 minutes.

Q. And how long did those meetings go on for?

A. All the way to July. In August he disappeared and became unresponsive, so the meetings stopped.

Q. Did Mr. Lessig attend the meetings in June and July?

A. Most of them.

Q. He missed a few?

A. Yes.

Q. How many?

A. I would say three.
Q. And what did you discuss in those meetings with Mr. Lessig?
A. I -- so during these meetings, we were just talking about the content, right: Here is module one. What are the laws? What have you done with regards to that module? I gave him feedback, and then he'd go back and revise the module and then he'll send it back for myself, Ms. Barley, and Ms. Lacey.
Q. At this point, when you started having these meetings with Mr. Lessig, what was the date that he was going to deliver the full course?
A. July 6th.
Q. And do you know if the Compliance program had a launch date?
A. Yes.
Q. What was that?
A. July 28 or '9.
MS. DeFAZIO: Let's go to Exhibit 17.
Your Honor, this exhibit is stipulated. We move to admit it.
THE COURT: 17 is admitted.
(Plaintiff's Exhibit 17 received.)
BY MS. DeFAZIO:
Q. What is Exhibit 17, Ms. Mohamed?
A. That is a weekly report sent by Ms. Barley to the senior

management.
Q. And under the Priorities for Next Week section, do you see any mention of the Compliance program?
A. Yes.
Q. And what does it say there?
A. "Ruby will confirm next steps on the Compliance program based on Lou's implementation of feedback."
Q. And what was the feedback she was referring to?
A. The new strategy that we came up with, which is weaving in the employee life cycle and teaching HR professionals how to apply the law rather than just giving them the text of the actual law.
Q. And scanning down, what is the update in this table on that program?
A. Ms. Barley shared with the senior leadership that SHRM is waiting on the vendor's revisions of existing modules and drafting new ones to see if they align with the new approach that we came up with.
Q. And what does the 13 percent in that right-hand column signify?
A. The progress.
Q. So that's how far along the program was?
A. Right. That's how complete the program was on that date.
Q. And what date was this exhibit sent?
A. June 13 -- 12. June 12.

Q. June 19th?
A. Oh, I'm sorry. I was looking at the -- ending at June 12th. Yes, June 19th.
Q. And this program was going to go live the next month, right?
A. Yes.
Q. At this stage, what was your role with respect to this project?
A. My role was to continue to support Mr. Lou to help him complete the content as soon as possible.
Q. And did Mr. Lessig follow the timeline that you established for him to complete the course?
A. No.
Q. And how so?
A. So part of the new approach, I came up with a timeline for Mr. Lessig to deliver these modules on separate dates, and I shared with him this timeline. Mr. Lessig did not deliver any content on the agreed-on dates.
MS. DeFAZIO: Let's turn to Exhibit 109.
Your Honor, this is so stipulated. We move to admit it.
THE COURT: 109 is admitted.
(Plaintiff's Exhibit 109 received.)
BY MS. DeFAZIO:
Q. Ms. Mohamed, what is Exhibit 109?

A. This is an email from Ms. Lacey to Mr. Lou, copying Ms. Barley and adding myself as well on the email.
Q. And what is Ms. Lacey communicating to Mr. Lessig in this email?
A. Ms. Lacey at that point said that she had an emergent issue and can't deliver the content on the agreed-on timeline, and Ms. Lacey mentioned to him that, "We are in a position that is significantly past our deadline. I need to get this wrapped up ASAP without compromising the education experience. We are scheduled to deliver this program in July" --
THE COURT: Let me have you slow down just a bit, ma'am.
A. "We are scheduled to deliver this program in July and can't afford to push it back any further."
MS. DeFAZIO: Let's look at Exhibit 18.
Your Honor, this exhibit is stipulated. We move to admit it.
THE COURT: 18 admitted.
(Plaintiff's Exhibit 18 received.)
BY MS. DeFAZIO:
Q. Ms. Mohamed, what is Exhibit 18?
A. That is an email exchange between myself, Ms. Lacey, and Ms. Barley.
Q. Let's start at the bottom of the first page.
That's an email from you at the very bottom, right?

A. Yes.
Q. And what are you communicating to Ms. Lacey and Ms. Barley in this email?
A. I communicated that Mr. Lou shared one module that does not follow the new approach and that it was incomplete and that I have concerns about Mr. Lou delivering the content on the extended deadline.
Q. And did you make a suggestion?
A. Yes.
Q. What was your suggestion?
A. I suggested that SHRM to just change the roles on that program with regards to the vendor and that SHRM takes on the development of the program while relying on Mr. Lessig to just provide legal context with regards to the topic.
Q. And did you think that would speed up the development of the program?
A. Yes.
Q. Had you ever taken over the development of a program from a contractor before?
A. Not in this matter.
Q. At any time at SHRM?
A. No.
Q. When you became the designer of Compliance law at this point, what stage was the course in the ADDIE framework?
A. Well, this course didn't really follow the ADDIE framework

that we spoke about yesterday.
Q. And how so?
A. When SHRM had drafted that contract with Mr. Lessig back in January, all they mentioned was, "Complete this course and deliver it to us on March 25th." SHRM did not put any conditions or instructions on following the ADDIE model. They just expected Mr. Lessig to deliver the content -- complete content by March 25th.
Q. So how did your role change at this point with respect to this project?
A. Mr. Lessig was struggling with the instruction strategy, which he's not an Instructional Designer; he's a lawyer. So I thought he can stick to his expertise providing the legal context while I can implement the instructional strategy, which is my expertise, creating the workflow or the content flow, the activities, the design. All he had to do is identify the legal or the laws, employment laws related to the HR tasks outlined in that course.
Q. Do you know if the launch date for the Compliance course changed at some point?
A. Yes.
Q. And what did it change to?
A. At some point in June, late June, SHRM decided to push the launch of the Compliance program because Mr. Lou wasn't delivering -- wasn't delivering the content. And they decided

to move it from July 29th to October 8th.

MS. DARROW: Move to strike as nonresponsive other than a date. The rest of it is speculation and lacks foundation.

MS. DeFAZIO: And I can lay a foundation for the other piece if need be.

THE COURT: The objection is sustained as lack of foundation for a portion from the answer, but the portion of that having to do with the date is accepted. The rest is stricken, and you can lay that foundation.

MS. DeFAZIO: Thank you, Your Honor.

BY MS. DeFAZIO:

Q. Ms. Mohamed, did you know why SHRM had moved the launch date?

A. Yes.

Q. And how did you know that?

A. I received an email from Ms. Samantha Hawa --

(Reporter requested clarification.)

THE WITNESS: H-A-W-A.

A. -- saying that --

MS. DARROW: Objection. Hearsay.

MS. DeFAZIO: Your Honor, we're not offering it for the truth of the matter asserted but the effect on the listener.

THE COURT: Ms. Darrow?

MS. DARROW: They absolutely are. That's the whole point of this testimony is she's trying to say what somebody told her was true.

THE COURT: Objection is sustained.

BY MS. DeFAZIO:

Q. As far as you knew, Ms. Mohamed, did the moving of the launch date have anything to do with you?

A. No.

Q. Since June had come and gone -- or July had come and gone, did you revisit with Mr. Lessig the timeline for when his content was due?

A. Yes.

Q. And what did you decide with Mr. Lessig?

A. So since our role changed and we agreed that he would stick to the legal text and I would stick to the instruction and layering in the content, we continued to meet weekly on Mondays where Mr. Lessig would identify the legal text and I would share with him revised modules that followed the new strategy.

Q. And was there a specific date that you had in mind that you --

A. Yes.

Q. And what was that?

A. The date that I had in mind is delivering a complete draft of the program by the end of August if Mr. Lessig continued to

Q. And was that for the HR -- the Digital HR program?
A. Correct.
Q. Did it have a different name at that time?
A. Optimizing the Digital Experience.
Q. Why did you suggest check-in meetings with Ms. Barley at this point?
A. At this point, I sensed anxiety from Ms. Barley with regards to my timelines and my deadlines, and I thought a -- to take initiative and suggest a check-in with her in order to just give her the comfort that things are actually going along and to have her not worry about timelines.
Q. And what was your basis for believing that she was anxious about your timelines?
A. Just shortly before this email, that's when I presented the -- or the design strategy was -- we were at the end of the design phase. The design document or strategy was presented. We received feedback.
THE COURT: Let me have you slow down just a bit. Thank you.
A. And I had the medical emergency with the dentist, and I needed one more day to finish the -- implementing the feedback on the design document. And Ms. Barley's attitude towards that indicated to me that maybe she doesn't believe that I had a medical emergency and I was just making up excuses for needing an extra day to develop -- to implement the feedback.

And I thought taking initiative to let her know periodically exactly where I am with regards to the development phase will help her be -- will help her feel comfortable with the pace that we're going.

BY MS. DeFAZIO:

Q. Ms. Mohamed, did you have a draft of the Digital HR PowerPoint course ready for review at some point?

A. Yes.

Q. When?

A. In March.

Q. Who did you send that to?

A. To Ms. Jeanne Morris, the director at that time, and to Ms. Barley, and to the members of the Instructional Design Team.

Q. Were you able to finalize the course at that point?

A. No.

Q. Why not?

A. Because Ms. Morris asked to change the scope of the course to address the disruption that happened because of COVID and have the course talk more about how can HR professionals manage fully remote workplaces.

Q. Did you ask for an extension for the project at that point?

A. No.

Q. Why not?

A. I didn't need an extension. I delivered on what I was asked for. It's just that manager -- management decided to change the scope, and I just complied with that request.
Q. And did you make the adjustment --
A. Yes.
Q. -- that Ms. Morris wanted?
A. Yes.
Q. When was the next time that you had a draft of the Digital HR PowerPoint ready?
A. End of April.
Q. And let's look at Exhibit 11 for a moment. And that one was admitted yesterday.
Under the heading "What were key accomplishments for the individual," under that number 1, that refers to the Digital HR project, doesn't it?
A. It does.
Q. And Ms. Barley wrote that it was complete, accurate, creative, and well executed?
A. Yes.
Q. And when was this review issued again?
A. May 20.
Q. So was the course finalized in May?
A. No.
MS. DeFAZIO: And this can come down. Thank you.
//

BY MS. DeFAZIO:
Q. Why not?
A. Because the -- Ms. Barley introduced a new instructor to the course who was also an expert on digital HR, and he had feedback on the scope. He thought that HR professionals are not ready to optimize; they just need to lay the foundation for digital HR first.
Q. So what were the changes that the instructor was requesting?
MS. DARROW: Objection. Hearsay.
BY MS. DeFAZIO:
Q. What was your understanding of the changes that needed to be made?
THE COURT: The objection is sustained.
THE WITNESS: Answer?
THE COURT: The objection was sustained to the first question, not to the second question. There was no objection to the second question.
A. My understanding of the changes requested by the instructor is to remove any advanced technology with regards to digital HR and really focus on helping HR professionals lay the foundation of a digital foundation that later on they can optimize.
BY MS. DeFAZIO:
Q. Let's look at Exhibit 100. And this one has already been

admitted.

And this is an update from Ms. Barley on the ISD -- the ID team's projects, right?

A. Correct.

Q. On the second page, in the Major Projects section, do you see Digital HR?

A. Yes.

Q. And what do the notes about that program indicate?

A. Ms. Barley said that the program is drafted and that the feedback received from the instructor will be layered into a revision.

Q. And what was the status of the program at that time?

A. The program was 80 percent complete.

Q. Did you ask for an extension because of the instructor's changes?

A. No.

Q. Why not?

A. Again, my understanding of an extension is that I did not perform appropriately to meet a deadline. However, the changes that were made here were not because of my tasks; it was because another subject matter expert or the instructor asked for more revisions and more changes in the program.

Q. Was there another time that you had a draft of the Digital HR PowerPoint ready for review?

A. Yes.

Q. When was that?
A. In June 2020.
Q. And had that -- had you incorporated the instructor's changes?
A. Yes.
Q. Let's look at Exhibit 17. And that exhibit has also been admitted.
Do you see the Digital HR program referred to in the Priorities for Next Week section?
A. Yes.
Q. And what does it say?
A. "Ruby will continue making final revisions to the Digital HR program."
Q. Do you see the program listed under the major chart -- or the Major Projects chart?
A. Yes.
Q. And what percentage complete was it at that point?
A. 93 percent.
Q. And what date was this sent?
A. June 19.
Q. So was the program finalized in June?
A. Yes.
Q. It was?
Did you receive any other feedback on it?
A. Once I finalized the program, incorporating feedback from

the instructor, I shared the final draft with Ms. Morris and the ISD team. And the feedback I received was very positive, that this was creative and will help HR professionals in that area.
Q. So were you done?
A. Yes.
Q. Okay. What happened next with the project?
A. Then Mr. Nick Schacht, the VP of the department, asked to review the course.
Q. Let's look at Exhibit 91.
MS. DeFAZIO: Your Honor, this is stipulated. We move to admit it.
THE COURT: 91 is admitted.
(Plaintiff's Exhibit 91 received.)
MS. DeFAZIO: Can you scroll down, Ms. Allen, to the second page.
BY MS. DeFAZIO:
Q. Just to clarify, what was Mr. Schacht's role at this point?
A. Chief global development officer.
Q. So what is Exhibit 91?
A. That is an email exchange between myself and Mr. Nick Schacht.
Q. And what was he emailing you about?
MS. DARROW: Objection. Hearsay. And the document

speaks for itself.

THE COURT: The objection is overruled. Just for introducing the idea, I don't find that that suggests the answer or is hearsay. I don't find that it's hearsay under the circumstances. It's not going to the truth of the matter asserted.

BY MS. DeFAZIO:

Q. You can answer.

A. I'm sorry. Can you -- can you repeat the question?

Q. Sure. What were you discussing in this email?

A. This email was a follow-up of a meeting that I had with Mr. Nick Schacht where I presented the Digital HR course, the final draft, and he was just following up saying that it was great to speak and that he attached his detailed comments to the program materials that I shared with him.

Q. And what did -- what was your understanding of what he intended you to do with those comments?

A. To implement them and revise the final draft to reflect his feedback.

Q. And did you do so?

A. Yes.

Q. So when was the next time that you had a final PowerPoint course for the Digital HR program ready?

A. July 9th.

Q. And in July, did you learn that the Digital HR program

launch date had been changed?
A. Yes.
Q. And what had it been changed to?
A. To October 8th.
Q. And did that change have anything to do with you?
A. No.
Q. Let's look at Exhibit 28.
Let's turn to the second-to-last page, Mohamed 9558.
And this is that ISD operations report we looked at, right?
A. Yes.
Q. And do you see Digital HR listed here?
A. Yes.
Q. What was the target completion date?
A. July 2020.
Q. And at the time you received this, did you have an understanding as to what that meant with respect to the Digital HR program?
A. That the course was to be completed by the end of July.
Q. Were you able to finalize the course in July?
A. No.
Q. Why not?
A. So in order to finalize the course after you have that final draft that's revised and agreed on, then we send that to the editor to take a look at any grammatical or punctuation

errors. And when I was going to send -- go ahead and proceed to that next step, Ms. Jeanne Morris asked me not to.
Q. And did she explain why?
A. Yes.
Q. Why is that?
A. That a new instructor, Dr. Waddill, is going to be teaching the course and that we -- that SHRM wanted her to review the final draft before finalizing the program.
Q. And did Dr. Waddill review the final draft?
A. Yes.
Q. And how do you know that?
A. I was there to present it.
Q. And what was her response to the final draft?
A. She was very pleased with the content, and she thought it was a good start for HR professionals on their digital HR transformation.
Q. Did she request that any changes be made?
A. Yes.
Q. What kinds of changes?
A. So Dr. Waddill wrote two books on that exact topic on digital HR, and Dr. Waddill was hoping that the course would align with the books she wrote.
Q. How long were those books?
A. I remember one of them was 500 pages.
Q. So what did you do with that request?

A. I brought it up to management that Ms. -- that Dr. Waddill has requested extensive feedback and changes to take place at this -- to take place in the Digital HR.
Q. And what was the response?
A. Initially, Ms. Jeanne Morris and Ms. Liz Lacey said that the course is just in a great state as is and that we can accommodate Dr. Waddill's requests in another -- maybe in the future we can add a second course on digital HR that can reflect on Dr. Waddill's requests.
Q. Did they change their mind at some point?
A. After -- on July 23rd, that's when the decision was made for Dr. Waddill to officially teach the -- teach the course, and her -- she kept reiterating the requests that she made to change the course. And management said, "I trust your judgment on what to do with the requests."
Q. And when you say "management," who did you mean?
A. Ms. Jeanne Morris specifically.
Q. Okay. So was it your understanding that you were to make Dr. Waddill's changes?
A. Yes.
Q. And going back to Exhibit 32, at the bottom of that first page -- so this is, again, before you're going on vacation -- what was your update on Digital HR to your team?
A. I told them that I'm incorporated -- I am working on incorporating Dr. Waddill's books on Digital HR into the

I told her I had no idea that there was tension on the team because of that. And she said, "Well, do you notice anyone talking to you?"

I said, "I was out of the office, and I just returned. So I didn't really notice that the team wasn't talking to me because I was out of the office."

MS. DeFAZIO: And, Ms. Mohamed, make sure that the microphone is right by you too. Thanks.

BY MS. DeFAZIO:

Q. What else did Ms. Long say in that meeting?

MS. DARROW: I'll object to this line of questioning, Your Honor, as hearsay.

MS. DeFAZIO: It's not going to the truth of the matter asserted, Your Honor. It's the effect on the listener.

MS. DARROW: I understand that. I would also like to point to the case of *RCHFU, LLC, versus Marriott Vacations Worldwide*, 106 F. Supp. 3d 316.

I'll give you another cite: 445 F. Supp. 3d 1327.

THE COURT: Okay. And for what proposition?

MS. DARROW: That -- would you like a sidebar, Your Honor?

THE COURT: That's fine.

(Proceedings at sidebar with all counsel.)

MS. DARROW: Case very similar, and the same objection, same exception offered by the other party. And the

Court rejected that argument and agreed that the statements were hearsay. Specifically, the Court found that the relevance of the out-of-court statement was in the line -- was in the truth of the statement, that they can't keep saying effect on the listener to try to avoid the hearsay. That's just not how it works when the statement itself is what they are relying on for its truth.

THE COURT: Ms. DeFazio.

MS. DeFAZIO: Sure. Well, the testimony that we're about to elicit is Ms. Long saying to Ms. Mohamed that she needed to complete these two courses or no one would listen to anything that she had to say.

I don't believe that that's true, that it's --

THE COURT: You don't believe it's true that she said that or that nobody would listen?

MS. DeFAZIO: That nobody would listen. The truth of the statement itself, it was putting pressure on Ms. Mohamed and making her feel that now the mediation was turning to a point where it was about her performance and not about the race discrimination explanation.

THE COURT: Okay. Ms. Darrow.

MS. WOODFORK: But the purpose -- but the purpose of that statement, Ms. Mohamed's reliance on it, is her belief that it's true that Ms. Long said that. So that impression that she says or the actions that she's doing, her belief is

based on Ms. Mohamed [sic] actually saying that statement.

MS. DeFAZIO: That's the effect on the listener.

THE COURT: The objection is overruled. I think it does go to the effect on the listener and not to the truth of the statement.

(Sidebar concluded.)

THE COURT: The objection is overruled.

BY MS. DeFAZIO:

Q. Ms. Mohamed, what else did Ms. Long say in that second meeting?

A. She said that no one is going to listen to me unless I finish the projects that I was working on.

Q. And what was your reaction to that?

A. I was quite shocked and confused that now the mediation sessions -- the focus of that is no longer about the complaints that I brought forward about Ms. Barley, but it became about my tone and my performance.

Q. Let's look at Exhibit 28.

THE COURT: Just so Counsel knows, at least for now, this monitor is down. Don's working with IT to see if we can remote reset it. So we will at least have to, at least at the witness table, use, as Ms. Mohamed is doing, the book. We'll let you know as soon as we have that fixed.

MS. DeFAZIO: Thank you, Your Honor.

//

Appellate Case: 26-1142 Document: 24-1 Date Filed: 09/28/2026 Page: 236


BY MS. DeFAZIO:
Q. And 28 has already been entered.
Let's turn to the second page, Mohamed 9557. At the bottom of the page, there's an email from Ms. Barley.
Do you see that, Ms. Mohamed?
A. Yes.
Q. Who did Ms. Ms. Barley send that email to?
A. To myself, Ms. Carrie Mills, and Ms. Ann Godmere.
Q. When?
A. On August 10th.
Q. And what is she requesting in that email?
A. "Please provide me a more specific update on currently active programs; specifically, what date will they be complete?"
Q. Were any of the projects on that bullet-pointed list yours?
A. Yes.
Q. Which ones?
A. Two of them: Digital HR and Compliance.
Q. Did you respond to Ms. Barley?
A. Yes.
Q. Okay. Let's scroll up.
And this is your response here?
A. Yes.
THE COURT: The monitor is now up.

Appellate Case: 26-1142     Document: 24-1     Date Filed: 09/28/2026     Page: 237


Thanks, Don.

MS. DeFAZIO: Just make sure you move the microphone.

BY MS. DeFAZIO:

Q. When did you send that response?

A. On August 11th.

Q. How did you respond to Ms. Barley?

A. I gave her specific update on the projects that I was working on, letting her know that the July 2020 date that was mentioned in that report was -- was set before management made the decision to incorporate Dr. Waddill's book for the Digital HR.

Q. Okay. So what else did you say with respect to your other course you were working on?

A. I mentioned that for the Compliance HR that we are still on track to deliver a full draft by the end of August, and I gave a general statement that both of these courses depend on the SME's interaction and responsiveness for them to be completed.

Q. And how did Ms. Barley respond?

A. She said that both programs to be finished by the end of the month, August 31st.

Q. What was your reaction to seeing that date?

A. This was the first time I heard the August 31st deadline.

Q. Did you have any idea where that deadline came from?

A. No.

Q. Had Ms. Barley discussed it with you before?
A. No.
Q. Did you respond in turn to Ms. Barley?
A. Yes.
Q. Can you find that message? Is this it (indicating)?
A. Yes.
Q. And when did you send that response?
A. So given Ms. Barley's very firm message about having both courses to be completed by the end of August, I sincerely thought that Ms. Barley just didn't understand how these courses -- or where were they and why they couldn't be completed by the end of August. So I thought to give a detailed explanation, letting her know exactly the obstacles that will be in the way of me completing that course by the end of the month.
Q. And in the third paragraph of your response, in the second line, you mentioned, "For example, I am open to delegating parts of either programs to you or others to finalize as I simultaneously work on the rest of the content."
Why did you offer that as a suggestion?
A. Well, it appeared to me that it was really important to reach that August 31st deadline. And usually, previously when urgent matters came up like that, ID team members drop what they're doing, and they're all hands on deck in order to reach that urgent deadline. For example, the PMQ program, that's

The objection is overruled. I think that that's proper fodder for cross-examination.

BY MS. DeFAZIO:

Q. What was your reaction after you received this email, Ms. Mohamed?

A. I thought, here is another example of how Ms. Barley's holding me to stricter rules than other White team members. Just earlier that day or maybe the day before in an ID meeting, Ms. Ann Godmere talks about how she's struggling with her course, and Ms. Barley told her to reach out to Sarah Cole, another member --

MS. DARROW: Objection. Hearsay. Move to strike. Hearsay.

THE COURT: Ms. DeFazio.

MS. DeFAZIO: We can withdraw the question.

THE COURT: Okay. The objection is sustained, and the nonresponsive -- the hearsay answer is stricken.

BY MS. DeFAZIO:

Q. Did you respond in turn to Ms. Barley's email?

A. Yes.

MS. DeFAZIO: Okay. Let's scroll up.

Up.

All right.

BY MS. DeFAZIO:

Q. And when did you send your response to Ms. Barley?

Q. Did you receive a response -- let me back up.

MS. DeFAZIO: Can we scroll up a little bit?

BY MS. DeFAZIO:

Q. Who else did you send this to besides Ms. Barley?

A. To Mr. Nick Schacht and Ms. Jeanne Morris.

Q. And did anybody respond to this email?

A. I believe Mr. Nick Schacht --

Q. Okay.

A. -- responded.

Q. Thank you. All right.

And when did he send this?

A. He sent this on August 14th.

Q. And what did Mr. Schacht say in this response?

A. Mr. Schacht said that he's disappointed in the tone that I used in that email, and simply kicking the problem up to your manager is not complete work.

Q. Did he mention anything about the deadlines?

A. He mentioned that the deadline is not a surprise; these are not last-minute deadlines and that I've asked for extensions several times.

Q. Was there anything in Mr. Schacht's response that you found to be inaccurate?

A. Yes.

Q. What?

A. That the -- that I knew about the August 31st deadline and

it wasn't a surprise.
Q. Anything else?
A. The fact I asked for extensions for my courses. I've never once asked for an extension for my courses.
Q. Did you respond to Mr. Schacht in turn?
A. Yes.
Q. How did you respond?
A. I thanked him for providing a teachable lesson.
Q. Why did you send that email?
A. I was so tired at that point. I just felt so defeated. Now not only HR and Ms. Barley and Ms. Morris, but also Mr. Schacht and Ms. Bernée Long, all of a sudden, my performance and my tone became an issue. I've been at SHRM for four-plus years at that point.
And I know what they wanted me to say at that point: "Thank you. Everything is great. My problems are solved. Let's move on," and to just stop speaking up.
Q. How did you feel about sending that message to Mr. Schacht?
A. I felt that I betrayed myself, honestly. I didn't want to thank him for criticizing my tone. There was no tone. I always use a professional tone when speaking to them. I know that -- I knew that I was being set up, that this was a diversion from the real issue, which is the racial discrimination claim -- complaint that I brought forward. And

Thank you.

BY MS. DeFAZIO:

Q. So when you first learned of the August 31st deadline for the Digital HR and Compliance courses, what steps did you take to complete them by the deadline?

A. For the Digital HR, I read the books that Dr. Waddill wrote on the topic to identify and gain a better understanding of her requests of changes. I tried to change the program to align with her book, which was her request, to the best I can.

And with regard to the Compliance, I reached out to Mr. Lessig a couple times, letting him -- asking him if he expects to send the remainder of content that I need to finish the three modules that were remaining.

And with regard to the two modules that I had context to, I finalized those and sent them for legal review.

Q. For the Digital HR course, did you send the PowerPoint of the course to Dr. Waddill to review?

A. Yes.

Q. And did she have -- or how did she respond to that?

A. Dr. Waddill, I outlined the changes that I made based on her request. She thanked me and she called me, "Thank you for being a true professional." And she also said that she expects more changes and more alignment in the program to align more with her -- with her book.

Q. So did you end up making additional changes?

A. At this point, I was trying to manage Dr. Waddill's expectations of the changes that would take place given the time frame that Ms. Barley gave to me. And even when I asked for guidance on what can I do with regards to those big changes, Ms. Barley said that, "We trust your judgment."

So that's exactly what I did. I tried the best I can to accommodate Dr. Waddill given the time frame that I was given.

Q. Let's look at Exhibit 51.

MS. DeFAZIO: And, Your Honor, 51 is stipulated. We move to admit it.

THE COURT: 51 is admitted.

(Plaintiff's Exhibit 51 received.)

BY MS. DeFAZIO:

Q. Let's go to the last page, Mohamed 8325 -- sorry -- second-to-last page.

Ms. Mohamed, what is this email from Ms. Lacey from August 26th referring to?

A. So on August 26th, I presented the Digital HR course to the sales team at SHRM to get them geared up to start selling it and marketing the course.

Q. And was the deck that you presented final?

A. Yes.

Q. And then moving to page 832 -- 8323.

In this email, you're corresponding with Ms. Lacey,

right?
A. Yes.
Q. And what had you learned about the Digital HR program at this point that you're commenting on in this email?
A. That Dr. Deborah withdrew her -- withdrew from instructing that course.
Q. Okay. And did you have any understanding as to why that happened?
A. No. I just learned about it from Ms. Lacey in the previous email.
Q. Okay. What happened with the Digital HR course after this interaction?
A. I submitted the final draft of the PowerPoint presentation to Ms. Morris, Ms. Lacey, and Ms. Barley.
MS. DeFAZIO: Let's go to the first page of this exhibit.
BY MS. DeFAZIO:
Q. Do you see what date you submitted the final draft?
A. August 27th.
MS. DeFAZIO: Okay. Let's scroll up a little more.
BY MS. DeFAZIO:
Q. And then Ms. Barley acknowledges receiving it, correct?
A. Correct.
Q. Did she reach out to you about the course after you submitted it on August 27th?

workbook for a course?
A. Maybe a day or two.
Q. Was there anything else remaining for this course?
A. Yes. So this course would be delivered face-to-face and virtually. So for the virtual delivery, we have to create a virtual training room, which I had already created for this course. All what was left was to upload the final materials to that virtual room so participants can download those materials once the course started.
Q. Let's look at Exhibit 50.
What is Exhibit 50, Ms. Mohamed?
A. That is a financial report for the week of August 21st to 27th, 2020, sent by Ms. Barley.
Q. And to whom did she send it?
A. She sent it to myself, Ms. Ann Godmere, and Ms. Carrie Mills.
MS. DeFAZIO: Your Honor, we move to admit Exhibit 50.
MS. DARROW: No objection.
THE COURT: 50 is admitted.
(Plaintiff's Exhibit 50 received.)
BY MS. DeFAZIO:
Q. And what generally does the financial report show?
A. The financial report shows the performance of the educational products in the market.

MS. DeFAZIO: Let's scroll down to the second page. A little further down.

BY MS. DeFAZIO:

Q. Under Virtual Courses, do you see Digital HR?

A. Yes.

Q. And does it have a different name?

A. Digital Transformations.

Q. At that point, according to this email, what was your understanding of how many people had registered to take that class?

A. Three.

Q. And when was it supposed to launch?

A. On October 8th.

Q. Now, you talked earlier about -- you testified earlier about the Compliance project and that you had sent the PowerPoint for legal review; is that right?

A. Correct.

MS. DeFAZIO: And this exhibit can come down. Thank you.

BY MS. DeFAZIO:

Q. What does that consist of?

A. So since this course was talking -- or was giving legal advice basically to HR professionals, Ms. Morris asked me earlier to send this -- once the program is complete to send it to the legal counsel within SHRM to review any laws that

THE COURT: Looks like it's up, Don.

(Pause in the proceedings.)

THE COURT: Sorry, folks. We tested everything repeatedly before and during, and here we are.

Looks like it's stable.

BY MS. DeFAZIO:

Q. So, Ms. Mohamed, what is Exhibit 47?

A. That is an email exchange between myself and Ms. Barley on August 25th.

MS. DeFAZIO: Let's go to the last page. Scrolling up just a bit to see the top of this email.

BY MS. DeFAZIO:

Q. This is an email from you to Ms. Barley?

A. Yes.

Q. When did you send that?

A. On August 24th.

Q. And what are you communicating to Ms. Barley in this email?

A. I let Ms. Barley know that I finalized the modules that I had legal context for with regards to the Compliance HR program. I shared with her that -- the finalized content for that material, and I let her know that I shared those modules with La Tanya for legal review.

I also shared that the only hurdle that is in the way now to complete this course is the legal text that I am

waiting for Mr. Lessig and that without this legal text, I cannot complete this course.
Q. Scrolling up to Ms. Barley's response, did she give you any suggestions on how to proceed?
A. Yes.
Q. And what did she suggest?
A. She suggest to keep finding creative ways to solicit contact from Mr. Lessig and to explore a different SME, a subject matter expert, as a backup.
Q. And what else -- were there any other suggestions?
A. She asked me to reach out to Mr. Lessig and ask him for specific dates that he plans to deliver the outstanding content on.
Q. And did she also suggest that you interview him to get the content?
A. Yes.
Q. So had you previously asked Mr. Lessig for delivery dates?
A. Yes.
Q. More than once?
A. Yes.
Q. Had you previously interviewed Mr. Lessig to get the content?
A. Yes.
Q. And how so?
A. We met every Monday for 30 minutes over the months of June

rest of the modules were outlined just without the legal part -- portion of that module.

Q. Did you take any further steps to secure a different SME?

A. No.

Q. And why not?

A. Because I was working on identifying the gaps that the SME would help me to fulfill. So this is just something -- when we onboard a SME on a project, we have to identify exactly how they will contribute and how they will help us. And I was taking the time to do so.

Q. Did you expect that you would be able to find a new SME and interview them and get content from them before the August 31st deadline?

A. Absolutely not.

Q. And why not?

A. Because it takes a lot of time to onboard a new SME at this point to the program, to let them know context about what is the program, to provide them an overview of the program, and letting them know exactly how they can contribute. So that's just preparation.

But the actual interviews, the SME would provide information. I will incorporate this information in the remaining, and then I'll have to send it back to them to review and approve. And then we go through this iteration process several times before reaching final version of that

content. And that would take more than four days.
Q. Besides this email with Ms. Barley, did you have any other contact with her on August 25th?
A. Yes.
Q. And what was that contact?
A. On August 25th, I had my one-on-one meeting with Ms. Barley where I shared my updates on the Compliance program.
Q. Okay. And what do you recall came up in that meeting?
A. So as I was giving my updates on the Compliance program, Ms. Barley interrupted me and she asked me to choose a different tone when speaking to her.
Q. And how did you respond?
A. I was shocked and confused. And I told her, "I'm sorry. I didn't know that I was using a tone." And I just withdrew and became more quiet. And I suggested that maybe we can use emails where I can share my updates since my tone is an issue.
Q. Did you record that meeting?
A. Yes.
Q. Why?
A. Given my interaction with Mr. Nick Schacht in the emails and -- I had a very solid feeling I was being set up.
Q. How did you record it?
A. Using my phone.
Q. And how did you do so?

Q. How are you doing now, Ms. Mohamed?
A. I know I will come back, but I am better. Actually, around this time last year, that's when I started being in touch with myself again. It was like a moment of realizing how I let years go by while I'm being withdrawn from social settings, from forming social relationship with friends, and even advancing in my career.
And I decided to slowly find myself and find ways that I can be myself while protecting my joy and putting boundaries. And I've been on that journey since then.
Q. Looking back, Ms. Mohamed, do you wish that you hadn't said anything to Ms. Morris on June 3rd?
A. Yes.
Q. Why is that?
A. I wouldn't wish on anyone to go through what I went through. Maybe I should have left or stayed complicit and just accepted how Ms. Barley treated differently -- treated me differently than the White peers and not spoke up about it. At the end, I was the one who was portrayed as the complainer, the bullier, that my reputation was tarnished as a person who doesn't deliver deadline and deflect and ultimately terminated just because I spoke up and responded to the call of action that SHRM was -- since has initiated on eliminating racial inequity in the workplace.
MS. DeFAZIO: Thank you, Ms. Mohamed.

Q. And you held that job title of Lead Instructional Designer between January 2022 and the time you left SHRM in December 2024, correct?
A. Correct.
Q. Now I'd like to talk to you about your working relationship with Ruby Mohamed.
Do you recall that you first met Ms. Mohamed in 2018 when you started working at SHRM?
A. Yes.
Q. And you and Ms. Mohamed worked together in the same office for a while before she became a remote employee, correct?
A. Yes.
Q. That means you got to interact with her in person on a regular basis?
A. Yeah. I mean, we saw each other in the office, yes.
Q. And so you knew what she looked like?
A. Yes.
Q. And you became her manager in approximately December 2019 when you were promoted into the role of Instructional Design Manager, correct?
A. Yes. There was a period before that where I was serving as an interim manager, but it was officially in December.
Q. And between 2018 and when you became the interim manager, as you put it, you and Ms. Mohamed were peers, correct?
A. Yes.

Q. And we're still on the first page. I would like you to silently read to yourself the paragraph that starts with "Ruby started by asking me . . ."
A. Okay. You want me to read the whole paragraph?
Q. You can just read the first half.
A. Okay.
(Witness complied.)
BY MR. SWAIN:
Q. Now that you've read that portion of Exhibit 15, do you recall describing Ms. Mohamed's tone during the June 4th meeting as accusatory, loud, and confrontational?
A. Yes. I used those words in my notes.
Q. And since you've just identified this document, Exhibit 15, as your notes, can you tell me during which time period you prepared these notes?
A. When I -- when I actually prepared them? I started after I had a meeting with Mr. Jackson, one of our HR specialists -- I forget what his title was at the time -- and I kept them through late August of 2020.
Q. You personally prepared this Exhibit 15, correct?
A. These were my -- these were my own notes, yes.
MR. SWAIN: I move to admit Exhibit 15 into evidence.
MS. DARROW: Objection, Your Honor. It's hearsay within hearsay. Some of the notes are triple hearsay. It contains Ms. Barley's own statements describing conversations

you had had with Ms. Mohamed and Ms. Morris, correct?
A. Yes.
Q. And you also informed Mr. Jackson that Ms. Mohamed had made a race discrimination complaint to you earlier that day, right?
A. Yes. In the follow-up meeting, yes. That same day, yeah.
Q. Do you recall asking Mr. Jackson if Ms. Mohamed's race discrimination complaint was something you should be concerned about?
A. I don't recall.
Q. I'd like to refresh your recollection.
Can you please turn to page 100 of your deposition?
A. Okay. I'm there.
Q. And, actually, I'd like you to silently read starting on the bottom of page 99, line 23, through 100, line 7.
A. Through 7? Okay. Yes.
Q. Does that refresh your recollection that you asked Mike Jackson if Ms. Mohamed's race discrimination complaint was something you should be concerned about?
A. Yes. Yes.
Q. And you wanted to check with him what you should do, correct?
A. Yes.
Q. And Mr. Jackson responded by advising you to keep documentation of your interactions with Ms. Mohamed going

forward, correct?
A. Yes.
Q. And he asked you to loop him in if things took a different turn, right?
A. I don't remember all the tones of the conversation off the top of my head.
Q. Well, I can refresh your recollection a little bit more.
MR. SWAIN: Just one moment, Your Honor.
THE COURT: Sure.
MR. SWAIN: You know, I'll retract that question and move on.
BY MR. SWAIN:
Q. You agree that, generally, when an employee makes a complaint of race discrimination, it's important that it be investigated, correct?
A. Yes.
Q. But you're not sure if you believed that Ms. Mohamed's complaint of race discrimination should be investigated after your June 12th meeting with Mr. Jackson, correct?
A. I'm sorry. Can you repeat that question?
Q. Sure.
A. Make sure I understand what you're asking.
Q. But you're not sure if you believed that Ms. Mohamed's complaint of race discrimination should be investigated after the June 12th meeting, correct?

A. I don't know.
Q. Let's move down to the entry of July 22nd on the same page.
MR. SWAIN: And I would like to publish this for the jury for a moment before I resume questioning.
(Pause in the proceedings.)
MR. SWAIN: And can we move back to Ms. Barley so I can resume questioning, please?
BY MR. SWAIN:
Q. Now, Ms. Barley, in this July 22nd, 2020, entry, towards the bottom, one of the things you wrote was, "I'm so upset more and more about this situation. These accusations have no justification. Ruby is allowed to keep saying them and is damaging my character and reputation across SHRM and continues to be rewarded for it. I am not sure" --
Well, let me ask you about that before I move on.
Did I read that correctly?
A. Yes, you read it correctly.
Q. So I'd like to unpack that entry a bit. It starts by you saying you were so upset more and more by these accusations, correct?
A. Yeah. I mean, it literally says "situation," but yes.
Q. Oh. "This situation." I'm sorry.
And then you go on to say, "These accusations have no justification," correct?

A. Yes.
Q. And did you agree with Mr. Schacht?
A. It seems accurate.
Q. Ms. Mohamed had asked you for advice about a few different topics in an earlier email, correct?
A. In an earlier email, yes.
Q. And you believed that you had answered her questions and her request for advice in that email that you sent that you collaborated on with Ms. Long, correct?
A. I said I didn't -- I didn't respond to each question individually, but I think I gave a summary answer of how she should proceed.
Q. Do you believe that you responded to her questions or not?
A. I think I responded to her email. I didn't answer each individual question.
Q. And in the second bullet point of Mr. Schacht's email that we were looking at, August 14th, Mr. Schacht writes that he believes the tone of Ms. Mohamed's email was concerning.
Do you see that?
A. Yes, I see that.
Q. Did you agree that the tone of Ms. Mohamed's email was concerning?
MS. DARROW: Objection. Calls for speculation and not relevant. It's also vague.
THE COURT: Objection is overruled on each ground.