Case No. 26-1142

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

REHAB MOHAMED,

Appellee,

v.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Appellant.

---

# APPELLEE'S SUPPLEMENTAL APPENDIX
# VOLUME 2 OF 2

(Supp. App. 253-367)

---

Appeal from the United States District Court for the District of Colorado

The Honorable Gordon P. Gallagher
Originating Case No. 1:22-cv-01625-GPG-KAS

Hunter A. Swain
SWAIN LAW, LLC
1490 N. Lafayette St., Ste. 303
Denver, CO 80218
Phone: (720) 815-5281

*Attorney for Appellee*

Ariel B. DeFazio
LOWREY PARADY LEBSACK DEFAZIO, LLC
1490 Lafayette St., Ste. 304
Denver, CO 80218
Phone: (303) 593-2595

*Attorney for Appellee*

# TABLE OF CONTENTS

## VOLUME 1 (Supp. App. 001-252)

Exhibit 1 to Plaintiff's Response to Motion for New Trial (Dkt 182-1, filed 3/13/2026) ..... 1-8

Exhibit 2 to Plaintiff's Response to Motion for New Trial (Dkt 182-2, filed 3/13/2026) ..... 9-41

Exhibit 3 to Plaintiff's Response to Motion for New Trial (Dkt 182-3, filed 3/13/2026) ..... 42-52

Exhibit 4 to Plaintiff's Response to Motion for New Trial (Dkt 182-4, filed 3/13/2026) ..... 53-58

Exhibit 5 to Plaintiff's Response to Motion for New Trial (Dkt 182-5, filed 3/13/2026) ..... 59-68

2025.11.05 (10:54 a.m.) Email to Chambers ..... 69

Attachment - Plaintiff's Second Competing and Non-Stipulated Jury Instructions (Clean) ..... 70-92

Attachment - Plaintiff's Second Competing and Non-Stipulated Jury Instructions (Redlined) ..... 93-114

2025.11.05 (12:55 p.m.) Email to Chambers ..... 115-117

Attachment - Plaintiff's Second Competing and Non-Stipulated Jury Instructions (Clean with Defendant's Additions) ..... 118-139

Attachment - Plaintiff's Second Competing and Non-Stipulated Jury Instructions (Redlined with Defendant's Additions) ..... 140-161

Trial Transcript Volume Ia ..... 162-179

Trial Transcript Volume II ..... 180-252

## VOLUME 2 (Supp. App. 253-367)

Trial Transcript Volume III ..... 253-316

Trial Transcript Volume IV ..................................................................... 317-352

Trial Exhibit 30 ..................................................................................... 353

Trial Exhibit 32 ..................................................................................... 354-355

Trial Exhibit 35 ..................................................................................... 356-358

Trial Exhibit 50 ..................................................................................... 359-361

Trial Exhibit 63 ..................................................................................... 362

Trial Exhibit 65 ..................................................................................... 363-364

Trial Exhibit 107 ................................................................................... 365-367

**Transcript of Jury Trial Proceedings - Vol. III**

[83, 84, 87, 88, 90-92, 94-111, 114-118, 120-123, 135, 138, 154, 155, 161, 164-166, 176, 177, 185, 189, 190, 194, 195, 198-200, 202-207, 228-230]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

REHAB MOHAMED,

Plaintiff,

vs.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

Case No. 22-CV-1625

Denver, Colorado

December 3, 2025
7:47 a.m.

Vol. III

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218

APPEARANCES: (Cont.)

For the Defendant:

TANJA DARROW
Littler Mendelson P.C.
633 West Fifth Street
63rd Floor
Los Angeles, CA 90071

VIRGINIA WOODFORK
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202

*MEGAN E. STRAWN, RPR, CRR*
*901 19th Street, Denver, CO 80294*
*303.335 2111 * strawnreporting@gmail.com*

*Proceedings reported with realtime stenography; transcript produced with computer-aided transcription.*

A. I joined SHRM in February 2020, and I believe she was fired in early September 2020, so the months in between.
Q. Do you live in Colorado?
A. No.
Q. Where do you live?
A. I currently live in Indiana.
Q. So you traveled here for this case?
A. Correct.
Q. How?
A. I drove here.
Q. How long did that take?
A. It was a little over 1100 miles. About 16, 18 hours.
Q. Were you subpoenaed to be here?
A. No.
Q. Ms. Mills, how did you come to work for SHRM?
A. I applied to SHRM when I was looking for new opportunities to switch from my employer at the time.
Q. And why did you choose SHRM in particular?
A. I worked in the DEI industry for a while, and it is well known that SHRM is the leading HR organization on the planet. They have hundreds of thousands of members. They bring in hundreds of millions of dollars a year. If you work at SHRM, you have the power to change workplaces globally, and I wanted to be a part of that.
Q. So you applied for a position?

A. Correct. I applied for Senior Instructional Designer.
Q. Did you interview?
A. Yes, I did.
Q. And who with?
A. I had an in-person interview with Carolyn Barley, Liz Lacey, and Jeanne Morris.
Q. And during the interview, did Ms. Barley say anything about the job?
A. She gave me an overview of the core responsibilities, how many courses I would need to make in a year. She shared with me insight about the team's composition, yeah.
Q. What did she tell you about how many courses you would be expected to produce in a year?
A. I was expected to produce two courses annually.
Q. And what did she share with you about the composition of the team?
A. I understood that I would have two virtual teammates: one was described as a junior designer that I would have the opportunity to mentor in my role, and the other was positioned as a senior designer based in Florida.
Q. And did you later develop an understanding as to who that junior designer was that Ms. Barley was referring to?
A. Yes. I learned when I started at SHRM that the junior designer she was referring to was Ruby Mohamed.
Q. So were you offered the job?

professionals globally that it was safe to return to the office and that they could begin making those arrangements for their own workplaces.

Q. Who else reported to Ms. Barley at the time that you joined the team in February 2020?

A. When I joined, the team consisted of Ruby Mohamed and Ann Godmere, and then Ebony Thompson and I joined on the same day.

Q. And what were your positions, all the teammates you just mentioned?

A. All four of us were Senior Instructional Designers.

Q. Were you surprised that Ms. Mohamed held that title?

MS. DARROW: Objection. Leading.

THE COURT: It doesn't suggest the answer. The objection is overruled.

BY MS. DeFAZIO:

Q. You can answer the question.

A. Yes, I was surprised.

Q. And why is that?

A. Part of the interview that I had, the in-person interview, was understanding what kind of growth potential I myself might have if I joined this team. So it was really important that I understand that there was someone I could mentor as a way to sort of prove my ability for management.

To find out that that was not the case, that everyone on the team held the same position, was a surprise. It

painted a different picture of my vertical mobility at SHRM.
Q. Did you go through an onboarding process?
A. Yes.
Q. What did that look like?
A. Organizationally, SHRM has one the first day where you meet organization-wide and go through an orientation program. And after that, it's up to the teams. And so Carolyn provided me with a packet of information for my onboarding process for the team.
Q. And did Ms. Barley say anything about the importance of various items in that intake process or onboarding process?
A. The activities I needed to do for my onboarding were listed numerically on one page. She let me know it was not important to prioritize any of the items that she assigned to Ruby and that I should prioritize items specifically assigned to Ann Godmere.
Q. Do you remember an example of one item she had assigned to Ms. Mohamed?
A. The topics that were assigned to Ruby were more formulaic. From what I recall, it was spending time reviewing the SHRM website together and how to navigate it, understanding uses of, like, the Slack communication channel.
Q. Okay. During your employment with SHRM, how frequently did you interact with Ms. Barley?
A. Daily, multiple times a day.

BY MS. DeFAZIO:
Q. Did you have occasion to review Ms. Mohamed's work product during your employment at SHRM?
A. Yes.
Q. And in what context?
A. Soon after I joined SHRM, so probably maybe sometime in April, Carolyn specifically met with Ann Godmere and I and asked us to give critical feedback to Ruby on her work product. And so the task was to review the deck that she had created, the course that she was working on at the time. I believe it was Digital HR or something similar.
And she made it very clear in what she said that it was not acceptable to simply say, "It's good." We were not to provide light feedback. We were specifically directed to provide critical, negative feedback on the work product.
Q. And did she explain why it had to be critical or negative feedback?
A. No.
Q. What was your impression of Ms. Mohamed's work after you reviewed it?
MS. DARROW: Objection. Relevance.
THE COURT: Objection is overruled.
A. I felt that it was above average for the team's work product.
//

BY MS. DeFAZIO:
Q. And what led you to believe that?
A. When creating a course using Instructional Design principles, the main focus is on the clarity of the content and how digestible it would be for a learner. Secondary to that are the visual aesthetics.
I felt, in looking at Ruby's work, that the core essence of Instructional Design was there, that she had synthesized information in a digestible way for the learners. The only feedback I felt I could provide was about visual aesthetics. There weren't really any guidelines for SHRM about what the visual aesthetics should be, so it was very subjective.
Q. Did Ms. Barley share her impressions of Ms. Mohamed's work product with you at any point during your employment with SHRM?
A. Yes, several times.
Q. And what did she share with you?
A. She felt that Ruby had a long way to go, that her design skills were below average for the team, and that she could only improve if we all collectively provided her constructive feedback.
Q. Let's talk about those weekly meetings with the ID team.
During the time that you worked with Ms. Mohamed, what did you observe about Ms. Barley's interactions with the

Senior Instructional Designers during those ID weekly team meetings?
A. She was very inconsistent about how she treated each person on the team. You could see that demonstrated very clearly in the team meetings. Her demeanor would change based on who she was directly asking questions of.
Q. Can you explain a little more?
A. Sure. It was essentially a gradient. Ann never received any feedback on anything she shared in the team meeting, whether it was appropriate for that venue or not. She never received any feedback about her projects being delayed. And Carolyn's demeanor when talking about Ann or celebrating her successes or asking direct questions of her was always cheerful and celebratory.
Probably then second is me. I never received any critical questions in any team meetings. I received a very positive and warm version of Carolyn pretty much at all times.
And then the way that she would direct questions to Ruby and Ebony was very different from that. Especially over time, the questions of Ruby became very critical, very pointed. It was as if the point was to humiliate her.
Q. Were there times in these meetings where people would bring up non-work matters?
A. Often.
Q. And can you think of some examples?

previously. And in a team meeting, she, as we were kicking off, shared some restaurants in the area that she would recommend.

I lived less than a block from the SHRM offices. That was relevant to anyone that may be in the office, including Carolyn. Carolyn shut her down as soon as she gave like one or two recommendations.

It sticks out to me because prior to this, Carolyn, Ebony and I had all had lunch together. Carolyn was very aware, in picking that restaurant for lunch, that I had been a vegetarian for 15 years. Ruby did not know this. And the restaurants that she recommended were bar-b-q joints. I had expected Carolyn to interject and say, like, "Well, Carrie's a vegetarian." So -- but that context wasn't provided.

That wasn't the point. She just stopped Ruby from having a congenial conversation with me on a topic we shared.

Q. Moving to the work you did as a Senior Instructional Designer, the jury at this point has heard about the ADDIE model.

Was that used at SHRM?

A. That was a backbone aspect of how our department was intended to conduct business.

Q. And what was the expectation for how long it would take to complete a course at SHRM using the ADDIE model?

A. The rough estimation was six months, but there was

flexibility for it to be shorter or longer as long as the two courses per year criteria was met.
Q. And who set that expectation for you of two courses a year?
A. Carolyn.
Q. At any time in your process of completing the course, did you share your course materials with your teammates?
A. Not that I recall, no.
Q. And why not?
A. It was never required of me, never asked of me.
Q. But you testified that you had seen Ms. Mohamed's because Ms. Barley specifically asked you to look at it, right?
A. That's correct.
Q. Ms. Mills, when were you given your first course to work on as a Senior Instructional Designer at SHRM?
A. I believe my first topic was assigned to me in my first week.
Q. So in February?
A. Correct.
Q. And what was the name of that course?
A. Leading a Future-Focused People Strategy.
Q. And who assigned it to you?
A. Carolyn Barley.
Q. Did Ms. Barley give you a date by which it had to be completed?

Appellate Case: 26-1142 Document: 24-2 Date Filed: 09/28/2026 Page: 16


A. Not initially, no. I think there was a loose projection of June, but that was never formalized.
Q. And what did completing the course entail, as far as you understood it?
A. Completing would be that the course is completely ready to be run virtually or in person. So that would include creating the deck, creating any supporting material for the classroom, writing all facilitator notes into the notes section of the deck, and then uploading the files to the share drive and also creating an Adobe Connect virtual environment with the necessary scenes for a facilitator to run the course.
Q. In practice, did completion mean something different?
A. Yes. I was explicitly told by both Carolyn and Ann that a course could be considered done if the deck was done, that the Adobe Connect environment could simply be created prior to the first iteration, like the first facilitation of a course.
Q. Okay. And that would be the course launch date?
A. Correct.
Q. What was your understanding as to how far in advance a course should be completed prior to the launch date?
A. Ideally, the course was supposed to be completed, like, one to two months before the launch date so that the facilitator would have time. But that was not the practice.
Q. What was the practice?
A. The SHRM facilitators generally do not look at course

materials until a week or two before they actually facilitate it. They're not technically required to review the materials in advance. And so it was acceptable but not ideal if the Adobe Connect environment was completed two weeks before a program, let's say.

Q. In your experience at SHRM, did the launch date of a course ever change?

A. Frequently.

Q. And what circumstances would lead to that happening, as far as you knew?

A. Low enrollment was the primary driver.

Q. So going back to the Leading a Future-Focused People Strategy course that you were assigned, did you complete the course by June?

A. No.

Q. Why not?

A. I didn't have it done.

Q. Any particular reason?

A. Candidly, when COVID hit, it was a difficult time, I think, for a lot of people, myself included. And I just really didn't do much work. Like, that course was very far from done. Spent a lot of days helping to call SHRM members and reschedule their courses since they were canceled. But I -- I didn't do a lot on the course for a while.

Q. And what did you do in June when you hadn't completed the

course?

A. I, in one of my one-on-ones with Carolyn, let her know that it would not be completed in time. I was not required to give a reason. She simply extended it into July as a month. It was not July 1st or July 31st; it was just July.

Q. And did you finish the course in July?

A. No.

Q. Why not?

A. I was not doing much work. At that point, I was in the office. There was a lot going on amongst the team. There were a lot of disturbances coming from Carolyn. And I just -- I did not feel motivated to be in an office where I did not feel safe because of COVID to create a course that wasn't going to launch anytime soon when I could see my peers were not doing all that much either. I saw in team meetings Ann's timeline slipping. I just felt it was perhaps unfair, and I just didn't complete it.

Q. Did you have another conversation with Ms. Barley about the deadline by which you would complete that course?

A. Yeah. I spoke with her again in a one-on-one conversation.

Q. And what transpired in that conversation?

A. She extended the deadline into August.

Q. What did you tell her about why you wouldn't be able to complete it in July?

A. I believe I said at the time that I was working on some interactivity for the course and that this had taken up a lot of my focus, and I just needed more time to bring it to life.
Q. And did you complete the course in August?
A. No.
Q. When did you complete it?
A. I sent out an email saying that it was done on September 1st. But for purposes of it being fully completed, including the Adobe Connect environment, it wasn't done for, like, another week into September. I don't know the exact date.
Q. And are you aware of any other Senior Instructional Designers who requested extensions for completing their courses?
A. All four of us repeatedly requested extensions on all of our projects during this time period.
Q. Okay. And how would Ms. Barley respond?
A. I don't -- I don't know what she was like in one-on-one meetings with people, but I know in team meetings where we would share that timelines were slipping, her response would follow that gradient. So if Ann said that her timeline was extended, Carolyn would say, "Yes, Ann, we've already talked about it, and it's all good."
When I would share that my timeline had slipped, she wouldn't necessarily jump to my defense like she would Ann, but she would show that she had approved it.

If Ruby or Ebony shared concerns about their course timeline, they would receive very specific pointed questions about what exactly was holding this up, the types of questions that would be addressed on a one-on-one but for them were addressed in a team meeting.

Q. Ms. Mills, did you learn at some point that Ms. Mohamed had brought up concerns about Ms. Barley discriminating against her?

A. Yes.

Q. And how did you find that out?

A. Carolyn.

Q. Okay. What do you recall about that?

A. Carolyn was very distraught that Ruby had brought up these concerns to HR. She would, without provocation, share her thoughts unsolicited to me, because we sat next to each other in a relatively secluded part of the floor.

Q. And this is when you were back working in person?

A. Correct.

Q. What do you recall about what she would share with you?

A. She would say things like, "I can't be racist. I have a Hispanic son." She asked me many times if Ruby is even Black. She would also share that our team had other Black women on it, our larger Education team; they had never shared any concerns, that no one else had voiced this. And she shared this often.

Q. How often?
A. Not quite daily, but whenever -- whenever she was experiencing strong, negative emotions about it, she would voluntarily speak these things to me because of our proximity.
Q. And how many of these conversations do you think you had with her?
A. Maybe more than 8, probably less than 12.
Q. And what would Ms. Barley's demeanor be during these conversations?
A. Frantic is probably the best word. She would become flushed and red in the cheeks. She would become a little bit sweaty. It was just very clear that she was experiencing strong emotions.
Q. And after you learned that Ms. Mohamed had brought up concerns about Ms. Barley treating her differently because of her race, what did you observe about Ms. Barley's demeanor in ID weekly team meetings?
A. The behavior continued to ramp up. Ruby still received very pointed questions, very critical questions that Ann and I continued to not receive. There was a little more formality to how she was asking them, but over time it just continued to exacerbate.
Q. What was Ms. Mohamed's demeanor in these ID team meetings?
A. It varied based on the topic. In general, for our work-focused meetings, she was very reserved. She only spoke

when it was her time to speak, when she was asked to speak. Yeah.

Q. Did you ever hear her raise her voice?

A. One time that I can recall, but it was in a different context. It was a team meeting, but it was -- for context, the murder of George Floyd was a very important watershed moment for SHRM, for us as employees at SHRM, for the world.

In response to that moment and the civil unrest that unfolded, SHRM launched Together Forward @ Work, which was a program to support thoughtful conversations in the workplace around difficult topics. We at SHRM were expected to leverage some materials to a certain extent within our team meetings.

Ruby -- in one meeting where Carolyn led the conversation, things got heated. It wasn't just Ruby, but that is the only time I recall Ruby elevating her voice. I don't know if I would say raised necessarily -- like . . .

Q. Did you ever witness Ms. Barley and Ms. Mohamed interact outside of these weekly ID team meetings?

A. Yes.

Q. And how did you know that Ms. Barley -- or what was the context of those interactions that you observed?

A. Many times Carolyn had her one-on-one conversations or whatever project meetings with Ruby at her cube.

Q. And how would you know that she was speaking to Ms. Mohamed at those times?

A. Two ways. One, Carolyn would often interrupt Ruby, it sounded like, by repeating her name, like, "Ruby, Ruby, Ruby," as if trying to halt conversation.

MS. DARROW: Objection. Speculation.

THE COURT: Objection is overruled.

A. But also, the route to get in the office on that floor from the bathroom to my cube puts me in direct eye contact with Carolyn's computer screen. Ruby -- I should clarify at this time at SHRM, because we had been remote for a period of time, there was a flexibility about whether or not you had your camera on; but the general expectation was that if you were in a virtual meeting, you would have your camera on if possible.

Ruby would not turn her camera on. That was a long-standing work boundary. And so it was very evident, looking at a computer monitor, if Carolyn was speaking to Ruby because it would appear as if no one else was on the screen.

BY MS. DeFAZIO:

Q. And what did you observe about Ms. Barley's demeanor when you would overhear these conversations with her and Ms. Mohamed.

A. It was a different version of Carolyn than I really ever experienced. It was a more aggressive tone. So she spoke louder. She spoke faster. She, again, would be flushed, red in the face, very determined eyes, like very serious eyes.

Yeah. Her body language, her tone, the word choice she would use was very different.
Q. Can you describe Ms. Barley's demeanor with you in your one-on-one meetings?
A. She was open, social. She'd ask me questions about my personal life. I'd ask her about her children. We'd share, like, a laugh. That would probably be maybe 25 percent of my one-on-one time. Then we would talk about business, speak about deadlines, talk about upcoming projects that may be coming for the team. We often ended early. It was, like, generally a pleasant experience.
Q. Ms. Mills, did you work on the PMQ project during your time at SHRM?
A. Yes.
Q. And was there a time when you took on more responsibility for that project?
A. Yes. That would have been summer of 2020.
Q. And what did your role become?
A. The PMQ project was done in partnership with a vendor. Most of the project was roughly scripted and complete. The vendor was completing the visual assets. But following, again, the murder of George Floyd and the heightened focus that SHRM had on race at the time, it was decided to add supplementary episodes to the PMQ slate that specifically covered topics of race since that had been omitted from the

original series.
Q. And were you in charge of those?
A. Correct.
Q. Was part of your role as the lead designer of those additional episodes to request feedback from other SHRM employees?
A. Yes. Yes.
Q. And did Ms. Barley ever provide you with direction about who you should or shouldn't be getting feedback from?
A. She had general recommendations for, like, leadership to include general recommendations around, like, other colleagues in Education. She very specifically told me not to include Ruby.
Q. Did she say why not?
A. She felt like there was already enough bandwidth on the team taken up by this project. She didn't want to extend that to any other designers.
Q. Do you recall meetings taking place over the summer of 2020 about the PMQ additional work you were doing?
A. Yes.
Q. Do you recall Ms. Barley telling Ms. Mohamed to not attend one of those meetings?
A. Yes.
Q. And what do you recall?
A. It was in a team meeting. I was sharing updates about PMQ

and what the next steps would be. Carolyn had previously said that, like, in a team meeting that PMQ was a collaborative effort for the whole team, and folks could raise their hand and get involved at any time.

Ruby exercised that in that team meeting and asked if she could join. Carolyn told her not to.

Q. Did you end up attending that meeting that was being referred to?

A. Yes. I led the meeting.

Q. And was Ms. Mohamed in attendance?

A. Yes, she was.

Q. And Ms. Barley, too?

A. Correct.

Q. What do you recall happened after that meeting took place?

A. Carolyn was very upset about this. She asked me why Ruby was there. I clarified that I asked her specifically to attend. I felt like I really needed a counterpart to help weigh in on these episodes given the gravity of the content, that I wanted a counterpart that had a unique lens on race issues in the workplace while also maintaining that Instructional Design background.

Q. Ms. Mills, based on your own observations, did you have concerns about how Ms. Barley was treating Ms. Mohamed?

A. Yes.

Q. And what were your concerns?

A. I couldn't understand why someone on a team could produce quality work and be treated so poorly so consistently. I was afraid that there was something larger at play, that it wasn't about her work quality, and it wasn't about her positive attributes; that it was some larger reason.

In conversations with Carolyn where she expressed her concerns about Ruby going to HR over concerns of racism, the way that Carolyn responded made me believe that that was actually the reason.

MS. DARROW: Objection, Your Honor. Ultimate opinion of -- that's for the trier of fact.

THE COURT: Objection is overruled.

BY MS. DeFAZIO:

Q. Ms. Mills, did you share with anyone at SHRM about your concerns regarding Ms. Barley's treatment of Ms. Mohamed?

A. Yes.

Q. And who did you share your concerns with?

A. The first person I spoke with was Nick Schacht, our chief learning officer. He asked to speak with me one morning when I was in the office. We met in his office for maybe half an hour. He wanted to learn from my perspective if I had seen anything that would suggest that the racial discrimination claims were accurate. I shared with him many examples.

Q. And how did he respond to the examples that you gave?

A. The first one or two examples he kind of explained away.

As I continued to share more examples, his demeanor changed. Most specifically, when I expressed that Carolyn continued to say, "I can't be racist. My son is part Hispanic," and shared with him why I felt like that was very offensive to say, yeah, that shifted his demeanor. He became very serious, shared that he would more closely coach her, yeah.

Q. Did he say anything about what next steps would be taken with respect to this situation?

A. He did define coaching in conversations with Carolyn as the next step, but he wanted to speak with others on the team.

Q. Did you tell anyone else at SHRM about your concerns?

A. Yes.

Q. Who else?

A. I also spoke with our VP of education, Jeanne Morris.

Q. And what do you recall telling Ms. Morris?

A. She asked to speak with me. She said that Nick had shared how enlightening our conversation was and that Nick suggested she and I meet.

I shared with her the same examples. I was more candid with Jeanne than perhaps I was with Nick. Jeanne expressed surprise. She -- this did not align with her image of Carolyn, but she had not heard any of these direct quotes herself. She understood why many of them were offensive, yeah.

Q. And did Ms. Morris say anything about what next steps she

would be taking with respect to this situation?
A. I don't recall her ever defining next steps.
Q. Did you tell anyone else at SHRM about your concerns?
A. Yes.
Q. Who else?
A. I also shared my concerns with Bernée Long. I forget her title. She worked in the HR department at SHRM.
Q. And what did you share with Ms. Long?
A. I was very candid with Bernée. I said that it was clear to me Carolyn was acting out of racist intent. I said -- I shared all the same examples.
Bernée immediately understood why these examples were very problematic. She was appalled. She felt that Carolyn specifically needed significant training. She identified that as her next step.
Q. And what examples -- other than the Hispanic son comment that you've mentioned, what other examples did you provide Ms. Long about your concerns?
A. Yeah. All the same. So I shared the many times that Carolyn said, "Is Ruby even Black?" That she had said no one else seems to have an issue with her, no other Black women that she's worked with for years seem to have issues. Yeah.
Q. Did you tell Ms. Long anything about how Ms. Barley treated you and Ms. Godmere?
A. Yes.

Q. What did you share with her?

A. I shared with her the reality that Ann was treated like an untouchable god, that everything she did was correct even when it wasn't; that I never received constructive feedback; the tones that Carolyn used were very different based on who on the team she was talking to, and that those behaviors were consistent over time, that I had seen that by two or three months by the time I talked to Bernée.

Q. Was there anyone else that you told at SHRM about your concerns?

A. Yes.

Q. Who else?

A. He worked in HR. His name is Mike. I forget his last name.

Q. Is it Jackson?

A. Correct.

Q. And what did you share with Mr. Jackson?

A. That was a very different conversation than the previous, and that was the last conversation I had prior to Ruby being fired. Mike said he was doing an investigation, but the questions he asked were very basic. I couldn't understand the questions he was asking because it was as if he knew nothing about the situation prior to speaking.

MS. DARROW: Objection, Your Honor. This is inappropriate opinion.

THE COURT: Ms. DeFazio?

MS. DeFAZIO: I can ask some more specific questions.

THE COURT: All right. The objection is sustained from the point of the answer where "Mike said he was doing an investigation," at that point. Everything thereafter is stricken as it's -- well, it's nonresponsive.

The question was, "What did you share with Mr. Jackson?" The answer then devolved into the witness's opinion about what Mr. Jackson was doing. So it's stricken as nonresponsive. It may also be an inappropriate opinion, but I don't need to address that at this juncture.

BY MS. DeFAZIO:

Q. What types of questions did Mr. Jackson ask you during that meeting with him?

A. Very basic, surface-level questions.

Q. Can you think of an example?

A. Like, what were my impressions of the team dynamics.

Q. Did Mr. Jackson ever follow up with you after that conversation?

A. No.

Q. Or speak with you again?

A. Not on this topic, no.

Q. Let's look at Exhibit 28.

THE COURT: And just for the jury and counsel's information, I think we may take lunch slightly later today,

Compliance course had progressed under Ms. Mohamed?

A. The Compliance course, I believe, was kind of specific to California law. That course was supposed to be reworked every year as new laws were enacted. There was one consistent subject matter expert for that course. It was Lou Lessig. It was well known --

MS. DARROW: Objection. Unresponsive.

THE COURT: The objection is denied as premature. It's not clear -- the question was with regard to the progression under Ms. Mohamed.

The answer was discussing something that has not yet been disclosed about Mr. Lessig which may or may not be responsive. So the objection is currently overruled, but it may be re-raised if the answer is nonresponsive once the answer is given.

BY MS. DeFAZIO:

Q. You can continue.

A. It was well known that Lou is a nonresponsive subject matter expert. Ruby had shared in team meetings several times that she was hitting the same wall, that she, without a legal background in certification from a California bar, could not complete the course without that guidance from an external source.

Q. And what was your basis of that knowledge about how the course had progressed?

A. This was shared several times in team meetings.
Q. And would Ms. Barley say anything with respect to Mr. Lessig?
A. Yes.
Q. And what would she say?
A. She would say things like, "That's Lou. He's very smart. It's just a matter of getting a hold of him."
Ann would share similar sentiments.
Q. Do you recall Ms. Barley ever suggesting that Ms. Mohamed find a different SME for that course?
A. Not that I recall.
Q. In August 2020, did Ms. Barley talk to you about Ms. Mohamed's upcoming deadlines for her two courses?
A. Yes.
Q. And what do you recall about that?
A. She shared with me that if Ruby was unable to complete her assignments that they would be moved to me. She expressed concerns as to whether we would be able to meet the deadline. She expressed skepticism.
Q. And what was your reaction to that?
A. Surprise. I felt Ruby had been very forthcoming with the issues that she was facing on her course development. I did not hear proactive solutions coming from management to address them.
Q. Now, going back to Exhibit 28, the email that we were just

looking at, did you end up responding to Ms. Barley about the -- your anticipated completion date for your project that you were working on?
A. I imagine I did, but I don't specifically recall.
Q. Do you recall --
MS. DeFAZIO: And this exhibit can be taken down. Thank you.
BY MS. DeFAZIO:
Q. Do you recall Ms. Barley talking to you about the date by which you would need to complete that course?
A. Yes.
Q. Tell us when that happened.
A. This would have been middle of August.
Q. And what happened?
A. Carolyn approached me in the office while I was at my desk. She said she needed to speak to me urgently and privately. She was, again, red-faced, sweaty. It was clear that this was a difficult conversation.
We met on the floor in a meeting room. The tone that she used with me was unlike she ever had before. She was very rushed and said that I had to have my project done by the end of August; there was no flexibility, that if it was not complete by the end of August, I would face career repercussions at SHRM, that our -- the people above us, so, like, Jeanne Morris and Nick, were going to be watching for

this and that there was a larger context and reason that she could not share with me at the time.
Q. Did you find this conversation with Ms. Barley unusual?
A. Yes.
Q. And why?
A. She had never been strict about a deadline up until this point. And then for her to be strict about a deadline with just a couple weeks remaining seemed like -- I mean, it was very inflexible. It was unlike -- it was just also the way she spoke to me, that prescriptive, that directive, no jovialness to it.
Q. And how did you respond?
A. I shared with her that I did not think I would be able to complete it by that timeline.
Q. And how did she respond?
A. She said that was not an option.
Q. Did you have a subsequent conversation with Ms. Barley about that deadline?
A. Yes, I spoke with her again in a subsequent one-on-one.
Q. And what did she say?
A. Again, that the timeline was not flexible, that others on the team had similar timelines that were also enforced and that there would be no flexibility for any of us.
Q. Did she say anything about what completing the project would entail?

A. When I expressed my concern that I wouldn't meet the timeline, she shared that it was fine to simply complete the deck and facilitator notes by the deadline, that the Adobe Connect virtual platform could wait until a later date, that ideally I would have any supplementary materials for the classroom also complete but that that was not required. It was just the deck.

Q. Ms. Mills, did you turn in the deck for Leading a Future-Focused People Strategy by the August 31st deadline?

A. No.

Q. Did you turn in any materials for that course by August 31st?

A. No.

Q. When did you turn in the deck?

A. I turned in the deck on September 1st.

Q. And how do you remember that date?

A. I did it intentionally. I decided to forego actually finishing the project the night before, and instead, I made a comedic birth announcement for my course containing a photo of me holding a child whose face was replaced by the cover slide of my deck, announcing its birth weight of 152 slides. And I sent that in an email to everybody, to the VP -- I believe Nick Schacht was also included, to all of my team members, to everybody in the Education department, the same names in the email that you shared.

break. Please rise for the jury.

(The jury exited the courtroom at 11:25 a.m.)

THE COURT: We'll be in recess for ten minutes. Thanks.

(A recess was taken from 11:26 a.m. to 11:35 a.m.)

THE COURT: Are we all set? Let's bring them in.

(The jury entered the courtroom at 11:36 a.m.)

THE COURT: You may continue, Ms. DeFazio.

MS. DeFAZIO: Thank you, Your Honor.

BY MS. DeFAZIO:

Q. Ms. Mills, before the break, we were talking about when you turned in your course.

Do you recall that?

A. Yes.

Q. After you turned in the deck on September 1st, did Ms. Barley follow up with you about finishing the workbook or the virtual room?

A. Nothing in particular. She, at one point, had expressed her disappointment that I submitted it late, but there weren't any conversations around when I would finish the remaining pieces.

Q. How long did it take you to complete the remaining pieces?

A. Maybe -- maybe two hours, but I just didn't do it for about a week.

Q. So is it your testimony that you finished all the pieces

of the course about a week after you turned in the deck?
A.   Correct.
Q.   Were you disciplined after you had missed the deadline?
A.   No.
Q.   Did you receive a performance evaluation while you were at SHRM?
A.   Yes.
Q.   How many?
A.   I received one formal review.
Q.   And did that review -- who wrote that review?
A.   Carolyn.
Q.   And was there any mention of you having missed this deadline in that review?
A.   No.
Q.   Did you learn at some point that SHRM had terminated Ms. Mohamed?
A.   Yes.
Q.   Do you know what happened to the two courses that Ms. Mohamed was working on after she was fired?
A.   I was tasked with finishing Digital HR, and Ann Godmere received the California law course to coordinate with Lou. But there was a lot of conversation around perhaps Lou should simply finish it himself.
Q.   Do you know if Mr. Lessig was ultimately tasked with finishing that project?

A. I don't recall the outcome.
Q. Okay. What did Ms. Barley tell you about the PowerPoint that had been turned in for Digital HR by Ms. Mohamed?
A. When she handed it off to me to complete, she asked that I first do an analysis of how much work remained. She herself had not reviewed the deck and did not know how much work was left to do or what the course needed.
Q. And did you do that analysis?
A. Yes.
Q. What was your conclusion about how complete it was?
A. I felt like the deck was pretty much done. There were content areas that they wanted to expand specific to technology around, like, human capital management, but it did not take me much time to fully finalize the course.
Q. How much time do you think it did take you to finalize it?
A. Maybe a week in total of dedicated time.
Q. Did Ms. Barley give you a deadline by which you had to complete the Digital HR course?
A. No.
Q. At the time that Digital HR was assigned to you, did you have an understanding as to when it was going to launch?
A. I understood from team meetings that there was likely a session scheduled for it in the fall. I don't recall what date it was supposed to launch, but there was still time -- I understood when it was assigned to me that there was a month,

maybe two, available to me if I needed it. It wasn't attached to a deadline.

Q. And who communicated that to you that you perhaps had a month or two?

A. Carolyn.

Q. Ms. Mills, how did you come to leave SHRM?

A. I made the decision in late 2020 that SHRM was not the work environment I thought it was, and I began interviewing with other places, accepted another role.

Q. So you resigned?

A. Correct.

Q. And why did you resign?

A. It was twofold. The primary reason was that I could not move past what Carolyn had done to Ruby. And then after Ruby was terminated, I was diagnosed with a brain condition, and Carolyn was not supportive of me while I was seeking treatment for this inoperable condition.

Q. I'm sorry.

When did you leave SHRM?

A. I believe my last day was the first week of March 2021.

Q. How did Ms. Barley respond when you submitted your resignation?

A. She was surprised. She asked if she could share that announcement with Jeanne Morris, and then they shortly after asked to speak to me together.

A. It varies by person. It's normally a very surface-level commitment to read more books, to engage in conversations, sometimes in the form of donations.
Q. Fighting for perceived -- fighting for justice for perceived racism?
A. That's not commonly associated with White guilt, no.
Q. You said you communicated your perception of mistreatment of Ms. Mohamed to others at SHRM, right?
A. Correct.
Q. When is the first time you perceived Ms. Mohamed being mistreated?
A. I can't recall. I would say that perception and reception are different. I probably perceived it before I actually understood what I was seeing.
Q. Give me a date. Your best estimate.
A. I think that the first manifestation of deference for Ann over Ruby comes in my first week at SHRM. I don't think I understood what that meant until maybe April.
Q. All right. April 2020.
When is the first time you complained to somebody that you believed Ms. Mohamed was being treated differently?
A. Complained to somebody inside of SHRM?
Q. Yes, ma'am.
A. I think my first conversation was with Nick, and I believe that that was in July.

else on your team?
A. I was never requested to review work of anyone else on the team.
Q. So you don't know what anybody else's work looked like?
A. No, I do, because I saw it in team meetings, and then I also had access to our shared files. Spent a lot of time reviewing the work products of folks. And there were several meetings where Ebony and I presented work since we started on the same day, so I saw her work product in those meetings.
Q. What did you think of her work product?
A. I felt like she needed significant improvement.
Q. And Ebony Thompson is Black, yes?
A. Correct.
Q. Let's talk about folks' experience -- because you mentioned that you were told that Ms. Mohamed was a junior designer, correct?
A. Correct.
Q. Have you ever seen her résumé?
A. No.
Q. Do you know if she has any formal Instructional Designer -- I just realized what I was doing.
Let me back up and not be disrespectful.
Have you ever seen Ms. Mohamed's résumé?
A. No.
Q. Do you know if Ms. Mohamed has any formal training in

THE COURT: Yes. We need a page and a line, please.

THE COURTROOM DEPUTY: The pages we were looking at before the break --

THE COURT: Let's let counsel. Thanks.

MS. DARROW: Page 6, lines 20 through 25.

A. Yeah. It looks like in the transcript I said, "I love her and her family and that dynamic and all that stuff."

BY MS. DARROW:

Q. And you also said, "She seemed like a wonderful person and we got along really well," correct?

A. It says, "Socially, she seemed like a wonderful person, and we got along really well."

MS. DARROW: No further questions, Your Honor.

THE COURT: Okay. Thank you very much.

Ms. DeFazio.

MS. DeFAZIO: Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MS. DeFAZIO:

Q. Ms. Mills, regarding that recording, do you recall mentioning -- or hearing yourself talk about what the contributing factor was for you leaving SHRM?

A. Yes. I believe I said it was Carolyn.

Q. Earlier in the cross-examination, Ms. Darrow asked you about the two-program-a-year expectation.

Do you recall that?

A. Yes.
Q. Did that change after COVID, the COVID pandemic occurred?
A. No.
Q. So that remained the expectation throughout your employment?
A. Yes.
Q. And, Ms. Mills, are you and Ms. Mohamed friends?
A. No.
Q. When is the last time before today that you spoke with Ms. Mohamed?
A. I think it was summer 2021.

MS. DeFAZIO: Thank you.

Your Honor, no further questions.

THE COURT: Okay. Ma'am, you may step down. Thank you.

Next witness.

MS. DARROW: We weren't given a lot of notice about the change in order --

THE COURT: That's okay. Sure.

MS. DARROW: -- so let me try to get --

MR. SWAIN: Your Honor, Plaintiff calls Keren Maldonado.

THE COURT: So, folks, sometimes there's a short shift in order just to accommodate everybody, and I'll tell you, the attorneys have worked very well on doing that.

Q. You prepared this checklist, didn't you?
A. This checklist is a template that we use. And I believe that this was provided to me.
Q. By whom?
A. By Mike Jackson, Mr. Mike Jackson.
MR. SWAIN: At this time, I'd like to introduce Exhibit 63 into evidence.
MS. WOODFORK: No objection.
THE COURT: Okay. 63 is admitted.
(Plaintiff's Exhibit 63 received.)
BY MR. SWAIN:
Q. Ms. Maldonado, do you see the line that says "Last date of employment"?
A. Yes.
Q. What date does it show as the last date of Ms. Mohamed's employment?
A. August 31st.
Q. And you indicated that you received this checklist from Mr. Jackson?
A. Yes.
Q. Now, I would like to look at Exhibit 61.
What is Exhibit 61, Ms. Maldonado?
A. This is the separation agreement letter.
Q. A cover letter to a separation agreement, correct?
A. Yes, correct.

Can you provide her with the one dated August 18th, 2023, please.
BY MR. SWAIN:
Q. Ms. Maldonado, at your deposition on August 18th, 2023, you were under oath, weren't you?
A. Yes.
Q. Under penalty of perjury?
A. Yes.
Q. Same as you are today, correct?
A. Yes.
Q. Can you turn to page 77 of that deposition.
And I'm going to read lines 14 through 17.
"Question: So would you agree you must have known that Ms. Mohamed was being terminated as of August 31st?
"Ms. Patel: Objection.
"Answer: Yes."
Did I read that correctly?
A. Yes.
Q. In fact, you learned that Ms. Mohamed was going to be terminated a few days before September 1st, didn't you?
A. I learned that Ms. Mohamed may be terminated a few days before.
Q. You learned that Ms. Mohamed was going to be terminated a few days before September 1st, didn't you?
A. I had been brought in to make sure that I understood how

to support Ms. Carolyn Barley in a termination that could happen.

MR. SWAIN: Move to strike the testimony as nonresponsive.

THE COURT: I believe that's a reasonable response to the question, and the request to strike is denied.

BY MR. SWAIN:

Q. Do you still have your deposition transcript in front of you?

A. Yes.

Q. Can you turn to page 75, please.

I'm going to read lines 2 through 7.

"Question: And your testimony is that you learned that Ms. Mohamed was going to be terminated a few days before September 1st, 2020?

"Ms. Patel: Objection. Outside the scope.

"Answer: That is correct."

Did I read that correctly?

A. Yes.

Q. And you learned of Ms. Mohamed's upcoming termination from Sean Sullivan and from Mike Jackson, correct?

A. Yes.

Q. Just to be clear, you learned of Ms. Mohamed's upcoming termination from Mr. Sullivan and Mr. Jackson a few days before September 1st, 2020, correct?

A. Correct. They had asked me to participate on this because Mr. Jackson was going to be out.
Q. Thank you.
MR. SWAIN: I have no further questions.
THE COURT: All right.
Ms. Woodfork, you may cross-examine.

**CROSS-EXAMINATION**

BY MS. WOODFORK:
Q. Good afternoon, Ms. Maldonado.
A. Good afternoon.
Q. Can you explain your role in Ms. Mohamed's termination?
A. I was asked to be prepared in case Ms. Mohamed was going to be terminated and participate in that meeting and support Ms. Barley and, obviously, the employee with information that was going to be provided.
Q. And you previously testified that you don't normally participate in terminations.
Why were you asked to participate in this meeting?
A. This was just --
MR. SWAIN: Objection. Foundation.
THE COURT: Objection is overruled.
A. It was because Mr. Jackson, who had been working with Ms. Barley, had a family medical leave and couldn't be there at the end of the period that was established.
//

Q. When Ms. Mohamed had raised these concerns, you said they were micromanagement concerns; is that right?
A. Micromanagement, and that I think she felt she was being micromanaged more than the other two senior designers.
Q. How did you feel about Ms. Mohamed raising those concerns with you?
A. I was glad that Ruby -- Ms. Mohamed was able to raise them with me, and I suggested that we talk to Ms. Barley about them to make sure that we bridged the gaps that she was feeling and that we could all move forward successfully together.
Q. What steps did you take after receiving Ms. Mohamed's -- actually, when she communicated her concerns, what steps did you take after that?
A. I -- I did contact our HR manager, Mr. Jackson, to let him know what had transpired, and I let him know also that I was going to set up a meeting between the three of us, Ms. Mohamed and Ms. Barley, so we could discuss and hopefully, like I said, bridge the gaps and come to some positive results where we could move forward and the business could move forward.
Q. Did that meeting occur?
A. It did. It occurred the very next day.
Q. What was discussed during that meeting?
A. So Ms. Mohamed shared with Ms. Barley how she was feeling about different things, communication styles, maybe being able to attend meetings with a subject matter expert independently

of Ms. Barley and, again, just kind of how she felt that perhaps she was being micromanaged and kind of how she was seeing the other two senior designers being managed.
Q. What was your impression of the demeanor of Ms. Barley and Ms. Mohamed during this meeting?
A. So as I recall, Ms. Barley was shocked and surprised, and she got -- because of that, she got very emotional, in my opinion, because, again, I think that she was very surprised. She thought, up to this point, that they had a solid relationship and that, you know, she was trying to be very helpful, et cetera.
As I recall, Ms. Barley kept saying she was sorry; she was sorry, and she was trying to explain things. And emotions escalated, and Ms. Mohamed, when Ms. Barley was getting emotional, said she had no empathy for Ms. Barley; she didn't care if she was sorry, you know, that she did not feel sorry for her. Again, there was no empathy.
And it was at that point when things escalated when I said, "I think it's probably best that we end this conversation for now," you know, and we talked about, I think at that point in time, you know, maybe when you guys have some of these issues, address them together in the moment.
And we ended the meeting, and I told them, you know, "We can continue this in a couple of days together." And then Ms. Barley and Ms. Mohamed came back and said that they were

familiar with that course that Ms. Mohamed was working on?
A. Yes.
Q. That had been canceled once in July of 2020 because it had zero registrants.
Do you recall that?
A. Yes.
Q. Do you recall that about six weeks before it was to happen again, it had about three registrants?
A. I don't -- I don't recall if there was three registrants.
Q. You testified to some workplace concerns regarding Ms. Mohamed while she reported to Liz Jackson.
Do you recall that?
A. Yes.
Q. Did Ms. Mohamed, during her employment, ever receive a less than solid performer or meets expectation rating?
A. No, I don't believe so.
Q. Was she --
A. So the answer is no.
Q. Thank you.
Was she ever disciplined?
MS. DARROW: Objection. Vague.
THE COURT: Objection is overruled.
BY MS. DeFAZIO:
Q. You can answer.
A. Okay. I -- I believe meeting deadlines was addressed in

Q. And that she said that that was racism, right?
A. Yes.
Q. Other than that comment, you have never personally observed racism at SHRM, right?
A. No.
Q. In over 30 years?
A. No.
Q. You think that treating employees differently because of race is unethical, don't you?
A. Yes.
Q. During the summer of 2020, after you learned that Ms. Mohamed had made complaints about race discrimination, Ms. Barley came into your office emotional about those allegations on several occasions, did she not?
A. I don't recall how many times, but, yes, she was upset.
Q. You observed that Ms. Barley was quite distressed by being accused of treating people differently because of race?
A. Yes.
Q. And you recall her telling you that she had a biracial child and that she can't operate from a racial mindset, right?
A. She -- she said something along those lines, yes, but she also had concerns about her son, who is biracial, hearing that his mom was being accused of racism.
Q. And Ms. Barley told you that she thought that Ms. Mohamed was spreading rumors that Ms. Barley was a racist, right?

A. I don't exactly recall that specifically, but, yes, that could be.

Q. But you did not perceive Ms. Mohamed bringing up a concern about race as spreading rumors, right?

A. No.

Q. Ms. Mohamed had the right to bring those concerns to people, didn't she?

A. Yes.

Q. You testified about the August 31st deadline that was given to Ms. Mohamed at some point right?

A. Uh-huh.

THE COURT: Is that a yes?

THE WITNESS: Yes.

BY MS. DeFAZIO:

Q. And you believed that Ms. Mohamed and Ms. Barley had negotiated that as a deadline, didn't you?

A. Yes.

Q. Now, prior to August 31st, you had discussions with Mr. Schacht and Mr. Sullivan about the fact that terminating Ms. Mohamed would be an option if she didn't meet that deadline, right?

A. I don't recall a discussion.

Q. Okay. But at the time --

A. We still were hoping that Ms. Mohamed was going to meet her deadline.

Q. Who do you report to?
A. Nick Schacht.
Q. Okay. You'd agree with me that SHRM is highly regarded as a provider of online and in-person learning for HR professionals, wouldn't you?
A. Yes.
Q. How many individuals signed up for SHRM seminars, both online and in person, last year?
MS. DARROW: Objection. Relevance.
MS. DeFAZIO: Your Honor, there has been a lot of discussion about the importance of getting product out timely, and this is just laying some context for who is taking those courses.
MS. DARROW: She's asking about last year.
MS. DeFAZIO: Okay. I'll ask about this year.
THE COURT: Objection is sustained as to last year, which I take as being 2024. It is not relevant.
MS. DeFAZIO: Okay.
BY MS. DeFAZIO:
Q. Ms. Morris, are you aware who SHRM hired to replace Ms. Mohamed?
A. I -- I believe it was Ms. Papp.
Q. Is that Amy Papp?
A. Yes.
Q. What is Ms. Papp's race?

A. White, Caucasian

MS. DeFAZIO: No further questions, Your Honor.

MS. DARROW: Nothing further, Your Honor.

THE COURT: All right. Ms. Morris, you are done and you may hang up.

All right. Ladies and gentlemen, we'll go ahead and take our afternoon break now since we're at a good stopping point. I'd say about 15 minutes. We'll go from about 3:27 to the end of the day, about 5:00 o'clock.

Please rise for the jury.

(The jury exited the courtroom at 3:13 p.m.)

THE COURT: Please be seated if you wish.

Is our next witness remote or in person?

MS. WOODFORK: In person.

THE COURT: So we'll just have whomever that is here in 15 minutes and be ready to go.

Okay. Sounds good. We'll take a break.

(A recess was taken from 3:13 p.m. to 3:24 p.m.)

THE COURT: Are we ready for the jury?

MS. DeFAZIO: Yes, Your Honor.

THE COURT: Okay. Let's bring them in.

(The jury entered the courtroom at 3:24 p.m.)

THE COURT: Thank you. Please be seated.

Next witness will be?

MS. DeFAZIO: Nick Schacht, Your Honor. Plaintiff

THE COURT: Let me have you slow down about half speed, sir. Thank you.

THE WITNESS: Yes, Your Honor.

A. -- people who obtain certifications, people who renew those certifications, people who use our assessments, organizations that ask us to come in and help them address issues with functions of their human resources organizations, and a number of other smaller sources of income.

BY MS. DeFAZIO:

Q. What was SHRM's total revenue in 2024?

MS. DARROW: Objection. Relevance.

THE COURT: Hold on a second, sir.

MS. DeFAZIO: Your Honor, it's relevant to the company's financial condition, which is relevant to punitive damages.

THE COURT: Ms. Darrow.

MS. DARROW: Not in 2024.

THE COURT: The objection to the question -- well, the objection is overruled as it isn't clear yet -- the objection is sustained for lack of foundation. It isn't clear that that's the most recent relevant year as the Court has no information on that.

So you may continue to inquire.

BY MS. DeFAZIO:

Q. Mr. Schacht, what are the most recent revenue -- what's

the most recent revenue data that you have?
A. The most recent complete reported year is 2024.
Q. Then I'll reask my question.
What was SHRM's total revenue in 2024?
A. Approximately $264 million.
Q. How much did SHRM pay you last year?
MS. DARROW: Objection. Relevance.
THE COURT: Ms. DeFazio.
MS. DeFAZIO: How much a company pays its executives also goes to punitive damages. I do have a case that high executive salaries are an indicator of corporate wealth and evidence of their financial condition. That's -- would you like that cite?
THE COURT: Please.
MS. DeFAZIO: *Thomm versus SB, Inc.* This is a District of New Mexico case, 2013 U.S. District LEXIS -- sorry. We don't have Westlaw -- 192706 at 3, and that's District of New Mexico, March 26th, 2013.
THE COURT: Ms. Darrow, in terms of the general proposition?
MS. DARROW: It's not relevant, and it's also an invasion of his privacy.
MS. DeFAZIO: If I may respond, Your Honor, that is information that is a matter of public record.
THE COURT: The objection is overruled.

BY MS. DeFAZIO:
Q. You may answer, Mr. Schacht.
A. Based on the public reporting that you note, Counselor, my reported revenue from the -- reported compensation from SHRM last year was in the range of $800,000. I don't recall the exact figure.
Q. So you can't recall the exact figure as you sit here?
A. That's correct.
Q. Would it refresh your recollection to see a copy of SHRM's 990 from 2024?
A. Yes, it would.
MS. DeFAZIO: Permission to approach, Your Honor.
THE COURT: You may.
BY MS. DeFAZIO:
Q. I believe it's on page 7.
A. Yes. Compensation reported for me last year for 2024 was $830,874.
Q. And there's also an estimated amount of other compensation, correct? Does this refresh your memory as to what that is?
A. Yes. The estimated other compensation is reported at $148,221.
Q. In total, that meant your compensation last year was about $979,000, right?
A. Mental math, yes, I would agree with that.

losses that resulted from in-person programs being canceled; right?
A. That's correct.
Q. Now, let's move on to Ms. Mohamed.
Do you recall Ms. Mohamed forwarding an email to you in August 2020 about two projects that she was working on?
A. I do.
Q. Let's look at Exhibit 28.
Do you recall this exchange on the first page?
A. I recall the page that I can see in front of me, but I can't see anything subsequent on the screen.
Q. Okay. But you see that you -- and my screen's not working, but that's fine.
Are we on 9556?
And you see that email from Ms. Mohamed there?
A. Yes, I can.
Q. Okay. Great.
So Ms. Mohamed had forwarded you and Ms. Morris an email exchange between her and Ms. Barley on August 12th in the morning.
Do you see that?
A. Yes, I do.
Q. Okay. And you thought that Ms. Barley should respond to Ms. Mohamed's email, didn't you?
A. Yes, I did.

Q. You made that suggestion to Ms. Morris, right?
A. I believe I did, yes.
Q. You told Ms. Morris that you thought it was important to correct Ms. Mohamed quickly or to support an eventual case for termination.
Do you remember that?
A. I don't remember the exact words. There's an email to that effect somewhere, but I don't remember the exact words.
Q. You don't? Would it refresh your memory to see that email?
A. Yes, it would.
Q. I'll have Ms. Allen pull up 35, which has not been admitted.
Do you see that in front of you?
A. Yes.
Q. Does that refresh your memory as to what you told Ms. Morris?
A. Yes, it does.
Q. So did you tell Ms. Morris that you thought it was important to correct Ms. Mohamed quickly or support an eventual case for termination?
A. Can you refresh the screen, please, because the screen has gone blank?
So what I said, if I can read the email back to you, is, "I suggest having Carolyn" -- Ms. Barley -- "confer with

Mike Jackson on a response to Ruby's email. That email shouldn't go unanswered by Ruby's manager, but this offers an opportunity to get the right language on the table to correct her quickly or to support an eventual case for termination. We want the right words in there."

Q. Thank you.

Ms. Mohamed sent you an email in which she expressed concern about being retaliated against; is that right?

A. I believe there was an email to that effect subsequent to this one.

Q. Sure. Let's pull up 29 and go to SHRM 0141.

Does that look like the email? Take your time.

A. I see my response to that email.

Q. Okay.

MS. DeFAZIO: Can you scroll down?

A. Yes. That email was from the following week.

BY MS. DeFAZIO:

Q. And in this email, Ms. Mohamed said that she believed she was being set up to fail by having --

MR. SWAIN: Your Honor, I think there may be some technical issues with the jury's -- yeah.

THE COURT: Thank you. Thank you very much.

MS. DeFAZIO: The jury's having trouble seeing the exhibit.

THE COURT: The screen that -- I can't see the

screen, but the screen that I can see is not on.

BY MS. DeFAZIO:

Q. In this email, Ms. Mohamed said that she believed she was being set up to fail by the imposition of that August 31st deadline.

Do you recall that?

A. I do recall, and I do see her saying that in that email.

THE COURT: And you're certainly welcome to keep inquiring, Ms. DeFazio. If you want us to stop until we get it fixed, that's fine, too.

MS. DeFAZIO: We'll give it a minute.

(Pause in the proceedings.)

MS. DeFAZIO: Thank you.

BY MS. DeFAZIO:

Q. Mr. Schacht, you don't know how that August 31st deadline was set, do you?

A. I -- my understanding -- I do not know the details of how it was set, but it was set in response to Ms. Mohamed's inability to finish the course by its original April deadline. So at some point in time before the end of April, the August 31st deadline was set.

Q. Okay. But you don't have any personal knowledge as to how it was set; is that right?

A. That's correct.

Q. At that time, you were chief global development officer,

right?
A. Yes.
Q. And in that role, you were not involved in setting deadlines for courses, correct?
A. No, I was not.
Q. That was up to the ID Team manager, Ms. Barley, right?
A. That was up to Ms. Barley with the participation of the ID team.
Q. And you had no independent knowledge of how Ms. Mohamed's two courses, Digital HR and Compliance, had progressed when they had been assigned to her, did you?
A. Could you please repeat or reframe the question?
Q. Sure. The two courses that were assigned to Ms. Mohamed were Digital HR and Compliance in this time frame.
Do you recall that?
A. I do recall that.
Q. You don't have any independent knowledge as to how Ms. Mohamed worked on them over time, do you?
A. I don't see them, no. What I see is based on what I'm told by the leaders of those teams.
Q. Okay. So what you know about the situation with respect to deadlines and purported extensions was based on what Ms. Morris or Ms. Barley told you, right?
A. That's correct.
Q. And you responded to Ms. Mohamed's email in which she

alleged retaliation, correct?

A. I did.

Q. And that's dated August 21st?

A. Yes, it is.

Q. Other than sending this response to Ms. Mohamed, you didn't take any other action with respect to her retaliation complaint, did you?

A. That's incorrect.

Q. Okay. What did you do?

A. I went and spoke to Sean Sullivan, who was the CHRO.

Q. Okay. And what did you two talk about?

A. We talked about the content of this email. We talked about Ms. Mohamed's statement that she believed she was being retaliated against. Because at SHRM, we don't tolerate retaliation. And at that point in time, I turned it over to HR to handle.

Q. Okay. Do you know what HR did to handle it?

A. I don't have detailed knowledge, no.

Q. Okay. And you had heard from Ms. Barley regarding how the situation with Mohamed -- Ms. Mohamed was developing around this time, didn't you?

MS. DARROW: Objection. Vague.

THE COURT: Objection is overruled.

A. I had heard a general statement that Ms. Mohamed was behind in her courses and that the work was not progressing as

THE COURT: You may.

MR. SWAIN: And, Your Honor, before I proceed, I don't know if we addressed this previously, but we're going to be reading both the designated and counterdesignated testimony all at once.

THE COURT: All right.

**LAURIE MCINTOSH, PLAINTIFF'S WITNESS**

**DEPOSITION TESTIMONY BY DESIGNATION**

BY MR. SWAIN:

Q. "Good morning, Ms. McIntosh. We met off the record, but I will introduce myself again. My name is Hunter Swain, and I am one of Ruby Mohamed's attorneys in this case.

It's nice to meet you.

A. Nice to meet you.

Q. Today, the deposition is a Federal Rule of Civil Procedure 30(B)(6) deposition. What that means is that the Society for Human Resource Management has designated you as its corporate designee to testify on behalf of the organization.

Do you understand that?

A. Yes.

Q. And that means that answers that you provide today are binding on behalf of SHRM as if SHRM were the one speaking, not Ms. McIntosh.

Understood?

A. Yes."

THE COURT: Let me stop for just a second, Mr. Swain.

Just so it's clear, it is not Ms. McIntosh sitting in front of you. This is the deposition of somebody named Ms. McIntosh. I think that that was clear, but just so it's not, that makes it crystal clear.

MR. SWAIN: Thank you for clarifying, Your Honor.

THE COURT: You may proceed.

BY MR. SWAIN:

Q. "What is the material factual basis for SHRM's decision to terminate Ruby Mohamed?

A. Ms. Mohamed was terminated because she missed -- she did not provide a full product for two of the programs that she was working on. It was not -- they were not complete. She submitted them on August 28th, but they were not complete. As such, did not meet the deadline of August 31st.

Q. Were there any other reasons for Ms. Mohamed's termination other than the one that you just gave?

A. No.

Q. Tell me every person who had input into or participated in the decision to terminate Ms. Mohamed's input or employment.

A. Carolyn Barley, Jeanne Morris, Nick Schacht, and Sean Sullivan.

Q. Describe the nature of Carolyn's input or participation in the decision to terminate Ms. Mohamed's input [sic].

A. As Ms. Mohamed's direct manager, the products were

submitted to her. She reviewed products that were submitted and, through that assessment, determined that it was not a final -- neither of the two were final products.

Q. So did -- who did Ms. -- did Ms. Barley describe the nature of her role in the actual decision to fire Ruby Mohamed?

A. Did she share what she actually described as her role? She was the primary. She was the person who made the primary decision based off of the products that were due on August 31st.

Q. When did she make that decision?

A. On September 1st.

Q. And with whom did Ms. Barley discuss her decision to fire Ms. Mohamed?

A. She contacted Jeanne Morris, and they had a discussion. They contacted Sean Sullivan, and Nick Schacht was also looped in.

Q. On what date did Ms. Barley contact Jeanne Morris about her recommendation that Ruby Mohamed be fired?

A. On September 1st.

Q. On what date did Carolyn Barley contact Sean Sullivan about the recommendation that Ms. Mohamed be fired?

A. On September 1st."

THE COURT: Let me have you all slow down just slightly, please. Thank you very much.

# Transcript of Jury Trial Proceedings - Vol. IV

[16-19, 29-33, 49, 59-63, 71, 74-76, 79, 89-91, 159, 161-163, 212-214, 242-244]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

---

REHAB MOHAMED,

Plaintiff,

vs.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT,

Defendant.

Case No. 22-CV-1625

Denver, Colorado

December 4, 2025
7:54 a.m.

Vol. IV

---

TRANSCRIPT OF JURY TRIAL PROCEEDINGS

BEFORE THE HONORABLE GORDON P. GALLAGHER
UNITED STATES DISTRICT JUDGE
AND A JURY OF NINE

---

APPEARANCES:

For the Plaintiff:

ARIEL DeFAZIO
Lowrey Parady Lebsack
1490 Lafayette Street
Suite 304
Denver, CO 80218

HUNTER SWAIN
Swain Law LLC
1490 Lafayette St Ste 303
Suite 303
Denver, CO 80218

APPEARANCES: (Cont.)

For the Defendant:

TANJA DARROW
Littler Mendelson P.C.
633 West Fifth Street
63rd Floor
Los Angeles, CA 90071

VIRGINIA WOODFORK
Littler Mendelson P.C.
1900 Sixteenth Street
Suite 800
Denver, CO 80202

*MEGAN E. STRAWN, RPR, CRR*
*901 19th Street, Denver, CO 80294*
*303.335 2111 * strawnreporting@gmail.com*

*Proceedings reported with realtime stenography; transcript produced with computer-aided transcription.*

training for the -- the SCP or -- sorry -- for the Society for Human Resource Management CP exam.

Q. Did you obtain your SHRM CP certification while you were employed at SHRM?

A. Yes, I did.

Q. And what qualifications do you have to be a human resources professional?

A. So my -- my experience, I worked for -- prior to moving into the HR function as a -- prior to moving into the HR function as -- in 2019 as the manager of employee experience, I worked for over a decade in the -- in a number of HR-adjacent areas involving, again, learning and development; helping facilitate training and internship programs; developing training internship placement plans with -- in conjunction with companies; helping to be able to manage compliance issues, again, from the immigration angle for individuals; managing my own direct reports within -- within the organization, but then also doing sort of educational development programs for foreign nationals that were under the programs that -- that I did, you know, both in the context of SHRM but also in a prior -- prior to us becoming part of SHRM at the American Council on International Personnel, and then in my prior experience as well.

Q. Is it fair to say that you've worked in -- that you've worked in human resources or human resources-adjacent roles

for decades now?
A. I would -- I would say that over -- I would say over a decade. You know, how you define decades could -- could be up for interpretation, but I've -- I've got -- at this point well over ten years. I'd have to stop and do the math, but . . .
Q. And how many complaints of employment discrimination have you investigated in your career?
A. Just -- just the one.
Q. Ruby Mohamed's?
A. Correct.
Q. What qualifications do you have to conduct investigations of employee complaints of discrimination?
A. It -- I guess the question would be how do you define qualification?
Q. Well, use your personal interpretation of that word.
A. Uh-huh. You know, again, I think you -- my experience, I worked -- I've had quite a lot of experience dealing with compliance-related matters, primarily in the immigration space, but then also dealing with -- dealing with issues and really just going through a process and -- process and method.
So I think I've dealt both in -- in my in -- in various roles with issues that -- that have arised where it did involve having to go through some sort of investigation, you know, to go through a process. So -- so do I -- you know, did I know -- going into this experience in a range of areas

even though this was the first, you know, discrimination-related matter that I had to investigate.
Q. Describe the previous experience that you had that qualified you to investigate -- conduct the investigation into Ms. Mohamed's discrimination complaint.
A. I would say -- I would point to a couple of different things dealing -- dealing with employee-related issues where -- where there was a disagreement or -- or disagreements or issues between employees, between being able to -- to see what happened, what occurred in that situation, and then work it through to -- to resolution.
Dealing with issues related to, again, with -- on the immigration side, looking -- looking -- reviewing people's -- people's information, again, making sure that we have compliance with various immigration laws under the J1 visa program. And those were just two off the top of my head.
Q. Have you ever undergone any training in conducting employee complaints of discrimination?
A. When I joined the HR department, I did do -- I did do a number of trainings, both online -- both virtual training but then also several of our in-person seminars, including one of the -- one on investigations. And I did that. I don't -- some -- it was sometime in the fall of 2019, if I remember correctly.
Q. So less than a year before Ms. Mohamed made her first

complaint of discrimination, correct?
A. It would have been -- it would have been less than a year before the events that occurred with Ms. Mohamed.
Q. Tell me what you recall from the training that you underwent on conducting employee investigations.
A. In terms of this specific curriculum, again, I haven't reviewed it in four years, so I can't speak specifically to details, but really talking through on a high level, really looking at the -- sort of the -- sort of the process and context for going through and doing an investigation, sort of some of the common scenarios that comes up and then -- and then that sort of -- the working through with and collaborating with -- with counsel, with other, you know, stakeholders, see the process through.
Q. Would you agree that it's important that employees -- employers conduct thorough investigations of complaints of discrimination made by their employees?
A. Yes.
Q. Why? Why is that important?
A. I -- it's important because it -- I -- to ensure that issues are addressed and that -- and that -- well, the issues, you know, if they are addressed, but then also by making sure the -- really ensure that compliance with federal, state, and local requirements and laws.
Q. In your mind, what steps are necessary to ensure that an

Manager of Employee Experience, not manager of employee -- manager of employee relations. But as I mentioned before, this was a -- this was a unique circumstance with me being out on medical leave and trying to -- trying to prepare for every conceivable contingency that I could think of that might come up, at least in -- as I knew at the -- at the time that may or may not be needed, and so trying to lighten the load as much as possible for my HR colleagues that may have to step in on various matters.

So this was a unique circumstance within my going out on -- with my going out on -- on open leave with my procedure.

Q. I would like to look at a document with you --

A. Yeah.

Q. -- that I'm going to place in the chat function of Zoom.

A. Okay.

Q. This document that I'm sending you has now been previously marked as Deposition Exhibit 41.

And when it appears in your chat box, please open it up.

A. One moment.

Yes, I see it.

Q. Have you ever seen this document before?

A. Yes.

Q. What is it?

A. It is -- it is a copy of a separation agreement and

general release.
Q. Between who?
A. You know, as -- as stated here, between Ruby Mohamed and SHRM."
MR. SWAIN: Your Honor, at this time I'd move to admit Exhibit 60, which is -- corresponds to Deposition Exhibit 41.
THE COURT: I show that Exhibit 60 was already admitted. That was the separation agreement.
MR. SWAIN: My apologies, Your Honor. Can we publish for the jury, please?
THE COURT: Sure. Sure. 60 is already admitted. You may publish.
MR. SWAIN: Just one moment, Your Honor.
(Discussion off the record.)
BY MR. SWAIN:
Q. "You prepared this document, didn't you?
A. In -- depends on how you define 'prepared.' This was based off of -- this was based off of a template that -- that we were provided and reviewed typically by general counsel or -- but let me rephrase it -- the general counsel's office."
THE COURT: Can I have you scoot that microphone a bit closer to you, sir? As you scooted left, the microphone kind of migrated away.
A. "Depends on how you define prepared. This was based off

of -- this was based off of a template that -- that we were provided and reviewed typically by general counsel or -- or -- let me phrase it -- the general counsel's office. Typically, it would be with the assistant general counsel. But typically it would be a combination of -- of me, of HR, my role working with legal counsel to prepare any sort of separation agreement and general release.

BY MR. SWAIN:

Q. And I'm not asking you in general terms. I'm asking specifically about this Deposition Exhibit 41.

So --

A. Uh-huh.

Q. -- you indicated that SHRM has a template, so someone had to take the template and insert the name "Ruby Mohamed," correct?

A. Well, there would be a number of things that would have been updated on -- on each template and not -- and name being one of them, but not -- but not just name.

Q. Who updated the template for this document --

A. I --

Q. -- Exhibit 41.

A. I -- I -- I don't recall specifically. I can't -- I can't remember. I can't remember if this one was one of the things that I had updated with other documents, or if this was updated and handled by counsel directly. I, unfortunately,

just don't recall the specifics.
Q. Okay. I'm going to share my screen.
A. Yeah.
Q. So right now I have Deposition Exhibit 41 right here.
A. Uh-huh.
Q. It's the very same document that I just showed to you.
A. Yeah.
Q. Do you see that?
A. Uh-huh.
Q. Is that a yes?
A. Yes. I can see your screen.
Q. Okay. I'm going to the properties of Deposition Exhibit 41, and I am going to -- let's see here. Here are the properties for Deposition Exhibit 41, the one that I just showed to you.
A. Uh-huh.
Q. That's the same title, correct?
A. I'm sorry. Let -- hold on. Let me -- 00589, Confidential.
Yes.
Q. I'm going to the details of the properties, and I'm going to scroll down.
So do you see the date the content was created?
A. Uh-huh.
Q. Is that a yes?

A. Yes.
Q. And what's the date and time that this content was created?
A. Per your screen, it says August 28th, 2020, 4:31 p.m. I'm not sure what time zone.
Q. And the date that the document was last saved, what's the date and time that it was last saved?
A. According to your screen, it says August 30th, 2020, 8:09 a.m.
Q. I am sharing with you what has been marked as Deposition Exhibit 54 with you, Mr. Jackson. Please let me know when you're ready. Go ahead and open it up.
A. One moment.
Yes, I've got it open.
Q. Okay. And bear with me just one moment, please.
While I'm doing something, please take a look at that document, and I am --
A. Uh-huh.
Q. -- going to ask you some questions about it.
A. Yeah.
Q. Okay. Deposition Exhibit 54, do you recognize this document, Mr. Jackson?
A. Yes, I do.
Q. And what is this Deposition Exhibit 54?
A. This is a copy of our standard exit letter that -- that --

A. One moment. Let me just -- let me just make -- verify -- 500585.

Yes.

Q. This indicates that the document was last saved by Mike Jackson, correct?

A. Correct.

Q. And you don't have a reason to think that's another Mike Jackson, correct?

A. No.

Q. And the properties of this document indicate that it was created at 7:40 a.m. on August 21st, 2020.

Do you see that?

A. Yes, I do.

Q. And is it your testimony that you just took it upon yourself to prepare Ms. Mohamed's termination documents on August 21st without any instruction from Sean Sullivan or La Tanya James-Rouse or anyone else?

A. As I mentioned previously, you know, I prepared a number of documents that may or may not have been needed by the HR department during the time of my leave, which, again, my surgery was on August 24. This was the Friday prior, if I'm -- and if I'm calculating the dates correctly, this would have been Friday the 21st.

And so, again, this would be consistent with -- with my trying to prepare things that may or may not have been

What is Deposition Exhibit 28?
A. This was -- it appears to be a copy of our resignation/termination policy."
MR. SWAIN: Your Honor, at this time I move to admit Exhibit 65, which corresponds to Deposition Exhibit 28.
MS. DARROW: No objection.
THE COURT: 65 is admitted.
(Plaintiff's Exhibit 65 received.)
BY MR. SWAIN:
Q. "And as the manager of employee engagement, were you familiar with SHRM's various internal human resources policies?
A. Yes.
Q. And did you follow SHRM's internal human resources policies in that role?
A. Yes.
Q. Would you agree that SHRM following its own internal human resources policies was important?
A. That's the nature of policies, yes.
Q. Why is it important for SHRM to follow its own policies?
A. In terms of consistency, in terms of, again, ensuring that we comply with various -- various legal requirements. It just -- it -- there was a range of -- yeah.
Q. Let's take a look at the second page of Deposition Exhibit 28. I want you to look at the page that says 'SHRM 0037' at

the bottom.
A. Yep. Yep, I've got it.
Q. Okay. And about one-third of the way through that page, there's a section called Involuntary Departure.
Do you see that?
A. Yep. Yep.
Q. And under Involuntary Departure, it says, 'If a supervisor believes an employee should be terminated, the supervisor must first discuss the situation with the director, Human Resources, or the manager, Employee Relations.'
Do you see that?
A. Uh-huh. Uh-huh.
Q. And did I read it correctly?
A. Well, I -- if you could read it again, I -- I will -- I can confirm that.
Q. How about you read it?
A. 'If a supervisor believes an employee should be terminated, the supervisor must first discuss the situation with the director, Human Resources, or the manager, Employee Relations.'
Q. So in August 2020, who was the director of Human Resources?
A. We did not have a director of Human Resources.
Q. Okay. And in August of 2020, who was the manager of Employee Relations?

A. We did not have a manager of employee relations. Again, that role, once it became vacant, evolved into a broader position, manager of employee experience.
Q. So do you believe that this portion of the policy was no longer applicable because there was not someone in either of those roles at the time of Ms. Mohamed's termination?
A. No, I do not believe that.
Q. Why not?
A. Because, again, the -- even though the titles have changed and the organizational structure has evolved, there was -- the essence of roles were there. And again, the policy to make sure that that -- that there is review, review before any decision, is -- remained the same. So even though titles changed in the organization, the essence being covered there remained the same.
Q. So who would those two individuals have been at the time of Ms. Mohamed's termination, given that there weren't folk folks in either of those two named roles?
A. So, you know, the equivalent in the structure that had at the time -- that we had at the time in question would have been -- would have been Sean Sullivan for the -- in the director, Human Resources, and then myself for the manager, Employee Relations, would have been the closest equivalents.
Q. Okay. And that next sentence says, 'The director, Human Resources, or the manager, Employee Relations, will ensure

that the progressive discipline policy has been adhered to as appropriate prior to concurring with an involuntary termination.'

Did I read that correctly?"

THE COURT: Let me have you slow down a little bit. Thank you.

A. "Yes, you did.

BY MR. SWAIN:

Q. And again, that would be either Sean Sullivan or you during this time period in August 2020, correct?

A. Correct.

Q. Describe SHRM's progressive discipline policy at the time.

A. So -- so in terms of progressive discipline policy, you know, at the -- at this time, this was something that had evolved within -- within the organization. The organization, prior to that point, had moved away from a -- from structured performance improvement plan structure to really being able -- to more of a -- as issues arised, working with -- working directly with the employee to address issues and lay out milestones for -- for an expectations for mitigating those, so that -- so that -- the process had evolved.

But, again, the essence of laying out markers for -- for addressing concerns and looking for improvement in processes was still there.

Q. Before Ms. Mohamed was terminated, did you ensure that

SHRM's progressive discipline policy had been adhered to?

A. When -- again, both Sean Sullivan and myself were -- have been connected with -- have been connected in with -- with the process of seeing the progression related to deadlines and -- and things there.

We had seen that expectations had been set out and then had seen that what had or had not occurred related to that. I would -- I would say that that was adhered to.

Q. When did you first meet Ruby Mohamed?

A. I don't recall specifically when I first met Ruby Mohamed, but I will say I knew her in my prior role when I worked at the Council for Global Immigration and with the J1 visa program. I had -- had known her and then had actually worked with her.

And at the time -- well, I worked with her, and my team had worked with her, too, to update an e-Learning program that we had for our program participants during that time. And so I had -- had worked with her in that capacity and then knew her from that -- from that time at SHRM.

Q. What were your observations about Ms. Mohamed's work on that e-Learning program that you and your team worked on with her?

A. From my experience, she did a fantastic job with it. She was very, very, very thorough with getting the updates. She -- she responded well to the feedback that we gave and

that do provide sort of out -- processes and outlines there.
Again, I haven't seen those within -- in several years, so you -- but any investigation would -- would be done, would be aligned with either -- our employee code of conduct that we had. We didn't have a handbook per se -- or the various policies that would be applicable.
Q. And tell me what you recall of the requirements of the policies for investigating employee complaints of discrimination.
A. At -- at this point, I -- I haven't seen that policy in a couple years. I wouldn't want to speculate. So I'm afraid that I would -- I wouldn't want to speculate without -- because, again, it's my memories two-plus years removed now, almost -- no -- yes. Three years? Two years -- almost two years.
Q. I'm not asking you to speculate. I'm asking you what your memory is, so if you can't remember anything about them, you can just say that.
A. Yeah. I'm afraid I don't recall the -- what the policy said.
Q. But you were the manager of employee experience at the time, correct?
A. Correct.
Q. So other than the chief human resources officer, the one person responsible for investigating and resolving employee

the complaint or that. So I'm being -- I'm, you know, erring on the side of caution.

Q. And you don't think it would make sense to ask Mohamed what her race was given that she had made a complaint of race discrimination?

A. In the -- well, in terms of asking, that's where -- in terms of the documentation, I would have looked at her employee personnel file, which would have had both EEO determination as well as would have information listed there. So it's something that I could have seen through -- through other -- and determined through other means, and I would have at the time.

Again, I -- that's something, again, I don't have in front of me. I'm being mindful of --

Q. And this was the only complaint of race discrimination you've ever investigated in your entire career?

A. That I -- to my -- to my recollection, yes.

Q. And you indicated that you had a series of conversations with Ms. Morris, with Ms. Barley?

A. Uh-huh.

Q. And that you had a facilitated discussion once with Ms. Barley and Ms. Mohamed, correct?

A. Correct.

Q. Did you ever meet with Ms. Mohamed or speak to her one on one about her complaints of discrimination?

A. I did prior to the facilitated discussion.
Q. Tell me about that discussion you had with Ms. Mohamed.
A. The conversation was, again, she had -- yeah, it was per her request and really wanted to discuss with me, you know, her -- her perspective of things prior to the facilitated conversation.
And so I had the conversation, the notes of which I -- I know are included, again, in the discovery documents that you have.
Q. Tell me, without us looking at the notes together, what you recall she said during that conversation.
A. Again -- again, this is without -- not -- without remembering the specifics, you know, the elements I do particularly recall, again, the elements of micromanagement that -- that she -- there had been something related -- again, this was the PMQ project she was on at the time where there had been some -- there had been a back-and-forth with Ms. Barley about attending and where she -- where she had felt that -- that Ms. Barley did not want her to -- -- to attend. I can't remember the specific language, but that was a piece.
And then also, if I recall, there was an element about concern -- about having the autonomy to work with the -- with the subject matter experts, you know, freely without having Carolyn engage with that, if I'm remembering.
I think those were three of the elements that I --

that I recall from the conversation.
Q. Is it your testimony that you investigated each of those three elements while you were investigating Ms. Mohamed's race discrimination complaints?
A. I -- those various elements, again, came through both with the conversations with -- with Ms. Barley, during the conversation -- in conversations with Ms. Mohamed, as well as with -- with others.
Q. I'm asking you if you investigated those three elements.
A. I -- I would say yes.
Q. What did you do to investigate those three elements?
A. As I mentioned before, I had conversations with multiple parties and ascertained their perspective on their -- on various elements.
Q. What's the source of your knowledge on conducting race discrimination investigations?
A. Again, as I had mentioned previously, my -- this was the first -- this was the first specific investigation that I had done. I had done the -- the training through the -- through the SHRM in-person seminar and had done other online trainings, but -- previously, you know, but -- so in terms of experience, there had been that -- that prior training. But this was the first case that I had actually been involved with.
Q. Do you believe you were qualified to handle this -- this

believe that there were -- that there would have been some small exchange back and forth. But, again, I don't recall. I can't say for certain some of -- what was what, but I believe it was a combination, but primarily verbally --
Q. Did you ever prepare --
A. -- to my recollection.
Q. Okay.
Did you ever prepare a written summary of your findings?
A. I -- again, I feel like I did provide -- provide something for Mr. Sullivan when he -- and, again, I'm vaguely -- my memory is a bit hazy here. But, again, outlining, I think, particularly sort of what had been -- had or had not been looked into. But -- and I believe it was in a Word document, but I -- but I don't recall, yeah, the specifics; again, you know, sort of outlining the allegations and then sort of what had or hadn't been looked into there. So it was a combination.
Q. Can you agree it would have been a best practice to document what you were actually doing as part of the investigation?
A. I would argue that I did document. I had notes from my conversations and then provided -- and you've got access to -- to those. So I would argue that to -- to your question, I did.

the -- the email correspondence that was saved. I don't remember specifics.

Q. And you didn't document in a summary of your investigation or anything like that specifically which documents you reviewed, did you?

A. I -- I had -- again, I shared my findings, primarily verbally, with -- with Sean Sullivan, but there was email communication that, as I recall, I believe also did include, in some cases, Microsoft Word documentation.

Q. Okay. I still haven't gotten an answer.

Did you or did you not investigate Ms. Mohamed's complaint of retaliation that she made separate from her complaints of discrimination?

A. As I've mentioned before and I will again reiterate, looked into -- look into various -- all the various matters of this that were raised. So, yes.

Q. What did you do to investigate her complaint of discrimination?

A. That's different than investigating her prior complaints of discrimination in terms -- in terms of -- again, this was looking at conversations and seeing what -- what -- the conversations with the stakeholders, looking to see if there were -- if there was any -- anything that pointed to retaliation.

And, again, based off my review and findings, I -- I

saw no instance that indicated retaliation.
Q. But you indicated earlier that your role in investigating Ms. Mohamed's complaints was primarily in June and July of 2020, didn't you?
A. Correct.
Q. Okay.
A. And, you know, in this -- this is where -- but that -- and, again, there were concerns being raised even in -- even in July, if I recall, even, you know, leading up about -- again, impacts on programs and deadlines. So this email that you point to was in August, but, again -- then, again, I wasn't included -- while my primary investigation and work was done in June and July, I was still included on emails after that with this.
Q. What did you do after -- on or after August 19th to investigate Ms. Mohamed's complaint of retaliation?
A. In terms of -- well, again, as I mentioned before with this email, I -- I don't recall if I had seen this particular email. Again, as I noted before, I was on -- was out of the office with my medical procedure on the 24th. So this -- this email would have been 19 -- probably the Wednesday. I would have to look at the calendar.
And so, you know, I -- so my time would have been -- would have been very narrow if I -- prior to that. Again, I don't know if I had seen this particular email, so I can't

really answer that.
Q. Are you willing to take responsibility for the integrity of SHRM's investigation into Ms. Mohamed's complaints of discrimination and retaliation?
A. I can only speak to the -- to the elements that I -- that I was involved with. You're asking for the overall -- there were many different players, not just me involved with -- with the circumstances here. I -- I can only speak for -- for my role and my -- the elements that I was involved with.
Q. You were the manager of employee experience, correct?
A. Yes.
Q. Second-in-command to the chief human resources officer?
A. I -- depends on -- again, I would object to -- you know, second-in-command technically, you know, depends on how you define the organizational structure.
Q. So when it comes to investigating complaints of discrimination, that was one of your duties secondary to Sean Sullivan, the chief human resources officer, correct?
A. Correct.
Q. Are you or are you not willing to take responsibility for the integrity of the investigation into Ms. Mohamed's race discrimination and retaliation complaints?
A. I can only -- I can only take responsibility for, you know, again, the elements that -- that I was directly involved with. Again, that -- so that's -- that's how I would respond.

A. Correct.
Q. Okay. Now you testified about serving as a mediator to Ms. Barley and Ms. Mohamed, right?
A. Yes. I wanted to mediate the -- and facilitate the discussion in a mediation-type process, yes.
Q. Sure. And you had never been pulled in before to help mediate an issue between a supervisor and an employee at SHRM before, have you?
A. Not to my knowledge. I can't remember an occasion where that was necessary.
Q. And I believe you testified to this, but, again, to ask, it was not your role to evaluate whether Ms. Mohamed's discrimination claim had any merit, right?
A. Oh, no. That was not my -- my role.
Q. You were just there to see if you could bridge the relationship between the two of them, right?
A. Yes, their working relationship.
Q. And you testified about meeting one-on-one with Ms. Mohamed, right?
A. Yes.
Q. And when you met with Ms. Mohamed, you believed that she was hurting, right?
A. I did.
Q. And you had no doubt that she was in pain?
A. No, no doubt.

A. I don't think a person can use that as a defense for not having racist views.
Q. Sure. And having children of mixed heritage doesn't mean that you don't have bias?
A. Correct.
Q. We probably all have bias, frankly?
A. I would think -- humans, by nature we have some biases.
Q. Let's take a look at Exhibit 35.
Ms. Long, when you've had a chance to review the exhibit, just let me know.
A. Okay.
Q. And is this a series of emails that you -- were forwarded to you eventually, but included yourself, Mr. Sullivan, and then, further back, Ms. Jeanne Morris and Nick Schacht? Is that right?
A. Yes. Let me just read . . .
Q. And they were all sent on August 13th, 2020?
A. Yes.
MS. DeFAZIO: Your Honor, we move to admit Exhibit 35.
THE COURT: Ms. Darrow, as to Exhibit 35?
MS. DARROW: No objection.
THE COURT: 35 is admitted.
(Defendant's Exhibit 35 received.)
//

BY MS. DeFAZIO:
Q. Now, this exhibit, the essence of it, you were being asked to write, along with Mike Jackson, a response for Ms. Barley to send to Ms. Mohamed; is that right?
A. I don't think that -- it doesn't look to me that I was being asked, because my email says that I -- I asked if -- I asked my manager whether he wanted me to draft a brief response --
Q. Sure.
A. -- for Carolyn, Ms. Barley.
Q. So let's look at the last page, SHRM 0543.
A. Okay.
Q. And you see an email from Nick Schacht there?
A. Uh-huh.
Q. And it looks like he's making a suggestion to Ms. Morris. I'll just read it aloud: "You may already be working down this track. I suggest having Carolyn confer with Mike Jackson on a response to Ruby's email. That email shouldn't go unanswered by Ruby's manager. But this offers an opportunity to get the right language on the table to correct her quickly or to support an eventual case for termination. We want the right words in there."
Do you see that?
A. I see that.
Q. Okay. And then above that there's an email from Jeanne

saying, "Hi, Nick. Carolyn is working with Bernée and Mike on a response."
Do you see that part?
A. I do.
Q. Okay. And so does that refresh your memory that you may have worked on a response to an email from Ms. Barley?
A. I didn't say that I didn't work on a response. I thought -- I don't know what the earlier question was, but --
Q. Okay.
A. -- anyway.
Q. Let me ask it again.
A. I'm not denying that I worked on a response. It's just whose it was. Whose -- yeah, I think that's what it was, which party. Okay.
Q. Sure. Absolutely.
So it is your recollection that you drafted a response for Ms. Barley to send to Ms. Mohamed at some point, right?
A. Yes.
Q. Okay.
A. Yes.
Q. Great. Thank you. Sorry. That was confusing.
Now, you talked in your testimony about taking neutrality very seriously as your -- in your role as a mediator, right?

Appellate Case: 26-1142 Document: 24-2 Date Filed: 09/28/2026 Page: 98



very much.

Ms. Darrow, would you like to call another witness?

MS. DARROW: Defense rests.

THE COURT: All right. Does the Plaintiff intend to present a rebuttal case?

MS. DeFAZIO: Yes, a brief one, Your Honor.

THE COURT: Who do you call?

MS. DEFAZIO: We call Ms. Mohamed.

THE COURT: All right. Ms. Mohamed, it's a new day so I'll need to administer a new oath.

(Witness sworn.)

THE COURT: Please be seated.

The record will reflect this is Ms. Mohamed again.

And your witness, Ms. DeFazio.

**REHAB MOHAMED, PLAINTIFF'S WITNESS, REBUTTAL EXAMINATION**

BY MS. DeFAZIO:

Q. Good afternoon, Ms. Mohamed.

A. Good afternoon.

Q. There has been some testimony in this case about your experience and qualifications at the time that you applied to be a Senior Instructional Designer.

Will you tell us in your own words what your qualifications were at that point?

A. Well, I can tell you in terms of certifications that I've gained in the field, but also the years of experience that

I've spent building online learning programs. In 2018 --

THE COURT: Let me have you slow down just a bit, ma'am.

THE WITNESS: Yes. I should know better by now. Thank you.

THE COURT: No problem.

A. In 2018, I obtained a certification from the Association for Talent Development, ATD, on design learning. I also obtained a certification on e-Learning instructional design from the same association.

I've attended several conferences annually with regards to instructional design and digital learning. One of them is called DevLearn. It's a big deal in the field. And I would go there in person. They would hold it in Vegas or in Chicago, and I would go and attend a three-to five-day conference and I would attend various conferences with regards to instructional design and digital learning solutions.

I would like to speak now about my career and the years of experience that I gained before applying to the Senior Instructional Designer.

From the year 2013 until 2016, I worked with Women's Learning Partnership to build online learning programs. I believe over the three years, I've launched over 15 blended learning programs, which means that they have virtual aspects and self-paced aspects and face-to-face.

These blended learning programs covered several topics: Financial stability for nonprofits in the Middle East, violence against women and empowering social workers and the global south, and leadership and political participation for women also in the Middle East.

I also helped the organization convert their entire face-to-face training into an online learning ecosystem. To do so, I had to test -- do extensive testing on learning the platforms to find out which platforms are capable of delivering these digital solutions. This is -- this was the same platform that SHRM used, by the way, which was one of the reasons why I applied for the position at SHRM, given my experience with that platform, additionally for Adobe Connect. I'm sure you've heard that platform throughout. I've also helped the organization to use Adobe Connect prior to joining SHRM.

So just before I even joining SHRM, I had about three years of experience in the field. Since my joining SHRM until the time I applied for the Senior Instructional Designer, I -- from 2016 until 2019, I believe, so two additional years that I applied adult learning theories and instructional design strategies to build various courses, including Leading Internal Investigations, California HR Employment Laws, and the communications storytelling workplace seminar.

Q. Thank you, Ms. Mohamed.

there are two paragraphs that reference economic damages that should also come out: the one that begins with "You may award as actual economic damages" and then the one that starts with "You must reduce any award."

THE COURT: So basically paragraph 3 and 4 would come out.

MS. DeFAZIO: Yes. Yes, Your Honor.

THE COURT: All right. Any problem with the rest of it?

MS. DeFAZIO: Not from Plaintiff, no.

THE COURT: All right.

MS. WOODFORK: Not from Defendant. No objection.

THE COURT: So paragraphs 3 and 4 are being removed. Otherwise, it is as it is.

27, multiple recovery.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: No objection.

THE COURT: 28, failure to mitigate.

MS. DeFAZIO: That should come out given that Ms. Mohamed is not seeking economic damages.

THE COURT: I'm guessing the Defense has no objection to that.

MS. WOODFORK: No objection. Sorry.

THE COURT: Failure to mitigate is coming out.

29, punitive.

MS. DeFAZIO: We just caught a typo on the fourth line, "engaged" and "in." Just need a space between --

THE COURT: Okay. Thank you.

MS. DeFAZIO: Other than that, no objection.

THE COURT: All right. From the Defense?

MS. WOODFORK: We would just renew our objection that we made in our briefing about introducing this before liability has been established.

THE COURT: I appreciate that. I previously rejected that, I think, in this case. If not, I think that the instruction on page 30 is the proper ameliorative instruction there.

MR. SWAIN: Your Honor -- oh, I'm sorry.

THE COURT: Go ahead.

MR. SWAIN: Just for the record, there have been multiple references to punitive damages throughout the trial, probably every day, although I don't know, and Defendant has not objected to our reference to the availability of punitive damages during the trial.

So that objection should be deemed waived to instructing the jury at this time.

THE COURT: Well, that's an issue for another day. Whether an objection has been waived is not a decision for this Court; it's for the Circuit. So I'm not going to tell them how to do their job.

In terms of -- though I'm not bifurcating damages, I am giving an instruction -- obviously, I haven't heard yet if the parties have a problem with the instruction on 30 yet or not, but I am going to give a punitive damages instruction in the case-in-chief. But I will make, of course, the typo change.

Any other change from the Defense?

MS. WOODFORK: No objection.

THE COURT: As to effect of instructions on what is now page 30?

MS. DeFAZIO: No objection from Plaintiff.

MS. WOODFORK: No objection.

THE COURT: Jury procedures, which are pages 31, 32, and 33, which, you know, I don't know they get split into two, but they are.

MS. DeFAZIO: No objection from the Plaintiff.

MS. WOODFORK: We would just -- for the purposes of preserving the record, appeal purposes, just renewing our request for the same actor instruction.

THE COURT: Let me come to that one in a moment because -- yeah, I am absolutely going to ask if anybody has other instructions and the like. You're not waiving that by waiting until the end.

But in terms of the jury procedures on 31 and 32, 33, any problem with those?

Monday, July 27th

**Ruby.Mohamed** 8:22 AM
Hi there

**carolyn.barley** 🏡 8:24 AM
Hi Ruby

**Ruby.Mohamed** 8:25 AM
I am about to put in a request for vacation, from this Wednesday to Friday (8/7) and wanted to ask if you foresee any issues with that.

I haven't taken much time off this year and Ryan is finally coming to town so I thought it's a good opportunity to disconnect

**carolyn.barley** 🏡 8:28 AM
Sure, thats fine with me. Would you just send me a note before you're OOO with an update on Digital HR and Compliance? Please also make sure the current decks are on the S drive.

**Ruby.Mohamed** 8:28 AM
there arent much updates but i'll send a note

**carolyn.barley** 🏡 8:29 AM
Thank you. I hope you enjoy your time off.

**Ruby.Mohamed** 8:31 AM
thank you

hmm do you remember which tab in Dayforce has the time off request form?

EXHIBIT
30
1:22-cv-01625-GPG-KAS

EXHIBIT
32
1:22-cv-01625-GPG-KAS

**From:** Mills, Carrie
**To:** Mohamed, Ruby
**Cc:** Godmere, Ann; Thompson, Ebony; Barley, Carolyn
**Subject:** RE: Updates
**Date:** Tuesday, July 28, 2020 10:23:44 AM

---

Thanks for the update, Ruby.
Sorry to hear about the late stage redesign in Digital HR, though that book sounds fascinating!
Enjoy your time away!

**Carrie Mills | Senior Instructional Designer**
**Educational Programs | Losey 4W03**
Society for Human Resource Management
carrie.mills@shrm.org | +1.703.842.5175
shrm.org | @shrm

---

**From:** Godmere, Ann <Ann.Godmere@shrm.org>
**Sent:** Tuesday, July 28, 2020 10:06 AM
**To:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>; Thompson, Ebony <Ebony.Thompson@shrm.org>; Mills, Carrie <carrie.mills@shrm.org>; Barley, Carolyn <Carolyn.Barley@shrm.org>
**Subject:** RE: Updates

Enjoy your time off and thanks for the updates.

Ann

---

**From:** Mohamed, Ruby <Ruby.Mohamed@shrm.org>
**Sent:** Tuesday, July 28, 2020 9:48 AM
**To:** Thompson, Ebony <Ebony.Thompson@shrm.org>; Mills, Carrie <carrie.mills@shrm.org>; Godmere, Ann <Ann.Godmere@shrm.org>; Barley, Carolyn <Carolyn.Barley@shrm.org>
**Subject:** Updates

Hello,

I will be out of the office starting from tomorrow Wednesday 7/29 until Friday 8/7, and I wanted to share with you a couple of updates to keep you informed on what I've been working on.

- Product Bundling project: Yesterday, we presented to leadership the project findings along with product bundle samples that we created for one of SHRM's personas. The leadership was pleased with the information presented and discussed how the project findings will be used moving forward.
- Compliance program: The content development is moving along. There are two modules that will be reviewed by the SME while I am OOO. The SME is also working on curating information for the next two modules.
- Digital HR: I am working on incorporating one of SHRM's published books, Digital HR, with the

program. The author, who will be instructing the program, has pointed out which parts of the book to be utilized and I am working on finding ways to integrate them. It's worth mentioning that Editorial informed us that we can use up to 10% of the book's content verbatim in the course. We are also able to offer the eBook version of this book as a supplemental resource to those that register for the program.

If you have any questions, feel free to reach out.

Best regards,

Ruby

**Ruby Mohamed | Senior Instructional Designer**
**Educational Programs | Remote**
Society for Human Resource Management
Ruby.mohamed@shrm.org | +1.703.535.6416
shrm.org

**Subject:** Re: A suggestion (from Nick to Carolyn)
**Date:** Thursday, August 13, 2020 at 10:46:52 AM Eastern Daylight Time
**From:** Long, Bernée E. <Bernee.Long@shrm.org>
**To:** Sullivan, Sean <Sean.Sullivan@shrm.org>
**Attachments:** image001.png, image002.png, image003.png

Thanks, Sean.

Bernée

**Better Workplaces. Better World.**

---

**From:** Sean Sullivan <Sean.Sullivan@shrm.org>
**Date:** Thursday, August 13, 2020 at 10:37 AM
**To:** Bernee Long <Bernee.Long@shrm.org>
**Subject:** Re: A suggestion (from Nick to Carolyn)

Yes, I do

**Sean T. Sullivan, SHRM-SCP | Chief Human Resources Officer**
Society for Human Resource Management
1800 Duke Street | Alexandria, VA 22314 USA
Sean.Sullivan@shrm.org | +1.703.535.6208
shrm.org

---

**From:** Bernée Long <Bernee.Long@shrm.org>
**Date:** Thursday, August 13, 2020 at 10:36 AM
**To:** "Sullivan, Sean" <Sean.Sullivan@shrm.org>
**Subject:** Re: A suggestion (from Nick to Carolyn)

Will do!

Do you recommend that I keep the appointments I have with Carolyn (12:45 pm) and Ruby (4:30 pm) today?

Bernée

**Better Workplaces. Better World.**

---

**From:** Sean Sullivan <Sean.Sullivan@shrm.org>
**Date:** Thursday, August 13, 2020 at 10:29 AM
**To:** Bernee Long <Bernee.Long@shrm.org>
**Subject:** Re: A suggestion (from Nick to Carolyn)

EXHIBIT
35
1:22-cv-01625-GPG-KAS

Bernée
Thank you, yes, please draft a response with Mike and I'll review, and I concur that brevity is warranted.

**Sean T. Sullivan, SHRM-SCP | Chief Human Resources Officer**
Society for Human Resource Management
1800 Duke Street | Alexandria, VA 22314 USA
Sean.Sullivan@shrm.org | +1.703.535.6208
shrm.org

---

**From:** Bernée Long <Bernee.Long@shrm.org>
**Date:** Thursday, August 13, 2020 at 9:51 AM
**To:** "Sullivan, Sean" <Sean.Sullivan@shrm.org>
**Subject:** FW: A suggestion (from Nick to Carolyn)

Good Morning, Sean,

Carolyn reached out to Mike and I this morning via Slack in response to Nick's email. I advised her to wait until after you and I had connected this morning. Let me know if you'd like me to draft a brief response for Carolyn's use for your review. I think brevity is warranted in this situation.

Bernée
**Better Workplaces. Better World.**

---

**From:** Nick Schacht <Nick.Schacht@shrm.org>
**Date:** Thursday, August 13, 2020 at 8:31 AM
**To:** Jeanne Morris <Jeanne.Morris@shrm.org>
**Cc:** Bernee Long <Bernee.Long@shrm.org>
**Subject:** Re: A suggestion

That's perfect – as I noted, you're ahead of me....

Best regards,

**Nick Schacht, SHRM-SCP | Chief Global Development Officer**
+1.703.535.6079 | +1.571.228.6718 M

---

**From:** Jeanne Morris <Jeanne.Morris@shrm.org>
**Date:** Thursday, August 13, 2020 at 8:29 AM
**To:** Nick Schacht <Nick.Schacht@shrm.org>
**Cc:** "Long, Bernée E." <Bernee.Long@shrm.org>
**Subject:** RE: A suggestion

Hi Nick,
Carolyn is working with Bernée and Mike on a response.
I have a doctor appointment at 9:30, so will be offline for a bit.
Thanks,
Jeanne

**From:** Schacht, Nick <Nick.Schacht@shrm.org>
**Sent:** Thursday, August 13, 2020 7:26 AM
**To:** Morris, Jeanne <Jeanne.Morris@shrm.org>
**Subject:** A suggestion

You may already be working down this track.

I suggest having Carolyn confer with Mike Jackson on a response to Ruby's email. That email shouldn't go unanswered by Ruby's manager – but this offers an opportunity to get the right language on the table to correct her quickly, or to support an eventual case for termination. We want the right words in there.

Best regards,

**Nick Schacht, SHRM SCP | Chief Global Development Officer**
Society for Human Resource Management
1800 Duke Street | Alexandria, VA 22314 USA
+1.703.535.6079 | +1.571.228.6718 M
www.shrm.org

**COVID-19 Information**
SHRM is here to help with up-to-the-minute resources to guide you and your workplace during this crisis. Visit our COVID-19 content center here.

SHRM, the Society for Human Resource Management, creates better workplaces where employers and employees thrive together. As the voice of all things work, workers and the workplace, SHRM is the foremost expert, convener and thought leader on issues impacting today's evolving workplaces. With 300,000+ HR and business executive members in 165 countries, SHRM impacts the lives of more than 115 million workers and families globally. Learn more at SHRM.org and on Twitter @SHRM.

EXHIBIT
50
1:22-cv-01625-GPG-KAS

**From:** Barley, Carolyn
**To:** Mills, Carrie; Godmere, Ann; Mohamed, Ruby
**Subject:** FW: Daily Count Report for Week 35 - August 21 - 27, 2020
**Date:** Wednesday, August 26, 2020 3:55:32 PM
**Attachments:** Road to $6M - Fall 2020.xlsx
Cert Prep Only Road to $1.8M - Fall 2020.xlsx
image003.png

---

FYI – financial report for this week.

**Carolyn Barley | Manager, Instructional Design**
**Education Programs | Losey 4W04**
Society for Human Resource Management
Carolyn.Barley@shrm.org| +1.703.535.6213 | +1.717.940.5487 M

SHRM PEOPLE MANAGER QUALIFIED

---

**From:** Estrella, Juan Carlos <JuanCarlos.Estrella@shrm.org>
**Sent:** Wednesday, August 26, 2020 12:20 PM
**To:** Lacey, Elizabeth <Liz.Lacey@shrm.org>; Morris, Jeanne <Jeanne.Morris@shrm.org>; Walker, Shawnetta <Shawnetta.Walker@shrm.org>; Kane, Tom <Tom.Kane@shrm.org>; Black, Sarah <sarah.payne@shrm.org>; Hall, Nicole <Nicole.Hall@shrm.org>; Smith, Jenna (Contractor) <Jenna.Smith@shrm.org>; Snow, Katherine <Katherine.Snow@shrm.org>; Cole, Sara <Sara.Cole@shrm.org>; Barley, Carolyn <Carolyn.Barley@shrm.org>
**Subject:** Daily Count Report for Week 35 - August 21 - 27, 2020

Good Morning,

Below you will find the weekly registration counts for the 35th week of the year concluding on August 27th, 2020.

As of this morning, we have added 78 new registrations against a weekly goal of 142, representing 55% of the target. Of the 78 new registrations, 53 were for Certification Preparation Programs (1 F2F), and 11 for Specialty Credentials.

We continue working in partnership with Marketing to increase our numbers as we are about to enter September, which typically is the fall's peak registration period.

For more detailed information, please review the below counts and the attached spreadsheets.

| Educational Programs Total | Count | Goal |
|---|---|---|
| Spring 2020 | 2467 | 3939 |
| Fall 2020 | 1134 | 4236 |

| Previous Three Weeks | Count | Goal |
|---|---|---|
| | | |

| | | |
|---|---|---|
| Week 32 / July 31 - August 6, 2020 | 86 | 142 |
| Week 33 / August 7, - 13 2020 | 121 | 142 |
| Week 34 / August 14, - 20 2020 | 116 | 141 |

| **Week 35 / August 21 - 27, 2020** | **Total Count*** | **Goal**** |
|---|---|---|
| FTF | 1 | 54 |
| Virtual | 66 | 52 |
| Specialty Credentials | 11 | 36 |
| **Total** | **78** | **142** |

**these numbers will vary by the end of the weekly count, Thursday*

***based on the Operating Report goals which counts registration from Friday to Thursday*

| **2020 Specialty Credential Purchases** | **Changes since last count** | **YTD*** | **Goal**** |
|---|---|---|---|
| Talent Acquisition Specialty Credential | +2 | 214 | 435 |
| People Analytics Specialty Credential | +3 | 166 | 310 |
| California Law HR Specialty Credential | +2 | 154 | 420 |
| Inclusive Workplace Culture Specialty Credential | +7 | 148 | 200 |
| HR Department of One Specialty Credential | +3 | 80 | 95 |
| U.S. Employment Immigration Specialty Credential | 0 | 33 | 45 |
| **Totals:** | | **795** | **1505** |

| **Virtual Courses** | **New Reg since last count** | **Paid Registrants** | **Goal** |
|---|---|---|---|
| Aug 27 - Virt - HR Department of One | +4 | **48** | 15 |
| Sept 8 - Virt - Foundations of Compensation | 0 | 8 | 24 |
| Sept 9 - Virt - People Analytics | +2 | **15** | 15 |
| Sept 10 - Virt - Certification Preparation | +16 | **96** | 70 |
| Sept 14 - Virt - California HR | +2 | **19** | 15 |
| Sept 14 - Virt - Talent Acquisition | +1 | 9 | 15 |
| Sept 15 - Virt - HR Business Partners | +2 | 16 | 20 |
| Sept 15 - Virt - Essentials of Human Resources | +1 | 18 | 25 |
| Sept 15 - Virt - HR Department of One | 0 | 14 | 15 |
| Sept 17 - Virt - Global Hiring | 0 | 7 paid + 3 Comp | 12 |
| Sept 17 - Virt - Mastering Your HR Generalist Role | +2 | 16 | 25 |
| Sept 19 - Virt - Certification Preparation (Saturday AM) | +10 | **75** | 60 |
| Sept 21 - Virt - Certification Preparation | +7 | **70** | 70 |
| Sept 23 - Virt - Leading Workplace Investigations | +1 | 9 | 20 |
| Sept 29 - Virt - Certification Preparation | +3 | 15 | 60 |
| Oct 1 - Virt - Digital Transformations | 0 | 3 | 12 |
| Oct 3 - Virt - Certification Preparation (Saturday PM) | +4 | 15 | 60 |

Please let me know if you have any questions.

Best,

**Juan Carlos Estrella | Education Programs Specialist**
**Education Team | Losey Building | 4W35**
Society for Human Resource Management
JuanCarlos.Estrella@shrm.org | +1.703.535.6450
shrm.org

**Term Employee Checklist**
*Updated 6-10-2020*

| Separation Agreement | Ruby Mohamed |
|---|---|
| Last Date of Employment | 31-Aug |
| Severance Amount | $7,692.33 |
| Number of Weeks of Severance | 5 |
| Days to Consider Agreement | 7 days - until 9/8 |
| Seven Day Revocation Period? | No |
| Date for Returning Signed Agreement | 8-Sep |
| Date for Returning SHRM Materials | 8-Sep |
| Months of Outplacement Services | 3 |
| May be Eligible for Retiree Medical | No |

| Benefits | |
|---|---|
| Medical, Dental, Vision | Yes |
| Group Life | Yes |
| Supplemental Life | No |
| Flexible Spending - HC | No |
| Flexible Spending - Dependent Care | No |
| 401(k) | |
| Pension | No |

| Other Items | | |
|---|---|---|
| Delete Work Email/Social Media from Phone | | |
| Personal Email Address | | None on file; obtain |
| Shipment of SHRM materials back to SHRM HQ | | Get shipping label from Brandon Robinson-Pitt |
| Reimbursements? | | |
| SHRM Corporate Card? | | Likely no |
| SHRM Social Media Account? | | Likely no |

| Post Exit Steps | |
|---|---|
| Notify IT to close network access | |
| Notify Admin Services re: building access | |
| Terminate Form in Dayforce | |
| JIRA Ticket | |
| Notify Amy and Jeanine | |
| Notify Senior HR Team | |

EXHIBIT
63
1:22-cv-01625-GPG-KAS

**SOCIETY FOR HUMAN RESOURCE MANAGEMENT**

**POLICIES AND PROCEDURES**

| | | |
|---|---|---|
| **DISTRIBUTION:** Management Staff | | **SUBJECT:** RESIGNATION/TERMINATION |
| **EFFECTIVE DATE:** 1/1/94 | **PAGE NO.** 1 **OF** 1 **PAGES** | **FILE UNDER SECTION** 1 **NO.** 015 |
| **REVISION DATE:** 10/31/06;6/2010, 4/19/2017 | **APPROVED BY:** President/CEO | |
| | | |

1. POLICY:

   SHRM will provide a fair and orderly resignation/termination process.

2. PROVISIONS:
   a. Voluntary Resignation
      1. A minimum of two calendar weeks notice is expected, but not required, of all employees prior to leaving SHRM's employment. It is SHRM's option to determine if such notice period shall be worked. Notice given but not worked may be paid at SHRM's discretion as time worked, up to a maximum of 2 weeks.
      2. Notice of voluntary resignation should always be communicated in writing to the department head with a copy forwarded to the Manager, Employee Relations.
      3. Employees will be considered to have resigned their employment voluntarily if they fail to return within three work days from any paid or unpaid absence, or if they have been absent without notice for three consecutive work days without explanation.
      4. Upon receipt of a letter of resignation, the Human Resource Department will take the following actions:
         1. Schedule an exit interview for the employee, if at all possible on the final day of employment. The Human Resource Department will provide the employee with an exit interview form to be completed prior to their scheduled exit interview. The exit interview form will serve as a basis for discussion during the exit interview. Employees may also have an informal exit interview with their department head, if desired.
         2. Provide notification to all necessary departments via the Notification system of action needed in the course of discharging the employee. Employees who have direct

EXHIBIT
65
1:22-cv-01625-GPG-KAS

deposit may elect to receive their final pay in the form of a check.

The employee will be responsible for completing all necessary paperwork, including submission of a final time report, turning in keys and other SHRM property and reviewing all pertinent matters with the HR Department prior to leaving the building. In addition, any outstanding loans, travel advances or educational assistance refunds owed to SHRM will be immediately due and payable, and will be deducted from the employee's remaining paycheck(s) to the extent allowable under applicable law.

b. Involuntary Departure

1. If a supervisor believes an employee should be terminated, the supervisor must first discuss the situation with the Director, Human Resources or the Manager, Employee Relations. The Director, Human Resources or the Manager, Employee Relations will ensure that the progressive discipline policy has been adhered to, as appropriate, prior to concurring with an involuntary termination. The CHRO must give final approval before an involuntary termination may take place for any employee with 10 or more years of service.
2. An employee who is terminated involuntarily due to a reduction in force will be treated in accordance with SHRM's RIF Severance Policy.
3. The employee will be responsible for turning in keys and other SHRM property and for reviewing all pertinent matters with the HR Department prior to leaving the building. Similarly, any outstanding loans, travel advances or educational assistance refunds owed to SHRM will be immediately due and payable, and will deducted from the employee's remaining paycheck(s) to the extent allowable under applicable law.

c. Deceased Employees

Termination due to the death of the employee will be made effective as of the date of the death.

1. Upon receiving notification of the death of the employee, the supervisor must notify HR as soon as possible.
2. HR will process all beneficiary and other pertinent forms and notifications.

d. Final Pay

Terminated employees will receive their final pay, including any accrued and unused vacation leave and minus any applicable outstanding debts to SHRM, in accordance with applicable state laws regarding payment upon termination.

**From:** Barley, Carolyn
**To:** Schacht, Nick; Morris, Jeanne; Lacey, Elizabeth; Davis, Susie; Hawa, Samantha; SaraBeth Davis
**Cc:** Godmere, Ann; Mohamed, Ruby; Mills, Carrie; Thompson, Ebony
**Subject:** ID Team Weekly Report Ending March 13
**Date:** Friday, March 13, 2020 10:09:35 PM

---

Hi Everyone -

I hope your Friday the 13th has been lucky! Please find the ID Team Weekly Update:

**Rockbridge Evaluation Summary for Spring 2020 (No new data for this week)**

TMSI Average: 81.3
Overall Impression: 79.7
Meeting Educational Needs: 83.2
Total Value (well worth the cost): 82%
Usefulness of Information: 82%
Likely to Recommend: 76%
Total Respondents: 62

**Weekly Highlights:**

- Inclusive Workplace Culture assessments are finalized and cut scores confirmed.
- Alpha review of PMQ has begun. The first set of episodes has been reviewed. Reactions from new eyes continue to be positive! Assessments are also moving along.
- Analysis for redesign of Success Planning was presented. Design should start soon.
- Optimizing the Digital Experience has begun development.
- 2 interviews were conducted for potential Instructional Designers.
- An intern interview occurred. She is a great candidate for our opportunity.

**Priorities for next week:**

- PMQ, PMQ, PMQ – Determine the right resources and assignments on the remaining Alpha reviews to ensure we are prepared to meet the timelines. Job aid review will begin. Beta validation for the first set of episodes will occur as well. Collaboration with other teams continue. The lift for PMQ will be large throughout Alpha and Beta Validation for all sets of episodes.
- Converting the Inclusive Workplace Culture assessments into Storyline and working with Ed Products to upload, test and make available to the public.
- One more interview for the instructional designer role occurs on Monday.

**Project Status (Major and Small Projects):**

- On Track
- Behind
- At Risk
- Done

EXHIBIT
107
Case No. 1:22-cv-01625-GPG-KAS

**Major Projects**

| Project | Designer(s) | Notes | Status |
|---|---|---|---|
| PMQ Project | Ann, Ruby, and Carolyn | • Alpha reviews have begun.<br>• Internal pilot has begun. | On Target |

| | | | |
|---|---|---|---|
| | | • Pilot collaboration continues. | |
| Elevating Performance | Ann | • Ann is digging back into analysis now that other priorities are wrapping up. | Started |
| Optimizing the Digital Experience | Ruby | • Development is underway. | 16% complete |
| Succession Planning | Ebony | • Analysis has been shared. Design should begin next week. | 5% |
| People Strategy (replace Strategic HR) | Carrie | • Analysis is underway and will be shared next week. Design should also begin next week. | 5% |
| Employment and Compliance Law Program | Ruby | • The vendor continues to be a challenge and not responsive. Carolyn and Ruby have continued to follow up. Lou indicated mid week that he would reach out to Ruby to schedule time to connect. And then, he went completely unresponsive. We have been in communication with Liz regarding the concern here. | Waiting Update from Vendor |
| Inclusive Workplace Culture Standard Setting | Ann - Lead Carolyn, Sara and Liz as support | • Final files received from HumRRO. Forms are complete! | DONE! |
| Inclusive Workplace Culture Assessment Creation and Launch | Ruby | • Assessments are ready and just need transferred to Storyline. Assessments will be live by March 23. | Starting Soon |
| LMS Selection | Carolyn | • Vendor selection is underway. Calls and meetings continue to clarify details with leading vendor. | On Target |
| Pathways Module Addition | Ann | • Ann has the module drafted. She is waiting on final sign-off from Pat. | 90% complete |

**Small Projects**

- OTD needs are supported as needed. Carolyn has quarterly check ins with the team for updates and questions.
- Ann and Ruby will be upskilling on Adapt to prepare for PMQ ongoing needs.
- Carolyn is working on a collaborative team effort to redesign the education website. Creative is working on images now.
- Ruby continues to explore how and where we could use chatbots in various SHRM platforms.
- Ann continues to upskill Ed Programs team on Adobe classroom needs.
- Carrie, Liz and Carolyn are brainstorming a way to provide content on Empowering Virtual Teams.

- Ruby is updating activities for Workplace Communication Using Storytelling so they work well in Adobe rather than Zoom.

Let me know what questions you have -
Carolyn

**Carolyn Barley | Manager, Instructional Designer**
**Education Programs | Losey 4W04**
Society for Human Resource Management
Carolyn.Barley@shrm.org| +1.703.535.6213 | +1.717.940.5487 M